# CERTIFICATE AS TO PARTIES, RULINGS, AND RELATED CASES

### a.    Parties

The parties in the district court included the United States of America and Samuel Carson; Sean Coates; Paul Franklin; Vincent Hill; William Hill; Donald Nichols; Jerome Martin, Jr.; Maurice Proctor; William K. Sweeney; Reginald Switzer; and Raymond Washington.  The parties before this Court include the United States of America and Samuel Carson ("Carson"); Sean Coates ("Coates"); Jerome Martin, Jr. ("Martin"); and William K. Sweeney ("Sweeney") (collectively, "Appellants").[1]

### b.    Rulings Under Review

This consolidated collateral appeal is taken from the district court's decision denying Appellants' motions under 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences, *United States v. Martin*, No. 98-cr-00329, 2021 WL 4989983 (D.D.C. Oct. 27, 2021) (Judge Royce C. Lamberth), and involves various issues and rulings made during the course of the underlying criminal trial proceedings in *United States v. Hill* (D.D.C. No. 98-cr-00329) (Judge Thomas Penfield Jackson) and on direct appeal in *United States v. Carson* (D.C. Cir. Nos. 02-3015, 02-3016, 02-3017,

---

[1] No Disclosure Statement under Federal Rule of Appellate Procedure 26.1 or under Circuit Rule 26.1 is necessary, because no Appellant is a corporation or similar entity.

02-3018, 02-3019, 02-3046) (Judges Karen LeCraft Henderson, A. Raymond Randolph, and Thomas B. Griffith), which culminated in a per curiam opinion by that panel reported as *United States v. Carson*, 455 F.3d 336 (D.C. Cir. 2006).

### c. Related Cases

The only related cases within the meaning of D.C. Circuit Rule 28(a)(1)(C) are those identified above as part of the "Rulings Under Review." There are no other related cases or any that are currently pending before this Court.

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com
*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com
*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com
*Counsel for Samuel Carson*

# TABLE OF CONTENTS

STATEMENT OF JURISDICTION.........................................................................1

STATEMENT OF THE ISSUES.............................................................................2

STATUTES AND REGULATIONS ........................................................................3

STATEMENT OF THE CASE.................................................................................6

I.      The Government's Expansive Allegations of Conspiracy .............................6

II.     The Government's Case Relied Heavily on the Testimony of
        Cooperating Witnesses and Jailhouse Informants, Including One
        Whose Testimony Was Put in as Hearsay Based on the Testimony of
        Other Cooperating Witnesses ..........................................................................9

        A.      Cooperating Witness James Montgomery ..........................................11

                1)      The "Butchie" Smith murder ....................................................12

                2)      The triple murder of Alonzo Gaskins, Darnell Mack, and
                        Melody Anderson.......................................................................14

                3)      The Anthony Fortune murder ....................................................15

                4)      The murder of Teresa Thomas and Terita Lucas......................16

                5)      The murder of Leonard Hyson and Maurice Hallman..............17

                6)      The murder of Chrishauna Gladden...........................................17

                7)      The attempted murder of Ulysses English.................................18

                8)      The shoot-out with the D.C. police............................................19

        B.      Special Agent Vincent Lisi ................................................................21

        C.      Jailhouse Informant Theodore Watson ..............................................23

        D.      Jailhouse Informant Charles Bender ..................................................24

        E.      Jailhouse Informant Arthur Rice .......................................................25

III.    The Government's Withholding of *Brady* Material Undermined the
        Defense's Ability to Impeach Key Prosecution Witnesses. ...........................26

IV.     The Direct Appeal...........................................................................................31

V.      The § 2255 Proceedings in the District Court ...............................................33

A.  Procedural History and the Eventual Unsealing of *Brady/Giglio* Materials.......................................................33

B.  *Brady/Giglio* Arguments Raised in Appellants' § 2255 Motions..........................................................................37

    1)  Watson: The government withheld information about its serious doubts as to Watson's credibility and lied about it...................38

    2)  Montgomery: The government hid evidence of ever-shifting stories. ........................................................................40

    3)  Butchie Smith: The government hid evidence of other suspects in the Butchie Smith murder while falsely stating it had none.42

    4)  Pinckney and Owens: The government misrepresented its relationship with Pinckney and Owens to keep them from testifying about another suspect in the triple murders..............43

    5)  Bender: The government failed to disclose evidence that would have allowed impeachment of Charles Bender. .......................44

    6)  Wilson: The government withheld evidence of Martin's innocence in the Anthony Fortune murder. ...............................44

C.  The District Court's § 2255 Decision ................................46

VI.  The § 2255 Proceedings in This Court .........................................46

SUMMARY OF THE ARGUMENT ......................................................46

ARGUMENT ...............................................................................49

I.  The Government's Repeated Withholding of Exculpatory Information Submitted to the Trial Court Under Seal Violated Appellants' Due Process Rights..........................................................................49

A.  Standards of Review....................................................49

B.  The prosecution repeatedly and improperly withheld exculpatory material information from the defense by sealing the material under false pretenses. ..........................52

C.  The sealed material included ample and classic *Brady* material. ..............................................................................54

    1)  Documents regarding alternative theories ................................55

    2)  Documents regarding acknowledged lies by government witnesses ...................................................................66

       3)     Information regarding government benefits provided to witnesses ...................................................................................73

  D.    The trial court's failure to meaningfully address the government's repeated failures to make disclosures required under *Brady/Giglio* and the Jencks Act provides further grounds for relief. ...................................................76

  E.    The evidence strongly supports the conclusion that the *Brady* violations were willful. ..............................................83

  F.    The pattern of withholding evidence prejudiced all Appellants. ...................................................................................85

  G.    The district court failed to properly address the merits of Appellants' § 2255 claims. .......................................................90

II.    Appellants Were Deprived of Their Sixth Amendment Right to Effective Assistance of Counsel When Appellate Counsel Failed to Challenge the Trial Court's *Brady*, *Giglio*, and Jencks Act Rulings Concerning Specific Portions of the Sealed Record .....................91

  A.    Standards of Review..........................................................................91

  B.    By failing to follow this Court's instructions, appellate counsel failed to function within the range of competence demanded of attorneys in criminal cases. ...........................................92

III.   Appellants' Claims Are Properly Before the Court Because They Were Timely Raised Once Discovered and Related Back to Timely § 2255 Motions. .........................................................................101

  A.    Standards of Review........................................................................101

  B.    Appellants' subsequent supplemental motions relate back to the timely, specific claims they initially raised..............................104

       1)     Legal Standard .....................................................................104

       2)     Each Appellant made sufficiently concrete claims in his original motion to which the later claims relate back. .........................106

  C.    The supplemental claims are timely, even if they do not relate back, because they arise from newly discovered evidence, were filed within deadlines set by the district court, or were subject to equitable tolling. ........................................111

       1)     Legal Standard .....................................................................112

2)     Appellants' claims in the supplemental motions based on the *Brady/Giglio* materials were timely filed. ...............................114

3)     The running of the statute of limitations was tolled by orders extending the parties' time to respond or for appointment of counsel. ................................................................................118

IV.     Carson's Trial Counsel Were Admittedly Ineffective, Having Inappropriately Placed Their Personal Interests Ahead of Their Duties in the Face of Improper Bias by the Trial Court. ........................................124

CONCLUSION....................................................................................131

CERTIFICATE OF COMPLIANCE....................................................133

CERTIFICATE OF SERVICE ............................................................134

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Banks v. Dretke,*
    540 U.S. 668 (2004)..................................................................23, 112

*Baugh v. Nagy,*
    2022 WL 4589117 (6th Cir. Sept. 30, 2022) ...................................117

*Bowen v. Maynard,*
    799 F.2d 593 (10th Cir. 1986) ...........................................................87

*Bracy v. Gramley,*
    520 U.S. 899 (1997)............................................................................59

*\*Brady v. Maryland*
    373 U.S. 83 (1963).................................................... passim\*\*

*Brecht v. Abrahamson,*
    507 U.S. 619 (1993)............................................................................86

*Bull S.A. v. Comer,*
    55 F.3d 678 (D.C. Cir. 1995)...........................................................113

*Bush v. Sec'y, Fla. Dep't of Corr.,*
    888 F.3d 1188 (11th Cir. 2018) .........................................................85

*Cadet v. Fla. Dept. of Corr.,*
    853 F.3d 1216 (11th Cir. 2017) .......................................................122

*California v. Trombetta,*
    467 U.S. 479 (1984).............................................................................82

*Carrillo v. Cnty. of L.A.,*
    798 F.3d 1210 (9th Cir. 2015) ...........................................................62

*Carson v. United States,*
    549 U.S. 1246 (2007)...............................................................106, 109

*Carter v. Bigelow,*
    787 F.3d 1269 (10th Cir. 2015) .......................................................112

vii

*Comstock v. Humphries,*
786 F.3d 701 (9th Cir. 2015) .......................................................49, 55

*Cone v. Bell,*
556 U.S. 449 (2009)................................................................49

*Crivens v. Roth,*
172 F.3d 991 (7th Cir. 1999) ...................................................64

*Cuyler v. Sullivan,*
446 U.S. 335 (1980)........................................................125, 129

*Daniels v. United States,*
54 F.3d 290 (7th Cir. 1995) ...................................................129

*Dennis v. United States,*
384 U.S. 855 (1966)..........................................................77, 83

*DeWitt v. District of Columbia,*
43 A.3d 291 (D.C. 2012) .........................................................39

*Douglas v. Workman,*
560 F.3d 1156 (10th Cir. 2009) ..........................................88, 117

*Entsminger v. State of Iowa,*
386 U.S. 748 (1967)................................................................85

*Evitts v. Lucey,*
469 U.S. 387 (1985)................................................................91

*Fuentes v. T. Griffin,*
829 F.3d 233 (2d Cir. 2016) ....................................................87

*\*Giglio v. United States,*
405 U.S. 150 (1972)........................................................ passim\*\*

*Gonzalez v. Mize,*
565 F.3d 373 (7th Cir. 2009) ..................................................129

*Hilliard v. United States,*
317 F.2d 150 (D.C. Cir. 1963)..................................................80

*Hinton v. Alabama*,
571 U.S. 263 (2014)......................................................94

*Holland v. Florida*,
560 U.S. 631 (2010)......................................................121

*Jarrell v. Balkcom*,
735 F.2d 1242 (11th Cir. 1984) ........................................62

*Jefferson v. United States*,
730 F.3d 537 (6th Cir. 2013) ..........................................113

*Jimenez v. Hunter*,
741 Fed. Appx. 189 (5th Cir. 2018)...................................122

*Jimerson v. Payne*,
957 F.3d 916 (8th Cir. 2020) ..........................................112

*In re Keith*,
2018 WL 8807240 (6th Cir. Oct. 26, 2018) .......................117

*Kimmelman v. Morrison*,
477 U.S. 365 (1986)......................................................94

*Krupski v. Costa Crociere S.p.A*,
560 U.S. 538 (2010)...............................................104, 106

*Kyles v. Whitley*,
514 U.S. 419 (1995)...............................................50, 64, 78, 84

*Mandacina v. United States*,
328 F.3d 995 (8th Cir. 2003) .........................................104

*Mayle v. Felix*,
545 U.S. 644 (2005)..............................................102, 105

*Miller v. Angliker*,
848 F.2d 1312 (2d Cir. 1988) ....................................62, 87

*Montgomery v. Bobby*,
654 F.3d 668 (6th Cir. 2011)(en banc) ............................117

*Mungin v. Sec'y, Fla. Dep't of Corr.*,
  89 F.4th 1308 (11th Cir. 2024) ........................................................104

*Napue v. Illinois*,
  360 U.S. 264 (1959)................................................................50, 51

*Nuckols v. Gibson*,
  233 F.3d 1261 (10th Cir. 2000) ...........................................................87

*On Lee* v. *United States*,
  343 U. S. 747 (1952)......................................................................23

*Palermo v. United States*,
  360 U.S. 343 (1959).................................................................27, 77

*Pennsylvania v. Ritchie*,
  480 U.S. 39 (1987) ..................................................................32, 92

*Prieto v. Quarterman*,
  456 F.3d 511 (5th Cir. 2006) ...........................................................113

*Robinson v. Dep't of Homeland Sec. Office of Inspector Gen.*,
  71 F.4th 51 (D.C. Cir. 2023)...........................................................114

*Ross v. Williams*,
  950 F.3d 1160 (9th Cir. 2020) .........................................................106

*Saunders v. United States*,
  316 F.2d 346 (D.C. Cir. 1963)...........................................................80

*Schiro v. Landrigan*,
  550 U.S. 465 (2007).....................................................................125

*Scott v. United States*,
  890 F.3d 1239 (11th Cir. 2018) ....................................................116, 117

*In re Sealed Case*,
  151 F.2d 1059 (D.C. Cir 1998)......................................................78, 79

*Slayton v. Am. Exp. Co.*,
  460 F.3d 215 (2d Cir. 2006) ...........................................................106

*Smith v. Robbins*,
  528 U.S. 259 (2000)......................................................................91

*Smith v. Sec'y of N.M. Dep't of Corr.*,
  50 F.3d 801 (10th Cir. 1995) ...............................................62, 87, 88

*Sossa v. Diaz*,
  729 F.3d 1225 (9th Cir. 2013) ....................................................113

*Strickland v. Washington*,
  466 U.S. 668 (1984)..................................................91, 94, 97, 126

*Strickler v. Greene*,
  527 U.S. 263 (1999).............................................................49, 62, 112

*Summerlin v. Stewart*,
  267 F.3d 926 (9th Cir. 2001) .....................................................129

*Turner v. United States*,
  582 U.S. 313 (2017)......................................................................49

*United States v. Abney*,
  812 F.3d 1079 (D.C. Cir. 2016)..................................................92

*United States v. Aguiar*,
  894 F.3d 351 (D.C. Cir. 2018)....................................................92

*United States v. Agurs*,
  427 U.S. 97 (1976)...............................................................64, 77, 86

*United States v. Auten*,
  632 F.2d 478 (5th Cir. 1980) .......................................................64

*United States v. Bagley*,
  473 U.S. 667 (1985)...................................................49-50, 52, 87-88

*United States v. Baxter*,
  761 F.3d 17 (D.C. Cir. 2014)......................................................49

*United States v. Borda*,
  848 F.3d 1044 (D.C. Cir. 2017)................................................112

*United States v. Bowie*,
    198 F.3d 905 (D.C. Cir. 1999)................................................................85

*United States v. Brooks*,
    966 F.2d 1500 (D.C. Cir. 1992)................................................64, 77, 88

*United States v. Bundy*,
    968 F.3d 1019 (9th Cir. 2020) ............................................................65

*United States v. Butler*,
    955 F.3d 1052 (D.C. Cir. 2020)......................................................47, 51

*United States v. Carson*,
    455 F.3d 336 (D.C. Cir. 2006)..................................1, 15, 32, 74, 98

*United States v. Cloud*,
    102 F.4th 968 (9th Cir. 2024) ..........................................53, 54, 84, 112

*United States v. Coates*,
    2022 WL 17980232 (D.C. Cir. Dec. 23, 2022) ....................................2

*United States v. Cronic*,
    466 U.S. 648 (1984).................................................................98, 125

*United States v. Driscoll*,
    984 F.3d 103 (D.C. Cir. 2021)...............................................................51

*United States v. Flores-Rivera*,
    787 F.3d 1 (1st Cir. 2015).......................................................100, 101

*United States v. Hicks*,
    283 F.3d 380 (D.C. Cir. 2002)...............................................105, 109

*United States v. Innamorati*,
    996 F.2d 456 (1st Cir. 1993).................................................................87

*United States v. Johnson*,
    592 F.3d 164 (D.C. Cir. 2010)............................................................100

*United States v. Martin*,
2021 WL 4989983 (D.D.C. Oct. 27, 2021) ..................................1, 46, 90, 130

*United States v. McDade*,
699 F.3d 499 (D.C. Cir. 2012)..........................................................122

*United States v. N. Am. Reporting, Inc.*,
740 F.2d 50 (D.C. Cir. 1984)..............................................................80

*United States v. Oruche*,
484 F.3d 590 (D.C. Cir. 2007)............................................................83

*United States v. Pasha*,
797 F.3d 1122 (D.C. Cir. 2015)..........................................................51

*United States v. Poindexter*,
492 F.3d 263 (4th Cir. 2007) .............................................................52

*United States v. Rivera*,
412 F.3d 562 &7 (4th Cir. 2005) .......................................................81

*United States v. Robinson*,
68 F.4th 1340 (D.C. Cir. 2023).......................................50, 52, 54, 89

*United States v. Rooney*,
37 F.3d 847 (2d Cir. 1994) ................................................................86

*United States v. Sayan*,
968 F.2d 55 (D.C. Cir. 1992)............................................................126

*United States v. Sedaghaty*,
728 F.3d 885 (9th Cir. 2013) .............................................................87

*United States v. Smith*,
104 F.4th 314 (D.C. Cir. 2024)..........................................................52

*United States v. Thomas*,
221 F.3d 430 (3d Cir. 2000) ............................................................104

*United States v. Trevino*,
89 F.3d 187 (4th Cir. 1996) ...............................................................80

*Valdovinos v. McGrath*,
   598 F.3d 568 (9th Cir. 2010), *vacated sub nom Horel v.
   Valdovinos*, 562 U.S. 1196 (2011), *reaffirmed on remand,* 423 F.
   App'x 720 (9th Cir. 2011) ...................................................................................105

*Walberg v. Israel*,
   766 F.2d 1071 (7th Cir. 1985) ...............................................................126, 127

*Wearry v. Cain*,
   577 U.S. 385 (2016)...................................................................................50, 53, 85

*Winkler v. Keane*,
   7 F.3d 304 (2d Cir. 1993) ...................................................................................129

*Winthrop-Redin v. United States*,
   767 F.3d 1210 (11th Cir. 2014) ........................................................................129

*In re Wogenstahl*,
   902 F.3d 621 (6th Cir. 2018) .............................................................................117

*Woodward v. Williams*,
   263 F.3d 1135 (10th Cir. 2001) ........................................................................105

**Statutes and Rules**

18 U.S.C. § 3231 ...........................................................................................................1

18 U.S.C. § 3500 .......................................................................................................2, 4

18 U.S.C. § 3500(e)(1)......................................................................................96, 97

18 U.S.C. § 3500(e)(2)......................................................................................96, 97

25 U.S.C. § 2255(f)(2) ........................................................................................101

28 U.S.C. § 1291 ...........................................................................................................2

28 U.S.C. § § 2253 and 2255 ...............................................................................2

28 U.S.C § 2254....................................................................................................117

28 U.S.C. § 2255 .................................................................................. passim**

28 U.S.C. § 2255(b) ...............................................................................................125

28 U.S.C. § 2255(f) ..................................................................................101, 102

28 U.S.C. § 2255(f)(1) .............................................................................102. 116

28 U.S.C. § 2255(f)(4) ...........................................................102, 103, 112, 124

Fed. R. Civ. P. 15(a) ...............................................................................104, 108

Fed. R. Civ. P. 15(c) .......................................................................102, 104, 106

Fed. R. Evid. 804(b)(1) ...............................................................................74, 76

Fed. R. Evid. 804(b)(6) ...............................................................................31, 81

Habeas Corpus Rule 2(c) ................................................................................102

## Other Authorities

Eve B. Primus, *Disaggregating Ineffective Assistance of Counsel
    Doctrine*, 72 Stan. L. Rev. 1581 (2020) ...........................................125

*The Shadowy World of Jailhouse Informants: Explained* (July 16,
    2018), *available at* https://theappeal.org/the-lab/explainers/the-
    shadowy-world-of-jailhouse-informants-explained/ ..........................23

\*    authorities on which we chiefly rely

\*\* dispensation is sought from the Court's passim rule as there are dozens of references to *Brady, Giglio*, and §2255 throughout given the nature of this case.

**STATEMENT OF JURISDICTION**

This consolidated habeas appeal arises from a federal criminal trial in the U.S. District Court for the District of Columbia over which the trial court exercised subject-matter jurisdiction pursuant to 18 U.S.C. § 3231. After trial and the jury's verdict, App. 712, the trial court sentenced Appellants and entered corresponding written judgments between January 31 and February 13, 2002, from which each Appellant timely appealed.

On direct appeal, a panel of this Court upheld Appellants' convictions and sentences "in toto." *United States v. Carson*, 455 F.3d 336, 338 (D.C. Cir. 2006). Thereafter, each Appellant timely filed various motions for post-conviction relief to vacate, set aside, or correct his sentence pursuant to 28 U.S.C. § 2255. *See* App. 969-1043. Those motions were supplemented by each Appellant between 2014 and 2018, after Appellants received access to a great deal of material that had been sealed during the trial proceedings and during the pendency of the direct appeals. The district court denied the motions as supplemented in their entirety in October 2021. *See generally United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021), App. App. 1691-1739. In May 2022, the district court also denied Appellants' subsequent requests for certificates of appealability. *See generally United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022). App. 1740-65.

Appellants sought certificates of appealability from this Court, which were granted in part on December 23, 2022. *See United States v. Coates*, 2022 WL 17980232 (D.C. Cir. Dec. 23, 2022). After Martin filed a motion for leave to file a second or successive motion pursuant to 28 U.S.C. § 2255 and related motions, this Court consolidated that motion with the existing appeals and directed the parties to address in their briefs whether the new motion was successive within the meaning of § 2255, and any request to expand the certificate of appealability and the merits of any claim on which appellants request an expanded certificate. Aug. 3, 2023 Order (Doc #2010832 in D.C. Cir. No. 21-3072).

This Court has jurisdiction pursuant to 28 U.S.C. § 1291 and 28 U.S.C. §§ 2253 and 2255.

## STATEMENT OF THE ISSUES

The issues presented are:

- Whether the government's repeated improper withholding of extensive materials submitted to the trial court under seal, which included substantial information that should have been disclosed to Appellants before trial pursuant to *Brady v. Maryland* 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150, 154 (1972), and the Jencks Act, 18 U.S.C. § 3500, violated Appellants' due-process rights.

- Whether Appellants' counsel on direct appeal was ineffective for failing to take the steps this Court had directed it to take to challenge the trial court rulings that such material need not be turned over.

- Whether the district court erred in denying Appellants' § 2255 motions as time-barred where they were filed timely and were supplemented as Appellants gained access to previously withheld material.

- Whether trial counsel for Carson was constitutionally ineffective where they repeatedly failed to act out of fear of drawing the ire of the trial court.

## STATUTES AND REGULATIONS

### 28 U.S.C § 2255

(a) A prisoner in custody under sentence of a court established by Act of Congress claiming the right to be released upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack, may move the court which imposed the sentence to vacate, set aside or correct the sentence.

(b) Unless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief, the court shall cause notice thereof to be served upon the United States attorney, grant a prompt hearing thereon, determine the issues and make findings of fact and conclusions of law with respect thereto. If the court finds that the judgment was rendered without jurisdiction, or that the sentence imposed was not authorized by law or otherwise open to collateral attack, or that there has been such a denial or infringement of the constitutional rights of the prisoner as to render the judgment vulnerable to collateral attack, the court shall vacate and set the judgment aside and shall discharge the prisoner or resentence him or grant a new trial or correct the sentence as may appear appropriate.

\*    \*    \*

(d) An appeal may be taken to the court of appeals from the order entered on the motion as from a final judgment on application for a writ of habeas corpus.

\*    \*    \*

(f) A 1-year period of limitation shall apply to a motion under this section. The limitation period shall run from the latest of—

> (1) the date on which the judgment of conviction becomes final;

> (2) the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action;

> (3) the date on which the right asserted was initially recognized by the Supreme Court, if that right has been newly recognized by the Supreme Court and made retroactively applicable to cases on collateral review; or

> (4) the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence.

**18 U.S.C. § 3500**

\*　　\*　　\*

(b) After a witness called by the United States has testified on direct examination, the court shall, on motion of the defendant, order the United States to produce any statement (as hereinafter defined) of the witness in the possession of the United States which relates to the subject matter as to which the witness has testified. If the entire contents of any such statement relate to the subject matter of the testimony of the witness, the court shall order it to be delivered directly to the defendant for his examination and use.

(c) If the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the court shall order the United States to deliver

such statement for the inspection of the court in camera. Upon such delivery the court shall excise the portions of such statement which do not relate to the subject matter of the testimony of the witness. With such material excised, the court shall then direct delivery of such statement to the defendant for his use. If, pursuant to such procedure, any portion of such statement is withheld from the defendant and the defendant objects to such withholding, and the trial is continued to an adjudication of the guilt of the defendant, the entire text of such statement shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge. Whenever any statement is delivered to a defendant pursuant to this section, the court in its discretion, upon application of said defendant, may recess proceedings in the trial for such time as it may determine to be reasonably required for the examination of such statement by said defendant and his preparation for its use in the trial.

(d) If the United States elects not to comply with an order of the court under subsection (b) or (c) hereof to deliver to the defendant any such statement, or such portion thereof as the court may direct, the court shall strike from the record the testimony of the witness, and the trial shall proceed unless the court in its discretion shall determine that the interests of justice require that a mistrial be declared.

## STATEMENT OF THE CASE

### I.     The Government's Expansive Allegations of Conspiracy

This case involves conduct occurring over more than a decade at the height of the federal government's War on Drugs.  The government alleged criminal acts spanning from 1988 through 1999 throughout various neighborhoods in the District of Columbia, Maryland, and Virginia.  The government's sweeping indictment painted a sprawling picture that aimed to weave isolated individuals and incidents into a massive conspiracy, creating the meaningful risk that the jurors would lose sight of the weaknesses of the government's case as to any given individual defendant or on a given count.

Appellants, who were teenagers when the events began and were each in their mid-to-late twenties during trial, are currently in federal prison after being convicted of participating in a conspiracy to distribute over 1,000 kilograms of marijuana that included attempted and completed homicides, firearms violations, and assaults. They have each been incarcerated for more than 27 years.

According to the evidence at trial, Appellants were recruited as teenagers during the early and mid-1980s into a drug dealing enterprise run by Vincent Hill. App. 197-203, 221-222, 225, 231-239, 459-462, 481-485.  None of the Appellants was alleged or shown at trial to have been the leader of the enterprise; that was Vincent Hill, who is not a party to this appeal.  App. 482-484, 557-558.  By the time

of trial, however, many of those who had worked with him had become cooperating witnesses against Hill and the Appellants, testifying under plea agreements.

Several of these witnesses testified that they began working with Hill when they were only 11 to 14 years old. *See, e.g.*, App. 192-193, 197-212, 459-462, 481-485. Hill supplied marijuana and other drugs to the youths for distribution and gave them walkie-talkies to alert each other when police were in the neighborhood. App. 558. Over time, the boys started selling marijuana and other drugs on their own, remaining under Hill's influence. App. 559.

Over the objections of Appellants, who sought separate trials through motions to sever, their cases were combined with Hill's, and with that of Gary Price who is also not a party to this appeal. App. 74. After forcing a joint trial, the trial court instructed the jurors that each Appellant was liable for the activities of fellow defendants within the expansively defined conspiracy and that verdicts could depend entirely on cooperating witnesses' testimonies. App. 555.

The government relied very heavily throughout trial on testimony from cooperating witnesses and jailhouse informants, as well as hearsay testimony. The government's heavy reliance on such testimony was clear throughout the trial and especially in its closing arguments, when it urged the jury to convict based on the testimony of "just those four men alone"—referring to the government's star cooperating witness James Montgomery and three others who gave testimony in

hopes of receiving lenient sentences in their separate criminal cases. App. 555. As acknowledged by the government, other evidence in the case was merely "corroboration support" of this testimony, App. 556, leaving the integrity of the verdict tethered to the narratives of those with much to gain and little to lose from testimony favorable to the government.

While the government heavily relied on cooperating witnesses, jailhouse informants, and hearsay testimony, it engaged in a deliberate pattern of withholding and sealing substantial information, including *Brady*/*Giglio* and Jencks Act material, that was highly probative of such testimony's admissibility and credibility. Appellants were unaware of these constitutional violations until almost a decade after they were sentenced, and still today do not and cannot know the full extent of the government's repeated failures to disclose this material, in part because nearly 40 volumes of the trial record have been lost or destroyed without explanation and are not available from the clerk's office or the government. But it is unquestionable that Appellants' lack of access to this material before and during trial substantially hindered their ability to challenge the admissibility of certain evidence and engage in effective cross-examination of the government's most critical witnesses.

The jury ultimately convicted each of the Appellants on charges of narcotics and RICO conspiracies, along with various other offenses. Carson was convicted of the first-degree murder of six individuals, as well as assault with intent to kill,

attempted murder, murders in aid of racketeering, and the related use and possession of firearms. Coates was convicted of murder in aid of racketeering, attempted murder, and assault with intent to kill, including specific charges related to firearm use and possession. Martin was convicted of first-degree murder, assault with a dangerous weapon against a police officer, and attempted murder in aid of racketeering, along with firearm-related charges and three counts of marijuana distribution. Sweeney was convicted of first-degree murder, murder in aid of racketeering, attempted murder in aid of racketeering, and corresponding firearm charges. App. 712. Each Appellant is currently serving a life sentence in federal prison.

II. **The Government's Case Relied Heavily on the Testimony of Cooperating Witnesses and Jailhouse Informants, Including One Whose Testimony Was Put in as Hearsay Based on the Testimony of Other Cooperating Witnesses**

As set forth more fully below, time and again at trial crucial aspects of the government's case rested primarily, if not entirely, on the testimony of cooperating witnesses who claimed the Appellants confessed to their crimes or provided incriminating information. These circumstances made it particularly critical that the Appellants be provided with the evidence in the government's possession that would have allowed the accounts of these witnesses to be challenge – evidence that was repeatedly withheld from them. Moreover, the broad and sweeping conspiracy charges that the government chose to bring meant that evidence that prejudiced one

9

of the Appellants readily spilled over to prejudice each of them, as the jury was firmly instructed that evidence as to one co-conspirator could be considered as to others.

The discussion below is organized by cooperating witness and by event — noting as appropriate where certain key *Brady/Giglio* and Jencks Act violations occurred. In recounting testimony and rulings from the trial and various weaknesses in the government's case, Appellants do not seek to reargue points that have already been decided on direct appeal, such as the propriety of the broad conspiracies alleged or whether the evidence presented was sufficient to convict them. The discussion is provided to show the centrality of the *Brady/Giglio* and Jencks Act violations to the case, and the prejudice to each Appellant of violations that may have been directed primarily to the conduct of one. The discussion also shows the great prejudice to the Appellants of the unexplained failure of their counsel on direct appeal to take the steps this Court outlined to present the issue of this withheld *Brady* material in that appeal. Simply put, having chosen to charge such a broad and sprawling conspiracy and to rely so heavily on cooperating witnesses, the government must also accept the consequences of those decisions when it comes to assessing the effects of the *Brady*/*Giglio* and Jencks Act violations in this case and the inadequacy of counsel on direct appeal.

## A. Cooperating Witness James Montgomery

James Montgomery was a key government witness whose testimony implicated the Appellants in a series of criminal activities. Despite his extensive criminal record, including admissions to, implications in, or convictions for multiple violent offenses such as assault with a deadly weapon, numerous murders, and assaulting a police officer while armed, Montgomery was freed from incarceration for a three year period after his arrest and received an extraordinarily lenient five-year sentence for his involvement in seven murders, leniency that confirmed his significant motive and interest in providing testimony helpful to the government and put his trustworthiness at the center of the trial. App. 308-312, 417, 434-45. Montgomery testified about nearly every significant violent act alleged at trial. Montgomery implicated one or more of the Appellants in eight murders and one attempted murder in all, along with a shootout with the D.C. Metropolitan Police Department. *See* App. 325-331, 334-335, 349-355, 361-375, 378-384, 405-406, 416, 489-496, 508-511. His testimony was the primary evidence the government presented on several charges, often with limited or no corroboration. For example, his account was so critical as to two of the murders that the government emphasized at closing: "Not until James Montgomery came forward were the police able to fit those clues and find the support needed to come to the conclusion which the evidence

supports, which is that Sam Carson murdered those girls." App. 558. We discuss each of these acts in turn.

### 1) The "Butchie" Smith murder

Montgomery testified that Appellants were responsible for the murder of Robert "Butchie" Smith, who had been acting as an FBI informant at the time of his murder. That testimony was doubly significant — not only in that it supported a portion of the indictment, but also because it formed the basis of the trial court's findings that all Appellants, either directly or through their participation in the conspiracy, were responsible for Smith's murder, which in turn caused the trial court to permit into evidence numerous hearsay statements Smith had made before his murder.

The FBI had targeted Smith in 1995 as a major marijuana supplier in Southwest D.C. and Smith became an informant after his arrest in December 1996. The government accordingly dismissed charges against him to maintain his informant status. Montgomery testified that Appellants Carson and Sweeney grew concerned that Smith was cooperating with federal authorities, and that after Sweeney disclosed during a jail visit from Carson that he had informed Smith about a murder, Carson responded that without Smith the police would not have a solid case, and that failing to "hit" Smith would likely lead to their arrests. App. 398-401, 504-505.

Montgomery testified that he and Carson then continued to look for Smith but were unable to carry out a shooting. App. 505-508. Montgomery continued that on June 16, 1997, he gave Carson his car keys, that Carson left without disclosing his destination, and that shortly thereafter he learned about a shooting on Half Street where Smith was killed. App. 508-509. Having tied Carson and Sweeney to the shooting solely through supposed conversations and surmise, Montgomery claimed at trial that "I said, you know them peoples got hit. He was like, yeah, I know. So he was like, we're all right. So I said, yeah. He said, -- so I said, you know who I'm talking about? He was like, yeah. He said, man, trust me, we're all right, just like that. And then he was like, oh, here are your keys, and gave me my keys." App. 510-511.

While Montgomery told this version at trial — confidently explaining that he knew Carson and Sweeney were planning to kill Smith in advance and suggesting that he knew right away they had done it—he had told a much less certain story when being debriefed by the Agent Lisi of the FBI. Contained within Agent Lisi's notes of his interview with Montgomery, which were sealed by the court and not available to Appellants until nine years after their trial, was the following: "After Butchie got hit, James did not know but thought either Chin [Carson] did it or get Pug or BJ to do it." App. 1363. Rather than pinning the murder on Carson, he suggested two others might have done it, and was not definite even as to that (James "did not know

but thought" they might have done it.)   Yet at trial Montgomery was able to offer his far more certain testimony without impeachment from the notes.

Left largely uncontradicted, Montgomery's testimony was thus critical in linking the Appellants to Smith's murder and formed much of the basis for the trial court's decision to allow Smith's hearsay testimony to be presented to the jury.  This is why, from their very first § 2255 filings, Appellants have stated the need for further investigation and complete discovery of the suppression of information about Montgomery's reliability and the government's dealings with him because of concerns about his reliability.  *See e.g.*, App. 966.  The sealed material relevant to these claims was finally turned over to Appellants only after their initial § 2255 motions were filed, far too late to make use of them at trial or even on direct appeal.

### 2)    The triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson

Montgomery testified extensively to Appellants' alleged involvement in the November 17, 1996 triple murder of Alonzo Gaskins, Darnell Mack, and Melody Anderson in Temple Hills, Maryland, allegedly in furtherance of the conspiracy. Montgomery implicated Appellants Carson, Coates, and Sweeney in this crime, while also minimizing his own role.  App. 378-395.

This testimony too, went largely unchallenged at trial, although Montgomery did testify that he had provided untrue grand jury testimony about it.  App. 403-404. The defense was aware at trial and on appeal of testimony before a Maryland grand

jury by two one-time government witnesses, John Pinckney and Cheree Owens, that the triple murders were committed by Dennis Green and not by any of the Appellants. But because Pinckney and Owens could not be located at the time of trial the defense was unable to present this testimony. *See United States v. Carson*, 455 F.3d at 377–81. Although Appellants sought to introduce the grand jury testimony itself, the trial court denied that request, finding that an insufficient connection between federal authorities prosecuting the Appellants and the authorities overseeing the Maryland case had been shown. *Id.* Carson's investigator discovered a decade after trial, however, that the government had known where Pinckney and Owens were all along. *See* pp. 43-44, 73-76 *infra*.

### 3) The Anthony Fortune murder

Montgomery was also a key witness to the murder of Anthony Fortune, which he claimed Carson admitted to him. App. 334-336. Fortune, a resident of the 58th Street Northeast neighborhood, was fatally shot in August 1991 after a dispute arising from a craps game. App. 334-335. Montgomery testified that this incident ignited a conflict (or "beef") between members of the "K Street Crew," the organization the government alleged as the basis of the conspiracy and contended had expanded to 37th Place, and persons associated with 58th Street Northeast. App. 335, 357. Montgomery claimed that Martin and Fortune had argued during the game and that Carson asked Martin if he should kill Fortune. App. 335. According to

Montgomery, Carson then retrieved a firearm from a car and shot Fortune. App. 336.

Again, Montgomery's testimony was key to this charge. The only other witness who testified about this dispute was Charlene Wilson, a paid informant who testified to seeing Carson kill Fortune. App. 280-285. It was later revealed that FBI Agent Warrener's notes reflected Wilson's initial account as having only "heard" about Fortune's murder, rather than witnessing it firsthand. App. 547-48. This crucial contradiction in Wilson's statements was not shared with the defense until four months after her testimony.

### 4) The murder of Teresa Thomas and Terita Lucas

Montgomery provided key testimony linking Carson to the murders of Teresa Thomas and her sister Terita Lucas on March 12, 1999. He testified that Thomas, who was romantically involved with Carson and lived with Lucas among other family members, had been entrusted with an AK-47 by Carson and that she had made excuses for not returning the weapon to him amidst rumored tensions between Carson and "Kenny Man," the father of one of Thomas's children. According to Montgomery, Carson had expressed frustration that Thomas's action could lead to his vulnerability, and Martin accused Carson of "going soft over a broad" who might cause his death using his own gun. App. 327-328. Montgomery claimed that when he first asked Carson about the murders, Carson denied involvement. App. 328-329.

After talking with the police, however, Montgomery claimed that Carson had confessed to him that he had killed the women and took steps to cover up his involvement. App. 329-331. Montgomery had also previously stated that another person, Wayne Perry, had committed the crime. App. 332.

### 5) The murder of Leonard Hyson and Maurice Hallman

Montgomery testified that he and Carson killed Leonard Hyson and Maurice Hallman in the Southwest James Creek Housing area. App. 325-326, 413-414. While negotiating a plea deal in November 1997, however, Montgomery admitted to lying to the government about his involvement in both murders. App. 422. However, the government had notes of a December 22, 1997 interview with Andre Murray, which were sealed and not made available to the defense until years after trial, in which Murray explained that Jakie "Boy" Burks had some New Yorkers kill Hallman and Hyson. App. 1277. Murray's statement undermines and contradicts Montgomery's trial testimony that he and Carson killed Hallman and Hyson. It further contradicts Arthur Rice's testimony that he saw Martin and Carson fleeing the scene. *See* p. 25, *infra*.

### 6) The murder of Chrishauna Gladden

Montgomery testified extensively about the murder of Chrishauna Gladden, whose murder was not charged in the indictment but was included as an overt act in furtherance of the conspiracy and made a key part of the government's case, leading

17

off its opening statements. App. 176-177. According to Montgomery, he and Carson sought out Gladden to kill her and prevent her from testifying against Martin in the Curtis Edwards murder trial. Montgomery testified that he saw Carson shoot and kill Gladden. App. 368-375. The government alleged that Martin directed co-conspirators to kill Gladden, believing she was a witness against him in a murder trial in the Superior Court of the District of Columbia. App. 656. Arthur Rice, who did not purport to witness the murder, but testified that Carson was looking for Gladden because she was a witness against Martin in his murder case. App. 475-476.

### 7) The attempted murder of Ulysses English

Montgomery similarly provided key testimony concerning events leading to the shooting of Ulysses English ("Lou"), a known drug dealer from the 58th Street neighborhood. According to the government, on the evening of June 26, 1994, Carson instructed Montgomery to either report or confront English if Montgomery saw him selling drugs within Carson's territory. Carson believed English was operating there and had endangered Carson's family by revealing sensitive information to rivals. App. 489-491. Montgomery claimed that on the night of June 26, 1994, Carson ominously indicated that "something was about to happen," App. 492-493, and that he then left the area to eat and apparently returned to discover a chaotic scene with police and paramedics surrounding a wounded English. App.

493. Having tied Carson to the shooting solely through a supposed prior conversation, Montgomery then testified that in a conversation the next day, Carson, believing English had not died in the shooting, expressed doubts that English would inform the authorities. App. 494-496.

### 8) The shoot-out with the D.C. police

The government also relied heavily on Montgomery's testimony to reconstruct the series of events surrounding a September 10, 1991 shoot-out at 60th and East Capitol Streets after Fortune's murder. App. 337-343. According to Montgomery, that day he, Martin, and Carson drove around in Martin's van, looking for rivals from the 58th Street group, but initially found none. App. 344-346. He claimed they resumed their search after dark, with Carson driving and Montgomery on a motorcycle, armed and ready for confrontation. App. 347-348. The situation escalated, leading to an exchange of gunfire, including by a figure Montgomery described as resembling a security guard or police officer. App. 349-351. Montgomery testified that the group fled in the van, discarding their guns during a police chase, which Montgomery later retrieved. App. 354-356. The government relied heavily on Montgomery's account in its closing statement, insisting he was a credible eyewitness to the crime. App. 565. Yet the only tangible evidence of the alleged shoot-out with the police were Martin's fingerprints in his own van and a bullet traceable to a police weapon found within the vehicle. Montgomery's

testimony provided the narrative that purportedly connected this evidence to the accused.

* * *

Throughout trial and particularly in its closing statements, the government stressed Montgomery's importance as a key witness, emphasizing his centrality to the prosecution's theory of the case. The government told the jury that Montgomery and the other "criminals that you heard from are the people who were in the best position to tell you how this crew operated," App. 554, and that "you can decide this case based solely on what the cooperating witnesses told you [about] the crew members. You can just stop and reflect on what they said in this courtroom and decide that's enough." App. 555. *See also* App. 568 (government could not tie Carson to the Thomas and Lucas murders "until James Montgomery came forward").

There was little physical evidence corroborating Montgomery's accounts, and the defense focused on questioning his credibility. The defense noted he had been untruthful in the past, cast doubt on his ability to accurately recount the details and timelines associated with the alleged crimes, and noted that when Montgomery admitted involvement in many of these crimes his testimony had the effect of shifting blame onto others to benefit himself. App. 409, 415-420, 514. However, while the defense could address Montgomery's motives for tailoring his testimony

to please the government, it was denied substantial *Brady* material that would have allowed it to directly undercut the truthfulness of the testimony, including, for example, Montgomery's identification of others not charged with a murder he attributed to Appellants that was included in withheld notes of the extensive government interviews of Montgomery.  *See* p. 40-42, *infra*.

### B.    Special Agent Vincent Lisi

Special Agent Vincent Lisi also played a pivotal role in the government's case.  In late 1995 through early 1996, Agent Lisi led the FBI team that established an observation post overlooking a D.C. street corner that Appellants allegedly frequented.  App. 184-188.  From this vantage point, Agent Lisi and his team conducted video surveillance, recording footage and capturing images of the Appellants (except Sweeney) engaging in what was described as drug activity and gambling.  Notably absent from these recordings, however, were any depictions of the violent crimes underpinning the prosecution's case.

Agent Lisi's testimony went far beyond the scope of the surveillance recordings and his personal observations.  Of greatest significance, Agent Lisi was permitted to recount hearsay statements from deceased informant Butchie Smith implicating Appellants in multiple crimes underpinning he government's conspiracy theory.  This hearsay testimony was permitted based on Montgomery's unreliable testimony outlined above implicating some of the Appellants in supposedly

procuring Smith's unavailability.  App. 529-531.  Lisi testified that, according to Smith, Sweeney had told Smith about his involvement in the triple murder in Temple Hills, Maryland, in the murder of Donnell "Robocop" Whitfield, and in a conspiracy to kill Kenneth Adams and to kidnap Anthony Pryor.  App. 517-519, 522-528, 553. Agent Lisi also testified that Smith, over the course of several briefings, provided information to him about a longstanding and escalating conflict (or "beef") with the Condon Terrace neighborhood.  App. 520-521.

Agent Lisi's hearsay testimony from Smith often served as the only evidence offered on certain charges, aside from Montgomery's account.  Because Smith was allowed to "testify" through Agent Lisi, Appellants had no opportunity to cross-examine him and thus had no meaningful ability to challenge the veracity of the statements relayed by the agent to the trial court and the jury.  Again, *Brady* material that was improperly withheld from Appellants would have allowed Appellants to challenge the admission of this testimony by challenging the narrative that Carson and Sweeney were responsible for Smith's unavailability.  *See* pp. 29-31, 42, *infra*.

## C.    Jailhouse Informant Theodore Watson[2]

Theodore Watson was an inmate and a key government witness who testified against Appellants, implicating them in various crimes, including kidnapping and murder.  Watson, who was also facing charges in the U.S. District Court for the District of Maryland, shared a holding facility with Sweeney at the Northern Neck Regional Jail.  App. 244-245.  There, Sweeney purportedly disclosed details to Watson of criminal activities, such as the kidnapping of Anthony Pryor.  Watson claimed that Sweeney had confided in him about these crimes and expressed a desire to have Montgomery killed for cooperating with the government.  App. 246-257.  These claims made Watson's credibility a central issue for the defense during the

---

[2] Throughout the trial, the prosecution relied on testimony from jailhouse informants.  The Supreme Court "has long recognized the 'serious questions of credibility' informers pose," *Banks v. Dretke*, 540 U.S. 668, 702 (2004)(quoting *On Lee v. United States,* 343 U. S. 747, 757 (1952), and legal scholars have explained the particularly unreliable nature of jailhouse informants specifically. *See, e.g.,* Alexandra Natapoff, TheAppeal.org, *The Shadowy World of Jailhouse Informants: Explained* (July 16, 2018), *available at* https://theappeal.org/the-lab/explainers/the-shadowy-world-of-jailhouse-informants-explained/ ("'in-custody informants[]' are a particularly risky and unreliable category of criminal informant.  Like all informants, they provide evidence to the government in the hope of receiving a benefit.  But they have additional characteristics that make them especially poor witnesses.  They are incarcerated, so they are surrounded by a ready-made supply of vulnerable targets who are already suspected of criminal conduct. At the same time, because jailhouse informants are under the control of jail officials, there are many benefits and incentives for which they can exchange information[.]").

trial. Yet, as outlined below, the government once again withheld key *Brady* information.

The government knew that it had refused to file a motion under Federal Sentencing Guidelines § 5K1.1 to recognize Watson's substantial assistance in a matter pending in Greenbelt, Maryland because it had abundant evidence that Watson had not been truthful, including Watson's own written admissions. Yet when asked by Appellants' counsel about the matter during trial, the government lied to the court about why the Greenbelt Office had not filed the motion, hiding ample evidence of Watson's untrustworthiness as a witness and limiting defense counsel's ability to cross-examine him effectively. App. 278-279. *See* pp. 38-40, 92, *infra*. Appellants only became aware of this when previously sealed material was made available to them well after trial and appeal and even after their § 2255 motions were initially filed.

### D.    Jailhouse Informant Charles Bender

Charles Bender, another jailhouse informant, was also a key witness. He claimed that during his incarceration with Martin in 1996 he overheard conversations implicating Martin in soliciting violence against an informant. App. 449-450. Bender also testified that Sweeney, in a separate discussion, expressed a resolve to deal with Butchie Smith for "snitching." App. 442-448. And he testified

that Sweeney admitted guilt in the murder of Donnell Whitfield following a nightclub altercation.  App. 439-442.

Although Bender's testimony at trial was used to implicate (and ultimately convict of first-degree murder) *both* Carson and Sweeney, *see* App. 451-454, 562, the long-withheld reports of his conversations with the government (302s) revealed that Bender had previously told the government only that Martin had been responsible for the murder.  App 1369, 1379.  *See* p. 44, *infra.*

### E.    Jailhouse Informant Arthur Rice

Arthur Rice was yet another jailhouse informant who offered his assistance to the government while incarcerated and thus anxious to curry favor with the government.  The government contended that Rice was an associate of Sweeney. Rice had told the government that he was present at the murders of Leonard Hyson and Maurice Hallman and saw Martin and Carson fleeing the scene.  *See* App. 1240. The government presented a different theory at trial through Montgomery's trial testimony that he and Carson, not Martin and Carson, had killed Hallman.  App. 325-326, 413-414.   The government did not disclose to the to the defense Rice's inconsistent statement, instead providing it under seal and relying on an unexplained finding of the trial court that it was not Brady or Jencks Act material.  App. 469.

### III.   The Government's Withholding of *Brady* Material Undermined the Defense's Ability to Impeach Key Prosecution Witnesses.

Efforts to challenge the credibility of key cooperating witnesses and informants formed the cornerstone of the defense strategy. These efforts were consistently obstructed by the government's failure to disclose critical *Brady* material, a failure often compounded by the trial court's acquiescence. Throughout the trial and subsequent appeals, defense counsel vigorously sought access to undisclosed *Brady* and Jencks Act material that they believed existed, but could of course not fully appreciate. In response, the government consistently assured the trial court that it had met all discovery obligations, and oftentimes submitted materials under seal to the trial court seeking confirmation that they need not be turned over. In doing so, the government repeatedly misrepresented the contents of the information it filed under seal, failing to acknowledge what was often obvious and powerful *Brady* or Jencks Act material, and the trial court accepted the government's representations and permitted the continued withholding.

On September 14, 2000, the government submitted *ex parte* and under seal a compendium of notes from Special Agent Lisi and AUSA Peter R. Zeidenberg from their meetings with Montgomery. *See* App. 1333-1363. Along with sealed transcripts of grand jury testimony from Special Agent Lisi, these materials were never released to the defendants during trial. App. 321-322 (trial court rules based on an *in camera* review that they are not Brady or Jencks material). This material

was not disclosed to defense counsel until long after trial, in the § 2255 proceedings now under review.

By submitting the material to the court under seal, the government effectively unloaded its own obligations to disclose exculpatory material onto the trial court, even though *Brady* and Jencks Act obligations are placed on the government and not the court. This procedure is appropriate only if there is legitimate room for doubt as to the disclosure obligation. *See Palermo v. United States*, 360 U.S. 343, 354 (1959) (approving the procedure "when it is doubtful whether the production of a particular statement is compelled by the statute"). In this instance as in many others documented elsewhere in this brief, material the government submitted under seal proved unquestionably to be *Brady* and/or Jencks Act material when it was finally disclosed to Appellants. And as it became clear that the trial court was inclined to accept virtually any representation the government made that the material was not *Brady*, the government faced no disincentive to simply dumping the material on the trial court rather than complying with its obligations.

On September 27, 2000, at the first hearing on the government's motion to admit Smith's statements as hearsay against the Appellants, the defense requested Brady material including any evidence the government had that others might have wanted to kill Butchie Smith. App. 145-147. The government stated it had none,

and the trial court unequivocally stated that if it had any, it should turn it over. App. 144-147.

For months before that hearing, defense counsel had continuously attempted to obtain exculpatory material from the government, with little success. As early as July 2000, Carson noted the government's "repeated violation of *Brady* through disclosure of clearly exculpatory evidence so belatedly that the defense cannot effectively use the evidence at trial." App. 603. These included the Government's unexplained failure to turn over "clearly exculpatory evidence about the Maurice Hallman/Leonard Hyson murders and the Teresa Thomas/Terita Lucas murders until more than two years after the charges were brought against Mr. Carson and his CoDefendants and between five and ten years after the information came into the Government's possession." App. 603. Coates and Martin joined in the motion. App. 82, 84. Sweeney had filed three separate motions, including a motion to obtain discovery of the investigative files pertaining to all of the suspects in the triple homicide. App. 166.

Carson's motion also asked the trial court to "establish[] a mechanism for independent review of the files of the United States Attorney and the law enforcement agencies involved in this case for the presence of information/evidence which may be deemed exculpatory under Brady." App.603 . The trial court denied all of the motions following the government's representations that it had no

information concerning other suspects in Butchie Smith's murder and that any disclosable material would be provided in due course. App. 621.

During trial on February 1, 2001, the defense again requested any evidence the government possessed as to other possible suspects in Smith's murder. App. 223-224. This request included materials obtained from witness Andre Murray. App. 224. The government delayed the matter, then falsely represented to the court that there were no relevant documents. In fact, the government had evidence identifying Andre Chappell and Anthony Ricardo Hawkins as potential suspects, App. 1259. and notes from interviews with Andre Murray suggesting that Petey Johnson, another individual with potential connections to the case, had a motive to kill Smith. App. 1269. Again, this material was placed under seal, and not disclosed to the Appellants until long after trial.

The defense encountered other significant obstacles to obtaining discovery. On January 10, 2001, the trial court stated that it had found no Jencks Act material in Agent Lisi's testimony, even though a prior representation by the government as to the absence of any *Brady* material had proven incorrect. App. 180-183. Trial counsel renewed their request for Agent Lisi's notes of James Montgomery, on March 7, 2001 at the time of Lisi's testimony. App. 303. The government again sought to interpose the court into its own disclosure obligation, and the trial court again refused to require the government to turn over any notes. App. 321-322.

Material unsealed later revealed that Agent Lisi's notes contained valuable impeachment evidence as to Montgomery. *See* pp. 40-42, *infra.*

Other instances of defense counsel renewing efforts to secure potentially exculpatory evidence included making a request for government counsel's notes on cooperating witnesses Andre Murray, Reginald Switzer, and others. App. 215-217. Again, the government sought to cast its disclosure obligations onto the trial court, App. 229-230, and again, once that information was unsealed, it became clear that whatever review the trial court may or may not have done, much of that material should, in fact, have been turned over to the defense. *See* pp. 54-76, *infra.*

Defense counsel also repeatedly urged the government to collect and turn over files from the prosecution of its jailhouse informant Theodore Watson, believing the file could contain *Brady* or Jencks Act material. *See, e.g.*, App. 273-274. The government obtained the files and misrepresented their contents, leading the court to decline even an *in camera* review. App. 278-279. Again, once that information was unsealed, it became clear that it should have been turned over to the defense, contrary to the government's misrepresentations. *See* pp. 54-76, *infra.* This pattern repeated itself throughout the case.

## IV. The Direct Appeal

Though each of the Appellants believed that the government had likely committed *Brady* and Jencks Act violations throughout trial, their lack of access to the sealed material hamstrung their ability to question the government at trial and on direct appeal.

Appellants filed a motion on June 28, 2002, to access to the sealed material for use in their direct appeal. The Government stated in opposition that "at trial the defense demanded to know why the defendants were moved to various outlying detention facilities and the government made an *ex parte* proffer to the court, which was sealed. **Plainly, that portion of the record does not qualify as material relevant to appellant's anticipated appeal, as he frames it.**" App. 160. (emphasis added). However, the material Appellants sought included the statement that "Investigation of [the Butchie Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." App. 1259. The defense was unable to use this statement at the Rule 804(b)(6) hearing as to whether Agent Lisi could testify as to statements made by Smith on the basis that Appellants (as opposed to Chappell and Hawkins or some other persons) were responsible for Smith's death.

Having reviewed the government's misstatements as to what was contained in the material, this Court instructed counsel to "identify on appeal

specific evidentiary rulings" that they claimed were erroneous, so that the Court could then "undertake its own *in camera* review" of the disputed materials. *United States v. Carson*, No. 02-3015, 2002 WL 31246900, at *1 (D.C. Cir. Oct. 2, 2002). The Court imposed this requirement because "[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files." *See id.* (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)). The Court thus instructed appellate counsel to identify the sealed docket entries and citations that might reveal improper withholding.

Appellate counsel failed entirely to heed this Court's instruction. The briefs on direct appeal neglected to identify the relevant docket entries or transcripts. Instead, appellate counsel argued their *Brady* claim at a level of generality that did not enable the detailed review this Court envisioned. For example, counsel were unable to effectively challenge the trial court's plainly erroneous ruling that a statement in the government's possession pointing to other persons as responsible for Smith's murder was not *Brady* material. This Court rejected the direct appeal in toto. *United States v. Carson*, 455 F.3d at 338).

## V. The § 2255 Proceedings in the District Court

### A. Procedural History and the Eventual Unsealing of *Brady/Giglio* Materials

Following their direct appeal, Appellants each filed timely § 2255 motions and supplemental § 2255 motions, presenting a series of claims under *Brady*, *Giglio*, and the Jencks Act, among other issues.

Before the deadline for filing Appellants' § 2255 motions, Sweeney filed two motions seeking access to the documents filed under seal before and during trial. App 930. Chief Judge Hogan, who had taken over the docket from Judge Jackson, granted these motions on February 15, 2008, less than a week before Appellants' § 2255 motions were due, and ordered that the Clerk's office provide copies of the sealed pleadings to Sweeney's counsel. App. 169. This was the first time these records were ordered unsealed, and Sweeney's counsel promptly went to the clerk's office seeking access to the documents, only to find they were not available. *See* App. 1690.

Having been unable to obtain prompt release of the documents, Appellants had to file their briefs without access to the sealed materials in order to be timely. Each of the Appellants raised the issue of the government's *Brady/Giglio* and Jencks Act violations. For example, Sweeney's motion expressly stated that the government had "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure . . . of *Brady*

information," and noted the need for "further investigation and complete discovery of *Brady*/Jencks violations, including suppression of information about Montgomery's reliability and [about the government's] deals with him after concerns about his reliability." App 966. This investigation of course included the sealed materials, none of which were yet made available to Appellants' counsel, even though Chief Judge Hogan had ordered them unsealed.

Similar to Sweeney's motion, Martin's motion identified undisclosed *Brady* material that cast doubt on the government's narrative, in particular regarding Martin's alleged involvement in the Fortune murder. This included a police interview with Stephen Thomas — a witness present at the shooting — who did not name Martin, and evidence showing that the government knew James Coulter's whereabouts—contrary to its claims—because they indicted him for another crime shortly after the trial. Coulter, Martin believed, would have testified that Martin did not shoot him. App. 981. Martin noted that information relevant to these issues remained under seal. *Id*. Coates' motion also raised issues of the failure to disclose *Brady* material and related government misconduct, and sought "further discovery into Giglio, Jencks and the sealed 302s." App. 991 Lastly, Carson filed pro se a motion on a form stating that "new evidence established due process violations." App. 989. Each Appellant also raised issues of inadequate assistance of counsel.

Appellants' timely § 2255 motions thus presented evidence of *Brady*/*Giglio* and Jencks Act violations based on the information known to them at the time, but necessarily could not yet address in detail the many matters in the sealed records that Appellants knew existed but had been unable to access, or the degree to which they were prejudiced by the ineffective assistance of counsel in accessing those materials on direct appeal.

Over the next few years, Appellants supplemented their § 2255 motions with information they were still in the process of obtaining from the previously sealed materials.  In May 2008, Martin moved to stay his § 2255 motion on the basis that the attorney who prepared it had an undisclosed conflict of interest because she had represented Arthur Rice, who testified against the Appellants at trial.  App. ___. [2999] The government responded in November 2008 that it did not oppose a stay, and the matter did not move forward until March 2010, when Judge Lamberth, who had been reassigned the case, ordered the government to respond to the motions by April 5, 2010, except as to Martin.  The government received an extension to July 6, 2010 to locate and review the files and transcripts.   App. 124.

Sweeney's counsel, Jenifer Wicks, had made numerous attempts since February 2008 to obtain the previously sealed material from the Clerk's office, and it was not until June 17, 2010, when she finally received at least some of these materials, as stated in her affidavit provided to the district court.  *See* App. 1690.

These previously sealed documents revealed a trove of suppressed *Brady* material that Appellants ultimately incorporated into their supplemental motions.[3]

Appellants sought and were granted additional extensions on various grounds related to counsel's inability to procure access to discovery, *see* 1051-1054 the need to get trial transcripts,[4] inability to locate key exhibits, and substitutions of counsel. *See* App. 124-129. Pursuant to these various extensions, supplemental § 2255 motions were filed by Sweeney on November 28, 2014, App. 3093, supplemented with two affidavits on July 23, 2015, App. 1425, 1689, and refiled June 16, 2017, by Carson on April 9, 2015, App. 3196, by Coates on June 27, 2016, App. 1471, and by Martin on November 21, 2018. App. 1651, The government's response, after

_____

[3] In denying Appellants' § 2255 filings, the district court misstated when Appellants had received access to the sealed material. The court cited a statement of Carson's counsel Kira West in Carson's supplemental § 2255 filing as conceding that this material was "turned over by the clerk in 2008." App. 1297 (citing ECF 1170 at 9 n.6; *see also* App. 1480 (stating that the material placed under seal at trial was "discovered by 2255 counsel in 2008.")). The district court misinterpreted the quoted statement, as confirmed by the attestation of Sweeney's counsel at the time, Jenifer Wicks, who had been the one to actually engage in the efforts to get the documents. *See* App 1690. Although the material was ordered unsealed on February 15, 2008, the clerk's office did not locate and turn it over until June 17, 2010. App. 1690. Even if it had been turned over when ordered, however, the material could not reasonably have been reviewed and used in the initial § 2255 motions filed only five days later.

[4] A number of transcripts have not been located to this day. Carson's appellate counsel, for example, was unable to receive most of trial counsel's copy of the trial record because it had been inadvertently destroyed. *See* App. 1164.

numerous extensions, was filed March 18, 2020.  App.  188.  Replies were filed by Sweeney on July 14, 2020, App. 190, and Carson on September 14, 2020.  App 190.

**B.** ***Brady/Giglio*** **Arguments Raised in Appellants' § 2255 Motions**

As noted above, it was not until February, 2008, when a new district court judge was assigned to the case, that *Brady* material previously hidden from Appellants was ordered unsealed, and then two more years passed before Appellants were first able to see the material in June 2010.  *See* pp. 35-36, *supra*.  When Appellants were finally able to access these materials over two years later, they quickly realized that the government had intentionally withheld a trove of *Brady/Giglio* and Jencks Act material, and informed the government that they would be filing supplements to their § 2255 motions to address it.  *See* App. 1054.  The volume of the material, complexity of the trial, and the records that were lost, misplaced, or destroyed in the decade since the trial, made this a very time-consuming task.  In short, the material compromised information on key government witnesses, including its star cooperating witness James  Montgomery, and thus affected every crime charged.  Below is a summary of the key points set out in Appellants' various supplemental § 2255 filings.

1) **Watson: The government withheld information about its serious doubts as to Watson's credibility and lied about it.**

Watson had previously sought a recommendation from the government for a reduced sentence in a case pending in Greenbelt, but the government denied his request because he had been untruthful. *See* pp. 66-72, *infra.* On cross-examination, however, Watson stated that it was actually because the prosecutor "did not like me and didn't want to give me anything." App. 264. The defense requested Watson's case file from Greenbelt to determine if the government had in fact found him not credible. Rather than simply order the government to turn the file over to the defense, the trial court suggested that the request was an improper attempt to have the government do the defense's investigative work and ordered the government to review the file and report back. App. 273-74. The government represented the next trial day that it had done so and that there was "nothing that suggest any Brady or Jencks material in the file" and "nothing to suggest that [Watson's testimony] was not worthy of belief or it was incredible." App. 278. The district judge did not examine the file and instead sealed it based on the government's false representation alone. App. 279.

When the file was unsealed and made available to the defense over a decade later, the government's representations were shown to be knowingly false. The file contains lengthy letters from Watson to the AUSA in Greenbelt that detail and

acknowledge the many occasions on which Watson lied to investigators.  *See e.g.*, App. 1178, 1181 ("Had I just simply complied and told you the truth at our initial meeting, I would have avoided the unnecessary mental anguish that entailed. . . . There is no denying that during my 30 years in the system, I have lied [,] connived and schemed to get things done."  In another letter he admitted again to lying and went on to say "I have stated to you that "yes," I have lied [,] schemed and connived at times to obtain my way or freedom.".  App. 1210.  In another letter, Watson begged for an opportunity to reduce his sentence and promised the prosecutor that he would "cooperate and do exactly as you say." App. 1198.  The prosecutor herself noted that "Mr. Watson continues to undermine his own credibility as well and his ability to follow directions from the government." App. 1203.

The government's misrepresentations prevented the defense from revealing the true reason Watson did not receive a § 5K1.1 letter: the government found him not credible.  The government not only withheld this valuable *Brady/Giglio* and Jencks Act material but also lied to avoid disclosure.  This was not a minor issue or witness; Watson was central to Sweeney's supposed confession and bolstered James Montgomery's damaging testimony.  The government's misrepresentations on this matter could also have been used to cast doubt on the government's representations that it did not send Watson, a federal prisoner, to a state facility for the purpose of obtaining incriminating statements from him, App. 258-260, which the defense

could have offered to show a pattern of untruthful activity by Watson as a repeat jailhouse informant.  App. 266-270.

### 2) Montgomery: The government hid evidence of ever-shifting stories.

The sealed material revealed that the government also hid evidence undermining the credibility of James Montgomery—evidence that the defense had repeatedly sought.  The sealed material included notes of Agent Lisi showing that Montgomery initially lied to Agent Lisi about the murder of Timothy Benton and was ultimately charged himself, along with Maurice Proctor, of the murder for which he fingered Carson.  Agent Lisi's withheld notes reveal this falsity.  *See* App. 1273.  ("1994 Chin [Carson] borrowed Grey Cadillac Said he & Poo-Poo [Proctor] killed Tim [Benton] in it.").  Because this information was withheld and not available to the defense until over a decade after trial, the defense was unable to use it to discredit Montgomery by demonstrating his (1) proclivity for lying and (2) ulterior motive to protect himself from criminal prosecution through the false incrimination of others—exactly the conduct the defense asserted Montgomery was engaged when he implicated the Appellants in crime after crime based solely on his own testimony.

The government also sought to protect Montgomery from legitimate attacks on his credibility by suppressing evidence concerning government witness Arthur Rice.  On April 24, 2001, defense counsel unsuccessfully requested the FBI 302 interview reports generated from the government's interview of Arthur Rice.  App. 469  Rice

was a jailhouse informant who the government contended was an associate of Sweeney. The unsealed material revealed that Rice told Agent Lisi and Agent Kevin White, in the presence of AUSA Kenneth Wainstein, that Rice was present at the murders of Leonard Hyson and Maurice Hallman and had witnessed *Martin* and Carson fleeing the scene. *See* App. 1237. The government's theory of the case, however, presented through Montgomery's testimony at trial, was that *Montgomery* and Carson had killed Hallman. App. 325-326, 413-14.

The suppression of Rice's 302 interview notes precluded the defense from pointing out these inconsistent statements from witnesses who had clear motives for trying to curry the government's favor. Initially withheld interview notes from December 22, 1997, in which Andre Murray told prosecutors that Jakie "Boy" Burks had brought some New Yorkers in from out of town to murder Leonard Hyson and Maurice Hallman, further undermined Montgomery's testimony that he and Carson committed the murders, and Rice's statement that he had seen Martin and Carson fleeing from the scene. App. 1277. The government also knew that Montgomery had falsely accused Carson of killing Paul Ridley, a crime for which the government had already convicted Steven DeWitt. *See DeWitt v. District of Columbia*, 43 A.3d 291 (D.C. 2012) (noting that DeWitt was convicted on May 13, 1991).

### 3) Butchie Smith: The government hid evidence of other suspects in the Butchie Smith murder while falsely stating it had none.

The undisclosed material from Smith's murder investigation revealed significant evidence pointing to others being responsible for the crime, which would have undercut the government's ability to admit Smith's hearsay testimony. At the September 27, 2000, hearing the government represented that "we don't have any such information" that anyone other than the Appellants wanted Smith murdered. App. 145-147. The trial court had admonished that "if the government has any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as *Brady* material." App. 144. Despite the government's unambiguous statement, and the trial court's clear warning, one of the previously sealed documents revealed that the government had stated expressly that "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." App. 1259. In addition, a collection of interview notes with government informant Andre Murray pointed to another individual, known as Petey Johnson or "Fat Petey," as the real killer. App. 1270. None of this was available to the Appellants until after they gained access to the sealed material after June 2010.

### 4) Pinckney and Owens: The government misrepresented its relationship with Pinckney and Owens to keep them from testifying about another suspect in the triple murders.

As noted above, the unavailability of Pinckney and Owens to testify at trial meant that their exculpatory evidence regarding the Appellants' lack of involvement in the triple murders could not be introduced. The government not only denied knowing the whereabouts of Pinckney and Owens but also falsely claimed that they had fled with government funds provided for their relocation shortly after their grand jury testimony. *See* App. 628

In reality, the payments continued through the trial and direct appeal of this case. *See* App. 1766-68. This was discovered when Carson's counsel hired a licensed investigator well after trial who located Owens in Florida, where she said she had been relocated by the government about seven months after she and Pinckney testified in the Prince George's County case that Dennis Green had committed the triple murders. The government continued to move Pinckney and Owens at least ten times during the six months after their testimony, paying their expenses, and then finally moved them to Florida, again paying their expenses and their rent. App. 1767. Thus, at the time the government was denying knowledge of Owens and Pinckney's whereabouts, it was simultaneously paying and relocating them. Carson moved for discovery into these payments and into the government's involvement in the relocation of these witnesses and knowledge of their whereabouts

during the briefing of his Supplemental § 2255 motions, *see* App. 1058, but the motion was not acted upon. *See* App. 131 (request for ruling two years later, no later ruling shown on docket sheet).

5) **Bender: The government failed to disclose evidence that would have allowed impeachment of Charles Bender.**

Charles Bender's testimony at trial significantly influenced the conviction of Carson, Sweeney and Martin for first-degree murder. However, the reports of Bender's earlier conversations with the government showed that Bender had only implicated Martin. App 1369, 1379. This discrepancy between his initial statements and his trial testimony went directly to the reliability of his testimony and is yet another example of a key government witness making a critical change in testimony unbeknownst to the defense at trial and for many years thereafter.

6) **Wilson: The government withheld evidence of Martin's innocence in the Anthony Fortune murder.**

The government's reliance on cooperating witnesses to secure Martin's conviction for the murder of Anthony Fortune was fraught with inconsistencies and, crucially, the withholding of exculpatory evidence. Charlene Wilson's trial testimony, as a paid informant and the sole purported eyewitness presented by the government on the Fortune murder, contradicted ballistic evidence and her initial statement to the FBI. App. 280-290, 545-546. Further undermining the government's narrative, other cooperating witnesses provided differing versions of

Martin's purported involvement, with some claiming he confessed to the shooting, others stating the gun jammed, and one even attributing the murder to Carson. App. 294-295, 465-466, 473, 474. The government's failure to disclose the existence of Steven Thomas, an eyewitness who could have contradicted Wilson's account and exonerated Martin, further exacerbated the due process violation.

The government also suppressed the whereabouts of James Coulter, the victim in the May 30, 1995 shooting for which Martin was charged. The prosecution failed to produce Coulter as a witness and Coulter thus never testified at trial. The prosecution even went as far as to tell the Court that it had no knowledge of Coulter's whereabouts, despite the fact that Coulter was under government supervision at the time and easily locatable. *See* App 575-577. Coulter, who had previously informed a defense investigator that Martin was not the shooter or that he did not know who shot him, would likely have exonerated Martin if he could have been subpoenaed. App. 296-297. The government misled the court regarding its inability to locate Coulter, thus depriving Martin of the opportunity to present exculpatory evidence that could have significantly impacted the outcome of his trial.

## C.    The District Court's § 2255 Decision

The district court did not reach the merits of Appellant's *Brady/Giglio* claims, finding them to be time-barred.  The district court thus denied all Appellants' § 2255 motions in their entirety, *United States v. Martin*, 2021 WL 4989983 (D.D.C. Oct. 27, 2021), and denied Appellants' subsequent requests for certificates of appealability, *United States v. Martin*, 2022 WL 1618869 (D.D.C. May 23, 2022).

## VI.    The § 2255 Proceedings in This Court

After being denied certificates of appealability by the district court, Appellants sought certificates of appealability from this Court.  This Court granted Appellants' motions in part on December 23, 2022, inviting briefing on two questions:  (1) whether the government's allegedly improper withholding of certain materials submitted to the trial court under seal violated appellants' due process rights; and (2) whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the trial court pertaining to that sealed material.  Document #1978935.

## SUMMARY OF THE ARGUMENT

This case is rife with problems.  Appellants, who have each now served approximately 27 years in prison, seek review of the denial of habeas relief for pervasive due process violations that should have never occurred.  Looking back on

the record, which is filled with twists, turns, and gaping holes, many of which have only been revealed in the post-conviction years, there is a sense of tragedy.

The government made a lengthy presentation of evidence in this case, but it was not a fair trial given the severity of the government's violations. The government repeatedly withheld key exculpatory evidence and critical material for cross-examination, concealing its non-disclosure behind the trial court's *in camera* review procedures. The eventual disclosure of the withheld information exposed these procedures as wholly inadequate in identifying the government's misrepresentations about the exculpatory nature of the material, preventing proper redress for its violations. Worse, all signs point to the government having done so knowingly.

This is not a case in which the government failed to disclose some isolated pieces of *Brady* material held in the offices of some other investigative agency or where a failure of diligence might have led to an isolated administrative snafu. The government made a repeated choice to err not on the side of disclosure, but on the side of withholding. Time and again, the prosecution submitted materials under seal to the trial court, claiming there was no *Brady* material, in order to hide its nondisclosure behind the trial court's tacit blessing that it need not be disclosed. Coupled with a hostile trial court judge whose rulings led trial counsel at times to cower and render ineffective assistance rather than face potential personal consequences, this withholding severely hamstrung the defense.

Since they were convicted Appellants have sought diligently to understand the *Brady* violations that they suspected had occurred but could not fully assess given that so much evidence had been filed *ex parte* and under seal. When the full picture finally started to emerge, Appellants were ill-served by ineffective counsel on direct appeal, and the district court improperly relied on those counsel's failures (and other errors of law) to rule that Appellants' § 2255 motions should be rejected as procedurally barred.

What Appellants have continually asked for, but still have not received, is a full and fair assessment of the government's misconduct here and its effect on confidence in the verdicts. If this Court undertakes that assessment, it will undoubtedly be troubled. The pervasiveness of the government's conduct and its effect on so many key parts of the government's case easily meets what this Court has described as the "quite easily satisfied" standard that the withheld evidence "reasonably *could* have affected the verdict." *United States v. Butler*, 955 F.3d 1052, 1058 (D.C. Cir. 2020) (emphasis in original). On this record, the only way to effectively right the government's wrongs is to vacate Appellants' convictions once and for all and order that the indictments be dismissed. In the alternative, the Court should vacate Appellants' convictions and remand for a new trial, together with an evidentiary hearing to further develop the record of the government's misconduct.

# ARGUMENT

I.  **The Government's Repeated Withholding of Exculpatory Information Submitted to the Trial Court Under Seal Violated Appellants' Due Process Rights.**

## A. Standards of Review

The Supreme Court's landmark *Brady* decision established that fundamental due process requires prosecutors to disclose evidence favorable to the defense and material to the defendant's guilt or punishment. Evidence is "favorable to the defense" if it is exculpatory or impeaching, *Strickler v. Greene*, 527 U.S. 263, 280 (1999), and is "material" if "there is a reasonable probability that, had the evidence been disclosed, the result of the proceeding would have been different," *Turner v. United States*, 582 U.S. 313, 324 (2017) (quoting *Cone v. Bell*, 556 U.S. 449, 469–70 (2009)). Favorable evidence includes both exculpatory evidence, which directly points to innocence, and impeachment evidence, which undermines the credibility of prosecution witnesses. *United States v. Baxter*, 761 F.3d 17, 23–24 (D.C. Cir. 2014). The Supreme Court has "disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes." *Kyles v. Whitley*, 514 U.S. 419, 433 (1995) (citing *United States v. Bagley*, 473 U.S. 667 (1985)); *see Comstock v. Humphries*, 786 F.3d 701, 708 (9th Cir. 2015) ("[E]vidence that has any . . . impeachment value is, by definition, favorable.").

With respect to materiality and prejudice, the question is not "whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence." *Kyles v. Whitley*, 514 U.S. 419, 434 (1995). "In other words, the undisclosed evidence must raise a 'probability sufficient to undermine confidence in the outcome.'" *United States v. Robinson*, 68 F.4th 1340, 1348 (D.C. Cir. 2023) (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). Notably, the applicable "'reasonable probability' standard . . . is not a particularly demanding one," and *Brady* and its progeny require reversal if the undisclosed evidence might have caused "even one juror" to "harbor[] a reasonable doubt as to the defendant's guilt on any count." *Id.* (citations omitted); *see also, e.g.*, *Wearry v. Cain*, 577 U.S. 385, 392 (2016) ("To prevail on [a] *Brady* claim, [a claimant] . . . must show only that the new evidence is sufficient to 'undermine confidence' in the verdict.") (citation omitted); *Robinson* at 1348 ("Had even one juror harbored a reasonable doubt as to the defendant's guilt on any count, the guilty verdict on that count could not have been returned.").

As this Court recently explained in the related context of alleged violations of *Giglio* and the holding of *Napue v. Illinois*, 360 U.S. 264 (1959), involving the government's knowing presentation of false evidence against a criminal defendant, which is subject to the same "reasonable likelihood" standard:

That "'reasonable likelihood' standard does not require the defendant to show 'that he more likely than not would have been acquitted' absent the false statements. Rather, the defendant need show only that the false testimony 'undermines confidence' in the verdict. Thus, even if the false testimony '*may* not have affected the jury's verdict,' it is material if the evidence reasonably *could* have affected the verdict."

So understood, the "reasonable likelihood" test "is quite easily satisfied." The standard is "strict" against the government, "not just because [the cases] involve prosecutorial misconduct, but more importantly because they involve a corruption of the truth-seeking function of the trial process." Indeed, we have described the reasonable-likelihood standard as establishing "a veritable hair trigger for setting aside the conviction," and as "mandat[ing] a virtual automatic reversal of a criminal conviction."

*United States v. Butler*, 955 F.3d at 1058 (emphases in original) (citations omitted).[5]

Assessing *Brady* violations, this Court "review[s] *de novo* the prejudice determination made by the district court, considering directly 'any adverse effect that the prosecutor's failure . . . might have had on the preparation or presentation of the defendant's case.'" *United States v. Pasha*, 797 F.3d 1122, 1133 (D.C. Cir. 2015). The remedy for a *Brady* violation generally is a remand for a new trial;

_____

[5] In *Giglio*, the Supreme Court made clear that the nondisclosure of evidence that would impeach the credibility of a key witness "falls within [the general *Brady*] rule." 405 U.S. at 154. A *Napue* violation occurs when the government introduces false or misleading testimony or allows it to go uncorrected, even though the government knew or should have known that the testimony was false.

however, dismissal may also be an appropriate remedy in certain circumstances, "where no other remedy would cure prejudice against a defendant." *United States v. Driscoll*, 984 F.3d 103, 109 (D.C. Cir. 2021) (quoting *Pasha*, 797 F.3d at 1129). "To uphold a verdict in light of a *Brady* violation, the evidence must be sufficient to show that there is no reasonable probability that the verdict would have been different." *Robinson*, 68 F.4th at 1348 (citing *Bagley*, 473 U.S. at 682).

This Court reviews *de novo* a district court's legal conclusions in denying a § 2255 motion. *United States v. Smith*, 104 F.4th 314, 321 (D.C. Cir. 2024). "When the district court denies § 2255 relief without an evidentiary hearing, the nature of the court's ruling is akin to a ruling on a motion for summary judgment," and the facts must be viewed "in the light most favorable to the § 2255 movant." *United States v. Poindexter*, 492 F.3d 263, 267 (4th Cir. 2007).

**B.    The prosecution repeatedly and improperly withheld exculpatory material information from the defense by sealing the material under false pretenses.**

Throughout the course of the trial proceedings and for several years thereafter, the government withheld substantial volumes of critical information and evidence that was both material and favorable to Appellants.  This was not some one-off mistake, but rather appears to have reflected a considered decision to tread close to, and at times over, the lines of due process.  Rather than simply turning over the materials to the Appellants before or during trial, the government repeatedly

identified potential *Brady* material in *ex parte* filings under seal, and then sought to use an *in camera* review process to hide its nondisclosure. While it is at times unclear how extensive the trial court's review of this material actually was, that court was not in the position to fully assess the government's nondisclosures, both because it was not as familiar as the government with its own case, but also due to affirmative misrepresentations by the government as to its exculpatory value.

Appellants filed repeated motions and requests to unseal these materials and permit discovery into the *Brady* issues, but were rejected at nearly every turn—making it impossible for them to contemporaneously understand the full scope of what was being hidden. Now, due in part to the government's practices, the passage of time, and incomplete records, there is no assurance that all sealed materials and *Brady* violations have been revealed; but what has been revealed is plainly enough to "undermine confidence" in the outcome of the trial verdicts. *Wearry*, 577 U.S. at 392; *see also, e.g.*, *United States v. Cloud*, 102 F.4th 968, 979–80 (9th Cir. 2024) (clear efforts at suppressing evidence establish a *Brady* violation).

The facts of this case go well beyond the application of *Brady* in the recent D.C. Circuit ruling in *Robinson*. There, where a nurse practitioner was convicted of prescribing a controlled substance without a legitimate medical purpose, this Court found that the prosecution's failure to provide two reports that demonstrated that the defendant had tried to discourage pill-seeking by patients could have raised

sufficient doubts in the eyes of jurors to constitute a *Brady* violation. *Robinson*, 68 F.4th at 1350. The Court found these to be *Brady* violations despite the suppression not rising to the level of "smoking-gun" exculpatory evidence. The *Brady* violations in this case are more numerous, the suppression more blatant and intentional, and the materiality is at least equivalent in degree to those in *Robinson*.

      **C.**    **The sealed material included ample and classic *Brady* material.**

For years, throughout the trial and the direct appeal, the government withheld multiple documents and other information plainly favorable to Appellants. Much of the material significantly undermines the testimony of the government's central witnesses in the case or, at the very least, raises serious questions about their credibility. Broadly, the documents and information can be grouped into three categories: (1) documents revealing evidence of alternative theories of key charged crimes; (2) documents regarding acknowledged lies by government witnesses; and (3) information revealing benefits provided to government witnesses. In each instance, the violations were endemic and willful. All that is needed to establish a *Brady* violation is that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different," and the government's actions here easily surpass that threshold. *Cloud*, 102 F.4th at 979 (citation omitted).

### 1) Documents regarding alternative theories

For witness after witness, the government knowingly withheld prior notes and interview memos that contained indicia that the government's theory at trial was wrong—or at least that there were alternative leads and evidence, and inconsistent accounts, that should have been pursued and subjected to cross-examination. *Comstock*, 786 F.3d at 708–09 ("Once the prosecutor acquires favorable information, [ ] if she . . . fails to communicate it to the defendant, evidence has been suppressed.").

For example, the government refused to disclose, and the trial court refused to unseal, substantial *Brady* information about the murder of Robert "Butchie" Smith, a crime that formed a key aspect of the government's case against all Appellants. Although the government's theory and argument at trial was that this murder was committed by Carson, the government withheld *Brady* information pointing to other suspects.

Specifically, the government withheld and filed under seal at least two separate sets of evidence pointing to other individuals as having been responsible for the murder: (1) conformation that the investigation had identified two separate individuals, Andre Chappell and Anthony Hawkins, as having been responsible for the murder, which the government disclosed to the trial court (but never to the defense) in an *ex parte* motion, App. 1259; and (2) a collection of notes from

interviews with government informant Andre Murray reporting rumors that another individual (Petey Johnson, also referred to as "Fat Petey") had been the person who killed Smith. *see* App. 1270. These statements were particularly material given that Special Agent Lisi testified at trial that Johnson was present at the time of Smith's murder and had initially been picked up by the police as a possible witness to the murder. App. 535-536.

Carson was accused of Smith's murder—a crime that formed, in part, the basis of the racketeering conspiracy against all Appellants. The government, however, did not turn over this highly relevant evidence pointing to other individuals as the killers. Th government instead provided the materials to the trial court, which erroneously found that "they contain nothing that could be characterized as either Jencks Act or *Brady* material," and placed them under seal. *See* App. 229-230. The trial court either overlooked the *Brady* and Jencks Act material or was simply unable to properly evaluate its significance, and its conclusion was entirely incorrect. In any event, the obligation to evaluate and turn over *Brady* material was the government's, and it was not fulfilled. This resulted in a violation of Appellant's due process rights to have that material, which was of obvious value to their defense.

In Sweeney's first Motion to Compel Discovery the defense specifically asked for "[a]ny information which has come to the attention of the government from any source indicating that persons other than the defendant may have caused or have

been responsible for any of the offenses alleged in the indictment." App. 578 (ECF

71), filed February 9, 1999, at 3. The Government responded that it had "seen the

investigative file" and that "there was not any information that would exculpate Mr.

Sweeney." App. 579.[6]

Again, this cannot be excused as an oversight or something that Appellants

bear responsibility for not obtaining. At the very first hearing on the government's

motion to admit Smith's statements as hearsay, held on September 27, 2000, the

defense requested that the government produce any evidence that it had about others

who might have wanted to kill Smith. App. 145-147. The government responded,

both to the trial court and to the Appellants, that it had no information that anyone

other than the trial defendants in the case wanted Smith dead:

> **MS. CHATURVEDI**: Certainly, your honor. If I could
> just address this briefly. Again, it is sort of a leap of faith.

---

[6] Four attachments to Sweeney's February 9, 1999 motion detailed prior
Brady/discovery requests. *See e.g.,* App. 588-596 (November 17, 1998 nine-page
letter detailing Brady/discovery requests); App. 597-98 (January 19, 1999 letter to
AUSA Wainstein making the specific Brady demand related to James Montgomery);
App. 599 (January 29, 1999 (letter to AUSA Wainstein reiterating counsels' need to
obtain the requested information pertaining to James Montgomery); App, 600-01 (_;
February 1, 1999 (record of a telephone conversation with AUSA Wainstein to
address the investigative materials related to James Montgomery. AUSA Wainstein
told counsel that he had seen the investigative file and there was not any information
that would exculpate Sweeney). App. 579. Additional motions included efforts to
obtain records from the Bureau of Prisons, see Ex Parte Motion under Seal to
Require the Federal Bureau of Prison to Fully Comply with Defendant's Subpoena
to Produce the Prison Records of Robert Smith, filed on September 6, 2000. *See*
App. 55.

If the other people who Mr. Smith implicated -- if they knew that he was cooperating with law enforcement, perhaps they had a motive. That is one leap of faith.

**THE COURT**: Sure.

**MS. CHATURVEDI**: And the second one is[,] is there any evidence to suggest any of those people, assuming they did know about the cooperation, took any steps to harm Mr. Smith. There is no such evidence. If the defense is trying to raise third-party culpability, there has to be more than mere speculation.

Mr. Kiersh cited to the *Brown Beale* case from the D.C. Court of Appeals. The *Winfield* case, which is the most recent case on that point, says you can't just draw a blank. You can't just pull at straws speculating that someone else may have wanted to have this person killed and we should be entitled to know that. I will provide --

**THE COURT**: I Agree. There has to be some evidence that there were others who had a reason to – that there was a motive for committing the homicide known to those who were in a position to effect it.

**MS. CHATURVEDI**: Right. **And we don't have any such information. And we recognize that if we did have such information and that steps had been taken to give that, that would be *Brady* information.** That would have been disclosed as *Brady* information.

**THE COURT**: Yes.

App 145-147. (emphasis added).

The government's statement that it had no information that someone other than the defendants had been implicated in the murder of Smith was demonstrably false. The government was aware, at least as early as April 2, 1999, that Andre Chappell and Anthony Ricardo Hawkins might have been involved in the murder of

Smith.  On that date, the government filed an *ex parte* notice, which the court sealed on April 6, 1999,[7] in which it stated, "Investigation of [the Robert Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." *See* App. 1259. [8]

A separate but related instance of the government's concealment of evidence of an alternate theory as to the Smith murder is found within the material submitted at trial *ex parte* and under seal, and marked "Court Exhibit No. 4," namely the handwritten notes relating to an interview of Andre Murray (who testified for the

---

[7] None of the material obtained pursuant to the Court's Order to unseal appeared in the docket in the district court until the Appellants obtained access to it in June 2010 and then cited it in their supplemental § 2255 petitions.

[8] The government's motion does not elaborate on the evidence in its possession that led to the identification of these two individuals as those responsible for Smith's murder.  Accordingly, Appellants request that if this Court orders any further proceedings, they include additional discovery and an evidentiary hearing with regard to this issue, as the evidence on which the government based its statement would itself be discoverable under *Brady*, and likely provide further evidence that the government's misrepresentations and discovery violations resulted in a trial, and subsequent appeal, that were constitutionally unsound.  Sweeney requested in the district court any and all files containing information about Andre Chappell and Anthony Ricardo Hawkins, relating to the murder of Robert Smith, and cited the facts above as "good cause" for discovery of the requested material. *See Bracy v. Gramley*, 520 U.S. 899, 908–09 (1997)("Good cause" is shown "where specific allegations before the court show reason to believe that the petitioner may, if the facts are fully developed, be able to demonstrate that he is . . . entitled to relief.")).

government at trial) in which Murray discussed with law enforcement the murder of

Keith Johnson.

The notes of that interview state, in part:

> Wit. Heard Gooch telling Draper [Sweeney] to kill Keith
> [Keith was Petey Johnson's brother] Wit. did not hear
> Draper return to advise Gooch he had killed Keith. He just
> heard Gooch give the order.
>
> The word is that Fat Petey started messing with Butchie –
> killed Butchie to get back at Draper – a mere rumor.

App. 1270. According to the long-sealed witness notes, the theory was that Petey

Johnson had killed Smith to punish Sweeney for having killed Johnson's brother

Keith.

The significance of the government's suppression of the motive of Petey

Johnson to kill Smith becomes more significant in light of the testimony of Agent

Lisi, in the following exchange:

> A. I will tell you right now, I never after "Butchie's"
> murder, picked up Michael Farrar and interviewed him.
>
> Q. How about Petey Johnson? Did you pick him up?
>
> A. Yes, sir, because it was believed he was a witness.
>
> Q. To Robert Smith's murder?
>
> A. Yes, sir.
>
> Q. Okay. And you questioned him not just as a witness,
> but as a possible suspect?
>
> A. I would say as a witness and maybe somebody – it was
> just a hunch that he was there and then he walked away,

we believed, at the time "Butchie" was killed.  So he may have called somebody to alert them that "Butchie" was there.

App. 535-536.

Agent Lisi was able to deflect the question as to whether Petey Johnson was a suspect rather than a witness because the government withheld from the defense evidence that Johnson might have had some role in Smith's murder and a motive to kill Smith that he might have told others about.  And the government believed Johnson was present at the time of Smith's murder.

The government's insistence on limiting the defense inquiry into others that might have wanted to kill Smith was further shown during cross-examination of Agent Lisi, when the government objected to questioning about whether any suspects other than Sweeney had been developed as leads in Smith's murder.  App. 537-541.  At sidebar, the government argued, "The only suspect – if Mr. Kiersh wants to hear it again – the only suspect in Agent Lisi's mind that ordered that murder was William Sweeney.  If Mr. Kiersh wants him to repeat it, that is fine."  App. 539.  The government knew the defense would be unable to confront Agent Lisi with questions about Petey Johnson's motive to kill Smith or the evidence that implicated Andre Chappell and Anthony Ricardo Hawkins in Smith's murder because this material had not been turned over to the defense.  *See also* Gov't Omnibus Opp'n, filed Aug, 18, 2000 [ECF 360], at 74-75 (referring to request for

information as to others with a motive to kill Smith as a cooperating witness as a "fishing expedition" and "speculation," and asserting that the government had no such information even though it did).

There is no rational basis on which the government could not consider these credible alternative leads, backed by a government agent, as core *Brady* material in a murder case. Evidence of other suspects is necessarily exculpatory: "*Brady* requires the prosecution to produce evidence that someone else may have committed the crime." *Jarrell v. Balkcom*, 735 F.2d 1242, 1258 (11th Cir. 1984) (citation omitted). *See also Carrillo v. Cnty. of L.A.*, 798 F.3d 1210, 1225 (9th Cir. 2015) ("[A]lternative suspect evidence . . . [falls] within *Brady*'s scope. "); *Smith v. Sec'y of N.M. Dep't of Corr.*, 50 F.3d 801, 834–35 (10th Cir. 1995) (police report and statements containing information indicating the guilt of an alternative suspect was "material" under *Brady* and "nondisclosure of this evidence altered and affected [the defendant]'s preparation and presentation of his defense at trial"); *Miller v. Angliker*, 848 F.2d 1312, 1321 (2d Cir. 1988) (granting habeas relief on *Brady* claim, noting that "there [cannot] be any question" that evidence that "murders might have been committed by [another suspect] rather than" the defendant was "'clearly' and obvious[ly]' exculpatory of the defendant") (alteration removed).

Regardless of the government's ultimate belief as to its initial theory or as to Murray's accusation, due process mandated that the prosecution share all leads with

the defense. Appellants had the right to investigate these leads to gather evidence, challenge the admission of Smith's hearsay testimony, or use that evidence for cross-examination. *Strickler*, 527 U.S. at 280 (holding that suppressed evidence is deemed material where "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

A second example relates to James Montgomery—who, as noted above, was the government's star cooperating witness and spent 10 days on the witness stand. *See* pp. 11-21, *supra*. The government never released to the defendants Agent Lisi or AUSA Peter R. Zeidenberg's notes as to their interviews with Montgomery, choosing instead to offload its obligation onto the trial court, whose conclusion that they were not *Brady* or Jencks Act material proved demonstrably wrong once those notes saw the light of day. *See* pp. 26-27, *supra*.

The notes of the government's meetings with James Montgomery reveal shifting stories, all of which undermine confidence in the accuracy of his eventual trial testimony. For instance, Agent Lisi's interview notes show that Montgomery changed his story about the murder of Timothy Benton. At trial, Montgomery vividly recounted that he was driving with Proctor and Benton when Proctor shot Benton in the head. Montgomery claimed to have pushed Benton out of the car and ran him over, before Proctor got out of the car and shot Benton again. App. 360-

365. However, notes from later interviews tell a different story—that Montgomery initially implicated Carson as one of the perpetrators. *See* App. 1338.

While the trial court might not have been able to fully grasp the extent to which these notes undermined the government's theory of the case, the government should have recognized the exculpatory value of this material and had no such excuse. "[T]he individual prosecutor has a duty to learn of any favorable evidence known to the others acting on the government's behalf in the case." *Kyles*, 514 U.S. at 437. Thus, the prosecution has a duty and obligation under *Brady* "not only . . . to disclose exculpatory information, but also . . . to search possible sources for information," including "files in the possession of agencies other than the prosecutor's office" and "maintained by branches of government 'closely aligned with the prosecution.'" *United States v. Brooks*, 966 F.2d 1500, 1502–04 (D.C. Cir. 1992). "The prudent prosecutor will resolve doubtful questions in favor of disclosure." *Kyles*, 514 U.S. at 439 (quoting *United States v. Agurs*, 427 U.S. 97, 108 (1976)). *See also United States v. Auten*, 632 F.2d 478, 481 (5th Cir. 1980) ("The basic import of *Brady* is . . . that there is an obligation on the part of the prosecution to produce certain evidence actually or constructively in its possession or accessible to it in the interests of inherent fairness.") (citation omitted); *Crivens v. Roth*, 172 F.3d 991, 996 (7th Cir. 1999) ("Prosecutors may not simply claim ignorance of *Brady* material.").

As a third example, the government refused to disclose a collection of prior statements by government witness Charles Bender, which again told a very different story of various crimes from what he ultimately recounted at trial. Bender was a key witness for the government in providing testimony about the Anthony Fortune murder. Although Bender's testimony at trial was used to implicate (and ultimately convict of first-degree murder) *both* Carson and Martin, *see* App.451-454, 712, long-withheld 302s revealed that Bender had previously told the government that only Martin had been responsible for the murder. *see* App 1369, 1379.

This discrepancy was favorable and material not only to Carson, but also to the other defendants, whose guilt for the racketeering conspiracy was linked to the Fortune murder, and even to Martin, because they could have used the shifting stories to attack Bender's credibility and that of the investigation more broadly. *See* p. 44, *supra. See United States v. Bundy*, 968 F.3d 1019, 1045 (9th Cir. 2020) (affirming dismissal with prejudice of indictment as to four defendants where government withheld exculpatory *Brady* evidence that substantiated allegedly false statements made by two defendants, which were central to the government's case against four defendants). The discrepancy, once again, should have been plain to the government. Buried in a stack of 302s filed *ex parte* and under seal without context, the trial court could perhaps be excused for its error in not recognizing it as *Brady* material, but the trial court too had an obligation to at least question what was

in these many sealed prior statements of key government witnesses. That the government failed its obligation is beyond question.

### 2) Documents regarding acknowledged lies by government witnesses

Although the various sealed witness notes and interview memos described above all serve as examples of the government improperly withholding indicia of changing testimony and alternative facts, a separate set of materials arguably stands alone: the government's willful refusal to provide *Brady* material regarding the credibility and motives of cooperating witness Theodore Watson, who had repeatedly acknowledged to the government in writing his own history of duplicity.

As noted above, Watson was a cooperating witness who had been separately convicted in the district court in Greenbelt, Maryland, but who had puzzlingly not received a § 5K1.1 letter from the government outlining his cooperation for sentencing purposes. Cross-examined on the issue at trial, Watson claimed the U.S. Attorney's Office refused him the letter because the prosecutor assigned to the case "made it very clear she did not like me and she didn't want to give me anything." App. 264.

Watson attempted to provide a reason that the prosecutor might not like him, trying to make it appear that she was angry with him for having made her look bad in front of another Assistant U.S. Attorney:

**Q.**  Sir, what was the substance of the conversation that day?

**A.**  Well, Ms. Barbara Skyler, one of the prosecutors for the District Court in Greenbelt – she wanted some information that one of my attorneys had passed on to Ms. Wilkinson, which Ms. Wilkinson had passed on to Ms. Skyler.  Sandra Wilkinson was the district attorney who was prosecuting my case.  When I first came in, Ms. Wilkinson told me, you know, "You're not on our team, and you're not likely to be on our team.  And I want you to answer all the questions that Ms. Skyler asks you truthfully and honestly."  And I explained to her some things that happened in her case – two of the cases she was prosecuting.  And when I finished talking with her, she made a statement – and this can be verified – she said, "Why didn't I hear about this before I gave all these lenient pleas out?"  And I looked at Ms. Wilkinson and I looked at my attorney.  I said, "I told you this months ago before you did that."  She just looked at Ms. Wilkinson, and that was the end of it.

App. 271.

At the conclusion of the court proceedings on February 12, 2001, the defense made the following request:

**MR. DAVIS**:  And I would ask that the United States Attorney's Office review that file.

**THE COURT**:  If they have not done that, and I would ask that they call the prosecutor's office in Greenbelt to find out whether or not there is anything that could be characterized as, quote, Brady material in their file.  Other than that --

**MR. DAVIS**:  Thank you, your Honor.

**THE COURT**:  -- that's the extent of the government's obligation.  Okay?

App. 274.

The following day, the government represented that it had obtained Watson's file from the U.S. Attorney's Office in Greenbelt, and the following exchanges occurred:

> **MR. ZEIDENBERG (AUSA)**: Just on a matter left over from yesterday, pursuant to the Court's instruction, we contacted the U.S. Attorney's Office in Greenbelt. We retrieved their file yesterday evening and have reviewed it. There is nothing, in our view, that suggests any Brady or Jencks material in the file. The Assistant U.S. Attorney out there indicates in one letter that the reason that Mr. Watson did not get a 5K letter was simply because she didn't believe his cooperation was of a significant enough nature to qualify. **There was nothing to suggest that it was not worthy of belief or it was incredible. There was nothing of that nature**. Detective Norris – we spoke with him briefly yesterday. And he had called – we tried to get in touch with him – and he indicated similarly that Mr. Watson had never provided him with information that he felt was untrustworthy of any kind. Nevertheless, we do have the file, and I don't know if the Court wishes to have it to peruse. There are letters --

> **THE COURT**: You mean the file from Greenbelt?

> **MR. ZEIDENBERG**: Yes. There are letters from Mr. Watson to the prosecutor, as he describes – several lengthy letters, talking about a variety of matters, including his own case and other cases that he knows about and things of that nature.

> **THE COURT**: Do you want to have it made part of the court record?

> **MR. KIERSH**: Yes, your Honor.

> **THE COURT**: All right.

**MR. KIERSH**: I ask that it be placed under seal and made a part of the record.

*     *     *

**THE COURT**: Number 5.  All right.  Number 5.  **I do not intend to review it in camera.**

**MR. ZUCKER**: That would be my request.

App. 278-279 (emphasis added).

Despite the government's assurances, and the trial court's full reliance on those assurances, the material in the Greenbelt file unquestionably goes directly to Watson's credibility as a witness.  The prosecutor's statement that there was nothing in the Greenbelt file to suggest that Watson was not worthy of belief or incredible appears to go beyond an error in judgment and to have been a deliberate falsehood.

The Greenbelt file was included in the material obtained by counsel after the record was unsealed in this case and the material started to be made available in June, 2010.  It contains copious amount of evidence that Watson chronically lied and schemed in pursuit of a sentencing departure, and that, contrary to its representations at trial, that the government was well aware of his untrustworthy nature as Watson referenced it on several occasions.  The file contains several lengthy letters from Watson to AUSA Wilkerson in Greenbelt detailing the many occasions on which he lied to investigators.  For example, in one letter, Watson states:

> This letter is to sincerely thank you for allowing me a "second opportunity" to cooperate and help myself.  I abysmally apologize for the asinine [sic] way I conducted

69

myself when the option was presented to me.  **Had I just simply complied and told you the truth at our initial meeting,** I would have avoided the unnecessary mental anguish that entailed. . . . **There is no denying that during my 30 years in the system, I have lied [,] connived and schemed to get things done**."

*See* App.  1178, 1181  (emphasis added).  Watson went on to note several prominent politicians who had lied, stating, "There is no way I am comparing myself with these figures other than a liar is liar regardless of who they are."  App. 1210.

Another letter reveals that not only was AUSA Wilkerson well aware that Watson was a liar, but also that she hesitated to continue cooperation with him due to his untrustworthy nature:

> I would like to touch lightly on your harshness towards me as a liar at the first conference and thereafter.  Ms. Wilkerson, **again I apologize and confess that at our first conference, I lied and somewhat distorted the truth regardless of my reasoning**. . . . Before I attempt to put the matter in its real perspective and sequence, again **I would like to touch briefly on your view towards me as a liar… I believe that I have stated to you that "yes," I have lied [,] schemed and connived** at times to obtain my way or freedom. . . . In reference to me attempting to secure assistance on my own in an effort to help myself, Ms. Wilkerson, you advised [my attorneys] that you did not want to hear or discuss anything for or about me, and you did not want to see me until trial.

*See* App 1209-1210 (emphasis added).  A third letter, written just after his sentencing hearing, at which the government declined to file a departure letter and he was

sentenced to 105 months' incarceration, reveals Watson's desperation and willingness to do anything in pursuit of a sentence reduction:

> I could have made a lot of cases from the street, but that was not to be. But with your blessings, I wish to try to do as much as possible from within. I do have pertinent information for other prosecutors at the moment. One case involving a multi-kilo drug dealer and "hit man." **I will cooperate and do exactly as you say.** I just hope and pray that I do and give enough to be afforded a sizable downward departure.

App. 1198 (emphasis added).

AUSA Wilkinson also wrote a letter on February 21, 2000, to the court in Greenbelt concerning Watson, in which, among other things, she stated, "Finally, please be advised that, since Mr. Watson's sentencing, he mailed me a second lengthy letter regarding the information he believes he has – despite my specific directions to not contact me directly. **Mr. Watson continues to undermine his own credibility** as well and his ability to follow directions from the government." *See* App. 1203 (emphasis added). Watson's repeated admissions that he lied to AUSA Wilkinson and his further statements that lying is an instinctive part of human nature fundamentally impeach his credibility and reliability as a witness.

Once the government had reviewed Watson's Greenbelt file, it should have taken steps to correct the testimony of Watson as to the reason he was not given a § 5K1.1 letter in Greenbelt, and certainly should have disclosed the material to defense counsel. It was not because Wilkinson did not like him, and it was not

because Watson had made Wilkinson look bad in front of another AUSA; it was in fact the result of Watson lying to her and admitting that he saw nothing wrong with lying to help himself out of a tight spot.

Instead of doing this, the government misrepresented to the trial court and the defense that there was "nothing to suggest that it was not worthy of belief or it was incredible. Nothing of that nature." **App. 278.** That statement, by a government officer representing that the government had reviewed the Greenbelt file, is shocking. The course of action pursued by the government can have only one of two explanations: an astounding lack of diligence, or a deliberate lie. In either case, it was a due process violation. As the Supreme Court held in *Brady*:

> We now hold that the suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution. The principle of *Mooney v. Holohan* is not punishment of society for misdeeds of a prosecutor but avoidance of an unfair trial to the accused. Society wins not only when the guilty are convicted but when criminal trials are fair; our system of the administration of justice suffers when any accused is treated unfairly. An inscription on the walls of the Department of Justice states the proposition candidly for the federal domain: "The United States wins its point whenever justice is done its citizens in the courts." A prosecution that withholds evidence on demand of an accused which, if made available, would tend to exculpate him or reduce the penalty helps shape a trial that bears heavily on the defendant. That casts the prosecutor in the role of an architect of a proceeding that does not comport with standards of justice . . . .

*Brady*, 373 U.S. at 87–88 (citations omitted).

The trial court's reliance on the government's representations regarding the contents of the Greenbelt file is made clear by its statement that, "I do not intend to review it in camera." App. 279. The trial court thus did nothing to cure the government's violation. As a result, it would be years before the Appellants learned the truth.

### 3) Information regarding government benefits provided to witnesses

The last category of withheld *Brady* information is similarly troubling and further contextualizes the misconduct of government counsel with respect to its disclosure obligations throughout trial. The government withheld information related to the improper payments to, and hidden locations of, two one-time government witnesses, John Pinckney and Cheree Owens, whom Appellants were unable to call for their own defense at trial.

Years before the trial in this case, Pinckney and Owens had testified under oath in front of a state-convened grand jury in Prince George's County, Maryland about the triple murder committed in November 1996. App. 149-150. Although Carson, Coates, and Sweeney would each ultimately be convicted of this triple murder at trial (and the crime formed, in part, the basis of the racketeering conspiracy against all Appellants), *see* App. 712, Pinckney and Owens had testified before the

grand jury on December 10, 1996, that Dennis Green—and not any of the Appellants—had committed the triple murders. App. 149-150.

When Appellants were unable to locate Pinckney and Owens to testify in their defense at trial, the government represented that it too was unable to locate them. Accordingly, Appellants attempted to introduce Pinckney's and Owens's grand jury testimony from the Prince George's County case under the hearsay exception for former testimony of unavailable witnesses. *See* Fed. R. Evid. 804(b)(1). *See* App. 617-20, 626. But the government opposed and argued adamantly against the admission of the grand jury testimony, including on the grounds that Pinckney and Owens were unreliable and untrustworthy, having absconded with government funds (which had purportedly been provided for relocation) shortly after their grand jury testimony. *See* App. 628. The trial court ultimately denied Appellants' request to introduce Pinckney's and Owens's testimony, finding that the United States was not a party to the state grand jury proceedings and there was insufficient evidence that the Maryland authorities were used or "effectively controlled" by the federal authorities. On direct appeal this Court affirmed that finding as not an abuse of discretion. *See Carson*, 455 F.3d at 376–81.

Once Appellants were finally able to get all of the information, a much different story was revealed. In 2014, after she was located by a private investigator, Owens explained that the FBI had moved her and Pinckney around to numerous

locations and paid them significant sums of money after their grand jury testimony. Once they were moved, neither Pinckney nor Owens ever heard from the FBI or federal government counsel again. *See* App. 1766-68. In other words, rather than having absconded with government funds and disappeared after their grand jury testimony, unable to be located again (including to testify at trial), it appears that Pinckney and Owens were *deliberately* moved by the federal government, which then either lost track of them or consciously decided not to disclose their location or make efforts to find them.

This bootleg witness-protection charade stood in sharp contrast to the government's protestations and representations at trial, when (in arguing against the admission of their testimony) the government not only (A) painted a picture of Pinckney and Owens as an unreliable and untrustworthy pair who absconded with government funds and could not be found but also (B) expressly and repeatedly disavowed any federal influence or control over the state grand jury process or authorities. *See* App. 628. That tale was patently false. Even if the federal government had reached some kind of behind-the-scenes "determination" that Pinckney and Owens were no longer trustworthy, this was information that the government should have made available to the defense. And the federal government's exercise of control over the physical and financial wellbeing of Pinckney and Owens in the immediate aftermath of their state grand jury testimony

severely undermines the government's insistence in successfully arguing at trial and on appeal that the federal government was not involved in the state grand jury proceedings or investigation into the triple murder, that the state authorities acted alone, and that the federal authorities thus could not be hampered by *Brady* material stemming therefrom. It calls into question whether Pinckney and Owens were actually unable to be called to testify at trial or—if they truly were unavailable— whether their grand jury testimony should have been admitted under Rule 804(b)(1).

The government's tactics in hiding away Pinckney and Owens and its misrepresentations to Appellants and to the trial court precluded Appellants from accessing their testimony, further undermining confidence in the fairness of their trial.

> **D.     The trial court's failure to meaningfully address the government's repeated failures to make disclosures required under *Brady/Giglio* and the Jencks Act provides further grounds for relief.**

The disclosure obligations set out in *Brady*, *Giglio*, the Jencks Act, and the Justice Department's own Criminal Resource Manual ("CRM") § 9-5.00 all fall on the government, and it is the government that is ultimately responsible for any nondisclosure. A trial court acting in a proper supervisory role can, however, help to ensure the government's obligations are met. In this case, the trial court was entirely ineffective in addressing the government's nondisclosures. It allowed the government to file materials under seal rather than disclose them even where the

material plainly should have been turned over, and failed to follow the procedures this Court has set out for *in camera* review where there is some legitimate question as to the disclosure obligation. While the trial court's errors in judgment and as to the applicable legal requirements do not excuse the government's misconduct, they allowed it to continue unchecked and thus bolster Appellants' entitlement to relief.

As set out above, the government repeatedly assured the trial court that it had met its disclosure obligations, often mispresenting the contents of the materials at issue. And rather than simply turning over what proved to be—once finally disclosed to the defense—obvious and powerful *Brady* or Jencks Act material, the government often chose instead to submit the materials under seal to the trial court. *See* pp. 26-31*, supra*. This procedure is appropriate only "when it is doubtful whether the production of a particular statement is compelled." *Palermo*, 360 U.S. at 354. *See also Dennis v. United States,* 384 U.S. 855, 874–75 (1966) ("The determination of what may be useful to the defense can properly and effectively be made only by an advocate.").

The frequent use of the *in camera* procedure in this case as to matters that were anything but doubtful, rather than simply turning the material over to the defense, is further evidence of the government's failure to meet its disclosure obligations. *See Brooks*, 966 F.2d at 1502–04 (emphasizing that it is the prosecutor's responsibility to identify and disclose *Brady* material). The Supreme Court has

cautioned that "the prudent prosecutor will resolve doubtful questions in favor of disclosure." *Agurs*, 427 U.S. at 108. Because it is difficult to assess the materiality of evidence before trial, prosecutors are directed to take a broad view of materiality and err on the side of disclosing exculpatory and impeaching evidence. *Kyles*, 514 U.S. at 439; *see also* CRM § 9-5.001.B.1. The trial court thus should not have received most of the submissions *in camera* to begin with; instead, the material should have been promptly and timely turned over to the defense, and the trial court should have so ordered rather than accepting repeated *in camera* submissions.

Faced with these repeated and in many cases inappropriate submissions, the trial court then compounded the problem by utterly failing to deal with them in any meaningful way. The trial court uniformly declined to direct the government to turn over potentially exculpatory material provided to it for review even when the most cursory review of the material reveals that it undoubtedly should have been turned over. In doing so, the trial court failed to keep a transcribed record of the *in camera* proceedings, failed to articulate a compelling interest for reviewing the *Brady* materials *in camera* to begin with, failed to make findings regarding the requested material, and failed to make a record to the defense indexing the material presented to the trial court, all of which are required by this Court. *See In re Sealed Case*, 151 F.2d 1059 (D.C. Cir 1998). Instead, the trial court simply provided conclusory statements that there was "no *Brady*," and made no other findings. *See, e.g.*, App.

229-30, 278.  And because the trial court kept insufficient documentation indexing the material presented but ultimately not disclosed to Appellants, the full record of these materials was not adequately preserved for this Court's review.

The trial court thus entirely failed to follow the requirements this Court has set out for *in camera* review.  This failure was particularly harmful because, as this Court has recognized, "*in camera*, *ex parte* submissions generally deprive one party to a proceeding of a full opportunity to be heard on an issue, and thus should only be used where a compelling interest exists."  *In re Sealed Case*, 151 F.2d at 1072 (cleaned up).

Had the trial court addressed these issues properly, it would have ordered disclosure.  The government would then have known that it had to make its required disclosures, rather than ignoring them or unloading the material on the trial court where, as the case went on, the government learned it would never be ordered to make such disclosure.  Rather than acting as a check on the government's repeated failures to meet its disclosure obligations, the trial court's actions encouraged them.

There were many instances of the trial court's failure to hold the government to its disclosure obligations.  As laid out at pp. 66-72 above, even the briefest review of the file of Watson's Greenbelt prosecution reveals that Watson repeatedly admitted to lying and that the government refused to grant him credit for testimony that it believed to be false.  Yet the trial court did not review this material to make

any determination as to what it contained and instead relied on the government's false representation that the file did not contain anything that even "suggests any *Brady* or Jencks material." App. 278-279. The trial court thus plainly neglected its "affirmative duty to determine whether any [Jencks Act] statement exists and is in the possession of the Government and, if so, to order the production of the statement." *Saunders v. United States*, 316 F.2d 346, 349 (D.C. Cir. 1963). Its failures to do so were clearly erroneous. *See also United States v. N. Am. Reporting, Inc.*, 740 F.2d 50, 55 (D.C. Cir. 1984) (remanding where the trial court failed "to engage in an adequate inquiry into the nature of the documents before ruling against Jencks Act production"); *Hilliard v. United States*, 317 F.2d 150, 151 (D.C. Cir. 1963) ("A trial judge is to conduct such inquiry as may be necessary to determine whether or not the conditions of the [Jencks] statute have been satisfied," remanding where no such inquiry was made); *United States v. Trevino*, 89 F.3d 187, 189-90 (4th Cir. 1996) ("Once the accused has made a plausible showing that the evidence would be both material and favorable, the trial court *must* review the information *in camera* to ascertain its true nature and determine whether it must be disclosed.") (emphasis added).

To take just a few additional examples, the trial court erred in sealing, rather than ordering the disclosure of, material relating to others with a motive to kill Robert "Butchie" Smith, specifically the government's belief that Andre Chappell

and Anthony Ricardo Hawkins had murdered Smith; that Petey Johnson, who was present at the murder of Smith, had a motive to kill Smith as he believed that Sweeney had killed his brother; and that Montgomery did not know that Carson had killed Smith but only thought he might have killed him or that Carson might have had Pug or BJ kill Smith. App. 1363. The trial court's suppression of this *Brady* material was especially harmful because it assisted the government's successful effort to allow Agent Lisi to testify to certain incriminating statements allegedly made by Sweeney to Smith under the hearsay exception of Fed. R. Evid. 804(b)(6). "The government's burden to provide the defense with exculpatory evidence pursuant to [*Brady*] applies to a Rule 804(b)(6) hearing. . . . a defendant's right to contest the government's Rule 804(b)(6) motion is an integral part of his right to a fair trial." *United States v. Rivera,* 412 F.3d 562, 569 nn. 6 &7 (4th Cir. 2005).

The government contended that Carson had killed Smith after meeting in the Prince George's County jail with Sweeney, who told him that Smith had implicated Sweeney, Carson, and Montgomery in the triple murder in Temple Hills, Maryland. After a September 27, 2000 hearing on the government's motion to admit Smith's statements as hearsay through Agent Lisi, the trial court declined a discovery request that the government produce any evidence it had that others might have wanted to kill Smith after the government stated in opposition that it had no such evidence, and the trial court accepted that representation without more. App. 145-147. The

defense was thereby deprived of any opportunity to challenge the government's theory that Sweeney and Carson had killed Smith, and of the opportunity to use the suppressed *Brady* material to cross-examine Agent Lisi and Montgomery at trial.

Trial testimony also disclosed that yet another of the government's witnesses, Ronald Sowells, had lied during his own trial, falsely implicating three people in murders they did not commit. *See* Tr. April 18 2001 at 22-24, 30-32, 83-85. Sowells had told the government about this before trial, but the government had not disclosed it to the defense, which only became aware of it while Sowells was testifying. *See* App. 1277. Rather than addressing the defense's protests that this was simply a further example of the government's ongoing failures to meet its *Brady/Giglio* obligations, the trial court noted that the witness had now acknowledged his prior lies in open court, and then went on to chastise *defense* counsel for supposedly "sit[ting] on [their] hands and do[ing] nothing" to find *Brady* material. *See* Tr. April 18, 2001, at 6.

Of course, the obligation the trial court sought to foist on defense counsel was the responsibility of the prosecution. *See California v. Trombetta*, 467 U.S. 479, 485 (1984) ("Even in the absence of a specific request, the prosecution has a constitutional duty to turn over exculpatory evidence that would raise a reasonable doubt about the defendant's guilt."). More fundamentally, the trial court's actions made clear to the government that it could avoid its disclosure obligations with

impunity, providing it no incentive to turn over exculpatory material. At most, the government would simply have to provide the material to the trial court, where it knew it would surely lie buried under seal. The trial court's failure to follow required procedures and its clearly erroneous determinations that the government did not have to turn over material it undoubtedly should have disclosed thus assured that the government's repeated disclosure failures would go unaddressed at trial.

The process that led to these repeated failures to disclose *Brady* and Jencks material also demonstrates the wisdom of the teaching in *Dennis* that the trial court is not in the best position to judge the value or usefulness of asserted *Brady* material, especially in a trial of considerable length and complexity. Had defense counsel been provided the material they would have readily seen its value for impeaching the government's witnesses and undermining its theories of the case.

### E. The evidence strongly supports the conclusion that the *Brady* violations were willful.

Even a single *Brady* violation constitutes a due process violation that can require a new trial. *United States v. Oruche*, 484 F.3d 590, 595 (D.C. Cir. 2007) ("[O]nce a court finds a *Brady* violation, a new trial follows as the prescribed remedy, not as a matter of discretion."). But as demonstrated above, this case does not present a one-off or isolated *Brady* infraction. Instead, in these proceedings the government stacked one violation after another, leaving a wealth of undisclosed *Brady* materials in its wake that was kept hidden from Appellants for almost a

decade. As the Supreme Court has explained, "suppressed evidence [must be] considered collectively, not item by item." *Kyles*, 514 U.S. at 436.

The quantity and severity of *Brady* violations in the present case goes well beyond those of another recent instance where this Court found *Brady* violations to have occurred. *See Robinson*, 68 F.4th at 1350. Here, the sheer number of instances where the government failed to fulfill its obligations under *Brady* shows a willful pattern of total disregard for the due process rights guaranteed under *Brady*. And the sampling of undisclosed *Brady* materials set forth above are almost certainly only a fraction of the total number of *Brady* violations that actually occurred in this case.[9]

---

[9] Appellants—through no fault of their own—are significantly hamstrung in even bringing this appeal, as large portions of the record continue to be unavailable because they have been apparently either lost or destroyed. Despite best efforts and repeated requests to prior defense counsel, the district court clerk, and the government, Appellate counsel has been unable to obtain trial transcripts for nearly forty days of the trial proceedings. Specifically, no transcripts have been located for the following court sessions, which include both testimony and argument sessions: 11/29/2000 PM, 01/08/2001 PM, 02/01/2001 PM, 02/14/2001 PM, 02/21/2001 AM and PM, 02/22/2001 AM and PM, 02/26/2001 PM, 02/27/2001 PM, 02/28/2001 PM, 03/01/2001 PM, 03/06/2001 PM, 03/12/2001 AM, 03/20/2001 PM, 03/21/2001 PM, 04/12/2001 AM and PM, 06/27/2001 PM, 06/28/2001 PM, 07/12/2001 AM, 07/16/2001 AM, 07/17/2001 AM and PM, 07/18/2001 AM and PM, 07/23/2001 AM and PM, 07/24/2001 AM and PM, 07/25/2001 AM and PM, 07/30/2001 AM and PM, 07/31/2001 AM and PM, 08/01/2001 AM and PM, 08/02/2001 AM and PM, 08/06/2001 AM and PM, 08/07/2001 AM, 08/08/2001 AM and PM, 08/09/2001 AM and PM, 08/12/2001 AM and PM, 08/13/2001 AM and PM, 08/14/2001 AM and PM, 08/15/2001 AM and PM, and 08/16/2001 AM and PM. And it is not merely

**F.    The pattern of withholding evidence prejudiced all Appellants.**

To prevail on their *Brady* claims, Appellants "need not show that [they each] 'more likely than not' would have been acquitted had the new evidence been admitted"; instead, they "must show only that the new evidence is sufficient to 'undermine confidence' in the verdict." *Wearry*, 577 U.S. at 392.  "[O]ne cannot be confident of the outcome when there is a 'reasonable' probability that it may be wrong." *United States v. Bowie*, 198 F.3d 905, 908–09 (D.C. Cir. 1999).  "[A]

---

trial court transcripts that have gone missing—there is no complete record of what was in fact filed under seal, and thus no assurance that everything has now been disclosed.

Given the government's documented pattern of *Brady* violations in this case, there can be little doubt the full record would only further shed light on the government's misconduct.  The absence of the transcripts, which are neither available at the clerk's office nor in the government's nor prior defense counsel's possession, is especially prejudicial to Appellants in the context of an appellate review of a pattern of alleged *Brady* violations over the course of a lengthy criminal trial.  *See Entsminger v. State of Iowa*, 386 U.S. 748, 751–52 (1967) (holding that states are required to make transcripts available to indigent defendants to ensure adequate and effective appellate review).  Where a transcript "might be critical to reviewing for alleged trial-court errors[,] affirming a conviction without one might be arbitrary," requiring vacatur of the conviction. *Bush v. Sec'y, Fla. Dep't of Corr.*, 888 F.3d 1188, 1195–96 (11th Cir. 2018).

Accordingly, to the extent this Court is not satisfied that the convictions should be vacated and the indictments dismissed or that a new trial should be granted, the *Brady* remedy of a remand should be granted at least to the extent necessary to investigate the incomplete records as habeas counsel is now severely handicapped in fulling their duty to provide effective representation and to challenge the validity of Appellants' convictions.

'reasonable probability' can be less than 50.01%. In other words, to reverse a conviction for a *Brady* violation, it does not have to be more likely than not that the defendant would have been acquitted had the evidence been disclosed." *Id.* at 908–09 (D.C. Cir. 1999). "[I]f the omitted evidence creates a reasonable doubt that did not otherwise exist, constitutional error has been committed." *United States v. Agurs*, 427 U.S. 97 (1976). *See also Cloud,* 102 F.4th at 980)("Whether a jury would ultimately find the evidence convincing and lead to an acquittal is not the measuring rod here.").

The pattern of government misconduct in these proceedings deeply undermines confidence in the verdicts as to each Appellant and every count. These "especially egregious errors" combined with the government's misrepresentations to the trial court, "so infect the integrity of the proceeding as to warrant the grant of habeas relief, even if it did not substantially influence the jury's verdict." *Brecht v. Abrahamson*, 507 U.S. 619, 638 n.9 (1993); *see United States v. Rooney*, 37 F.3d 847, 856 (2d Cir. 1994) (prejudicial spillover requires vacating judgment on all counts when evidence presented in support of an invalidated count was "otherwise . . . inadmissible on the remaining counts" and "presented in such a manner that tends to indicate that the jury probably utilized this evidence in reaching a verdict on the remaining counts"). The handling of multiple pieces of sealed evidence over

the eight-month trial undermines confidence in the entire verdict, far beyond the withholding of individual pieces of evidence.

The government's *Brady* violations hamstrung Appellants throughout the trial including these examples:

- They could not pursue alternative evidence, leads, and witnesses that had been hidden from them, which "clearly [would have] impacted the defense's preparation and presentation of its case at trial" and "dramatically altered and limited the effectiveness of [their] defense at trial" given that the knowledge of an alternative investigative lead both "would arguably carry significant weight with the jury in and of itself" and "would also have been useful in 'discredit[ing] the caliber of the investigation or the decision to charge the defendant[s].'" *Smith*, 50 F.3d at 830 (first citing *Bagley*, 473 U.S. at 683; then quoting *Bowen v. Maynard*, 799 F.2d 593 (10th Cir 1986)); *see also, e.g.*, *Fuentes v. T. Griffin*, 829 F.3d 233, 252 (2d Cir. 2016) (finding *Brady* violation when prosecution suppressed evidence that, if disclosed, may have permitted counsel "to develop [a] line of defense further by obtaining in time for trial [material] that was obtainable only after the belated discovery of the withheld [evidence]"); *Miller*, 848 F.2d at 1322–23 (concluding "that the withheld information [suggesting that another person might have committed the crime] was material within the meaning of the *Brady v. Maryland* line of cases"); *cf. United States v. Innamorati*, 996 F.2d 456, 480–81 (1st Cir. 1993) (no *Brady* violation when the defendant did not demonstrate "an avenue of investigation that would have been pursued had [the evidence] been disclosed earlier").

- They could not challenge government witnesses James Montgomery, Charles Bender, or Theodore Watson, among others, with their shifting stories and prior lies. *See United States v. Sedaghaty*, 728 F.3d 885, 903 (9th Cir. 2013) (*Brady* violation when prosecution failed to disclose notes indicating a shifting and possibly untruthful story "in light of the importance of allowing a full and fair cross-examination of government witnesses whose testimony is important to the outcome of the case"); *Nuckols v. Gibson*, 233 F.3d 1261, 1267 (10th Cir. 2000) ("[B]ecause of the value of cross-examination, when the credibility of a prosecution witness is important, impeaching evidence is subject to

*Brady* disclosure."); *Brooks*, 966 F.2d at 1504 (recognizing the importance of prosecution fulfilling its obligation to search for and disclose evidence "that may contain material exculpatory information (undermining the credibility of [the witness], either as a general matter or with special reference to this case)").

- They could not challenge Special Agent Lisi with his apparent bias and investigative tunnel-vision. *See Douglas v. Workman*, 560 F.3d 1156, 1172–73 (10th Cir. 2009) ("[N]o distinction is recognized between evidence that exculpates a defendant and 'evidence that the defense might have used to impeach the [State's] witnesses by showing bias and interest.'") (quoting *Bagley*, 473 U.S. at 676); *Smith*, 50 F.3d at 830 (recognizing that knowledge of alternative evidence, investigative leads, and witnesses "would also have been useful in 'discredit[ing] the caliber of the investigation or the decision to charge the defendant[s]'") (citation omitted).

Appellants were even hamstrung in their legal arguments. Again, one of the more contentious issues at trial was whether the out-of-court statements of deceased witness Robert "Butchie" Smith could be admitted. Had it been revealed that there were multiple other credible suspects for Smith's murder, *see* pp. 12-14, 29-31, 55-66, *supra,* the trial court may well have held that Smith's statements were inadmissible hearsay. Likewise, had it been revealed that the federal government was gatekeeping prior grand jury testimony (and potential live trial testimony) from two other paid government witnesses and lying about their whereabouts and availability, *see* pp. 43-44, 73-76, *supra,* then the trial court may well have decided that the government could not have it both ways and decline to admit Smith's testimony. Because of the prior *Brady*, *Giglio*, and Jencks Act violations, the due

process impact on Appellants was compounded, and the testimony was admitted unrebutted.

Given the pattern and significance of the *Brady*, *Giglio*, and Jencks Act violations, there is no need to conduct a defendant-by-defendant analysis of how the violations impacted each defendant or each count. The violations went to the heart of the government's case. As a RICO conspiracy case, the government repeatedly pointed to the testimony of its various cooperating witnesses to support all charges, even where individual acts could otherwise be viewed in isolation. For example, during its closing argument, the government argued to the jury: "That person isn't pulling the trigger, but the law says that if you are with a crime – if you, by your actions, want that crime to succeed, you are just as guilty as the person who pulled the trigger. The law makes no distinction. None." App. 563-564. *See also, e.g.*, App. 560-561 ("So for each and every one of them, they are responsible for what the other members sold, and they are also responsible for what other co-conspirators – other people – other members of this crew sold."); App. 569. ("And like I've said before, with respect to the charge of this kidnapping, we don't know who physically got Wysocki up and put him in that trunk. We don't know which of these defendants actually shot him. But it doesn't matter."). And that is precisely why confidence in the full verdicts is undermined—one cannot know what piece of evidence the jury found most persuasive; where, as here, the pattern of *Brady* violations went to the

heart of the government's case and their star witnesses, the prejudice must be presumed.

### G. The district court failed to properly address the merits of Appellants' § 2255 claims.

In rejecting Appellants' habeas motions, the district court did not contend with their various *Brady* arguments, erroneously concluding that the arguments were procedurally barred. The only aspect of Appellants' *Brady* challenges that the district court considered on the merits was that related to the grand jury testimony of Owens and Pinckney. Even there, the district court's analysis was superficial and wrong. The court ruled that the government "met its *Brady* obligations" with respect to Owens and Pinckney by disclosing "(1) Owens's and [Pinckney's] testimony that someone other than Carson killed the three victims; (2) the relocation payments to Owens and [Pinckney]; and (3) the fact that [Pinckney] and Owens absconded with the government's money." *Martin*, 2021 WL 4989983 at *7. The court did not consider the newly discovered evidence from Owens or its impact on the government's representations more broadly to show that the government either knew or should have known of Pinckney and Owens' whereabouts at the time it was representing it did not. Properly viewed, the repeated *Brady* violations can only be understood as a conscious pattern of abuse.

## II. Appellants Were Deprived of Their Sixth Amendment Right to Effective Assistance of Counsel When Appellate Counsel Failed to Challenge the Trial Court's *Brady*, *Giglio*, and Jencks Act Rulings Concerning Specific Portions of the Sealed Record

This Court's Certificate of Appealability asked "whether appellate counsel was ineffective for failing to challenge on direct appeal specific evidentiary rulings made by the district court pertaining to [the] sealed material [underlying Appellants' Brady claims." Appellate counsel was indeed ineffective, and that ineffectiveness led to Appellants' *Brady* challenges not being raised and addressed effectively on direct appeal, a failing that has led Appellants to spend now almost 20 additional years in prison.

### A. Standards of Review

The Sixth Amendment guarantees a criminal defendant the right to "have the assistance of counsel for his defence." U.S. Const. Amend. VI. This right includes the "right to effective assistance of counsel on appeal." *Evitts v. Lucey*, 469 U.S. 387, 397 (1985). The Supreme Court established the basic standard to assess ineffective assistance claims in *Strickland v. Washington*, 466 U.S. 668, 685–86 (1984), and it applies to both trial and appellate counsel. *See Smith v. Robbins*, 528 U.S. 259, 263 (2000) (holding that "the proper standard for evaluating" claim that appellate counsel was ineffective "is that enunciated in *Strickland. . .*"). The two-prong *Strickland* test requires showings that (1) counsel's performance was "objectively unreasonable," and (2) those deficiencies prejudiced the defense.

*Smith*, 28 U.S. at 263. "As the court resolved in *United States v. Abney*, 812 F.3d 1079, 1086–87 (D.C. Cir. 2016), our review of the denial of a § 2255 motion on the ground of ineffective assistance of counsel is *de novo*." *United States v. Aguiar*, 894 F.3d 351, 355 (D.C. Cir. 2018).

**B.      By failing to follow this Court's instructions, appellate counsel failed to function within the range of competence demanded of attorneys in criminal cases.**

On direct appeal to this Court, Sweeney's appellate counsel moved to review materials the trial court sealed for potential *Brady*, *Giglio*, and Jencks Act violations. This Court denied that request in an October 2, 2002 order, and instructed counsel instead to "identify on appeal specific evidentiary rulings" that Appellants claimed were erroneous. The Court, not appellate counsel, would then "undertake its own *in camera* review" of the disputed materials. *See* United States v Carson, No. 02-3015, 2002 WL 31246900, at * 1 (stating that "'[a] defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files.'" (quoting *Pennsylvania v. Ritchie*, 480 U.S. 39, 59 (1987)).

Despite the Court's unequivocal order, appellate counsel instead filed a motion on May 29, 2003 that, while identifying specific evidentiary rulings as this Court had directed, again requested that counsel be personally allowed to inspect the sealed materials. This was the same request this Court had already denied, citing *Ritchie* as binding precedent that such review had to be undertaken by the court and

not by counsel.  On August 28, 2003, this Court again denied the motion, admonished appellate counsel for not taking direction from its previous order, and restated the legal authority cited in its previous order.  App. 750 ("**As explained in the order filed October 2, 2002**, appellants may not review sealed portions of the trial record in order to mount a challenge to the district court's rulings under" *Brady* and the Jencks Act) (emphasis added).  This Court went on to explain, citing additional precedent as to the impropriety of counsel's request to review the material, that

> [b]ecause appellants seek to review the sealed material themselves, their motion must be denied. Any future arguments concerning the district court's application of Brady and/or the Jencks Act **should be presented in the appellants' brief,** rather than by motion.

*Id*.  (emphasis added).

This Court thus made appellate counsel's path clear.  The specific evidentiary rulings counsel identified could not be the basis for review by counsel—binding precedent foreclosed that request so that it "must be denied."  *Id*.  This Court nonetheless clearly outlined that the proper way forward was to present the identified rulings and related arguments in Appellants' brief.  Nonetheless, while the consolidated appellate brief made general references to *Brady* arguments, it failed to pinpoint specific trial court decisions regarding potential *Brady* materials, thus directly violating this Court's instructions. App. 761-770. Counsel's failure to adhere to the Court's repeated directives effectively blocked Appellants from having

their strongest arguments considered on direct appeal.

It cannot be reasonably disputed that appellate counsel's noncompliance with a court order "fell below an objective standard of reasonableness," that standard stated in *Strickland*. The explicit disregard of this Court's directives cannot be considered a reasonable strategic decision, and constitutes an unreasonable error. *See Hinton v. Alabama*, 571 U.S. 263, 274 (2014) ("An attorney's ignorance" that is "fundamental to his case" combined with his "failure to perform basic" tasks is a "quintessential example of unreasonable performance"); *Kimmelman v. Morrison*, 477 U.S. 365, 385 (1986) (deficient performance where failure to act was "not based on 'strategy'" but on counsel's mistake). The government itself acknowledged (and benefited from) this failure on direct appeal, highlighting counsel's non-compliance with the Court's clear instructions.

Appellants' counsel took this tack despite recognizing the potential importance of this material. In the first Motion to Review Sealed Material appellants' counsel argued "The heart of the appeal is the materiality of the undisclosed evidence." App. 1732. The May 29, 2003 renewed motion to review the sealed material likewise stated that the "entire defense may very well be within the FBI 302s that were not released prior to or during trial," as "defendants' entire focus was the lack of credibility of the government's witnesses." Doc. # 751872-1.

Counsel's failure to raise the issue on appeal as this Court directed is

particularly inexplicable because in the renewed motion Appellants' counsel had already listed the specific rulings at issue and presented a colorable claim that *Brady* or Jencks Act materials had been withheld. This material has been discussed above, but is briefly re-summarized here for convenience.

1. **Theodore Watson.** On February 13, 2001, after Appellants had asked to view the letters addressed to the prosecutor from Watson for Jencks Act and *Brady* material, the government represented it had reviewed then and here was no Brady or Jencks material. App. 278. The trial court denied the request, marked the letters as "Courts Exhibit 5," and placed them under seal. App. 279. The defense also sought communications between the prosecutors and Watson regarding cooperation and leniency, including the reasons he was denied a 5K1 letter, in order to attack his credibility by showing that he was motivated to testify against Appellants by either the explicit or implicit promise of leniency and that the government itself harbored doubts about his credibility. App. 273-74.

2. **James Montgomery.** On March 7, 2001, Appellants requested FBI 302s for Montgomery with particular reference to Butchie Smith and Jencks Act material regarding Agent Lisi. App. 303-306. The trial court stated the material did not contain information the government was required to disclose, App. 305, and that Agent Lisi's notes did not contain either *Brady* or Jencks Act material. App. 322, and it allowed the defense access only to redacted versions of the FBI 302s.

3. **Reginal Switzer.** On January 30, 2001, Appellants requested during Switzer's testimony the handwritten notes of AUSA Zeidenberg and AUSA Chaturvedi taken during their interview of Switzer, but the trial judge ruled that these notes were not Jencks Act material. App. 216-17.

4. **Andre Murray.** On February 1, 2001, Appellants requested material from Detective Fulton regarding the reliability of Murray. App. 223-24. The trial court held it was not Jencks Act material because it did not concern events about which Murray testified, despite Appellants' contention that the reliability of one of the government's "star" witnesses was inherently material to their defense and that the notes were adopted or approved by Murray or were substantially verbatim accounts of his interview. *Id.* 18 U.S.C. § 3500(e)(l), (e)(2). The court also denied a February 1, 2001 request for letters that Murray had written to AUSA Wainstein stating he did not want any "help" from AUSA Zeidenberg, App. 224. and for notes taken by AUSA Wainstein during his interview with Murray that the trial court found was conceivably *Brady* material but refused to order disclosure of because the source of the information was defendant Hill and not Murray. App. 223 Defense counsel reviewed its request for Murray's letters to AUSA Wainstein on February 5, 2001, but were allowed only redacted versions that removed references to offenses not related to the case, even though Murray had denied cooperating with the government in relation to those other offenses.

5.    **Arthur Rice.**  On April 24, 2001, Appellants requested the FBI 302's in regard to government witness Arthur Rice. The trial court reviewed the January 27, 1999 302 and stated that it contained no information that would permit it to be characterized as *Brady* material, and that it was clearly not a *Jencks* statement.  App. 469.

The requested FBI 302 qualifies as a statement producible under the Jencks Act if it has been adopted or approved by Mr. Rice, or if it is a substantially verbatim account of Mr. Rice's interview. 18 U.S.C. sec. 3500(e)(l) and (2). The trial court gave no reason why the 302 did not constitute a Jencks statement, and appellate counsel failed to identify this error for direct review.

Prejudice from the failure to pursue these matters on direct appeal is presumed because of the government's and the trial court's actions of placing the material under seal and thus denying Appellants any access to it, and from the fact that the failure precluded the matter from being considered on appeal.  *See Strickland*, 466 U.S. at 692 ("In certain Sixth Amendment contexts, prejudice is presumed . . . [including] various kinds of state interference with counsel's assistance"); *United States v. Cronic*, 466 U.S. 648, 659 & n.25 (1984).  Even if a showing of prejudice were required, the prejudice here is clear.  Had appellate counsel raised the critical *Brady* issue in the briefs on appeal, this Court would have reviewed the material *in*

*camera* and found widespread *Brady* and Jencks Act violations had indeed occurred, as detailed above. *See* pp. 54-76, *supra*.

Finally, counsel's failure to raise this issue as this Court had twice directed cannot be excused as a rational strategy to limit the number of appellate issues to the strongest ones. The opening brief of appeal raised 15 separate arguments in 71,583 words. App. 751-771. None of these arguments, all of which this Court rejected (including dismissal of a juror during deliberations, judicial bias, confrontation clause challenges, joinder, and sentencing challenges), were stronger than the *Brady* and Jencks Act arguments, which themselves would have been greatly strengthened by access to the sealed material. Instead, appellate counsel raised three poorly developed *Brady* arguments, with the result that this Court's opinion affirming the convictions on direct appeal contains only one passing reference to *Brady* in the context of "allegedly biased rulings by the trial judge." *Carson*, 455 F.3d at 355.

Taking each of the three virtually undeveloped *Brady* arguments in turn, the direct appeal briefs first suggested that Brady material that *had* been turned over should have been turned over sooner and that the trial court's failure to do so was evidence of bias. App. 761-63 (referring to an earlier inconsistent statement of government witness Charlene Wilson as to the Fortune murder that was provided four months after Wilson testified; disclosure of Jencks Act materials within "48 hours of the time the witness would be called to the stand," and the failure to have

been given "well before trial" evidence that another witness had confessed to lying in a debriefing). Framing the issue as bias was particularly ineffective because a bias claim can almost never be based on trial rulings. The second attempt at a *Brady* argument was limited to Carson and Martin's convictions for the Fortune murder and largely rehashed the first argument, with some additional detail and the name of the FBI agent whose cross-examination allowed the defense "four months later" to learn of "the existence of a contrary, undisclosed FBI record of Wilson's prior inconsistent statement." App. 767. The final reference was a sub-argument that the trial court "erred in denying defendant sanctions for *Brady* violations." App. 768-69. This argument was necessarily based on the prior alleged *Brady* issues and again did not relate in any way to the sealed material. Appellate counsel's failure to raise the issue of the material sealed by the trial court under the procedure this Court directed was unreasonable and could not be a strategic choice to advance Appellants' strongest argument.

The record shows a reasonable probability that if the sealed material had been disclosed the trial would have been different in terms of impeachment of the cooperators and the presentation of alternative theories of the case. As this Court has said, the question of materiality is simply whether the withheld evidence, if disclosed to the jury, would have placed the government's case (evidence) "in a different light." *U.S. v. Johnson,* 592 F.3d 164, 172 (D.C. Cir. 2010).

In *United States v. Flores-Rivera*, 787 F.3d 1 (1st Cir. 2015), the U.S. Court of Appeals for the First Circuit reversed two convictions on *Brady* grounds where the government withheld material evidence tending to show that its three star witnesses perjured themselves. The case turned substantially on the credibility of those witnesses, and included a government witness's undisclosed handwritten notes showing that, like Theodore Watson in this case, one of the witnesses was a "fawning, desperate supplicant willing to 'do everything [the prosecutor] said'" to obtain relief. *Id*. at 19. The First Circuit held that the letter was "greatly" probative because it would have been "a powerful tool in the hands of any good trial counsel to call into question the credibility of both the key witness and, implicitly, the lead prosecutor." *Id*.

Appellate counsel's failure to follow this Court's express and explicit instructions prevented any effective review of the *Brady* issues on direct appeal. The error, combined with the meritorious *Brady* claims detailed above, demonstrates clear prejudice to Appellants' case. Appellate counsel's failure to follow this Court's explicit orders represents a textbook example of deficient performance. This deficient performance, coupled with the resulting prejudice, necessitates a finding of ineffective assistance of appellate counsel.

## III. Appellants' Claims Are Properly Before the Court Because They Were Timely Raised Once Discovered and Related Back to Timely § 2255 Motions.

As noted above, in rejecting Appellants' § 2255 motions, the district court did not reach any of the claims detailed above. Instead, the district court broadly ruled that each Appellant's argument was untimely. That ruling was incorrect.

### A. Standards of Review

28 U.S.C. § 2255(f) sets a one-year limitation for filing a motion to vacate, set aside, or correct a sentence "upon the ground that the sentence was imposed in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack," and establishes that the limitation will run from the latest of four enumerated circumstances, three of which are relevant here. The one-year limitations period will start to run from:

- "the date on which the judgment of conviction becomes final," 28 U.S.C. § 2255(f)(1);

- "the date on which the impediment to making a motion created by governmental action in violation of the Constitution or laws of the United States is removed, if the movant was prevented from making a motion by such governmental action," *id.* § 2255(f)(2); or

- "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence," *id.* § 2255(f)(4).

The movant gets the most favorable of the applicable dates to start the running of the limitations period.  28 U.S.C. § 2255(f).  All Appellants in this case filed timely § 2255 motions that raised the *Brady*, *Giglio*, and Jencks Act issues at the center of this appeal, either directly or by adopting the arguments of their co-defendants.

As described in more detail below, Appellants did not make, and could not have made within the one-year deadline of § 2255(f)(1), the kinds of detailed claims required by Habeas Corpus Rule 2(c), which states that a petition must "specify all the grounds for relief available to the petitioner" and "state the facts supporting each ground."  *See generally Mayle v. Felix*, 545 U.S. 644, 655 (2005).  However, the potential harshness of this requirement, which read strictly would bar a habeas petitioner from relief in any circumstances in which the petitioner was unable to obtain wrongfully withheld *Brady* materials until after the statutory deadline, is tempered by two doctrines.

*First*, petitioners who timely file claims can supplement them at a later date, and those claims will be deemed timely if they satisfy the relatively liberal standard applicable to "relation back" under Fed. R. Civ. P. 15(c)(1)(B): "relation back depends on the existence of a common core of operative facts uniting the original and newly asserted claims." *Mayle*, 545 U.S. at 659 (citation and internal quotations marks omitted).  In this case, each Appellant filed a timely § 2255 motion raising *Brady* arguments, and the later-filed supplements—which could only be filed after

Appellants had received and investigated the sealed materials—directly related back to (and filled out) those arguments.

*Second*, even where there is not a timely petition to which later filings relate back, as provided by the statute, a petitioner can file a claim based on newly discovered evidence with the one-year statute of limitations running from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." 28 U.S.C. § 2255(f)(4). While this analysis is somewhat fact-intensive, the record reflects that all Appellants exercised due diligence to identify such claims.

Any claim of prejudice here from the time it took Appellants to perfect their habeas arguments would ring hollow. Further, as the record amply demonstrates, the running of the statute of limitation period was tolled throughout this period by filing extensions granted by the district court, or by periods in which Appellants were awaiting the appointment of counsel following orders by the court for the appointment of such, or seeking access to sealed material and missing transcripts. All the while, the only reason it took Appellants years to present their arguments is because the government and trial court had improperly withheld and sealed materials in the first place. It is the Appellants that have suffered prejudice, not the government.

## B. Appellants' subsequent supplemental motions relate back to the timely, specific claims they initially raised.

### 1) Legal Standard

Relation back of claims made in § 2255 motions is governed by Federal Rule of Civil Procedure 15. Although this Court has not explicitly decided the question, sister circuits that have considered the issue agree that this is a legal question entitled to *de novo* review under the Supreme Court's decision in *Krupski v. Costa Crociere S.p.A*, 560 U.S. 538 (2010). *See Mungin v. Sec'y, Fla. Dep't of Corr.*, 89 F.4th 1308, 1322 n.2 (11th Cir. 2024) (collecting cases).

Under Federal Rule of Civil Procedure 15, an amendment to a pleading "relates back" to the date of the original pleading when "the amendment asserts a claim or defense that arose out of the conduct, transaction, or occurrence set out— or attempted to be set out—in the original pleading." Fed. R. Civ. P. 15(c)(1); *see also United States v. Hicks*, 283 F.3d 380, 387–88 (D.C. Cir. 2002) (applying the "relation back" principles of Rule 15(c) to a § 2255 claim). As this Court stated in *Hicks,* "the 'permissive approach' evinced by Rule 15(a) to the amendment of pleadings applies with equal force to § 2255 motions," 283 F.3d at 386 (quoting *United States v. Thomas,* 221 F.3d 430, 435–36 (3d Cir. 2000)).

The Eighth Circuit has held that even "generalized assertions that evidence obtained by [relevant law enforcement] was withheld" are sufficient to allow more particularized, later claims, to relate back. *See Mandacina v. United States*, 328 F.3d

995, 1000 (8th Cir. 2003); *see also Mayle*, 545 U.S. at 664 n.7 (citing *Mandacina* with approval). The Ninth Circuit reached a similar result in *Valdovinos v. McGrath*, holding that new allegations about the withholding of an anonymous letter and a crime scene photo that both pointed to a different perpetrator related back to previous *Brady* allegations about the withholding of impeachment material and a police station photo line-up because they were of the "same type"—*i.e.*, allegations of "suppressed exculpatory evidence" the "government had in its file." 598 F.3d 568, 575 (9th Cir. 2010), *vacated sub nom. Horel v. Valdovinos*, 562 U.S. 1196 (2011), *reaffirmed on remand,* 423 F. App'x 720 (9th Cir. 2011); *see also Woodward v. Williams*, 263 F.3d 1135, 1142 (10th Cir. 2001) (allowing relation back when an amendment simply "clarifies or amplifies a claim or theory in the original") (citation and internal quotation marks omitted); *cf. Hicks*, 283 F.3d at 388 ("[I]n cases in which [sufficient notice of the facts and claims giving rise to the proposed amendment] has been afforded, for example where the prisoner's amendment seeks merely to elaborate upon his earlier claims, this effort should not generally be barred by the statute of limitations. Thus, . . . an amendment offered for the purpose of adding to or amplifying the facts already alleged in support of a particular claim may relate back . . . .") (citations omitted).

    A petitioner need not succeed in setting out the operative facts for the later filed claims to relate back: he need only attempt to do so. "The central question

under this framework is whether the amended and original petitions share a common core of operative facts, as those facts are laid out in the amended petition and 'attempted to be set out' in the original petition." *Ross v. William*s, 950 F.3d 1160, 1168 (9th Cir. 2020) (quoting Fed. R. Civ. P. 15(c)(1)(B)). The quality of the attempt must be measured against the information available to the petitioner at the time of the original petition. *See Slayton v. Am. Exp. Co.*, 460 F.3d 215, 229 (2d Cir. 2006), (originally pleaded "claim gave adequate notice of the amended complaint's allegation"); *see also Krupski*., 560 U.S. at 550 (noting remedial purposes of amendments to Rule 15 and "the preference expressed in the Federal Rules of Civil Procedure in general, and Rule 15 in particular, for resolving disputes on their merits").

### 2) Each Appellant made sufficiently concrete claims in his original motion to which the later claims relate back.

#### (a) Sweeney

Sweeney's conviction became final on February 20, 2007, when the Supreme Court denied his petition for certiorari. *See Carson v. United States*, 549 U.S. 1246, 1246 (2007). On February 5, 2008, his counsel filed an emergency motion for access to material the government had filed with the trial court *ex parte* and under seal. On February 15, 2008, the district court ordered the clerk's office to provide "copies of any necessary sealed pleadings in this matter to counsel for William Sweeney." App. 122 [ECF 1016]. That same day, his counsel went to the clerk's office looking

for the documents, but the clerk's office could not find them. *See* App. 1690. Four days later, on February 18, 2008, Sweeney filed a § 2255 motion to vacate his convictions. *See* App. 951-67.

At that time, Sweeney did not have access to the sealed *Brady/Giglio* materials, which he would not begin to be able to access for another two years. Nonetheless, based on what he did know, and incorporating the arguments that he had previously made on his direct appeal, Sweeney made the following arguments: "[P]rosecutors engaged in . . . the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony, in violation of Mr. Sweeney's constitutional rights, but counsel needs further investigation as well as a complete set of discovery, Jencks, *Brady* and *Giglio* provided to trial counsel." App. 966. "In violation of Mr. Sweeney's right to effective assistance on appeal [], appellate counsel failed to note sections of sealed matters for the Court to review and to cite authority for those requests, in contradiction of the Circuit's direct order (October 2, 2002), although such authority had been provided in the joint co-appellants' motion, so Mr. Sweeney's convictions in this matter were without judicial review of the undisclosed materials[.]" App. 962.

These arguments sufficiently identified the arguments that Sweeney developed in his supplemental motions filed in 2014 and 2015 (and has now raised on this appeal), that: (1) Montgomery lied to prosecutors and withheld evidence that

would have otherwise contradicted his testimony at trial; (2) Watson lied to prosecutors in a separate case, which the government knew about; and (3) the government failed to disclose evidence of alternative suspects in "Butchie" Smith's murder.[10]  *See* pp. 54-76, *supra.*

In each case, the arguments raised by Sweeney in his supplemental motions are encompassed within the claim made in Sweeney's initial 2008 motion that the government had engaged in "the nondisclosure and late disclosure of *Brady* information and the use of perjured testimony" in the trial of the case against Sweeney.  Sweeney's motion also noted that "counsel needs further investigation as well as a complete set of discovery, Jencks, *Brady* and *Giglio* provided to trial counsel."  App. 966.   The later claims all fall within the "common core of operative facts" laid out in Sweeney's initial motion.

Finally, the question of whether the later claims "relate back" must be considered in light of the facts of this case.   The government had withheld *Brady*/*Giglio* and Jencks Act materials and was thus "on notice" of the claims Sweeney could raise even when Sweeney himself was not.  Accordingly, permitting "relation back" here would not prejudice the government.   *Cf. Hicks*, 283 F.3d at

---

[10] These supplements did not require the government's consent or leave of the court because the government had not yet filed a response, and did not do so until 2020. *See* Fed. R. Civ. P. 15(a)(1)(B).

389(relation back not allowed where the amended claim was "completely different from that asserted in the original § 2255 motion," because it "advances an entirely new legal theory that arises from an entirely different set of facts and type of conduct").

### (b) Martin

Martin's conviction became final on February 20, 2007, the same date as Sweeney's, when the Supreme Court denied his petition for certiorari. *See Carson*, 549 U.S. at 1246. Martin filed a timely first motion under § 2255 on February 18, 2008. App. 968-984. The two claims this motion, that the government withheld evidence exonerating Martin and Carson for murder, and that the government had prevented Martin from calling a helpful witness, were both timely and adequately described, even though they of necessity could not consider or be based on the abundant additional evidence of *Brady/Giglio* and Jencks violations that began to become available in June, 2010. App. 973-87. Martin filed a supplemental motion on November 21, 2018. App. 1651-1688. All of Martin's claims are accordingly timely.

### (c) Coates

Coates filed a timely first motion under § 2255 on February 19, 2008. App. 991-1043. While Coates, like the other Appellants, did not have access to the sealed materials at that time, he argued that he had received ineffective assistance of trial and appellate counsel and asserted that the government had withheld *Brady*, *Giglio*,

and Jencks Act material, specifically information that would have allowed Appellants to effectively impeach one of the government's key witnesses, James Montgomery, whose key testimony is described in detail above. App. 994. Coates filed a supplemental motions on February 10, 2015. App. 1155-1163.

While Coates's own motions under § 2255 did not in each case list out every aspect of the *Brady*, *Giglio*, and Jencks Act violations now raised, they argued from the outset—and with consistency—that his due process rights had been violated in these fundamental ways, and the district court expressly permitted Coates to join the applications of his co-defendants who made the arguments in more detail. App. 132 [ECFR 1194]. Thus, Coates appropriately, and timely, preserved the claims now presented.

### (d) Carson

Carson filed his original timely motion under § 2255 pro se on February 18, 2008, and the filing was docketed ten days later. App. 985.[11] The motion raised claims of due process violations and ineffective assistance of counsel . Carson, through his former appellate counsel, thereafter moved to join the petitions filed by

---

[11] This filing was date-stamped February 28, 2008 but signed by Carson on February 18, 2008. The district court noted that there was a factual dispute between Carson and the government as to whether the filing was timely under the "jailhouse mailing rule" but did not decide, assuming for the purposes of the motion that Carson had filed timely. App. 1701 n.4.

Sweeney, Coates and Martin, and for appointment of counsel under the Criminal Justice Act to pursue his post-conviction claims. App. 170.

Carson supplemented his motion on April 9, 2015. App. 1289. In his first supplement, Carson made claims based on the undisclosed *Brady/Giglio* materials described above in connection with James Montgomery and Theodore Watson, as well as claims of ineffective assistance of trial counsel and judicial interference. *Id.* Carson further supplemented his motion on July 1, 2020. App. 137.

As with Coates, the district court permitted Carson to join the applications of his co-defendants. App. 131.

> **C. The supplemental claims are timely, even if they do not relate back, because they arise from newly discovered evidence, were filed within deadlines set by the district court, or were subject to equitable tolling.**

Appellants' supplemental claims are timely, regardless of whether they relate back to the original claims. If the supplemental claims do not relate back, they are still timely because they are based on newly discovered evidence, were filed within deadlines set by the district court, or were equitably tolled. Alternatively, even if the supplemental claims do not relate back to the timely original motions, they are still timely because of the late discovery of the *Brady/Giglio* materials and the numerous extensions granted by the district court for filing supplements or appointing counsel.

### 1)     Legal Standard

Section 2255's one-year statute of limitations commences on "the date on which the facts supporting the claim . . . could have been discovered through the exercise of due diligence."   28 U.S.C. § 2255(f)(4).   The prosecution has "an affirmative duty to disclose exculpatory evidence to the defense, even if no request has been made by the accused." *United States v. Borda*, 848 F.3d 1044, 1066 (D.C. Cir. 2017) (citing *Strickler*, 527 U.S. at 280; *Brady*, 373 U.S. at 87).   Defendants have no obligation to "scavenge for hints of undisclosed *Brady* material when the prosecution represents that all such material has been disclosed." *Banks v. Dretke*, 540 U.S. at 695.  *See also Cloud*, 102 F.4th at 976 ("the Government's obligation is not contingent on a request by the accused").   Thus, the statute of limitations did not begin running until the district court's order granting access to the sealed documents. *See Carter v. Bigelow*, 787 F.3d 1269, 1282 (10th Cir. 2015) (statute of limitations begins running a reasonable time after a defendant first gains access to previously undisclosed *Brady* material).

In the case of a *Brady* violation, those facts include whether the prosecution suppressed evidence that was favorable to the accused.  *See Jimerson v. Payne*, 957 F.3d 916, 925 (8th Cir. 2020); *see also Strickler v. Greene*, 527 U.S. at 281–82. While Appellants knew evidence had been suppressed, they did not know the contents of what had been suppressed or whether it was favorable to them.   The

government had represented to the trial court it was not favorable. Accordingly, until the *Brady*/*Giglio* materials were both unsealed and in fact available to Appellants, they had an "unsubstantiated suspicion" the government had violated *Brady*, *see Jefferson v. United States,* 730 F.3d 537, 547 (6th Cir. 2013)*,* which is not enough to trigger the running of the statute of limitations.[12]

The time to file a § 2255 motion is also tolled by court-ordered extensions for the filing of necessary papers. *See, e.g.*, *Sossa v. Diaz*, 729 F.3d 1225, 1235 (9th Cir. 2013) (magistrate judge's scheduling order tolled statute of limitations) ("No litigant, pro se or otherwise, asks for an extension of time to file an untimely petition."); *Prieto v. Quarterman*, 456 F.3d 511, 513–15 (5th Cir. 2006). Motions for the appointment of counsel also toll the statute of limitations until disposed of by the district court. *See Bull S.A. v. Comer*, 55 F.3d 678, 681 (D.C. Cir. 1995) ("[C]ourts may properly allow tolling where . . . a motion for appointment of counsel is pending and equity would justify tolling the statutory period until the motion is acted upon[.]") (citations omitted).

---

[12] None of this undermines Appellants' argument in the previous section that the later filed claims "relate back" to their indisputably timely original motions. Appellants identified with sufficient concreteness the *Brady*/*Giglio* claims that the government was undeniably aware of well before the statute of limitations even started to run.

This Court reviews *de novo* the district court's decision regarding equitable tolling. *See Robinson v. Dep't of Homeland Sec. Office of Inspector Gen.*, 71 F.4th 51, 58 (D.C. Cir. 2023).

> ### 2)  Appellants' claims in the supplemental motions based on the *Brady/Giglio* materials were timely filed.

Appellants repeatedly asked for the sealed material to be disclosed to them, first at trial and then on appeal. The government represented that the material was not *Brady*, and the district court refused to unseal it. Just days before Appellants' motions were due, the district court finally ordered the materials unsealed, but the clerk's office could not locate the documents until June 2010, as set out in a declaration by Sweeney's counsel, Jenifer Wicks. App. 1690. *See* pp.35-36 & n. 3, *supra*.[13] Given the volume of the materials (more than a thousand pages) and that

---

[13] The district court seemed to accept this clear attestation that Appellants did not receive the *Brady/Giglio* materials until June 17, 2010, which was squarely supported by Ms. Wicks' declaration as to her repeated unsuccessful attempts to obtain it before them. App. 1689-90. The district court suggested at another point, however, that another counsel conceded that the materials had been produced in 2008. App. 1694. The cited statement makes no such concession. First, it was made by a counsel, Ms. West, who did not enter the case until November, 2010, and thus unlike Ms. Wicks did not have firsthand knowledge of the matter. App. 125 [ECF 1060] entry of appearance by West on Nov. 10, 2010). Ms. West's statement was part of a larger discussion about the government's failure to produce the *Brady/Giglio* materials, and noted that "no record has been released to the defense indexing the material presented to the Court that matches up with the documents released by the Clerk's office in 2008." Nothing in this comment or the related footnote (such as "Several documents turned over by the clerk in 2008 as part of the

Appellants were incarcerated at this time, one hundred and twenty days or until mid-October 2010 is a reasonable time for Appellants to be deemed to have obtained access to the *Brady/Giglio* materials such that the statute of limitations could be deemed to be running.

The district court's conclusion that the statute of limitations started running on Appellants' claims based on the *Brady/Giglio* materials more than two years before they had access to them, *Martin*, 2022 WL 1618869, at *5, without any discussion of when any Appellant actually obtained those materials or was able to make practical use of them, is not supported by the facts, law, or logic. The district

---

sealed exhibits are not listed on the Court's exhibit list as having been sealed") conceded or was intended to concede that Appellants (or any of the defendants) had had actually received the *Brady/Giglio* materials in 2008, even though the Clerk's office had been ordered to turn them over then.

In fact, as Ms. Wicks averred, Appellants did not obtain access to *any* of the sealed *Brady/Giglio* materials until June, 2010. App. 1690. Some appellants did not receive full access for several more years, as some of the documents remained sealed as to them. *See* App. 1153 (2015 filing referencing the materials apparently still under seal: "during a status hearing some time ago before this Honorable Court, undersigned counsel argued that these exhibits [*i.e.*, the ones attached to Sweeney's Supplemental Motion to Vacate] should be unsealed as to all parties to the litigation, not just one party and the Court orally from the bench granted that motion."

To the extent that there was any remaining contention that Appellants were able to obtain any access to the *Brady/Giglio* materials before June, 2010, or effective access before October, 2010, and the district court was intending to rely on that fact in making its ruling, the district court should have held a hearing to confirm the matter. The district court held no hearings in connection with Appellants' § 2255 applications.

court acknowledged that, for example, Sweeney, despite vigorously challenging the government's efforts to withhold the *Brady*/*Giglio* materials until June 2010, still lacked access to those documents by February 20, 2008, the deadline under § 2255(f)(1). *Id*. at *4. Then, although Sweeney, practically speaking, could not have identified the errors resulting from the *Brady*/*Giglio* violations in his initial motion, the district court denied Sweeney relief because he alleged violations of *Brady*, *Giglio*, and the Jencks Act in his 2008 motion "at a high level of generality." *Id.* at *7.

This demand for the impossible is particularly indefensible in setting the statute of limitations for constitutional claims of government misconduct resulting in life sentences for Appellants. "Because of the nature of a *Brady* violation, the petitioner often cannot learn of such a violation at all, even when acting diligently, unless and until the government discloses it." *Scott v. United States*, 890 F.3d 1239, 1250 (11th Cir. 2018).[14] Were the district court's reasoning correct, the government could insulate any trial result by preventing the defendant from obtaining the relevant *Brady* material until after the "one year" statute under § 2255(f)(1) had run,

---

[14] The Eleventh Circuit in *Scott* ultimately declined to grant relief under § 2255 on the basis that the petitioner's § 2255 motion alleging *Brady* violations was a "second or successive" motion that could not satisfy the stringent requirements of AEDPA for such motions. *See* 890 F.3d at 1243. Because Appellants each filed only one motion for § 2255 purposes, these concerns do not apply to this case.

an outcome that would effectively nullify the writ. "So imprisoning someone based on the results of an unfair trial and then precluding any remedy at all might well work a suspension of the writ of habeas corpus." *Scott*, 890 F.3d at 1251.

In a case addressing a similar factual scenario in the context of a "second or successive" application under § 2254, the Sixth Circuit held that "[t]he prosecution has a constitutional obligation under *Brady* to provide material exculpatory and impeachment evidence and the defendant is not required to request continuously *Brady* information in order to show due diligence." *In re Keith*, 2018 WL 8807240, at *6 (6th Cir. Oct. 26, 2018) (citing *Montgomery v. Bobby*, 654 F.3d 668, 678 (6th Cir. 2011)(en banc)). Because the petitioner in that case had continually made reasonable and appropriate efforts to obtain the information the government had withheld from him, the appropriate time for the statute of limitations was the date the petitioner obtained the *Brady* material needed to flesh out his claims. *See Baugh v. Nagy*, 2022 WL 4589117, at *9 (6th Cir. Sept. 30, 2022) (§ 2254 petitioner "could not have discovered [*Brady* material] earlier through due diligence"). Other decisions have reached the same conclusion. *See, e.g.*, *In re Wogenstahl*, 902 F.3d 621, 629 (6th Cir. 2018) (given the government's refusal to produce *Brady* timely despite § 2254 petitioner's request, statute of limitations started from time *Brady* material was received); *Douglas v. Workman*, 560 F.3d 1156, 1192 (10th Cir. 2009) (same).

Accordingly, the earliest that the statute of limitations could have started running against any of Appellants' claims in this appeal was from the date that they could have made effective use of the *Brady*, *Giglio*, and Jencks Act materials, or no earlier than October 2010.[15]

> **3)    The running of the statute of limitations was tolled by orders extending the parties' time to respond or for appointment of counsel.**

The district court's timeliness rulings are particularly hard to square with the fact that, beginning shortly after Appellants filed their original motions in February 2008, both the government and Appellants made numerous applications for extensions of time to respond, each of which the district court consistently granted. On May 7, 2008, Martin moved for a stay of the § 2255 proceedings for the purpose of allowing Martin to amend or supplement his motion, App. 123 [ECF 1028], to which the government responded six months later and did not object. *Id*. [ECF 1036]. In March 2010, the district court ordered the government to respond to Carson's, Coates's, and Sweeney's motions within 30 days. App. 124 [ECF 1042-44]. In April 2010, the government, without opposition, moved for an additional 90 days in which to respond as to those three motions. *Id.* [ECF 1048.] The district

---

[15] As noted below, Appellants were making applications for extension of time starting in May 2008 and continuing throughout this period, meaning that there were overlapping and independent bases for tolling throughout much of this period.

court granted Carson's, Coates's, and Sweeney's motions for an extension of their time April 7, 2010. *Id.* In July 2010, the government again moved without opposition for an extension of time, this time for 90 days after Sweeney had filed a supplemental motion, which Sweeney was scheduled to do in October 2010, making the government's response to all three motions due January 3, 2011.[16] App. 124-25 [ECF 1053]

In September 2010, Sweeney moved to extend his time to file a supplemental motion by 45 days and requested a corresponding extension of the government's time to respond to all three motions. App. 125 [ECF 1056]. Sweeney's motions were granted. App. 125 [ECF 1057]. Additional orders granting extensions of time for some or all Appellants were entered on November 23, 2010, App. 125 [ECF 1064]; February 3, 2011, *Id*. [ECF 1066]; May 31, 2011, App. 126 [ECF 1073]; December 6, 2011, *Id.* [ECF 1081];[17] July 24, 2012, App. 127 [ECF 1097]; May 9

---

[16] The government noted in its motion that the application for a stay filed by Martin had been awaiting action by the district court since the government filed its response, stating its lack of opposition to the motion to stay, in November 2008.

[17] The district court noted in its decision that Sweeney did not comply with this deadline set in this order to file a supplemental motion by July 30, 2012. App. 1760. However, the district court disregarded that Sweeney was without counsel for almost all of this period. The deadline was set on December 6, 2011, App. 126 [ECF 1081], and Sweeney's then-lawyer's motion to withdraw was granted 10 days later, on December 16, 2011. Id. [ECF 1083]. New counsel appeared for Sweeney approximately one year later, on December 7, 2012. App. 127 [ECF 1105].

2013. *Id.* [ECF 1115], September 3, 2013, App. 128 [ECF 1122]; May 29, 2014, *Id.* [ECF 1128]; November 25, 2014, App. 129 [ECF 1137]; December 1, 2014, *Id.* [ECF 1149]; and February 25, 2015, App. 130 [ECF 1158].

On July 14, 2020, Section 2255 counsel for Sweeney filed a 24-page Reply to the Government's Opposition to his motion to vacate addressing in great detail the procedural, equitable tolling, and relation back aspects of the government's argument. *See* App. 1766-1828. Counsel attached to his Reply seven letters from Sweeney, written over several years, which showed where he had repeatedly and diligently taken steps to preserve his legal rights. Sweeney identified relevant legal precedent for his counsel. App. 1797-98. He highlighted witnesses for her to speak to, records for her to review, and reviewed reams of unsealed material to identify Brady evidence himself.[18]

---

Furthermore, the district court ordered an additional nine-month extension in September 2013 without a mention of this gap. App. 128 [ECF 1122]. In any event, even if this approximately nine-month gap between the appearance of new counsel and the order granting an extension were charged against Sweeney, his supplemental motions would still be timely filed because no other time ran against the statute of limitations before Sweeney filed his supplemental motions, meaning that less than one year of time had passed untolled since the time Sweeney was able to make effective use of the *Brady*/*Giglio* materials.

[18] *See, e.g.,* App. 1824-25 (listing parts of the record where material was placed under seal) App. 1818-22 (describing Brady material). Sweeney wrote letters with detailed notes and theories of relief that he sent to Wicks for inclusion in his supplemental petition. *See* App. 1793-1808, 1818-22 (five separate letters with

Counsel did not act on these requests despite repeated requests from Sweeney and his family. *See* Sweeney Affidavit, ECF No. 1280, at 5. *Cf. Holland v. Florida,* 560 U.S. 631, 653, n.3 (2010) (equitable tolling is appropriate where a lawyer "abandons" her client). *Holland* identifies such conduct as supporting an equitable tolling claim. 560 U.S. at 652.

The district court disposed of Sweeney's equitable tolling argument on the basis that despite his counsel's dereliction, "nothing prevented [Sweeney] from filing the motion pro se." This holding is contrary to *United States v. McDade,* 699 F.3d 499 (D.C. Cir. 2012), where the defendant hired an attorney to perfect his Motion for Relief from Judgment under 28 U.S.C. § 2255 and despite his requests to his counsel to include a claim of attorney error for failure to interview potential impeachment witnesses, "counsel inadvertently omitted this claim." *Id.* at 501. This Court found equitable tolling was warranted because McDade, like Sweeney here, researched and gathered evidence in support of his claim, told his counsel what he hoped to be included in his petition, expressed his desire to file the petition expeditiously, requested counsel send him a draft of the motion, and his counsel

---

same. He also emphasized the importance of filing his supplemental petition promptly and requested she send him a draft. *See* App. 1796, 1800, 1810-14, 1827-31.

failed to comply. 699 F.3d at 501-05.  Indeed Sweeney's diligence was greater here, where he wrote a letter to his attorney in August 2010 "laying out the Brady material 'in impressive detail.'"  App. 1705.

Like McDade, Sweeney was diligent in exercising his rights, conveyed the substance of the arguments to counsel for filing, and his counsel "failed to heed [his] requests until after the § 2255 deadline had passed."  699 F.3d at 505.  Sweeney also filed affidavits from his new counsel outlining all of this,  but the district judge ignored all of the evidence of abandonment.  *See* App. 1790-1828 (ten exhibits outlining the evidence).  In any event, Sweeney's affidavit, which detailed firm assurances from his prior counsel Ms. Wicks unequivocally demonstrates that Sweeney was effectively abandoned by his attorney.  *See* App. 1829-1831.  As such, tolling was appropriate. *See Cadet v. Fla. Dept. of Corr*., 853 F.3d 1216, 1227 & n.2 (11th Cir. 2017) (attorney abandonment is grounds for equitable tolling); *Jimenez v. Hunter,* 741 Fed. Appx. 189, 192 (5th Cir. 2018) (tolling warranted for abandonment).

On April 7, 2017, the district court entered an order summarizing the above history of extensions, noting that all Appellants had filed supplemental motions in addition to the original motions, and granted an additional 30 days for Appellants to file any additional supplemental motions and for the government to file its response within 60 days.  App. 131 [ECF 1188]  On June 19, 2017, the district court granted

Carson's and Coates's motions to join the motions of their co-defendants and further granted Coates's motion to file a late supplement to his motion, and denied as moot motions by Martin, Carson, Coates, and Sweeney for extensions to file supplements as having been addressed by the district court's April 17, 2017 Order.[19]   App 132 [ECF 1194-1195].  Based on difficulties of Martin's counsel, the time for filing his petition was extended several additional times, and was ultimately filed in November, 2018.  App. 134 [ECF 1233]  The government filed several requests for extensions to file its response to the motions and supplements, and did not file that response until June 11, 2020.  App 136 [ECF 1255].  Appellants filed replies, and the district court decided the motions on October 27, 2021.  App 138 [ECF 1284], App. 1691-1739.

---

[19] Throughout this period, Appellants also filed several motions for appointment of counsel, which often sat pending for extended periods and led to additional delays that cannot be held against Appellants.  For instance, on March 17, 2008, Carson moved for appointment of counsel.  App. 123 [ECF 1025].  This motion was granted on May 13, 2009, App. 124 [ECF 1039], and counsel appeared for Carson on November 5, 2010, App 125 [ECF 1060].  On June 27, 2011, the district court permitted Martin's counsel to withdraw and directed that new counsel be appointed to represent him.  App. 126 [ECF 1077].  On March 8, 2012, new counsel appeared for Martin.  *Id.*  [ECF 1086].  On December 14, 2011, Sweeney's counsel moved to withdraw and for the appointment of new counsel, *Id.*  [ECF 1082]. which was granted on December 16, 2011, *id.* [ECF 1083], with a directive to the Federal Public Defender to identify new counsel for Sweeney.  New counsel appeared for Sweeney approximately one year later, on December 7, 2012.  App. 127 [ECF 1105].

As is clear from the above, the supplemental motions filed by Appellants were all timely, given that, following the production of the *Brady/Giglio* materials beginning in June 2010, equitable tolling effected by the district court's scheduling orders and the periods that certain Appellants were awaiting appointment of counsel after orders appointing counsel had been entered by the district court. The motions, and supplements thereto, were therefore timely under § 2255(f)(4).

### IV. Carson's Trial Counsel Were Admittedly Ineffective, Having Inappropriately Placed Their Personal Interests Ahead of Their Duties in the Face of Improper Bias by the Trial Court.[20]

Carson's supplemental § 2255 motion raised not only the suppression of exculpatory evidence in violation of *Brady*, *Giglio*, and the Jencks Act; it also showed that Carson's two court-appointed trial counsel labored under a blatant conflict of interest, which caused them to provide ineffective representation that pervaded the entire trial. The conflict of interest and their interaction with the suppression of exculpatory evidence were documented by the April 10, 2015

---

[20] While this Court did not include ineffectiveness of trial counsel in initial Certificate of Appealability, it should consider this claim in conjunction with the others raised above. The record evidence in support of this claim is clear, undisputed, and discrete, as Carson is in a unique position where his trial counsel has acknowledged their own ineffectiveness under oath; and an understanding of this issue (which is rooted in improper bias and conduct of the trial court) provides further context to the manner in which the trial court allowed the government to file document after document under seal without appropriately questioning whether the government was meeting its *Brady* obligations.

affidavit of Lexi Negin Christ, one of Carson's two trial counsel, which was attached to Carson's supplemental § 2255 motion.

Christ's affidavit shows that trial counsel had a conflict of interest that caused them to sacrifice their duty to professionally represent Carson throughout the trial. Together with the suppressed *Brady* issue, the affidavit warranted an evidentiary hearing, which the district court never held. *See* 28 U.S.C. § 2255(b) (requiring an evidentiary hearing "[u]nless the motion and the files and the records of the case conclusively show that the prisoner is entitled to no relief"); *Schiro v. Landrigan*, 550 U.S. 465, 474 (2007).

Although the prejudice resulting from these violations is evident, Appellant Carson is not required to demonstrate prejudice in this instance. Under *United States v. Cronic*, no showing of prejudice is necessary when "circumstances that are so likely to prejudice the accused that the cost of litigating their effect in a particular case is unjustified." 466 U.S. at 658, 662. Where "counsel entirely fails to subject the prosecution's case to meaningful adversarial testing," as happened here, that renders "the adversary process itself presumptively unreliable." *Id.* at 659.[21] *See Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980).

---

[21] *See* Eve B. Primus, *Disaggregating Ineffective Assistance of Counsel Doctrine*, 72 Stan. L. Rev. 1581 (2020) (disentangling the four different forms of attorney

Christ's affidavit also shows a conflict of interest between counsel's personal interests in receiving payment through court-approved vouchers under the Criminal Justice Act, and avoiding being ordered to show cause why they should not be held in contempt, like defense counsel for two of their co-defendants already had been. Christ admits that this conflict greatly affected their representation throughout the long trial, thus obviating the need for an additional showing of prejudice. *See, e.g.*, *United States v. Sayan*, 968 F.2d 55, 64–65 (D.C. Cir. 1992) (recognizing that "a conflict between a lawyer and his client may provide the basis of a new trial") (citing *Walberg v. Israel*, 766 F.2d 1071, 1074 (7th Cir. 1985)).

In *Walberg*, the Seventh Circuit ordered a new trial for the defendant even though the evidence of his guilt was "overwhelming." "There [was] no proof" in *Walberg* "that [defense counsel] Clark pulled his punches at trial, [although] he had every incentive to do so." *Id*. at 1074. During a pretrial hearing recess, however, the judge berated defense counsel for vigorously representing Walberg and being ungrateful for all that the judge had done to advance the attorney's career. The judge admonished: "[D]on't ever come to me with your bill on this thing, because I am not

---

ineffectiveness, explaining that *Strickland*'s two-prong test applies only to one of them: episodic personal ineffectiveness).

going to pay for all these motions [to recuse him] you are bringing up in the Supreme Court." *Id.* at 1073.

On appeal, Judge Posner wrote: "The appearance was of a judge who had made up his mind at the start that the defendant was guilty and who proceeded to intimidate the defendant's lawyer so that the proceeding could be got over with and Walberg shipped off to prison for many years." *Id.* at 1077–78. The Seventh Circuit further explained:

> After the judge's pretrial outburst Clark knew that he would have to be on his best behavior at trial if he was to have any hope of a subsequent appointment by Judge Seraphim—and perhaps if he was to have any hope of getting paid for defending Walberg. And Judge Seraphim had indicated that good behavior meant not just avoiding unethical conduct but also not pressing too hard, even well within ethical boundaries, in favor of an obviously guilty defendant.

*Id.* at 1074.

Here, as in *Walberg*, the trial court judge's hostility to Carson's defense attorneys and the defendant caused them to fear the judge's wrath if they zealously represented their clients. Christ's affidavit explains that she and her co-counsel **deliberately chose not to do what they knew counsel should have done**:

> The contempt charges brought against two of the attorneys at trial, and later dropped after trial, as well as the search warrant executed against on one of the attorney's offices during trial by the prosecution team, had a chilling effect on us in the representation of Mr. Carson. This chilling effect caused us to forgo the filing of motions and other

127

challenges to the Judge's arbitrary rulings regarding time limits, cross examination and use of impeachment evidence.

We were aware that the judge was the one reviewing and approving our payments and that by winning the approval of the judge during the trial would most likely mean our vouchers would be fully paid. Due to the length of the trial, many, if not all the attorneys involved, had to clear their case docket to participate in this trial. Loss of payment for these services would have been a substantial financial burden. The implicit threats by the Court that compensation would be disallowed if the perceived delay tactics placed all the attorneys in the case in a position of conflict of personal interest.

During the trial, I believed that Mr. Beshouri felt that if we were in the good graces with the Judge by being "reasonable" in the judge's eyes during the trial, that the judge's prejudicial rulings, contempt sanctions, and biased comments would be directed at other attorneys. I believed that our strategy was driven by an unreasonable desire to avoid these actions by the judge toward us, rather than defend our client to the best of our abilities.

* * *

The decision to appease the judge, rather than to pursue valid objections, arguments and motions was not a reasonable one and I believe we were ineffective by making that choice.

* * *

Mr. Beshouri and I continued representation of Mr. Carson knowing that the chilling effect had risen to the level where we could no longer be Constitutionally effective in our representation.

App. 1426-27.

As Carson argued in his supplemental § 2255 petition, Carson's counsel had a conflict between their personal interest in getting paid and avoiding being held in contempt and their duty to professionally and effectively represent Carson. Id. They should have raised this conflict of interest with the court and sought to withdraw. *See Cuyler v. Sullivan*, 446 U.S. 335, 348–50 (1980) (a conflict of interest can be a basis for an ineffective assistance of counsel claim if the defendant proves that "an actual conflict of interest adversely affected his lawyer's performance" and "a defendant who shows that a conflict of interest actually affected the adequacy of his representation need not demonstrate prejudice in order to obtain relief"); *Daniels v. United States*, 54 F.3d 290, 294 (7th Cir. 1995) ("A conflict of interest arises when the defense attorney is required to make a choice advancing his own interests to the detriment of his client's interests" and "[a] conflict may . . . arise when a client's interests are adverse to his lawyer's pecuniary interests."); *Winkler v. Keane*, 7 F.3d 304, 308 (2d Cir. 1993) (contingent fee in criminal case created an actual conflict of interest); *Gonzalez v. Mize*, 565 F.3d 373, 381 (7th Cir. 2009) ("An adverse effect is established by showing that 'but for the attorney's actual conflict of interest, there is a reasonable likelihood that counsel's performance somehow would have been different.'"); *Summerlin v. Stewart*, 267 F.3d 926, 935–41 (9th Cir. 2001) (defense counsel was conflicted because he had a romantic "entanglement" with the prosecutor).

The district court made no mention of Christ's affidavit.  *See Martin*, 2021 WL 4989983 at *11–12.  That omission requires at least a remand with directions to consider the affidavit and hold an evidentiary hearing.  *See Winthrop-Redin v. United States*, 767 F.3d 1210, 1216 (11th Cir. 2014) (court may consider the entire record when determining whether to require an evidentiary hearing).

The failures to provide effective assistance of counsel were especially prejudicial given that, as explained previously, much of the government's case was weak and depended on the testimony of cooperating witnesses and jailhouse informants,  especially as to the murder counts and other violent conduct alleged in connection with the conspiracy.  Moreover, as also explained previously, much of that testimony was shielded from effective attack by the government's failure to comply with its *Brady/Giglio* and Jencks Act obligations.  And it is the life sentences on these weak murder counts that keep Appellants in prison today.

In sum, conflicted trial counsel's failure to do their jobs in a highly complex and lengthy case, combined with the prosecution's massive suppression of exculpatory evidence to deny Carson and his co-defendants a fair trial, is in violation of due process.

## CONCLUSION

This Court should vacate Appellants' convictions and order that the indictments be dismissed to account for the pattern of prosecutorial misconduct and egregious due process violations that took place here, and the ineffective assistance of counsel. In the alternative, the Court should vacate Appellants' convictions and remand for a new trial, together with an evidentiary hearing to further develop the record of the government's misconduct and the effect of the ineffective assistance.

Respectfully submitted,


\_\_\_/s/ John Longstreth\_\_

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com
*Counsel for Jerome Martin, Jr.*


\_\_\_/s/ Mark Lanpher\_\_\_\_\_

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

___ /s/ Eric Kirchman___
Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

___/s/ David Smith_____
David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

September 27, 2024

**CERTIFICATE OF COMPLIANCE**

Pursuant to the Court's Per Curiam Order dated November 21, 2023, which provided for the filing of a joint brief not to exceed 35,000 words, undersigned counsel certify that the attached Joint Brief of Appellants complies with the Court's Order.  The word count is 29,789, including all footnotes and legal citations but excluding the table of contents, table of authorities, any certificates of compliance or service, and any other items not required to be included by Fed. R. App. P. 32 (f).  The brief was prepared using a Microsoft Word in Times New Roman 14 point type.

.

_____/s/ John Longstreth_____

## CERTIFICATE OF SERVICE

I hereby certify that on this 28th day of September 2024, I caused a true and complete copy of the foregoing to be served via the Court's cm/ecf system on the following:

Chrisellen Rebecca Kolb, Assistant U.S. Attorney
U.S. Attorney's Office
(USA) Appellate Division
Room 8104
601 D Street, NW
Washington, DC 20530
Chrisellen.R.Kolb@usdoj.gov

Daniel Joseph Lenerz, Attorney
U.S. Attorney's Office
(USA) Appellate Division
Suite 8229
601 D Street, NW
Washington, DC 20530
daniel.lenerz@usdoj.gov

_____/s/ John Longstreth_____