ORAL ARGUMENT NOT YET SCHEDULED

# No. 21-3072

**(consolidated with Nos. 21-3073, 21-3078, 22-3016, 23-3015)**

In the

# United States Court of Appeals
### for the District of Columbia Circuit

———————————

## UNITED STATES OF AMERICA,

*Appellee*,

v.

## SEAN COATES, WILLIAM K. SWEENEY, JEROME MARTIN, JR., AND SAMUEL CARSON,

*Appellants*.

———————————

On Appeal from the
United States District Court for the District of Columbia
(Nos. 1:98-cr-00329-RCL-002, -003, -004, -006)

———————————

## APPELLANTS' APPENDIX

Volume II of V

John Longstreth
Jonathan M. Cohen
Tre A. Holloway
K&L GATES LLP
1601 K Street NW
Washington, DC 20006
Phone: (202) 778-9000
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

*Counsel for Jerome Martin, Jr.*

Mark Lanpher
ALLEN OVERY
  SHEARMAN STERLING US LLP
1101 New York Avenue NW
Washington, DC 20005
Phone: (202) 508-8000
mark.lanpher@aoshearman.com

Katherine Stoller
ALLEN OVERY
  SHEARMAN STERLING US LLP
599 Lexington Avenue
New York, NY 10022
Phone: (212) 848-4000
katherine.stoller@aoshearman.com

*Counsel for Sean Coates*

Eric Hans Kirchman
LAW OFFICE OF ERIC H. KIRCHMAN
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
Phone: (202) 347-4052
kirchlaw@cs.com

*Counsel for William Sweeney*

David B. Smith
DAVID B. SMITH, PLLC
108 North Alfred Street
Alexandria, VA 22314
Phone: (202) 548-8911
dbs@davidbsmithpllc.com

*Counsel for Samuel Carson*

*Counsel for Appellants*

# TABLE OF CONTENTS

**PAGE(S)**

## VOLUME I (APP 1–141)

United States District Court Docket Report, Case No. 98-329
(accessed September 27, 2024)............................................................................App 1–141

## VOLUME II (APP 141–575)

Excerpts of Transcript
(September 27, 2000)..............................................................................App 142–147

Excerpts of Transcript
(December 10, 1996) .............................................................................App 148–150

Excerpts of Transcript
(June 8, 2000).......................................................................................App 151–173

Excerpts of Transcript
(January 8, 2001) (AM) .........................................................................App 174–177

Excerpts of Transcript
(January 10, 2001) (AM) .......................................................................App 178–188

Excerpts of Transcript
(January 23, 2001) (PM) ........................................................................App 189–193

Excerpts of Transcript
(January 24, 2001) (AM) .......................................................................App 194–212

Excerpts of Transcript
(January 30, 2001) (PM) ........................................................................App 213–217

Excerpts of Transcript
(February 1, 2001) (AM) ........................................................................App 218–225

Excerpts of Transcript
(February 5, 2001) (AM) ........................................................................App 226–241

Excerpts of Transcript
(February 8, 2001) (PM) ........................................................................App 242–260

Excerpts of Transcript
(February 12, 2001) (AM) ......................................................................App 261–274

i

Excerpts of Transcript
(February 13, 2001) (AM) ...............................................................App 275–290

Excerpts of Transcript
(February 15, 2001) (PM) ...............................................................App 291–299

Excerpts of Transcript
(March 7, 2001) (PM) .....................................................................App 300–322

Excerpts of Transcript
(March 12, 2001) (PM) ...................................................................App 323–357

Excerpts of Transcript
(March 13, 2001) (PM) ...................................................................App 358–375

Excerpts of Transcript
(March 14, 2001) (AM) ...................................................................App 376–395

Excerpts of Transcript
(March 14, 2001) (PM) ...................................................................App 396–409

Excerpts of Transcript
(March 15, 2001) (AM) ...................................................................App 410–435

Excerpts of Transcript
(April 4, 2001) (AM) .......................................................................App 436–455

Excerpts of Transcript
(April 9, 2001) (AM) .......................................................................App 456–462

Excerpts of Transcript
(April 9, 2001) (PM) ........................................................................App 463–466

Excerpts of Transcript
(April 24, 2001) (PM) ......................................................................App 467–469

Excerpts of Transcript
(April 25, 2001) (AM) ......................................................................App 470–476

Excerpts of Transcript
(May 1, 2001) (AM) .........................................................................App 477–485

Excerpts of Transcript
(May 23, 2001) (AM) .......................................................................App 486–496

Excerpts of Transcript
(May 23, 2001) (PM) ........................................................................App 497–514

Excerpts of Transcript
    (May 29, 2001) (PM) ..................................................................................App 515–531

Excerpts of Transcript
    (May 30, 2001) (AM) .................................................................................App 532–541

Excerpts of Transcript
    (June 14, 2001) (PM) .................................................................................App 542–550

Excerpts of Transcript
    (June 26, 2001) (AM) .................................................................................App 551–565

Excerpts of Transcript
    (June 26, 2001) (PM) .................................................................................App 566–569

Excerpts of Transcript
    (July 2, 2001) (PM)....................................................................................App 570–575

## VOLUME III (APP 576–1043)

Sweeney Motion to Compel Discovery Number 1
    (February 9, 1999) (Doc. 71) .....................................................................App 576–602

Carson Motion for Dismissal of Counts, to Compel Disclosure of Exculpatory Evidence,
    and for Additional Sanctions Due to Violations of *Brady v. Maryland*
    (July 16, 2000) (Doc. 329).........................................................................App 603–616

Sweeney Motion to Admit into Evidence the Maryland Grand Jury Testimony of Two
    Unavailable Witnesses Who Were Introduced
    by the State's Attorney for Prince George's County
    (November 2, 2000) (Doc. 450)..................................................................App 617–620

Order Denying Motions to Compel (Jackson, J.)
    (September 28, 2000) (Doc. 451) ...............................................................App 621–625

Carson Motion to Adopt William Sweeney's Motion to Admit into Evidence the Maryland
    Grand Jury Testimony of Two Unavailable Witnesses Who Were Introduced by the State's
    Attorney for Prince George's County
    (November 6, 2000) (Doc. 452).......................................................................App 626

Government's Memorandum in Opposition to Sweeney and Hill's Motions for Admission of
    Grand Jury Testimony of Unavailable Witnesses
    (November 16, 2000) (Doc. 481)................................................................App 627–632

Second Retyped Indictment
    (July 2, 2001) (Doc. 760)...........................................................................App 633–711

Verdict Form
    (August 16, 2001) (Doc. 810) .................................................................App 712–749

Order Denying Appellants' Motion to Allow Counsel to Review Specific Sealed Portions of the
    Trial Record
    (August 28, 2003) (USCA Case No. 02-3015, Doc. 769196) .......................................App 750

Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
    (April 25, 2005) ...........................................................................App 751–771

Appeal from the United States District Court for the District of Columbia
    (June 14, 2005)............................................................................App 772–814

Reply Brief of Appellants Sweeney, Carson, Coates, Martin, and Hill
    (July 6, 2005) .............................................................................App 815–929

Sweeney Emergency Motion for Access to Court Records and Points and Authorities in Support
    Thereof
    (February 5, 2008) (Doc. 1013) .............................................................App 930–933

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant
    to 28 U.S.C. Section 2255
    (February 18, 2008) (Doc. 1021) ...........................................................App 934–950

Sweeney Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 USC §2255
    (February 19, 2008) (Doc. 1017) ...........................................................App 951–967

Martin Motion to Vacate, Set Aside, Correct Sentence Pursuant to 28 U.S.C. Section 2255
    (February 18, 2008) (Doc. 1021) ...........................................................App 968–984

Carson Motion Under 28 USC § 2255 to Vacate, Set Aside, or Correct Sentence by a Person in
    Federal Custody
    (February 18, 2008) (Doc. 1023) ...........................................................App 985–990

Coates Motion Pursuant to 28 U.S.C. § 2255 to Vacate, Set Aside or Correct Sentence
    (February 19, 2008) (Doc. 1020) ..........................................................App 991–1043

## VOLUME IV (APP 1044–1456)

Carson Motion to Join the Petitions Filed by Co-Defendants for Relief
    Pursuant to 28 U.S.C. § 2255
    (March 17, 2008) (Doc. 1024) ............................................................App 1044–1045

Martin Motion to Stay the 28 U.S.C. 2255 Motion
    (May 7, 2008) (Doc. 1028) ...............................................................App 1046–1050

Carson and Sweeney Joint Unopposed Motion for Extension of Time to File Supplements to Motions to Vacate
(February 2, 2011) (Doc. 1065) ..................................................................App 1051, 1056–1057

United States' Unopposed Motion for Extension of Time to File Response to Defendants' Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255
(July 2, 2010) (Doc. 1053) .................................................................................App 1052–1055

Carson Motion to Reconsider Motion for Discovery Based Upon New Evidence
(October 9, 2014) (Doc. 1132) ...........................................................................App 1058–1068

Sweeney Supplemental Motion to Vacate, Set
Aside or Correct Sentence, Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law (November 28, 2014) (Doc. 1140-2) .........................................App 1069–1152

Carson Motion to Join Petitioner Sweeney's Motion to Unseal Specific Exhibits
(January 29, 2015) (Doc. 1153) .........................................................................App 1153–1154

Coates Pro Se Supplemental
Claims in Relation to the Original Motion Pursuant to 28 U.S.C. § 2255
(February 24, 2015) (Doc. 1166) .......................................................................App 1155–1163

Exhibit 1 to Sweeney's Supplemental Motion
(February 25, 2015) (Doc. 1156-2).....................................................................App 1164–1173

Exhibit 2 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1144-1, 1145-1, 1146-1, 1147-1) .........................App 1174–1226

Exhibit 3 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1141-2) ..................................................................App 1227–1230

Exhibit 4 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1141-3) ..................................................................App 1231–1236

Exhibit 5 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-1) ..................................................................App 1237–1246

Exhibit 6 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1143-1) ..................................................................App 1247–1268

Exhibit 7 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-2) ..................................................................App 1269–1270

Exhibit 8 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-3) ..................................................................App 1271–1272

Exhibit 9 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-4) ...............................................App 1273–1275

Exhibit 10 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-5) ...............................................App 1276–1277

Exhibit 11 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-6) ...............................................App 1278–1280

Exhibit 12 to Sweeney's Supplemental Motion
(November 28, 2014) (Doc. 1142-7) ...............................................App 1281–1285

Defendants' Unopposed Motion for Extension of Time to File Memorandum in Support of
Defendants' Motion to Vacate Sentence
(February 25, 2015) (Doc. 1158) ...............................................App 1286–1288

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
Section 2255
(April 9, 2015) (Doc. 1170) ...............................................App 1289–1332

Government's Ex Parte Submission of Additional Materials to the Court Regarding James
Montgomery
(April 9, 2015) (Doc. 1174-3)...............................................App 1333–1363

Court Exhibit 8
(April 9, 2015) (Doc. 1175-1)...............................................App 1364–1424

Affidavit of Lexi Negin Christ
(April 9, 2015) (Doc. 1178-1)...............................................App 1425–1427

Application for Statement of Charges
(April 9, 2015) (Doc. 1178-3)...............................................App 1428–1429

Court Exhibit 4
(April 9, 2015) (Doc. 1174) ...............................................App 1430–1456

## VOLUME V (APP 1458–1831)

Carson Unopposed Motion for Leave to File Under Seal
(July 23, 2015) (Doc. 1180)...............................................App 1458–1461

Martin Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 23, 2016) (Doc. 1182) ...............................................App 1462–1465

Carson Supplement to Motion to Vacate After Johnson Decision
(June 24, 2016) (Doc. 1183) ...............................................App 1466–1468

Coates Supplement to Motion to Vacate in Light of *Johnson v. United States*
(June 27, 2016) (Doc. 1184) ...............................................................App 1469–1470

Coates Motion for Leave to Join Samuel Carson's Supplemental Motion and to File Under Seal
and to Late File This Motion
(June 27, 2016) (Doc. 1185) ...............................................................App 1471–1517

Carson Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C.
Section 2255
(June 27, 2016) (Doc. 1185-1)...............................................................App 1518–1561

Order Granting Carson's Motion for a Briefing Schedule (Lamberth, R.)
(April 7, 2017) (Doc. 1188) ...............................................................App 1562–1563

Sweeney Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 USC
§2255 and Incorporated Memorandum of Facts and Law
(June 26, 2017) (Doc. 1197) ...............................................................App 1564–1647

Sweeney Supplement to Amended Supplemental Motion to Vacate, Set Aside or Correct
Sentence Pursuant to 28 USC §2255 and Incorporated Memorandum of Facts and Law
(October 31, 2018) (Doc. 1229)...............................................................App 1648–1650

Martin Supplement to Motion to Vacate, Set Aside, or Correct Sentence Pursuant to 28 U.S.C.
§2255 by a Person in Federal Custody
(November 21, 2018) (Doc. 1233)...............................................................App 1651–1688

Affidavit of Jennifer Wicks
(October 6, 2020) (Doc. 1280)...............................................................App 1689–1690

Memorandum Opinion (Lamberth, R.)
(October 27, 2021) (Doc. 1283)...............................................................App 1691–1739

Memorandum Opinion (Lamberth, R.)
(May 23, 2022) (Doc. 1305) ...............................................................App 1740–1765

Sweeney's Reply to the Government's Opposition to His Motions to Vacate, Set Aside or Correct
Sentence Pursuant to 18 U.S.C. § 2255
(July 14, 2020) (Doc. 1277)...............................................................App 1766–1828

Declaration of William K. Sweeney
(October 6, 2020) (Doc. 1280-2) ...............................................................App 1829–1831

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
  GOVERNMENT,    :

 VS.        :  CR. NO. 98-329

VINCENT HILL,    :
JEROME MARTIN,   :
SAMUEL CARSON,   :
WILLIAM K. SWEENEY,  :
MAURICE PROCTOR,   :
SEAN COATES,    :
  DEFENDANTS.  :

UNITED STATES    :
  GOVERNMENT,   :
        :
 VS.        :  CR. NO. 99-348
        :
GARY PRICE,    :
  DEFENDANT   :

WASHINGTON, D. C.
SEPTEMBER 27, 2000

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

FOR THE GOVERNMENT:    PETER ZEIDENBERG, AUSA
           ANJALI CHATURVEDI, AUSA
           555 4TH ST., N.W.
           WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:  CHRISTOPHER DAVIS, ESQ.
           601 INDIANA AVE., N.W.
           #901
           WASHINGTON, D. C.  20001

FOR THE DEFENDANT MARTIN: JOANNE HEPWORTH, ESQ.
           305 H STREET, N.W.
           2ND FLOOR
           WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN CHRIST, ESQ.
                                   419 7TH STREET, N.W.
                                   WASHINGTON, D. C.   20004

FOR THE DEFENDANT SWEENEY:         STEVEN R. KIERSH, ESQ.
                                   717 D STREET, N.W.
                                   SUITE 400
                                   WASHINGTON, D. C.   20004


                                   LEONARD LONG, ESQ.
                                   1818 11TH ST., N.W.
                                   WASHINGTON, D.C.   20001


FOR THE DEFENDANT PROCTOR:         HOWARD BRAMSON, ESQ.
                                   717 D STREET, N.W.
                                   THIRD FLOOR
                                   WASHINGTON, D. C.    20004

FOR THE DEFENDANT COATES:          FREDERICK JONES, ESQ.
                                   901 6TH STREET, S.W.
                                   #409
                                   WASHINGTON, D. C.   20024


FOR THE DEFENDANT PRICE:           JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #901
                                   WASHINGTON, D. C.   20004




COURT REPORTER:                    PHYLLIS MERANA
                                   6816 U. S. COURTHOUSE
                                   3RD & CONSTITUTION AVE., N.W.
                                   WASHINGTON, D. C.  20001

127

KILL ROBERT SMITH. AND WE ALSO WANT ALL THE RECORDS, FOR INSTANCE, FROM THE HOPE VILLAGE SHOOTING, TO SHOW TO THE JURY TO SAY, "SOMEONE ELSE WAS OUT THERE, NOT EVEN JUST WITH A MOTIVE TO KILL HIM, BUT SOMEONE ELSE TRIED TO KILL HIM."

AND THIS ALL COMES WITHIN THE THIRD-PARTY DEFENSE THAT THE D. C. COURT OF APPEALS UNDER THE BROWN BEALE STANDARD HAS SET FORTH. THAT WE HAVE TO SHOW TO THE JURY THAT THERE IS A FACTUAL BASIS TO ASSERT A THIRD-PARTY DEFENSE -- A THIRD-PARTY PERPETRATED DEFENSE.

THE COURT: I WOULD THINK THAT IF THE GOVERNMENT HAS ANY EVIDENCE -- ANY EVIDENCE THAT SOMEONE OTHER THAN A NAMED DEFENDANT WAS RESPONSIBLE FOR ROBERT SMITH'S DEATH, THEN THAT EVIDENCE WOULD BE PRODUCIBLE AS BRADY MATERIAL.

MR. KIERSH: THAT'S OUR POSITION.

THE COURT: ALL RIGHT.

MR. KIERSH: BUT I JUST WANT TO MAKE THE RECORD CLEAR, TOO, THAT THE GOVERNMENT MAY LOOK AT SOME EVIDENCE AND SAY, "WELL, WE DON'T THINK -- HERE IS SOME EVIDENCE THAT HE WAS SHOT."

THE COURT: THAT'S TRUE OF ANY EVIDENCE.

MR. KIERSH: BUT I WOULD SUBMIT TO THE COURT IT'S BRADY. IF THERE IS ANY EVIDENCE WHATSOEVER THAT ANYBODY ON THIS PLANET, OTHER THAN WILLIAM SWEENEY, TRIED TO KILL ROBERT SMITH, IT IS BRADY. AND ANY RECORD THAT THE GOVERNMENT HAS RELATED TO THE SHOOTING, FOR INSTANCE, AT

200

MR. KIERSH:  WELL, SURE HE WAS.

THE COURT:  HOW ABOUT UNRELATED ONGOING INVESTIGATIONS?

MR. KIERSH:  HE WAS GETTING A BENEFIT FOR IT. THERE ARE TWO REASONS WHY THAT INFORMATION SHOULD BE TURNED OVER.  NUMBER ONE IS TO SHOW THAT MR. SMITH WAS TRYING TO CURRY FAVOR WITH THE GOVERNMENT BECAUSE HE WAS GETTING HUGE BENEFITS FROM THE GOVERNMENT.

AGAIN, THIS MAN IS A CAREER CRIMINAL WHO IS OUT ON THE STREET ONLY BY VIRTUE OF THE FACT THAT HE IS COOPERATING WITH THE GOVERNMENT.  BUT THE OTHER REASON IS WHAT WE TALKED ABOUT BEFORE.  THE FACT THAT MR. SMITH WAS GIVING INFORMATION IN UNRELATED CASES, THOSE INDIVIDUALS, IF THEY KNEW ABOUT HIS COOPERATION, HAD A MOTIVE TO KILL HIM.  AND THAT'S EXACTLY WHAT WE WANT TO OFFER TO THE JURY.  THAT THERE WAS MOTIVATION BEYOND THESE PEOPLE TO KILL HIM.  SO THERE ARE TWO VERY SOUND REASONS.

THE COURT:  LET ME TAKE A LOOK AT THE 302'S UNREDACTED IN CAMERA.

MS. CHATURVEDI:  CERTAINLY, YOUR HONOR.  IF I COULD JUST ADDRESS THIS BRIEFLY.  AGAIN, IT IS SORT OF A LEAP OF FAITH.  IF THE OTHER PEOPLE WHO MR. SMITH IMPLICATED -- IF THEY KNEW THAT HE WAS COOPERATING WITH LAW ENFORCEMENT, PERHAPS THEY HAD A MOTIVE.  THAT IS ONE LEAP OF FAITH.

201

THE COURT: SURE.

MS. CHATURVEDI: AND THE SECOND ONE IS IS THERE ANY EVIDENCE TO SUGGEST ANY OF THOSE PEOPLE, ASSUMING THEY DID KNOW ABOUT THE COOPERATION, TOOK ANY STEPS TO HARM MR. SMITH.

THERE IS NO SUCH EVIDENCE. IF THE DEFENSE IS TRYING TO RAISE THIRD-PARTY CULPABILITY, THERE HAS TO BE MORE THAN MERE SPECULATION.

MR. KIERSH CITED TO THE BROWN BEALE CASE FROM THE D. C. COURT OF APPEALS. THE WINFIELD CASE, WHICH IS THE MOST MOST RECENT CASE ON THAT POINT, SAYS YOU CAN'T JUST DRAW A BLANK. YOU CAN'T JUST PULL AT STRAWS SPECULATING THAT SOMEONE ELSE MAY HAVE WANTED TO HAVE THIS PERSON KILLED AND WE SHOULD BE ENTITLED TO KNOW THAT. I WILL PROVIDE --

THE COURT: I AGREE. THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO -- THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

MS. CHATURVEDI: RIGHT. AND WE DON'T HAVE ANY SUCH INFORMATION. AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION. THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

THE COURT: YES.

(Page 14 of Total)

202

MS. CHATURVEDI: YOUR HONOR, I WOULD LIKE TO JUST BRIEFLY ADDRESS ONE OTHER MATTER. IN TERMS OF THE MANNER IN WHICH YOUR HONOR EXPECTS TO HEAR THIS PROFFER, IT'S OUR POSITION THAT AN EVIDENTIARY HEARING ON THE ISSUE IS NOT NEEDED. THAT IS PROFFERED EVIDENCE -- WHAT WE HAVE PRIMARILY SUBMITTED IN OUR PAPERS, COMBINED WITH THE GIGLIO INFORMATION, INCLUDING IMPEACHMENTS --

THE COURT: YOU MEAN THE EVIDENTIARY PREDICATE FOR ADMITTING THE STATEMENT?

MS. CHATURVEDI: RIGHT.

THE COURT: IT MAY BE THAT I WILL BE SATISFIED WITH THE PROFFER. I DON'T KNOW. LET'S SEE.

MS. CHATURVEDI: THE PROFFER -- I WOULD JUST LIKE TO CLARIFY -- IS WHAT WE HAVE PRESENTED IN OUR PAPERS THUS FAR.

THE COURT: ALL RIGHT.

MS. CHATURVEDI: I AM PREPARED TO SUPPLEMENT THAT BY INFORMATION CONCERNING PRIOR CONVICTIONS AND PLEA AGREEMENTS OF THE WITNESSES. AND WHAT I BELIEVE I SHOULD FILE BY FRIDAY WOULD BE A SUBMISSION TO THE COURT TO TAKE THAT INFORMATION INTO ACCOUNT.

THE COURT: ALL RIGHT.

MS. CHATURVEDI: BUT IT'S NOT OUR INTENTION TO PUT ON WITNESSES OUTSIDE THE PRESENCE OF THE JURY ON THE ISSUE.

THE COURT: LET'S RESERVE ON THAT AND SEE WHETHER

S-E-C-R-E-T

IN THE CIRCUIT COURT

FOR PRINCE GEORGE'S COUNTY, MARYLAND

IN RE:

Special Investigation          Grand Jury No. 56,192

_____/

TRANSCRIPT OF PROCEEDINGS

Grand Jury Room

County Courthouse

Upper Marlboro, Maryland

Tuesday, December 10, 1996

The Grand Inquest for the State of

Maryland for the Body of Prince George's County, was

convened at 9:30 o'clock a.m., Betty C. Ford,

Foreman, presiding.

PRESENT:

(A quorum of twenty-one members of the

Grand Jury was present.)

JOHN MALONEY, Assistant State's

Attorney for Prince George's County.

W. C. LYNN, Clerk-Reporter to the

Grand Jury.

S-E-C-R-E-T

FILED

NOV 02 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT



4

forth by me and other people here in the Grand Jury.

Do you understand that?

A.    Yes.

Q.    First of all, who is John Pinkney?

A.    My fiance.

Q.    And do you know a person named Dennis Green?

A.    Yes.

Q.    How did you know him?

A.    Through John.

Q.    And did there come a time, some days before Thanksgiving, that you saw Dennis Green?

A.    Yes.

Q.    Describe what happened.

A.    Dennis came to my house and asked me could he come in.  I let him in.  He was on the telephone, talking to one of his friends.

Q.    And who else was in the -- is it a townhouse?

A.    Yes.

Q.    Who else was there?

A.    Just me and Dennis.

Q.    And what, if anything, did you hear?

A.    He told whoever he was talking to on the telephone that they should have came around there

(Page 17 of Total)

5

and they must have asked him why, and he said because me just took three people out of the street.

Q.   Did you hear anything else?

A.   And whoever he was talking to must have asked him who is we.  He said me, California, and Free, and the rest of the guys.

*Who*

Q.   Do you know who the rest of the guys are?

A.   I know of California and Free, but I don't know them.

Q.   Showing you what is a statement made by you, apparently a nine page statement.

Look at that.

Is this the statement that you made to the police yesterday?

A.   Yes, it is.

Q.   And is that a truthful statement that you gave to them?

A.   Yes, it is.

Q.   Okay.

MR. MALONEY:  For the record, I am showing a statement given 12-8-96 by Cheree Lenette Owens, and signed by her.

*We are getting this son*

BY MR. MALONEY:

Q.   Describe what happened after you

*Clerks File*

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

**FILED**

**DEC 1 4 2000**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES,
      GOVERNMENT,    :

  VS.    :    CR. NO. 98-329

VINCENT HILL,    :    *File*
JEROME MARTIN,    :
SAMUEL CARSON,
WILLIAM K. SWEENEY,    :
MAURICE PROCTOR,    :
SEAN COATES,    :
      DEFENDANTS.    :

UNITED STATES    :
      GOVERNMENT,    :

  VS.    :    CR. NO. 99-348

GARY PRICE,    :
      DEFENDANT    :

WASHINGTON, D. C.
JUNE 8, 2000

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

FOR THE GOVERNMENT:    PETER ZEIDENBERG, AUSA
    ANJALI CHATURVEDI, AUSA
    555 4TH ST., N.W.
    WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:    CHRISTOPHER DAVIS, ESQ.
    601 INDIANA AVE., N.W.
    #901
    WASHINGTON, D. C. 20001

FOR THE DEFENDANT MARTIN:    JOANNE HEPWORTH, ESQ.
    305 H STREET, N.W.
    2ND FLOOR
    WASHINGTON, D. C. 20001

506
142

2

FOR THE DEFENDANT CARSON:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7TH STREET, N.W.
                                   WASHINGTON, D. C.   20004

FOR THE DEFENDANT SWEENEY:         STEVEN R. KIERSH, ESQ.
                                   717 D STREET, N.W.
                                   SUITE 400
                                   WASHINGTON, D. C.   20004

                                   LEONARD LONG, ESQ.
                                   1818 11TH ST., N.W.
                                   WASHINGTON, D.C.   20001

FOR THE DEFENDANT PROCTOR:         HOWARD BRAMSON, ESQ.
                                   717 D STREET, N.W.
                                   THIRD FLOOR
                                   WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:          FREDERICK JONES, ESQ.
                                   901 6TH STREET, S.W.
                                   #409
                                   WASHINGTON, D. C.   20024

FOR THE DEFENDANT PRICE:           JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #901
                                   WASHINGTON, D. C.   20004

COURT REPORTER:                    PHYLLIS MERANA
                                   6816 U. S. COURTHOUSE
                                   3RD & CONSTITUTION AVE., N.W.
                                   WASHINGTON, D. C.   20001

50

(Page 20 of Total)

3

P-R-O-C-E-E-D-I-N-G-S

(THE DEFENDANTS AND COUNSEL WERE PRESENT.)

THE DEPUTY CLERK:  CRIMINAL CASE 98-329, UNITED STATES OF AMERICA VERSUS VINCENT HILL, JEROME MARTIN, SAMUEL CARSON, WILLIAM SWEENEY, MAURICE PROCTOR AND SEAN COATES, AND CRIMINAL CASE 99-348, UNITED STATES OF AMERICA VERSUS GARY PRICE.

PETER ZEIDENBERG AND ANJALI CHATURVEDI FOR THE GOVERNMENT.

CHRISTOPHER DAVIS FOR THE DEFENDANT HILL.

JOANNE HEPWORTH FOR THE DEFENDANT MARTIN.

JOSEPH BESHOURI FOR THE DEFENDANT CARSON.

STEVEN KIERSH AND PAUL DEWOLFE FOR THE DEFENDANT SWEENEY.

HOWARD BRAMSON FOR THE DEFENDANT PROCTOR.

FRED JONES FOR THE DEFENDANT COATES.

JONATHAN ZUCKER FOR THE DEFENDANT GARY PRICE.)

THE DEPUTY CLERK:  IS MR. BRAMSON HERE?

MR. ZUCKER:  NO.

THE DEPUTY CLERK:  MR. BRAMSON IS NOT PRESENT, YOUR HONOR.

THE COURT:  DOES ANYONE KNOW WHERE HE IS?

MR. ZEIDENBERG:  I DON'T, YOUR HONOR.  IT'S POSSIBLE THAT -- I NEVER CALLED HIM ABOUT THIS DATE.  I DID SPEAK WITH THEM A COUPLE OF WEEKS AGO, BUT I THINK, IN

4

RETROSPECT, IT MAY HAVE BEEN PRIOR TO THIS DATE BEING SET. AND IF CHAMBERS DIDN'T CALL HIM, I DIDN'T CALL HIM TO REMIND HIM OR TO INFORM HIM OF THE DATE. SO IT IS POSSIBLE HE WAS NEVER APPRISED.

THE COURT: ALL RIGHT. WELL, WE'RE GOING TO DO NOTHING SUBSTANTIVE TODAY. WHAT WE'RE GOING TO DO IS SIMPLY ESTABLISH A SCHEDULE FOR FURTHER PROCEEDINGS IN THE CASE. AND IF MR. BRAMSON, AFTER REVIEWING THE SCHEDULE THAT WE ESTABLISH, FEELS THAT IT IS NECESSARY TO ADDRESS THE COURT, WE'LL MAKE ARRANGEMENTS FOR HIM TO DO SO.

DO I NOW HAVE ALL DEFENSE MOTIONS?

MS. HEPWORTH: NO, YOUR HONOR.

THE COURT: I DON'T?

MS. HEPWORTH: NO, YOUR HONOR. NOT ON BEHALF OF MR. MARTIN.

THE COURT: I HAVE GOT A LOT OF MOTIONS. I CAN TELL YOU THAT.

MS. HEPWORTH: YOU DON'T HAVE ANY FROM MR. MARTIN, OTHER THAN THE EARLIER ONES.

THE COURT: AND YOU ARE PLANNING TO FILE MOTIONS?

MS. HEPWORTH: YES, YOUR HONOR.

THE COURT: ALL RIGHT. NOT SIMPLY TO JOIN MOTIONS ALREADY OF RECORD?

MS. HEPWORTH: NO. WE WILL JOIN SOME OF MR. SWEENEY'S MOTIONS, BUT WE WILL ALSO BE FILING OUR OWN.

(Page 22 of Total)

THE COURT:  ALL RIGHT.

MR. ZUCKER:  YOUR HONOR --

THE COURT:  MR. ZUCKER.

MR. ZUCKER:  -- ON BEHALF OF MR. PRICE, SINCE WE WERE JUST JOINED, I DON'T EVEN KNOW WHAT HAS BEEN FILED IN THIS CASE.  I HAD PREVIOUSLY JOINED IN THE CO-DEFENDANTS' MOTIONS IN THE OTHER CASE, BUT I NEED TO REVIEW AND SEE WHAT THERE IS TO JOIN AND ASSESS IF THERE IS ANYTHING ELSE TO FILE.

MR. KIERSH:  STEVEN KIERSH ON BEHALF OF WILLIAM SWEENEY.

THE COURT:  YES.

MR. KIERSH:  GOOD MORNING.

WE FILED, SO FAR, ABOUT 15 SUBSTANTIVE MOTIONS. WE HAVE MORE COMING.  AND THE GOVERNMENT FILED A VERY EXTENSIVE PLEADING THIS WEEK ON A MOTION TO ADMIT STATEMENTS OF MURDERED WITNESSES.  THAT IS OPENING UP, I WOULD SUBMIT TO THE COURT -- AND I HAVE ALREADY SPOKEN TO MR. ZEIDENBERG -- A PANDORA'S BOX OF ADDITIONAL MOTIONS THAT ARE GOING TO BE COMING IN.

SO I THINK THAT THERE IS A SUBSTANTIAL AMOUNT OF ADDITIONAL LITIGATION COMING, BASED ON THE INFORMATION WE RECEIVED THIS WEEK FROM THE GOVERNMENT.

THE COURT:  WELL, WHAT WOULD BE A REALISTIC DATE TO ASK FOR ALL DEFENSE MOTIONS?

6

MS. HEPWORTH: YOUR HONOR, JOANNE HEPWORTH FOR MR. MARTIN.

FOR MR. MARTIN, I BELIEVE THAT WE CAN HAVE OUR MOTIONS IN BY THE END OF JUNE OR THE FIRST WEEK IN JULY.

MR. DAVIS: YOUR HONOR, I AM AT THE END OF THE TABLE HERE, AND THERE ARE TWO OTHER DEFENSE COUNSEL. WE SEEM TO BE OF THE MIND THAT PERHAPS MID-JULY WOULD BE A GOOD TIME FOR THE DEFENSE TO FILE THEIR MOTIONS.

THE COURT: ALL RIGHT. WHAT YOU'RE TELLING ME MAKES THE TRIAL DATE THAT WE HAVE SET SOUND UNREALISTIC.

MR. DAVIS: WELL, PERHAPS IF WE FILE IN MID-JULY AND THE UNITED STATES HAS A PERIOD OF TIME --

THE DEPUTY MARSHAL: STEP UP TO THE PODIUM.

MR. DAVIS: CERTAINLY.

USUALLY MY PROBLEM IS THE EXACT OPPOSITE, YOUR HONOR. PEOPLE TELL ME I AM TOO LOUD.

IF WE FILE IN MID-JULY, AND THE UNITED STATES FILES PERHAPS AT THE END OF THE FIRST WEEK OF AUGUST, I THINK WE WOULD STILL BE ABLE TO DO THE MOTIONS, PERHAPS, DURING THE END OF AUGUST OR THE FIRST WEEK IN SEPTEMBER AND THEN BEGIN.

THE COURT: ALL RIGHT. MID-JULY?

MR. KIERSH: YOUR HONOR, I THINK I SHOULD RAISE ANOTHER MATTER BEFORE WE ACTUALLY PROCEED TO SETTING A FIRM DATE ON THE MOTIONS, BECAUSE I THINK THE MATTER I WANT TO

7

RAISE WILL AFFECT THE SCHEDULING.

IN THIS PLEADING -- AND I SPOKE WITH MR. ZEIDENBERG YESTERDAY ABOUT THIS.  IN THIS PLEADING THAT THE GOVERNMENT FILED TO ADMIT EVIDENCE --

THE COURT:  I HAVEN'T LOOKED AT IT.

MR. KIERSH:  IT IS 30 PAGES.  AND WHAT THE GOVERNMENT, IN ESSENCE, IS TRYING TO DO IS ADMIT STATEMENTS OF PEOPLE WHO ARE DECEASED THROUGH THE LEAD F.B.I. INVESTIGATOR IN THIS CASE.

THE INVESTIGATOR WILL COME IN AND SAY, "WELL, THIS PERSON, WHO IS NOW DECEASED, TOLD ME THIS, TOLD ME THAT," AND SO ON AND SO FORTH.

THE PROBLEM IS THAT IT IS RAISING IN ITS PLEADING A NUMBER OF NEW SUBSTANTIVE OFFENSES, PARTICULARLY AGAINST MY CLIENT, MR. SWEENEY, INCLUDING ADDITIONAL MURDERS.  AND I ASKED MR. ZEIDENBERG YESTERDAY WHETHER OR NOT THAT INFORMATION IS IN THE PLEADING SIMPLY AS CONTEXT TO SUPPORT THEIR POSITION THAT THIS INFORMATION COMES IN, OR ARE THEY GOING TO TRY TO ADMIT ACTUAL TESTIMONY ABOUT THESE ADDITIONAL MURDERS AND OTHER VERY SERIOUS OFFENSES AS SUBSTANTIVE EVIDENCE -- AS UNCHARGED ACTS.

IF THE GOVERNMENT'S POSITION IS THAT THEY WANT TO ADMIT IT SUBSTANTIVELY AS UNCHARGED ACTS IN SUPPORT OF THE RACKETEERING COUNTS IN THE INDICTMENT, WE NOW HAVE TO DEAL WITH A NUMBER OF NEW VERY SERIOUS SUBSTANTIVE OFFENSES,

8

WHICH WE WOULD SUBMIT WE'RE ENTITLED TO DISCOVERY ON, THAT WE NEED TO LITIGATE, AND THAT WE NEED A SUBSTANTIAL AMOUNT OF TIME INVESTIGATE, GIVEN THAT THESE MURDERS OCCURRED THREE, FOUR, OR FIVE YEARS AGO.

SO IF THE GOVERNMENT IS SEEKING TO ADMIT THAT AS SUBSTANTIVE EVIDENCE, THEN THE SEPTEMBER 5TH DATE IS ENTIRELY UNREALISTIC.

THE COURT:  IN WHAT OTHER CONTEXT WOULD THEY COME IN?

MR. KIERSH:  WELL, I DON'T KNOW.  I DON'T KNOW WHETHER OR NOT THE GOVERNMENT PUT THAT IN AS CONTEXT TO SUPPORT THEIR LEGAL POSITION AND THEY JUST WANT THE COURT TO UNDERSTAND WHAT'S OUT THERE, AND THEN THEY MAY LIMIT IT AND NOT INTRODUCE ACTUALLY THE EVIDENCE OF OTHER OFFENSES.

FOR INSTANCE, THERE IS A WITNESS NAMED ROBERT SMITH.  I THINK THE COURT IS FAMILIAR WITH THIS PERSON.  AND MR. SWEENEY, IN A SUPERSEDING INDICTMENT, IS CHARGED WITH CONSPIRING TO KILL MR. SMITH.

NOW, WE KNEW THAT THAT IS A SUBSTANTIVE COUNT IN THE INDICTMENT.  THE GOVERNMENT IS NOW SAYING, "WELL, BECAUSE MR. SMITH IS DEAD, VINCENT LISI, THE F.B.I. AGENT IN CHARGE OF THE INVESTIGATION, SHOULD BE ABLE TO TELL THE JURY WHAT MR. SMITH SAID TO HIM."

THAT'S THE FIRST PART OF THEIR MOTION, AND THAT'S WHAT THEY ARE TRYING TO ACCOMPLISH THROUGH THEIR MOTION.

9

THE COURT: ALL RIGHT.

MR. KIERSH: BUT THEN THEY ALSO PUT IN THEIR MOTION EVIDENCE THAT RELATES TO UNCHARGED ACTS IN THIS CASE, INCLUDING OTHER MURDERS. AND THEY SAY THAT, WELL, MR. SMITH TOLD AGENT LISI THAT MR. SWEENEY WAS INVOLVED IN ANOTHER MURDER, ANOTHER SHOOTING, SO ON AND SO FORTH.

IT'S THOSE ASPECTS OF THE GOVERNMENT'S PLEADING, NOT RELATED TO MR. SMITH, THAT WE DON'T KNOW YET IF THE GOVERNMENT IS GOING TO TRY TO ADMIT THOSE INTO EVIDENCE. SO IF THEY ARE TRYING --

THE COURT: WHAT YOU'RE SAYING IS THAT THE OTHER MURDERS WERE SIMPLY PART OF THE ARGUMENT THAT THE GOVERNMENT --

MR. KIERSH: PART OF THE ARGUMENT. AND WE DON'T KNOW IF IT IS JUST PART OF THE ARGUMENT FOR CONTEXT OR IF THEY WANT TO PUT IT IN AS EVIDENCE -- AS UNCHARGED ACTS. AND, AGAIN, IF IT IS GOING IN AS UNCHARGED ACTS, WE NEED TO INVESTIGATE IT TO REBUT IT. AND THEN IF THAT IS THEIR POSITION, WE CAN'T POSSIBLY GO TO TRIAL SEPTEMBER 5TH.

SO I THINK WE NEED A PRELIMINARY DETERMINATION AS TO WHETHER OR NOT THAT IS PART OF THE GOVERNMENT'S CASE IN CHIEF.

THE COURT: WELL, I AM NOT GOING TO ASK HIM TO COMMIT ON THAT RIGHT NOW UNTIL I SEE WHAT YOUR OPPOSITION IS TO HIS MOTION.

10

ALL RIGHT.

MS. HEPWORTH:  YOUR HONOR, AGAIN, JOANNE HEPWORTH ON BEHALF OF JEROME MARTIN.

IT IS OUR POSITION THAT THIS TRIAL HAS BEEN PENDING FOR A LONG, LONG TIME AND THAT WE ALL --

THE COURT:  YOU HAVE TOLD ME THAT BEFORE.

MS. HEPWORTH:  I UNDERSTAND, YOUR HONOR.  I JUST NEED TO MAKE THE RECORD.  WE OBJECT TO ANY MOVING OF THE TRIAL DATE. .

THANK YOU.

YOUR HONOR, GIVE ME CREDIT FOR CONSISTENCY.

THE COURT:  I BEG YOUR PARDON?

MS. HEPWORTH:  YOU HAVE GIVE TO ME CREDIT FOR CONSISTENCY.

THE COURT:  PERSISTENCY I THINK I WILL GIVE YOU CREDIT FOR.

ALL RIGHT.  I UNDERSTAND.

AGAIN, LET ME COME BACK TO A JULY 14TH DATE FOR ALL DEFENSE MOTIONS.

MR. ZEIDENBERG, WHAT WOULD BE A REALISTIC RESPONSE DATE?

MR. ZEIDENBERG:  WE HAVE THE --

THE COURT:  I THINK THE TRIAL DATE IS ALREADY VULNERABLE.  I DO NOT SEE THAT --

MR. ZEIDENBERG:  WELL, I WOULD ASK FOR THE 18TH OF

(Page 28 of Total)

11

AUGUST. THAT WOULD BE JUST OVER THIRTY DAYS.

THE COURT: THE 18TH OF AUGUST, YOU SAY?

MR. ZEIDENBERG: YES.

THE COURT: ALL RIGHT. THE DEFENSE REPLIES?

MR. KIERSH: MAY WE HAVE ABOUT TWO WEEKS, AT LEAST ON BEHALF OF MR. SWEENEY, FOR REPLIES?

THE COURT: IS THERE ANY DEFENSE COUNSEL WHO DOES NOT THINK THAT A TWO-WEEK PERIOD IS GOING TO BE SUFFICIENT TO REPLY TO THE GOVERNMENT'S OPPOSITION?

MR. ZUCKER: YOUR HONOR, OUT OF AN ABUNDANCE OF CAUTION, BECAUSE I AM GOING TO BE IN TRIAL PART OF THAT TIME -- ONLY IF WE'RE PUTTING OFF THE TRIAL DATE ANYWAY, I WOULD ASK FOR --

THE COURT: I'M SORRY? YOU WOULD ASK FOR WHAT?

MR. ZUCKER: IF YOU'RE PUTTING OFF THE SEPTEMBER 5TH TRIAL DATE -- AND YOU ARE CERTAINLY DOING THAT -- THEN I WOULD ASK FOR THREE WEEKS TO REPLY, ONLY BECAUSE ONCE HE FILES ON AUGUST 18TH, I AM GOING TO BE IN TRIAL FOR AWHILE AND WON'T BE ABLE TO GET TO IT FOR A WEEK OR TWO.

THE COURT: ALL RIGHT. REPLIES BY SEPTEMBER 8TH. AND WE SHOULD PROBABLY SET A MOTIONS HEARING DATE -- PROBABLY A MOTIONS HEARING WEEK -- THE WEEK OF SEPTEMBER 25TH, BEGINNING ON SEPTEMBER 25TH AND EXTENDING FOR AS LONG DURING THAT WEEK AS WE NEED TO GO.

MR. ZUCKER: I HAVE AN ORAL ARGUMENT IN THE COURT

12

OF APPEALS IN THIS CIRCUIT THAT MORNING.  IF WE START IN THE AFTERNOON, I AM FINE.

THE COURT:  THE 26TH?

MR. ZUCKER:  THE 26TH IS FINE.

THE COURT:  ALL RIGHT.  THE HEARING TO COMMENCE ON THE 26TH.

MR. ZUCKER:  SHOULD WE ALL BLOCK OUT THAT ENTIRE WEEK THEN?

THE COURT:  I'M SORRY?

MR. ZUCKER:  SHOULD WE ALL BLOCK OUT THAT ENTIRE WEEK?

THE COURT:  YES.  EVERYBODY BUT YOU OUGHT TO HAVE THE REMAINDER OF THE YEAR PRETTY WELL BLOCKED OUT.

I HAVEN'T SCANNED THE MOTIONS.  I HAVEN'T REVIEWED THE MOTIONS CAREFULLY.  ARE THERE ANY THAT ARE LIKELY TO REQUIRE THE TAKING OF TESTIMONY?

MR. KIERSH:  YOUR HONOR, ON BEHALF OF MR. SWEENEY, WE HAVE A MOTION TO SUPPRESS CUSTODIAL STATEMENTS THAT I WOULD ANTICIPATE WILL TAKE MORE THAN A FEW DAYS TO ACTUALLY HAVE A HEARING ON.  WE HAVE GOT A MOTION TO SUPPRESS PHYSICAL EVIDENCE THAT MAY TAKE SOME TIME.

WE ALSO HAVE A MOTION -- WELL, WE HAVE REQUESTED PRETRIAL HEARINGS AS TO THE ACTUAL EXISTENCE OF BOTH THE CONSPIRACY AND THE RACKETEERING ENTERPRISE.  THOSE ARE PENDING BEFORE THE COURT.

(Page 30 of Total)

13

THE COURT: YES.

MR. KIERSH: SO THE COURT WILL HAVE TO MAKE A RULING ON THOSE. AND, AGAIN, GOING BACK TO THE GOVERNMENT'S MOTION THAT WAS FILED THIS WEEK, PART OF OUR POSITION IS GOING TO BE THAT THE COURT SHOULD HOLD A PRETRIAL EVIDENTIARY HEARING TO SEE IF THERE IS ANY BASIS -- IF THE GOVERNMENT STILL IS SEEKING TO ADMIT THAT TESTIMONY, IF THERE IS A FACTUAL BASIS -- A SUFFICIENT FACTUAL BASIS TO ADMIT THAT. SO IT COULD BE LENGTHY HEARINGS.

MS. HEPWORTH: ALSO, ON BEHALF OF MR. MARTIN, WE WILL ALSO HAVE EVIDENTIARY MOTIONS ON STATEMENTS AND EVIDENCE.

THE COURT: SO WE ARE GOING TO HEAR TESTIMONY FROM MORE THAN ONE WITNESS, I TAKE IT, IN CONNECTION WITH THESE MOTIONS?

MS. HEPWORTH: I WOULD IMAGINE, YES.

THE COURT: ALL RIGHT. WELL, THEN WE'LL START ON THE 26TH AND GO AS LONG AS NECESSARY.

IT DOES NOT SEEM REALISTIC TO ME TO ASSIGN A NEW TRIAL DATE TODAY, BUT MAYBE IT IS. MAYBE IT WOULD BE BETTER SIMPLY TO ASSIGN A NEW TRIAL DATE SO YOU CAN BEGIN WORKING ON YOUR CALENDARS FOR THAT.

MS. HEPWORTH: YOUR HONOR, WOULD THE NEW TRIAL DATE BE IMMEDIATELY FOLLOWING THE MOTIONS HEARINGS?

THE COURT: WELL, REASONABLY PROXIMATE, BUT, OF

(Page 31 of Total)

COURSE, WE HAVE GOT A LONG JURY SELECTION PROCESS HERE.

MS. HEPWORTH:  I WOULD BE IN FAVOR OF SETTING A TRIAL DATE TODAY.

THE COURT:  IS THERE ANYBODY WHO WOULD NOT WANT TO SET A TENTATIVE TRIAL DATE TODAY?

(NO RESPONSE.)

THE COURT:  HEARING NONE, WE WILL DO THAT.

NOVEMBER 13TH?

HEARING NO DISSENT, NOVEMBER 13TH WILL BE OUR TENTATIVE NEW TRIAL DATE.

I WOULD LIKE TO HAVE VOIR DIRE QUESTIONS FROM THE DEFENSE BY NOVEMBER 1 AND BY NOVEMBER 8TH FROM THE GOVERNMENT.

ARE THERE ANY OTHER DATES THAT YOU ARE OF A MIND WE NEED TO FIX AT THIS TIME?

MR. BESHOURI:  JOSEPH BESHOURI ON BEHALF OF MR. CARSON.

GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING.

MR. BESHOURI:  CAN THE COURT GIVE US A SENSE ON WHAT DAY OF THE WEEK THE COURT WILL NOT BE IN TRIAL AND WHAT THE SCHEDULE WILL BE DURING THE HOLIDAYS?

THE COURT:  SURE.  SURE.  IT IS MY CONTEMPLATION THAT WE WILL FOLLOW A NORMAL TRIAL DAY MONDAY THROUGH THURSDAY.  FRIDAY IS GOING TO BE A LAY DAY THROUGHOUT THE

(Page 32 of Total)

15

TRIAL. AND WHEN I SAY A "NORMAL DAY," A NORMAL DAY IS TRIAL COMMENCING AT 10:00 O'CLOCK IN THE MORNING, AN HOUR TO AN HOUR AND A HALF FOR LUNCH, AND RECESSING BEFORE, OR, AT THE LATEST, 5:00 O'CLOCK.

MR. BESHOURI: AND FOR THE HOLIDAYS, YOUR HONOR FOR THOSE OF US THAT GO OUT OF TOWN?

THE COURT: ORDINARY HOLIDAYS ARE GOING TO BE OBSERVED. WHICH ONES ARE YOU CONCERNED ABOUT?

MR. BESHOURI: WELL, PARTICULARLY, THE THANKSGIVING PERIOD AND CHRISTMAS.

THE COURT: SURE. WE WILL BE IN RECESS OVER THE HOLIDAYS.

MR. BESHOURI: FOR THOSE WEEK PERIODS, I GUESS IS WHAT I AM ASKING, AS OPPOSED TO JUST THE ONE DAY?

THE COURT: OH, SURE. SURE. WHATEVER PERIOD THE COURT IN EXECUTIVE SESSION ELECTS TO BE IN RECESS, WE WILL BE IN RECESS. AND THAT USUALLY SPANS A NUMBER OF DAYS, ENCOMPASSING THE HOLIDAY ITSELF.

AND I URGE YOU, ONCE AGAIN, TO PROTECT YOUR CALENDARS, AND TO THE EXTENT THAT YOU NEED TO CALL UPON ME TO ASSIST IN PROTECTING YOUR CALENDARS, I AM AVAILABLE. I WILL DO SO.

MR. KIERSH: YOUR HONOR, A FEW OTHER MATTERS. CAN WE HAVE ONE OF THE WITNESS ROOMS ACROSS THE HALL ASSIGNED TO US DURING THE TRIAL SO THAT WE CAN MOVE IN FILING CABINETS?

16

THIS IS A VERY DOCUMENT-HEAVY CASE. IF WE COULD SET UP --

THE COURT: I AM NOT SURE ABOUT THE WITNESS ROOM, BUT I WILL FIND YOU SPACE. THERE IS A PROTRACTED LITIGATION SUPPORT SPACE, WHICH IS ADJACENT TO MY CHAMBERS ON THE SECOND FLOOR. AND I WILL TRY TO ARRANGE TO MAKE SURE THAT THAT'S AVAILABLE TO YOU. IT HAS THE NECESSARY EQUIPMENT, TELEPHONE CONNECTIONS, FILE SPACE AND THINGS OF THAT NATURE.

MR. KIERSH: FINE.

AND ON BEHALF OF MR. SWEENEY, WE HAVE PENDING A MOTION TO COMPEL DISCOVERY AND AN ADDENDUM TO THE MOTION TO COMPEL DISCOVERY. WE WOULD ASK FOR AN IMMEDIATE HEARING, AS SOON AS THE COURT CAN SET THAT, SO THAT WE CAN MOVE FORWARD IN OUR INVESTIGATION. WE ARE REQUESTING VERY SIGNIFICANT MATTERS RELATED TO THE PREPARATION OF OUR CASE. WE WOULD ALSO ASK THE COURT TO SET IT DOWN AT THE EARLIEST TIME.

THE COURT: WHICH MOTIONS ARE YOU ADVERTING TO?

MR. KIERSH: IT'S OUR INITIAL MOTION TO COMPEL DISCOVERY, WHICH WAS FILED. AND THE GOVERNMENT HAS FILED A RESPONSE TO THAT. AND THEN WE FILED AN ADDENDUM TO THE MOTION TO COMPEL DISCOVERY. AND THESE MOTIONS RELATE TO THE INVESTIGATIVE FILES PERTAINING TO ALL OF THE SUSPECTS IN THE TRIPLE HOMICIDE, WHICH OCCURRED IN TEMPLE HILLS, MARYLAND, WHICH IS BOTH SUBSTANTIVE COUNTS AND RACKETEERING COUNTS IN THIS INDICTMENT.

THE COURT: IS THAT MATERIAL WHICH IS WITHIN THE

17

CONTROL OF THE GOVERNMENT?

MR. KIERSH: YES, IT IS. THIS INDICTMENT AROSE AS PART OF A JOINT TASK FORCE WITH PRINCE GEORGE'S COUNTY, MONTGOMERY COUNTY, THE FEDERAL BUREAU OF INVESTIGATION AND D. C. HOMICIDE. AND THEY HAVE BEEN PASSING THIS INFORMATION BACK AND FORTH FOR A NUMBER OF YEARS.

THE COURT: HAS THE GOVERNMENT RESPONDED TO ALL OF THE MOTIONS EXCEPT THE ADDENDUM?

MR. KIERSH: YES. AND THERE IS ALSO A BILL OF PARTICULARS THAT WE FILED THAT WE WOULD ALSO LIKE TO HAVE RESOLVED.

THE COURT: A MOTION FOR A BILL OF PARTICULARS?

MR. KIERSH: THAT'S CORRECT.

THE COURT: AND HAS THE GOVERNMENT RESPONDED TO THAT?

MR. KIERSH: YES.

THE COURT: ALL RIGHT.

WILL IT BE NECESSARY TO TAKE TESTIMONY IN CONNECTION WITH ANY OF THESE MOTIONS?

MR. KIERSH: WELL, I THINK IT IS A LEGAL ARGUMENT. I DON'T KNOW IF MR. ZEIDENBERG WANTS TO PUT ON TESTIMONY PERTAINING TO THE AVAILABILITY OF THE INFORMATION, BUT I THINK AS A THRESHOLD, IT IS A LEGAL ARGUMENT UNDER BRADY, AS WELL AS THE OTHER CASES WE CITED.

THE COURT: ALL RIGHT.

18

IF THEY ARE ALL READY TO BE HEARD, HOW ABOUT JULY 18TH? THAT'S A TUESDAY.

MR. KIERSH: THAT'S NOT A GOOD DAY FOR MR. DE WOLFE. IF AT ALL POSSIBLE, WE WOULD LIKE TO DO IT SOONER THAN THAT. IT IS REALLY IMPACTING ON OUR INVESTIGATION, NOT HAVING ACCESS TO THIS INFORMATION. IF THE COURT HAS ANY AVAILABILITY --

THE COURT: I AM STARTING A TRIAL ON MONDAY. I DON'T KNOW HOW LONG THAT ONE IS GOING TO GO. I HAVE GOT ANOTHER ONE ON THE 19TH.

JUNE 26TH OR 27TH? LET'S SAY THE 27TH.

MR. ZEIDENBERG: YOUR HONOR, I APOLOGIZE. THAT'S GOING TO BE THE ONE WEEK THAT I AM GOING TO BE OUT OF TOWN, THE WEEK OF THE 26TH THROUGH THE 30TH. I AM AVAILABLE LITERALLY ANY DAY BETWEEN NOW AND JULY 18TH. I KNOW THE COURT IS LEAVING TOWN.

THE COURT: CAN WE DO THEM IN ONE DAY, DO YOU THINK?

MR. KIERSH: OH, I BELIEVE SO.

THE COURT: ALL RIGHT.

MR. ZEIDENBERG: I THINK IT WOULD BE AN HOUR.

THE COURT: HOW ABOUT JUNE 15TH THEN, OR JUNE 16TH, RATHER. JUNE 16TH.

MR. KIERSH: WHAT TIME, YOUR HONOR?

THE COURT: WE'LL START AT 10:00 O'CLOCK.

19

MR. KIERSH: VERY WELL.

MR. DE WOLFE: YOUR HONOR, I HAVE A SCHEDULING CONFERENCE THAT DAY.

THE COURT: YOU HAVE GOT A SCHEDULING CONFERENCE SOMEWHERE?

MR. DE WOLFE: AND A HEARING IN DISTRICT COURT.

MR. KIERSH: WELL, IF THE 16TH IS THE EARLIEST DATE, BECAUSE THIS IS IMPORTANT, I THINK WE WOULD PREFER TO GO FORWARD.

THE COURT: ALL RIGHT. JUNE 16TH.

THESE ARE THE MOTIONS THAT CAN BE CHARACTERIZED AS DISCOVERY MOTIONS?

MR. KIERSH: THAT'S CORRECT.

MR. ZUCKER: YOUR HONOR, MR. PRICE HAS ASKED IF HE CAN BE EXCUSED FROM ATTENDING THAT.

THE COURT: I AM SORRY.

MR. ZUCKER: MR. PRICE HAS ASKED IF HE COULD BE EXCUSED FROM ATTENDING THAT. HE WOULD LIKE TO GO TO WORK THAT DAY I WILL BE HERE.

THE COURT: ALL RIGHT. HE MAY BE EXCUSED.

MR. KIERSH: MAY MR. DE WOLFE AND I APPROACH THE BENCH EX PARTE?

MS. HEPWORTH: MAY I JUST ASK THAT MR. MARTIN BE EXCUSED FROM THE JUNE 16TH HEARING? WE HAVE ONGOING DISCUSSIONS WITH THE GOVERNMENT. WE DON'T KNOW -- AT THIS

20

POINT, WE DON'T HAVE ANY DISPUTES THAT AREN'T RESOLVED.

THE COURT:  ALL RIGHT.  AT YOUR REQUEST, YOU MAY BE EXCUSED FROM THAT HEARING.

MS. HEPWORTH:  THANK YOU.

MR. DAVIS:  YOUR HONOR, ON BEHALF OF VINCENT HILL, WE ARE ALSO REQUESTING THAT WE BE EXCUSED FROM THAT HEARING.

THE COURT:  YOU MAY BE EXCUSED.

ALL RIGHT.  YOU WANT TO APPROACH?

MR. KIERSH:  WE WOULD ASK THAT IT BE PLACED UNDER SEAL.

(SEALED BENCH CONFERENCE.)

21

(IN OPEN COURT.)

THE COURT:  ALL RIGHT.  ARE THERE ANY OTHER MATTERS THAT WE NEED TO ADDRESS THIS MORNING?  IF NOT, I WILL ENTER AN ORDER VACATING THE TRIAL DATE AND SETTING FORTH THIS SCHEDULE.

MR. KIERSH:  THERE IS ONE MORE PENDING MOTION THAT WE HAVE THAT I WOULD ASK THE COURT TO RULE ON TODAY.  THIS IS OUR MOTION ON BEHALF OF MR. SWEENEY.  I THINK SOME OF THE OTHER GENTLEMEN FROM WARSAW MAY HAVE JOINED, BUT WE HAVE MOVED AND ASKED THE COURT FOR A CHANGE IN HIS LOCATION.  THE GOVERNMENT YESTERDAY FILED THEIR OPPOSITION.

THE COURT:  WELL, THEN I AM NOT GOING TO HEAR IT. I HAVEN'T LOOKED AT THE PAPERS ON IT --

MR. KIERSH:  VERY WELL.

THE COURT:  -- AND WOULD NOT BE IN A POSITION TO TO BE ABLE TO RULE TODAY.  I WILL RULE ON THE PAPERS.

MR. KIERSH:  VERY WELL.  AND IF THE COURT WANTS TO, AT LEAST FOR ME TO PRESENT, FURTHER ARGUMENT ON JUNE 16TH ON THIS ISSUE, I CAN DO THAT.

THE COURT:  I WILL LET YOU KNOW.

MR. KIERSH:  VERY WELL.

THE COURT:  ALL RIGHT.

ALL RIGHT.  THANK YOU, COUNSEL.

(WHEREUPON, THE ABOVE-ENTITLED MATTER WAS ADJOURNED.)

22

CERTIFICATE OF REPORTER

THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO

BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.

PHYLLIS MERANA

RECEIVED

Dec 14  8 07 AM '03

N. MAYER-WHITTINGTON
CLERK
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

(Page 41 of Total)

Clerk's File

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,        :

                      :

 VS.                  :     CR. NO. 98-329

                      :

VINCENT HILL,         :

JEROME MARTIN,       :

SAMUEL CARSON,       :

WILLIAM K. SWEENEY,  :

MAURICE PROCTOR,     :

SEAN COATES,         :

        DEFENDANTS.     :

                      :

UNITED STATES       :

        GOVERNMENT,        :

                      :

 VS.                  :     CR. NO. 99-348

                      :

GARY PRICE,         :

        DEFENDANT       :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JANUARY 8, 2001
(MORNING SESSION.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:             PHYLLIS MERANA
                                6816 U. S. DISTRICT COURT
                                3RD & CONSTITUTION AVE., N.W.
                                WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:             HOWARD BRAMSON, ESQ.
                                       717 D STREET, N.W.
                                       THIRD FLOOR
                                       WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

(Page 43 of Total)

App 175

THE COURT:  AND IF YOU WILL JUST PICK AN APPROPRIATE POINT IN THE COURSE OF YOUR OPENING TO INTERRUPT --

MR. ZEIDENBERG:  THAT'S FINE.

THE COURT:  -- I WOULD APPRECIATE IT.

ALL RIGHT, MARSHAL.  WOULD YOU BRING THE JURY IN.

THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

(JURY BROUGHT IN.)

THE DEPUTY MARSHAL:  THE JURY PANEL IS ALL PRESENT, YOUR HONOR.

THE COURT:  THANK YOU, MARSHAL.

MR. ZEIDENBERG, YOU MAY OPEN.

MR. ZEIDENBERG:  THANK YOU, YOUR HONOR.

OPENING STATEMENT ON BEHALF OF THE GOVERNMENT

MR. ZEIDENBERG:  GOOD MORNING, LADIES AND GENTLEMEN.

THE JURORS:  GOOD MORNING.

MR. ZEIDENBERG:  ON THE EVENING OF AUGUST 29TH, 1992, A FIFTEEN-YEAR-OLD GIRL, NAMED CHRISHAUNA GLADDEN, WHO IS KNOWN TO HER FRIENDS AS CHRISSY, WAS A WITNESS TO A MURDER.  IT WAS A MURDER THAT OCCURRED IN THE AREA OF 37TH PLACE, SOUTHEAST.

CHRISSY WASN'T THE ONLY WITNESS TO IT.  THERE WERE A NUMBER OF PEOPLE FROM THAT NEIGHBORHOOD WHO SAW THE MURDER.  IT WAS A MURDER THAT WAS COMMITTED B

30

OF WHOM IS SEATED HERE IN COURT.  THAT MAN'S NAME IS JEROME MARTIN, SEATED RIGHT HERE AT THE END OF COUNSEL TABLE.  HIS STREET NAME IS "PIMP".

HE COMMITTED THAT MURDER WITH SOMEONE NAMED ANTONIO KNIGHT.

NOW, THE METROPOLITAN POLICE DEPARTMENT INVESTIGATED THAT CASE, AND IT TOOK AWHILE TO SOLVE.  IT TOOK AWHILE PRIMARILY BECAUSE THE PEOPLE IN THE NEIGHBORHOOD THAT SAW IT WERE AFRAID AND RELUCTANT TO COOPERATE.  THEY DIDN'T WANT TO GET INVOLVED BECAUSE THE PEOPLE WHO WERE INVOLVED IN THE MURDER HUNG OUT OR LIVED -- I AM TALKING ABOUT JEROME MARTIN, "PIMP," AND ANTONIO KNIGHT WERE FROM THAT NEIGHBORHOOD AND HUNG OUT THERE.

AND OVER TIME, LADIES AND GENTLEMEN, THE F.B.I., FOR REASONS THAT WILL BECOME CLEAR TO YOU AS THIS CASE PROGRESSES, BECAME INVOLVED IN THAT INVESTIGATION, AND THEY WORKED ON IT.  AND, EVENTUALLY, THEY TALKED TO CHRISSY GLADDEN.  SHE WAS PUT INTO THE GRAND JURY AND TOLD THE GRAND JURY WHAT IT IS THAT SHE KNEW, AND SHE WAS SERVED WITH A SUBPOENA TO TESTIFY AT A TRIAL.  IT WAS GOING TO BE THE TRIAL OF JEROME MARTIN AND ANTONIO KNIGHT IN THE SUPERIOR COURT HERE IN D. C.  THAT TRIAL WAS SCHEDULED FOR OCTOBER 9TH, 1996.

NOW, PRIOR TO THAT TRIAL, CHRISSY GLADDEN WAS MOVED OUT OF THE NEIGHBORHOOD WITH THE ASSISTANCE OF THE

*Clerks File*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,                :

 VS.                                 :          CR. NO. 98-329

VINCENT HILL,                        :
JEROME MARTIN,                       :          **FILED**
SAMUEL CARSON,                       :
WILLIAM K. SWEENEY,                  :          JUL 1 9 2001
MAURICE PROCTOR,                     :
SEAN COATES,                         :          NANCY MAYER-WHITTINGTON, CLERK
          DEFENDANTS.                :              U.S. DISTRICT COURT
_____
UNITED STATES                        :
          GOVERNMENT,                :

 VS.                                 :          CR. NO. 99-348
                                     :
GARY PRICE,                          :
          DEFENDANT                  :
_____            :

                                     WASHINGTON, D. C.
                                     JANUARY 10, 2001
                                     (MORNING SESSION.)

                 TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:             HOWARD BRAMSON, ESQ.
                                       717 D STREET, N.W.
                                       THIRD FLOOR
                                       WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

(Page 47 of Total)

App 179

14

MS. HEPWORTH:  THANK YOU, YOUR HONOR.

THE COURT:  NOW, I HAVE LOOKED AT THE CASE AUTHORITY THAT YOU HAVE PROVIDED ME WITH RESPECT TO THE JENCKS ACT AND ITS APPLICATION TO GRAND JURY TESTIMONY AND 302'S OF SPECIAL AGENT LISI.

I BELIEVE THE MOST PERTINENT CASE IS THE CASE OF UNITED STATES VERSUS MASON, D. C. CIRCUIT, AT 523 F. 2D, 1122, DECIDED IN 1975, WHICH, IN EFFECT, HOLDS THAT STATEMENTS OF A WITNESS WHICH ARE NOT RELEVANT TO HIS TESTIMONY AT TRIAL NEED NOT BE DISCLOSED UNDER THE JENCKS ACT.  THE COURT, HOWEVER, OBSERVES THAT THE UNREDACTED STATEMENTS OUGHT TO BE FILED UNDER SEAL WITH THE COURT, AND I WILL ASK THE GOVERNMENT TO PROVIDE THE UNREDACTED STATEMENTS.

MS. HEPWORTH:  GOOD MORNING, YOUR HONOR.  JOANNE HEPWORTH FOR MR. MARTIN.

THE COURT:  I ALSO AM RELYING UPON THE CASE OF UNITED STATES VERSUS CARTER, ALSO THE D. C. CIRCUIT, 70 F.3D 146, DECIDED IN 1995, WHERE THE COURT STATES, QUOTE, IF THE UNPRODUCED STATEMENT COULD NOT HAVE ASSISTED THE DEFENSE IN CROSS-EXAMINING THE WITNESS, THERE IS NO REASON FOR THE TRIAL COURT TO ORDER A MISTRIAL OR FOR AN APPELLATE COURT TO REVERSE A CONVICTION.

IF I UNDERSTAND THE GOVERNMENT'S REPRESENTATION CORRECTLY, THAT MATERIAL WHICH HAS BEEN EXCISED FROM SPECIAL

15

AGENT LISI'S GRAND JURY TESTIMONY AND HIS 302'S IS HIS PARAPHRASE OF THE QUOTATIONS OF OTHER PERSONS WHO MAY OR MAY NOT BECOME WITNESSES IN THE CASE, RATHER THAN STATEMENTS OF HIS OWN, AND HE DOES NOT INTEND, ON HIS DIRECT TESTIMONY AT THIS TIME, TO RELATE ANY OF THOSE STATEMENTS OF OTHER PERSONS, AND SO THEY ARE NOT RELEVANT TO THE SUBJECT OF HIS TESTIMONY.

I AM NOT PREPARED AT THIS POINT, HOWEVER, MR. ZEIDENBERG, TO CONCLUDE THAT THEY WILL NOT BECOME JENCKS MATERIAL IF THE OTHER PERSONS ARE THEMSELVES CALLED TO TESTIFY.

NOW, YOU WANTED TO BE HEARD, MS. HEPWORTH?

MS. HEPWORTH:  I AM SORRY, YOUR HONOR.  I THINK MR. KIERSH WANTED TO BE HEARD FIRST.

MR. KIERSH:  THANK YOU, YOUR HONOR.  GOOD MORNING.

YOUR HONOR, WE WOULD ASK, AND WE THINK IT'S CONSISTENT WITH THE VERY SPECIFIC LANGUAGE OF THE JENCKS ACT THAT THE INFORMATION THAT THE GOVERNMENT SEEKS -- WELL, THE REDACTED INFORMATION -- NOT THAT IT JUST BE PLACED UNDER SEAL, BUT THAT THE COURT REVIEW IT IN CAMERA.

AND I WOULD SUBMIT TO THE COURT THE ACT REQUIRES THE COURT TO CONDUCT A FULL IN CAMERA EVALUATION OF THE SUBSTANCE OF THE TESTIMONY, AND I POINT OUT THAT WE SUBMIT THIS IS VERY IMPORTANT.

AND I WANT TO GO BACK TO SOMETHING THAT OCCURRED

16

IN SEPTEMBER AT THE MOTIONS HEARINGS.  WE HAD FILED A BRADY MOTION PURSUANT TO THE 302 STATEMENTS OF AGENT LISI.  THE GOVERNMENT REPRESENTED TO THE COURT, "WELL, THERE IS NO BRADY IN THERE."  THE COURT THEN REVIEWED THE 302'S IN CAMERA AND THEN THE COURT CAME BACK AND SAID, "WELL, THERE IS BRADY," AND THEN YOU ORDERED THAT THE GOVERNMENT TURN OVER --

THE COURT:  I FOUND ONE INSTANCE OF BRADY.

MR. KIERSH:  WELL, WHATEVER IT IS, YOU DID FIND BRADY, WHICH WAS INCONSISTENT WITH WHAT THE GOVERNMENT WAS PROFFERING TO THE COURT.  AND UNDER SECTION (C) OF THE BRADY ACT OR THE JENCKS ACT, IT REQUIRES THE COURT TO CONDUCT AN IN CAMERA REVIEW.

AND WE WOULD ASK THAT -- I KNOW IT'S BURDENSOME, BUT THIS IS SOMETHING THAT SHOULD HAVE BEEN -- WE ALL SHOULD HAVE BEEN ALERTED TO THIS PRETRIAL.  BUT I WOULD ASK THE COURT TO REVIEW ALL OF THE GRAND JURY TESTIMONY THAT IS REDACTED AND ALL THE 302'S SO THAT THE COURT CAN MAKE AN INDEPENDENT EVALUATION, BECAUSE I WOULD SUBMIT TO THE COURT THAT, YOUR HONOR, YOU ARE IN A MUCH, MUCH BETTER SITUATION AND POSTURE TO EVALUATE THIS TESTIMONY THAN THE COURT OF APPEALS IS.

YOU'RE FAMILIAR WITH THIS CASE.  YOU KNOW WHAT THE RESPECTIVE PARTIES' THEORIES ARE.  YOU HAVE MUCH MORE ABILITY TO GIVE THIS A CONTEXTUAL ANALYSIS THAN THE COURT OF

17

APPEALS CAN.  SO WE WOULD ASK FOR THAT PROCESS TO BE DONE.

THE COURT:  MR. ZEIDENBERG?

MR. ZEIDENBERG:  YOUR HONOR, WE WILL PROVIDE THE REDACTED AND UNREDACTED GRAND JURY TESTIMONY, AND IF THE COURT WISHES --

THE COURT:  IT ISN'T THAT THE COURT WISHES.  IT'S THAT THE ACT REQUIRES IT UPON REQUEST OF THE DEFENSE.

MR. ZEIDENBERG:  WE CERTAINLY HAVE NO OBJECTION IF THE COURT WISHES TO DO IT.  WE'RE NOT REQUESTING IT.  I UNDERSTAND THAT, PERHAPS OUT OF AN ABUNDANCE OF CAUTION, SO THERE IS NO QUESTION --

THE COURT:  THE ACT REQUIRES IT.

MR. ZEIDENBERG:  THAT'S FINE, YOUR HONOR.

THE COURT:  YOUR MASON CASE REQUIRES IT.

MR. ZEIDENBERG:  WE'RE PREPARED TO GIVE THE COURT THAT MATERIAL.

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  AND I THINK THAT THE COURT WILL SEE IT'S QUITE VOLUMINOUS.

THE COURT:  I AM SURE IT IS.

MR. ZEIDENBERG:  BUT I THINK THAT IN SOME WAY, THE COURT'S JOB WILL BE MADE EASIER WHEN THE COURT HEARS THE NATURE OF THE DIRECT EXAMINATION BECAUSE THE DIRECT EXAMINATION IS GOING TO BE -- THE ONE WE INTEND TO PROVIDE IS A VERY GENERAL OVERVIEW.  AND THE MATERIAL THAT IS

(Page 51 of Total)

30

BLOCKS.

Q.  THANK YOU.  YOU CAN RESUME THE STAND.

(WITNESS RETAKING STAND.)

Q.  NOW, AGENT LISI, AFTER WAYNE PERRY WAS ARRESTED AND INCARCERATED, CAN YOU TELL US WHETHER OR NOT YOU NOTICED ANY MARKED DIFFERENCE IN THE LEVEL OF VIOLENCE OR DRUG ACTIVITY IN SOUTHWEST WHERE YOU'RE REFERRING TO?

MR. BRAMSON:  OBJECTION.

THE COURT:  OVERRULED.

THE WITNESS:  NO, WE DID NOT.

BY MR. ZEIDENBERG:

Q.  CAN YOU DESCRIBE WHAT OBSERVATIONS -- PERSONAL OBSERVATIONS YOU HAD MADE -- AND I AM REFERRING NOW TO POST-1993, GOING INTO 1994 -- OF THE DRUG ACTIVITY IN THE AREA OF GREENLEAF GARDENS?

A.  SURE.

DURING THAT TIME, AS SOME MAY REMEMBER, THE SOUTH CAPITOL STREET RAMP WAS UNDER CONSTRUCTION.  OUR OFFICE IS LOCATED IN SOUTHWEST, DOWN NEAR BUZZARD'S POINT ALL THE WAY AT THE WATER, NEAR THE COAST GUARD BUILDING.

THE ROUTE THAT WE HAVE HAD TO TAKE FROM OUR OFFICE AND TO OUR OFFICE THROUGHOUT THE DAY WOULD GO NEAR THIS AREA.

WE WERE ALREADY FAMILIAR WITH THIS AREA FROM THE WAYNE PERRY INVESTIGATION, AND WE WOULD RIDE BY, AND WE

WOULD NOTICE --

MR. BRAMSON:  OBJECTION.  HE IS TALKING ABOUT WHAT OTHER PEOPLE WOULD NOTICE.

THE COURT:  HE IS TALKING ABOUT WHAT HE NOTICED, I BELIEVE.

MR. BRAMSON:  BUT HE IS SAYING "WE," YOUR HONOR.

THE COURT:  THE OBJECTION IS OVERRULED.

MR. BRAMSON:  THANK YOU.

THE WITNESS:  I NOTICED, WHILE RIDING THROUGH THERE, AN INCREASE IN THE VEHICLE TRAFFIC.  SPECIFICALLY, YOU COULD RIDE THROUGH THERE, AND IT WAS AN OPEN-AIR MARKET.

THERE WERE TIMES WHEN CARS WOULD BE LINED UP IN THE EVENINGS ON WEEKENDS, FRIDAY NIGHTS -- THREE OR FOUR CARS LINED UP, AND PEOPLE COMING TO THE WINDOW, AND YOU COULD SEE THEM REACH IN THE WINDOW AND TAKE MONEY AND HAND SOMETHING IN.  AND THIS KIND OF TRAFFIC REALLY PICKED UP.

BY MR. ZEIDENBERG:

Q.  WHAT TIMES OF THE DAY, NIGHTS, OR WEEKENDS DID YOU NOTICE THAT?

A.  ALL TIMES.  MORNING, AFTERNOON, AND EVENING.  ON WEEKENDS -- YOU KNOW, IF I WOULD HAVE A CHANCE TO RIDE THROUGH THERE ON THE WEEKEND.  ALL TYPES OF WEATHER.  HEAVY SNOW AND HEAVY RAIN.

Q.  NOW, IN REGARDS TO VIOLENCE -- SPECIFIC ACTS OF VIOLENCE IN THE AREA -- DID YOU RECEIVE REPORTS OF VIOLENCE IN THAT

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 54 of 443
Case 1:98-cr-00329-RCL    Document 654    Filed 07/19/01    Page 32 of 77

32

AREA?

A.   YES, SIR.

Q.   AND AS A RESULT OF THOSE REPORTS AND AS A RESULT OF YOUR OBSERVATIONS AND THOSE OBSERVATIONS OF OTHER AGENTS, WAS A DECISION MADE REGARDING CONDUCTING AN INVESTIGATION THERE?

A.   YES, SIR.  IN LATE 1995 -- THROUGHOUT 1995, WE WERE URGED BY SOME PEOPLE TO OPEN AN INVESTIGATION INTO THAT AREA.  AND IN LATE 1995, WE DID OPEN AN INVESTIGATION.

Q.   WHAT DOES THAT MEAN?

A.   IT MEANS A COUPLE OF THINGS.  ADMINISTRATIVELY FOR US, THE F.B.I. -- THE TYPES OF CASES THAT WE WORK, WE HAVE TO SIT DOWN AND DOCUMENT WHAT WE PLAN TO DO, WHERE OUR INVESTIGATION WILL BE FOCUSED, AND WHAT WE EXPECT THE INVESTIGATION TO COVER.

        WE DID THIS.  WE ARE GIVEN A CASE NUMBER.  ONCE WE HAVE THAT CASE NUMBER, THAT IS THE CASE NUMBER FOR THAT INVESTIGATION.  AND ANYTHING WE DO IS A PART OF THAT INVESTIGATION THROUGHOUT THE INVESTIGATION.

Q.   WHAT DID YOU HAVE TO DO -- WELL, SPECIFICALLY, WHAT WAS THE GOAL OF YOUR INVESTIGATION?

A.   WHEN WE BEGAN THE INVESTIGATION, OUR SQUAD OR TASK FORCE PRIMARILY WOULD HAVE TWO TYPES OF INVESTIGATIONS.  ONE WOULD FOCUS ON INDIVIDUALS -- PEOPLE THAT WERE BELIEVED TO HAVE BEEN RESPONSIBLE FOR VIOLENT CRIMES.  OTHERS WOULD BE TO FOCUS ON NEIGHBORHOODS.

(Page 54 of Total)

33

THIS WAS TO FOCUS ON THAT NEIGHBORHOOD, TO

IDENTIFY WHO WAS RESPONSIBLE FOR THE VIOLENCE IN THAT AREA

AND INVESTIGATE THEM AND ULTIMATELY PROSECUTE THE PEOPLE

RESPONSIBLE.

Q.   DID YOU HAVE SPECIFIC INDIVIDUALS -- WHEN YOU OPENED

THIS INVESTIGATION, DID YOU HAVE SPECIFIC INDIVIDUALS IN

MIND AS TO WHO YOU INTENDED TO TARGET AND ARREST IN THE

COURSE OF THAT INVESTIGATION?

A.   NO, NOT SPECIFICALLY.   WE LOOKED AT THE AREA, AND WE

TRIED TO GET AN IDEA OF HOW WE WANTED TO PROCEED WITH THE

INVESTIGATION, BUT THERE WERE NO SPECIFIC PEOPLE THAT WE

TARGETED.   IT WAS MOSTLY THE AREA THAT WE FOCUSED ON.

Q.   NOW, ARE YOU FAMILIAR WITH THE DEFENDANTS THAT ARE

PRESENT IN THE COURTROOM TODAY?

A.   YES, SIR.

Q.   AND COULD YOU PLEASE IDENTIFY THEM BY NAME AND INDICATE

WHERE IT IS THEY ARE SEATED?

A.   SURE.

Q.   AND IF YOU COULD ALSO INDICATE WHETHER YOU'RE FAMILIAR

WITH ANY PARTICULAR STREET NAMES THAT ARE ASSOCIATED WITH

THAT DEFENDANT.

A.   SURE.   SITTING -- I GUESS WE'LL START THE FURTHEREST

FROM ME -- AT THE END OF DEFENSE TABLE, WEARING A DARK SUIT,

A WHITE SHIRT, AND A DARK TIE IS GARY PRICE.   HE IS KNOWN AS

"HARRY O."

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 56 of 443
Case 1:98-cr-00329-RCL   Document 654   Filed 07/19/01   Page 41 of 77

41

THE COURT: OVERRULED. GOVERNMENT'S PB-12 IS ADMITTED.

(WHEREUPON, GOVERNMENT'S

**EXHIBIT NUMBER PB-12** WAS

RECEIVED IN EVIDENCE.)

BY MR. ZEIDENBERG:

Q. NOW, YOU SAID THE DECISION WAS MADE TO CONDUCT AN INVESTIGATION INTO THIS AREA?

A. YES, SIR.

Q. CAN YOU TELL THE LADIES AND GENTLEMEN, FIRST OF ALL, WHAT YOUR ROLE WAS IN THAT INVESTIGATION?

A. SURE. I WAS THE CASE AGENT FOR THE INVESTIGATION.

THERE WERE SEVERAL AGENTS, AS WELL AS DETECTIVES AND/OR OFFICERS, WHO WOULD WORK ON IT. ONE PERSON IS LISTED AS THE CASE AGENT. HOWEVER, WE ALL WORKED AS CO-CASE AGENTS. IT WAS MORE OF A TEAM.

AT ONE POINT, I WOULD SAY WE HAD AS MANY AS FIVE AGENTS WORKING ON THE INVESTIGATION AND PERHAPS THREE DETECTIVES. SOMETIMES IT WAS AS LITTLE AS TWO AGENTS AND TWO DETECTIVES.

Q. WHAT DID YOU DO INITIALLY WHEN YOU DECIDED TO CONDUCT OR INITIATE THIS INVESTIGATION? WHAT WERE THE FIRST STEPS YOU HAD TO TAKE?

A. WHEN WE FIRST DECIDE TO OPEN UP A CASE, WE GET A GENERAL PLAN OF ATTACK -- WHAT WE WANT TO DO. TO GIVE US AN IDEA OF

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           .   Docket No. CR 98-329

       Government,                   .   Washington, D.C.
                                    .   January 23, 2001
  vs.                               .   2:15 p.m.
                                    .
VINCENT HILL,                       .   (AFTERNOON SESSION)
JEROME MARTIN,                      .
SAMUEL CARSON,                      .
WILLIAM K. SWEENEY,                 .
MAURICE PROCTOR,                    .
SEAN COATES,                        .

       Defendants

.  .  .  .  .  .  .  .  .  .  .  .  .  .

UNITED STATES OF AMERICA,           .

       Government,                   .

                                    .   Docket No. CR 99-348
  vs.                               .

GARY PRICE,                         .

       Defendant.                    .

.  .  .  .  .  .  .  .  .  .  .  .

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Proctor:       HOWARD BRAMSON, ESQ.
                                 717 D Street, N.W.
                                 Third Floor
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

3

# I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| **WITNESSES FOR THE GOVERNMENT:** | | | | |
| Vincent Lisi | -- | -- | 5 | 36 |
| Reginald Switzer | 61 | -- | -- | -- |

|  | MARKED | RECEIVED |
|---|---|---|
| **EXHIBITS:** | | |
| Defendant Martin's Exhibit No. 6 | 48 | -- |
| Defendant Martin's Exhibit No. 7 | 54 | -- |
| Government's Exhibit No. 2 | 69 | 69 |
| Government's Exhibit Nos. IA404 & IA405 | 90 | 90 |

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

A.    33.

Q.    And can you tell us how far you went in school?

A.    Tenth grade.

Q.    And what was the last school that you attended?

A.    Coolidge Senior High School.

           THE COURT:  I'm sorry?

           THE WITNESS:  Coolidge Senior High School.

BY MS. CHATURVEDI:

Q.    Now, while you were attending Coolidge Senior High School, can you tell us in what quadrant of the city you were living at the time?

A.    Southwest, D.C.

Q.    Do you have any nicknames, Mr. Switzer?

A.    Doo Doo.

Q.    And how did you get that nickname?

A.    Vito gave it to me.

Q.    And when you say, Vito, do you know Vito by another name?

A.    Vincent Hill.

Q.    Do you see Mr. Hill in the courtroom today?

A.    Yeah, he's right there to my right with the coovie on.

           MS. CHATURVEDI:  If the record would reflect that the witness has identified Vincent Hill.

           THE COURT:  All right.  The record will so reflect. I missed your nickname.  What is it?

           THE WITNESS:  Doo Doo.

THE COURT:  How do you spell it?

THE WITNESS:  Doo Doo.

THE COURT:  Doo Doo.  All right.

BY MS. CHATURVEDI:

Q.   And Mr. Switzer, can you tell us about how old you were when you first got that nickname?

A.   I was about 12 or 13.

Q.   And can you also tell us for how long it's been that you've known Vincent Hill?

A.   I known him ever since I was about 11, 12 years old.

Q.   Okay.  Now, Mr. Switzer, were you originally charged in this case that's on trial?  Were you charged as part of this indictment?

A.   Yes.

Q.   And are you testifying in connection with a plea agreement that you've entered into with the United States?

A.   Yes.

MS. CHATURVEDI:  May I approach the witness, Your Honor?

THE COURT:  Surely may.

BY MS. CHATURVEDI:

Q.   Mr. Switzer, I'm going to hand you what's been marked Government's Exhibit No. G2 for identification.  Do you know what that is, sir?

A.   Yes.

Clerks File

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,        :

 VS.                 :     CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
MAURICE PROCTOR,
SEAN COATES,
        DEFENDANTS.

UNITED STATES
        GOVERNMENT,

 VS.                :     CR. NO. 99-348

GARY PRICE,
        DEFENDANT

**FILED**

JUL 19 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JANUARY 24, 2001
(MORNING SESSION)
(11:17 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:        PHYLLIS MERANA
                          6816 U. S. DISTRICT COURT
                          3RD & CONSTITUTION AVE., N.W.
                          WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:             HOWARD BRAMSON, ESQ.
                                       717 D STREET, N.W.
                                       THIRD FLOOR
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 64 of 443

3

I N D E X

WITNESS                          DIRECT (CONTINUED.)

REGINALD SWITZER

    BY MS. CHATURVEDI          5


E X H I B I T S

GOVERNMENT'S                          IN EVIDENCE

M-1                                        37

IA-400, IA-401 AND IA-403               52

(Page 64 of Total)

Case 1:98-cr-00329-RCL   Document 658   Filed 07/19/01   Page 6 of 61

6

AND YOU INDICATED TO US WHEN IT WAS THIS PHOTOGRAPH WAS TAKEN.  CAN YOU REMIND US OF THAT DATE?

A.  IT WAS 1989.

Q.  AND CAN YOU TELL US ABOUT HOW OLD YOU WERE AT THE TIME THIS PHOTOGRAPH WAS TAKEN?

A.  ABOUT 19 OR 20.

Q.  AND HOW MUCH OF AN AGE DIFFERENCE WAS THERE BETWEEN YOU AND MR. PERRY, ROUGHLY?

A.  I THINK IT WAS LIKE FIVE OR SIX YEARS.  SOMETHING LIKE THAT.

Q.  KEEP YOUR VOICE UP.

A.  ABOUT FIVE OR SIX YEARS DIFFERENCE.

Q.  AND WHO WAS OLDER?

A. HE WAS.

Q.  OKAY.

YOU TOLD US YESTERDAY THAT MR. HILL -- VINCENT HILL HAD BEEN THE PERSON WHO HAD GIVEN YOU YOUR NICKNAME OF "DOO-DOO," YOU SAID.

HOW OLD WERE YOU, AGAIN, WHEN YOU FIRST HAD CONTACT WITH MR. HILL?

A.  BETWEEN 10 AND 11.

Q.  ALL RIGHT.  I AM GOING TO SAY TO YOU ONE LAST TIME, HOPEFULLY, KEEP YOUR VOICE UP JUST A LITTLE BIT MORE SO THAT ALL THE MEMBERS OF THE JURY CAN HEAR YOU.  OKAY?

A.  ALL RIGHT.

Q.  ALL RIGHT.

AND HOW WAS IT THAT YOU FIRST MET MR. HILL?

A.  I MET HIM THROUGH MY SISTER'S BOYFRIEND.

Q.  AND WHO WAS YOUR SISTER'S BOYFRIEND?

A.  "DINO" ROACH?

Q.  AND IS "DINO" ROACH ANY RELATION TO THE PERSON YOU IDENTIFIED YESTERDAY IN ONE OF THOSE PHOTOGRAPHS, ANOTHER INDIVIDUAL WITH THE LAST NAME OF ROACH?

A.  YES.

Q.  WHO WAS THE PERSON YOU IDENTIFIED IN THE PHOTOGRAPH?

A.  DANA ROACH.

Q.  AND WHAT IS DANA ROACH AND DINO ROACH'S RELATIONSHIP?

A.  THEY ARE BROTHERS.

Q.  WHAT WAS THE AGE DIFFERENCE AND WHAT IS THE AGE DIFFERENCE BETWEEN YOU AND MR. HILL, APPROXIMATELY?

A.  PROBABLY ABOUT FIVE -- FOUR OR FIVE YEARS DIFFERENCE, OR SIX.  BETWEEN FOUR AND SIX YEARS DIFFERENCE.

Q.  OKAY.  AND WHO IS OLDER?

A.  HE IS.

Q.  BACK WHEN YOU FIRST MET MR. HILL, CAN YOU DESCRIBE FOR US WHAT YOUR RELATIONSHIP WAS LIKE WITH HIM?

A.  WHAT OUR RELATIONSHIP WAS LIKE?

BIG BROTHER/LITTLE BROTHER RELATIONSHIP.

Q.  AND WHAT DO YOU MEAN BY THAT?

A.  I LOOKED UP TO HIM.

Q.   WHY?

A.   AS A BIG BROTHER.

Q.   WHY?

A.   HE HAD MONEY.  HE HAD OTHER INDIVIDUALS.

THE COURT:  I AM SORRY.  HE HAD WHAT?

THE WITNESS:  HE HAD OTHER INDIVIDUALS THE SAME
AGE AS I -- OTHERS WHO SOLD DRUGS.  AND I LOOKED UP TO HIM,
AND I LIKED THAT.

BY MS. CHATURVEDI:

Q.   WHAT DID YOU LIKE?

A.   I LIKED THE MONEY, YOU KNOW, AND THE POWER THAT HE HAD.
I MEAN I COULD -- I MEAN, BASICALLY, AFTER I GOT IN THE
FAMILY, I COULD DO ANYTHING I WOULD LIKE, MEANING --

MR. DAVIS:  OBJECTION TO THE CHARACTERIZATION.

THE COURT:  OBJECTION TO WHAT?

MR. DAVIS:  THE CHARACTERIZATION.  HE
CHARACTERIZED SOMETHING AS BEING A FAMILY.  I OBJECT TO THE
CHARACTERIZATION.

THE COURT:  OVERRULED.

BY MS. CHATURVEDI:

Q.   AND WHEN YOU FIRST MET MR. HILL, HOW FREQUENTLY WERE YOU
IN CONTACT WITH HIM WHEN YOU FIRST MET HIM?

A.   I STAYED IN CONTACT WITH HIM QUITE FREQUENTLY.

Q.   AND WHAT KINDS OF THINGS DID YOU DO WITH MR. HILL WHEN
YOU FIRST MET HIM WHEN YOU WERE AROUND 11 YEARS OLD?

9

A.   WELL, WHEN I FIRST MET MR. HILL, I STARTED OUT WITH HIM AS A LOOKOUT GUY.  A LOOKOUT GUY IS A PERSON THAT BASICALLY INFORMS HIM AND THE OTHER INDIVIDUALS THAT WERE DOING DRUGS FOR HIM THAT THE POLICE ARE CLOSE BY -- THAT THEY ARE SOMEWHERE IN THE AREA.  AND I MIGHT SEE THE POLICE AT A LIGHT OR ANYTHING.  AND I HAD GOT SO GOOD AT IT THAT I COULD SEE THE SIGNALS -- THE TURN SIGNALS AND LET YOU KNOW IF THE POLICE WAS GOING TO TURN OR IF HE WAS GOING TO KEEP STRAIGHT.  AND I WOULD LIKE LET HIM KNOW AND THE OTHER INDIVIDUALS KNOW BY HOLLERING OUT, "HEY, V., THE POLICE ARE GOING STRAIGHT," OR "THE POLICE ARE MAKING A RIGHT."

          AND THAT'S WHAT I WOULD DO AS A LOOKOUT.  AND, ALSO, I WOULD CASE THE JOINT -- "CASE THE JOINT" MEANING THAT I WOULD WALK AROUND AND LET THEM KNOW, YOU KNOW, HAVE I STILL SEEN ANY POLICE OR NOT.

Q.   NOW, WHEN YOU FIRST STARTED SPENDING TIME WITH MR. HILL, DID YOU IMMEDIATELY BECOME A LOOKOUT FOR HIM?

A.   NO, I DIDN'T IMMEDIATELY BECOME A LOOKOUT.

Q.   WHAT DID YOU DO BEFORE YOU BECAME A LOOKOUT FOR HIM?

A.   WELL, I STARTED OUT BY DOING THINGS TO IMPRESS HIM.

Q.   WHY?

A.   BECAUSE I JUST LIKED WHAT HE WAS DOING.  AND I WANTED, YOU KNOW -- I WANTED TO BE A PART OF THAT FAMILY.  IT WAS LIKE A FAMILY THING GOING ON.  AND I JUST LOOKED UP TO HIM LIKE THAT.

USCA Case #23-3015     Document #2077668     Filed: 10/01/2024     Page 69 of 443

10

Q.   AND WHAT KINDS OF THINGS WOULD YOU DO TO TRY TO IMPRESS HIM?

A.   I WOULD SEE HIM SOMETIMES ARGUE WITH PEOPLE -- NOT NECESSARILY ARGUE, BUT HE MIGHT HAVE DISAGREEMENTS WITH SOMEBODY, AND THAT SAME PERSON WHO HE HAD A DISAGREEMENT WITH, I MIGHT LATER ON SEE THAT PERSON, AND I MIGHT JUST BEAT THAT PERSON UP FOR NO REASON.

Q.   AND WHAT WAS YOUR GOAL BY BEATING UP THAT PERSON FOR NO REASON?

A.   MY GOAL WAS, YOU KNOW, TO IMPRESS VINCENT -- TO LET HIM KNOW I WANTED TO BE A PART OF FAMILY AND TO GET INVOLVED WITH HIM AS FAR AS SELLING DRUGS.

Q.   AND DID YOU HAVE ANY CONVERSATIONS WITH MR. HILL AT THE TIME YOU WERE TRYING TO IMPRESS HIM?

A.   HE WOULD SAY -- HE WOULD SAY, YOU KNOW, THINGS LIKE -- LET ME KNOW -- I DON'T REMEMBER EXACTLY WHAT WAS SAID, BUT I KNOW HE WOULD LET ME KNOW THAT, YOU KNOW, HE LIKED WHAT I DID.  AND WHAT HE DID WAS SAY THINGS TO HAVE ME CONTINUE TO DO THE THINGS THAT I WAS DOING.

Q.   LIKE WHAT?

A.   HE WOULD SAY LIKE -- LIKE AFTER I FINISHED FIGHTING SOMEBODY OR BEATING SOMEBODY UP OR WHATEVER, HE WOULD BRAG ABOUT IT.

Q.   HOW?

A.   "GOD DAMN.  DOO-DOO KNOCKED HIM OUT.  DOO-DOO THIS.

(Page 69 of Total)

DOO-DOO THAT," YOU KNOW, AND THIS AND THAT.  AND THAT WOULD MAKE ME -- MOTIVATE ME TO CONTINUE TO GO FURTHER AND TO DO IT MORE.

Q.  AND DID YOU GO FURTHER?

A.  YES.

Q.  HOW?

A.  I WENT AS FAR AS TO -- I REMEMBER ONE INCIDENT I WAS IN THE 203 AREA.  AND I THINK I WAS LIKE ABOUT 11 AT THE TIME -- 11 OR 12 AT THE TIME.  AND --

MR. KIERSH:  YOUR HONOR, OBJECTION.  THIS PREDATES, ACCORDING TO HIS CALCULATION, THE CONSPIRACY THAT IS CHARGED IN THIS COUNT.

THE COURT:  OVERRULED.

BY MS. CHATURVEDI:

Q.  WHAT HAPPENED AT 203 AT THAT TIME?

A.  THIS WAS -- LIKE I SAID, I WAS ABOUT 11 YEARS OLD, AND I GOT INTO IT WITH A GUY, AND I THINK -- I DON'T REMEMBER QUITE THE INCIDENT, BUT I GOT INTO IT WITH A GUY, AND I ENDED UP BEATING THE GUY UP OR WHATEVER.

HE CONTINUED TO CONGRATULATE ME FROM THE LAST TIME THAT I BEAT THE GUY UP.  AND I TOOK IT UPON MYSELF TO DO IT AGAIN.

Q.  WHO CONGRATULATED YOU?

A.  "VITO"

Q.  AND WHEN HE WOULD CONGRATULATE YOU, WOULD THERE BE OTHER

PEOPLE AROUND OR WERE YOU ON YOUR OWN?

MR. DAVIS:  OBJECTION TO THE LEADING NATURE OF THE QUESTION.

THE COURT:  DO YOU WANT TO REPHRASE YOUR QUESTION?

BY MS. CHATURVEDI:

Q.  CAN YOU DESCRIBE FOR US WHAT WAS GOING ON AT THE TIME THAT MR. HILL WOULD CONGRATULATE YOU?

A.  IT WAS DURING THE TIME ME AND A COUPLE OTHER GUYS THAT WERE OUT, YOU KNOW -- THEY WERE A LITTLE HIGHER THAN I WAS BECAUSE I WAS STILL -- AS I SAY, I WAS A LOOKOUT GUY, AND LIKE I SAID, I DID THINGS TO IMPRESS HIM SO I COULD GRADUATE INTO DOING DRUGS AS THE OTHER GUYS.

Q.  ALL RIGHT.  YOU TALKED A LITTLE BIT A FEW MINUTES AGO ABOUT BECOMING A LOOKOUT.  HOW OLD WERE YOU, WOULD YOU SAY, AT THE TIME YOU STARTED AS A LOOKOUT?

MR. ZUCKER:  OBJECTION.  ASKED AND ANSWERED.

THE COURT:  I DON'T THINK IT HAS BEEN.  OVERRULED.

BY MS. CHATURVEDI:

Q.  ABOUT HOW OLD WERE YOU?

A.  I WAS BETWEEN 10 AND 12 YEARS OLD.

Q.  AND YOU WERE TELLING US WHAT YOU DID AS A LOOKOUT.  TELL US WHAT YOUR PURPOSE WAS AT THE TIME THAT YOU WERE A LOOKOUT.  WHAT WAS YOUR GOAL?

A. MY GOAL WAS TO BE ABLE TO SELL DRUGS AS THE OTHER INDIVIDUALS WERE SELLING FOR HIM.

EVERYTHING ELSE, BUT HE DIDN'T PAY US.  HE DIDN'T PAY ME AT THE TIME.

Q.  SO THEN WHY DID YOU DO IT?

A.  IT WAS FOR -- YOU KNOW, HAVING THE POWER, AND KNOWING THAT I COULD, YOU KNOW, DO ANYTHING I WANTED AS FAR AS, YOU KNOW, IN THE COMMUNITY.  I JUST WANTED TO BE A PART OF THE FAMILY.

Q.  DID THERE COME A TIME -- YOU MENTIONED THE WORD -- THAT YOU WANTED TO GRADUATE.  DID THERE COME A TIME WHEN YOU GRADUATED?

A.  YES.

Q.  WHAT CHANGED?

A. I STOPPED BEING A LOOKOUT GUY, AND I STARTED SELLING.

Q.  AND WHAT WERE YOU SELLING WHEN YOU STARTED SELLING?

A.  I SOLD MARIJUANA IN THE YELLOW ENVELOPES FIRST, AND THEN I STARTED SELLING P.C.P., WHICH --

Q.  SORRY.

A.  -- WHICH IS CALLED "BOAT."

Q.  WHERE DID YOU GET THE MARIJUANA IN THE YELLOW ENVELOPES FROM?

A.  I GOT IT FROM VINCENT HILL.

Q.  AND CAN YOU REMIND US AGAIN ABOUT HOW OLD YOU WERE AT THE TIME YOU STARTED SELLING?

A.  I WOULD SAY BETWEEN 11 AND 13.

Q.  OKAY.  AND AT THE TIME YOU STARTED SELLING, WHERE WAS IT

THAT YOU STARTED SELLING AT?

A.   I STARTED SELLING AT 203 N STREET, SOUTHWEST.

Q.   AND WHAT WAS THE ARRANGEMENT THAT YOU HAD IN TERMS OF GETTING THIS MARIJUANA FROM MR. HILL?

A.   WELL, HE WOULD ACTUALLY TELL ME TO HOLD THE MARIJUANA UNTIL HE WOULD GET BACK.  SO I WOULD BE UNDER THE TUNNEL AREA AT 203, AND A LONG PERIOD OF TIME WENT PAST BEFORE HE CAME BACK.  BUT I KNEW THAT THAT WAS DESIGNED FOR ME TO -- WHEN I FIRST STARTED SELLING, YOU KNOW, BECAUSE SALES WERE COMING WHILE I HAD THE DRUGS, AND NOBODY -- SOME OF THE OTHER GUYS PROBABLY WERE OUT, AND I WAS THE ONLY ONE THAT HAD DRUGS.  SO I KNEW THAT I COULDN'T LET THOSE SALES GET AWAY.

Q.   SO WHAT WOULD YOU DO?

A.   SO I WOULD GET THE SALES.

Q.   AND WHAT WOULD YOU DO WITH THE MONEY THAT YOU GOT FROM THE SALES?

A.   ALL THE MONEY THAT I RECEIVED FROM CUSTOMERS I GAVE RIGHT TO VINCENT HILL.

Q.   NOW, AT THE TIME YOU WERE SELLING THIS MARIJUANA, CAN YOU TELL US WHAT TIME OF DAY YOU WERE OUT THERE SELLING?

A.   I KNOW WHEN I CAME HOME FROM SCHOOL, I WAS OUT THERE UNTIL LATE HOURS.  I THINK THE LATEST HOUR I WAS OUT THERE WAS LIKE 11:00 OR 12:00 O'CLOCK.

Q.   AND WHEN IT GOT THAT LATE AT NIGHT -- WHEN IT GOT DARK,

CAN YOU TELL US WHAT THE LIGHTING WAS LIKE OUT IN THE 203 BUILDING WHERE YOU WERE SELLING?

A. WELL, THE APARTMENT BUILDING HAD -- IT WAS WELL LIT INSIDE -- IN AND OUT, BUT THERE CAME A TIME WHEN VINCENT -- AND HE HAD OTHER GUYS TO KNOCK THE LIGHTS OUT.

Q. DID YOU ACTUALLY SEE MR. HILL DO THAT?

A. YES.

Q. HOW WOULD HE KNOCK THE LIGHTS OUT?

A. WELL, I REMEMBER ONE TIME HIM SHOOTING ONE OF THE LIGHTS OUT AND OTHER TIMES HIM JUST TAKING A BRICK AND KNOCKING THE LIGHTS OUT.

Q. AND AT THAT SAME TIME THAT YOU SAW HIM DOING THIS, WERE YOU STILL LIVING IN THAT BUILDING?

A. YES.

Q. WERE YOU AWARE OF HOW PEOPLE WERE WALKING AROUND IN THE BUILDING AT NIGHT?

A. WELL, AT NIGHTTIME -- WHEN NIGHTTIME CAME, I SEEN THE PEOPLE THAT LIVED IN THE BUILDING -- THE PARENTS, THE MOTHERS OR WHATEVER -- EVERYONE HAD TO GET FLASHLIGHTS. I MEAN PEOPLE WENT WHEREVER THEY COULD TO GET FLASHLIGHTS BECAUSE THEY KNEW WHEN THEY CAME BACK IN THE BUILDING, THERE WAS A CHANCE, DAY OR NIGHT, THAT THE LIGHTS WOULD BE ALL OUT.

Q. YOU ALSO INDICATED THAT THERE WAS A TIME YOU SOLD "BOAT." CAN YOU DESCRIBE THAT FOR US?

(Page 74 of Total)

A.  YES.  WHEN I SOLD THE "BOAT," I STOOD OUT THERE MANY DAYS -- LATE DAYS AND LATE NIGHTS AND ON THE WEEKENDS AND SOLD "BOAT" FOR VINCENT HILL.

Q.  NOW, AT THE TIME THAT YOU WERE SELLING THE "BOAT," WHEN YOU WOULD MAKE MONEY FOR THAT FROM POTENTIAL BUYERS OR FROM BUYERS, WHAT WOULD YOU DO WITH THE MONEY?

A.  I WOULD GIVE ALL OF THE MONEY TO VINCENT.

Q.  AND AT THAT TIME, THE ENVELOPES THAT YOU WERE SELLING THE MARIJUANA IN -- HOW MUCH DID THE MARIJUANA GO FOR?

A.  THE MARIJUANA WAS $5.00.

Q.  AND THE "BOAT"?

A.  IT WAS 15 AT ONE TIME, AND THEN IT WENT DOWN TO 10.

Q.  AND CAN YOU DESCRIBE FOR US WHEN YOU WOULD SELL MARIJUANA, DID YOU JUST HAVE ONE ENVELOPE WITH YOU AT A TIME, OR HOW DID THAT WORK?

A.  WELL, VINCENT WOULD GIVE US THE MARIJUANA IN -- LIKE 25 BAGS IN A ZIPLOCK-LIKE SANDWICH BAG.  THERE WOULD BE LIKE 20 TO 30 BAGS INSIDE OF IT.

Q.  AND ON A GIVEN DAY, HOW MANY BAGS WOULD YOU -- ZIPLOCK BAGS, I GUESS, WOULD YOU GO THROUGH IN TERMS OF HOW MANY YOU WOULD SELL?

A.  IN THE COURSE OF A DAY, I WOULD SELL AT LEAST FOUR PACKAGES.

Q.  DOES THAT MEAN FOUR ZIPLOCK BAGS?

A.  YES.

Q.   AND WHAT ABOUT THE "BOAT?"  HOW WAS THAT GIVEN TO YOU TO SELL?

A.   HE WOULD GIVE THAT TO US LIKE -- BETWEEN LIKE 40 AND 50 TINFOILS IN A ZIPLOCK BAG.

Q.   AND HOW MANY OF THOSE PACKETS WOULD YOU GO THROUGH IN A DAY?

A.   MOST DAYS, IT WOULD BE LIKE THREE TO FOUR OF THEM.

Q.   AND WERE YOU THE ONLY PERSON DOING THIS?

A.   NO.

Q.   DID YOU ACTUALLY SEE MR. HILL TAKE MONEY FROM ANYONE ELSE WHO WAS SELLING FOR HIM?

A.   YES.

Q.   AND THE AGE OF THE PEOPLE -- HOW DID THAT COMPARE TO YOU -- THE PEOPLE THAT WERE GIVING HIM MONEY AT THE END OF THE DAY AFTER SELLING DRUGS?

A.   SOME OF THEM WERE ABOUT, I WOULD SAY, MAYBE TWO TO THREE YEARS OLDER AND TWO OR THREE YEARS YOUNGER.

Q.   NOW, CAN YOU DESCRIBE FOR US IN TERMS OF THE SELLING PATTERN -- WERE YOU SELLING CONSTANTLY, OR WERE THERE BREAKS, OR HOW DID THAT WORK?

A.   THERE WERE NO BREAKS.  I HAD MY SHIFT -- "SHIFT" MEANING WHEN I CAME HOME OR WHENEVER, I WOULD SELL MINE, AND I KNEW I HAD TO BE IN, YOU KNOW, THE LATEST BY 11:00 O'CLOCK.  SO, BASICALLY, I WOULD SELL HOWEVER MUCH IN THAT PERIOD OF TIME, BUT I KNEW THAT IT CONTINUED AFTER I LEFT.

43

Q.   WHEN YOU WOULD GO IN AT THE END OF THE DAY, WHAT, IF ANYTHING, DID MR. HILL GIVE YOU IN EXCHANGE FOR YOU SELLING THE DRUGS ON HIS BEHALF?

MR. DAVIS:   OBJECTION, YOUR HONOR.   I THINK THIS HAS BEEN ASKED AND ANSWERED.

THE COURT:   OVERRULED.

BY MS. CHATURVEDI:

Q.   WHEN YOU WOULD SELL THE DRUGS -- WHEN YOU WERE ACTUALLY SELLING THE DRUGS, WHAT WOULD YOU GET FOR IT?

A.   I GOT NOTING IN RETURN.   I MEAN THERE CAME DAYS WHEN I SOLD -- AND I KNOW THAT I WAS SO GOOD AT IT, YOU KNOW.   I MEAN I SOLD SO MUCH FOR HIM.   I MEAN THERE WERE DAYS WHEN I WAS HUNGRY.   I MEAN I STOOD OUT ALL DAY SELLING, WATCHING OUT OR WHATEVER, AND HE WOULDN'T EVEN HAVE THE DECENCY TO ASK ME DID I WANT SOMETHING TO EAT, OR WAS I HUNGRY, OR WHATEVER.

Q.   SO WHAT MOTIVATED YOU TO DO THIS?

MR. DAVIS:   OBJECTION.

THE COURT:   OVERRULED.

BY MS. CHATURVEDI:

Q.   YOU CAN ANSWER.

A.   JUST THE MONEY -- THE POWER, YOU KNOW.   I MEAN THAT'S JUST WHAT I LOVED AT THE TIME.

Q.   DID THERE COME A TIME WHEN YOU DECIDED TO CHANGE YOUR RELATIONSHIP WITH MR. HILL?

44

A.   YES.

Q.   AND ABOUT HOW OLD WERE YOU WHEN YOU DECIDED TO CHANGE THAT?

A.   I THINK I WAS BETWEEN 15 AND 18.  SOMETHING LIKE THAT.

Q.   AND WHAT STEPS DID YOU TAKE?  WHAT CHANGED?

A.   WELL, I KNEW THAT I WAS BEING A FLUNKY.

Q.   WHAT DO YOU MEAN?

A.   A "FLUNKY" JUST MEANS THAT YOU WILL JUST DO ANYTHING FOR SOMEBODY WITHOUT GETTING PAID FOR IT.  SO I TOOK IT UPON MYSELF, YOU KNOW, BECAUSE I WAS STILL SELLING FOR HIM AT THE TIME.  SO I STOLE BAGS FROM HIM.  LIKE HE MIGHT GIVE ME A PACKAGE, AND I MIGHT TAKE LIKE FOUR OR FIVE BAGS OUT OF EACH PACKAGE AND JUST TELL HIM THAT WAS THE SHORTS.

Q.   WHAT DO YOU MEAN THE "SHORTS?"

A.   "SHORTS" MEANS LIKE SOMEBODY WOULD COME -- THE "BOAT" OR THE MARIJUANA COST -- THE MARIJUANA COST $5.00.  THE "BOAT" COST $15 OR $10.  SO THEY MIGHT COME WITH 8.  FOR THE MARIJUANA, THEY MIGHT COME WITH $4 OR $3.

          SO I WOULD TAKE -- I WOULD ACTUALLY TAKE SOME OF THE BAGS AND THEN SAVE THEM UP DURING THE COURSE OF THE TIME BECAUSE I KNEW I WAS GOING TO BRANCH OUT ON MY OWN AND LEAVE HIM ALONE.

Q.   AND WHAT DID YOU DO WITH THE BAGS THAT YOU TOOK FROM HIM?

A.   WELL, I SOLD -- I SOLD THOSE BAGS AND GOT THE MONEY.

THEN I MOVED TO THE OTHER SIDE.

Q. HOW DID YOUR RELATIONSHIP CHANGE WITH MR. HILL AS YOU STARTED TO DO THIS -- AS YOU STARTED TO SELL SOME OF THESE BAGS ON YOUR OWN?

A. WELL, HE WASN'T -- HE WASN'T HAPPY AT ALL ABOUT THAT. WHEN I MOVED TO THE OTHER SIDE, ME AND A GUY NAMED "IRKY BERK" -- WE WERE REAL CLOSE. WE STARTED, YOU KNOW, MESSING WITH EACH OTHER, MEANING WE STARTED MESSING WITH EACH OTHER AS FAR AS DRUGS. YOU KNOW, I WOULD HELP HIM OUT SOMETIMES AND SOMETIMES HE WOULD HELP ME OUT, MEANING THAT HE WOULD SOMETIMES SELL FOR ME AND WHATEVER, AND, YOU KNOW, WE WOULD JUST HELP EACH OTHER OUT.

Q. DID YOU EVER SPEAK WITH MR. HILL ABOUT YOUR CHANGE OF HEART?

A. IT DIDN'T ACTUALLY ALL THE WAY STOP RIGHT AT THAT POINT. I MEAN I FOUND MYSELF SOMETIMES -- HE'D ASKED ME -- YOU KNOW, LIKE HE CAME TO ME ONE TIME AND SAID, "TAKE THESE TWO BOTTLES OF WATER TO THE TWO WHITE GUYS THAT ARE IN THE CAR IN THE PARKING LOT." AND HE WOULD SAY, "THEY ARE GOING TO GIVE YOU $1400.00. MAKE SURE YOU COUNT THE MONEY BEFORE YOU COME BACK."

Q. WHAT BOTTLES WERE YOU TAKING? WHAT KIND OF BOTTLES?

A. WELL, THEY PUT THE P.C.P. IN LITTLE VANILLA EXTRACT BOTTLES. AND THESE BOTTLES AT THIS TIME WOULD COST $700.00 WHEN IT FIRST STARTED OUT -- LITTLE EXTRACT BOTTLES OF

46

P.C.P.  $700.00.

Q.  WHY DID YOU CONTINUE TO DO THAT FOR MR. HILL IF YOU CONSIDERED YOURSELF A FLUNKY?

A.  IT WAS A RELATIONSHIP THAT I HAD WITH MR. WAYNE PERRY -- THAT I HAD WITH HIM BASICALLY WHILE I STILL BASICALLY STAYED IN IT WITH MR. HILL.

Q.  EXPLAIN THAT TO US.

A. WELL, THE RELATIONSHIP BETWEEN ME AND MR. PERRY WAS QUITE DIFFERENT THAN ME AND VINCENT.  AT ONE PERIOD OF TIME, HE HAD GOTTEN LOCKED UP AND CAME HOME.

MR. KIERSH:  YOUR HONOR, OBJECTION TO THIS LINE FOR THE REASONS I OUTLINED YESTERDAY AT THE RECESS.

THE COURT:  OVERRULED.

BY MS. CHATURVEDI:

Q.  TELL US WHY YOU CONTINUED THE RELATIONSHIP WITH MR. HILL.

A.  BECAUSE WAYNE PERRY -- I MEAN AT THAT PERIOD OF TIME, THEY WERE REAL, REAL TIGHT.

Q.  WHO?

A.  VINCENT HILL AND WAYNE PERRY.

Q.  OKAY.

A.  SO I BASICALLY DID WHATEVER I COULD TO MAKE SURE -- NOT SO MUCH THAT "VITO" WOULD BE HAPPY, BUT TO MAKE SURE THAT WAYNE WOULD BE HAPPY.

Q.  ALL RIGHT.

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        .  Docket No. CR 98-329

         Government,            .  Washington, D.C.
                      .  January 30, 2001
  vs.                            .  2:10 p.m.

VINCENT HILL,                    .  (AFTERNOON SESSION)
JEROME MARTIN,                   .
SAMUEL CARSON,                   .
WILLIAM K. SWEENEY,              .
MAURICE PROCTOR,                 .
SEAN COATES,                     .

         Defendants             .

. . . . . . . . . . . . . .  .

UNITED STATES OF AMERICA,        .

         Government,            .
                      .  Docket No. CR 99-348
  vs.                            .

GARY PRICE,                      .

         Defendant.             .

. . . . . . . . . . . . . .  .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER



2

For the Defendant Carson:     JOSEPH BESHOURI, ESQ.
                              LEXI NEGIN-CHRIST, ESQ.
                              419 7th Street, N.W.
                              Washington, D.C.   20004

For the Defendant Sweeney:    STEVEN R. KIERSH, ESQ.
                              717 D Street, N.W.
                              Suite 400
                              Washington, D.C.   20004

For the Defendant Proctor:    HOWARD BRAMSON, ESQ.
                              717 D Street, N.W.
                              Third Floor
                              Washington, D.C.   20004

For the Defendant Coates:     FREDERICK JONES, ESQ.
                              901 6th Street, S.W.
                              Suite 409
                              Washington, D.C.   20024

For the Defendant Price:      JONATHAN ZUCKER, ESQ.
                              601 Indiana Ave., N.W.
                              Suite 901
                              Washington, D.C.   20024

Court Reporter:               BEVERLY J. BYRNE
                              Official Court Reporter
                              Room 6810 U.S. Courthouse
                              Washington, D.C.   20001
                              (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

Case 1:98-cr-00329-RCL    Document 944    Filed 03/11/03    Page 3 of 104

3

## I N D E X

|  | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| WITNESSES FOR THE GOVERNMENT: |  |  |  |  |
| Reginald Switzer | -- | 7 | 25 | 31 |
| Rodney Armstrong | 44 | 50 | -- | -- |
| Cindy Perkins | 51 | 70 | -- | -- |

| EXHIBITS: | MARKED | RECEIVED |
|---|---|---|
| Defendant Price Exhibit No. 3 | 20 | -- |
| Government's Exhibit No. LW300 | 49 | 49 |

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

(Page 83 of Total)

4

P R O C E E D I N G S

THE COURT: During the noontime recess I have looked at the handwritten notes of Mr. Zeidenberg and Ms. Chaturvedi as you requested, Mr. Zucker.

I looked at them for both what might be described as Brady material and Jencks material, and I find they contain neither in their entirety. So, Ms. Chaturvedi, you may have your notes back.

MS. CHATURVEDI: Thank you, Your Honor.

MR. ZUCKER: The inquiry and the request was based on Jencks, but the Brady request regarding the three witnesses had nothing to do with the notes from Switzer. The Brady request was for the three witnesses that we're still --

THE COURT: Well, all I can tell you is that I looked at those file notes for both -- material of both characterizations.

MR. ZUCKER: No, I understand that. But those would have only been the notes of Switzer. The Brady request relates to the three witnesses that were referenced in the Mayrant murder by the government as providing testimony that contradicted with Mr. Switzer. That was the Brady request.

THE COURT: I have not examined anything that meets that description yet.

MR. ZUCKER: And my recollection is Mr. Zeidenberg said he was tracking it down and would provide it.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

MR. KIERSH:  Your Honor, if I --

THE COURT:  If it exists.

MR. KIERSH:  If I could just be heard on the Jencks issue.  What we were provided I presume is what the Court reviewed in camera in terms of the Jencks, but that's inconsistent -- well, we received a certain Jencks package with respect to Mr. Switzer.  Based on Mr. Zucker's cross-examination, it appeared from Mr. Switzer's testimony that there was additional Jencks.  Mr. Switzer was very clear.  He said other people were taking notes.

THE COURT:  And I have looked at the notes that were taken by Mr. Zeidenberg and Ms. Chaturvedi.

MR. KIERSH:  And you consider them not to be Jencks?

THE COURT:  They are not Jencks material.

MR. KIERSH:  Okay.  Well, I would ask that a copy of those documents be made and made a part of this record and placed under seal so the record has a copy of that material.

THE COURT:  All right.

MR. ZUCKER:  Along with that, Switzer also made reference to Brigidini and confirming it in the first arrest meeting.  I'd ask for production --

THE COURT:  The Brigidini notes, they will be examined as well.

MR. ZUCKER:  Well, is the government being instructed to obtain them or to at least request them of Mr.

Clerks File

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
              GOVERNMENT,                    :

                                             :

  VS.                                        :     CR. NO. 98-329

                                             :

VINCENT HILL,                                :

JEROME MARTIN,                               :

SAMUEL CARSON,                               :

WILLIAM K. SWEENEY,                          :

MAURICE PROCTOR,                             :

SEAN COATES,                                 :

              DEFENDANTS.                    :

                                             :

UNITED STATES                                :

              GOVERNMENT,                    :

                                             :

  VS.                                        :     CR. NO. 99-348

                                             :

GARY PRICE,                                  :

              DEFENDANT                      :

                                             :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 1, 2001
(MORNING SESSION)
(10:24 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                    PHYLLIS MERANA
                                   6816 U. S. DISTRICT COURT
                                   3RD & CONSTITUTION AVE., N.W.
                                   WASHINGTON, D. C. 20001

(Page 86 of Total)

2

FOR THE GOVERNMENT:                PETER ZEIDENBERG, AUSA
                                   ANJALI CHATURVEDI, AUSA
                                   555 4TH ST., N.W.
                                   WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:            CHRISTOPHER DAVIS, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #910
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:          JOANNE HEPWORTH, ESQ.
                                   305 H STREET, N.W.
                                   2ND FLOOR
                                   WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7TH STREET, N.W.
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:         STEVEN R. KIERSH, ESQ.
                                   717 D STREET, N.W.
                                   SUITE 400
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:         HOWARD BRAMSON, ESQ.
                                   717 D STREET, N.W.
                                   THIRD FLOOR
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:          FREDERICK JONES, ESQ.
                                   901 6TH STREET, S.W.
                                   #409
                                   WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:           JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #901
                                   WASHINGTON, D. C.  20004

(Page 87 of Total)

I N D E X

WITNESS                    DIRECT      CROSS

ANDRE MURRAY

    BY MR. ZEIDENBERG    9

    BY MR. KIERSH                      69

(Page 88 of Total)

PROCTOR OR "POO POO?"

A.   YES.

Q.   AND DO YOU SEE HIM IN COURT?

A.   YES.

Q.   AND COULD YOU POINT OUT MR. PROCTOR?

A.   "POO POO" IN THE BLACK.  HE HAS ON A BLACK TOP.

MR. ZEIDENBERG:  YOUR HONOR, MAY THE RECORD REFLECT THE IDENTIFICATION OF MR. PROCTOR?

MR. BRAMSON:  OBJECTION.  HE DID NOT IDENTIFY MR. PROCTOR, BUT SOMEBODY ELSE.

THE COURT:  WHAT WAS YOUR OBJECTION?

MR. BRAMSON:  THE WITNESS DID NOT IDENTIFY MR. PROCTOR, BUT ANOTHER INDIVIDUAL.

THE COURT:  ALL RIGHT.  WHO DO YOU THINK IS MR. PROCTOR?

THE WITNESS:  SITTING IN FRONT OF THE SCREEN.

THE COURT:  SITTING IN FRONT OF THE SCREEN?

THE WITNESS:  YES.

THE COURT:  MR. BRAMSON?

MR. BRAMSON:  A CONTINUING OBJECTION.

THE COURT:  THE OBJECTION IS OVERRULED.  THE RECORD WILL REFLECT AN IDENTIFICATION.

BY MR. ZEIDENBERG:

Q.   AND HOW LONG HAVE YOU KNOWN MR. PROCTOR, "POO POO."

A.   SINCE HE WAS YOUNG.

Q.  AND WAS THERE ONE INDIVIDUAL THAT YOU GENERALLY ASSOCIATED WITH MR. PROCTOR IN TERMS OF BEING EITHER FRIENDS OR ASSOCIATES -- CLOSE FRIENDS OR ASSOCIATES OF HIS?

MR. BRAMSON:  OBJECTION.

THE COURT:  OVERRULED.  YOU CAN CROSS-EXAMINE.

MR. BRAMSON:  YOUR HONOR --

THE COURT:  YOU CAN CROSS-EXAMINE.

MR. BRAMSON:  GUILT BY ASSOCIATION IS NOT LEGITIMATE EXAMINATION.

THE COURT:  WOULD YOU PLEASE SIT DOWN, MR. BRAMSON.  THE OBJECTION IS OVERRULED.  YOU CAN CROSS-EXAMINE.

BY MR. ZEIDENBERG:

Q.  WAS THERE AN INDIVIDUAL THAT HE WAS PARTICULARLY CLOSE WITH, TO YOUR KNOWLEDGE?

MR. BRAMSON:  OBJECTION.  IT CALLS FOR OPINION AND SPECULATION.

THE COURT:  OVERRULED, MR. BRAMSON.

BY MR. ZEIDENBERG:

Q.  IF YOU KNOW.

A.  SIR?

Q.  IF YOU KNOW, WAS THERE SOMEONE THAT HE WAS PARTICULARLY CLOSE TO, TO YOUR KNOWLEDGE -- MR. PROCTOR, "POO POO"

A.  YES.

Q.  WHO WAS THAT?

(Page 90 of Total)

65

(JURY OUT.)

(AFTER RECESS.)

THE COURT:  ALL RIGHT.  MR. KIERSH, ARE YOU READY FOR THE JURY?

MR. KIERSH:  YES, YOUR HONOR.  I HAVE JUST ONE PRELIMINARY MATTER.

MR. DAVIS BROUGHT UP THIS ISSUE OF THE PRESENTENCE REPORT EARLIER THAT YOUR HONOR SAID YOU WOULD SIGN AN ORDER FOR.

QUITE FRANKLY, I CAME IN HERE THIS MORNING NOT EXPECTING TO HAVE TO EXAMINE MR. MURRAY, BUT GIVEN HIS TESTIMONY, I DO HAVE TO EXAMINE HIM.

I WOULD JUST ASK THE COURT TO ALLOW ME TO LATER ON COME BACK, IF THERE IS SOMETHING IN THE PRESENTENCE REPORT, AND REOPEN MY CROSS.

I WILL GO FORWARD NOW, BUT IF THERE IS SOMETHING IN THE PRESENTENCE REPORT THAT IS RELEVANT, I WOULD ASK TO REOPEN.

THE COURT:  I WILL HOLD THAT IN RESERVE.

MR. KIERSH:  VERY WELL.

THE COURT:  LET'S BRING THE JURY IN.

MS. NEGIN-CHRIST:  GOOD MORNING, YOUR HONOR.

CAN I ASK THE COURT'S INDULGENCE A MINUTE?

WITH RESPECT TO THIS WITNESS, I WOULD MAKE TWO JENCKS REQUESTS.  THE FIRST ONE IS THAT HE TESTIFIED THAT HE

HAD A RELATIONSHIP WITH DETECTIVE OR OFFICER FULTON, WHO I KNOW IS IN THE COURTROOM, AND THAT HE HAD, ON SEVERAL OCCASIONS, INFORMED OFFICER FULTON ABOUT PLACES THAT HE COULD -- THAT OFFICER FULTON COULD RECOVER GUNS.  AND TO THE EXTENT THAT OFFICER FULTON WOULD HAVE ANY DOCUMENTATION OF THIS PERSON BEING A RELIABLE INFORMANT, OR, ON THE OTHER HAND, BEING AN UNRELIABLE INFORMANT, THAT WOULD BE JENCKS AND POTENTIALLY BRADY MATERIAL.

THE SECOND JENCKS REQUEST I HAVE IS FOR THE GOVERNMENT TO PROVIDE US WITH THE LETTER THAT MR. MURRAY WROTE TO ASSISTANT UNITED STATES ATTORNEY WAINSTEIN AT THE TIME THAT HE WAS ASKING FOR HELP WITH PAROLE, BECAUSE THIS WITNESS HAS BASICALLY SAID IN HIS DIRECT TESTIMONY THAT, YOU KNOW, HE DIDN'T -- HE DOESN'T WANT ANY HELP FROM MR. ZEIDENBERG.

HE DIDN'T WANT ANY HELP.  HE DID THIS BECAUSE HE WAS CONCERNED FOR THE COMMUNITY.  BUT, ON THE OTHER HAND, THERE IS THIS LETTER TO MR. WAINSTEIN, AND I WOULD ASK THE GOVERNMENT TO PRODUCE THAT, IF THEY HAVE IT IN THEIR POSSESSION.

THE COURT:  MR. ZEIDENBERG.

MR. ZEIDENBERG:  WELL, ON THE FIRST ISSUE, I WOULD DISAGREE RESPECTFULLY THAT ANYTHING HE TALKED ABOUT TO OFFICER FULTON WOULD BE JENCKS.  IT WOULDN'T BE JENCKS UNLESS IT CONCERNED THE EVENTS ABOUT WHICH HE TESTIFIED.

Q. AND YOU WENT TO A SENTENCING HEARING THEN, CORRECT?

A. I WENT TO A WHAT?

Q. A SENTENCING HEARING.

A. NO, I DIDN'T.

Q. WELL, THE JUDGE HAD TO IMPOSE A SENTENCE BECAUSE SOMEBODY GAVE YOU TWO TO SIX YEARS IN JAIL FOR THAT.

A. YES. A SENTENCING HEARING MEANING WHAT?

Q. DID YOU PRESENT AN ARGUMENT TO THE JUDGE AS TO WHAT YOU BELIEVED YOUR SENTENCE SHOULD BE?

A. DID I PRESENT IT?

Q. OR YOUR COUNSEL.

A. YES.

Q. OKAY. SO THE JUDGE HEARD BOTH SIDES?

A. BY A P.S.I. REPORT.

Q. OKAY. AND DID THE JUDGE SAY TO YOU, "WELL, MR. MURRAY, BEFORE I IMPOSE A SENTENCE, I WANT TO HEAR WHAT YOU HAVE TO SAY"?

A. YES.

Q. AND DID YOU ANSWER.

A. YES, I DID.

Q. AND YOU SAID SOMETHING TO THE EFFECT, "I AM SORRY, AND I AM CHANGING MY LIFE, AND I AM GOING TO FOLLOW THE RULES NOW"?

A. I NEVER TOLD HIM I WAS CHANGING MY LIFE.

Q. WELL, YOU SAID, "I AM GOING TO FOLLOW THE RULES NOW"?

USCA Case #23-1395    Case 1:98-cr-00329-RCL   Document 2077-668673   Filed 07/19/011/2024   1 of Page 94 of 443

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,                    :

  VS.                                      :    CR. NO. 98-329

VINCENT HILL,                             :
JEROME MARTIN,                            :
SAMUEL CARSON,                            :
WILLIAM K. SWEENEY,                       :
MAURICE PROCTOR,                          :
SEAN COATES,                              :
        DEFENDANTS.                   :

UNITED STATES                             :
        GOVERNMENT,                   :
                    :
  VS.                                      :    CR. NO. 99-348
                    :
GARY PRICE,                               :
        DEFENDANT                     :

**FILED**

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 5, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                 PHYLLIS MERANA
                                6816 U. S. DISTRICT COURT
                                3RD & CONSTITUTION AVE., N.W.
                                WASHINGTON, D. C. 20001

(Page 94 of Total)



2

FOR THE GOVERNMENT:                     PETER ZEIDENBERG, AUSA
                                        ANJALI CHATURVEDI, AUSA
                                        555 4TH ST., N.W.
                                        WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                 CHRISTOPHER DAVIS, ESQ.
                                        601 INDIANA AVE., N.W.
                                        #910
                                        WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:               JOANNE HEPWORTH, ESQ.
                                        305 H STREET, N.W.
                                        2ND FLOOR
                                        WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:               JOSEPH BESHOURI, ESQ.
                                        LEXI NEGIN-CHRIST, ESQ.
                                        419 7TH STREET, N.W.
                                        WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:              STEVEN R. KIERSH, ESQ.
                                        717 D STREET, N.W.
                                        SUITE 400
                                        WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:              HOWARD BRAMSON, ESQ.
                                        717 D STREET, N.W.
                                        THIRD FLOOR
                                        WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:               FREDERICK JONES, ESQ.
                                        901 6TH STREET, S.W.
                                        #409
                                        WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:                JONATHAN ZUCKER, ESQ.
                                        601 INDIANA AVE., N.W.
                                        #901
                                        WASHINGTON, D. C.  20004

(Page 95 of Total)

3

I N D E X

WITNESS                    DIRECT      CROSS

ANDRE MURRAY

    BY MR. ZUCKER          8

E X H I B I T S

DEFENDANTS'

 4                              48

 5                              85

(Page 96 of Total)

4

P-R-O-C-E-E-D-I-N-G-S

THE DEPUTY CLERK:  CRIMINAL CASE 98-329, UNITED STATES OF AMERICA VERSUS VINCENT HILL, JEROME MARTIN, SAMUEL CARSON, WILLIAM SWEENEY, MAURICE PROCTOR AND SEAN COATES, AND CRIMINAL 99-348, UNITED STATES VERSUS GARY PRICE.

ANJALI CHATURVEDI AND PETER ZEIDENBERG FOR THE GOVERNMENT.

CHRISTOPHER DAVIS FOR THE DEFENDANT HILL.

JOANNE HEPWORTH FOR THE DEFENDANT MARTIN.

MR. BESHOURI AND ALEXANDRA NEGIN-CHRIST FOR THE DEFENDANT CARSON.

STEVEN KIERSH FOR THE DEFENDANT SWEENEY.

HOWARD BRAMSON FOR THE DEFENDANT PROCTOR.

FRED JONES FOR THE DEFENDANT COATES.

JONATHAN ZUCKER FOR THE DEFENDANT PRICE.

(THE DEFENDANTS AND COUNSEL WERE PRESENT.)

MS. HEPWORTH:  GOOD MORNING, YOUR HONOR.

MR. ZEIDENBERG:  GOOD MORNING, YOUR HONOR.

THE COURT:  GOOD MORNING, EVERYONE.

MR. ZUCKER:  GOOD MORNING, JUDGE HONOR.

THE COURT:  I HAVE REVIEWED MR. ZEIDENBERG'S NOTES OF HIS INTERVIEWS WITH MR. MURRAY, AND MR. MURRAY'S CORRESPONDENCE, WHICH WAS ALL ONE WAY WITH MR. WAINSTEIN.

I HAVE REVIEWED THEM IN CAMERA.  ONCE AGAIN, I FIND THAT THEY CONTAIN NOTHING THAT COULD BE CHARACTERIZED

5

AS EITHER JENCKS OR BRADY MATERIAL.

THEY WILL, AS WAS DONE WITH RESPECT TO OTHER SIMILAR MATERIALS, BE PLACED UNDER SEAL AND KEPT AS PART OF THE COURT RECORD AS A COURT EXHIBIT.

MR. WEST.  (COURT PASSING TO MR. WEST.)

MR. ZUCKER:  YOUR HONOR, COULD I INQUIRE, JUST FOR CLARIFICATION, BECAUSE I EXPECT IT TO BE PART OF MY EXAMINATION?  YOU SAID YOU ESTIMATED THAT THERE WERE SIX TO EIGHT LETTERS TO MR. WAINSTEIN REGARDING PAROLE?

THE COURT:  YES.

MR. ZUCKER:  IS THERE AN EXACT NUMBER?  I'LL GO WITH THAT NUMBER.  I JUST DON'T WANT TO --

THE COURT:  SIX TO EIGHT.

MR. ZUCKER:  OKAY.

THE COURT:  I DIDN'T COUNT THEM EXACTLY.

MR. ZUCKER:  OKAY.  ALL RIGHT.

THE COURT:  DO YOU WANT ME TO COUNT THEM?

MR. ZUCKER:  WELL, I ANTICIPATE I WILL BE ASKING HIM.

THE COURT:  ALL RIGHT.  LET ME COUNT THEM.

MR. ZUCKER:  AND THAT MIGHT BE SLOPPY.

THE COURT:  THERE ARE SEVEN.

MR. ZUCKER:  THANK YOU, JUDGE.

THE COURT:  THAT IS SIX TO EIGHT.

ARE YOU READY FOR THE JURY, MS. NEGIN-CHRIST?

38

COLLATERAL MATTER OF TRYING THE UNDERLYING FACTS OF THE PARTICULAR OFFENSE. AND PUTTING ASIDE, FOR INSTANCE, WHETHER THIS IS EVEN A PROPER MEANS OF PROVING THOSE FACTS --

THE COURT: WELL, DID YOU TAKE A LOOK AT THE MORGAN CASE, WHICH WAS CITED TO ME BY MR. DAVIS THE OTHER DAY?

MR. ZEIDENBERG: YES, YOUR HONOR, I DID.

THE COURT: THE MORGAN CASE WOULD SEEM TO STAND FOR THE PROPOSITION THAT IF THE GOVERNMENT SPONSORS A PARTICULAR FACTUAL VIEW, IT'S THE ADMISSION OF A PARTY OPPONENT.

THE DIFFERENCE IN THAT CASE WAS THAT THAT WAS AN AFFIDAVIT IN SUPPORT OF A SEARCH WARRANT.

MR. ZEIDENBERG: RIGHT.

THE COURT: BUT I DON'T DRAW ANY SIGNIFICANCE IN TERMS OF ITS OPERATIVE EFFECT AS AN ADMISSION BY A PARTY OPPONENT BETWEEN AN AFFIDAVIT BY A POLICE OFFICER AND A PLEADING FORMALLY SIGNED AND FILED BY AN ASSISTANT UNITED STATES' ATTORNEY.

MR. ZEIDENBERG: I WOULD AGREE WITH THE COURT'S ANALYSIS ON THAT. MY POSITION IS THAT THIS IS NOT, AT LEAST ARGUABLY, AN ADMISSION ANALOGOUS TO THAT ADMITTED IN THE MORGAN CASE.

OUR POSITION IS THAT THE SCENARIO IN WHICH IT IS

39

COMING IN IS ENTIRELY DIFFERENT IN THAT HE IS ATTEMPTING TO IMPEACH -- WE ALL KNOW YOU CAN USE PRIOR CONVICTIONS TO IMPEACH.  I THINK IT'S FAR LESS CLEAR AND, IN FACT, IS AN INCORRECT ASSERTION OF THE LAW TO SAY THAT WE CAN THEN IMPEACH THE PERSON BY INQUIRING AS TO THE UNDERLYING FACTS OF AN UNDERLYING CONVICTION, AND THEN WITH COLLATERAL MATTERS, ATTACK THAT TO PROVE THAT THE PERSON IS NOT TELLING THE TRUTH HERE AT TRIAL.

AND THAT IS WHAT MR. ZUCKER IS TRYING TO DO.  HE IS INQUIRING WHAT WERE THE UNDERLYING FACTS OF THAT CONVICTION.  "OH, NO, THEY WEREN'T, AND I AM GOING TO PROVE, THROUGH A COLLATERAL MEANS, WHAT ACTUALLY HAPPENED.  THEREFORE, WE CAN ARGUE LATER TO THE JURY THAT YOU'RE NOT A TRUTHFUL PERSON."

THE COURT:  I DON'T THINK HE IS CONCERNED ABOUT THE CONVICTION SO MUCH AS THE WITNESS' DENIAL THAT THOSE WERE THE UNDERLYING FACTS OF THAT PARTICULAR OFFENSE.

MR. ZEIDENBERG:  EXACTLY.  THAT'S RIGHT.  HE IS TRYING TO GET AT THE UNDERLYING FACTS OF THE OFFENSE, NOT SIMPLY THAT HE PLED TO THE CONVICTION.  AND WE HAVE THE CONVICTION, AND YOU CAN USE THAT, BUT LET'S FIND OUT WHAT HAPPENED TO THAT CONVICTION.

OBVIOUSLY, THIS WITNESS HAS A NUMBER OF CONVICTIONS, WHICH HE HAS TALKED ABOUT AT LENGTH.  OTHER WITNESSES WILL HAVE, AS YOUR HONOR CAN WELL ANTICIPATE, LONG

RECORDS. AND IF THE COURT WERE TO PERMIT CROSS-EXAMINATION ALONG THOSE LINES -- "WHAT HAPPENED IN THAT PARTICULAR OFFENSE? OH, LET'S ATTACK WHAT HAPPENED IN THAT 1997 CONVICTION. AND WE HAVE INDEPENDENT MEANS TO SHOW THAT THOSE WERE NOT THE ACTUAL FACTS. EVEN THOUGH YOU HAVE ALREADY PLED GUILTY TO THEM, IT DIDN'T HAPPEN THE WAY YOU SAID IT HAPPENED."

I SIMPLY THINK IT'S A COLLATERAL MATTER. HE HAS PLED GUILTY.

THE COURT: THAT WOULD BE THE ONLY BASIS ON WHICH TO EXCLUDE IT.

MR. ZEIDENBERG: AND THAT IS THE BASIS WE'RE REQUESTING.

THE COURT: BUT NOW THAT HE HAS BEEN ASKED ABOUT IT AND HAS DENIED THAT THOSE WERE THE UNDERLYING CIRCUMSTANCES, SINCE HE IS SPONSORED BY THE GOVERNMENT AND THE GOVERNMENT IS, IN EFFECT, VOUCHING FOR HIS TESTIMONY, I THINK HE CAN BE IMPEACHED BY USE OF THAT PLEADING FILED BY THE GOVERNMENT IN THE OTHER CASE -- SIGNED AND FILED BY AND UNDER THE AUSPICES OF THE UNITED STATES ATTORNEY. BUT IT'S GOING TO COME INTO EVIDENCE, IF YOU WANT TO ASK HIM --

MR. ZUCKER: AGREED. I WANT BOTH THAT AND THE INDICTMENT INTO EVIDENCE. AND I WILL PROFFER TO THE COURT THE INDICTMENT THAT IS MARKED CURRENTLY HAS A COUPLE OF NOTES ON IT, WHICH I WILL WHITE OUT.

THE COURT: YES. THIS IS NOT COMING IN THE WAY IT IS. THAT IS ANOTHER ISSUE.

MR. ZUCKER: I UNDERSTAND. I DIDN'T EXPECT THE COURT'S RULING TO BE THAT WAY. SO I HAD MY NOTES RIGHT ON THE INDICTMENT.

IF ANY OF MY CO-COUNSEL HAVE A CLEAN COPY OF THE INDICTMENT, I WILL DO IT RIGHT NOW. OTHERWISE, I WILL SUBMIT A WHITED-OUT COPY.

THE COURT: THIS IS NOT TO BE DISPLAYED TO THE JURY.

MR. ZUCKER: FINE.

MR. DAVIS, DO YOU HAVE A COPY?

MR. DAVIS: YES.

MR. ZUCKER: I WILL SUBSTITUTE HIS FOR MINE.

THE COURT: ALL RIGHT. I DON'T UNDERSTAND THE EXHIBIT NUMBER. IT SAYS "DEFENDANTS' 4, NUMBER 3 PRICE."

MR. ZUCKER: THAT IS MR. WEST'S. I WILL LET HIM ADDRESS THAT.

THE COURT: WELL, MR. WEST HAS DONE THINGS THAT I HAVEN'T UNDERSTOOD BEFORE.

MR. ZUCKER: BUT I AM SURE THEY WILL COME OUT RIGHT.

THE COURT: THEY USUALLY DO.

MR. ZUCKER: WE CAN SUBSTITUTE THAT.

AND I WILL NOTE, JUDGE, THE COPY I HAVE,

DEFENDANTS' 5, WHICH IS THE PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW -- BECAUSE IT'S COMING IN AS A STATEMENT OF A PARTY OPPONENT -- WELL, FACTUALLY, THAT WAS THE ONE SIGNED OFF BY THE HEARING COMMISSIONER.  IF THEY WANT THAT WHITED OUT, I HAVE NO PROBLEM BECAUSE IT'S COMING IN AS A STATEMENT OF A PARTY OPPONENT.

THE COURT:  I THOUGHT YOU SAID IT WAS PROPOSED FINDINGS OF FACTS AND CONCLUSIONS OF LAW.

MR. ZUCKER:  IT IS.  IT IS.  IT IS.  BUT THEN THE ONE THAT WAS IN THE COURT FILE, THE JUDGE SIGNED.  SO I HAVE NO OBJECTION TO WHITING OUT THAT.  I DON'T HAVE A COPY THAT ISN'T SIGNED, BUT I WILL MAKE IT INTO ONE.

THE ONE THEY FILED, HE SIGNED.  AND IF THEY HAVE AN OBJECTION TO HIS SIGNATURE BEING ON IT, I DON'T MIND WHITING IT OUT.  I SHOULDN'T HAVE THE ADDED ADVANTAGE OF A JUDICIAL FINDING THAT THEY WERE RIGHT, UNLESS THEY AGREE TO IT OR HAVE NO OBJECTION TO IT.

THE COURT:  WHAT'S YOUR PLEASURE?  IT IS BEING ADMITTED AS THE ADMISSION OF A PARTY OPPONENT FOR WHICH THE OPERATIVE SIGNATURE IS THE SIGNATURE OF THE ASSISTANT UNITED STATES ATTORNEY WHO SUBMITTED IT?

MR. ZEIDENBERG:  I BELIEVE THAT'S CORRECT, YOUR HONOR.

THE COURT:  WHAT?

MR. ZEIDENBERG:  I BELIEVE THAT'S CORRECT.

THE COURT: DO YOU WANT TO HAVE THE SIGNATURE OF COMMISSIONER BYRD OBLITERATED?

MR. ZEIDENBERG: YES. YES, YOUR HONOR.

THE COURT: ALL RIGHT.

MR. ZEIDENBERG: AND I WOULD, JUST FOR FUTURE REFERENCE, BECAUSE I THINK THE SITUATION MAY ARISE WITH OTHER WITNESSES -- I WOULD JUST LIKE THE RECORD AND THE COURT TO REMEMBER THAT THE REASON THAT MR. DAVIS PROFFERED FOR THE COURT WHY HE SHOULD BE PERMITTED TO INQUIRE AS TO THE UNDERLYING FACTS OF THAT OFFENSE WAS UNDER THE RATIONALE THAT MR. MURRAY STATED THAT HE HAD AN AVERSION TO VIOLENCE, AND HE WANTED TO HELP CLEAN UP THE VIOLENCE IN THE CITY. AND UNDER THAT, HE SAID TO YOUR HONOR, "WELL, I SHOULD BE PERMITTED TO INQUIRE AS TO THE FACTS OF THIS CASE TO SHOW THAT THIS WAS A VIOLENT OFFENSE." AND THE COURT SAID, "OKAY. FOR THAT PURPOSE, YOU CAN INQUIRE AS TO VIOLENCE." AND THEN ONCE HE SAYS "YES, IT WAS VIOLENT," THEN THEY COME BACK AND THEY SAY, "OH, BUT IT WASN'T THE SAME ACCOUNT AS YOU GOT EARLIER."

THE COURT: I UNDERSTAND YOUR RATIONALE, BUT I DON'T THINK IT'S A SIGNIFICANT DISTINCTION OF ITS ADMISSION.

MR. ZEIDENBERG: VERY WELL.

THE COURT: I ALSO THINK IT IS SOMETHING THAT YOU CAN ADDRESS ON REDIRECT EXAMINATION.

MR. ZEIDENBERG: VERY WELL, YOUR HONOR.

THE COURT:  THIS IS OFF THE RECORD.

(THE COURT CONFERRING WITH THE COURTROOM CLERK AT THE BENCH.)

THE COURT:  MR. WEST HAS EXPLAINED HIS LABELING OF THE EXHIBIT TO ME.  IT'S CORRECT.

MR. ZUCKER:  OKAY.

UPON INQUIRY, I WILL BE ASKING HIM IF HE IS AWARE OF THE SENTENCING EXPOSURE, AND I WILL ATTEMPT TO REFRESH HIS RECOLLECTION WITH THE D. C. CODE -- THAT HE OBVIOUSLY KNOWS --

THE COURT:  IF HE SAYS HE IS NOT AWARE OF IT, THEN IT'S CLOSED.

MR. ZUCKER:  I WILL THEN ASK THE COURT TO TAKE JUDICIAL NOTICE.  IF HE SAYS THAT HE KNEW AT THE TIME -- OR DIDN'T KNOW, I WILL ASK THE COURT TO TAKE JUDICIAL NOTICE OF WHAT THE SENTENCES ARE, ACCORDING TO THE D. C. CODE, AND I HAVE THE CODE WITH ME FOR EACH OFFENSE.

THE COURT:  THE CODE SAYS WHAT IT SAYS.

MR. ZUCKER:  RIGHT, BUT THE JURY DOESN'T KNOW IT. I HAVE TO ESTABLISH WHAT HIS EXPOSURE WAS.

THE COURT:  IT'S NOT RELEVANT.

MR. ZUCKER:  IT'S NOT RELEVANT?

THE COURT:  IT'S NOT RELEVANT IF HE IS NOT AWARE OF IT BECAUSE YOU'RE TRYING TO SHOW THAT HE AVOIDED A LIFE SENTENCE WITHOUT PAROLE BY CUTTING A DEAL WITH THE

PROSECUTION.  IF HE IS NOT AWARE THAT HE AVOIDED IT, THEN IT'S NOT RELEVANT.

MR. ZUCKER:  ALL RIGHT.  I WILL INQUIRE OF HIM WHETHER AT THE TIME HE KNEW.

THE COURT:  THAT'S RIGHT.

MR. ZUCKER:  OKAY.

THE COURT:  AND YOU'RE GOING TO LIVE WITH HIS ANSWER.

OKAY.  ARE YOU READY TO BRING THEM BACK?

MR. ZUCKER:  SURE.

MR. JONES:  COULD I HAVE A RESTROOM BREAK?

THE COURT:  I'M SORRY?  I BEG YOUR PARDON?

MR. JONES:  COULD I HAVE A RESTROOM BREAK?

THE COURT:  ALL RIGHT.  TELL THE JURY WE'RE GOING TO BE OUT FOR ANOTHER TEN MINUTES.

THE DEPUTY MARSHAL:  OKAY, JUDGE.

THE COURT:  WHAT IS THIS CHART ON THE MONITOR?

MR. ZUCKER:  IT'S JUST A LIST OF WHAT THE FOUR CHARGES WERE.

THE COURT:  IT HASN'T BEEN ADMITTED INTO EVIDENCE, AND IT HAS COME ACROSS THE MONITOR.

MR. ZUCKER:  IT IS ILLUSTRATIVE.  IT WOULDN'T BE ADMITTED INTO EVIDENCE.  IT IS JUST A LIST.

THE COURT:  IT DOESN'T MAKE ANY DIFFERENCE.  IT IS NOT TO BE SHOWN TO THE JURY UNTIL IT HAS BEEN ADMITTED.

46

(RECESS WAS TAKEN.)

(AFTER RECESS.)

THE COURT:  ARE YOU READY FOR THE JURY?

MR. ZUCKER:  YES.

THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

(JURY IN.)

84

THE COURT: ALL RIGHT. DEFENDANTS' NUMBER 5 IS IN EVIDENCE.

(WHEREUPON, DEFENDANTS'

**EXHIBIT NUMBER 5** WAS

RECEIVED IN EVIDENCE.)

THE WITNESS: SIR, YOU KEEP TRYING TO INSINUATE THAT I AM DOING THIS OUT OF A SIX-YEAR SENTENCE, AND I'VE BEEN IN FOUR YEARS ALREADY. COME ON, SIR. YOU'RE A DEFENSE ATTORNEY.

Q. SO YOU'RE SAYING THAT THOSE TWO EVENTS, THE FACT THAT THEY AGREED TO YOUR RELEASE AND YOU GOT A TWO-TO-SIX, IS JUST A COINCIDENCE?

A. WHO AGREED TO MY RELEASE?

Q. THE PROSECUTORS.

A. NO.

Q. THEY AGREED TO YOUR RELEASE AT THE TIME OF THE PLEA, DIDN'T THEY?

A. NO.

Q. WELL, THEY AGREED TO YOUR GOING INTO WORK RELEASE, RIGHT?

A. SIR?

Q. THEY AGREED TO YOUR GOING INTO WORK RELEASE?

A. THEY NEVER AGREED WITH ANYTHING. I HAVE ASKED THEM TO SEND ME TO A DRUG TREATMENT PROGRAM, BUT --

Q. I AM NOT TALKING ABOUT SINCE SENTENCING.

85

A. NOT THAT I KNOW OF HAVE THEY AGREED WITH ANYTHING.

Q. SIR, I WANT TO BE CLEAR WE'RE TALKING ABOUT THE SAME THING. I AM NOT TALKING ABOUT AT THE TIME OF SENTENCING. I AM TALKING ABOUT THE DAY OF THE PLEA, FIVE DAYS AFTER YOU TESTIFIED. THEY AGREED TO YOUR BEING RELEASED FROM JAIL, NO LONGER BEING HELD WITHOUT BOND, AND GOING INTO A WORK RELEASE PROGRAM, DIDN'T THEY?

A. NOT THAT I KNOW OF. I KNOW I WAS SENT TO A HALFWAY HOUSE, BUT AS FAR AS ME KNOWING THEM AGREEING TO IT, NO, I DON'T KNOW THAT.

Q. THAT'S BECAUSE SOMEBODY WROTE "WAIVED STEPBACK" ON THE FORM AFTER IT WAS FILED WITH THE COURT, RIGHT?

A. YES, BECAUSE I HAVE NEVER SEEN THAT.

MR. ZEIDENBERG: OBJECTION.

THE COURT: SUSTAINED.

BY MR. ZUCKER:

Q. INCIDENTALLY, YOU ACKNOWLEDGE THAT YOU WROTE TO MR. WAINSTEIN TO ASK HIM FOR HELP WITH THE PAROLE BOARD; ISN'T THAT CORRECT?

A. SIR?

Q. I SAID YOU ACKNOWLEDGE THAT YOU DID WRITE TO MR. WAINSTEIN, THE PRIOR PROSECUTOR, AND ASK HIM FOR HELP WITH THE PAROLE BOARD; ISN'T THAT CORRECT?

A. NO. I ASKED HIM FOR HELP FOR RECEIVING DRUG TREATMENT.

Q. YOU NEVER ASKED MR. WAINSTEIN -- YOU NEVER WROTE TO

App 241

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,   .   Docket No. CR 98-329

        Government,   .   Washington, D.C.
                    .   February 8, 2001
   vs.   .   2:20 p.m.

VINCENT HILL,   .   (AFTERNOON SESSION)
JEROME MARTIN,   .
SAMUEL CARSON,   .
WILLIAM K. SWEENEY,   .
MAURICE PROCTOR,   .
SEAN COATES,   .

        Defendants   .

. . . . . . . . . . . . .   .

UNITED STATES OF AMERICA,   .

        Government,   .

                    .   Docket No. CR 99-348
   vs.   .

GARY PRICE,   .

        Defendant.   .

. . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:       PETER ZEIDENBERG, AUSA
                          ANJALI CHATURVEDI, AUSA
                          U.S. Attorney's Office
                          555 Fourth Street, N.W.
                          Washington, D.C.  20001

For the Defendant Hill:   CHRISTOPHER DAVIS, ESQ.
                          601 Indiana Avenue, N.W.
                          Suite 910
                          Washington, D.C.  20004

For the Defendant Martin: JOANNE HEPWORTH, ESQ.
                          305 H Street, N.W.
                          Second Floor
                          Washington, D.C.  20001

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Proctor:       HOWARD BRAMSON, ESQ.
                                 717 D Street, N.W.
                                 Third Floor
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 112 of 443

Q.   Yes.

A.   Maybe a few weeks.

Q.   And after you were in Charles County, where did you go?

A.   I was transferred from Charles County to Northern Neck Virginia Regional Jail, Warsaw County.

Q.   Approximately when did you get to Northern Neck?

A.   Sometime in March

Q.   That would be March of what year?

A.   2000.

Q.   How long were you at Northern Neck?

A.   Oh, about three weeks.

Q.   Now, while you were at Northern Neck Regional Jail, did you meet someone there by the name of Draper?

A.   Yes.

Q.   Did you ever get to know his true name?

A.   Yes.

Q.   What was that?

A.   William Sweeney.

Q.   Do you see Mr. Sweeney in court today?

A.   Yes.

Q.   Could you point him out please?

A.   The gentleman sitting there with the yellow shirt on and the glasses.

     MR. ZEIDENBERG:  Your Honor, may the record reflect the identification of William Sweeney?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

46

MR. KIERSH:  No objection.

THE COURT:  The record will so reflect.

BY MR. ZEIDENBERG:

Q.    Now, can you describe how it was you met Mr. Sweeney?

A.    Another gentleman by the name of Wayne Johnson and I were in his room --

Q.    Mr. Johnson's room?

A.    Mr. Johnson's room discussing law.  And he said, one of your homey's is here.  I said, excuse me?  Yeah, he said, one of my homey's is here.  I said, yeah, where?  He said, the next room to me.  His name is Sweeney.

So I said, I'll holler at him.  So when we finished talking, I went and introduced myself to Mr. Sweeney, and we started our conversation from there.

Q.    Now, when you first met Mr. Sweeney, how did he identify himself?

A.    Well, when I spoke to him, he said, my name -- I'm Draper, and I said, eh?  Because, you know, I never heard of him.  And he said, you haven't heard of me?  I said, no.  I said, besides, I'm old enough to be your grandfather, you know.  I said, I haven't heard of you, you know.  And we went from there.

Q.    Now, where were you housed in Northern Neck in relation to Mr. Sweeney during the time that you were there?

A.    We were on the second tier.  We were about three cells

55

he was faring or how he was enjoying life at Northern Neck?

A.    Well, it wasn't the same as it was at D.C. Jail.  Just the regular jail time he was doing there.  Was no big deal about this one here at Northern Neck.

Q.    Did he say what he was going to do about it?

A.    At one point he said, we got to make a power move and get the fuck up out of here.

Q.    A power move?

A.    Yes.

Q.    Now, what did you understand that to mean?

        MR. BRAMSON:  Objection.

        THE COURT:  Overruled.

        THE WITNESS:  They were going to escape.

BY MR. ZEIDENBERG:

Q.    Now, did you have any conversations with Mr. Sweeney about criminal activity that he had been involved in?

A.    Yes.

Q.    Can you tell us about what Mr. Sweeney said about that?

A.    Well, he had told me that during the conversation that he was doing everything, and which consisted of kidnapping, murder and drugs.

Q.    Now, when he mentioned kidnappings, did you ask him any questions about that?

A.    Yes.

Q.    What was your reaction when he said, kidnappings?

56

A.   I was a little amazed.  That's something that you rarely hear about.  People kidnapping people unless they're going to do it for revenge or something like that, but just something that people don't usually do.

Q.   Did you ask Mr. Sweeney any questions about the kidnappings?

A.   Yes.

Q.   What did you say and what did he say?

        MR. BRAMSON:  Objection.  May we approach?

        THE COURT:  Are you sure this is necessary?

        MR. BRAMSON:  I think it's necessary.

        THE COURT:  All right.

    (Bench conference on the record.)

57

(Bench conference on the record.)

MR. BRAMSON:  I'm going to ask for assurances that this witness is only going to talk about Mr. Sweeney and what Mr. Sweeney had done, and not Mr. Sweeney and others.

THE COURT:  I understand he is not going to mention the names of any other persons.

MR. BRAMSON:  That was for the other matter.  Let me make sure that no matters -- again, even if he says, we, you know, we were doing is an improper inference to the rest of the defendants in this case.  I think if the Court allows this kind of testimony that the Court should limit it to what Sweeney said Sweeney was doing and nobody -- there's no, we were going to, or me and the boys or anything of that nature.

THE COURT:  If he was doing it collectively, then he is going to be allowed to -- the witness is going to be allowed to disclose that the admission was made as to collective behavior.  As long as he doesn't mention any names at this point.

MR. KIERSH:  Your Honor, while we're up here, again, I'm learning information during this examination from my client.  I mean, information is coming to me from both sides, and it's -- this is a bombshell, the information that's coming out, the testimony that's coming out

THE COURT:  I imagine it's somewhat of a surprise.

MR. KIERSH:  It's a surprise, and the substance of

58

it is obviously very damning to my client.

THE COURT:  I wouldn't think so.

MR. KIERSH:  Well, it is.  We all can see that.  But what I'm also learning is that apparently this man in Charles County did the same thing.  Went down to Charles County.  Someone who is awaiting trial, and became friendly with that person and provided testimony --

THE COURT:  Why are you telling me this right now?

MR. KIERSH:  Because I'm telling this to you because I need time.

THE COURT:  This is in the middle of the examination.  I have ruled on an objection.

MR. KIERSH:  Right.  And I need time to investigate.

THE COURT:  I'll talk to you about that at the appropriate time.

MR. KIERSH:  Fine.

(End of bench conference.)

59

(End of bench conference.)

THE COURT:   The objection is overruled.  What's your question again?

BY MR. ZEIDENBERG:

Q.   I think my question was what questions, if any, did you ask Mr. Sweeney about the kidnappings he had been involved with, and what was his response?

A.   I asked was kidnapping profitable?  He said, yes.

Q.   Did he elaborate?

A.   Yes.

Q.   What did he say?

A.   He told me that he kidnapped one person twice, and he kidnapped another person.

Q.   What was your reaction when he said that he kidnapped one person two times?

A.   I wanted to know why?

MR. KIERSH:   Objection, Your Honor.

THE COURT:   Overruled.

BY MR. ZEIDENBERG:

Q.   What was your reaction?

A.   I was kind of stunned, you know, at the fact he had hit the same person twice.  And I asked him, I said, so you all must have had masks or something on?  He said, yeah.

Sorry.  I was talking too fast.  I asked him did they have masks or something one when they kidnapped him, and he

USCA Case #23-3015   Document #2077668      Filed: 10/01/2024   Page 119 of 443

60

said, yes.

The first time he said he kidnapped this guy, his name was Kenneth or Keith Johnson, Whitey, something like that. And they got a big chunk of money from somebody by the name of Gooch. I don't know him either.

I said, well, what happened on the second time? He said, second time we snatched him at Potomac Gardens, and he tried to jump out the car and run, and I shot him.

Q. Did Mr. Sweeney indicate whether or not the person lived or died?

A. No.

Q. This was one particular kidnapping he described to you involving Whitey?

A. Yes.

Q. And he said Whitey was kidnapped two times, is that your testimony?

A. Yes.

Q. Now, did he tell you about another kidnapping involving another individual?

A. Yes, but it wasn't any name.

Q. What did Mr. Sweeney tell you about the second kidnapping? And when I say second kidnapping I mean other victim.

A. He said they had snatched him and threw him in the trunk of the car, and while they were driving the guy kicked the car

(Page 119 of Total)

61

trunk open and got out and started running, and they jumped out of the car and shot him in his hip or his ass and he still got away. I said, that's kind of preposterous. I said you shot him and he still got away? And he said yes.

Q. Did you believe that story?

A. No, I still don't.

Q. What was Mr. Sweeney's tone of voice when he was describing these events to you?

A. As a matter of fact, he, you know, -- just an every day thing, it wasn't no big deal about it.

Q. Now, did you talk to Mr. Sweeney about his pending case that he was awaiting trial on?

A. Yes.

Q. What did Mr. Sweeney tell you about that?

A. Well, at different intervals he said that he didn't think the government had anything on him. And I said -- my response to that, I said, Draper, I said, generally when the feds, meaning the federal government, put their hands on you they generally are right. They don't just grab you up and don't have anything. I said, either you did it, you're deeply involved, or you know a whole lot about it.

Q. What was Mr. Sweeney's response when you said that?

A. You know, I still don't think they have anything on me, you know.

Q. Did he tell you what his concerns were about the case

62

against him?

A.   Yes.

Q.   What was that?

A.   A certain fellow by the name of James Montgomery.

Q.   What did he tell you about James Montgomery?

A.   That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.

Q.   If you could just fill in the he there and tell us that again, Mr. Watson.  In other words, when he said he brought him into the organization --

A.   Mr. Sweeney brought Mr. Montgomery into the organization. Is that okay?

A.   Yes, thank you.  And what did Mr. Sweeney say about that?

A.   Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.

Q.   Who is flipping on --

A.   Mr. Montgomery is turning on Mr. Sweeney to save himself.

Q.   Did Mr. Sweeney ask you any advice about that?

A.   Yes.

Q.   What did Mr. Sweeney ask you about that?

A.   He asked me if he could prove that Mr. Montgomery was in on the killings and did as much killing as he did that would

63

they, the jury or whatever, try to work in his favor. I told him no, I didn't think so because it doesn't usually work like that. I said usually the first person that testifies is usually what they go with. And if they got you targeted as the ring leader then that makes the difference.

Q. What was Mr. Sweeney's response?

A. Yeah, I figured as much.

THE COURT: I'm sorry?

THE WITNESS: Yes, I figured as much.

BY MR. ZEIDENBERG:

Q. Now, did Mr. Sweeney talk to you about what role Mr. Montgomery was to play in this case?

A. He was suppose to testify against him.

Q. Did you have any conversation about that fact?

A. Yes. He was talking that Montgomery is going to testify against him. And I said, well, if you got all this muscle and all this gun power and everything, I said, why don't you just kill him, you know. And he said, we been trying to get to that mother fucker but the feds got him hid away too well.

Q. Did he say where they had been looking for him?

A. No.

Q. Now, did Mr. Sweeney talk to you about his personal life?

A. Yes.

Q. What do you recall him telling you about that?

A. He was a little down, despondent, depressed about the

64

fact that he had just had a new baby boy I think he said, just born baby boy, and he hadn't had a chance to really cuddle him and be with him or anything, you know.  And my advice was to him, you know, that maybe he should just go on and tell the lady to go on and get her own life, go ahead and find another life, because from what you're telling me all the time you're going to have, you know, you can't expect her to wait around for you.  And he said, yeah.  He said, -- he said, these bitches are no good anyway.  He said, I had to down a couple of them anyway, you know, so --

Q.   Let me go back over it.  What is it -- when you told him that he should tell the woman, his girlfriend or wife, to go on without him, what was his response?

MR. BRAMSON:  Objection, Your Honor, relevance to this trial.

THE COURT:  Approach the bench.

(Bench conference on the record.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

67

(End of bench conference.)

BY MR. ZEIDENBERG:

Q.   Mr. Watson, going back to the conversation you had about Mr. Sweeney's domestic situation, after you advised Mr. Sweeney that perhaps he should tell his baby's mother, wife, however you described it, as someone who should go on with her life without him, can you tell us what his response was to that?

A.   Well, he kind of agreed with it, and he felt that -- he said he had a little animosity towards women, particular women.   And he said, yeah, these bitches no good anyway, you know, because I had to down a couple of them anyway.

Q.   He said, I had to down a couple of them anyway?

A.   Yeah.   Yeah.

Q.   And when you say the term, down a couple of them, what did you understand that to mean?

          MR. BRAMSON:   Objection.

          THE COURT:   Overruled.

          THE WITNESS:   Kill them.

BY MR. ZEIDENBERG:

Q.   I'm sorry?

A.   Kill them.

Q.   Now, did Mr. Sweeney tell you how it was, other than kidnapping, he was able to make money while he was out on the outside?

68

A.    He said he did a whole lot of crack cocaine and had boat loads of weed.

Q.    Weed?

A.    Marijuana.

Q.    Now, Mr. Watson, if you could, could you tell the ladies and gentlemen how it is you came to the attention of the U.S. Attorney's Office, you personally?

A.    I had spoken with Mr. Sweeney but really I had forgotten all about him, because things he was saying was somewhat preposterous and ludicrous to me, so I didn't really pay him any more attention, and that was back in March of 2000.  And around December 2000, when I was at this institution, my buddy and I came into the mess hall and as we were about to leave he was finishing up his meal, and I was sitting there talking to him, and four young fellows came in behind us and sat down behind us and they were talking.  They said, yeah --

          MR. BRAMSON:  Objection.

BY MR. ZEIDENBERG:

Q.    I am not going to ask you -- in fact, I am going to ask you not to repeat the conversation.  But let me try and do it this way.  At some point did you contact an attorney?

A.    Yes.

Q.    What was your purpose in contacting an attorney?

A.    Well, I have 105 months to do.  I am 67 years old.  And I wanted to try to get some time off me, and I felt this was one

reveal an investigation method that they may not be obliged to reveal.

MR. KIERSH:  Again, I think that an inquiry -- we could save us all a lot of time if the Court would simply inquire of government counsel how it is, what he knows, then the issue may get resolved without us having to spend a lot of additional time.

MR. ZEIDENBERG:  If I may, Your Honor.  I have no idea how it is that this witness ended up in that jail.  I don't know if they have a contract with the local jail, that facility, because of over-crowding.  I simply do not know.  But I do know that there was certainly no targeting of Mr. Sweeney, or any other defendant in this case, by a government agent.  And, frankly, I'm surprised that Mr. Kiersh would make such a suggestion.

Obviously, we wouldn't be disclosing it, we wouldn't be calling a witness if he was in that position and then turn it over as Brady.  It would be a situation we would never put ourselves in.

THE COURT:  All right.  Your office disclaims any connection with Mr. Watson's presence in Northern --

MR. ZEIDENBERG:  And I don't, frankly, think that -- I don't know how he got there, but Mr. Kiersh has no -- certainly I have no better connections with the Bureau of Prisons --

80

THE COURT:  A call to the Marshal in the District of Maryland would give an answer to it.  But he can spend his weekend any way he wants to spend it.

MR. KIERSH:  I don't want to waste time unnecessarily.  There is a lot of things I have to do in this case, and I want to be prepared to go forward on Monday.  But what I do want to know, if the Court would inquire of government counsel, is whether or not the United States Attorney's Office for the District of Maryland was involved with Mr. Watson in getting him to Charles County.  That sounds like how it probably occurred.

THE COURT:  You call --

MR. KIERSH:  They are not going to answer my question.

THE COURT:  I am not going to have Mr. Zeidenberg call.

MR. KIERSH:  Well, can you inquire of Mr. Zeidenberg if he knows whether or not the Office of the United States Attorney for the District of Maryland --

MR. ZEIDENBERG:  Your Honor, there has been no collaboration between our office and the U.S. Attorney's Office in Greenbelt about this case.  As far as I know, they don't even know who Mr. Sweeney is.  There has not been any --

THE COURT:  I take your assurance.

MR. ZEIDENBERG:  -- investigative sharing between

our offices regarding this case, at least maybe in a most peripheral way, but certainly not in this context.

THE COURT: Okay.

MR. KIERSH: What I would inquire of the Court -- we talked about jury instructions on impeachment earlier in the week.

THE COURT: Why in the world would I give these three instructions, four instructions, now -- five instructions -- why would I give these five instructions now?

MR. KIERSH: And the answer to your question is that on Tuesday afternoon at just about this hour of the day you asked me to provide you with those instructions.

THE COURT: An instruction which addressed the question of --

MR. KIERSH: No, you --

THE COURT: -- the various methods by which impeachment can be done and why certain questions are being asked. And all you did is copy the Red Book instructions.

MR. KIERSH: That's what you asked me to do.

THE COURT: No, I didn't. I have got a Red Book, I don't need you to copy it for me. I need a thoughtful instruction which represents a little legal craftsmanship which will get across the idea to the jury that you were trying to express to me the other day, which I thought, as you expressed it, had some superficial validity.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

---

UNITED STATES,
          GOVERNMENT,                    :

 VS.                                     :    CR. NO. 98-329

VINCENT HILL,                            :
JEROME MARTIN,                           :
SAMUEL CARSON,                           :
WILLIAM K. SWEENEY,                      :
MAURICE PROCTOR,                         :
SEAN COATES,                             :
          DEFENDANTS.                    :

---

UNITED STATES                            :
          GOVERNMENT,                    :

  VS.                                    :    CR. NO. 99-348

GARY PRICE,                              :
          DEFENDANT                      :

---

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 12, 2001
(MORNING SESSION)
(10:55 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                PHYLLIS MERANA
                               6816 U. S. DISTRICT COURT
                               3RD & CONSTITUTION AVE., N.W.
                               WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                PETER ZEIDENBERG, AUSA
                                   ANJALI CHATURVEDI, AUSA
                                   555 4TH ST., N.W.
                                   WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:            CHRISTOPHER DAVIS, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #910
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:          JOANNE HEPWORTH, ESQ.
                                   305 H STREET, N.W.
                                   2ND FLOOR
                                   WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7TH STREET, N.W.
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:         STEVEN R. KIERSH, ESQ.
                                   717 D STREET, N.W.
                                   SUITE 400
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:         HOWARD BRAMSON, ESQ.
                                   717 D STREET, N.W.
                                   THIRD FLOOR
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:          FREDERICK JONES, ESQ.
                                   901 6TH STREET, S.W.
                                   #409
                                   WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:           JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #901
                                   WASHINGTON, D. C.  20004

3

I N D E X

| WITNESS | DIRECT | CROSS |
|---|---|---|
| THEODORE R. WATSON | | |
| BY MR. KIERSH | | 10 |
| BY MR. DAVIS | | 45 |
| BY MS. HEPWORTH | | 55 |
| BY MR. BRAMSON | | 62 |
| BY MR. ZUCKER | | 67 |

(Page 131 of Total)

USCA Case #23-3015    Document #2077668       Filed: 10/01/2024      Page 132 of 443

BY MR. KIERSH:

Q. IF YOU KNOW, SIR.

A. REPEAT IT AGAIN NOW.

Q. OKAY. LET ME JUST GO BACK. AGAIN, IF I AM NOT MAKING SENSE, JUST LET ME KNOW.

A. YOU'RE MAKING SENSE. JUST GO HEAD.

Q. YOU HAVE ALREADY TOLD US THAT YOU MET WITH MS. WILKINSON; CORRECT?

A. CORRECT.

Q. AND THAT YOU GAVE YOU HER INFORMATION, CORRECT?

A. CORRECT.

Q. AND YOU DID NOT GET THE 5K1 LETTER FOR SUBSTANTIAL ASSISTANCE; CORRECT?

A. CORRECT.

Q. OKAY.

MY QUESTION IS DO YOU KNOW WHY YOU DID NOT GET THE 5K1 LETTER FROM MS. WILKINSON?

A. YES.

Q. WHAT WAS THE REASON?

A. SHE MADE IT VERY CLEAR SHE DID NOT LIKE ME AND SHE DIDN'T WANT TO GIVE ME ANYTHING.

THE COURT: I AM SORRY?

THE WITNESS: SHE MADE IT VERY CLEAR THAT SHE DID NOT LIKE ME AND SHE DID NOT WANT TO GIVE ME ANYTHING.

BY MR. KIERSH:

(Page 132 of Total)

20

Q. OKAY.

AND WHEN YOU TELL US THAT SHE MADE IT VERY CLEAR THAT SHE DID NOT LIKE YOU, WHAT DID SHE SAY THAT LED YOU TO FORMULATE THE BELIEF THAT SHE DID NOT LIKE YOU?

A. NUMBER ONE WAS HER ATTITUDE TOWARDS ME, AND MY ATTORNEYS HAD TOLD ME, "MS. WILKINSON DOESN'T LIKE YOU, AND SHE DOESN'T WANT TO GIVE YOU ANYTHING. SHE DOESN'T WANT TO HEAR ANYTHING FROM YOU. SHE DOESN'T WANT TO TALK TO YOU ABOUT ANYTHING. THE ONLY TIME SHE WANTS TO SEE YOU IS AT TRIAL."

Q. OKAY. BUT YOU DIDN'T GO TO TRIAL BECAUSE SHE NEGOTIATED A PLEA?

A. SHE CAME BACK WITH A PLEA, YES.

Q. OKAY. THE PLEA, INCLUDING THE NOTATION THAT IF YOU PROVIDED SUBSTANTIAL ASSISTANCE, SHE WOULD SUBMIT THE 5K1 LETTER?

A. THAT WAS IN THE PLEA AGREEMENT.

Q. RIGHT. BUT THE 5K1 LETTER WAS NEVER SUBMITTED ON YOUR BEHALF?

A. NO, IT WASN'T.

Q. OKAY.

NOW, THE CIRCUMSTANCES BEHIND YOUR ARREST -- I JUST WANT TO GO INTO THOSE BRIEFLY -- THAT LED YOU TO APPEAR BEFORE THE FEDERAL JUDGE IN GREENBELT -- YOU TOLD THIS JURY, WHEN YOU WERE HERE LAST WEEK, ON DIRECT EXAMINATION, THAT YOU HAD WORKED AS A PHARMACEUTICAL ADMINISTRATIVE ASSISTANT;

(BENCH CONFERENCE.)

THE COURT: YOU'RE GOING TO SHOW THAT HE WAS IN PROTECTIVE CUSTODY BECAUSE HE FEARED REPRISAL?

MR. KIERSH: BECAUSE HE WAS GIVING INFORMATION ABOUT THESE INMATES, AND THAT HE DID FEAR REPRISAL. THAT'S WHY THEY PUT HIM IN PROTECTIVE CUSTODY, THE SAME TYPE OF CIRCUMSTANCES THAT LED HIM TO GIVE TESTIMONY AGAINST MR. SWEENEY.

THE COURT: ALL RIGHT. IF THAT'S THE PURPOSE OF OFFERING THE EVIDENCE, WHAT'S THE RELEVANCE?

MR. KIERSH: THE RELEVANCE IS THAT THIS IS HIS PATTERN OF CONDUCT. THAT HE GOES AND HE JUST GETS SENT TO THESE JAILS. HE IS AN OLDER MAN. HE SPEAKS TO THE YOUNGER GUYS AND GETS THEM TO TRUST HIM, AND THEN HE GOES AND TRIES TO GET INFORMATION THAT HE CAN USE FOR REDUCTION OF HIS OWN SENTENCE.

THE COURT: HOW DOES THAT BEAR ON HIS CREDIBILITY?

MR. KIERSH: WELL, BECAUSE THE FACT THAT -- IT BEARS DIRECTLY ON HIS CREDIBILITY, BECAUSE IF HE IS DOING THIS AS A PATTERN, THEN IT SUGGESTS THAT IT MAY NOT BE TRUTHFUL WHAT HE IS SAYING, AND THE FACT THAT THERE IS A SUGGESTION, AT LEAST, THAT THE U.S. ATTORNEY'S OFFICE IN GREENBELT REJECTED JUST THIS TYPE OF TESTIMONY FROM HIM.

THE COURT: WHAT'S THE BASIS OF THE OBJECTION?

MR. ZEIDENBERG: MY QUERY WOULD BE THE SAME AS THE

(Page 134 of Total)

USCA Case #23-3015    Document #2077668        Filed: 10/01/2024      Page 135 of 443
Case 1:98-cr-00329-RCL   Document 669   Filed 07/19/01   Page 32 of 78

32

COURT'S.  I DON'T UNDERSTAND HOW THE FACT THAT HE

PROVIDED -- IF HE IS GOING TO DEMONSTRATE THAT HE PROVIDED A

PATTERN OF UNTRUTHFUL TESTIMONY, THEN HE COULD SAY, "WELL,

IT SEEMS THAT HE CONSTANTLY GIVES UNTRUTHFUL TESTIMONY AND

TRIES TO PASS IT OFF AS TRUTHFUL."  THAT IS ONE THING, BUT

THE FACT THAT HE DID OR DID NOT OBTAIN INFORMATION ON OTHER

INMATES ON PRIOR OCCASIONS -- THERE IS NO INDICATION OF

WHICH I AM AWARE.  IN FACT, TO THE CONTRARY.  THE

INFORMATION HE PROVIDED, AT LEAST FROM MY UNDERSTANDING, WAS

COMPLETELY CORRECT.  IT WAS JUST THAT THE PROSECUTOR IN

MARYLAND, AS MR. WATSON SAID, SAID SHE DIDN'T CARE WHAT

INFORMATION HE HAD ABOUT WHATEVER.  SHE WASN'T GIVING HIM

ANYTHING.

SO I DON'T HAVE ANY EVIDENCE THAT SUGGESTS THAT

HIS TESTIMONY OR THAT ANY INFORMATION HE HAS PROVIDED WAS

UNTRUSTWORTHY.

THE COURT:  WELL, I THINK IT'S TENUOUS, BUT THE

RATIONALE IS THAT HE VIEWS HIS TESTIMONY OR THE INFORMATION

THAT HE MAY HAVE THAT CAN BE USED AGAINST OTHER

DEFENDANTS -- HE VIEWS IT AS SOMETHING OF A COMMODITY TO

THAT EXTENT.

WHY DOES THAT SUGGEST IT IS ANY LESS RELIABLE?

MR. KIERSH:  WELL, BECAUSE IF IT'S A PATTERN OF

CONDUCT ON SOMEONE'S PART, THAT'S WHY I SUGGEST IT'S

UNRELIABLE.  THAT HE IS DOING WHATEVER HE CAN TO GET

(Page 135 of Total)

INFORMATION TO USE AGAINST PEOPLE FOR HIS OWN BENEFIT.  SO THAT SIMPLY IT'S A HABIT.  IT'S A PATTERN FOR A MAN WHO HAS ALREADY TESTIFIED THAT HE IS TRYING TO GET HIS SENTENCE REDUCED.  THAT'S HIS GOAL IN THIS WHOLE PROCESS.

THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.

(END OF BENCH CONFERENCE.)

(Page 136 of Total)

USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 137 of 443
Case 1:98-cr-00329-RCL   Document 669   Filed 07/19/01   Page 35 of 78

35

A.   BECAUSE HE THOUGHT THAT A GENTLEMAN THAT WAS TESTIFYING AGAINST HIS ORGANIZATION -- HE AND SOME OTHER FRIENDS HAD TALKED TO ME AND TOLD ME WHAT WAS GOING ON.  AND IT HADN'T HAPPENED.  HE HAD THAT GRUDGE.  AND HE THOUGHT THAT I OVERHEARD SOME OF HIS CONVERSATIONS.  THEY WERE OFTEN TALKING IN THE ROOM NEXT TO ME.  AND HE FEARED THAT I OVERHEARD A LOT OF THOSE CONVERSATIONS.  AND THAT ENTAILED THE ALTERCATION.

Q.   SO IT WAS YOUR UNDERSTANDING THAT HE HAD OVERHEARD A CONVERSATION YOU WERE INVOLVED WITH?

A.   NO.

Q.   COULD YOU REPEAT THAT?  COULD YOU REPEAT YOUR ANSWER?

A.   HIS ROOM WAS ABOUT A DOOR FROM MY ROOM, AND HE WOULD OFTEN HAVE CONVERSATIONS WITH OTHER CO-DEFENDANTS IN HIS ROOM.  AND HE THOUGHT I OVERHEARD SOME OF HIS CONVERSATIONS, AND COUPLED WITH THE FACT THAT HE BELIEVED I ALREADY WAS TESTIFYING AGAINST HIM, THAT PROVOKED THE ALTERCATION.

Q.   SO HE THOUGHT YOU WERE ALREADY COMMITTED TO TESTIFYING AGAINST HIM?

A.   THAT IS CORRECT.

Q.   OKAY.

     NOW, YOU KNOW A PRIVATE INVESTIGATOR BY THE NAME OF JAMES BRADLEY, DON'T YOU?

A. YES, I DO.

Q.   AS A MATTER OF FACT, AFTER YOU WERE SENTENCED IN

FEBRUARY OF 2000, YOU HIRED MR. BRADLEY?

A.   YES.

Q.   OKAY.

AND YOU KNOW THAT MR. BRADLEY USED TO BE EMPLOYED BY THE METROPOLITAN POLICE DEPARTMENT?

A.   SO HE SAYS, YES.

Q.   YOU ALSO KNOW THAT HE WAS EMPLOYED BY THE DRUG ENFORCEMENT AGENCY?

A.   THAT'S WHAT HE SAID.

Q.   AND YOU ALSO KNOW THAT HE IS NOW A PRIVATE INVESTIGATOR, WHEREBY HE COULD BE HIRED BY INDIVIDUALS TO DO PRIVATE INVESTIGATIVE WORK?

A.   YES.

Q.   AND YOU PAID HIM A SUBSTANTIAL AMOUNT OF MONEY TO WORK WITH YOU; ISN'T THAT CORRECT?

A.   YES.

Q.   OKAY.  AND THE REASON THAT YOU HIRED MR. BRADLEY IS THAT YOU ASKED HIM IF HE COULD BRING YOU SOME INFORMATION ABOUT CRIMINAL ACTIVITY THAT YOU COULD THEN USE TO BRING TO THE ATTENTION OF THE PROSECUTING AUTHORITIES IN MARYLAND?

A.   THAT IS TOTALLY INCORRECT.

Q.   OKAY.  WHY DID YOU HIRE MR. BRADLEY?

A.   I HAD INFORMATION THAT I WANTED -- I THOUGHT HE WAS SUPPOSED TO HAVE BEEN WORKING WITH DRUG ENFORCEMENT AND THE METROPOLITAN POLICE AND THAT HE COULD GET SOMEONE TO COME

(END OF BENCH CONFERENCE.)

THE COURT:   THE OBJECTION HAS BEEN WITHDRAWN.

BY MR. KIRSCH:

Q.   SIR, WHAT WAS THE SUBSTANCE OF THE CONVERSATION THAT DAY?

A.   WELL, MS. BARBARA SKYLER, ONE OF THE PROSECUTORS FOR THE DISTRICT COURT IN GREENBELT -- SHE WANTED SOME INFORMATION THAT ONE OF MY ATTORNEYS HAD PASSED ON TO MS. WILKINSON, WHICH MS. WILKINSON PASSED ON TO MS. SKYLER.  SANDRA WILKINSON, WAS THE DISTRICT ATTORNEY WHO WAS PROSECUTING MY CASE.  AND WHEN I FIRST CAME IN, MS. WILKINSON TOLD ME, YOU KNOW, "YOU'RE NOT ON OUR TEAM, AND YOU'RE NOT LIKELY TO BE ON OUR TEAM.  AND I WANT YOU TO ANSWER ALL THE QUESTIONS THAT MS. SKYLER ASKS YOU TRUTHFULLY AND HONESTLY."

AND I EXPLAINED TO HER SOME THINGS THAT HAPPENED IN HER CASE -- TWO OF THE CASES SHE WAS PROSECUTING.  AND WHEN I FINISHED TALKING WITH HER, SHE MADE A STATEMENT -- AND THIS CAN BE VERIFIED -- SHE SAID, "WHY DIDN'T I HEAR ABOUT THIS BEFORE I GAVE ALL THESE LENIENT PLEAS OUT?"  AND I LOOKED AT MS. WILKINSON AND I LOOKED AT MY ATTORNEY.  I SAID, "I TOLD YOU THIS MONTHS AGO BEFORE YOU DID THAT."  SHE JUST LOOKED AT MS. WILKINSON, AND THAT WAS THE END OF IT. MS. WILKINSON PULLED A CHAIR UP AND SAID, "WELL, I WANT TO TALK TO YOU, AND I DON'T WANT TO HEAR NOTHING ELSE YOU'VE GOT TO TALK ABOUT OR ANY OTHER INFORMATION YOU WANT TO GIVE

ME.  I JUST WANT TO HEAR ABOUT ERSKINE HARTWELL AND PEOPLE SURROUNDING HIM."  AND THAT WAS EXTENT OF THAT MEETING.

Q.  OKAY.  THAT'S ALL I HAVE.  THANK YOU, MR. WATSON.

THE COURT:  MR. DAVIS?

MR. DAVIS:  I JUST HAVE A COUPLE QUESTIONS, YOUR HONOR.

THE COURT:  OF COURSE.

CROSS EXAMINATION

BY MR. DAVIS:

Q.  MR. WATSON, AM I CORRECT IN UNDERSTANDING YOUR TESTIMONY TO BE THAT YOU MET WITH SEVERAL DIFFERENT PROSECUTORS IN GREENBELT?

A.  TWO.  I THINK I STATED THAT I MET WITH TWO THAT I KNEW WERE PROSECUTORS.  THERE WAS A D.E.A. AGENT AND A FEW OTHER GENTLEMEN IN THERE, BUT I DIDN'T KNOW WHO THEY WERE.

Q.  SO YOU HAD BEEN UP TO THE COURTHOUSE IN GREENBELT ON SEVERAL OCCASIONS IN YOUR EFFORTS TO PROVIDE ASSISTANCE TO THE PROSECUTORS, CORRECT?

A.  TWO OR THREE, YES.

Q.  AND THEY TOLD YOU THAT IT WAS UNLIKELY THAT YOU WOULD BE ABLE TO GET ON THEIR TEAM?

A.  THEY DIDN'T SAY IT.  MS. SANDRA WILKINSON SAID IT.

Q.  HOW LONG DID IT TAKE YOU TO GET ON THE TEAM OF THE DISTRICT OF COLUMBIA'S U.S. ATTORNEY'S OFFICE?

MR. ZEIDENBERG:  I OBJECT TO THE FORM OF THAT

OR RIGHT DOWN TO THE FACT THAT HE SAID HE DIDN'T COOPERATE AGAINST "PEEWEE", IF THERE ARE INDICATIONS THAT HE COOPERATED AGAINST "PEEWEE", WE WOULD ASK THAT THESE MATERIALS BE MADE AVAILABLE TO US OR THE INFORMATION BE MADE AVAILABLE TO YOU.

THE COURT:  THAT HE COOPERATED AGAINST WHO?

MR. DAVIS:  HE NAMED SEVERAL PROSECUTORS AND SEVERAL DEFENDANTS.  ONE DEFENDANT HE REFERENCED WAS "PEEWEE".

THE COURT:  ALL RIGHT.

MR. DAVIS: AND THIS WAS A FAIRLY NOTORIOUS CASE OUT IN GREENBELT, AND A LOT OF PEOPLE WERE BROUGHT IN TO PROVIDE --

THE COURT:  WELL, YOU TELL ME WHY THE FACT THAT HE MAY HAVE GIVEN TESTIMONY IN ANOTHER CASE REPRESENTS BRADY MATERIAL.

MR. DAVIS:  OH, IT WOULD JUST BE GIGLIO MATERIAL. IT WOULD BE IMPEACHMENT MATERIAL.  IF HE SAYS HE DID NOT PROVIDE THAT, THAT WOULD IMPEACH HIM.

I AM PARTICULARLY INTERESTED IN IF HE WROTE LETTERS, BECAUSE HE SEEMS LIKE THE TYPE OF INDIVIDUAL THAT WOULD BE VERY -- IT JUST SEEMS LIKE HE WOULD BE VERY PERSISTENT IN HIS EFFORTS TO DO SOMETHING.

I GUESS THE BOTTOM-LINE REASON I AM MAKING THIS REQUEST IS THAT THEY MADE A DETERMINATION THAT HE WAS

UNRELIABLE. AND I DON'T KNOW IF IT WAS BASED ON SPECIFIC FACTS THAT CAME TO LIGHT AS THEY WERE WORKING WITH HIM OR THINGS FROM HIS PAST, BUT I BELIEVE THAT WE HAVE A BASIS --

THE COURT: THE GOVERNMENT IS NOT REQUIRED TO DO YOUR INVESTIGATIVE WORK FOR YOU, MR. DAVIS.

MR. DAVIS: WELL, YOUR HONOR, I'M NOT --

THE COURT: AS A MATTER OF FACT, I RECALL PAYING AN INVESTIGATOR OF YOURS A FAIR AMOUNT OF MONEY.

MR. DAVIS: LAST MONTH, YES. I SAW THAT, YOUR HONOR. THAT'S ANOTHER MATTER THOUGH. IN REFERENCE TO THIS, I WILL BE HAPPY TO PROVIDE THE COURT WITH THE CASE CITATION, BUT THE CASE IS PRETTY SPECIFIC.

THE COURT: I WILL TAKE YOUR REPRESENTATION AS TO WHAT THE CASE STANDS FOR.

MR. DAVIS: AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.

THE COURT: IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, BRADY MATERIAL IN THEIR FILE. OTHER THAN THAT --

MR. DAVIS: THANK YOU, YOUR HONOR.

THE COURT: -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION.

OKAY?

*Clerks File*

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES,<br>          GOVERNMENT,<br><br>  VS.<br><br>VINCENT HILL,<br>JEROME MARTIN,<br>SAMUEL CARSON,<br>WILLIAM K. SWEENEY,<br>MAURICE PROCTOR,<br>SEAN COATES,<br>          DEFENDANTS. | :<br>:<br>:<br>:  CR. NO. 98-329<br>:<br>:<br>:<br>:<br>:<br>:<br>:<br>: |
| UNITED STATES<br>          GOVERNMENT,<br><br>  VS.<br><br>GARY PRICE,<br>          DEFENDANT | :<br>:<br>:<br>:  CR. NO. 99-348<br>:<br>:<br>:<br>: |

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 13, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:

PHYLLIS MERANA
6816 U. S. DISTRICT COURT
3RD & CONSTITUTION AVE., N.W.
WASHINGTON, D. C. 20001

(Page 143 of Total)

USCA Case #23-3015     Document #2077668          Filed: 10/01/2024     Page 144 of 443

2

```
FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                 ANJALI CHATURVEDI, AUSA
                                 555 4TH ST., N.W.
                                 WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #910
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                 305 H STREET, N.W.
                                 2ND FLOOR
                                 WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7TH STREET, N.W.
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
                                 717 D STREET, N.W.
                                 SUITE 400
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:       HOWARD BRAMSON, ESQ.
                                 717 D STREET, N.W.
                                 THIRD FLOOR
                                 WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
                                 901 6TH STREET, S.W.
                                 #409
                                 WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #901
                                 WASHINGTON, D. C.  20004
```

(Page 144 of Total)

3

I N D E X

WITNESS                            DIRECT      CROSS

CHARLENE WILSON

     BY MS. CHATURVEDI           7

     BY MR. BESHOURI                         40


GOVERNMENT'S              IN EVIDENCE

TF107                         29



DEFENDANT CARSON'S      IN EVIDENCE

8                             65

MR. ZEIDENBERG:  I BELIEVE WE ARE, YOUR HONOR.

JUST ON A MATTER LEFT OVER FROM YESTERDAY, PURSUANT TO THE COURT'S INSTRUCTION, WE CONTACTED THE U.S. ATTORNEY'S OFFICE IN GREENBELT.  WE RETRIEVED THEIR FILE YESTERDAY EVENING AND HAVE REVIEWED IT.

THERE IS NOTHING, IN OUR VIEW, THAT SUGGESTS ANY BRADY OR JENCKS MATERIAL IN THE FILE.  THE ASSISTANT U. S. ATTORNEY OUT THERE INDICATES IN ONE LETTER THAT THE REASON THAT MR. WATSON DID NOT GET A 5K LETTER WAS SIMPLY BECAUSE SHE DIDN'T BELIEVE HIS COOPERATION WAS OF A SIGNIFICANT ENOUGH NATURE TO QUALIFY.  THERE WAS NOTHING TO SUGGEST THAT IT WAS NOT WORTHY OF BELIEF OR IT WAS INCREDIBLE.  THERE WAS NOTHING OF THAT NATURE.

DETECTIVE NORRIS -- WE SPOKE WITH HIM BRIEFLY YESTERDAY.  AND HE HAD CALLED -- WE TRIED TO GET IN TOUCH WITH HIM -- AND HE INDICATED SIMILARLY THAT MR. WATSON HAD NEVER PROVIDED HIM WITH INFORMATION THAT HE FELT WAS UNTRUSTWORTHY OF ANY KIND.  NEVERTHELESS, WE DO HAVE THE FILE, AND I DON'T KNOW IF THE COURT WISHES TO HAVE IT TO PERUSE.  THERE ARE LETTERS --

THE COURT:  YOU MEAN THE FILE FROM GREENBELT?

MR. ZEIDENBERG:  YES.  THERE ARE LETTERS FROM MR. WATSON TO THE PROSECUTOR, AS HE DESCRIBES -- SEVERAL LENGTHY LETTERS, TALKING ABOUT A VARIETY OF MATTERS, INCLUDING HIS OWN CASE AND OTHER CASES THAT HE KNOWS ABOUT

6

AND THINGS OF THAT NATURE.

THE COURT:  DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?

MR. KIERSH:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. KIERSH:  I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.

THE COURT:  WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT, MR. WEST?

THE DEPUTY CLERK:  I BELIEVE SO, YOUR HONOR.

MR. ZUCKER:  YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --

THE COURT:  WAIT A MINUTE.

THE DEPUTY CLERK:  NUMBER 5, YOUR HONOR.

THE COURT:  NUMBER 5.  ALL RIGHT.  NUMBER 5.  I DO NOT INTEND TO REVIEW IT IN CAMERA.

MR. ZUCKER:  THAT WOULD BE MY REQUEST.

THE COURT:  ALL RIGHT.  ARE WE READY FOR THE JURY?

MS. CHATURVEDI:  YES, YOUR HONOR.

THE COURT:  LET'S ASK FOR MS. WILSON.

THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

THE COURT:  VERY WELL.

(JURY IN.)

(Page 147 of Total)

13

Q.  OKAY.

HOW WOULD YOU, WHEN YOU WOULD GO TO -- DID YOU EVER VISIT --

THE COURT:  WHAT WAS THAT EXHIBIT NUMBER AGAIN?

MS. CHATURVEDI:  IT'S THE SAME EXHIBIT, A-17. IT'S JUST AN ENLARGEMENT OF A PORTION OF IT, YOUR HONOR.

THE COURT:  OKAY.  ALL RIGHT.

BY MS. CHATURVEDI:

Q.  DID YOU EVER VISIT MS. KNIGHT'S APARTMENT -- REGINA KNIGHT'S APARTMENT?

A.  YES.

Q.  HOW WOULD YOU GO FROM YOUR APARTMENT OVER TO REGINA KNIGHT'S APARTMENT?

A.  OVER THE ROOF.

Q.  WHAT DO YOU MEAN BY THAT?

A.  I WOULD CLIMB OVER THE ROOF.

Q.  WHAT FLOOR WAS YOUR APARTMENT ON?

A.  THE THIRD FLOOR.

Q.  AND HOW MANY FLOORS DID THE BUILDING HAVE?

A.  THREE.

Q.  SO YOU WOULD WALK UP TO THE ROOF AND WALK ACROSS?

A.  YES.

Q.  AND THEN DO WHAT?

A.  GO OVER TO THE NEXT BUILDING AND THEN DOWN.

Q.  OKAY.  HOW MANY TIMES DO YOU THINK YOU VISITED REGINA

14

KNIGHT'S APARTMENT IN THE TIME THAT YOU LIVED DOWN THERE?

A. MANY TIMES.

Q. LET ME DIRECT YOUR ATTENTION TO THE MONTH OF AUGUST OF
1991. DID YOU KNOW SOMEONE BY THE NAME OF TONY FORTUNE?

A. NOT PERSONALLY.

Q. DID YOU KNOW OF HIM?

A. YES.

Q. AND DO YOU KNOW WHAT HAPPENED TO HIM THAT DAY -- THAT
MONTH IN 1991?

A. YES.

Q. WHAT'S THAT?

A. HE GOT KILLED.

Q. ON THE DAY THAT HE WAS KILLED -- THAT TONY FORTUNE WAS
KILLED -- DID YOU GO TO REGINA KNIGHT'S HOUSE ON THAT
PARTICULAR DAY?

A. YES.

Q. APPROXIMATELY WHAT TIME WAS IT THAT YOU WENT TO REGINA'S
HOUSE?

A. I'M NOT SURE.

Q. WAS IT DAYTIME, OR AFTERNOON, OR EVENING?

A. IT WAS IN THE EVENING.

Q. OKAY. AND THAT DAY, DID YOU GET OVER TO MS. KNIGHT'S
APARTMENT BY WALKING OVER THE ROOF?

A. YES, I DID.

Q. WHEN YOU GOT INTO HER APARTMENT, WERE THERE PEOPLE

15

THERE?

A.  YES.

Q.  WHO WAS THERE?

A.  "PIMP", "LITTLE COW", MIKIE, REGINA, RINA, "BIG COW," SAM, ME MYSELF, AND MY LITTLE DAUGHTER.

Q.  OKAY.  DO YOU KNOW SOMEBODY BY THE NAME OF CARLOS?

A.  YES.

Q.  WAS HE THERE?

A.  YES, HE WAS.

Q.  AND THE PERSON THAT YOU HAVE IDENTIFIED AS "PIMP" -- DO YOU SEE THAT PERSON IN THE COURTROOM TODAY?

A.  YES.

Q.  CAN YOU PLEASE IDENTIFY HIM BY WHERE HE IS SITTING AND AN ARTICLE OF CLOTHING THAT HE IS WEARING?

A.  HE IS SITTING TO MY RIGHT WITH A WHITE T-SHIRT ON.

Q.  CAN YOU BE MORE SPECIFIC?

A.  RIGHT THERE.  (INDICATING.)

Q.  CAN YOU DESCRIBE WHO HE IS SITTING NEXT TO?  JUST A DESCRIPTION OF THAT PERSON?

A.  IT'S A LADY.

        MS. CHATURVEDI:  MAY THE RECORD REFLECT AN IDENTIFICATION OF MR. MARTIN, YOUR HONOR?

        THE COURT:  THE RECORD WILL SO REFLECT.

BY MS. CHATURVEDI:

Q.  THE PERSON THAT YOU HAVE INDICATED BY THE NAME OF SAM --

Q.  DID YOU NOTICE ANYONE COME OUT OF THE BUILDING WHILE YOU WERE WAITING WITH REGINA?

A.  YES.

Q.  WHO DID YOU NOTICE COME OUT OF THE BUILDING?

A.  "MIKIE", CARLOS, "PIMP", AND SAM.  THAT'S IT.

Q.  DID YOU KNOW "COW"?

A.  YES.

Q.  DID YOU SEE HIM COME OUT OF THE BUILDING; DO YOU RECALL?

A.  YES, ALSO.

Q.  OKAY.

DID YOU PAY ANY PARTICULAR ATTENTION TO WHERE ANY OF THESE FIVE MEN WENT?

A.  NO, I DID NOT.

Q.  DID GINA'S DATE SHOW UP?

A.  YES.

Q.  WHAT HAPPENED WHEN GINA'S DATE SHOWED UP OR THE RIDE SHOWED UP?

A.  WE WERE AT THE CAR TALKING TO THE GUY.

Q.  WHILE YOU WERE TALKING TO THE GUY, DID SOMETHING TAKE YOUR ATTENTION AWAY FROM THAT CONVERSATION?

A.  YES, IT DID.  GUNSHOTS.

Q.  WHERE WERE THE GUNSHOTS COMING FROM?

A.  AT MY LEFT.

Q.  WHEN YOU HEARD THE GUNSHOTS, WHAT DID YOU DO, MS. WILSON?

25

A.   I STOOD THERE.

Q.   DID YOU LOOK IN ANY PARTICULAR DIRECTION?

A.   YES, I DID.

Q.   WHERE DID YOU LOOK?

A.   TO WHERE THE SHOTS WERE BEING FIRED.

          THE COURT:  SAY AGAIN.

          THE WITNESS:  WHERE THE SHOTS WERE BEING FIRED.

BY MS. CHATURVEDI:

Q.   WHEN YOU LOOKED IN THE DIRECTION WHERE THE SHOTS WERE BEING FIRED, WHAT DID YOU SEE?

A.   SAM.

Q.   WHAT WAS SAM DOING?

A.   WALKING TOWARDS TONY FORTUNE, SHOOTING.  HE THEN STOOD OVER TOP OF HIM AND SHOT HIM.

Q.   AT WHAT POINT DID YOU NOTICE TONY FORTUNE BEING OUT THERE?

A.   WHILE I WAS STANDING OUT THERE WITH REGINA, HE WAS WALKING TOWARDS HIS CAR.  THERE WAS A CRAPGAME GOING ON ACROSS THE STREET WHERE HE HAD ROBBED AND WAS ON HIS WAY TO HIS CAR.

Q.   WHAT KIND OF CAR DID HE HAVE?

A.   I BELIEVE A BLACK MERCEDES.

Q.   OKAY.  ARE YOU SURE ABOUT THAT?

A.   I BELIEVE SO.

Q.   OKAY.

USCA Case #23-3015   Document #2077668   Filed: 10/01/2024   Page 153 of 443

AS TONY FORTUNE WAS WALKING TO HIS CAR, WHAT WAS SAM DOING?

A. WALKING TOWARDS HIM, SHOOTING. THEN HE STOOD OVER TOP OF HIM AND SHOT HIM.

Q. DID YOU SEE "PIMP" AT THIS TIME?

A. NO, I DID NOT.

Q. DID THE SHOOTING FINALLY STOP?

A. YES, IT DID.

Q. WHEN THE SHOOTING STOPPED, DID YOU SEE WHAT SAM DID AT THAT POINT?

A. HE RAN DOWN THE STREET.

Q. NOW, CAN YOU TAKE THAT ARROW AGAIN ON THAT PEN AND POINT TO APPROXIMATELY WHERE IT WAS WHERE YOU SAW SAM SHOOTING TONY FORTUNE?

A. RIGHT ABOUT HERE. (INDICATING.)

Q. OKAY. AND FOR THE RECORD, YOU'RE INDICATING ON 58TH STREET IN FRONT OF 255 58TH STREET, JUST ON THE ROADWAY AREA; IS THAT RIGHT?

A. YES.

Q. OKAY. AND YOU HAVE LEFT A GREEN DOT THERE. CAN YOU INDICATE -- TAKE THAT PEN AGAIN AND, LIKE YOU DID EARLIER, MAKE A LINE IN THE DIRECTION THAT YOU SAW SAM GO AFTER THE SHOOTING STOPPED?

A. (DOING AS DIRECTED.)

Q. OKAY. AND YOU HAVE GOT A LINE GOING FROM UP TO DOWN --

(Page 153 of Total)

72

PARKED ON THE SAME SIDE OF 58TH STREET THAT YOU LIVED ON;

CORRECT?

A. YES.

Q. AND IT IS YOUR TESTIMONY THAT MR. CARSON WALKED OR CAME

FROM THE AREA OF CLAY STREET TO THE AREA AT LEAST OF THE

MERCEDES BENZ?

A. YES.

Q. AND THAT IS WHERE HE SHOT MR. FORTUNE?

A. YES.

Q. AND WALKED OVER AND STOOD OVER HIM AND SHOT HIM AGAIN?

A. YES.

Q. AND THEN HE GOT INTO A VAN WITH MR. MARTIN, AND THEY

DROVE AWAY?

A. YES.

Q. MS. WILSON, HAVE YOU EVER OWNED A GUN?

A. NO.

Q. HAVE YOU EVER USED A GUN?

A. NO.

Q. DO YOU KNOW WHAT A SEMI-AUTOMATIC WEAPON IS?

A. NOT IF I WAS TO SEE IT, NO.

Q. DO YOU KNOW THAT SEMI-AUTOMATIC WEAPONS EJECT CASINGS

AFTER THE BULLETS ARE FIRED?

A. NO, I DON'T.

Q. SO YOU DON'T KNOW THAT TYPICALLY WHEN A SEMI-AUTOMATIC

WEAPON FIRES A BULLET, THE CASING LANDS A FEW FEET AWAY FROM

(Page 154 of Total)

73

THE SHOOTER?  YOU DON'T KNOW THAT?

A. NO, I DON'T.

Q.  WOULD YOU BE SURPRISED THEN, MS. WILSON, IF YOU WERE TO LEARN THAT CASINGS WERE FOUND 60 TO 80 FEET AWAY FROM MR. FORTUNE?

MS. CHATURVEDI:  OBJECTION, YOUR HONOR.

MR. BESHOURI:  I AM ASKING HER IF SHE WOULD BE SURPRISED.

THE COURT:  APPROACH THE BENCH.

(BENCH CONFERENCE.)

(Page 155 of Total)

(END OF BENCH CONFERENCE.)

THE COURT:  DO YOU WANT TO PUT THE QUESTION AGAIN?

MR. BESHOURI:  I WILL, YOUR HONOR.  I AM GOING TO ASK A PREDICATE QUESTION.

BY MR. BESHOURI:

Q.  MS. WILSON, PROCEEDING FROM EAST CAPITOL, AS I AM POINTING ON THE MAP, DOWN TOWARDS AMES, DOWN TOWARDS BLAINE, AND THEN ON TOWARDS CLAY --

THE COURT:  NO, THAT WASN'T YOUR QUESTION.  THE QUESTION WAS WOULD SHE BE SURPRISED IF CASINGS WERE FOUND 60 FEET TO 80 FEET AWAY.

MR. BESHOURI:  I WILL ASK THAT QUESTION FIRST, IF THE COURT PREFERS, BUT I WANT TO --

THE COURT:  I BEG YOUR PARDON?

MR. BESHOURI:  I'LL ASK THAT QUESTION, IF THE COURT PREFERS, FIRST, BUT I WANTED TO LAY A PREDICATE HERE. I'LL ASK IT.

THE COURT:  THAT'S THE QUESTION BEFORE YOU.  WOULD YOU BE SURPRISED?

THE WITNESS:  NO.

THE COURT:  ALL RIGHT.  NOW, YOU CAN DO WHATEVER YOU WANT.

BY MR. BESHOURI:

Q.  AND WOULD YOU BE -- WELL, THE PREDICATE.  PROCEEDING FROM EAST CAPITOL, MS. WILSON, DOWN TOWARDS AMES, DOWN

77

TOWARDS BLAINE -- THAT'S A DOWNHILL RUN; ISN'T IT?

A.   YES, IT IS.

Q.   AT THE BOTTOM OF THAT RUN DOWNHILL IS APPROXIMATELY WHERE MR. FORTUNE WAS SHOOT; RIGHT?

A.   YES.

Q.   WOULD YOU BE SURPRISED THEN TO LEARN THAT THE SHELL CASINGS WERE FOUND BETWEEN BLAINE AND WHERE MR. FORTUNE WAS FOUND DEAD?  WOULD YOU BE SURPRISED TO LEARN THAT?

A.   NO.

Q.   YOU WOULDN'T BE?

A.   NO.

Q.   IN SPITE OF THE FACT THAT MR. CARSON APPROACHED FROM THE DIRECTION OF CLAY, ACCORDING TO YOUR TESTIMONY, AND SHOT MR. FORTUNE DEAD?

          MS. CHATURVEDI:  OBJECTION, YOUR HONOR.

          THE COURT:  SUSTAINED.

BY MR. BESHOURI:

Q.   WOULD YOU BE SURPRISED TO LEARN, MS. WILSON, THAT EACH AND EVERY ONE OF THOSE CASINGS WERE FOUND TO HAVE COME FROM THE SAME GUN?

A.   I DON'T KNOW ANYTHING ABOUT A GUN.

Q.   WELL, THAT IS THE POINT, MS. WILSON.  YOU DIDN'T TAKE THAT INTO ACCOUNT, DID YOU, WHEN YOU MADE UP THE STORY ABOUT SAM CARSON SHOOTING MR. FORTUNE?

A.   MY STORY IS NOT MADE UP.

(Page 157 of Total)

Q.  IT'S NOT MADE UP?

A.  NO, IT'S NOT.

Q.  BUT YOU DIDN'T KNOW ANYTHING ABOUT SHELL CASINGS AT THE TIME YOU TALKED TO THE F.B.I. ABOUT WHAT YOU SAY YOU SAW OUT THERE, DID YOU?

A.  NO.

            MR. BESHOURI:  MAY I HAVE A MOMENT, YOUR HONOR?

            THE COURT:  SURE.

BY MR. BESHOURI:

Q.  MS. WILSON, DID YOU STAY THERE AFTER ANTHONY FORTUNE -- DID YOU SEE ANTHONY FORTUNE, IN FACT, BE KILLED?

A.  YES.

            THE COURT:  SAY THAT AGAIN.

            MR. BESHOURI:  I ASKED HER IF SHE, IN FACT, SAW MR. FORTUNE BE SHOT.

            THE WITNESS:  YES.

            MR. BESHOURI:  YOUR HONOR, I HAVE TO LOOK FOR A PHOTO.  IS THIS A GOOD TIME TO TAKE A BREAK?

            THE COURT:  HOW MUCH LONGER ARE YOU LIKELY TO BE?

            MR. BESHOURI:  TEN MINUTES.

            THE COURT:  WE WILL HAVE OUR NOONTIME RECESS, LADIES AND GENTLEMEN.  WE WILL SEE YOU AT 2:00 O'CLOCK.

            (WHEREUPON, AT 12:22, THE ABOVE-ENTITLED MATTER WAS RECESSED FOR LUNCH.)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,           .   Docket No. CR 98-329
                                    .
          Government,               .   Washington, D.C.
                                    .   February 15, 2001
    vs.                             .   2:30 p.m.
                                    .
VINCENT HILL,                       .   (AFTERNOON SESSION)
JEROME MARTIN,                      .
SAMUEL CARSON,                      .
WILLIAM K. SWEENEY,                 .
MAURICE PROCTOR,                    .
SEAN COATES,                        .
                                    .
          Defendants                .
                                    .
. . . . . . . . . . . . . . . .     .
                                    .
UNITED STATES OF AMERICA,           .
                                    .
          Government,               .
                                    .
                                    .   Docket No. CR 99-348
    vs.                             .
                                    .
GARY PRICE,                         .
                                    .
          Defendant.                .
                                    .
. . . . . . . . . . . . . . . .


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 291

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Proctor:       HOWARD BRAMSON, ESQ.
                                 717 D Street, N.W.
                                 Third Floor
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

(Page 160 of Total)

App 292

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 161 of 443

57

warrant out for me or I knew I didn't have a license in my name then I would use an alias name.

Q.    And if you could just explain to the ladies and gentlemen how that would work.  What type of information would you have to have?

A.    Well, you would -- you would generally try to find somebody who you knew didn't get in trouble with the police, who was basically an upstanding citizen whose license was valid, and you knew that it was a high probability that they wouldn't have a warrant or wouldn't be wanted by the police in any type of way.

Q.    And what information would you need from that person?

A.    Their name, birth date, Social Security number, and probably their address.

Q.    And you would have that memorized?

A.    Yes.

Q.    Now, were you familiar with an alias that Mr. Sweeney was using?

A.    I heard -- I heard at one time that he was using the alias name Kirk Newton

Q.    Were you familiar with an individual named Kirk Newton?

A.    I knew him.

Q.    It was an actual person?

A.    Yes.

Q.    Now, when you were home in 1995 did your relationship

58

with Jerome Martin become closer?

THE COURT: Become what?

MR. ZEIDENBERG: Closer.

THE WITNESS: Yeah, out of all of the defendants I would say I had a relationship with him as opposed to any other one of them besides Switzer and probably Paul Franklin.

BY MR. ZEIDENBERG:

Q. And when you say that you mean you had a close relationship with him, is that what you're saying?

A. Yeah, I would say so, yes.

Q. Now, do you recall during 1995 having a conversation with Mr. Martin regarding Tony Fortune?

A. I recall having a conversation in which I was asking why was it a beef going on with 37th, and at the time I thought it was Kenilworth. And they were saying that a guy named Tony Fortune had tried to rob them in a crap game, or actually did rob the crap game, and that Tony robbed them and he wasn't going to let him get away with it.

Q. And who was this conversation with?

A. Jerome Martin.

Q. And when he said -- did he say he wasn't going to let him get away with it or they weren't going to let him get away with it?

A. He said he wasn't going to let him get away with it.

Q. And did he say what he did to Tony Fortune?

59

A.   He said he shot him.

THE COURT:  I'm sorry?

THE WITNESS:  He said he shot him.

THE COURT:  He shot him?

THE WITNESS:  Yes.

BY MR. ZEIDENBERG:

Q.   Now, after you were indicted and after you were incarcerated in D.C. Jail did you have a conversation with Mr. Martin regarding the shootout with the police, which was part of the indictment?

A.   When we would meet -- when we would come over the jail in a group and meet in the courtroom it would be some things that we might look at in the indictment and just be like, it's absurd, or it's just ridiculous.  I mean, we would -- in one instance he was just like, you know, they got in there that he was shooting at the police over at Kenilworth, and he was just like, they was shooting at me, what else was I suppose to do but shoot back at them.

Q.   Had you been familiar with that incident?

A.   No.

Q.   Now, are you familiar with someone named Creeko?

A.   Yeah.

Q.   And back in '95 was there talk amongst you and others that Creeko was either hot, or was a snitch, or had been cooperating with the police?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

63

A.   Generally anybody that I saw Vincent Hill talking -- Mr. Martin's response was just no response.  I mean, I didn't hear, you know, really any dialog or anything going back and forth.

Q.   Now, did you have a conversation with Mr. Martin while he was incarcerated regarding James Coulter, Creeko, and his being charged in connection with that case?

A.   I had a conversation in which he had asked me to talk to Creeko, to have Creeko give his investigator a statement, and it was something about Creeko being shot.  He wanted Creeko to give his investigator a statement.

Q.   So Mr. Martin asked you to assist in that way?

A.   He asked me to just talk to Creeko to see if he would give his investigator a statement.

Q.   Now, when you were talking to Mr. Martin about this were you -- you were in jail or out of jail?

A.   I was out of jail.

Q.   Mr. Martin was in jail or out of jail?

A.   In jail.

Q.   And did he say what kind of statement he wanted you to get Creeko to give to his investigator?

A.   He said -- he just said he wanted Creeko to talk to  his investigator and give him a statement.  He didn't specifically say what he wanted him to give the statement about.

Q.   Did you attempt to do this?

64

A.    I mean, I had talked to Creeko and asked him to give up

his statement.  And initially he was saying that he wasn't

going to give up a statement because he didn't know, you

know,, why Pimp wanted a statement so, you know, he wasn't to

give up a statement.  And the next time I talked to Pimp I

told him that.  And he was like, well, you know, just see if

he will give up the statement.  So I talked to him again.  And

he said he wouldn't give up -- I asked him then, really if

you're not suppose to be testifying or, you know, if you're

saying that nothing happened, then give up a statement to that

effect, saying that nothing happened.  And he was just like --

Creeko was just like, well, I'm  not going to get involved in

it, you know, I'm not coming to court and testifying period,

so I ain't going to get involved in it.

Q.    Did you relay that message to Mr. Martin?

A.    Yeah, I told him that, you know, Creeko -- me and Mr.

Martin's investigator, whose name was Andy, we had rode, you

know, to try to get the statement, and I don't know -- yeah, I

relayed the message to Mr. Martin.

Q.    Now, are you familiar with someone name Michael Floyd?

A.    Yes.

Q.    And did you have a conversation with Mr. Martin regarding

getting a statement from Michael Floyd?

A.    Yeah.  I had had a conversation where he had asked me to

--

65

Q.   Who asked you?

A.   Mr. Martin asked me to see if Michael Floyd will give up a statement saying that, you know, he was out there that night, and just testify as to what he saw that night.

Q.   And did you speak with Mr. Floyd?

A.   Yeah, I had spoke to him.

Q.   And was he willing to give a statement?

A.   He was saying that he was not going to give up a statement because he didn't want to get involved with the FBI, and he just didn't want to get involved with the case.

Q.   Now, did you relay that message to Mr. Martin that Mr. Floyd said he didn't want to get involved?

A.   Yeah, I had told Mr. Martin that Mike said he wasn't going to give up a statement, and he was just like, just smack his bitch ass for me.  I was just like -- just trying to see if he was going -- you know, see if Mike was going to give up a statement for Mr. Martin.

Q.   Now, at some point did Mr. Martin  ask you to do something regarding Mr. Floyd and Creeko?

A.   He had asked me to show Creeko and Mike Floyd to his uncle named Dino.

Q.   Did you know who Dino was?

A.   I knew he -- I didn't really know him.

Q.   And what was your understanding -- what exactly was it that Mr. Martin asked you to do with Dino, Michael Floyd, and

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 167 of 443

66

Creeko, what did he want you to do?

A.   He just asked that I show Michael Floyd and Creeko to Dino.  And one day I rode out there with Dino to see if I saw him, but I didn't see Michael Floyd or Creeko, so --

Q.   Well, why did you take -- so you attempted to follow through on that request?

A.   Yes.

Q.   Now, what was your understanding of why Mr. Martin wanted you to do this?

MS. HEPWORTH:  Objection.

THE COURT:  Approach the bench.

(Bench conference on the record.)

(Page 167 of Total)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. CR 98-329 |
| Government, | Washington, D.C. |
| | March 7, 2001 |
| vs. | 2:12 p.m. |
| VINCENT HILL, | (AFTERNOON SESSION) |
| JEROME MARTIN, | |
| SAMUEL CARSON, | |
| WILLIAM K. SWEENEY, | |
| SEAN COATES, | |
| Defendants | |

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Government, | |
| vs. | Docket No. CR 99-348 |
| GARY PRICE, | |
| Defendant. | |

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                          ANJALI CHATURVEDI, AUSA
                          U.S. Attorney's Office
                          555 Fourth Street, N.W.
                          Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                          601 Indiana Avenue, N.W.
                          Suite 910
                          Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                          305 H Street, N.W.
                          Second Floor
                          Washington, D.C.  20001

2

For the Defendant Carson:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7th Street, N.W.
                                   Washington, D.C.  20004

For the Defendant Sweeney:         STEVEN R. KIERSH, ESQ.
                                   717 D Street, N.W.
                                   Suite 400
                                   Washington, D.C.  20004

For the Defendant Coates:          FREDERICK JONES, ESQ.
                                   901 6th Street, S.W.
                                   Suite 409
                                   Washington, D.C.  20024

For the Defendant Price:           JONATHAN ZUCKER, ESQ.
                                   601 Indiana Ave., N.W.
                                   Suite 901
                                   Washington, D.C.  20024

Court Reporter:                    BEVERLY J. BYRNE
                                   Official Court Reporter
                                   Room 6810 U.S. Courthouse
                                   Washington, D.C.  20001
                                   (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

3

P R O C E E D I N G S

THE COURT:  Would you ask Officer Best, please, to return.  You can bring the jury in now.

(Jury In.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

(Page 170 of Total)

52

(Bench conference on the record.)

MS. CHATURVEDI:  Your Honor, the next witness is James Montgomery, and the marshals have asked for us to take a recess to allow them to bring him up.  He's the next witness.

MR. BESHOURI:  Your Honor, before the government goes, can we take up an issue or two briefly?  The Court was provided some months ago with a James Montgomery file, and the Court noted within that file were a number of FBI 302's.  I think amounting to 10 or 11 of them.

The government has advised that they don't intend to turn those over as Jencks.  It's my recollection when we took this issue up before in another context that the Court believed that 302's were statements of the witness, and I would ask the government to turn those over.  That's the first point.

THE COURT:  I don't recall that they were statements of the witness.  I mean, in the case of Montgomery, if you're talking about the materials that I reviewed in camera --

MR. BESHOURI:  Yes.

THE COURT:  -- then I will ask the government to double-check and see whether or not any one of them is in substance a statement of the witness.

MR. ZEIDENBERG:  Your Honor, we have reviewed the 302's.  All the 302's that pertain to Robert Smith, Butchie, have been turned over.  The other 302's do not in our view

53

constitute Jencks. They are not -- they are -- Agent Lisi takes rough notes, and then from them he writes up a narrative that is not shown to the witness. It is not meant to be substantially verbatim and is not substantially verbatim and in no way can be construed under the Jencks Act in the cases interpreting it as statements of James Montgomery.

MR. BESHOURI: If I may reply briefly.

MR. ZEIDENBERG: I'm happy -- if I may -- we've litigated this I believe in the context of another witness, but I'm happy to provide the Court with case authority to support that proposition. 302's drafted in that fashion do not constitute Jencks.

MR. BESHOURI: My view, if I may, Your Honor?

THE COURT: Sure.

MR. BESHOURI: My view is -- I'm in total agreement with the government when it comes to rough notes. That is not Jencks. But when rough notes evolve into from phrases and words into full statements and sentences, we come much, much closer if not substantially verbatim in terms -- as to the witness' statements to the FBI agent.

I have to defer to the Court, because obviously I can't look at these to make an argument that they are substantially verbatim.

THE COURT: How many of them are there? How many of them are we talking about?

54

MR. ZEIDENBERG:  I can't --

MS. CHATURVEDI:  Rather lengthy, Your Honor.  We previously submitted a three-ring notebook to Your Honor with a table of contents, and it listed -- it included all of the 302's.

THE COURT:  Well, I gather that the only ones that I have looked at are the ones that deal with Butchie?

MS. CHATURVEDI:  No, Your Honor.

THE COURT:  I've looked at all of them?

MS. CHATURVEDI:  Actually, Your Honor, you had asked the government to provide in camera all the 302's relating to James Montgomery.  I did do that previously.  Your Honor reviewed those documents.

THE COURT:  We did review those?

MS. CHATURVEDI:  In camera.

THE COURT:  All right.

MS. CHATURVEDI:  Your Honor previously ruled that they weren't Jencks.

THE COURT:  Then my prior determination stands.

MR. BESHOURI:  With all due respect, I do remember the Court saying that there was no Brady in those 302's save for one point that the Court advised us of in that order, but I don't recall the Court taking any position on whether they were Jencks.

THE COURT:  Maybe that's true.  I am not sure that I

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

55

did look for Jencks.

MS. CHATURVEDI:  I think Your Honor returned the notebook to the government.

THE COURT:  Would you see if you can find it and let me look at it again.

MS. CHATURVEDI:  In addition, Your Honor, as Mr. Zeidenberg has said, we have case authority as to whether or not 302's constitute Jencks material and we can provide that to counsel and the Court at the same time.

MR. KIERSH:  On a related matter, we'd like to see the --

THE COURT:  Let me let the jury go.

MR. KIERSH:  Okay.

(End of bench conference.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

76

Q.    Subsequent to that, Mr. Montgomery, on November 2, 2000, did you enter into a third plea agreement with the United States?

A.    Yes, I did.

MR. ZEIDENBERG:  Can I approach again, Your Honor?

THE COURT:  Yes.

BY MR. ZEIDENBERG:

Q.    Showing you what's been marked G42A, do you recognize that, sir?

A.    Yes.

Q.    Is that the plea agreement that you entered into on November 2, 2000?

A.    Yes.

Q.    Can you tell the ladies and gentlemen what it is you pled guilty to on November 2, 2000?

A.    Each count?

Q.    Well, the count to which you pled guilty was what, the charge you pled guilty to was what?

A.    RICO conspiracy.

Q.    And in pleading guilty to that RICO conspiracy did you have to admit your responsibility for a number of criminal acts?

A.    Yes.

Q.    Okay.

MR. ZEIDENBERG:  Your Honor, if I haven't already

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

77

done so, I move to admit Government Exhibit G42E and G42A.

THE COURT:  E is already in, G42A is admitted.

MR. ZEIDENBERG:  Thank you.

(Whereupon, Government's Exhibit G42A was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.    Now, going to the overt acts, or the predicate acts, going to the first one, Mr. Montgomery, can you tell the ladies and gentlemen what the first predicate act you pled guilty to pursuant to that plea agreement?

A.    To the December 19, 1989 murders of Maurice Hallman and Leonard Hyson.

Q.    Actually that's number two.  I would ask you to look just above that.  It should be on the --

A.    I'm sorry.  To conspiracy, conspiracy to distribute and possess with intent to distribute 1,000 kilograms of marijuana.

Q.    Okay.  And let me just stop you and ask you about that. Were you involved in a marijuana conspiracy in the 1990's?

A.    Once it was explained to me, yes, I realized that I was.

Q.    At the time you were selling marijuana did you believe you were involved in a conspiracy?

A.    No.

Q.    As you understand it, your responsibility here, you say that you pled guilty to distribute and possess over a thousand

78

kilos of marijuana, did you -- do you believe you personally sold a thousand kilos of marijuana?

A.   No.

Q.   What is your understanding of why it is you're responsible for selling 1,000 kilos of marijuana?

A.   I don't remember -- I don't remember how it was explained to me, but I remember certain aspects.

Q.   Well, what is your understanding of why it is you are responsible for selling a thousand kilos if you didn't personally sell a thousand kilos?

A.   If I am correct, that any conspiracy that everyone is responsible for -- everyone who sold it is responsible for each other.

Q.   Now, going to number two, what was the second predicate act that you admitted your responsibility for?

A.   For the December 19, 1989 murders of Maurice Hallman and Leonard Hyson.

Q.   Did you participate in the murders of Maurice Hallman and Leonard Hyson?

A.   Yes.

Q.   Going to number three, what was the third predicate act that you admitted responsibility for in that plea?

A.   Assault with intent to kill of a police officer on September 10, 1991.

Q.   Where did that shooting occur?

79

A.    On East Capitol Street.

Q.    Did you participate in that shooting?

A.    Yes.

Q.    What was the fourth predicate act that you admitted responsibility for?

A.    First degree murder while armed on June 22, 1994, the murder of Timothy Benton.

Q.    Did you participate in the murder of Timothy Benton on June 22, 1994?

A.    Yes.

Q.    What was the fifth predicate act that you pled guilty to, or I should say admitted responsibility for?

A.    Conspiracy to commit murder in connection with the efforts made to kill Kenneth Adams.

Q.    And Kenneth Adams, as far as you knew at the time, was a government witness at the time you were trying to kill him?

A.    Yes.

Q.    Is that why you were trying to kill him?

A.    Yes.

Q.    What was the sixth predicate act that you admitted responsibility for in that plea?

A.    Aiding and abetting in first degree premeditated murder in connection with Chrishauna Gladden's murder.

Q.    Which occurred when?

A.    October 5, 1996.

80

Q.    What was the seventh -- let me jump back.  Did you participate in the murder of Chrissy Gladden and assist in that murder?

A.    Yes.

Q.    And number seven, what was that predicate act that you admitted responsibility for?

A.    Three counts of attempted armed robbery and three counts of murder in connection with the November 17, 1996 murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson.

Q.    Mr. Montgomery, did you participate in that home invasion and subsequent murders of those three individuals?

A.    Yes.

Q.    What was the eighth and final predicate act that you admitted responsibility for in connection with this plea?

A.    Conspiracy to commit murder in connection with the efforts to find and kill Robert Smith, aka Butchie, a government witness.

Q.    Did you make efforts to try and find and kill Butchie?

A.    Yes.

Q.    What was the reason you were trying to kill Butchie, was it because of his status as a government witness?

A.    No.  Because of some information he found out about us.

        MR. KIERSH:  Objection.

        MR. ZEIDENBERG:  I will rephrase it, Your Honor.

        THE COURT:  Do you want to approach the bench?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

81

MR. KIERSH:  If the question is going to be rephrased so that we avoid the problem then we don't need to.

THE COURT:  Well, I'm not sure what the rephrasing is that needs to be made.  Do you mean it was a leading question?

MR. KIERSH:  No, no, Your Honor.  It's the substance of it.  Mr. Zeidenberg has already agreed to rephrase it to avoid problems.

BY MR. ZEIDENBERG:

Q.    Did you believe that Butchie, Robert Smith, might end up testifying against you and others?

A.    Yes.

Q.    Is that why you wanted to kill him?

A.    Yes.

Q.    Now, what is your understanding, Mr. Montgomery, of what penalties you face potentially in connection with this plea agreement that you signed, this last plea agreement, in November of 2000?

A.    Excuse me?

Q.    What do you think -- what's your penalty?  What's the possible penalty in this case?

A.    Life without parole.

Q.    Mr. Montgomery, can you tell the ladies and gentlemen when you first started committing robberies in the District of Columbia, how old were you?  When I say robberies -- let me

82

rephrase it.  Why don't we rephrase it as stealing.

THE COURT:  As what?

MR. ZEIDENBERG:  Stealing.

THE WITNESS:  When I was about 7 or 8.

BY MR. ZEIDENBERG:

Q.    Where were you stealing from?

A.    From out of stores.

Q.    What kind of stores?

A.    Like food stores.

Q.    Such as?

A.    Safeway, People's Drug Store.

Q.    What were you stealing?

A.    Toys, candy.

Q.    Did that stealing from stores, such as the Safeway or drug stores, progress into other activities?

A.    Yes.

Q.    Such as what?

A.    Going to shopping malls and shoplifting and breaking into things.

Q.    Did you do that alone or did you do that with other people?

A.    With other people.

Q.    Who did you do it with?

A.    A lot of other people.

Q.    I am asking if you could confine your answer to the

83

defendants that are involved in this case.

A.   Me, Chin, Bird, and Pimp.

Q.   What type of activities were you involved in with Chin, Birdy, and Pimp, and if you could give us an age range, how old were you at the time?

A.   Personally myself I had been doing it longer than they had.

Q.   Okay.

A.   I think it was maybe around the age of 13 or 14.

Q.   And what type of activities were you getting involved in by that time?

A.   Pretty much breaking into video game machines and parking meters.

Q.   Who were you involved in this activity with?

A.   Chin, Bird, and Pimp.

Q.   What did you -- after you were 13-14 what type of activities subsequent to that did you get involved in?

A.   Selling drugs.

Q.   At some point were you stealing dirt bikes?

A.   Yes.  Yeah, I was stealing dirt bikes before I was selling drugs.

Q.   And where were you stealing dirt bikes from?

A.   From different places.  But at times, if I couldn't find a dirt bike nowhere out in the community, I would go down to the police station and steal one.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

84

Q.    How would you steal a dirt bike from the police station?

A.    I would have to have somebody to go with me to keep lookout.

Q.    I'm sorry?

A.    I would have to take somebody with me to keep lookout.

Q.    Who did you bring with you as lookouts?

A.    Chin a few times.

Q.    And can you just explain how it is that you could go to the police station and steal a dirt bike?

A.    Well, back then I assume that because we was so young they would never expect us to be up to nothing, so it made it kind of pretty easy.

        THE COURT:  You can pick a convenient point, Mr. Zeidenberg.

        MR. ZEIDENBERG:  This is as good as any, Your Honor.

        THE COURT:  All right.  Ladies and gentlemen, we are going to conclude for the day.  And as you recall, we are not going to be in session tomorrow.  So we will be back on Monday morning at 10:00.  Have a nice weekend.  Be healthy.

        (Jury out.)

85

(Jury out.)

MR. DAVIS:  Your Honor, after Mr. Montgomery is out of the courtroom I would like to address the Court very briefly.

THE COURT:  You may address the Court briefly.

MR. DAVIS:  Very briefly, Your Honor, we would make -- on behalf of Mr. Hill I would make a Jencks and a combination Jencks and Brady request regarding Mr. Montgomery's witness protection file and related paperwork.  I do this for several reasons.  The Witness Protection Program -- I have been through this in other cases -- it involves a process of interviewing witnesses, interviewing the witness that wants to enter the program, and it also -- a series of evaluations are done to determine whether the witness is appropriate for the program.

And once the individual is accepted then there are evaluations done to determine whether the witness' continued acceptance and continuance in the program is acceptable. Polygraphs are done, psychologicals are done -- I don't know much about Mr. Montgomery's background, and I mean no disrespect to him, but he sounds a bit slow.  Say, for example, if he were retarded, there is a wealth of information out there that indicates that individuals that suffer from retardation are literally extremely easily led.  They thrive on pleasing other individuals.  This is something we would

86

consider Brady.

I have some unsubstantiated information that Mr. Montgomery has suffered brain damage in the past. I noticed he has a very large scar on the side of his head. When they did the psychological testing these are factors that would have been touched upon possibly during the evaluation process.

But I think since the whole objective of the Witness Protection Program is to interview the witness and determine that witness' fitness in the program, there must be some Jencks material or Brady material that has come out of it.

Now, since we are going to be in recess for several days, what I would request, understanding the sensitive nature of all these materials, what I would request is is that the United States make his complete Witness Protection file and related paperwork available to Your Honor, and Your Honor can review it ex parte and make a determination as to whether or not there is Brady material or Jencks contained in it.

I have received these materials in the past in cases of this nature.

THE COURT: Do you have any authority on it?

MR. DAVIS: Well, I haven't. I have never had it contested before.

THE COURT: What other Judges have you had it --

MR. DAVIS: Well, most recently with Judge Sporkin in the Fern Street case, where several polygraphs that were

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

87

turned over, there were some evaluations that were turned over that were within like a report format.

MR. ZEIDENBERG:  Your Honor, if I could, I don't mean to interrupt.

MR. DAVIS:  I think Mr. Volkov turned them over to us before.  And I think he is the head of the gang unit now. I don't know why he did it.  But we didn't even have to file for it, we just requested it and the Judge reviewed it.

MR. ZEIDENBERG:  Your Honor, as a matter of fact, we have already turned that material over to Your Honor.  That was part of the material that the Court reviewed months ago.

THE COURT:  In camera?

MR. ZEIDENBERG:  In camera review, pursuant to a request -- I think Mr. Kiersh made the request at that time -- the entire paperwork pertaining that Mr. Davis is referring to was reviewed already by Your Honor.

THE COURT:  Okay.

MR. ZEIDENBERG:  And the Court ruled that there was no Brady of any type.

THE COURT:  That's correct.  And it's already been placed under seal and is a Court exhibit as I recall.

MR. ZEIDENBERG:  Your Honor, I --

MR. DAVIS:  Your Honor, I don't mean to interrupt, but the very fact that Mr. Montgomery was discharged from the program shows that he was not in compliance with the rules.

88

And I have a glimpse of what was -- of the reason, as to why he was discharged from the grand jury materials. But in the context of not being able to follow the rules or not being totally forthright with individuals or having been caught making misrepresentations, these are things that at this stage of the case -- this is probably the most critical witness in this case for all of these defendants. And I think we have to be very careful in reviewing his materials.

THE COURT: Whatever exists, according to Mr. Zeidenberg, I have already reviewed.

MR. DAVIS: Plus, I am not an expert, but there are some mental health issues with this man, either in terms of retardation or in terms of brain damage. There is something going on here, just from watching him, what little I can see from where I am seated.

THE COURT: I will, once again, review the materials if they are available to me.

MR. DAVIS: That's what I would ask, Your Honor. I would ask that you be provided the complete materials, and then in the context of my representations now, check them again to see if there is something.

THE COURT: I will look.

MS. CHATURVEDI: Your Honor, just factually, Mr. Montgomery was not discharged from the Witness Protection Program, contrary to Mr. Davis' assertions. I will return the

89

notebook to chambers that I had previously provided, so that Your Honor can have a chance to look at those materials again. And there is no evidence of any sort of brain damage or retardation found in any of the documents provided to the Court, but I will provide them by the close of business tomorrow.

THE COURT:  All right.

MR. KIERSH:  Maybe I can shed some light on this. There is a document, and I don't have it with me now so I can't identify it with precision  -- what I will do is I will find it and I will provide it to all counsel.  But there is a document in Mr. Montgomery's past that talks about him having brain damage.  So this notion of him --

THE COURT:  Well, if you can find a document it might help us identify what it is that you're talking about.

MR. KIERSH:  Yes, I will.  Over the recess I will get that and supply it to everyone so everyone knows -- give it some context.

THE COURT:  Okay.

MR. BESHOURI:  Separate issue, Your Honor.  I have resisted objecting up until now about these events that happened when Mr. Montgomery was a young teenager, an adolescent, parking meters, stealing -- breaking into parking meters, that sort of thing -- he has included my client in that activity.  That's, of course, way beyond or prior to the

90

conspiracy alleged here.

THE COURT:  And I will reiterate the instruction, if you will remind me on Monday, that this background material is not charged in the indictment and is to be considered by the jury only in connection with Mr. Montgomery's credibility.

MR. BESHOURI:  I appreciate that, Your Honor.  It, obviously, has an impact on my client.  And I am asking the Court to put some brakes on to what extent the government can go into this just to establish a relationship.  They have, obviously, established a relationship, so the need for this kind of testimony is -- frankly, it's unnecessary to establish a relationship any longer.  All it's doing is piling on during a period that precedes the conspiracy by many, many years.

THE COURT:  At the moment it does not appear to me to be excessive, but I will keep that in mind.  If you will remind me on Monday, if you wish a repetition of the cautionary instruction, I will be glad to give it.

MR. BESHOURI:  Very well.

MR. ZUCKER:  Your Honor, if I may, it was touched on before by Mr. Beshouri but it seems to have fallen by the wayside.  On the 302s -- in connection with the conversation on the 302s that Agent Lisi prepared there was also reference to some notes he prepared, notes he made while interviewing Mr. Montgomery, and I would ask that those be --

THE COURT:  I have reviewed those.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

91

MR. ZUCKER:  You have?

THE COURT:  I have reviewed Agent Lisi's notes. They do not constitute Brady material --

MR. ZUCKER:  Or Jencks?

THE COURT:  And none that I saw would be characterized as Jencks Act statements.

MR. ZUCKER:  Thank you.

THE COURT:  Monday morning at 10:00.

(Whereupon, the hearing was adjourned at 4:35 p.m.)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA, | .   Docket No. CR 98-329 |
| Government, | .   Washington, D.C. |
|  | .   March 12, 2001 |
| vs. | .   1:42 p.m. |
|  | .. |
| VINCENT HILL, | .   (AFTERNOON SESSION) |
| JEROME MARTIN, | . |
| SAMUEL CARSON, | . |
| WILLIAM K. SWEENEY, | . |
| SEAN COATES, | . |
|  | . |
| Defendants | . |

. . . . . . . . . . . . . . . . . :

UNITED STATES OF AMERICA,

Government,

vs.

GARY PRICE,

Defendant.

. . . . . . . . . . . . . . . .

**FILED**

**MAR 1 1 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Docket No. CR 99-348

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Government: | PETER ZEIDENBERG, AUSA |
| | ANJALI CHATURVEDI, AUSA |
| | U.S. Attorney's Office |
| | 555 Fourth Street, N.W. |
| | Washington, D.C.  20001 |
| | |
| For the Defendant Hill: | CHRISTOPHER DAVIS, ESQ. |
| | 601 Indiana Avenue, N.W. |
| | Suite 910 |
| | Washington, D.C.  20004 |
| | |
| For the Defendant Martin: | JOANNE HEPWORTH, ESQ. |
| | 305 H Street, N.W. |
| | Second Floor |
| | Washington, D.C.  20001 |

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

3

P R O C E E D I N G S

THE COURT: Ready for the jury?

MR. ZEIDENBERG: Yes, Your Honor.

THE COURT: All right. Mr. Montgomery, you may resume the stand, and we can bring the jury in.

THE DEPUTY MARSHAL: Jury panel, Your Honor.

(Jury In.)

THE DEPUTY MARSHAL: Jury panel is all present. THE COURT: Thank you, Marshal. We're all set.

MR. ZEIDENBERG: Thank you, Your Honor.

JAMES MONTGOMERY, GOVERNMENT'S WITNESS, RESUMED THE STAND

DIRECT EXAMINATION (Cont.)

BY MR. ZEIDENBERG:

Q. Mr. Montgomery, I just have a -- want to go back and ask you a couple of more questions about the murders of Maurice Hallman and Leonard Hyson, who you knew as Slick.

Immediately after the shootings while you were still in the alley or leaving the alley with Mr. Carson, did you talk to Mr. Carson about whether or not he had fired his gun?

A. I mean, it was obvious that he had fired his gun, cause I seen Slick laying right there bleeding in the head. He said to me that I was scared. So I was like I ain't scared. And I told him -- so I told him do he think that this is my first time ever killing someone, like that.

Q. When the shooting happened, you said that you couldn't

4

hear the other gunshots; is that right?

A.    I told him that when I was shooting Maurice, I ain't hear his gun go off, and he told me that that's because he's sharp.

Q.    He's sharp?

A.    Right.  And he said that he hit him in the head six times before he hit the ground.

Q.    Did he say where he had shot the victim, Mr. Hyson?

A.    In the head.

Q.    Did you say where you had shot Mr. Hallman?

A.    I told him that I hit him one in the body and the rest in the head.

Q.    Did you know whether or not that was true?

A.    I wasn't sure if I hit them all in his head, but I know I hit him in his head.

Q.    Now, I want to direct your attention to 1991.  Do you recall Samuel Carson getting a red Acura Legend in 1991 at some point?

A.    Yes.

Q.    Do you remember the first time you had gotten inside that car?

A.    Yeah.

Q.    Can you tell the ladies and gentlemen about that?

A.    I don't remember exactly what time of the year it was.  I know it was warm outside.  I had this scooter, so he told me to park it in front of his mother house.  And his mother was

14

associated with?

A.    The Fifth and O and Sursum Corda.

Q.    How did you know that he was her baby's father?

A.    Because I heard Chin saying it before.

Q.    Now, did you have a conversation with Mr. Carson shortly before those young women were killed about him possibly getting killed with his own gun?

A.    Yes.

Q.    Can you tell the ladies and gentlemen about that conversation, what you remember of it?

A.    Chin was saying that he had an AK, and he put it over T.T. house.

Q.    What's an AK?

A.    AK-47 is a assault rifle.

Q.    What did he say he had done with it?

A.    Put it over T.T. house.  He kept it over T.T. house.  And she was -- she kept telling Chin that she put the gun in a closet behind a lot of stuff so her kids wouldn't find it and play with it or whatever.

Chin said that he kept on asking her about the gun, and she kept giving him excuses.  So he say that Pimp told him that he going soft over a broad.

Q.    I'm sorry?

A.    Chin said that Pimp told -- Pimp kept saying to him that he going soft over a broad.

15

Q.    Soft over a broad?

A.    Right.  And that she going to end up letting him get killed by his own gun.

Q.    Now, had you ever been in that apartment?

A.    Yeah.

Q.    When you were in the apartment, did you notice any photographs of Sam Carson?

A.    One.

Q.    Where was it?

A.    Not exactly sure, but I believe it was on the wall over top of the table like where the little kitchen area is.

Q.    What did the picture look like?

A.    Chin had on a Kufie and a stripy shirt and some blue jeans.

Q.    What size was the picture?

A.    A poster size.

Q.    Now, in the spring or summer of 1991, did you have a conversation with Sam Carson about the murders of T.T. and Terita?

A.    I believe when I first seen it on the news that they had got killed, I asked Chin was that his work, and he told me, no.  And then one day I was coming over his mother house, and he was coming in, and he said he was about to lay down because the homicide detectives had came and got him and questioned him about T.T. and Terita murder.

16

Q.    Did he tell you about what happened when he got picked up by the homicide?

A.    They questioned him.

Q.    What did h say about it?

A.    That they ain't have nothing on him.  But, I mean, at that particular time he didn't tell me that whether he did or whether he didn't commit those murders or not.

Q.    Did he subsequently talk to you about what happened?

A.    Yes.

Q.    What did he tell you?

A.    That Meechie and Poo-Poo and Chin, they went over T.T. house, and Meechie was driving, and Poo-Poo was in the back, and Chin said that he went in.  You know, he came up the steps and knocked on the door, and she came downstairs and opened the door.

Q.    I'm going to ask you to keep your voice up, Mr. Montgomery so everyone can hear you.

A.    He say that she came downstairs to open the door, and he came in.  He closed the door behind him, and he went up the steps, and they went into the living room area, and he was talking to her, and she asked him who was with him, and he said, that he told her nobody wasn't with him.  But Poo-Poo and Meechie was outside waiting for him.

So he said that they sat down on the couch and was talking, and he kept asking her about the gun, and she kept on

17

saying that she got to get the knob fixed or whatever and --

Q.    I'm sorry?

A.    She kept saying that she had to get the knob fixed.

Q.    The knob to what?

A.    To her door.  She said the knob was broke off the door. And Chin said he told her that he know how to open it with a butter knife.  So he said that she kept on saying that she'll get the gun for him, but she couldn't get it right now because it was behind a lot of stuff; and she didn't want to wake her kids up or wake the kids up, whatever.

So Chin said that he got up and went to the bathroom, and put his gun in a clothes hamper, and he said he came back out. And he said he yawned in front of her, and lift his shirt up so she could see that he wasn't strapped.

So he said he sat back down, and he said he was trying to give her the benefit of the doubt, you know, so she could get the gun.  And she kept giving him excuses and kept giving him excuses.  So he said that he got back up and he went in the bathroom.  Told her that he had to go back to the bathroom and got the gun.

And he said that he came out and he shot her in the head, and then Terita was in the bed, and he said that she was lifting up, and before she opened her eyes that he shot her in the head, and she just laid back down.

Q.    Did he say what he did at that point?

18

A.   He said that he wiped off everything that he touched, and he took his picture and left.  And he said, when he got back outside and got in the car, then Meechie pulled off fast and made the tires screech, and he got mad at him about that, and told him, don't never pull off like that.

Q.   Now, going back to the picture, did he tell you why it is he took the picture?

A.   I'm not sure if he told me the reason why he took the picture.

Q.   Did he say what he did with the picture once he took it?

A.   I don't know what he did with the picture.

Q.   Now, did you have a conversation with Meechie about this homicide, double homicide?

A.   Yeah, down at Lorton.

Q.   And when was it that you were down in Lorton?

A.   From '91 to '94.

Q.   And do you remember when it was in '91 that you got arrested?

A.   November 13.

Q.   I'm sorry?

A.   November 13.

Q.   1991?

A.   Yes.

Q.   How long before you got sent to Lorton after you got arrested in November of '91?

28

A.    Off a phone.

Q.    What do you mean?

A.    Off the phone.  It was posted on the phone in the jail.

Q.    I'm sorry?

A.    It was posted on the phone in the D.C. Jail.

Q.    What's posted on the phone there?

A.    The number to the FBI.  So I called them and lied to them telling them that I knew of some murders that had happened, and they questioned me about it, and I blamed it on Wayne.

Q.    On who?

A.    On Wayne.

Q.    Wayne who?

A.    On Wayne Perry.

Q.    Now, after you called the FBI, did they bring you some place to speak with them?

A.    Yeah.

Q.    And what murders did you blame on Wayne Perry?

A.    T.T. and Terita murder and Penny Baker.

Q.    Penny Baker?

A.    Yeah.

Q.    And when you told them that Wayne Perry was responsible for that, can you tell the ladies and gentlemen why it was you picked Wayne Perry's name?

A.    Because Alpo already had got locked up, and when Alpo got locked up, Wayne and them was making bets that Alpo was going

29

to snitch on them.

Q.    Okay.  Let me stop you there, because that's a name that we haven't heard before.  Who is Alpo?

A.    Alberto Martinez.

Q.    And what relationship did Alpo have with Wayne Perry?

A.    Drug dealer.

Q.    Okay.  So you're saying that Alpo -- he was close to Wayne?

A.    I don't know what their friendship relationship was.

Q.    Alpo gets arrested?

A.    Yeah.

Q.    And what was Wayne saying about what was going to happen once Alpo got arrested?

A.    That Alpo was going to snitch on him, because they said Alpo was crying in court.

Q.    So as a result that you knew that Alpo was likely to snitch on Wayne, why did you think it was a good idea to blame these murders on Wayne?

A.    So that -- I was trying -- well, really, I got charged for the assault on a police officer, and I knew that I didn't assault the police officer.  I ain't know how I was going to beat it, so I more or less I was trying to make a fake bargain with them to get me off of it.  I mean, basically that's it.

Q.    So was it -- was there any truth to that story that Wayne Perry was involved in killing those two women?

33

something to do with Boo-Boo getting killed or getting Boo-Boo killed.

Q.   So as far as you understood, they were responsible?

A.   Right.

Q.   So what happened while you were at Chin's mother's house this day, right after Boo-Boo gets killed?  What is the discussion about?

A.   Pimp was calling around trying to find a van within a reasonable price, because he was saying that they knew his van when they see it.

Q.   So what happened?

A.   So he never got another van from out of that book or nothing.  Basically I don't think nothing will happen that particular day.

Q.   Now, after Boo-Boo got killed, did you have a conversation with Sam Carson about what led up to Boo-Boo getting killed and the murder of Tony Fortune?

A.   Yeah.

Q.   Can you tell the ladies and gentlemen about your conversation with Sam Carson about that?

A.   Chin was saying that -- let me say this first.  Once Boo-Boo got killed, I really didn't care why the beef was on, but Chin was telling me that Boo-Boo got killed because he killed Tony Fortune.

Q.   Because who killed Tony Fortune?

34

A.   Chin.

Q.   Did you know who Tony Fortune was?

A.   I heard of him.  I didn't know him.

Q.   What did Chin tell you about what happened with Tony Fortune?

A.   He say that Pimp and Tony Fortune had had some words before, and Tony Fortune was trying to lean on Pimp.

Q.   Lean on Pimp?

A.   Yeah.  Like trying to -- they said -- I heard a lot of different rumors about Tony Fortune, but I don't know him. But Chin was telling me that Tony Fortune was trying to make Pimp pay him, pay him money.  And, you know, they had a brief brush right then and there, but nothing happened.

Then he was saying that at the crap game Pimp had won most of the money, and Tony Fortune was mad about it, and telling Pimp that he couldn't quit or that he had to give him back some of his money.

So Chin say that he whispered in Pimp ear and ask him, do you want me to kill this piece of shit?

Q.   Did he say what, if any, response Mr. Martin, Pimp, said when Chin asked him if he wanted him to kill Tony Fortune?

A.   He didn't say Pimp say yes or no, but he said he went and got a gun.

Q.   Did he say where he went to get his gun?

A.   He said he went to the car.  But as to what car, I don't

35

know.

Q.   What did he say happened once he got his gun?

A.   That he shot Tony and he fell, and then he went over top of him and hit him some more.

Q.   Did Chin say what happened after he had killed Tony Fortune in terms of a beef starting up?

A.   Yeah, and he said that they had came through -- that Boot-Em-Up and them had came through before and had shot or whatever and Boo-Boo and Pimp was mad at each other because Pimp was creeping with Boo-Boo baby mother, Shaun, so they was having words.  They wasn't beefing with each other, but they just wasn't having words.

Q.   Now, after Boo-Boo was killed, do you recall visiting Boo-Boo's baby's -- strike that.

Do you remember visiting Boo-Boo's mother's house on Ridge Road?

A.   Yeah.

Q.   And do you recall who else was there?

A.   Me and Ty was together, and we came in.  Boo-Boo was already dead, so we came in Boo-Boo mother house, and Pimp and South was in there cleaning their guns.  So me and Ty came in there to put our guns up.  The gun I had belonged to Ty.

Q.   Ty, the individual you identified from a picture the other day?

A.   Right.

36

Q.    Okay.   What happened next?

A.    So we was about to leave back out, and Pimp said that Kyle had just gave him a call saying that Block and them was around 58th.

Q.    And who is Block again?   Remind us.

A.    What do you mean, who is he?

Q.    Who is Block?

A.    I don't know him personally.

Q.    No, who did you understand Block to be?   What role did he have?

A.    Drug dealer.

Q.    I'm sorry?

A.    A drug dealer as far as I know.   I mean, as far as from being around 58th

Q.    Okay.   And was he someone that you associated with being responsible for Boo-Boo getting killed?

A.    Right.   That he had something to do with Boo-Boo getting killed.

Q.    Now, what was your plan for that evening, this particular evening?

A.    Before this?

Q.    Well, once you got into the house this evening, at Boo-Boo's mother's house, what was the plan?   Was there just a plan discussed for that evening?

A.    No.

37

Q.    What happened?

A.    We was putting the guns -- Ty was about to put the guns in Boo-Boo mother house, so Pimp said that Kyle called him saying that Block was around there.  So Pimp asked me was I going?  So I say, no doubt.

Q.    Going where?

A.    Around there to where Block was at.  So I say, no doubt. And he ask me did I have a gun?  So I showed him the pistol I had.  It was a revolver.  So he gave me another pistol.

Q.    What kind of gun did he give you?

A.    An automatic, a 9 millimeter automatic.

Q.    So what happened once you had that 9 millimeter.

A.    What do you mean, what happened?

Q.    What happened?  Did you guys stay in the house or did you go out?

A.    We left.

Q.    Tell us.

A.    So Pimp had a AR 15, so he asked me did I want to take that.  And I was like, no, cause it was too big, and I didn't want somebody to see me coming out Boo mother house with that gun.

So we get in Anthony car, and Pimp driving and South in the passenger seat.  Ty sitting behind Pimp, and I was sitting behind South.  So we go around there, and I'm telling Pimp that I don't know none of them.  I say the only one I know is

38

Keith Holmes.  I said I know him when I see him.  I don't really know him, but I know him when I see him.

So I said if you see anybody that you think with it, let me know, and I said, I'm going to blast them.  You know what I mean?  And I had every intention of doing it.  So I said, I'm going off of whatever you go off of.  So we kind of finished and went through the alley.  Pimp was telling everybody to spread out in case they see us and try to bust.  So we won't -- so one of us won't shoot one of our own.

So we walked out, came out the alley and was walking up Blaine, and we had our guns out in full view.  So we walked almost to the top of Blaine.

Q.    Is this daytime or nighttime?

A.    It's nighttime.

Q.    And what happened when you got to the top of Blaine?

A.    So it was mostly like little kids.  Other people was running as they seen us coming up the street.  So I say, you don't see nobody?  I was pressed to bust somebody.  I was pressed.

Q.    What does that mean?

A.    I was pressed to shoot somebody.  I wanted to get some get-back for them killing Boo-Boo.

Q.    What happened?

A.    It could have been a person that didn't have nothing to do with it.  If he had pointed to them and said they did, I

39

was going to give it to them.

Q.    What happened?

A.    So I said, you don't see nobody that look like -- he was like, no, and we left.  So we go back the same way that we came up there, and we come back through the alley and went back to the car.

So as we was getting in the car, Putney pulled up.

Q.    Who did?

A.    Putney.

Q.    Who is Putney?

A.    Lawrence Brown.

Q.    Who is he?

A.    Putney is a friend of ours.

Q.    Where is -- does he work?

A.    .He work in the court building.

Q.    What court building?

A.    Superior Court.

Q.    What happened when you saw Putney?

A.    He pulled up on us.  He pulled up on us unexpectedly, and all of us drew our guns on him, and he was scared.

Q.    What was Putney driving?

A.    He was driving a Jetta.

Q.    What happened when you pointed your guns at him?

A.    I mean, you could just see the look of fear on his face.  And Pimp was saying, no, no, no, no, no, like that.  And so we

40

got in the car, and Putney was saying, man, I was just speechless. That's it. Like that.

So, you know, we laughed about it real brief and then he pulled off. And then we got back in the car and we pulled off.

Q. Now, on this particular night, did you end up shooting your gun?

A. Yeah.

Q. Tell us about when the shooting started.

A. We was going back down East Capitol Street. So we got by where East Capitol and Benning Road, and Pimp spotted Block van and said he was going by way of Texas Avenue. So he was like, they go right there. Saying he trying to come through there, trying to come through. So we hurry up and got back around B Street.

So Pimp parked Anthony car on B Street. So we got out and we ran behind these big green trash cans. And so we was waiting for them to come. Pimp was saying, they probably going to come from the top, meaning they going to come down Ridge Road. So I didn't know what type of vehicle they was in at the time. I knew that he's saying they was in a van, but I didn't see the van when he was saying that they was in the van. There they go. There they go.

So I told him, I said, I don't know how the vehicle look. I say, whatever you go on, I'm going on, like that. So we

41

stay right there behind the trash cans.  It seemed like it took forever, like he must have just kept going or maybe it wasn't them or whatever, so we started walking out, and sure enough, the van came through.

Q.    What did the van look like?

A.    It was a white Caravan.

Q.    A white Caravan?

A.    Yeah.

Q.    And when you saw the white caravan, who started shooting first?

A.    We was walking out, about to walk back out to B Street, so Pimp said, there they go right there.  And he ran out busting his gun.  So I started busting my guns.

Q.    Who else was shooting, do you recall?

A.    South and Ty.  They started busting their guns.

Q.    What happened?

A.    We shot the van up, and it sped off across Minnesota Avenue and South had the Mac, so he was still shooting after we had got done.

Q.    What happened after you finished shooting?

A.    So we was walking back through these woods.  We was going through this path, and so Pimp said, man, you ain't even shooting.  So I said, yes, I did.  I said, shit, I was lighting that joint up.

So he was like, let me see your gun.  So I gave him the

42

gun that he gave me. I give it to him, and he checked the clip and see that I did. I bust that joint. So the other revolver I had, I think I only shot like two or three times out of that.

Q. What did he say after he saw that you had shot?

A. He said that I did good.

Q. Now, --

A. And I told him, I said, let's go reload and get their ass.

Q. I'm sorry?

A. I said, let's go reload and get their ass some more.

Q. What did he say?

A. He said, that's enough for tonight.

Q. Now, did you even know who it was that you were shooting at in that van?

A. No.

Q. Did you care who it was?

A. No.

Q. Why were you shooting at it?

A. Because he said that it's Block and them. He knew better than I knew.

Q. And your reason for wanting to kill Block was what?

A. Cause he had something to do with Boo-Boo getting killed.

THE COURT: I'm going to interrupt you now, Mr. Zeidenberg. We're going to take a brief recess.

45

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel is all present, Your Honor.

THE COURT:  Thank you, Marshal.

BY MR. ZEIDENBERG:

Q.    Good afternoon.  Mr. Montgomery, I'd like to direct your attention to the evening of September 10, 1991.  Were you involved in a shootout with the Metropolitan Police on that evening?

A.    Yes.

Q.    And directing your attention to slightly earlier in the evening, prior to the shootout actually beginning, can you tell the ladies and gentlemen what led up to that shooting?

A.    I had came around Ridge Road probably about -- around noontime to meet with Pimp.  We had discussed the day before that I was going to meet him there so that we could try to catch up with the dudes that we was trying to retaliate on.

Q.    And specifically who was it you were looking for?

A.    Keith Holmes and Block and Sugar Spoon.

Q.    Again, did you know them by face or just by name?

A.    I only knew Keith Holmes by face.

Q.    So when you came around on September 10 around noontime, what happened?  Did you see Pimp?

A.    No, I'm not sure what time it was when he came, but I was waiting there for awhile before he got there.

46

Q.    Then what happened?

A.    Then we went to get South.  We went to get South, and then we come got a dude, Boo.  He got this dude named Boo, Juan Bowie, to -- Juan Bow.  It's Bow or Bowie.  It's one or the other -- to get him some illegal paper tags.

Q.    Paper tags?

A.    For his Mazda van.

Q.    Right.

A.    So after we had got that, then me, Pimp and South went down to Southwest and got Chin.  Went over to Chin mother house and got Chin.  So then we went riding around looking for Boot-Em-Up and Block, Keith Holmes, Sugar Spoon, Pee-Wee or anybody else affiliated with them or with the death of Boo-Boo.

Q.    What were you planning on doing if you saw any of those individuals?

A.    We discussed that if we catch Boot-Em-Up that we was going to rob him and torture him and we was going to kill him.

Q.    And any of the others?

A.    On sight, anybody else on sight we was going to deal with them right then and there.

Q.    Meaning what?

A.    We was going to kill them right there.

Q.    What happened?  Did you find them?

A.    No, we went around Wheeler Road, through Paradise.  We

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

47

went around Fifth and Sixth Street, Northeast.  We went around 58th.  We went up Eastern High School, and we went to Anacostia High School and we went over H.D. Woodson.

Q.   Did you find anyone you were looking for?

A.   No.

Q.   Now, did you go back out later that evening shortly -- right around dark?

A.   When it started getting dark, I was keeping -- Ty let me keep his motorcycle, so I already had it.  It was parked at the top of Ridge Road.

Q.   And this is Ty, the individual you identified the other day?

A.   Right.  So I told -- I made the suggestion that one of them could get on the bike with me and shoot off the back of the bike, since they know the van, since they know Pimp van. So if they see Pimp van, they might not be focused on a motorcycle.  You know what I mean?  We came back out.  We went through Mayfair and Paradise.

Q.   Now, at this point are you on a motorcycle or in a van?

A.   I'm on a motorcycle and Pimp is on the back.

THE COURT:  Who are these guys you were looking for? What neighborhood are they associated with?

THE WITNESS:  In various neighborhoods.  It's like a few different neighborhoods.

THE COURT:  Okay.  This Ridge Road crowd or --

48

THE WITNESS:  Two of us was from Southwest, and the rest was from Ridge Road.

THE COURT:  And where were these guys that you were looking for?

THE WITNESS:  In various parts of D.C.

THE COURT:  Okay.

BY MR. ZEIDENBERG:

Q.   What neighborhood --

MR. ZEIDENBERG:  If I may, Your Honor.

BY MR. ZEIDENBERG:

Q.   What neighborhood did you associate -- the individuals that you were looking for, what neighborhood did you associate them with?

A.   Paradise and 58th.

Q.   58th Street, Northeast?

A.   Right.

Q.   And that was the area around where Tony Fortune hung out?

A.   Yes.

Q.   Now, the second time that you go out on this September 10, 1991, when you're on the motorcycle, who is on the motorcycle with you?

A.   Pimp.

Q.   Who is in the van?

A.   Chin, Chin was driving the van, and South was in the passenger seat, and Man and Steve Bay in the back.

49

Q.   I'm sorry.  In the back are who?

A.   Man and Steve Bay.

Q.   Steve Bay?

A.   Yeah.

Q.   Do you know Steve Bay's true name?

A.   No.

Q.   Have you ever heard the name Steve Ellington?

A.   No.

Q.   Are you armed at the time?

A.   Yeah.

Q.   How are you armed?

A.   With a semiautomatic pistol.

Q.   Was Jerome Martin, Pimp, armed?

A.   Yes.

Q.   What was he armed with?

A.   Glock.

Q.   A Glock?  Do you know what caliber?

A.   I'm not sure, but I believe it was a 9 millimeter.

Q.   The individuals in the van, Sam Carson, Steve Bay, South, and Man, were they armed?

A.   Yes.

Q.   Do you know -- could you tell us what you know about that, what you recall?

A.   Chin had a semiautomatic pistol and -- everybody had a semiautomatic pistol except for South.  He had a Mac-11.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

(Page 216 of Total)

55

Q.    Okay.   The car -- the van -- strike that.

The car that you saw, was it turning in the direction of Southern Avenue such as that (indicating)?

A.    I'm not sure if it went on the right side or if it went down the wrong way of the street, but it did go in that direction.

Q.    Okay.   And what did you see Jerome Martin do?

A.    Shooting at the car.

Q.    On foot or on the motorcycle?

A.    On foot.

Q.    And while he was shooting at the car, was his helmet on or off?

A.    He was taking it off.   He was running and trying to unfasten the helmet while he was busting.

Q.    And then what do you recall happening next?

A.    The van pulled out into by the median strip diagonal.   It was diagonal.

Q.    Diagonally across the street?

A.    Diagonally in the lane.

Q.    Okay.

A.    I pulled out and was telling Pimp to hop on, because I wanted him to hop on so that we could continue to chase the car going out Maryland so he could shoot at them while I was riding the bike.

Q.    What happened?

56

A.    He didn't hop back on, so I just kept on hollering for him to hop back on the bike, to hop on, hop on. I kept saying that. And then he turned around and was shooting from the direction where the high-rise was at.

So I didn't know at that particular time who he was shooting at. I'm thinking that it was probably more of them dudes.

Q.    At some point did you look in the direction of the high-rises?

A.    Yeah. I mean, I could see some shots coming from that way, but I just didn't realize at that time that they was police.

Q.    At some point did you realize it was the police?

A.    Yeah, when one of them fell.

Q.    I'm sorry?

A.    When they fell.

Q.    What did you see happen?

A.    I could see the badge.

Q.    What did you see? Tell --

A.    I was thinking that it was more or less a security guard or something probably from that building.

Q.    What did you see happen?

A.    The person was shooting at Pimp, and Pimp was shooting back, and he was saying, get your ass back.

Q.    Who was saying, get your ass back?

57

A.   Pimp.

Q.   What direction was Pimp shooting at at the time he was saying that?

A.   In the direction where the officer or the security was shooting from.

Q.   Did you notice how many police officers there were?

A.   I only seen one, but there could have been more.

Q.   How long -- strike that.

     What happened next after Pimp was shooting in the direction of the police officers?

A.   They opened the door on the side of the van and South started busting.  South started shooting out the side of the van.

Q.   In what direction?

A.   In the direction of the security or the officers.

Q.   Then what happened?

A.   Pimp hopped in the van and they sped -- we took off.

Q.   Now, which direction did you take off?

A.   We went up South Capitol -- I mean, Southern Avenue.

Q.   Now, as you look at this picture, EC300, was it a right turn or a left turn on to Southern Avenue?

A.   A right turn.

Q.   Now, where were you in relation to the van?

A.   On the motorcycle.  I was behind the van.

Q.   Okay.  Did you follow after the van?

58

A.    Yeah.

Q.    Now, while this shooting was going on, did you -- where were you in relation to where all these bullets were flying?

A.    Right in the middle.

Q.    Did you get hit?

A.    No.

Q.    Did you consider taking off and leaving while the bullets were flying?

A.    No.

Q.    Why not?

A.    Because I was responsible for Pimp, and if I would have left him, then I would have got killed.

Q.    What do you mean when you say you were responsible for Pimp?

A.    He was on the bike with me.

Q.    So what?

A.    So he my responsibility if he on the bike with me.

Q.    What does that mean that he's your responsibility?

A.    That if he on the bike with me, I can't leave him.  I can't leave him.

Q.    Why not?

A.    For the reason I just explained.  He's my responsibility. I mean, I wouldn't have left him anyway, though.

Q.    Now, where did the van and you go once you turned right on to Southern Avenue?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

59

A. We stayed on Southern Avenue going all the way up Southern Avenue, and then I seen -- no, we stayed on Southern Avenue and I'm not sure -- I knew it was from the passenger side of the van that Pimp shot at somebody that was going down the street. At that time I didn't -- put it like this. I'm not going to say Pimp shot at the person, because I didn't know at that particular time, but somebody shot at a person on the sidewalk.

Q. Okay. So while you're driving along you hear a shot come from the van?

A. Right.

Q. And you believe it was directed at someone on the street?

A. Right.

Q. What did you do when you heard the shot come?

A. So I slowed down on the bike, and I was about to stop and shoot the person because I was thinking that that was one of the people. I'm thinking that's one of them has something to do with Boo being killed.

Q. Did you shoot at that person?

A. Did I shoot them?

Q. Yes.

A. No.

Q. What happened next?

A. The van kept going and I sped back up to keep up with them.

60

Q.    Now, at some point did you see a police car?

A.    Yeah.

Q.    Can you tell us about that?

A.    The police was coming in the opposite direction of where we was traveling. So as -- and he had his lights on. He didn't have his siren on, but he had his lights on, so I slowed down, and I was watching the police, and he slowed -- after he went past us, I could see him looking at the van, and that was the reason why I slowed down and was watching him.

So the police car, I seen his brake lights come on and looked like he was about to make a U-turn. So I sped up and was pointing back telling Chin and them the police is about to come. I said, the police is about to come.

Q.    Who is driving the van at this point?

A.    Chin was driving.

Q.    Okay. What happened when you notified -- when you signaled to Chin that the police were coming?

A.    They turned on a side street.

Q.    What did you see happen next?

A.    I turned on the side street with them, and then they turned on another street and pulled over briefly and threw their guns out, and I stopped and got their guns and got back on the bike. I ain't never throw my gun. I picked their guns up.

Q.    Now, how many guns did you see come flying -- how did the

61

guns get out of the van? What did you see?

A.    I don't know who particularly threw the guns out.

Q.    Did the van come to a complete stop?

A.    Right.

Q.    Where were the guns thrown?

A.    In somebody yard.

Q.    Now, after the guns came out of the van, did the van continue on?

A.    Yeah.

Q.    What did you do?

A.    I stopped. I stopped and put the bike in neutral and picked up -- I picked up Pimp gun, and I picked up South gun, and I picked up Steve Bay gun and got back on the bike. I didn't see Chin gun.

Q.    And how were you able to carry all those guns?

A.    I put them in my waistband, and I pushed some of them in my pants pocket.

Q.    What did you do at that point?

A.    I went back around Ridge Road.

Q.    What happened when you got back to Ridge Road?

A.    When I got back around there, I parked the bike and knocked on Steve Bay and them door, and I think it's his uncle or his nephew, Darrell, or somebody answered the door, and I asked him could he hold the guns till Steve Bay and them got back. And he did, he held them.

62

Q.    Now, at some point later did you meet up again with Chin and Pimp?

A.    Yeah.

Q.    How much later?

A.    I'm not sure.  Probably about -- maybe 30 to 45 minutes.

Q.    When you saw them again, were they in the van or were they on foot or how would they get there?

A.    They was in the car with Anthony.

Q.    Any sign of Pimp's van?

A.    No.

Q.    Did you talk about what happened with Pimp and Chin?

A.    Well, when they first pulled up, I told -- I just said, I said, I got you all guns.  And Pimp says, you got mine?  I said, yeah.  And South said, you got mine?  I said, yeah.  I said I got everybody gun except for Chin.

Q.    What happened then?

A.    So we went back up there to the yard.  I showed him where the yard was that I found their guns, and we looked, and we never found Chin gun.  Then we rode on the street where they had abandoned the van, and Pimp was mad saying that -- he said, he was like, shit.  He was like, man, we should have hit the Maryland side like that.  And then he was mad because he left his ID and his pager.

Q.    I'm sorry?

A.    He was mad because he left his ID and pager in the van.

67

A.    We needed them for that particular beef for Block and them.  We hardly had no guns.

Q.    And what about 37th Place?  Do you know how Mr. Martin was able to get guns?

A.    Chin told me that Pimp uncle be having guns.  That he get his guns.  I don't know.  I'm not saying that just because that's Pimp uncle, but that's where Pimp got his guns, but Chin particularly told me that he gets his guns from Pimp uncle.

Q.    Now, when these beefs were going on, and I'm talking about this beef with 58th Street, was the two evenings that you just talked about, September 10 and you talked before the break about another evening you went out looking for them, were these the only occasions that you went out looking to shoot at the people from 58th Street?

A.    No.

Q.    Can you just -- without going into the details of every time, give the ladies and gentlemen some idea of how frequently you did this and who you were with?

A.    Pretty much of the time I didn't know any of the people by face except for Keith Holmes.  A lot of times whenever I had the transportation, a motorcycle or car or whatever, and then I go around Mayfair trying to find any car that looked like a car that belonged to them or could possibly belong to one of them and write down the tag number.

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .  Docket No. CR 98-329

        Government,                .  Washington, D.C.
                      .  March 13, 2001
  vs.                            .  2:20 p.m.

VINCENT HILL,                      .  (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,

        Defendants                 .

. . . . . . . . . . . . . . . . .  .

UNITED STATES OF AMERICA,          .

        Government,                .

                      .  Docket No. CR 99-348
  vs.                            .

GARY PRICE,                        .

        Defendant.                 .

. . . . . . . . . . . . . . . . .

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER



2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

(Page 227 of Total)

App 359

I said, let me think about it. Then he kept on saying, you bull shitting. You ain't trying to get this money.

Q. You ain't -- I'm going to ask you to keep your voice up, Mr. Montgomery.

A. He said, you're bull shitting. You ain't trying to get this money. So I said, would you let me think about it? So he's like, man, you bull shitting. He said, I'm going to let Bird get this money then.

Q. I'm sorry?

A. He said, I'm going to let Bird get this money then.

Q. Mr. Montgomery, I'm going to ask you now about the murder of someone by the name of Tim-Tim or Timothy Benton. Are you familiar with somebody by the name of Tim-Tim?

A. Yes.

Q. And were you a witness to and a participant in the murder of Tim-Tim?

A. Yes.

Q. And directing your attention to the evening of June 22, 1994, were you driving your car in Southeast, D.C.?

A. Yes.

Q. Did you see Tim-Tim?

A. Yes.

Q. Can you tell the ladies and gentlemen what happened? First of all, who Tim-Tim was and what happened when you saw him?

31

A.   Tim-Tim was a person, he was a friend of Poo-Poo's.  I really didn't know him that well.  I had just recently met him.  I was coming through Capers, and he flagged me down and asked me where Poo-Poo was at.  So I told him that I didn't know.

And he asked me was I about to go down to Southwest.  I told him, yeah.  He asked me could I take him down there.  So I told him I'd take him down there, but I wasn't bringing him back.  So he agreed.

Q.   What car are you driving?

A.   My Cadillac.

Q.   What happened?

A.   So when we first came down Southwest, we came through K Street, and Poo-Poo wasn't out there.  So I took him around Second Street.  I was going to drop him off around Second Street.  So we seen Poo-Poo around Second Street in the court.

So when we pulled up, Poo-Poo came over to the car and was talking to Tim-Tim.  So he was saying that something about Tim-Tim been ducking him and this and that and this and that, and told me to pull down in front of where his mother was living at.

Q.   Who told you to pull down?

A.   Poo-Poo.

Q.   What happened?  Did you do that?

A.   Yeah.

32

Q.   What happened at that point?

A.   So Poo-Poo went to -- he said he had to go put his stash up.  To my knowledge, he wanted to put his stash up.  And he got in the back seat and was telling Tim-Tim that he fucked up with him for messing up his money, this and that, this and that.

Q.   Now, let me stop you.  Where are people seated in the car?

A.   I'm driving.

Q.   Okay.  Who is in the front passenger seat?

A.   Tim-Tim.

Q.   Who is in the back seat?

A.   Poo-Poo.

Q.   Now, what is the conversation between Poo-Poo and Tim-Tim once Poo-Poo gets in the car?

A.   Poo-Poo wasn't hollering at him, but he told him that he was mad at him for messing up his money.

Q.   Did he say what he was messing his money up over?

A.   That's all he said was that Tim-Tim messed up his money.

Q.   What happened next?

A.   So Tim-Tim was telling him that if you make another move with him that he wasn't going to mess it up.  So Poo-Poo told him that he'll give him some more coke, but Tim-Tim had to bring him back all the money for them to be back on ground level.

33

Q.    Did Tim-Tim agree to this?

A.    He did agree.  So I told Poo-Poo that I was about to go back around the other side of the house, so he told me to take him -- to drive him to get this coke to give to Tim-Tim right quick.  It wasn't going to take long.  So I agreed, and I took them.

Q.    Where were you at this point?  What part of town?

A.    We were still sitting in front of his mother house.

Q.    Where is this?

A.    On Canal Street.

Q.    Then what happened?

A.    So we -- I'm listening to the directions he's telling me to go.  So we get on M Street, and we come across South Capitol Street Bridge, and then we come down where Barry Farm is at and we're on Martin Luther King Avenue.

Q.    What part of town?

A.    Southeast.

Q.    What happened then?

A.    So we go up Good Hope Road, and then we get on Minnesota Avenue.  So Poo-Poo in the back seat, and he keep like jumping around, acting silly or whatever.  So I'm looking at him in the rearview mirror.

So I'm really not saying nothing.  Tim-Tim not saying nothing.  Poo-Poo really not saying much.  We continued down Minnesota Avenue and we turn on some street that he told me to

34

turn onto.  So I made the left turn on the street.

So I was assuming we was where wherever Poo-Poo said his father lived at or whatever.  So then he told me to make another turn.  So we turned, and he was like slow down right here.  So I slowed down.

Then he shot Tim-Tim in the head.  And when he shot him in the head, I jumped.

Q.   What was the first indication you had that that was happening?

A.   Well, when he shot him, his blood splashed all over the side of my face, and it was warm.  So I wiped it off.  And I looked back at Poo-Poo, and he's sitting with his arms on the seat, and he going like this (indicating).  So I was mad.  I was mad, because he shot him in my car.  So I look at Tim-Tim, and he got blood running down his face, and it's like dripping off his nose.

Q.   Could you see where he had been shot?

A.   No.  I could see the blood running off his nose.

Q.   What did you notice about Tim-Tim's face?

A.   So his eyes was just blinking like he was dazed.  So I was like, damn, you fucked up.  So I said, hit him again.

Q.   You said that to who?

A.   I said it to Poo-Poo.  So I said, hit him again.

Q.   What did Poo-Poo say?

A.   So Poo-Poo shot again, bam, he missed, and he shot my

35

car. I said, damn, man, you shot my mother fucker car. Man, good night.

So he said, push him out. So I leaned over and pushed him out and pulled forward and let his feet fall out. So we was pulling off. So I looked in the rearview mirror and Tim-Tim is lifting up off the ground.

So I said, ho, I said, he's getting up. I busted a U-turn, and I don't know or I'm not sure if I ran him over. But my intent was to run him over with the car. So Poo-Poo got out, and he shot him again in the head and got back in the car.

Q. Did you have any conversation with Poo-Poo when he got back in the car?

A. He got back in the back. He got back in the back seat. So I told him to get up front. So he climbed over the seat and got up front. So then he was like, man, it's a good thing I did killing him, man, because if I would give him some more coke, he was going to kill both of us. You know he had a gun on him.

So I said, did you get his gun? So he was like, no. So I said, why you ain't get his gun? He said, no, that joint probably got bodies on it. But as I say, all of us is we kill somebody, we're going to get their gun. You going to get their gun. So I didn't argue with him or nothing. I didn't say nothing, but in my mind I was thinking that he just trying

36

to say that to make me feel better about him shooting him in my car.

Q.   What did the inside of your car look like?

A.   There was blood specks everywhere.

Q.   What did you do with your car?

A.   So we got back on 295, and I came off the Howard Road exit and came back down, came back across South Capitol Street.  We got back down to Southwest, and we parked in front of Poo-Poo mother live at.  So we seen the uncle, Poo-Poo Uncle Willy.

So Poo-Poo got his uncle to wash my car, wipe the inside of it out, to wash it up.  And me and Poo-Poo walked down to the waterfront to throw the gun away.

Q.   Where did you throw the gun away?

A.   In the river, in the Potomac River.

Q.   What part of the waterfront were you at when you threw it in?

A.   The same part where I threw the .30 carbine.

Q.   That's over by Ft. McNair?

A.   Yeah.

Q.   Mr. Montgomery, I'm going to ask you now about the murder of Chrishauna Gladden.  Did you have a conversation in the summer, late summer of 1996 with Meat about some witnesses?

A.   Yes.

Q.   Can you tell us about that conversation?

37

A.    He came to me one day and said that Pimp was trying to get in contact with me and that he needed me to get on top of some witnesses for him.

Q.    Now, what does that mean to you when you heard that?

THE COURT:  Say it again?

MR. ZEIDENBERG:  The question or the answer, Your Honor?

THE COURT:  His answer.

BY MR. ZEIDENBERG:

Q.    What was it that you recall Meat saying to you?

A.    He came to me and said that Pimp was trying to get in contact with me, and that Pimp needed for me to get on top of some witnesses for him.

Q.    Now, what does that mean to you when he said, you were needed to get on top of some witnesses for Pimp?

A.    It mean that whatever witnesses he have, he want me to get rid of them.

Q.    And when you say, get rid of them, what do you mean?

A.    To kill them.

Q.    How many conversations did you have with Meat about this? Do you remember exactly?

A.    I don't remember exactly how many, but a few.

Q.    And what else did Meat tell you during this first conversation?

A.    He said that Pimp said he going to call me at 907.

58

A.    44.

Q.    M44?

A.    Yes.

Q.    Is that a fair and accurate representation of what the area of 37th Place looked like at the time?

A.    This is 37th.  I'm not sure if it looked like this at that time.

Q.    Okay.  Does that show the building that you were in the night that Chrissy Gladden was killed, is that shown on that photograph?

A.    It shows the row of houses.  I can't see the actual house.

Q.    All right.  Mr. Montgomery, let me ask you about what happened once you are in the house and Big Jim left.  You said you had a conversation with Chin?

A.    Yes.

Q.    What happened next?

A.    Nothing.  They went in the house.

Q.    How long did the girls go in the house?

A.    For maybe an hour or an hour and a half.

Q.    What did you and Chin do for that hour or hour and a half?

A.    Stayed looking out the window.

Q.    What happened after about an hour or an hour and a half?

A.    When they first went in the house it was our assumption

59

that they was in the bedroom downstairs, because no sooner they went in the house a light in the room downstairs -- a light in the room downstairs came on. And we could see people moving around in there, so we assumed that it was them.

After about an hour or hour and a half of waiting the light went out. So I said -- I said, I think they are about to come out, and for sure they came out.

Q.   What happened when they came out?

A.   First Chrissy came out, then Trina came out, and then Rashida came out. So Chin hopped down and put his hood on.

Q.   What was Chin wearing that night?

A.   He had on a blue and white polo sweatshirt, it was a white sweatshirt with a blue hood.

Q.   I'm sorry?

A.   A white sweatshirt with a blue hood on it, and a black leather jacket.

Q.   What type of jacket?

A.   A black leather jacket.

Q.   Okay.

A.   And some blue jeans.

Q.   What happened next?

A.   So when he jumped down, I said, -- I said, you sure you don't want me to do it, because I still wasn't sure.

Q.   You were not sure about what?

A.   I still wasn't sure if he had listened to me when I asked

60

him not to shoot Trina. So he said, no, I got it. He said, just let me know when to go. So I stayed looking out the window, and I waited until I seen Rashida locking the door. That way I knew they wasn't going to be able to run back in the house.

So when I seen her locking the door, as soon as she turned around to walk away from the door, so I said, go, go, go, like that. And he ran out there and had his hand up like this (indicating).

Q. You're indicating he had his arm --

A. His right hand.

Q. In front of his face?

A. Right.

Q. And then what happened?

A. And he bust a few shots in the girl, and Chrissy started screaming -- all of them, all of them started screaming. And Chrissy and Rashida ran back to the door and was bunched up in the door. And I jumped down and ran out the back and met Chin back at the car.

Q. How many shots did you see Chin fire?

A. Maybe once or twice.

THE COURT: I'm sorry?

THE WITNESS: Maybe once or twice.

BY MR. ZEIDENBERG:

Q. Did you stick around to see him finish or did you leave

61

before it was all over?

A.   I left before it was over.

Q.   Where did you run?

A.   Back to the car.

Q.   What route did you take?

A.   The same route we took to get there.

Q.   Back out the back door?

A.   Right.  And through those fences.

Q.   What happened when you got back to the car?

A.   Right after I got there Chin was -- Chin was right on my heels, he was right there.

Q.   What happened once he got back to the car?

A.   Chin was driving, I was in the passenger's seat.  And I still had my scanner on, my police scanner.

Q.   Where was the scanner while you were inside the house?

A.   I had it in my ear.  I had an ear plug in my ear.

Q.   And once you got into the car and started going where did you go?

A.   We left out and we went up Ridge Road.  We went going -- I guess that's east or north up Ridge Road.

Q.   Where did you go once you got up Ridge Road?

A.   Made a right onto I think that's Alabama Avenue, I believe that's Alabama Avenue, and we went down to Pennsylvania Avenue, and then came straight over down Pennsylvania Avenue and got on 295.

62

Q.   Where did you go from there?

A.   We came off the Howard Road exit and came back across South Capitol Street Bridge.

Q.   What did you do once you got off the South Capitol Street Bridge?

A.   We went -- we parked the Caddy behind Chin mother building, and then we walked down the waterfront and threw the gun away.

Q.   Who threw the gun away?

A.   I don't remember if I threw it away or Chin threw it away.

Q.   Were you together?

A.   Yeah.  It's either I threw the gun away and he threw the clip away or vice-versa.

Q.   What happened after you threw the gun in the river?

A.   We was walking back down to our neighborhood.  So I asked Chin did he want to go get Robin.

THE COURT:  Did he want to do what?

THE WITNESS:  Did he feel like going to get Robin. So he said, do you want to?  So I said, it don't matter to me, I don't give a fuck, like that.  So he said, I don't got not more iron.  So I said, take me to get mine.  So I went to get my .30 carbine, the gun that you showed earlier.

BY MR. ZEIDENBERG:

Q.   Where did you get it from?

63

A.    From over this girl's house that I was messing with at the time.

Q.    Did you get the gun?

A.    Yeah.

Q.    What happened after you got the gun?

A.    So we went around Wheeler Road.  So I was strapped and he wasn't strapped.

Q.    Why were you going to Wheeler Road?

A.    To try to catch Robin so we can kill her.

Q.    What happened when you got to Wheeler Road?

A.    When we got there we didn't see her car there, so we went and parked.  And I still had the scanner in my ear, my police scanner, I still had it on.  So we went into -- we got in some bushes whereas so we could see when she pulled up, we got in some bushes.  So we stayed right there for a while.  We stayed right there for probably about an hour.

On my police scanner I kept on hearing the police was nearby, they was like a couple of streets over.  So I told -- I told Chin that it sounded like -- I took the plug out so he can hear it.  I didn't want him to think I was faking, so I let him hear it.  I let him hear the police thing come across the scanner.  And I told him that the police was in the area, and let him hear it.  So he asked me did I want to leave.  So I said, it would probably be the safest thing to do for right now.  So we left.

64

Q.   When Chin ran back to the car initially after you left the house, did you have any conversation with him while you were driving back to the waterfront?

A.   When we was going up Ridge Road, right after we left, -- before any of this even took place he -- Chin used to always keep on saying that the scanner was fake, and this and that, it don't pick up shit, and all this stuff.  So after when -- after we killed Chrissy -- so we was going up Ridge Road -- so I took the ear plug out and turned the scanner up so he can hear the call, so he can hear the call for gunshots going across -- coming out on the radio.  So I turned down the radio in the car -- so I said, do you hear that, do you hear that shit, I said, you talking about this joint don't work, do you hear that, like that.  And then he rubbed me on my head like that, like I was a little boy, way to be there Bama, like that.  He just said, way to be there Bama, like that.

Q.   Mr. Montgomery, when you were at the window, before you ran out the back of the house, did you see who it was Chin was running up to, which of the three women?

A.   If she was in this room right now today I don't know how she looks.

Q.   But you said there were three women that you did know -- I mean, there were two women -- there were three women altogether, correct?

A.   Right.

65

Q.    And you knew two of them?

A.    Right.

Q.    Who were the two you knew?

A.    Rashida and Trina.

Q.    The person that Chin ran up to was it Trina?

A.    No.

Q.    Was it Rashida?

A.    No.

Q.    Was it the person that Big Jim had identified as Chrissy?

A.    Yes.

Q.    What did you see Chrissy do when Chin ran up to her?

A.    She was screaming.

Q.    After she screamed what happened?

A.    She fell.

Q.    After Chrissy fell did you see what Chin did?

A.    No.

Q.    Is that when you ran out?

A.    Yes.

        MR. ZEIDENBERG:  Your Honor, this might be a good time to break for the day.

        THE COURT:  Very well.  We will recess for the day, ladies and gentlemen, and reconvene tomorrow morning at 10:00.

        (Jury out.)

        (Whereupon, the hearing was adjourned at 4:20 p.m.)

                    - - - - - -

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
            GOVERNMENT,              :

                                     :

 VS.                                 :        CR. NO. 98-329

                                     :

VINCENT HILL,                        :
JEROME MARTIN,                       :
SAMUEL CARSON,                       :
WILLIAM K. SWEENEY,                  :
SEAN COATES,                         :
            DEFENDANTS.              :

                                     :

UNITED STATES                        :
            GOVERNMENT,              :

                                     :

    VS.                              :        CR. NO. 99-348

                                     :

GARY PRICE,                          :
            DEFENDANT                :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MARCH 14, 2001
(MORNING SESSION)
(10:20 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

2

```
FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                ANJALI CHATURVEDI, AUSA
                                555 4TH ST., N.W.
                                WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
                                601 INDIANA AVE., N.W.
                                #910
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                305 H STREET, N.W.
                                2ND FLOOR
                                WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                LEXI NEGIN-CHRIST, ESQ.
                                419 7TH STREET, N.W.
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
                                717 D STREET, N.W.
                                SUITE 400
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
                                901 6TH STREET, S.W.
                                #409
                                WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                601 INDIANA AVE., N.W.
                                #901
                                WASHINGTON, D. C.  20004
```

(Page 245 of Total)

14

A. (INDICATING.)

Q. OKAY. SO IT'S BEFORE YOU GET TO THE SIDEWALK WHICH RUNS IN BETWEEN THE TWO SETS OF BUILDINGS?

A. YES.

Q. AND THE WOMAN THAT YOU BELIEVED TO HAVE BEEN CHRISSY, MR. MONTGOMERY -- WHERE WAS SHE THE LAST TIME YOU SAW HER?

A. IN THE YARD.

Q. OKAY. WHERE WAS SHE -- IF YOU COULD JUST INDICATE AGAIN WITH THE POINTER. LET ME ERASE THE MARK YOU HAVE THERE. AS NEARLY AS YOU CAN REMEMBER, WHERE WAS CHRISSY THE LAST TIME YOU SAW HER ALIVE?

A. COMING OUT OF -- COMING OUT -- WALKING TOWARDS THE EXIT TO COME OUT OF THE YARD.

Q. TO THE SIDEWALK?

A. RIGHT.

Q. MR. MONTGOMERY, I'D LIKE TO ASK YOU SOME QUESTIONS NOW ABOUT A TRIPLE MURDER WHICH OCCURRED IN TEMPLE HILLS, MARYLAND ON NOVEMBER 17, 1996. WERE YOU PRESENT WHEN THOSE MURDERS TOOK PLACE?

A. YES.

Q. AND HAVE YOU PLED GUILTY TO PARTICIPATING IN THOSE MURDERS?

A. YES.

Q. I'D LIKE TO TALK TO YOU ABOUT THOSE MURDERS AND THE EVENTS THAT LED UP TO THEM AT THIS TIME.

NOW, SOMETIME PRIOR TO THESE MURDERS, WAS THERE -- DID YOU HAVE A CONVERSATION WITH ANY OF YOUR CO-DEFENDANTS OR YOUR FORMER -- ANY OF THE DEFENDANTS IN THIS CASE ABOUT ATTENDING A FIGHT IN LAS VEGAS?

A. ME AND "CHIN".

Q. CAN YOU TELL US ABOUT THAT CONVERSATION -- WHAT YOU REMEMBER OF IT?

A. BASICALLY, HE ASKED ME WAS I GOING TO THE FIGHT.

Q. WHAT FIGHT WAS IT?

A. HOLYFIELD-TYSON. HOLYFIELD-TYSON ONE.

Q. AND DO YOU RECALL WHERE THAT FIGHT WAS GOING TO BE HELD?

A. LAS VEGAS.

Q. DID "CHIN" TELL YOU WHO WAS GOING TO BE GOING TO THE FIGHT?

A. I DON'T KNOW IF HE TOLD ME AT THAT PARTICULAR TIME.

Q. AT SOME POINT, DID HE?

A. YES.

Q. WHO DID HE SAY WAS GOING TO GO?

A. THAT HIM AND "DRAPER" WAS GOING, AND THAT IF I WAS GOING, THAT I NEEDED TO GIVE "DRAPER" MY -- GIVE HIM MY MONEY OR EITHER GIVE THE MONEY TO "DRAPER" SO THAT "DRAPER" COULD GIVE IT TO SOMEBODY HE KNEW -- A TRAVEL AGENT OR SOMETHING, SO THEY COULD BOOK MY RESERVATIONS.

Q. DID YOU GO TO THE FIGHT?

A. NO.

16

Q.   WHY NOT?

A.   MY FINANCIAL STATUS WAS MESSED UP.

Q.   WHAT DO YOU MEAN BY THAT?

A.   I DIDN'T HAVE THAT MUCH MONEY.

Q.   NOW, DID YOU HAVE A CONVERSATION WITH "CHIN" AFTER THE FIGHT -- AFTER HE GOT BACK FROM THE FIGHT?

A.   YES.

Q.   WHAT DID HE TELL YOU ABOUT HIS TRIP?

A.   BASICALLY, WHEN WE FIRST SPOKE ABOUT IT, HE WAS JUST TELLING ME HOW THE GIRLS WAS UP THERE AND STUFF LIKE THAT. THAT THEY HAD A NICE TIME.  IT WAS REAL NICE.  HE SAID THAT HIM, "DRAPER" AND -- "CHIN," "DRAPER" AND BAM AND "GOOCH" HUNG TOGETHER MOST OF THE TIME THEY WAS UP THERE.  AND HE SAID THAT THE DUDE, "LONNIE," HAD WON LIKE $50,000.00. LONNIE -- HE SAID HE HAD WON LIKE $50,000.00 WHILE HE WAS UP THERE.

Q.   DID YOU KNOW THE NAME "LONNIE?"

A.   NO.

Q.   WHAT DID "CHIN" TELL YOU ABOUT "LONNIE" AND WHO HE WAS?

A.   "CHIN" SAID THAT "DRAPER" TOLD HIM THAT "LONNIE" WAS WORTH LIKE A HALF A MILLION OR BETTER.

Q.   WHERE WAS "LONNIE" FROM?

A.   I DON'T KNOW.

Q.   DID "CHIN" AT SOME POINT TELL YOU WHERE HE LIVED?

A.   IT HAD LATER BEEN DISCUSSED.  I DON'T KNOW IF "DRAPER"

SAID IT OR "CHIN" SAID IT, BUT --

Q. WHERE DID THEY TELL YOU HE LIVED OR HE WAS FROM?

A. TEMPLE HILLS.  THAT HE HAD A CRAP HOUSE OUT THERE.

Q. I AM SORRY?

A. THAT HE HAD A CRAP HOUSE OUT IN TEMPLE HILLS.

Q. WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" AND "DRAPER" ABOUT ROBBING "LONNIE"?

A. YES.

Q. CAN YOU TELL THE LADIES AND GENTLEMEN ABOUT THAT?

A. FIRST, "CHIN" HAD TOLD ME THAT "DRAPER" HAD A MOVE LINED UP WITH THE DUDE, "LONNIE", THAT HE HAD ALREADY TOLD ME ABOUT.  IT'S THE SAME DUDE THAT HE WAS SAYING WON THE $50,000.00.  SO WHEN HE WAS TELLING ME THAT "DRAPER" HAD THE MOVE LINED UP, I ASKED HIM WAS I WITH IT.  AND HE SAID "YES."  BUT HE TOLD ME, "DON'T TELL `BIRD' ABOUT IT."

Q. DID "CHIN" SAY WHY NOT TO TELL "BIRD" ABOUT IT?

A. BECAUSE "BIRD" DON'T EVER WANT TO DO NOTHING.  WHENEVER THINGS HAPPEN, "BIRD" DON'T EVER WANT TO DO NOTHING.  HE JUST ALWAYS WANTS TO BE THE DRIVER.

Q. WHAT ELSE DID "CHIN" TELL YOU ABOUT IT?

A. I MEAN, AT THAT PARTICULAR TIME, I BELIEVE THAT WAS ALL THAT PARTICULAR CONVERSATION WAS.

Q. DID "CHIN" TELL YOU HOW MUCH MONEY HE HOPED TO MAKE OUT OF THIS MOVE?

A. NOT AT THAT PARTICULAR TIME.

Q. AT SOME POINT LATER, DID HE?

A. YES. WHEN WE FURTHER DISCUSSED ROBBING "LONNIE".

Q. WHAT DID "CHIN" TELL YOU ABOUT THAT?

A. I AM NOT SURE WHO GAVE THE MOST INSIGHT AS FAR AS ABOUT THE DUDE "LONNIE" OR WHATEVER. I DON'T KNOW "LONNIE". I NEVER KNEW HIM. IF I SEEN HIM TODAY, I WOULDN'T KNOW WHO HE WAS. BUT I KNOW MORE OR LESS THE CONVERSATION CONSISTED OF THAT "LONNIE" WAS A BITCH ASS NIGGER, THAT HE WAS SOFT, THIS AND THAT, AND THAT WE COULD ROB HIM AND WE DIDN'T HAVE TO KILL HIM. AND THAT IF WE EVER GET LOW ON MONEY AGAIN, WE COULD SNATCH HIM AGAIN.

Q. IF YOU EVER WHAT?

A. IF WE EVER GET LOW ON MONEY AGAIN, THAT WE WOULD BE ABLE TO SNATCH HIM AGAIN.

Q. WAS THERE AN AMOUNT OF MONEY DISCUSSED ABOUT HOW MUCH YOU WERE HOPING TO GET FROM THIS?

A. 250,000.00.

Q. WHO HAD THAT FIGURE?

A. "CHIN"

Q. DID "CHIN" SAY HOW THE MONEY WOULD BE DIVIDED?

A. THAT WE WOULD GET $83,000.00 APIECE.

Q. SPLIT BETWEEN WHOM?

A. ME, "CHIN" AND "DRAPER".

Q. NOW, AT THIS TIME IN NOVEMBER OF 1996, WHAT WAS YOUR FINANCIAL SITUATION LIKE?

A.   MESSED UP.

Q.   HOW SO?

A.   WELL, MY HUSTLING WEED HAD SLOWED DOWN A LOT.  SO I MEAN, MORE OR LESS, I WAS JUST HUSTLING DAY-TO-DAY.

Q.   WHAT WAS THE PROBLEM WITH HUSTLING OUT IN SOUTHWEST AT THIS POINT, IF ANYTHING?

A.   I WAS SELLING DIME BAGS OF WEED THEN.  SO IT TOOK LONGER TO MAKE A NICE AMOUNT OF MONEY, AND TENSION WAS RUNNING HIGH BECAUSE WE WERE "BEEFING" WITH L STREET.

Q.   AND WHAT ABOUT THE FACT THAT YOU WERE "BEEFING" WITH L STREET?  HOW DID THAT AFFECT SELLING MARIJUANA OUT THERE?

A.   BECAUSE YOU HAVE TO BE CAUTIOUS AS TO WHO YOU SERVE OR WHO YOU LET WALK UP ON YOU.  YOU HAVE TO PRETTY MUCH TRY TO JUST STAY ON POINT AND TRY NOT TO LET NOBODY, YOU KNOW, GET UP ON YOU THAT COULD SHOOT YOU OR WHATEVER.

Q.   WHAT WERE YOU GOING TO DO WITH THIS MONEY?

A.   WE WERE GOING TO GET SOME MORE GUNS SO WE CAN GO BACK SO WE CAN GET AT "WOOZIE" AND THEM -- SO WE COULD KILL "WOOZIE" AND THEM.

Q.   WHAT WAS THE SITUATION WITH GUNS AT THIS POINT, AS FAR AS YOUR GROUP WAS CONCERNED?

A.   WE DIDN'T HAVE ANY.

Q.   WHAT HAPPENED TO THEM ALL?

A.   I MEAN I HAD A FEW GUNS, BUT AT THAT PARTICULAR TIME, I DIDN'T HAVE THEM ANY MORE.

Q. WHAT HAD HAPPENED TO THEM?

A. I HAD A S.K.S. AND THE GUY I GOT IT FROM WANTED -- I HAD A S.K.S., AN ASSAULT RIFLE, AND THE GUY THAT I GOT IT FROM WANTED IT BACK. SO I HAD TO GIVE IT BACK TO HIM. AND THEN I HAD A MACHINE GUN. I DON'T KNOW WHAT PARTICULAR KIND IT WAS, BUT IN ONE INSTANCE I SHOT AT "WOOZIE" AND THEM, AND THE GUN KEPT JAMMING. I HAD CLEANED IT AND OILED IT, AND IT JUST KEPT JAMMING. SO I GOT RID OF IT. I GAVE IT BACK TO THE DUDE THAT I GOT IT FROM AND GOT MY MONEY BACK.

Q. AS FAR AS YOU KNOW, WHAT DID "CHIN" TELL YOU ABOUT WHETHER OR NOT HE HAD A GUN IN THAT TIMEFRAME?

A. WHAT TIMEFRAME ARE YOU TALKING ABOUT?

Q. WE'RE TALKING ABOUT NOVEMBER OF '96.

A. DURING THE TIME WE WERE IN THE DISCUSSION TALKING ABOUT ROBBING "LONNIE"?

Q. YES.

A. NO, WE DIDN'T HAVE A GUN.

Q. DID HE HAVE A GUN?

A. NO.

Q. WHAT ABOUT "DRAPER"?

A. NONE OF US HAD GUNS.

Q. OKAY. WAS THERE A DISCUSSION BETWEEN YOU AND "CHIN" ABOUT INVESTING SOME OF THE PROCEEDS YOU HOPED TO GET FROM THIS ROBBERY?

A. YES.

(Page 252 of Total)

A.  "CHIN" IS DRIVING, "DRAPER" IS IN THE PASSENGER'S SEAT, AND I AM SITTING IN THE BACK

Q.  WHAT HAPPENED WHEN YOU GOT TO TEMPLE HILLS?

A.  WE PARKED -- WE PARKED ON THE SAME STREET, BUT AT THE TOP OF -- THE TOP END OF THE CORNER OF WHERE THE HOUSE WAS AT.

Q.  NOW, IF I COULD HAVE A25.

CAN YOU TURN OFF THE JURY'S MONITOR.

CAN YOU SEE THAT, MR. MONTGOMERY, ON YOUR SCREEN?

A.  I CAN SEE IT, BUT NOT REAL CLEAR.

Q.  ALL RIGHT.  HAVE YOU HAD AN OPPORTUNITY TO LOOK AT -- IN FACT, I HAVE A --

MAY I APPROACH, YOUR HONOR?

THE COURT:  SURELY.

BY MR. ZEIDENBERG:

Q.  I AM SHOWING YOU WHAT'S BEEN MARKED A25, A HARD COPY OF THAT PHOTOGRAPH.  DO YOU RECOGNIZE THAT?

A.  YES.

Q.  IS THAT THE AREA IN TEMPLE HILLS, MARYLAND THAT YOU WENT OUT TO ON NOVEMBER 17, 1996?

A.  YES.

Q.  AND DOES THAT APPEAR TO BE A FAIR AND ACCURATE AERIAL PHOTOGRAPH OF THAT AREA?

A.  YES.

MR. ZEIDENBERG:  YOUR HONOR, I MOVE TO INTRODUCE

GOVERNMENT'S EXHIBIT A25.

THE COURT:  GOVERNMENT'S EXHIBIT A25 IS ADMITTED.

(WHEREUPON, GOVERNMENT'S

**EXHIBIT NUMBER A25** WAS

RECEIVED IN EVIDENCE.)

MR. ZEIDENBERG:  AGENT LISI, I'D ASK IF YOU COULD FOCUS IN ON 25TH AVENUE, KEEPING A PORTION OF 25TH AVENUE BOTH ON IVERSON STREET AND IT LOOKS LIKE THE STREET OPPOSITE OR PARALLEL TO IVERSON.

THANK YOU.

BY MR. ZEIDENBERG:

Q.  ALL RIGHT, MR. MONTGOMERY.  CAN YOU SEE THAT ON YOUR SCREEN NOW?

A.  YES.

Q.  ALL RIGHT.  THE STREET WHERE -- THE LOCATION YOU WERE LOOKING FOR -- WHAT TYPE OF RESIDENCE OR LOCATION WAS IT? WHAT DO YOU UNDERSTAND TOOK PLACE AT THAT HOUSE?

A.  THEY GAMBLE IN THERE.  IT WAS A CRAP HOUSE.

Q.  OKAY.  AND DO YOU SEE THE LOCATION OF WHERE THAT CRAP HOUSE WAS LOCATED ON 25TH AVENUE IN THAT PICTURE?

A.  I SEE IT.  YES.

Q.  OKAY.  USING THE PEN -- THE LIGHT PEN NEXT TO YOUR MONITOR, CAN YOU PUT AN ARROW, THE BEST YOU CAN RECALL, WHERE THAT LOCATION IS?

A.  (DOING AS DIRECTED.)

31

Q. AND IF YOU JUST TOUCH IT AGAINST THE SCREEN -- YOU HAVE LEFT AN ARROW. IS THAT THE APPROXIMATE LOCATION?

A. YES.

Q. AND, FOR THE RECORD, YOU'RE INDICATING A RESIDENCE THAT'S LOCATED IN THE MIDDLE OF 25TH AVENUE; IS THAT CORRECT?

A. YES.

Q. NOW, WHEN YOU FIRST CAME UP TO TEMPLE HILLS THAT NIGHT, WHERE EXACTLY DID YOU, "CHIN" AND "DRAPER" GO? WHERE DID YOU PARK THE CAR?

A. (INDICATING.)

Q. OKAY. AND YOU'RE INDICATING ON THE CORNER OF -- WELL, YOU WERE ON 25TH AVENUE; IS THAT CORRECT?

A. YES.

Q. YOU WERE ON THE SAME SIDE OF THE STREET AS WHERE THE CRAP HOUSE WAS LOCATED?

A. RIGHT.

Q. AND I TAKE IT YOU WERE POINTING TOWARDS IVERSON STREET?

A. RIGHT. YES.

Q. NOW, WHEN YOU GOT THERE, WHAT HAPPENED? WHAT DID YOU DO?

A. WE SAT THERE FOR A WHILE. AND THEN "CHIN" HAD DECIDED THAT IT WAS A BAD SPOT SITTING RIGHT THERE. SO WE LEFT. WE LEFT FROM RIGHT THERE. WE RODE AROUND. WE WENT PAST WHERE HIS BARBER SHOP WAS AT. IT WAS CLOSED. IT WAS ALREADY

32

CLOSED.  WE WENT TO WENDY'S AND GOT SOMETHING TO EAT.  WE CAME BACK.  THEN WE PARKED OVER HERE.  (INDICATING.)

Q.  NOW, YOU'RE INDICATING 25TH AVENUE ON THE OTHER SIDE OF COLEBROOK ROAD?

A. YES.

Q.  OR COLEBROOK DRIVE.  YOU'RE STILL ON THE SAME SIDE OF THE STREET AS WHERE THE CRAP HOUSE IS LOCATED?

A.  YES.

Q.  NOW, AT SOME POINT DID YOU GO BACK TO YOUR HOUSE?

A.  YES.

Q.  AND I SAY "YOUR HOUSE."  THAT WOULD BE YOUR MOTHER'S HOUSE?

A.  RIGHT.

Q.  DID SHE LIVE NEARBY THERE?

A.  ONE BLOCK OVER.

Q.  WHAT STREET DID SHE LIVE ON AT THE TIME?

A. 26TH AVENUE.

Q.  WHY DID YOU GO TO YOUR HOUSE?

A.  WE HAD CUT THE ENGINE OFF IN THE VAN.  SO WE WENT IN MY MOTHER'S HOUSE AND DRUNK SOME TEA AND HOT CHOCOLATE.

Q.  HOW LONG WERE YOU AT YOUR MOTHER'S HOUSE, WOULD YOU ESTIMATE?

A.  BETWEEN 15 AND 30 MINUTES.

Q.  DID YOU STAY THERE OR DID YOU LEAVE?

A.  WE LEFT BACK OUT.

(Page 256 of Total)

Q.  WHERE DID YOU GO?

A.  WE CAME BACK -- WE CAME BACK AND DROVE -- WE DROVE -- WE DROVE IN THE BACK ON THE PARKING LOT TO SEE IF WE SEE ANY CAR THAT "LONNIE" MIGHT BE DRIVING BECAUSE "DRAPER" WAS SAYING THAT HE DIDN'T SEE "LONNIE" -- I GUESS WHATEVER CAR "LONNIE" NORMALLY DRIVES, HE DIDN'T SEE IT.

Q.  NOW, WHAT PARKING LOT ARE YOU REFERRING TO?

A.  THE PARKING LOT BEHIND "LONNIE'S HOUSE -- BEHIND THE CRAP HOUSE.

Q.  IS THAT SHOWN HERE IN THIS PICTURE?

A.  YES.

Q.  OKAY.  THAT WOULD BE WHAT LOOKS LIKE A PARKING LOT RIGHT BEHIND WHERE THE CRAP HOUSE IS LOCATED?

A.  RIGHT.

Q.  WHAT HAPPENED THEN?

A.  WE CAME FROM BEHIND THERE.  WE MADE A RIGHT COMING OUT OF THERE AND RODE BACK DOWN TOWARDS WHERE IVERSON STREET IS AT.

Q.  AND WENT WHERE?

A.  AND WE WAS LOOKING ON THAT STREET TO SEE -- SO WE COULD SEE IF LONNIE'S CAR WAS OUT THERE.

Q.  DID YOU SPOT LONNIE'S CAR AT THAT POINT?

A.  NO.

Q.  WHERE DID YOU GO THEN?

A.  SO WE WENT AND GOT "BIRD."

Q. WHERE DO YOU GO TO GET "BIRD"?

A. KENNILWORTH.

Q. TELL US ABOUT THAT.

A. BEFORE WE WENT AND GOT HIM, "DRAPER" CALLED HIM ON HIS CELLPHONE TO MAKE SURE HE WAS THERE TO LET HIM KNOW WE WERE ABOUT TO COME AND PICK HIM UP.

Q. AT THIS POINT, HAD "BIRD" BEEN TOLD WHAT WAS GOING TO HAPPEN THAT NIGHT?

A. NO.

Q. WHAT HAD CHANGED?  WHY DID YOU MAKE A DECISION TO GET "BIRD"?

A. BECAUSE WE DIDN'T KNOW IF "LONNIE" WAS IN THE HOUSE, AND WE DIDN'T KNOW HOW MANY PEOPLE WAS IN THE HOUSE, IF, INDEED, "LONNIE" WAS IN THERE.

Q. HOW WAS "BIRD" GOING TO HELP YOU WITH THAT?

A. BECAUSE THEY SAID THAT "BIRD" GO THERE SOMETIMES AND GAMBLE AND THAT "BIRD" AND "LONNIE" WAS COOL AND THAT "LONNIE" BE GIVING "BIRD" TABLE SCRAPS -- LIKE GIVING HIM TWO OR THREE HUNDRED DOLLARS.  THEY SAID THAT LONNIE USED TO GIVE "BIRD" TABLE SCRAPS -- LIKE GIVE HIM TWO OR THREE HUNDRED DOLLARS FOR NOTHING.

Q. AND WHY WAS IT HELPFUL, IN YOUR UNDERSTANDING, TO HAVE "BIRD" ALONG IF HE WAS COOL WITH "LONNIE"?

A. SO THAT "BIRD" COULD GO IN TO SEE HOW MANY PEOPLE WAS IN THE HOUSE OR TO SEE IF "LONNIE" WAS IN THERE.

(Page 258 of Total)

A.   THE LIVING ROOM.

Q.   WHAT HAPPENED NEXT?  DID YOU SEE WHERE "DRAPER" WAS AT THIS POINT?

A.   NOT FULLY.  I SEEN HIM.  HE WAS TO MY LEFT, BUT I DIDN'T SEE WHAT EXACTLY HE WAS DOING.

Q.   WHO DID HE HAVE?

A.   HE HAD THE OTHER GUY, "LONNIE".

Q.   WHAT HAPPENED NEXT?

A.   SO DARNELL MACK WAS -- HE SAID, "I AIN'T EVEN LOOKING AT YOU."  HE SAID, "I AIN'T TRYING TO SEE YOUR FACE."

          I WASN'T WORRIED ABOUT HIM SEEING MY FACE ANYWAY BECAUSE HE HAD THE MASKS ON," BUT I TRIED TO LIFT UP HIS -- I WAS IN THE PROCESS OF LIFTING UP HIS JACKET SO I COULD SHOCK HIM WITH THE STUN GUN.  AND THEN --

          MR. KIERSH:  YOUR HONOR, I WAS NOT ABLE TO UNDERSTAND THE LAST RESPONSE OF THE WITNESS.

          THE COURT:  HE WAS LIFTING UP HIS JACKET SO HE COULD STUN HIM WITH THE STUN GUN.

          MR. KIERSH:  OKAY.

          THE WITNESS:  SO THEN "DRAPER" STARTED SHOOTING -- STARTED BUSTING.  I DIDN'T KNOW WHY.  SO I MEAN I WAS LIKE -- WHEN THE SHOTS FIRST HAPPENED, I WAS KIND OF LIKE AWESTRUCK AS TO WHY HE WOULD SHOOT "LONNIE" WHEN THAT'S THE ONE WE WANT.  THEN HE CAME -- HE HIT -- HE SHOT DARNELL MACK.

(Page 259 of Total)

52

AND I MEAN I WAS RIGHT -- WE WAS CLOSE.  AND THE GUNPOWDER RESIDUE HAD GOT UP MY NOSE.  SO I WAS LIKE -- (SNIFFING) -- DOING LIKE THAT TO CLEAR MY SINUSES UP.  THEN HE SHOT "LONNIE" SOME MORE.  AND THEN HE SHOT DARNELL MACK SOME MORE AND THEN RAN OUT THE DOOR.  SO I WAS STILL STANDING RIGHT THERE DOING LIKE THIS -- (INDICATING) -- CLEARING MY SINUSES.  THEN I RAN OUT.  I RAN OUT THE DOOR AS WELL.

Q.  WHO RAN OUT THE DOOR FIRST?

A.  "DRAPER" DID.

Q.  DID THE DOOR ACTUALLY CLOSE BEFORE YOU WENT OUT?

A.  YES.

Q.  WHAT TYPE OF DOOR ARE WE TALKING ABOUT?

A.  A SCREEN DOOR.

Q.  DID YOU OPEN THE SCREEN DOOR?

A.  I PUSHED IT OPEN WITH MY THUMB.

Q.  WHAT HAPPENED OR WHAT DID YOU SEE ONCE YOU GOT TO THE DOOR?

A.  I WAS COMING OUT BASICALLY LIKE RIGHT -- PRETTY MUCH RIGHT AFTER HIM.  AND HE SHOT WHILE WE WERE OUTSIDE, BUT I DIDN'T SEE HIM ACTUALLY SHOOT THE GIRL, BUT HE DID SHOOT WHEN WE WAS OUTSIDE WHEN I WAS COMING OUT.

Q.  HOW MANY GUNSHOTS DID YOU HEAR AS YOU WERE GOING OUT?

A.  WELL, WE WERE RUNNING ACROSS THE LAWN -- THE GRASS.  AND HE SHOT BACK.  AND I JUMPED.  I JUMPED WHILE I WAS RUNNING

(Page 260 of Total)

BECAUSE HE ALMOST SHOT ME.  HE WAS SHOOTING BACK WHILE HE WAS RUNNING.  AND I WAS THINKING THAT HE ALMOST SHOT ME.  SO JUST, OUT OF INSTINCT, I JUMPED.

Q.  WHEN YOU RAN OUT THE DOOR, DID YOU SEE ANYONE LAYING IN YOUR PATH?

A.  WHEN I CAME OUT, I HAD TO JUMP ACROSS THE GIRL.  SHE WAS LAYING ON THE PORCH.

Q.  WHERE DID YOU GO ONCE YOU JUMPED OVER THE GIRL ON THE PORCH?

A.  I RAN BACK TO THE VAN.

Q.  WHO GOT INTO THE VAN FIRST?

A.  "DRAPER" DID.

Q.  AND THEN?

A.  AND THEN ME.

        MR. ZEIDENBERG:  WOULD YOU TURN OFF THE JURY'S MONITOR.

        THE COURT:  WOULD THIS BE AN APPROPRIATE TIME FOR A RECESS?

        MR. ZEIDENBERG:  THAT WOULD BE FINE, YOUR HONOR.

        THE COURT:  ALL RIGHT.  TEN MINUTES, LADIES AND GENTLEMEN.

        (RECESS WAS TAKEN.)

        (JURY OUT.)

YOUNG WOMAN?

A. YES.

THE COURT: WHO SHOT DARNELL MACK?

THE WITNESS: "DRAPER"

THE COURT: ALL RIGHT. YOU HAD ONLY A STUN GUN; IS THAT RIGHT?

THE WITNESS: YES.

THE COURT: ALL RIGHT.

BY MR. ZEIDENBERG:

Q. AND JUST SO IT'S CLEAR, WHO SHOT "LONNIE" GASKINS?

A. "DRAPER."

Q. WHAT WERE YOU DOING AT THE TIME "DRAPER" SHOT GASKINS AND MACK?

A. TRYING TO CLEAR MY SINUSES AT FIRST. I MEAN HE SHOT THE GUY WITH THE BLUE JACKET, "LONNIE," FIRST. AND THEN WHEN HE SHOT DARNELL MACK -- WHEN HE FIRST SHOT "LONNIE," I LOOKED BECAUSE I HAD JUMPED WHEN I FIRST HEARD THE GUNSHOT. I JUMPED FROM THE BLAST. AND THEN HE SHOT DARNELL MACK. AND THE GUN WAS CLOSE TO MY FACE, SO THE GUNPOWDER RESIDUE OR WHATEVER HAD GOT INTO MY SINUSES. I WAS DOING LIKE THAT TO CLEAR MY SINUSES. (INDICATING.)

Q. THEN YOU SAID HE WENT BACK AND SHOT GASKINS?

A. HE WENT BACK AND SHOT "LONNIE", AND THEN SHOT DARNELL MACK AGAIN.

Q. NOW, WHEN YOU WERE LEAVING THE HOUSE, YOU SAID YOU

(Page 262 of Total)

STEPPED OVER A WOMAN?

A.  YES.

Q.  AND IF WE COULD TURN OFF THE JURY'S MONITOR, MR. WEST.

I WOULD LIKE TO SHOW YOU WHAT'S MARKED PG102 AND PG103.  HAVE YOU HAD AN OPPORTUNITY TO LOOK AT THOSE PHOTOGRAPHS TODAY AND ALSO PRIOR TO THIS MORNING?

A.  YES.

Q.  AND ARE THEY FAIR AND ACCURATE REPRESENTATIONS OF WHAT THE SCENE LOOKED LIKE AS YOU WERE LEAVING THE HOUSE THAT DAY?

A.  YES.

MR. ZEIDENBERG:  YOUR HONOR, I MOVE TO INTRODUCE PG102 AND 103 AND ASK TO PUBLISH THEM TO THE JURY, STARTING WITH PG102.

THE COURT:  AND THAT'S 103?

MR. ZEIDENBERG:  THE ONE THAT IS ON THE MONITOR RIGHT NOW IS 102, YOUR HONOR, AND THE CLOSE-UP IS 103.

THE COURT:  ALL RIGHT.

YOU HAVE SEEN THEM BOTH?

THE WITNESS:  YES.

THE COURT:  ARE THEY BOTH FAIR AND ACCURATE?

THE WITNESS:  YES.

THE COURT:  GOVERNMENT'S EXHIBITS PG102 AND 103 ARE ADMITTED.





1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,    .  Docket No. CR 98-329

        Government,    .  Washington, D.C.
                        .  March 14, 2001
  vs.               .  2:20 p.m.

VINCENT HILL,          .  (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,

        Defendants

. . . . . . . . . . . . . . .

UNITED STATES OF AMERICA,

        Government,

                        .  Docket No. CR 99-348
  vs.

GARY PRICE,

        Defendant.

. . . . . . . . . . . . . . .

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:      PETER ZEIDENBERG, AUSA
                        ANJALI CHATURVEDI, AUSA
                        U.S. Attorney's Office
                        555 Fourth Street, N.W.
                        Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                        601 Indiana Avenue, N.W.
                        Suite 910
                        Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                        305 H Street, N.W.
                        Second Floor
                        Washington, D.C.  20001

2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

8

(End of bench conference.)

THE COURT:  The objection is overruled.  You may proceed.

BY MR. ZEIDENBERG:

Q.   What did Chin tell you about his conversation with Draper?

A.   He said that when he went to see Draper, he specifically asked him, who did he tell about the murder that happened out in Temple Hill.  He said that Draper told him the only person he told was Butchie, his cousin.

Q.   And did you know who Butchie was?

A.   Yes.

Q.   Who --

A.   Butchie is Draper cousin.

Q.   What did Chin say about the fact that Draper had told Butchie?

A.   He said that if we hit Butchie, then they don't have no case, but eventually they was going to come and get us, if we don't hit Butchie.

Q.   And when he said hit Butchie or get Butchie, what did you understand that to mean?

A.   To kill him.

Q.   When he explained that to you, did that sound like a reasonable proposition, a reasonable plan?

A.   Yes.

9

Q.   Did Chin tell you what he thought would happen to you and him if you didn't kill Butchie?

A.   Eventually that they was going to come and pick us up too.

Q.   On the triple?

A.   Yes.

Q.   Now, directing your attention to July 31, 1997, were you arrested, along with Sam Carson, Chin, on that date?

A.   Yes.

Q.   Where was it that you were arrested?

A.   On Second Street in Southwest.

THE COURT:  I'm sorry.  I didn't get your date again?

MR. ZEIDENBERG:  July 31, '97.

BY MR. ZEIDENBERG:

Q.   At the time you were arrested, what did you understand you were being charged in connection with?

A.   When we first got arrested, they didn't say what we was being charged for.  I mean, when the Metropolitan Police first grabbed us, they didn't say where they was taking us or why we was being handcuffed.

Q.   Where did they take you eventually?

A.   To the Metropolitan Police Department Homicide.

Q.   At some point did you come to learn what it was they wanted to talk to you about and what you were arrested for?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

14

and shot the girl and I said when the gunshots started that I was telling Chin to pull off, to pull off, and we left.

Q.    Now, did you identify the person that you believe Draper went into the house with?

A.    Yes.

Q.    Who did you say Draper went into the house with?

A.    J.P.

Q.    And who is J.P.?

A.    I don't really know.

Q.    Is he an actual person?

A.    Yeah, I know him from -- met him one time with Draper, and me and Bird talked about robbing him before.

Q.    Can you explain -- first of all, when you were talking to the police, before you gave this statement, who did they tell you they knew was involved in the murder?

A.    Excuse me?

Q.    When you were talking to the police prior to giving this statement, who did they tell you they believed was involved in this?

A.    Me, Chin, Bird, and Draper.

Q.    And when you gave this statement that you gave, blaming basically Draper and this person named J.P. -- well, let me ask you this.

What did you tell in your statement to the police abut whether what you, Chin, and Birdy knew about what was going to

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 400

15

happen?

A.   I told them that we didn't have no knowledge of what was going to happen, and I told them we didn't have nothing to do with it or have any knowledge of what was going to happen.

Q.   Now, what was going through your mind when you gave this statement?  What was your thinking?

A.   I was upset that -- I was already upset that Draper had told his cousin about what had happened.  Because of him telling Butchie, it brought the heat on all of us.

Q.   So, therefore, what?

A.   So I tried to disassociate me, Bird, and Chin with having anything to do with it and blame it on Draper.

Q.   And your reason for wanting to blame it on Draper was what?

A.   Because he told his cousin, and his cousin was an informant.

Q.   How did you learn that his cousin was an informant?

A.   Chin said that Draper later found out that Butchie was cooperating with the FBI.

Q.   When did Chin tell you that?

A.   Not the same day when he went to see Draper.  It was at a later time.

Q.   Now, after you gave this statement, the statement was an oral statement or a written statement at this point?

A.   What do you mean?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

16

Q.   Was it -- at this point was it a written statement or are you just telling them what happened?

A.   I believe I just told them.  I'm not certain.

Q.   Okay.  At some point did you give a written statement saying basically the same thing that you just said to the Prince George's County Homicide?

A.   Yes.

MR. ZEIDENBERG:  May I approach?

THE COURT:  Surely.

BY MR. ZEIDENBERG:

Q.   Showing you what's been marked M47 and ask you if you recognize it?

A.   Yes.

Q.   What is M47?

A.   It's a statement of victim, witness, suspect.  This is the statement that I wrote.

Q.   Is that your handwriting?

A.   Yes.

MR. ZEIDENBERG:  Your Honor, I'd move to introduce Government's Exhibit M47?

MR. KIERSH:  Objection.

THE COURT:  Approach the bench.

(Bench conference on the record.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

22

THE COURT:  August 5 he went into the Grand Jury in Prince George's County?

MR. ZEIDENBERG:  Yes, Your Honor.

THE COURT:  All right.

BY MR. ZEIDENBERG:

Q.    And at the time you appeared in the Grand Jury at Prince George's County, were you asked to adopt that statement that's before you, sitting right before you, M47?

A.    What do you mean by adopt?

Q.    Were you asked whether or not your statement about the triple murder was true and accurate?

A.    Yes.

Q.    And they referred specifically to that handwritten statement?

A.    Yes.

Q.    They asked you in the Grand Jury is that a truthful recitation of what happened?

A.    Yes.

Q.    What did you say about it?

A.    I said that it was.

Q.    And I take it was that the truth or a lie?

A.    That was a lie.

Q.    Now, after you left the Grand Jury in Prince George's County, were you brought over to the District of Columbia and asked to go into the Grand Jury here?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

23

A.    Yes.

Q.    And I take it after you -- well, why don't you tell us. After you gave that statement in Prince George's County and you went into the Grand Jury, what happened to the charges against you in Prince George's County?

A.    They was -- I was charged in D.C. with them.

Q.    Okay.  You were charged in D.C.  What were you told about what you were facing in D.C.?

A.    That an indictment was about to be brought against Southwest on a conspiracy.

Q.    What kind of a conspiracy?

A.    On a  marijuana conspiracy, narcotics.

Q.    And what was the evidence -- did someone explain to you what the evidence was against you in regards to that?

A.    Yes.

Q.    What was told to you about that?

        MR. ZUCKER:  Your Honor, I'd ask -- it's hearsay. Could he at least tell us who the defendant was?

        THE COURT:  Tell what?

        MR. ZUCKER:  He said, was it explained to you?  And he's about to say what was explained.  Could we at least find out who gave this explanation, which prosecutor?

        THE COURT:  Okay.

BY MR. ZEIDENBERG:

Q.    Did someone tell you about what the charges were or what

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Q.   Was money spent direct -- just explain to the ladies and gentlemen how you received this money that you did get?

A.   Each time that they gave me money, I always had to sign for it.

Q.   And what was the money to go for?

A.   When I first got out, they gave me money for cosmetics and things like that and money to eat with and things like that.

Q.   What about your housing?

A.   I didn't have a house at that time.

Q.   No, but, I mean, as far as paying rent?

A.   I was given money to pay my rent, and maybe a little extra money to like get groceries and things like that, but not a substantial amount of money, not a whole lot.

Q.   Now, at this location you were at, were you visited by Agent Lisi?

A.   Yes.

Q.   And during one of these visits in 1997, after you had pled guilty the first time, did you tell Agent Lisi that there was more information that you had not disclosed?

A.   Yes.

Q.   And what information did you tell Agent Lisi?  Without going into the specifics, what incidents did you tell him about?

A.   T.T. and Terita murder and Chrissy, Chrissy murder.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 405

Q. T.T. and Terita, the two women?

A. Yes.

Q. And Chrissy Gladden up on 37th Place?

A. Yes.

Q. Did you tell him about what you knew about those incidents, those murders?

A. Yes.

Q. Can you tell the ladies and gentlemen what prompted you to tell Agent Lisi at that point about T.T. and Terita and Chrissy Gladden?

A. Because of the conversation I had with the U.S. Attorney Jim Dinan.

Q. What about that conversation?

A. That --

Q. Was it a recent conversation or an old conversation?

A. It was a recent conversation.

Q. And what had he said in that conversation?

A. That if they find out, like if he said, if, for instance, someone else come forward and cooperate and they tell -- and that person tell them about incidents or something that I was involved in that I did not tell them about, that especially if it was like murder or whatever, that I would definitely be charged with it, and it's better for me to be up front and put it all on the table with them so that they -- it would be better if they hear it from me than to hear it from someone

35

Q. And at that point when you entered into that plea agreement, did you tell about all the criminal activity about which you knew about?

A. No.

Q. Did you tell about all the criminal activity you were involved in?

A. No.

Q. So you didn't fulfill the obligations under that second plea agreement, did you?

A. No.

Q. Now, going back to the beginning of 1999, did you contact Agent Lisi again and tell him you had additional information you wanted to give him?

A. Yes.

Q. What was that information you wanted to tell him about?

A. I told him the truth about the murder of Maurice and Slick. I told him about my involvement in Tim-Tim's murder. I told him that -- I told him about 95 percent of the truth of the triple homicide murder.

Q. What did you tell him about the triple homicide at this point?

A. Told him that me, Chin, Bird, and Draper, that it was, indeed, us, and not somebody else with Draper.

Q. So you put -- you took J.P. out of it?

A. Right.

36

Q.   And what did you say what your particular roles were in it at this point when you talked to Agent Lisi?

A.   I told him that it was the truth that Chin did not go in the house, and that -- I told him that I was the actual person that went in the house, but I told him that I didn't go in the house, that Bird went in the house.

Q.   Okay.  So at this point you're saying you did or did not go in the house?

A.   Right.

Q.   Which one?

A.   Say that I didn't go in the house.

Q.   Did not?

A.   Did not.

Q.   And who did you say went in the house?

A.   Bird.

Q.   And who else?

A.   And Draper.

Q.   Was that the truth?

A.   No.

Q.   Why was it -- first of all, as to the other incidents, the other murders, Tim-Tim's, Slick and Mo, why did you decide to disclose this information to Agent Lisi in the beginning of 1999?

A.   Because after -- when we first killed Maurice and Slick, Raymond knew about it, and Raymond used to be running his

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

66

Q.    And you said, well, you know, Draper over there, he went on some of the moves with me; is that right?

A.    I don't recall me saying that.

Q.    Well, you said that Mr. Sweeney went into that house in Maryland and committed the triple murder.  That was your testimony about an hour and a half ago; is that right?  Didn't you testify to that?

A.    Yes.

Q.    Okay.  That event, is that one of the moves that you talked about?

A.    Yes, it wasn't my move.

Q.    Well, but you said it was a move, correct?

A.    Yes.

Q.    All right.  And you're saying that Mr. Sweeney was part of that, right?

A.    Yes.

Q.    And you said you knew him from the streets; is that right?

A.    Yes.

Q.    Okay.  On August 5, 1997, when you spoke with the Prince George's County Police, you had known Mr. Sweeney for about six or seven years; is that correct?

A.    I'm not sure.

Q.    Well, if you know him for about 11 years, and the statement to the police was about 4 years ago, 11 minus 4 is

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
                    GOVERNMENT,                    :
                                                   :
                                                   :
  VS.                                              :        CR. NO. 98-329
                                                   :
VINCENT HILL,                                      :
JEROME MARTIN,                                     :        **FILED**
SAMUEL CARSON,                                     :
WILLIAM K. SWEENEY,                                :        JUL 1 9 2001
SEAN COATES,                                       :
                    DEFENDANTS.                    :        NANCY MAYER-WHITTINGTON, CLERK
                                                   :        U.S. DISTRICT COURT
UNITED STATES                                      :
                    GOVERNMENT,                    :
                                                   :
  VS.                                              :        CR. NO. 99-348
                                                   :
GARY PRICE,                                        :
                    DEFENDANT                      :
                                                   :

                                    WASHINGTON, D. C.
                                    MARCH 15, 2001
                                    (MORNING SESSION)
                                    (10:15 A.M.)


                    TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE THOMAS P. JACKSON




COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

2

```
FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                ANJALI CHATURVEDI, AUSA
                                555 4TH ST., N.W.
                                WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:         CHRISTOPHER DAVIS, ESQ.
                                601 INDIANA AVE., N.W.
                                #910
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:       JOANNE HEPWORTH, ESQ.
                                305 H STREET, N.W.
                                2ND FLOOR
                                WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:       JOSEPH BESHOURI, ESQ.
                                LEXI NEGIN-CHRIST, ESQ.
                                419 7TH STREET, N.W.
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:      STEVEN R. KIERSH, ESQ.
                                717 D STREET, N.W.
                                SUITE 400
                                WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:       FREDERICK JONES, ESQ.
                                901 6TH STREET, S.W.
                                #409
                                WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:        JONATHAN ZUCKER, ESQ.
                                601 INDIANA AVE., N.W.
                                #901
                                WASHINGTON, D. C.  20004
```

Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 3 of 88

3

                              INDEX

WITNESS:                      CROSS (CONTINUED.)

JAMES MONTGOMERY

     BY MR. KIERSH              6

YOU TALKED ABOUT -- YOU ADMITTED YOUR INVOLVEMENT IN THE FIRST DEGREE MURDERS OF MAURICE HALLMAN AND LEONARD HYSON; CORRECT?

A.  CORRECT.

Q.  OKAY.  NOW, WHEN DID THOSE MURDERS OCCUR?

A.  1989.

Q.  OKAY.  NOW, MR. SWEENEY, MY CLIENT, HAD NOTHING TO DO WITH THOSE MURDERS?

A.  NOT AT ALL.

Q.  RIGHT.

NOW, THOSE MURDERS -- THOSE MURDERS OF MR. HALLMAN AND MR. HYSON -- WHERE DID THEY OCCUR?

A. IN SOUTHWEST.

Q.  OKAY.  WHERE IN SOUTHWEST?

A.  IN THE JAMES CREEK HOUSING AREA.

Q.  OKAY.  WHERE IS THAT IN RELATION TO K STREET, SOUTHWEST?

A.  BETWEEN FIRST STREET AND HALF STREET, SOUTHWEST.

Q.  NOW, MR. HALLMAN AND MR. HYSON -- WERE THESE PEOPLE, AS FAR AS YOU KNEW, USING THE TERMINOLOGY YOU USED YESTERDAY, "SNITCHES"?

A.  NO.

Q.  YOU DIDN'T KILL THEM BECAUSE THEY WERE "SNITCHES," IS THAT RIGHT?

A.  NO.

Q. YOU DIDN'T KILL THEM BECAUSE OF SELLING MARIJUANA ON K STREET; DID YOU?

A. NO.

Q. IT HAD NOTHING TO DO WITH SOME CONSPIRACY; ISN'T THAT RIGHT?

A. CORRECT.

Q. OKAY. THEN YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF TIMOTHY BENTON. DO YOU REMEMBER THAT?

A. YES.

Q. OKAY. WHEN WERE YOU INVOLVED WITH THE MURDER OF MR. BENTON?

A. 1994.

Q. AND WHERE WAS MR. BENTON KILLED?

A. IN MY CAR.

Q. AND WHERE WAS YOUR CAR AT THE TIME MR. BENTON WAS KILLED?

A. WE WERE IN SOUTHEAST.

Q. OKAY. SOUTHEAST WASHINGTON?

A. YES.

Q. OKAY. AND HOW FAR FROM K STREET IN SOUTHWEST WASHINGTON AT THE TIME WERE YOU INVOLVED WITH THE MURDER OF MR. BENTON?

A. HOW FAR?

Q. YES.

A. IT'S A GREAT DISTANCE. IT'S A GREAT DISTANCE. I'M NOT

A. NO.

Q. AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT WHERE? IN THE HEAD IN YOUR CAR?

A. YES.

Q. OKAY. AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?

A. NOT ONLY THAT. IT WAS BECAUSE IT WAS DONE WITHOUT MY KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.

Q. RIGHT. YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?

A. CORRECT.

Q. AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING YOU KNOW AHEAD OF TIME?

A. CORRECT.

Q. HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS EVENT?

A. NOT AT ALL.

Q. AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND AND TRY TO DRIVE OVER HIM?

A. CORRECT.

Q. AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT -- MR. BENTON'S MURDER, AS FAR AS YOU KNOW?

A.  PRETTY MUCH FOR MYSELF.

Q.  FOR YOURSELF.

AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

A.  YES.

Q.  AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY HOUSE?

A.  CORRECT.

Q.  NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A JAIL OR PRISON; ISN'T THAT RIGHT?

A.  YES.

Q.  LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE OUT DOING YOUR BUSINESS; RIGHT?

A.  YES.

Q.  YOU JUST HAVE TO BE IN THERE AT NIGHT?  THEY SET A CURFEW FOR YOU?

A.  RIGHT.

Q.  SO IT'S NOT SO BAD; RIGHT?

A.  CORRECT.

Q.  BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A HALFWAY HOUSE?

A.  YES.

Q.  BECAUSE THAT SUITED YOUR NEEDS?

A.  YES.

Q.  AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?

A.   YES.

Q.   LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE PRESENTENCE REPORT, "LOOK, I AM OKAY NOW.  I AM GOING TO LEAD A STRAIGHT LIFE.  I AM GOING TO BE CLEAN."  BUT YOU HAD NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

A.   I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

Q.   OKAY.

A.   BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON DOING RIGHT.

Q.   AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A GRAND JURY IN MARYLAND?

A.   YES.

Q.   AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST TO LIE TO THE GRAND JURY.  SO YOU MADE UP A LIE; CORRECT?

A.   YES.

Q.   ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL SOMEONE NAMED ROBIN?

A.   YES.

Q.   WHO IS THAT?

A.   SHE WAS A GOVERNMENT WITNESS AS WELL.

Q. AND WHEN YOU CAME BEFORE JUDGE JACKSON ON MARCH 4TH OF 2000 -- THAT WAS THE DAY THAT FINALLY YOU WERE TAKEN INTO CUSTODY -- YOU SAID TO JUDGE JACKSON, "JUDGE, NOBODY HAS THREATENED ME." DO YOU REMEMBER THAT?

A. WHEN WAS THIS?

Q. MARCH 4TH, THE DAY THAT YOU WERE STEPPED BACK AND TAKEN INTO CUSTODY.

A. MARCH 4TH?

Q. MARCH 4TH, 2000. YOU CAME BEFORE JUDGE JACKSON. DO YOU REMEMBER THAT?

A. THAT'S INCORRECT.

Q. EXCUSE ME. MARCH 15TH, 2000.

A. YES.

Q. OKAY. IT WAS ACTUALLY ONE YEAR AGO TODAY?

A. YES.

Q. OKAY. YOU CAME BEFORE JUDGE JACKSON; CORRECT?

A. CORRECT.

Q. BECAUSE YOU WALKED OUT OF THE WITNESS PROTECTION PROGRAM; CORRECT?

A. CORRECT.

Q. AND YOU SAID TO JUDGE JACKSON, "YOUR HONOR, NOBODY HAS THREATENED ME." DO YOU RECALL THAT?

A. NO, I DO NOT RECALL THAT.

Q. WOULD SEEING THE TRANSCRIPT FROM MARCH 4TH, 2000 REFRESH YOUR RECOLLECTION?

A.    MAYBE.

Q.    OKAY.

          IF I MAY HAVE THE COURT'S INDULGENCE.

          MR. MONTGOMERY, I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS SWEENEY'S EXHIBIT NUMBER 4, THE MARCH 15, 2000 TRANSCRIPT.

          MR. KIERSH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

          THE COURT:  SURE.

BY MR. KIERSH:

Q.    SIR, I ASK YOU FIRST TO JUST TAKE A LOOK AT THIS.  CAN YOU READ THIS?

A.    YES, I READ VERY WELL.

Q.    TAKE A LOOK AT THIS AND SEE WHAT'S UP AT THE TOP.

A.    UNITED STATES GOVERNMENT VERSUS --

Q.    JUST READ IT TO YOURSELF.

A.    ALL RIGHT.

Q.    OKAY?

A.    UH-HUH.

Q.    NOW, I DIRECT YOUR ATTENTION -- COUNSEL, IT'S PAGE 4, LINE 7.

          READ THAT TO YOURSELF.  OKAY?

A.    FROM PAGE 7 ON DOWN?  I MEAN  --

Q.    LINE 7, PAGE 4.

A.    HERE YOU GO, SIR.

(Page 287 of Total)

Q.  NOW, HAVING READ THIS DOCUMENT, DOES THIS REFRESH YOUR RECOLLECTION AS TO WHAT YOU TOLD JUDGE JACKSON ON MARCH 15TH, 2000?

A.  I MEAN IF IT'S IN THE TRANSCRIPT, I GUESS I MUST HAVE SAID IT.

Q.  YOU DON'T DISPUTE IT, DO YOU?

A.  NO, I AM NOT DISPUTING IT.

Q.  OKAY.  YOU TOLD THE JUDGE, "EVEN THOUGH MY LIFE WASN'T THREATENED OR ANYTHING," CORRECT?

A.  BUT I DID TELL AGENT LISI THAT I SPOKE WITH "LOVEY" AND "LOVEY" TOLD ME THAT "PIMP" TOLD HER --

            MS. HEPWORTH:  OBJECTION.

            THE WITNESS:  -- THAT I HAD BETTER KEEP MY MOUTH SHUT --

            MR. HEPWORTH:  OBJECTION.

            THE WITNESS:  -- IF I KNOW WHAT'S GOOD FOR ME. AND I ALSO TOLD THEM THAT --

            MS. HEPWORTH:  OBJECTION, YOUR HONOR.

            THE WITNESS:  -- MY SISTER'S BOYFRIEND, KIM, TOLD ME THAT --

            MS. HEPWORTH:  OBJECTION, YOUR HONOR.

            THE COURT:  WAIT A MINUTE.  THERE IS NO QUESTION PENDING.

BY MR. KIERSH:

Q.  NOW, LET'S ME JUST GO BACK.  YOU TOLD JUDGE JACKSON --

OF 1997, BEFORE YOU ENTERED INTO THE PLEA, DID YOU TELL THE GOVERNMENT -- DID YOU TELL AGENT LISI THAT YOU HAD LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

A.   WHAT PARTICULAR TIME ARE YOU SPEAKING ABOUT?

Q.   IN AUGUST OF 1997 WHEN YOU WENT INTO THE GRAND JURY IN PRINCE GEORGE'S COUNTY AND SAID, "JOHNNIE PROCTOR WENT INTO THE HOUSE AND DID THE TRIPLE."

A.   NO, I WAS NOT TRUTHFUL.

Q.   I KNOW YOU WEREN'T TRUTHFUL, BUT HAD YOU TOLD THEM PRIOR TO NOVEMBER 4TH OR 5TH, 1997, THAT YOU HAD LIED IN THE PRINCE GEORGE'S COUNTY GRAND JURY?

A.   I DON'T THINK I DID TELL THEM AT THAT TIME.

Q.   WHEN YOU ENTERED INTO THE SECOND AGREEMENT, THAT AGREEMENT HAD THE SAME REQUIREMENT THAT YOU BE FORTHRIGHT AND TELL THEM EVERYTHING YOU KNOW; RIGHT?

A.   THE SECOND AGREEMENT WAS NOT IN AUGUST OF '97.

Q.   NO.  NO.  OKAY.  I AM SORRY.  THE SECOND AGREEMENT WAS SIGNED ON NOVEMBER 4TH, '97, AND FORMALLY ENTERED IN THIS COURT ON NOVEMBER 5TH, '97; IS THAT RIGHT?

A.   YES.

Q.   AND THE SECOND AGREEMENT HAD THE SAME REQUIREMENTS AS THE FIRST AGREEMENT, THAT YOU BE FORTHRIGHT AND YOU TELL THE GOVERNMENT EVERYTHING YOU KNOW; ISN'T THAT RIGHT?

A.   CORRECT.

Q.   OKAY.  MY QUESTION IS DID YOU TELL THE GOVERNMENT,

BEFORE YOU ENTERED INTO THE SECOND AGREEMENT, THAT YOU HAD LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

A. I DON'T THINK I DID.

Q. SO YOU WERE VIOLATING THE AGREEMENT RIGHT FROM THE BEGINNING; WEREN'T YOU?

A. YES.

Q. AND YOU DIDN'T TELL THE GOVERNMENT, PRIOR TO ENTERING INTO THE SECOND AGREEMENT, THAT YOU WERE INVOLVED IN THE MURDER OF MR. HALLMAN; ISN'T THAT RIGHT?

A. CORRECT.

Q. SO YOU WERE VIOLATING ON THAT LEVEL; CORRECT?

A. YES.

Q. YOU DIDN'T TELL THE GOVERNMENT ON NOVEMBER 4TH AND NOVEMBER 5TH THAT YOU WERE INVOLVED IN THE MURDER OF MR. HYSON; ISN'T THAT CORRECT?

A. CORRECT.

Q. YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE MURDER OF MR. BENTON; ISN'T THAT CORRECT?

A. CORRECT.

Q. YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE TRIPLE MURDER IN TEMPLE HILLS; ISN'T THAT CORRECT?

A. CORRECT.

Q. SO ON NOVEMBER 4TH AND NOVEMBER 5TH, EVEN THOUGH THIS IS THE SECOND TIME BACK AND EVEN THOUGH YOU SWORE TO TELL THE TRUTH TO JUDGE JACKSON, YOU WERE LYING?

85

A. I THINK WITHHOLDING INFORMATION IS MORE LIKE IT.

Q. OKAY. WELL, DIDN'T THE AGREEMENT SAY YOU HAVE TO TELL EVERYTHING?

A. YES.

Q. AND YOU SAID YOU WOULD TELL EVERYTHING; RIGHT?

A. YES.

Q. BUT YOU DIDN'T DO IT; RIGHT?

A. TRUE.

Q. SO WHEN YOU SIGNED THE AGREEMENT WITH THE UNITED STATES ON NOVEMBER 4TH, WHERE YOU PROMISED TO TELL EVERYTHING, YOU WERE LYING BECAUSE YOU DIDN'T TELL THEM EVERYTHING?

A. YES.

Q. ISN'T THAT RIGHT?

A. YES, YOU ARE CORRECT.

Q. AND YOU LIED BECAUSE YOU THOUGHT IT WAS IN YOUR BEST INTEREST TO LIE; ISN'T THAT RIGHT?

A. YES.

MAY I ADD SOMETHING ELSE?

Q. JUST ANSWER MY QUESTIONS.

A. ALL RIGHT.

THE COURT: YOU WILL GET A CHANCE ON REDIRECT EXAMINATION TO OFFER ANY EXPLANATION YOU NEED.

MR. KIERSH: THE COURT'S INDULGENCE.

BY MR. KIRSCH:

Q. NOW, YOU CAME BACK BEFORE JUDGE JACKSON IN FEBRUARY --

13

A. NO.

Q. AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT WHERE?  IN THE HEAD IN YOUR CAR?

A. YES.

Q. OKAY.  AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?

A. NOT ONLY THAT.  IT WAS BECAUSE IT WAS DONE WITHOUT MY KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.

Q. RIGHT.  YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?

A. CORRECT.

Q. AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING YOU KNOW AHEAD OF TIME?

A. CORRECT.

Q. HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS EVENT?

A. NOT AT ALL.

Q. AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND AND TRY TO DRIVE OVER HIM?

A. CORRECT.

Q. AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT -- MR. BENTON'S MURDER, AS FAR AS YOU KNOW?

PERRY AND DARNELL MACK?

A. TO MY UNDERSTANDING, YES.

Q. AND YOU WERE INVITED TO THE PARTY?

A. YES.

Q. OKAY.

SO IN TERMS OF THE PREDICATE ACTS TO THE RICO CONSPIRACY THAT YOU ACKNOWLEDGE INVOLVEMENT WITH, THERE WERE SIX MURDERS SO FAR THAT WE'VE TALKED ABOUT; CORRECT?

A. YES.

Q. OKAY. AND THEN YOU ALSO TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF CHRISHAUNA GLADDEN; CORRECT?

A. CORRECT.

Q. SO THERE ARE SEVEN MURDERS THAT YOU'RE DIRECTLY INVOLVED WITH AND YOU ACKNOWLEDGE AS PREDICATE ACTS AS PART OF YOUR PLEA BEFORE THIS COURT; CORRECT?

A. CORRECT.

Q. OKAY. NOW, DO YOU KNOW ANYTHING ABOUT A DOMINICO BENSON?

A. YES.

Q. WERE YOU INVOLVED IN HIS MURDER?

A. NO.

Q. MICHAEL SALTERS? WERE YOU INVOLVED IN HIS MURDER?

A. NO.

Q. NOW, WE HAVE GOT SEVEN MURDERS THAT YOU HAVE TOLD THE

LADIES AND GENTLEMEN OF THE JURY ABOUT.

YOU TOLD US THAT YOU WERE INVOLVED WITH AN ASSAULT WITH INTENT TO KILL A POLICE OFFICER; IS THAT CORRECT?

A.  YES.

Q.  THAT YOU WERE DIRECTLY INVOLVED WITH, RIGHT?

A.  CORRECT.

Q.  OKAY.  AND YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR PLANS TO DISCUSS KILLING "WOOZIE," WHOSE REAL NAME IS THOMAS FIELDS; IS THAT RIGHT?

A.  YES.

Q.  OKAY.  AND MR. FIELDS WAS FROM L STREET; RIGHT?

A.  YES.

Q.  YOU DIDN'T KNOW MR. FIELDS?

A.  I DIDN'T KNOW HIM?

Q.  DID YOU KNOW HIM?

A.  YES.

Q.  YOU KNEW HIM PERSONALLY?

A.  YES.

Q.  DID YOU CONSIDER HIM TO BE A FRIEND?

A.  YES, BEFORE THE BEEF HIT.  BEFORE THE BEEF CAME DOWN, YES.

Q.  HE WAS A FRIEND OF YOURS?

A.  HE WAS ALL RIGHT.

Q.  ALL RIGHT, BUT THEN HE WAS A GUY, YOU KNOW, YOU GOT INTO THIS BEEF WITH, AND THEN YOU SAID, "I AM GOING TO GO OUT AND

A.   PRETTY MUCH FOR MYSELF.

Q.   FOR YOURSELF.

         AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

A.   YES.

Q.   AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY HOUSE?

A.   CORRECT.

Q.   NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A JAIL OR PRISON; ISN'T THAT RIGHT?

A.   YES.

Q.   LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE OUT DOING YOUR BUSINESS; RIGHT?

A.   YES.

Q.   YOU JUST HAVE TO BE IN THERE AT NIGHT?  THEY SET A CURFEW FOR YOU?

A.   RIGHT.

Q.   SO IT'S NOT SO BAD; RIGHT?

A.   CORRECT.

Q.   BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A HALFWAY HOUSE?

A.   YES.

Q.   BECAUSE THAT SUITED YOUR NEEDS?

A.   YES.

Q.   AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?

32

A.  YES.

Q.  LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE PRESENTENCE REPORT, "LOOK, I AM OKAY NOW.  I AM GOING TO LEAD A STRAIGHT LIFE.  I AM GOING TO BE CLEAN."  BUT YOU HAD NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

A.  I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

Q.  OKAY.

A.  BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON DOING RIGHT.

Q.  AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A GRAND JURY IN MARYLAND?

A.  YES.

Q.  AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST TO LIE TO THE GRAND JURY.  SO YOU MADE UP A LIE; CORRECT?

A.  YES.

Q.  ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL SOMEONE NAMED ROBIN?

A.  YES.

Q.  WHO IS THAT?

A.  SHE WAS A GOVERNMENT WITNESS AS WELL.

Q. OKAY. SHE WAS ONE OF THOSE SNITCHES -- MAGGOTS TYPE OF PEOPLE YOU TALKED ABOUT?

A. YES.

Q. OKAY. AND HAVE YOU TOLD THE GOVERNMENT -- THE PROSECUTORS AND AGENT LISI -- ABOUT ALL OF THESE DIFFERENT CRIMES: THE ROBBERIES, THE LIES, THE CONSPIRACIES, AND THE MURDERS? DID YOU TELL THEM ALL THIS OVER SOME COURSE OF TIME?

A. YES.

Q. OKAY. AND AFTER YOU TOLD THEM ABOUT YOUR INVOLVEMENT IN THIS CASE, FROM 1997 UNTIL 2000 -- UNTIL MARCH OF 2000, YOU WEREN'T EVEN LOCKED UP; ISN'T THAT RIGHT?

A. CORRECT.

Q. OKAY.

AND YOU WEREN'T LOCKED UP -- YOU WERE IN COURT WHEN THE GOVERNMENT WOULD COME IN UP UNTIL MARCH -- UP UNTIL NOVEMBER OF 1999 -- THE GOVERNMENT WOULD COME IN AND SAY, "WE'RE NOT ASKING FOR MR. MONTGOMERY TO BE LOCKED UP"?

A. THAT'S NOT CORRECT.

Q. WELL, WEREN'T YOU IN COURT WHEN THE GOVERNMENT SAID, "WE DO NOT OPPOSE MR. MONTGOMERY'S BEING RELEASED"?

A. THAT WAS IN '97.

Q. OKAY. AND IN '98?

A. I WAS STILL OUT.

Q. RIGHT. YOU DIDN'T GET LOCKED UP UNTIL MARCH OF 2000?

A. CORRECT.

Q. AND THAT'S AFTER TELLING THE GOVERNMENT, OVER THE COURSE OF TIME, ABOUT ALL OF THESE CRIMES THAT YOU HAVE BEEN INVOLVED WITH; ISN'T THAT RIGHT?

A. ON TWO OCCASIONS, THEY DID ASK FOR ME TO GET STEPPED BACK.

Q. RIGHT, BUT JUDGE JACKSON DIDN'T STEP YOU BACK, RIGHT?

A. CORRECT.

Q. HE LET YOU STAY OUT ON THE STREET; ISN'T THAT RIGHT?

A. CORRECT.

Q. AND YOU KNOW THAT MY CLIENT, WILLIAM SWEENEY, SINCE 1997 -- YOU KNOW HE HAS BEEN LOCKED UP THE WHOLE TIME; ISN'T THAT RIGHT?

A. YES.

Q. OKAY. YOU KNOW THAT THE ONLY REASON THAT YOU WEREN'T LOCKED UP DURING THIS TIME IS BECAUSE YOU WERE PROVIDING INFORMATION TO THE GOVERNMENT; ISN'T THAT RIGHT?

A. COULD YOU ASK THAT QUESTION AGAIN?

Q. YES. THE REASON WHY YOU WEREN'T LOCKED UP DURING THIS PERIOD OF TIME FROM 1997 TO 2000 WAS BECAUSE YOU WERE PROVIDING INFORMATION TO THE GOVERNMENT?

A. TO MY UNDERSTANDING?

Q. TO YOUR UNDERSTANDING.

A. TO MY UNDERSTANDING, IN 1997, WHEN I TOLD MR. LISI ABOUT MY INVOLVEMENT IN CHRISSY'S MURDER, THEY BROUGHT ME BACK TO

41

Q. AND WHEN YOU CAME BEFORE JUDGE JACKSON ON MARCH 4TH OF 2000 -- THAT WAS THE DAY THAT FINALLY YOU WERE TAKEN INTO CUSTODY -- YOU SAID TO JUDGE JACKSON, "JUDGE, NOBODY HAS THREATENED ME." DO YOU REMEMBER THAT?

A. WHEN WAS THIS?

Q. MARCH 4TH, THE DAY THAT YOU WERE STEPPED BACK AND TAKEN INTO CUSTODY.

A. MARCH 4TH?

Q. MARCH 4TH, 2000. YOU CAME BEFORE JUDGE JACKSON. DO YOU REMEMBER THAT?

A. THAT'S INCORRECT.

Q. EXCUSE ME. MARCH 15TH, 2000.

A. YES.

Q. OKAY. IT WAS ACTUALLY ONE YEAR AGO TODAY?

A. YES.

Q. OKAY. YOU CAME BEFORE JUDGE JACKSON; CORRECT?

A. CORRECT.

Q. BECAUSE YOU WALKED OUT OF THE WITNESS PROTECTION PROGRAM; CORRECT?

A. CORRECT.

Q. AND YOU SAID TO JUDGE JACKSON, "YOUR HONOR, NOBODY HAS THREATENED ME." DO YOU RECALL THAT?

A. NO, I DO NOT RECALL THAT.

Q. WOULD SEEING THE TRANSCRIPT FROM MARCH 4TH, 2000 REFRESH YOUR RECOLLECTION?

42

A.  MAYBE.

Q.  OKAY.

IF I MAY HAVE THE COURT'S INDULGENCE.

MR. MONTGOMERY, I AM GOING TO SHOW YOU WHAT HAS BEEN MARKED FOR IDENTIFICATION AS SWEENEY'S EXHIBIT NUMBER 4, THE MARCH 15, 2000 TRANSCRIPT.

MR. KIERSH:  MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT:  SURE.

BY MR. KIERSH:

Q.  SIR, I ASK YOU FIRST TO JUST TAKE A LOOK AT THIS.  CAN YOU READ THIS?

A.  YES, I READ VERY WELL.

Q.  TAKE A LOOK AT THIS AND SEE WHAT'S UP AT THE TOP.

A.  UNITED STATES GOVERNMENT VERSUS --

Q.  JUST READ IT TO YOURSELF.

A.  ALL RIGHT.

Q.  OKAY?

A.  UH-HUH.

Q.  NOW, I DIRECT YOUR ATTENTION -- COUNSEL, IT'S PAGE 4, LINE 7.

READ THAT TO YOURSELF.  OKAY?

A.  FROM PAGE 7 ON DOWN?  I MEAN  --

Q.  LINE 7, PAGE 4.

A.  HERE YOU GO, SIR.

43

Q.  NOW, HAVING READ THIS DOCUMENT, DOES THIS REFRESH YOUR RECOLLECTION AS TO WHAT YOU TOLD JUDGE JACKSON ON MARCH 15TH, 2000?

A.  I MEAN IF IT'S IN THE TRANSCRIPT, I GUESS I MUST HAVE SAID IT.

Q.  YOU DON'T DISPUTE IT, DO YOU?

A.  NO, I AM NOT DISPUTING IT.

Q.  OKAY.  YOU TOLD THE JUDGE, "EVEN THOUGH MY LIFE WASN'T THREATENED OR ANYTHING," CORRECT?

A.  BUT I DID TELL AGENT LISI THAT I SPOKE WITH "LOVEY" AND "LOVEY" TOLD ME THAT "PIMP" TOLD HER --

        MS. HEPWORTH:  OBJECTION.

        THE WITNESS:  -- THAT I HAD BETTER KEEP MY MOUTH SHUT --

        MR. HEPWORTH:  OBJECTION.

        THE WITNESS:  -- IF I KNOW WHAT'S GOOD FOR ME. AND I ALSO TOLD THEM THAT --

        MS. HEPWORTH:  OBJECTION, YOUR HONOR.

        THE WITNESS:  -- MY SISTER'S BOYFRIEND, KIM, TOLD ME THAT --

        MS. HEPWORTH:  OBJECTION, YOUR HONOR.

        THE COURT:  WAIT A MINUTE.  THERE IS NO QUESTION PENDING.

BY MR. KIERSH:

Q.  NOW, LET'S ME JUST GO BACK.  YOU TOLD JUDGE JACKSON --

USCA Case #23-3015 Case 1:98-cr-00329-RCL Document #2077668 Document 682 Filed 07/19/01 Filed: 10/01/2024 Page 60 of 88 Page 302 of 443

60

A.   I GOT ARRESTED IN WASHINGTON, D. C.

Q.   OKAY.   YOU GOT ARRESTED ON AUGUST 5TH; CORRECT?

A.   THAT'S INCORRECT.

Q.   OKAY.   ON AUGUST 7, 1997, YOU SIGNED THIS LETTER WITH YOUR LAWYER SAYING YOU AGREE TO MEET WITH THE OFFICE OF THE UNITED STATES ATTORNEY HERE IN THE DISTRICT OF COLUMBIA TO HAVE AN OFF-THE-RECORD DISCUSSION; CORRECT?

A.   I GUESS IT MUST BE CORRECT BECAUSE IT IS SIGNED BY ME.

Q.   YOU DON'T DISPUTE THIS LETTER -- THE AUTHENTICITY; DO YOU?

A.   NO, I AM NOT DISPUTING IT.

Q.   AS A MATTER OF FACT, NOT ONLY DID YOU SIGN IT, BUT YOU ALSO DATED IT AUGUST 7, 1997; IS THAT RIGHT?

A.   CORRECT.

Q.   AND THAT'S SIX DAYS BEFORE YOU ENTERED INTO YOUR PLEA THAT TALKS ABOUT THE 5K1.1 LETTER; CORRECT?

A.   CORRECT.

Q.   OKAY.

SO ON AUGUST 12TH, 1997, WHEN YOU SIGNED THE PLEA LETTER WHERE IT TALKED ABOUT THE 5K1.1, YOU HAD SOME UNDERSTANDING THAT IF YOU WERE COOPERATING WITH THE GOVERNMENT, YOU COULD GET OUT OF THE GUIDELINE SENTENCE; ISN'T THAT RIGHT?

A.   COULD YOU REPEAT THAT?

Q.   OKAY.   YOU WEREN'T JUST GOING TO WALK INTO COURT AND

PLEAD GUILTY AND HAVE THE JUDGE SENTENCE YOU TO LIFE AND HAVE HIM TAKE YOU AWAY?  THAT WOULDN'T HAVE BEEN VERY SMART; RIGHT?

A.  BASICALLY, MY MINDSET WAS FOR THEM TO JUST LET ME GO.  I TOLD THEM I DON'T WANT NO LAWYER.  I SAID, "I DON'T WANT NO LAWYER.  JUST LET ME GO."  THAT'S IT.

Q.  OKAY.  JUST LET YOU GO?

A.  THAT'S IT.

Q.  OKAY.

A.  I MEAN IT WAS JUST THAT CUT AND DRY.

Q.  OKAY.  NOW --

A.  AND THEY EXPLAINED TO ME THAT LEGALLY THEY COULDN'T DO IT LIKE THAT.  THAT I HAD TO BE REPRESENTED BY AN ATTORNEY.

Q.  OKAY.

IF YOU GO UP A FEW PAGES TO PARAGRAPH 14, SIR, ON YOUR AUGUST 12TH LETTER -- DO YOU SEE THAT?

A.  YES.

Q.  AND IF YOU GO ON TO THE NEXT PAGE, IT'S 14, SUBSECTION (B).  CAN YOU GO THERE?

NOW, THE GOVERNMENT MADE SOME OTHER CONCESSIONS -- OTHER AGREEMENTS WITH YOU WHEN YOU SIGNED THIS LETTER; CORRECT?

A.  CORRECT.

Q.  AND IT SAYS:  THE GOVERNMENT, AS PART OF THIS PLEA AGREEMENT, AGREES TO, NUMBER ONE, DISMISS CASE M-5819-97,

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,                    :
                                       :
  VS.                                  :       CR. NO. 98-329
                                       :
VINCENT HILL,                          :
JEROME MARTIN,                         :
SAMUEL CARSON,                         :
WILLIAM K. SWEENEY,                    :
SEAN COATES,                           :
        DEFENDANTS.                    :
                                       :
UNITED STATES                          :
        GOVERNMENT,                    :
                                       :
  VS.                                  :       CR. NO. 99-348
                                       :
GARY PRICE,                            :
        DEFENDANT                      :

FILED
JUL 1 9 2001

                              WASHINGTON, D. C.
                              APRIL 4, 2001
                              (MORNING SESSION)
                              (10:15 A.M.)


              TRANSCRIPT OF PROCEEDINGS
        BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

(Page 304 of Total)

2

FOR THE GOVERNMENT:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             555 4TH ST., N.W.
                             WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:      CHRISTOPHER DAVIS, ESQ.
                             601 INDIANA AVE., N.W.
                             #910
                             WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:    JOANNE HEPWORTH, ESQ.
                             305 H STREET, N.W.
                             2ND FLOOR
                             WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:    JOSEPH BESHOURI, ESQ.
                             LEXI NEGIN-CHRIST, ESQ.
                             419 7TH STREET, N.W.
                             WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:   STEVEN R. KIERSH, ESQ.
                             717 D STREET, N.W.
                             SUITE 400
                             WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:    FREDERICK JONES, ESQ.
                             901 6TH STREET, S.W.
                             #409
                             WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:     JONATHAN ZUCKER, ESQ.
                             601 INDIANA AVE., N.W.
                             #901
                             WASHINGTON, D. C.  20004

3

                              INDEX

WITNESS:                      DIRECT  CROSS  REDIRECT  RECROSS

MARK WHITMORE

          BY MR. ZEIDENBERG   6

          BY MR. KIERSH              21

          BY MR. ZUCKER              30

CHARLES BENDER

          BY MS. CHATURVEDI 38


                    E X H I B I T S

GOVERNMENT'S              IN EVIDENCE

M60                          9

M61                          12

M63 THROUGH M71              16

G152-A                       50

67

A.  YES.

Q.  CAN YOU TELL US BY NAME OR NICKNAME THOSE INDIVIDUALS WHO YOU KNOW OR RECOGNIZE?

A.  I RECOGNIZE "PUG", "PIMP" AND LARRY.

Q.  MR. BENDER, YOU INDICATED THAT YOU KNEW SOMEONE OR YOU KNOW "DRAPER"?

A.  YES.

Q.  DID YOU ALSO KNOW SOMEONE BY THE NICKNAME OF "ROBOCOP"?

A.  YES.

Q.  AND WHILE YOU WERE IN OAK HILL, DID THERE COME A TIME THAT YOU LEARNED THAT SOMETHING HAD HAPPENED TO "ROBOCOP"?

A.  YES.

Q.  WHAT HAPPENED TO HIM?

            MR. KIERSH:  OBJECTION.  IT CALLS FOR HEARSAY.

            MS. CHATURVEDI:  I CAN REPHRASE THE QUESTION.

            THE COURT:  I BEG YOUR PARDON?

            MS. CHATURVEDI:  I CAN JUST REPHRASE THE QUESTION, YOUR HONOR.

            THE COURT:  I THINK YOU CAN REPHRASE IT.  OKAY. REPHRASE IT.

BY MS. CHATURVEDI:

Q.  DID THERE COME A TIME WHEN YOU WERE IN OAK HILL THAT YOU LEARNED SIMPLY THAT "ROBOCOP" HAD BEEN MURDERED?

A. YES.

Q.  DID YOU EVER SPEAK WITH WILLIAM SWEENEY, "DRAPER," ABOUT

68

THE MURDER OF "ROBOCOP"?

A. YES.

Q. WHERE DID THAT CONVERSATION TAKE PLACE?

A. ON K STREET, SOUTHWEST.

Q. HOW LONG AFTER YOU WERE RELEASED FROM OAK HILL, ROUGHLY, WOULD YOU SAY IT WAS THAT YOU HAD THE CONVERSATION WITH "DRAPER"?

A. NOT LONG. IT WAS BEFORE '95. SO IT WAS LIKE THE END OF '94.

Q. AND WHAT DID "DRAPER" TELL YOU?

A. WELL, I HAD INITIATED THE CONVERSATION. I ASKED HIM -- I SAID THAT I HEARD THAT HIM AND "ROBOCOP," YOU KNOW, HAD GOTTEN INTO IT. HE SAID, "NO, HE SWUNG ON ME," YOU KNOW, LIKE HE WAS SHOCKED THAT IT HAPPENED.

Q. SAY THAT AGAIN? DRAPER SAID THAT WHAT?

A. THAT "ROBOCOP" HAD STOLE HIM IN A CLUB OR SOMETHING.

Q. THAT "ROBOCOP" HAD STOLE --

A. HAD PUNCHED HIM. PUNCHED HIM. STOLE, MEANING PUNCHED.

Q. THAT "ROBOCOP" HAD PUNCHED WHO?

A. "DRAPER."

Q. AND THEN WHAT DID "DRAPER" SAY?

A. HE SAID THEY WERE FIGHTING IN THE CLUB, THE MIRAGE.

Q. AND THEN WHAT HAPPENED?

A. AND IT LED TO GUN PLAY LATER ON. THEY WERE SHOOTING. THEY WERE SHOOTING AT EACH OTHER.

69

Q.  MR. BENDER, I ASK YOU TO STAY A LITTLE BIT OF A DISTANCE FROM THE MICROPHONE.  IT WILL MAKE IT A LITTLE BIT EASIER TO HEAR.  OKAY?

"DRAPER" SAID THAT WHAT HAPPENED AFTER THEY LEFT THE NIGHTCLUB?

A.  THEY HAD A SHOOT-OUT.

Q.  AFTER THAT SHOOT-OUT, DID "DRAPER" TELL YOU WHAT HAPPENED?

A.  HE SAID HE CAUGHT HIM AT A CRAPGAME.

A.  WHO CAUGHT WHO AT A CRAP GAME?

A.  "DRAPER" CAUGHT HIM AT A CRAP GAME.

Q.  CAUGHT WHO?

A.  "ROBO."

Q.  AND WHEN "DRAPER" CAUGHT "ROBO" AT THE CRAP GAME, WHAT HAPPENED?

A.  HE SAID HE PUNISHED HIM.

Q.  PUNISHED HIM?

A.  HE PUNISHED HIM.

Q.  DID "DRAPER" SAY WHERE IT WAS -- WHERE THE CRAPGAME WAS?

A.  SURSUM CORDAS.

Q.  ONCE "DRAPER" TOLD YOU ABOUT HAVING PUNISHED "ROBOCOP", DID YOU SAY ANYTHING?

A.  I SAID I HEARD THAT "ROBOCOP" AND SWITZER WAS "BEEFING" BEFORE.

Q.  AND DID "DRAPER" MAKE ANY RESPONSE ABOUT THAT?

USCA Case #23-3015     Document #2077668     Filed: 10/01/2024     Page 310 of 443
Case 1:98-cr-00329-RCL   Document 689   Filed 07/19/01   Page 70 of 95

70

A. HE SAID -- I CAN'T RECALL IF HE SAID THE POLICE OR PEOPLE -- DUDES IN GENERAL IN THE NEIGHBORHOOD THAT "ROBO" HAD TOLD THAT SWITZER WAS STANDING OUTSIDE HIS WINDOW OR SOMETHING.  HE SEEN SWITZER.

Q. AFTER YOU WERE INCARCERATED AFTER 1995, DID THERE COME A TIME WHEN YOU CAME INTO CONTACT WITH "DRAPER" IN WHAT'S CALLED R AND D AT THE JAIL?

A. YES.

Q. WILL YOU TELL US FIRST WHAT "R AND D" IS?

A. RECEIVE AND DEPARTURE.

Q. AND WHAT IS THAT?

A. THAT'S WHEN YOU FIRST ENTER THE FACILITY, YOU KNOW, YOU GO THROUGH THE PROCESS OF INTAKE.  AND DEPARTURE IS IF YOU'RE GOING TO COURT OR WHATEVER.

A. WHEN YOU SAW "DRAPER" IN R AND D, DID YOU SPEAK WITH HIM ABOUT A NUMBER OF THINGS?

A. YES.

Q. DID THE NAME JAMES MONTGOMERY COME UP?

A. YES.

Q. TELL US ABOUT WHAT WAS SAID.

A. HE WAS JUST -- HE WAS JUST SAYING JIM WAS TELLING ON THEM.  WELL, HE BASICALLY SAID THAT -- HE EXPLAINED HIS PURPOSES FOR BEING OVER THERE.  HE SAID HE HAD A MISDEMEANOR B.R.A.  AND I TOLD HIM I HEARD ABOUT JIM.  AND HE WAS LIKE, "YEAH, HE WAS TELLING ON A CASE THAT HE WAS IN IN MARYLAND,

A TRIPLE HOMICIDE."   HE SAID -- YOU KNOW, HE JUST MADE A STATEMENT ABOUT IF HE SEEN HIM, HE'D KILL HIM.

Q.   IF WHO SAW HIM?

A.   "DRAPER."

Q.   IF HE SAW WHO?

A.   JIM.

Q.   THAT HE WOULD DO WHAT?

A.   KILL HIM.

Q.   DID "POOPOO'S" NAME COME UP IN THE COURSE OF THAT CONVERSATION?

A.   "POO POO," AMONG OTHER PEOPLE'S NAMES, CAME UP.

Q.   AND WHAT, IF ANYTHING, DID "DRAPER" SAY ABOUT "POO POO"?

A.   HE SAID THAT "POO POO'S" NAME WAS ON A WITNESS LIST, AND HE SAID THAT "POO POO," AS WELL AS "BIRDY" AND A COUPLE OTHER -- WELL, A LOT OF OTHER PERSONS' FROM SOUTHWEST NAMES WAS ON A WITNESS LIST THAT HE SHOWED ME THAT WERE SUPPOSED TO HAVE BEEN TESTIFYING AGAINST HIM.

Q.   DID HE SAY WHY THEY WOULD BE TESTIFYING AGAINST HIM?   ON WHAT CASE?

A.   THE TRIPLE HOMICIDE IN MARYLAND.

Q.   HE ACTUALLY SHOWED YOU A DOCUMENT?

A.   YES.

Q.   "DRAPER" DID?

A.   YES.

Q.   AND ONCE HE SHOWED YOU THE DOCUMENT AND INDICATED THE

NAMES OF THE PEOPLE WHO HE SAID WERE SNITCHING ON HIM, WHAT ELSE DID HE SAY ABOUT THOSE FOLKS?

A.  HE SAID HE THOUGHT "VITO" WAS TELLING ON HIM, HE SAID, BECAUSE THEY HAD SOME WORDS OR SOMETHING ABOUT SOMETHING. AND HE SAID "VITO" TRIED TO SAY HE WAS TELLING ON HIM.  HE SAID HE THOUGHT "VITO" WAS TELLING ON HIM.

Q.  DID "DRAPER" MAKE ANY COMMENTS ABOUT THE WITNESS LIST -- THE FACT THAT THE NAMES WERE ON A WITNESS LIST?

A.  HE SAID -- HE SAID THAT HE THOUGHT THAT THE PROSECUTORS WERE TRYING TO SCARE HIM AND THAT WAS A FABRICATED LIST, AND HE SAID A LOT OF PEOPLE -- I MEAN THEY CAN HAVE A LAWSUIT AGAINST THEM BECAUSE A LOT OF PEOPLE AND THEIR FAMILIES CAN GET KILLED.

Q.  WHO COULD HAVE A LAWSUIT AGAINST THEM?

A.  THE PROSECUTORS.

Q.  WHY?

A.  BECAUSE A LOT OF PEOPLE AND THEIR FAMILIES COULD GET KILLED, YOU KNOW, FOR THAT LIST.

Q.  WHY?

A.  BECAUSE IT HAD WITNESSES OR ALLEGED WITNESSES.

Q.  THIS TRIPLE HOMICIDE -- WERE YOU FAMILIAR WITH THAT INCIDENT?

A.  NO.  NOT REALLY.

Q.  WERE YOU AWARE THAT "DRAPER" HAD BEEN CHARGED IN CONNECTION WITH THE TRIPLE HOMICIDE?

A.   YES.

Q.   IN FACT, ONCE YOU BECAME AWARE THAT "DRAPER" HAD BEEN CHARGED WITH THIS TRIPLE HOMICIDE, DID YOU DO SOMETHING?

A.   YES.  I WROTE HIM A LETTER.

Q.   WHERE?

A.   WHEREVER HE WAS.  I CAN'T EVEN RECALL THE ADDRESS.

Q.   WHY DID YOU WRITE HIM A LETTER?

A.   BECAUSE, YOU KNOW, WE WAS CLOSE.  WE WAS OKAY.  I MEAN WE WAS COOL, YOU KNOW.  SO I MEAN I, YOU KNOW, JUST SENT HIM A LETTER.

Q.   SAYING WHAT?

A.   IT WASN'T REALLY -- IT WAS BASICALLY TELLING HIM TO KEEP HIS HEAD UP.  IT WASN'T BASICALLY NOTHING IN REFERENCE TO THE CASE OR MY CASE.  JUST A FRIENDLY LETTER.

Q.   DID "DRAPER" SPEAK ABOUT ANY ADVICE THAT HE HAD GIVEN TO "POO POO"?

A.   HE TOLD HIM -- HE SAID THAT HE SHOULD TAKE A PLEA BECAUSE THEY COULDN'T GET AT THE WITNESSES.

Q.   AT THE TIME THAT YOU AND "DRAPER" WERE HAVING THIS CONVERSATION, TO YOUR KNOWLEDGE WAS "POO POO" IN CUSTODY?

A.   YES.

Q.   ON WHAT CHARGE?

A.   MURDER.

Q.   MURDER OF WHOM?

A.   PHIL SOMETHING.  I DON'T KNOW HIS LAST NAME.

Q.  AND IN TERMS OF "POO POO" AND JAMES' RELATIONSHIP, DID "DRAPER" MAKE ANY COMMENTS ABOUT "POO POO" AND JAMES' RELATIONSHIP?

A.  HE JUST SAID THAT "POO POO" SHOULD BE WORRIED ABOUT JAMES TELLING ON HIM BECAUSE HE DID A LOT OF THINGS WITH HIM.

Q.  DID "BUTCHIE'S" NAME COME UP --

A.  YES.

Q.  -- WHEN YOU SPOKE WITH "DRAPER"?

A.  YEAH.

Q.  DID YOU KNOW WHO "BUTCHIE" WAS?

A.  NO.  NOT REALLY.  HUH-UH.

Q.  HAD YOU HEARD THAT NAME BEFORE?

A.  YES.

Q.  AND WHAT WAS YOUR UNDERSTANDING AS TO THE RELATIONSHIP, IF ANY, BETWEEN "BUTCHIE" AND "DRAPER"?

          MR. KIERSH:  OBJECTION, YOUR HONOR.  THAT'S HEARSAY.

          THE COURT:  OVERRULED.

          THE WITNESS: WELL, PRIOR TO THE CONVERSATION WITH "DRAPER" ABOUT "BUTCHIE", ME AND HIS UNCLE -- WELL, I CALL HIM -- I ACKNOWLEDGE HIM AS "DRE."  I AM NOT SURE IF IT WAS ANDRE SWEENEY OR NOT, BUT I KNEW HIS LAST NAME WAS SWEENEY. AND WE ACKNOWLEDGED HIM AS "DRE."  AND HE WAS A CELLMATE OF MINE BEFORE SEEING "DRAPER" LATER ON.  WE WAS IN THE CELL,

75

AND HE INFORMED ME OF --

        MR. KIERSH:  YOUR HONOR, THIS IS SIMPLY HEARSAY.

        THE COURT:  IT SOUNDS LIKE IT TO ME.

        MS. CHATURVEDI:  I CAN REPHRASE THE QUESTION.

        THE COURT:  ALL RIGHT.

        MS. CHATURVEDI:  STRIKE THAT QUESTION AND I WILL ASK A DIFFERENT QUESTION.

BY MS. CHATURVEDI:

Q.  MR. BENDER, WHEN YOU WERE SPEAKING WITH "DRAPER" --

A.  I UNDERSTOOD YOUR QUESTION.  I WAS GOING TO GET -- I WAS GOING TO GET TO IT.

Q.  I'M ASKING A DIFFERENT QUESTION THOUGH.

A.  OKAY.

Q.  I KNOW.  I AM ASKING A DIFFERENT QUESTION THOUGH.

        THE COURT:  SHE HAS GOT TO REPHRASE THE QUESTION.

        THE WITNESS:  OKAY.

BY MS. CHATURVEDI:

Q.  WHEN YOU SPOKE WITH "DRAPER," WHAT DID "DRAPER" SAY ABOUT "BUTCHIE"?

A.  HE SAID THAT "BUTCHIE" WAS SNITCHING ON HIM, AND HE SAID, "FAMILY OR NOT, HE HAS GOT TO GET DEALT WITH."

Q.  HE HAS GOT TO GET WHAT?

A. DEALT WITH.

Q.  AND WHAT DID YOU TAKE THAT TO MEAN?

A.  HE HAS GOT TO DIE, BASICALLY.

(Page 315 of Total)

3

76

Q.  AT THE TIME YOU SPOKE WITH "DRAPER" ABOUT "BUTCHIE", WERE YOU AWARE AS TO WHETHER OR NOT "BUTCHIE" WAS ALIVE OR DEAD?

A. I WAS AWARE.

Q.  WHAT WERE YOU AWARE OF?

A.  I WAS AWARE THAT HE -- YOU KNOW, HE WAS ALREADY DECEASED.

Q.  AND DID "DRAPER" SAY ANYTHING TO YOU ABOUT "BUTCHIE" BEING KILLED?

A.  WELL, I MEAN IT WAS ALREADY DONE, SO I KNEW.  SO I MEAN THERE WASN'T REALLY NO POINT OF HIM SAYING NOTHING THAT I ALREADY KNEW.

Q.  SO MY QUESTION, I GUESS, SIMPLY IS DID HE SAY ANYTHING SPECIFICALLY ABOUT "BUTCHIE'S" MURDER OR NOT?

A.  WELL, HE JUST BASICALLY SAID THAT -- I MEAN --

          MR. BESHOURI:  OBJECTION, YOUR HONOR.  MAY WE APPROACH?

          THE COURT:  SURE.

          (BENCH CONFERENCE.)

App 448

A.   "PUG."

Q.   FROM WHICH NEIGHBORHOOD?

A.   37TH.

Q.   DID YOU HEAR MR. MARTIN TALKING AT THE PRAYER SERVICE?

A.   YES.

Q.   WHAT WAS HE SAYING?

A.   HE WAS BASICALLY INFORMING "VITO," YOU KNOW, ABOUT A WITNESS -- ALLEGED WITNESS AGAINST HIM AND "PUG" ON THE CASE THEY WAS INCARCERATED ON.

Q.   WHAT DID HE SAY ABOUT THIS ALLEGED WITNESS?

A. HE SAID THAT -- HE BASICALLY TOLD HIM THEY NEEDED SOMEBODY TO GET AT THE BROAD THAT WAS SNITCHING ON THEM.

Q.   THE WHAT?

A.   GET AT THE BROAD, BUT I MEAN THE "BROAD" WASN'T THE WORD --

        MR. JONES:  I'M SORRY.  I DON'T UNDERSTAND WHAT HE'S SAYING.

        MS. CHATURVEDI:  IF I COULD JUST HAVE A MOMENT, I THINK I CAN CLEAR IT UP.

BY MS. CHATURVEDI:

Q.   IS THE WORD THAT YOU'RE USING "BROAD"?

A.   WELL, THAT WASN'T REALLY THE WORD.  I JUST SAID BROAD, BUT HE SAID -- I MEAN, YOUR HONOR, IF I MAY --

Q.   SAY THE WORD.

A.   HE SAID, "WE NEED SOMEBODY TO GET AT THAT BITCH."

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 318 of 443
Case 1:98-cr-00329-RCL   Document 689   Filed 07/19/01   Page 82 of 95

82

Q.   WHAT IF ANYTHING ELSE DID MR. MARTIN SAY ABOUT GETTING AT THAT ALLEGED WITNESS?

A.   NOTHING AFTER THAT.

Q.   DID THERE COME A TIME, AGAIN WHILE YOU WERE IN CUSTODY, THAT JEROME MARTIN WAS IN THE SAME BLOCK AS YOU WERE?

A.   YES.

Q.   DID YOU EVER HAVE ANY CONVERSATIONS WITH MR. MARTIN AT THAT TIME ABOUT JAMES MONTGOMERY?

          MS. HEPWORTH:  CAN WE HAVE A TIME?  YOUR HONOR, MAY WE HAVE A TIME -- A TIME FOR THIS CONVERSATION?

          THE COURT:  IT WAS WHILE HE WAS AT D. C. JAIL WHILE THEY WERE THERE TOGETHER, I GUESS.

          MS. HEPWORTH:  THE OTHER CONVERSATION WAS IN '96. I WOULD JUST LIKE TO KNOW THE TIME.

          THE COURT:  I'M SORRY?

          MS. HEPWORTH:  I WOULD LIKE TO KNOW IF HE CAN SPECIFY THE TIME.

          THE COURT:  WELL, ASK HIM IF HE CAN SPECIFY THE TIME.

BY MS. CHATURVEDI:

Q.   TO THE BEST OF YOUR RECOLLECTION, MR. BENDER, CAN YOU GIVE US A YEAR?

A.   IT WAS IN '97.

Q.   AND IN THAT CONVERSATION YOU HAD WITH MR. MARTIN IN 1997, DID JAMES MONTGOMERY'S NAME COME UP?

83

A.   YES.

Q.   WHAT DID "PIMP" SAY -- MR. MARTIN SAY?

A. HE INFORMED ME THAT JIM WAS TESTIFYING AGAINST "DRAPER" AND "CHIN" IN THE TRIPLE HOMICIDE IN MARYLAND.

Q.   DID THE SUBJECT OF --

        MS. HEPWORTH:  OBJECTION.

        THE COURT:  I BEG YOUR PARDON?

        MS. HEPWORTH:  I AM OBJECTING TO THE ANTICIPATED LEADING NATURE OF THIS QUESTION.

        THE COURT:  LET HER FINISH THE QUESTION AND THEN MAKE THE OBJECTION.

        MS. HEPWORTH:  YES, YOUR HONOR.

BY MS. CHATURVEDI:

Q.   DID THE SUBJECT OF WHAT MR. MARTIN FELT ABOUT JAMES MONTGOMERY COME UP IN THE COURSE OF THAT CONVERSATION?

A.   YES.

Q.   WHAT DID HE SAY?

A.   HE SAID HE WAS FUCKED UP AT JIM.  YOU KNOW, HE WOULD KILL FOR HIM, YOU KNOW.  I MEAN HE JUST COULDN'T BELIEVE HE WOULD DO SOMETHING LIKE THAT.

        HE ALSO STATED THAT JIM WAS TELLING ON HIM -- WAS SNITCHING ON HIM ON THE OLD '91 CASE.

Q.   THAT JIM WAS SNITCHING ON WHO?

A.   "PIMP."

Q.   ON WHAT?

A. AN OLD '91 CASE.

Q. WHAT KIND OF CASE?

A. HE BASICALLY REALLY DIDN'T -- HE DIDN'T REALLY CLARIFY.

Q. AND WHAT DID MR. MARTIN SAY ABOUT JIM SNITCHING ON HIS OLD CASE?

A. HE SAID HE WASN'T WORRYING ABOUT IT BECAUSE ALL THEY HAD WAS JIM.

Q. NOW, AT SOME POINT -- WELL, IN 1997, WHEN YOU SAW MR. MARTIN, DID THERE COME A TIME WHEN HE LEFT THE JAIL?

A. YES.

Q. WHEN HE RETURNED BACK TO THE JAIL, DID YOU HAVE A CONVERSATION WITH HIM ABOUT WHERE HE HAD BEEN?

A. YES.

Q. WHAT DID HE TELL YOU?

A. HE SAID THAT THEY HAD SENT ON A LOAD DOWN TO LORTON.

Q. ON A LOAD, L-O-A-D?

A. TO THE LORTON FACILITY. AND HE SAID HE THOUGHT THAT AN INDIVIDUAL BY NAME OF RODNEY SHORT HAD SOMETHING TO DO WITH IT.

Q. DID YOU KNOW THAT NAME, RODNEY SHORT?

A. YES.

Q. WHAT NEIGHBORHOOD WAS HE FROM?

A. 58TH.

Q. 58TH?

A. YES.

Q. WHAT IF ANYTHING ELSE DID MR. MARTIN SAY ABOUT HIS BELIEF THAT RODNEY SHORT HAD ARRANGED FOR HIM TO BE SENT TO LORTON?

A. BECAUSE THEY HAD A "BEEF" -- 58TH AND 37TH HAD A BEEF AND ABOUT HIM KILLING TONY FORTUNE.

Q. YOU HAD A CONVERSATION WITH HIM ABOUT -- I AM SORRY. THE LAST PART OF YOUR ANSWER, I GOT DISTRACTED.  WHAT DID YOU SAY?

A. KILLING TONY FORTUNE.

Q. WHO KILLED TONY FORTUNE, ACCORDING TO "PIMP"?

A. "PIMP."

Q. AND DID "PIMP" SPEAK ABOUT THE MURDER OF TONY FORTUNE WITH YOU?

A. YES.

Q. WHAT DID "PIMP" TELL YOU ABOUT THE MURDER --

        MS. HEPWORTH:  YOUR HONOR, THIS IS SO LEADING. IT'S SO LEADING.

        THE COURT:  NO, IT'S NOT LEADING.  THE OBJECTION IS OVERRULED.

        GO AHEAD.

BY MS. CHATURVEDI:

Q. WHAT DID MR. MARTIN SAY TO YOU ABOUT THE MURDER OF TONY FORTUNE?

A. HE SAID THAT HE TRIED -- WELL, HE WAS MAKING MOTIONS LIKE HE WAS GOING TO TRY TO ROB THE CRAPGAME.

(Page 321 of Total)

86

Q. WHO WAS MAKING MOTIONS?

A. TONY FORTUNE.

Q. AND WHAT HAPPENED AT THAT POINT?

MR. BESHOURI: OBJECTION.  IF WE CAN APPROACH.

MS. CHATURVEDI:  OKAY.

THE COURT:  CAN YOU ANTICIPATE WHAT HIS OBJECTION IS?

MS. CHATURVEDI:  YES.  I DON'T BELIEVE THE ISSUE IS GOING TO ARISE.

MR. BESHOURI:  ALL RIGHT.  WITHDRAWN.

THE COURT:  ALL RIGHT.  GO AHEAD.

BY MS. CHATURVEDI:

Q. ALL RIGHT.  WHAT DID "PIMP," MR. MARTIN, TELL YOU ABOUT THE MURDER OF TONY FORTUNE?

A. HE BASICALLY SAID THAT TONY FORTUNE WAS BASICALLY MAKING GESTURES LIKE HE WAS GOING TO ROB THE CRAPGAME.  AND HE SAID HE PUNISHED HIM.

Q. WHO PUNISHED HIM?

A. "PIMP."

Q. WHAT DID YOU UNDERSTAND IT TO MEAN WHEN HE SAID THAT HE PUNISHED HIM?

A. HE KILLED HIM.

Q. DID "PIMP" DESCRIBE FOR YOU WHAT HAPPENED AFTER TONY FORTUNE WAS KILLED?

A. HE STATED THAT HE COULD HAVE SURVIVED BUT --

)

Q.  WHO COULD HAVE SURVIVED?

A.  TONY FORTUNE, BUT THEY JUST LET HIM DIE.  THE POLICE JUST DIDN'T CALL FOR NO PARAMEDIC OR NOTHING.

Q.  NOW, FINALLY, AND BRIEFLY -- YOUR HONOR, I ONLY HAVE A FEW MORE MINUTES LEFT -- DID YOU HAVE AN OPPORTUNITY, WHILE YOU WERE IN CUSTODY, TO SPEAK WITH MAURICE PROCTOR?

A.  YES.

Q.  WHEN YOU SPOKE WITH MAURICE PROCTOR, DO YOU KNOW WHAT IT WAS HE WAS INCARCERATED FOR AT THE TIME?

A.  YES.

Q.  WHAT WAS THAT?

A.  THE MURDER OF PHIL.

Q.  DID YOU SPEAK WITH MR. PROCTOR ABOUT HIS CASE?

A.  YES.

Q.  AND PRIOR TO GOING TO TRIAL, DID MR. PROCTOR -- DID "POO POO" TELL YOU WHERE OR THE CIRCUMSTANCES OF THAT MURDER?

A.  YES.

Q.  WHAT DID HE TELL YOU?

        MR. ZUCKER:  OBJECTION.

        THE COURT:  YOU HAD BETTER APPROACH THE BENCH.

        (BENCH CONFERENCE.)

)



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
      GOVERNMENT,       :

  VS.                   :    CR. NO. 98-329

VINCENT HILL,          :
JEROME MARTIN,        :
SAMUEL CARSON,        :
WILLIAM K. SWEENEY,   :
SEAN COATES,          :
      DEFENDANTS.   :

UNITED STATES         :
      GOVERNMENT,     :

  VS.                   :    CR. NO. 99-348

GARY PRICE,          :
      DEFENDANT     :

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
APRIL 9, 2001
(MORNING SESSION)
(10:15 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:        PHYLLIS MERANA
                       6816 U. S. DISTRICT COURT
                       3RD & CONSTITUTION AVE., N.W.
                       WASHINGTON, D. C. 20001

2.

| | |
|---|---|
| FOR THE GOVERNMENT: | PETER ZEIDENBERG, AUSA |
| | ANJALI CHATURVEDI, AUSA |
| | 555 4TH ST., N.W. |
| | WASHINGTON, D. C. 20001 |
| | |
| FOR THE DEFENDANT HILL: | CHRISTOPHER DAVIS, ESQ. |
| | 601 INDIANA AVE., N.W. |
| | #910 |
| | WASHINGTON, D. C.  20004 |
| | |
| FOR THE DEFENDANT MARTIN: | JOANNE HEPWORTH, ESQ. |
| | 305 H STREET, N.W. |
| | 2ND FLOOR |
| | WASHINGTON, D. C.  20001 |
| | |
| FOR THE DEFENDANT CARSON: | JOSEPH BESHOURI, ESQ. |
| | LEXI NEGIN-CHRIST, ESQ. |
| | 419 7TH STREET, N.W. |
| | WASHINGTON, D. C.  20004 |
| | |
| FOR THE DEFENDANT SWEENEY: | STEVEN R. KIERSH, ESQ. |
| | 717 D STREET, N.W. |
| | SUITE 400 |
| | WASHINGTON, D. C.  20004 |
| | |
| FOR THE DEFENDANT COATES: | FREDERICK JONES, ESQ. |
| | 901 6TH STREET, S.W. |
| | #409 |
| | WASHINGTON, D. C.  20024 |
| | |
| FOR THE DEFENDANT PRICE: | JONATHAN ZUCKER, ESQ. |
| | 601 INDIANA AVE., N.W. |
| | #901 |
| | WASHINGTON, D. C.  20004 |

(Page 325 of Total)

3

INDEX

WITNESS:                          DIRECT   CROSS   REDIRECT   RECROSS

DR. JONATHAN ARDEN

        BY MS. CHATURVEDI      7

        BY MR. ZUCKER                    49

        BY MR. BESHOURI                  56

EUGENE BYARS

        BY MR. ZEIDENBERG     64


                    E X H I B I T S

GOVERNMENT'S                 IN EVIDENCE

HH207 & HH208                9

HH200                        11

HH201                        13

HH204                        16

HH202                        18

HH203                        22

HH205                        24

TF203                        27

TF202                        32

TF201                        34

TB203                        35

TB200                        37

TB202                        42

TB201                        44

(Page 326 of Total)

70

THE COURT:  THE RECORD WILL SO REFLECT.

BY MR. ZEIDENBERG:

Q.   WHAT NAME DID YOU KNOW VINCENT HILL BY?

A.   "VITO."

Q.   NOW, MR. BYARS, DIRECTING YOU BACK TO WHEN YOU WERE APPROXIMATELY -- YOU SAID YOU'RE 29 YEARS OLD?

A.   YES.

Q.   YOU WERE BORN IN WHAT YEAR?

A.   1972.

Q.   BACK AROUND 1986, WHEN YOU WERE ABOUT 14 YEARS OLD, DID YOU BEGIN SELLING DRUGS?

A.   YES.

Q.   WHERE DID YOU BEGIN SELLING DRUGS?

A.   203 N STREET, SOUTHWEST.

Q.   WHAT DRUG DID YOU START SELLING?

A.   P.C.P.

Q.   DID YOU HAVE A SUPPLIER?

A.   YES.

Q.   WHO WAS THAT?

A.   VINCENT HILL.

MR. DAVIS:  YOUR HONOR, I WOULD ASK FOR A CAUTIONARY INSTRUCTION SINCE WE'RE OUTSIDE THE TIMEFRAME OF THE INDICTMENT NOW.

THE COURT:  ALL RIGHT.

YOU RECALL, LADIES AND GENTLEMEN, THAT THE PERIOD

71

AS TO WHICH HE IS TESTIFYING NOW IN 1986 IS OUTSIDE THE

PERIOD CONTAINED IN THE INDICTMENT.

MR. ZEIDENBERG:  THANK YOU, YOUR HONOR.

THE COURT:  OKAY.

BY MR. ZEIDENBERG:

Q.  CAN YOU TELL THE LADIES AND GENTLEMEN A LITTLE BIT ABOUT

HOW YOU WERE HUSTLING BACK IN 1986?

A.  WELL, I WAS HUSTLING UNDERNEATH THE 203 TUNNEL.  IT'S

LIKE AN APARTMENT BUILDING.

MR. JONES:  SPEAK UP.

THE WITNESS:  I  WAS HUSTLING UNDER THE 203

TUNNEL.  IT'S LIKE AN APARTMENT BUILDING.

BY MR. ZEIDENBERG:

Q.  AND YOU SAID YOU WERE SELLING P.C.P.?

A.  YES.

Q.  HOW DID YOU GET THE P.C.P.?

A.  I WAS GETTING IT FROM VINCENT HILL AT NIGHT, AND I WOULD

SELL IT IN THE MORNING.

Q.  HOW MUCH P.C.P. WERE YOU GETTING FROM VINCENT HILL EVERY

DAY?

A.  A THOUSAND DOLLARS.  ABOUT A HUNDRED BAGS.

Q.  A HUNDRED BAGS?

A.  YES.

Q.  A HUNDRED BAGS -- HOW MUCH IS A SINGLE BAG OF P.C.P. --

DO YOU SELL IT FOR?

72

A.  $10.00.

Q.  SO FROM A HUNDRED BAGS, YOU WOULD GENERATE HOW MUCH INCOME?

A. 1000.

Q.  WHAT TIME OF THE DAY WERE YOU SELLING?

A.  IN THE MORNING TO AROUND 4:00 O'CLOCK.  SOMETHING LIKE THAT.

Q.  4:00 O'CLOCK IN THE AFTERNOON?

A.  YES.

Q.  YOU WOULD START WHAT TIME IN THE MORNING?

A.  ABOUT 8:30.

Q.  DID YOU GO TO SCHOOL DURING THIS TIME?

A.  NO.

Q.  WHAT HAPPENED TO SCHOOL?

A.  I DROPPED OUT OF SCHOOL AND STARTED HUSTLING.

Q.  NOW, WHAT WOULD HAPPEN -- WHAT DID YOU DO WITH THE MONEY AT THE END OF THE DAY?

A.  I'D HOLD IT AND WAIT UNTIL VINCENT WOULD COME AND PICK IT UP.

Q.  WHERE WOULD HE PICK IT UP FROM?

A.  HE WOULD COME ON P STREET TO PICK IT UP.  I WOULD BE OUTSIDE.

Q.  HOW MUCH OF THAT THOUSAND DOLLARS DID YOU HAVE TO GIVE BACK TO VINCENT HILL?

A.  ALL OF IT.

73

Q.   HOW MUCH MONEY WERE YOU GETTING?

A. BASICALLY NOTHING.   PROBABLY ABOUT $50.00 OR SOMETHING LIKE THAT, AND THAT'S IT.

Q.   NOW, FROM WHAT YOU COULD SEE, MR. BYARS, WERE YOU THE ONLY ONE THAT WAS SELLING FOR VINCENT HILL?

A.   NO.

Q.   WERE THERE OTHERS LIKE YOU?

A.   YES.

Q.   WHAT AGES?

A.   YOUNGER AND OLDER.

Q.   AND IF YOU COULD JUST REMIND US, HOW OLD WERE YOU AT THE TIME?

A. FOURTEEN.

Q.   IF YOU WEREN'T MAKING ANY SIGNIFICANT AMOUNT OF MONEY, WHY WERE YOU DOING IT?

A.   WELL, I WANTED TO BE LIKE "VITO" AND WAYNE, YOU KNOW, AND HAVE POWER AND HAVE PEOPLE RESPECT ME, YOU KNOW.   I WAS TRYING TO IDOLIZE THEM.

Q.   WHEN YOU SAY "WAYNE," WHO ARE YOU REFERRING TO?

A.   WAYNE PERRY.

Q.   WHO IS WAYNE PERRY?

A. HE IS FROM SOUTHWEST.   HE IS A FRIEND OF VINCENT HILL'S.

Q.   WHAT WAS THE RELATIONSHIP, IF ANY, BETWEEN WAYNE PERRY AND VINCENT HILL?

A.   WELL, THEY WERE REAL CLOSE.

(Page 330 of Total)

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          .   Docket No. CR 98-329
                                   .
          Government,              .   Washington, D.C.
                                   .   April 9, 2001
     vs.                           .   2:12 p.m.
                                   .
VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .
                                   .
          Defendants               .
                                   .
. . . . . . . . . . . . . . . .    .
                                   .
UNITED STATES OF AMERICA,          .
                                   .
          Government,              .
                                   .
     vs.                           .   Docket No. CR 99-348
                                   .
GARY PRICE,                        .
                                   .
          Defendant.               .
                                   .
. . . . . . . . . . . . . . . .    .


TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

For the Defendant Carson:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7th Street, N.W.
                                   Washington, D.C.   20004

For the Defendant Sweeney:         STEVEN R. KIERSH, ESQ.
                                   717 D Street, N.W.
                                   Suite 400
                                   Washington, D.C.   20004

For the Defendant Coates:          FREDERICK JONES, ESQ.
                                   901 6th Street, S.W.
                                   Suite 409
                                   Washington, D.C.   20024

For the Defendant Price:           JONATHAN ZUCKER, ESQ.
                                   601 Indiana Ave., N.W.
                                   Suite 901
                                   Washington, D.C.   20024

Court Reporter:                    BEVERLY J. BYRNE
                                   Official Court Reporter
                                   Room 6810 U.S. Courthouse
                                   Washington, D.C.   20001
                                   (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

13

A.   I was just basically telling him about guys that's down Lorton talking about they wanted to kill him.

Q.   Mr. Byars, if you could put your hand down.

A.   I was basically telling him about guys that's down Lorton talking about they wanted to kill him and do things to him because of the results of Tony Fortune.

Q.   The people that you had talked to in Lorton who wanted to kill -- said they wanted to kill Mr. Martin, where were they from?

A.   They was from 58th and Paradise.

Q.   What did Pimp say when you told him that there were people down at Lorton from 58th and Paradise who wanted to kill him?

A.   It didn't matter.  He was saying things like, he ain't tripping off that shit, and what happens just happens.

Q.   Did you ask him what the problem was between him and 58th and Paradise?

A.   Yes.  He told me -- he was telling me that Tony jumped out there, was trying to advantage take when they was gambling.

Q.   Now, when he said Tony, did you know who he was referring to?

A.   I don't know the dude personally, but I know the name, because the guys in 58 was accusing him of -- that's the reason why they was beefing with them.

14

Q.   And the individual that the beef was over was named whom?

A.   Tony Fortune.

Q.   What did Pimp tell you about Tony Fortune?

A.   He would just say that he was trying to advantage take, you know, at a crap game.  And a guy named Block was with Tony, and he wasn't having it.

Q.   Did Pimp tell you what happened when Tony tried to take advantage?

A.   Yes.

Q.   What did he say?

A.   He said he shot him.

Q.   Now, did Pimp tell you what happened as a result of the murder of Tony Fortune?

A.   Yes, it started a turf war.

Q.   Between where?

A.   58th, Paradise and Southwest and Ridge Road.

Q.   Now, as a result of this turf war, did he tell you whether or not there were any casualties?

A.   Repeat that?

Q.   Was anyone hurt or injured or killed as a result of this turf battle?

A.   Yes.

Q.   Who?

A.   A guy named Boo-Boo and a girl named Felicia.  She was paralyzed.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,          . Docket No. CR 98-329

           Government,             . Washington, D.C.
                                   . April 24, 2001
     vs.                           . 2:15 p.m.

VINCENT HILL,                      . (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .

           Defendants              .

. . . . . . . . . . . . . . . . .  .

UNITED STATES OF AMERICA,          .

           Government,             .

                                   . Docket No. CR 99-348
     vs.                           .

GARY PRICE,                        .

           Defendant.              .

. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

2

For the Defendant Carson:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7th Street, N.W.
                                   Washington, D.C.   20004

For the Defendant Sweeney:         STEVEN R. KIERSH, ESQ.
                                   717 D Street, N.W.
                                   Suite 400
                                   Washington, D.C.   20004

For the Defendant Coates:          FREDERICK JONES, ESQ.
                                   901 6th Street, S.W.
                                   Suite 409
                                   Washington, D.C.   20024

For the Defendant Price:           JONATHAN ZUCKER, ESQ.
                                   601 Indiana Ave., N.W.
                                   Suite 901
                                   Washington, D.C.   20024

Court Reporter:                    BEVERLY J. BYRNE
                                   Official Court Reporter
                                   Room 6810 U.S. Courthouse
                                   Washington, D.C.   20001
                                   (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

3

P R O C E E D I N G S

THE COURT:  The record will reflect that over the noon hour I have reviewed the FBI 302 dated January 27, 1999 as being the 302 related to testimony about to be given by Mr. Rice, and I find nothing in it to permit it to be characterized as Brady material, and it is clearly not a Jencks Act statement.

Consequently I'm going to direct that the Clerk of the Court file this again under seal as a court exhibit and make it part of the record.

Are you ready?

MS. CHATURVEDI:  Yes, sir.

THE DEPUTY MARSHAL:  Jury panel, Your Honor.

(Jury In.)

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

*Clerks File*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
                GOVERNMENT,

    VS.                          :          CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,
                DEFENDANTS.

UNITED STATES
                GOVERNMENT,

    VS.                          :          CR. NO. 99-348

GARY PRICE,
                DEFENDANT

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
APRIL 25, 2001
(MORNING SESSION)
(10:35 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:          PHYLLIS MERANA
                         6816 U. S. DISTRICT COURT
                         3RD & CONSTITUTION AVE., N.W.
                         WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

(Page 339 of Total)

3

INDEX

WITNESS:                    DIRECT  CROSS  REDIRECT  RECROSS

ARTHUR RICE

    BY MS. CHATURVEDI    8

40

(END OF BENCH CONFERENCE.)

THE COURT: ALL RIGHT. THE OBJECTION IS OVERRULED. YOU CAN ASK YOUR QUESTION AGAIN.

BY MS. CHATURVEDI:

Q. MR. RICE, YOU HAD INDICATED THAT EVEN BEFORE YOU HAD BEEN INCARCERATED IN 1994, YOU HAD AN UNDERSTANDING AS TO WHO WAS RESPONSIBLE FOR THE MURDER OF TONY FORTUNE.

A. YES, I DID.

Q. AND WHAT WAS YOUR UNDERSTANDING AS TO WHO WAS RESPONSIBLE FOR THAT MURDER?

A. MY UNDERSTANDING WAS THAT IT WAS "PIMP" AND THAT IT WAS 37TH PLACE BECAUSE 58TH WAS ALWAYS "BEEFING" WITH 37TH PLACE AND NOT US.

Q. WHEN YOU WERE AT THE CHINESE CARRY-OUT WITH "CHIN" AND DAVE CARSON, CAN YOU TELL US HOW YOU BROUGHT UP THE MURDER OF TONY FORTUNE?

A. WELL, "CHIN" RARELY SAID ANYTHING EVER TO ME ABOUT ANYTHING HE'D EVER DONE. AND I REALLY DIDN'T KNOW HOW TO ASK HIM. I WAS KIND OF -- I HAD HEARD ALL KINDS OF -- NOT RUMORS, BUT PEOPLE TALKED TO ME A LOT BECAUSE ON THE STREET WHEN WE WAS LOCKED UP, DUDES ALWAYS RESPECTED ME FROM JAIL.

Q. SO WHAT DID YOU SAY TO "CHIN"?

A. I SAID, "MAN, ALL THAT TIME I THOUGHT IT WAS `PIMP,' AND COME TO FIND OUT IT WAS YOU, MAN."

Q. WHAT DID "CHIN" SAY WHEN YOU SAID THAT TO HIM?

HA 1045

41

A. HE STARTED LAUGHING. HE SAID, "WELL, NOW YOU KNOW." HE DIDN'T SAY NOTHING FURTHER. I KIND OF EXPRESSED THE FACT, "THIS IS HOW THE DUDE SAID IT HAPPENED," YOU KNOW. HE REALLY JUST SAID, "NOW YOU KNOW."

Q. AGAIN, HAD YOU SAID THE NAME OF THE PERSON TO HIM?

A. YES. I DIDN'T SAY "TONY FORTUNE." I JUST SAID "TONY" AT 58TH.

Q. WHEN "CHIN" SAID TO YOU, "NOW YOU KNOW," CAN YOU DESCRIBE HOW HE LOOKED AT YOU WHEN HE SAID THAT TO YOU?

A. IT'S TIME FOR ME TO SHUT UP, MAN, AND MIND MY BUSINESS, LIKE I HAD REALLY KIND OF LIKE MESSED UP BY EVEN ASKING HIM.

Q. WHY DID YOU ASK HIM?

A. WHY DID I ASK HIM?

Q. YES.

A. BECAUSE THE WAY IT WAS BROUGHT TO ME, I DIDN'T LIKE IT BECAUSE "BOO-BOO" WAS KILLED BEHIND THAT, AND SEVERAL PEOPLE TOLD ME --

Q. I AM NOT GOING TO ASK YOU WHAT OTHER PEOPLE TOLD YOU. "BOO BOO," THE PERSON THAT YOU MENTIONED WAS KILLED BEHIND THAT -- "BOO BOO" WAS SOMEONE THAT YOU WERE CLOSE WITH?

A. YES, WE WAS COOL WHEN WE WAS YOUNGER. I NEVER HAD A PROBLEM WITH "BOO-BOO."

Q. IN 1996 WHEN YOU WERE ON THE STREET AS WELL, MR. RICE, WERE YOU IN THE AREA OF SECOND AND P STREET AT A TIME WHEN YOU HEARD GUNSHOTS AND "CHIN" WAS IN THE AREA?

LLA 1046

46

Q.   AFTER YOU WERE LOCKED UP --

        THE COURT:   WHAT YEAR WAS THIS?

        THE WITNESS:   1996.   JULY 12TH.

BY MS. CHATURVEDI:

Q.   WHILE YOU WERE LOCKED UP -- DID YOU GO BACK TO THE D. C. JAIL AFTER YOU WERE LOCKED UP IN JULY OF 1996?

A. YES.   THAT'S WHERE I WENT.

Q.   DID THERE COME A TIME YOU SAW "PIMP" WHILE YOU WERE LOCKED UP AT THE D. C. JAIL?

A. YES, I DID.

Q.   WERE YOU AWARE OF WHY "PIMP" WAS LOCKED UP -- WHAT HE HAD BEEN CHARGED WITH?

A.   MURDER.

Q.   AND WERE YOU AWARE OF WHERE THAT MURDER HAD TAKEN PLACE?

A.   NOT REALLY AWARE WHERE THE MURDER TOOK PLACE, NO.

Q.   BEFORE YOU HAD GONE INTO THE D.C. JAIL IN 1996 -- WE'RE TALKING BETWEEN FEBRUARY OF 1996 AND JULY OF 1996 -- AT THAT POINT, WERE YOU AWARE AS TO WHETHER OR NOT THAT MURDER CHARGE WAS PENDING AGAINST "PIMP"?

A. YEAH.   I WAS AWARE OF THAT.   YEAH.

Q.   IT WAS?

A. YES.

Q.   DID YOU EVER HAVE ANY CONVERSATIONS WITH SAM ABOUT "PIMP'S" MURDER CASE?

A.   YES, I DID.

47

Q. AND CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY WHAT CONVERSATIONS YOU AND SAM HAD ABOUT "PIMP'S" MURDER CASE?

A. WELL, AT THE TIME I WAS HANGING WITH DAVE REAL TIGHT. WE WAS OVER AT SAM'S MOTHER'S HOUSE -- ME, HIM AND DAVE. SAM CAME IN, AND HE KNEW THAT I WAS HANGING AROUND 37TH -- ME AND "HEAVY HEAD" WAS GOING AROUND 37TH PLACE LIKE EVERY DAY. HE ASKED ME DID I KNOW A GIRL -- I FORGET HER NAME. "SISSY." I THINK HER NAME WAS "SISSY."

Q. WHO ASKED YOU IF YOU KNEW A GIRL BY THE NAME OF "SISSY"?

A. SAM. AND I SAID, "I DON'T THINK I KNOW HER." SO HE SAID -- DESCRIBED HER TO ME. HE TOLD ME WHERE SHE LIVED AT.

Q. WHERE DID SAM TELL YOU THAT THE GIRL LIVED AT?

A. HE SAID SHE LIVED AT THE TOP OF 37TH PLACE. YOU GO TO THE TOP OF 37TH AND YOU MAKE A LEFT. IT IS LIKE FIVE HOUSES DOWN BEFORE YOU GO DOWN TO THE BOTTOM OF THE STEPS.

Q. AND WHAT DID SAM TELL YOU ABOUT THE GIRL?

A. SHE WAS TESTIFYING AGAINST "PIMP."

Q. WHAT DID SAM ASK YOU TO DO ABOUT THIS GIRL?

A. HE LET ME KNOW -- FIRST, HE SAID -- HE STARTED LAUGHING. I CAN'T REMEMBER EXACTLY WHAT HE SAID.

Q. MR. RICE, MOVE A LITTLE BIT BACK FROM THE MICROPHONE.

A. OKAY. I CAN'T REMEMBER EXACTLY WHAT HE SAID RIGHT NOW -- THE EXACT WORDS THAT WERE USED, BUT HE TOLD ME, "IF YOU SEE HER, MAN, SHE IS TESTIFYING AGAINST `PIMP.'"

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,                    :

 VS.                                     :     CR. NO. 98-329

                                         :

VINCENT HILL,                            :
JEROME MARTIN,                           :
SAMUEL CARSON,                           :
WILLIAM K. SWEENEY,                      :
SEAN COATES,                             :
          DEFENDANTS.                    :
                                         :

UNITED STATES                            :
          GOVERNMENT,                    :

                                         :

 VS.                                     :     CR. NO. 99-348

                                         :

GARY PRICE,                              :
          DEFENDANT                      :

**FILED**

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MAY 1, 2001
(MORNING SESSION)
(10:23 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:          PHYLLIS MERANA
                         6816 U. S. DISTRICT COURT
                         3RD & CONSTITUTION AVE., N.W.
                         WASHINGTON, D. C. 20001

2

FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                      ANJALI CHATURVEDI, AUSA
                                      555 4TH ST., N.W.
                                      WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:        CHRISTOPHER DAVIS, ESQ.
                                      601 INDIANA AVE., N.W.
                                      #910
                                      WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:      JOANNE HEPWORTH, ESQ.
                                      305 H STREET, N.W.
                                      2ND FLOOR
                                      WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:      JOSEPH BESHOURI, ESQ.
                                      LEXI NEGIN-CHRIST, ESQ.
                                      419 7TH STREET, N.W.
                                      WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:     STEVEN R. KIERSH, ESQ.
                                      717 D STREET, N.W.
                                      SUITE 400
                                      WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:      FREDERICK JONES, ESQ.
                                      901 6TH STREET, S.W.
                                      #409
                                      WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:       JONATHAN ZUCKER, ESQ.
                                      601 INDIANA AVE., N.W.
                                      #901
                                      WASHINGTON, D. C.  20004

3

I-N-D-E-X

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

OFC. SHEILA HUDNELL

BY MS. CHATURVEDI    6

OFC. KEVIN JETER

BY MS. CHATURVEDI    20

BY MS. NEGIN-CHRIST    33

PAUL FRANKLIN

BY MS. CHATURVEDI    35


| GOVERNMENT'S EXHIBITS | IN EVIDENCE |
|---|---|
| MJ102 | 9 |
| M80 | 10 |
| MJ300 | 13 |
| MJ400, MJ401 & MJ402 | 15 |
| MJ101 | 18 |
| CG300 | 23 |
| CG400, CG401 AND CG402 | 24 |
| CG403 & CG404 | 25 |
| CG101 | 26 |
| M46 | 27 |
| M82 | 28 |
| M83 | 29 |
| CG104 | 31 |
| CG103 | 32 |

4

I N D E X (CONTINUED.)

M84                                      37

M85                                      51

55

MS. CHATURVEDI:  IF THE RECORD WOULD REFLECT AN IDENTIFICATION OF GARY PRICE, YOUR HONOR.

THE COURT:  THE RECORD WILL SO REFLECT.

BY MS. CHATURVEDI:

Q.  MR. FRANKLIN, DO YOU ALSO KNOW SOMEONE BY THE NAME OF VINCENT HILL?

A.  YES.

Q.  WHERE WAS IT THAT YOU FIRST MET HIM?

A.  1200.

Q.  1200 DELAWARE?

A.  YES.

Q.  DOWN IN SOUTHWEST?

A.  YES.

Q.  ABOUT HOW OLD WERE YOU WHEN YOU FIRST MET VINCENT?

A.  ABOUT 16 OR 17.

Q.  AND CAN YOU TELL US WHETHER OR NOT THERE IS AN AGE DIFFERENCE BETWEEN YOU AND VINCENT HILL?

A.  HE IS ABOUT SEVEN YEARS OLDER THAN ME.  SIX OR SEVEN.

Q.  WHO IS OLDER?

A.  HE IS THE OLDEST.

Q.  AND WHEN YOU MET MR. HILL, DID YOU START SPENDING TIME WITH HIM?

A.  YES.

Q.  WHY?

A.  HE WAS AN INTERESTING GUY.

56

Q.  WHAT WAS INTERESTING ABOUT HIM?

A.  HE HAD POWER.  HE HAD EVERYTHING THAT YOU WANTED.

Q.  AND DID YOU LOOK UP TO THAT?

A.  YES, I DID.

Q.  DID THERE COME A TIME WHEN YOU WERE EXPECTING, IN THE LATE 1980'S, THE BIRTH OF YOUR FIRST CHILD?

A.  YES.

Q.  DURING THE TIME WHEN YOU WERE EXPECTING THE BIRTH OF YOUR FIRST CHILD, DID YOU DEVELOP EVEN A CLOSER RELATIONSHIP WITH VINCENT HILL?

A.  YES, I DID.

Q.  WHY?

A.  MY SON WAS COMING.  I HAD NO WAY OF GETTING MONEY.  I WENT TO HIM.  HE HELPED ME OUT.  HE ASSISTED ME.

Q.  HOW DID HE HELP YOU OUT -- VINCENT HILL?

A.  HE GAVE ME SOME DRUGS.  HE GAVE ME SOME MONEY.

Q.  DO YOU SEE VINCENT HILL IN THE COURTROOM?

A.  YES.

Q.  COULD YOU PLEASE IDENTIFY VINCENT HILL BY WHERE HE IS SITTING OR AN ARTICLE OF CLOTHING THAT HE IS WEARING?

A.  HE'S SITTING BESIDE "DRAPER" WITH A BLACK CAP ON.

          MS. CHATURVEDI:  MAY THE RECORD REFLECT AN IDENTIFICATION OF VINCENT HILL, YOUR HONOR?

          THE COURT:  THE RECORD WILL SO REFLECT.

BY MS. CHATURVEDI:

58

A.  GIVE IT BACK TO HIM.

Q.  HOW WERE YOU MAKING ANY MONEY OUT OF THIS?

A.  HE WAS GIVING ME MONEY LIKE ON FRIDAYS.

Q.  LIKE A PAYDAY?

A.  YES, LIKE A PAYDAY.

Q.  WHERE WAS IT THAT YOU WERE SELLING THESE DRUGS?

A.  203 N STREET.

Q.  AND THE P.C.P. THAT YOU WERE SELLING, IT WAS IN THE FORM OF WHAT?

A.  WATER.

Q.  LIQUID?

A. YES.

Q.  WHEN YOU FIRST STARTED SELLING THESE DRUGS FOR VINCENT HILL AND RETURNING THE MONEY BACK TO VINCENT HILL, HOW MANY DAYS A WEEK WERE YOU SELLING?

A.  REGULAR.

Q.  AND DID THIS CONTINUE THROUGH THE BIRTH OF YOUR SON?

A.  YES, IT DID.

Q.  FOR HOW LONG DID YOU HAVE THIS ARRANGEMENT WITH VINCENT HILL, ROUGHLY?

A.  ABOUT TWO YEARS, ROUGHLY.

Q.  AFTER THAT --

        MR. DAVIS:  YOUR HONOR, I AM SORRY TO INTERRUPT. MAY WE HAVE THAT INSTRUCTION?

        HE JUST TOOK US UP TO THE TIME PERIOD WHEN THE

HA 2041

INDICTMENT BEGINS. I REQUEST THE INSTRUCTION YOUR HONOR HAS GIVEN IN THE PAST ABOUT ACTIVITIES THAT PRECEDE THE INDICTMENT PERIOD.

THE COURT: ALL RIGHT.

I HAVE BEEN ASKED TO REMIND YOU THAT TESTIMONY HAVING TO DO WITH MATTERS THAT PRECEDE THE INDICTMENT -- THE INTERVAL COVERED BY THE INDICTMENT IN THIS CASE -- ARE NOT CHARGED CRIMES HERE.

MS. CHATURVEDI: MAY I PROCEED, YOUR HONOR?

THE COURT: I BEG YOUR PARDON?

MS. CHATURVEDI: MAY I PROCEED?

THE COURT: YOU MAY.

BY MS. CHATURVEDI:

Q. NOW, MR. FRANKLIN, WERE YOU EVER IN A POSITION TO SEE WHETHER OR NOT VINCENT HILL WAS GIVING ONLY YOU DRUGS TO SELL, OR DID YOU EVER SEE HIM GIVING OTHER PEOPLE DRUGS TO SELL?

A. YES, I DID SEE HIM GIVE OTHER PEOPLE DRUGS TO SELL.

Q. AND THE AGE RANGE OF THE PEOPLE TO WHOM YOU SAW VINCENT HILL GIVE DRUGS TO SELL, COMPARED TO YOURS?

A. THEY WERE YOUNGER THAN HIM.

Q. YOUNGER THAN HIM?

A. YES.

Q. WHAT ABOUT COMPARED TO YOU?

A. ROUGHLY ABOUT MY AGE.

UA 2042

60

MR. JONES:  MAY WE HAVE THE TIME PERIOD, YOUR HONOR?

MS. CHATURVEDI:  I HAVE ASKED THAT QUESTION, YOUR HONOR.  COUNSEL CAN INQUIRE ON CROSS-EXAMINATION.

THE COURT:  YES.

BY MS. CHATURVEDI:

Q.  MR. FRANKLIN, WERE YOU EVER PRESENT WHEN PEOPLE WOULD RETURN MONEY OR COME BACK TO VINCENT HILL AND RETURN MONEY TO HIM?

A.  YES.

Q.  DID YOU EVER SEE VINCENT HILL GET UPSET WITH PEOPLE?

A.  YES, I DID.

Q.  CAN YOU TELL THE LADIES AND GENTLEMEN OF THE JURY UNDER THOSE CIRCUMSTANCES WHAT WOULD GET VINCENT HILL UPSET?

A.  MONEY SHORT.  STUFF WASN'T RIGHT.

Q.  WHAT DO YOU MEAN STUFF WASN'T RIGHT?

A.  THE BOAT WASN'T RIGHT.  IT WAS DRIED UP.  IT WASN'T RIGHT.

Q.  AND BOAT IS WHAT?

A.  P.C.P. POURED ON MARIJUANA.

Q.  DID VINCENT HILL EVER GET UPSET WITH YOU?

A.  YES.

Q.  OVER WHAT?

A.  MONEY BEING SHORT.

Q.  NOW, YOU INDICATED THAT YOU HAD THIS ARRANGEMENT WITH

UA 2043

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,               :
                                  :
                                  :
 VS.                              :     CR. NO. 98-329
                                  :
VINCENT HILL,                     :
JEROME MARTIN,                    :
SAMUEL CARSON,                    :
WILLIAM K. SWEENEY,               :
SEAN COATES,                      :
        DEFENDANTS.               :
_____      :
UNITED STATES                     :
        GOVERNMENT,               :
                                  :
 VS.                              :     CR. NO. 99-348
                                  :
GARY PRICE,                       :
        DEFENDANT                 :
                                  :

**FILED**

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MAY 23, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:            PHYLLIS MERANA
                           6816 U. S. DISTRICT COURT
                           3RD & CONSTITUTION AVE., N.W.
                           WASHINGTON, D. C. 20001

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001


FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004


FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001


FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004


FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004


FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

                              INDEX

WITNESS:                    DIRECT   CROSS   REDIRECT   RECROSS

SP. AGT. VINCENT LISI

        BY MS. CHATURVEDI      7

        BY MR. DAVIS                    11

        BY MR. ZUCKER                   22

JAMES MONTGOMERY

        BY MR. ZEIDENBERG   24

(Page 356 of Total)

)

(JAMES MONTGOMERY, GOVERNMENT'S WITNESS, PREVIOUSLY SWORN.)

THE COURT:  GOOD MORNING, MR. MONTGOMERY.

THE WITNESS:  GOOD MORNING, YOUR HONOR.

THE COURT:  YOU ARE STILL UNDER OATH, SIR.

THE WITNESS:  YES.

                    DIRECT EXAMINATION

BY MR. ZEIDENBERG:

Q.  GOOD MORNING, SIR.

A.  GOOD MORNING.

Q.  COULD YOU PLEASE JUST REMIND US -- STATE YOUR NAME AGAIN FOR THE COURT REPORTER?

A.  MY NAME IS JAMES MONTGOMERY.

Q.  NOW, MR. MONTGOMERY, YOU TESTIFIED SOME MONTHS AGO IN THIS CASE.  AND I JUST HAVE A COUPLE OTHER INCIDENTS THAT I WANT TO ASK YOU ABOUT TODAY.

SPECIFICALLY, I WANT TO DIRECT YOUR ATTENTION BACK TO 1994 -- THE SUMMER OF 1994 -- AND ASK YOU IF YOU WERE FAMILIAR BACK AT THAT TIME WITH SOMEONE BY THE NAME OF LOU OR LOU ENGLISH FROM THE K STREET AREA?

A.  YES.

Q.  WHO WAS LOU?

A.  IT WAS AN INDIVIDUAL THAT LIVED IN THAT NEIGHBORHOOD.

Q.  WAS HE SOMEONE WHO FREQUENTED OR WAS COMMONLY OUT ON K STREET SELLING MARIJUANA?

A.    HE CAME THERE OCCASIONALLY.   NOT DAY IN, DAY OUT.

Q.    OCCASIONALLY, YOU'RE SAYING?

A.    YES.

Q.    NOW, HAD YOU EVER HAD OCCASION TO SPEAK WITH SAM CARSON, "CHIN," ABOUT LOU PRIOR TO LOU BEING SHOT?

A.    YES.

Q.    CAN YOU TELL US ABOUT SOME OF THOSE CONVERSATIONS?

A.    WELL, ONE TIME HE SPOKE TO ME AND HE TOLD ME THAT --

Q.    WHO ARE WE REFERRING TO?   WHEN YOU SAY "HE," WHO ARE YOU REFERRING TO?

A.    "CHIN"

Q.    OKAY.

A.    THAT HE THINKS THAT -- HE SAID THAT HE WAS ALMOST CERTAIN THAT LOU HAD TOLD KEITH HOLMES AND THEM WHERE HIS MOTHER LIVES AT.

Q.    REMIND US AGAIN WHO KEITH HOLMES WAS.

A.    KEITH HOLMES AND "BLOCK" AND THEM -- AND THERE WERE SOME MORE INDIVIDUALS -- THEY HAD SOMETHING TO DO WITH "BOO-BOO" GETTING KILLED -- ONE OF MY FRIENDS NAMED "BOO BOO."

Q.    AND KEITH HOLMES YOU ASSOCIATED WITH WHAT NEIGHBORHOOD?

A.    58TH AND PARADISE.

Q.    OKAY. SO "CHIN" SAID SOMETHING ABOUT LOU TELLING KEITH HOLMES WHERE "CHIN'S" MOTHER LIVED?

A.    YES.

Q.    AND COULD YOU TELL US WHAT SIGNIFICANCE THERE IS, IN

26

YOUR EXPERIENCE, WITH TELLING PEOPLE IN THE NEIGHBORHOOD WHERE YOU LIVE?  IS THAT INFORMATION THAT IS GENERALLY KEPT PRIVATE?

A. PRETTY MUCH.

Q.  WHY IS THAT?

A.  BECAUSE IT COULD BRING TROUBLE TO YOUR HOME.

Q.  WHAT DID "CHIN" SAY ABOUT LOU TELLING -- WHAT DID "CHIN" TELL YOU ABOUT THE FACT THAT HE THOUGHT LOU HAD TOLD KEITH HOLMES THIS INFORMATION?

A.  HE SAID THAT KEITH HOLMES AND LOU WAS COUSINS AND THAT HE BELIEVED THAT LOU MAY HAVE TOLD KEITH WHERE HIS MOTHER LIVED AT, BUT HE SAID FOR SURE THAT HE KNEW THAT KEITH AND THEM KNEW EXACTLY WHERE HIS MOTHER LIVED AT.

Q.  WAS HE CONCERNED ABOUT THAT?

A.  YES.  I WAS CONCERNED, TOO.

Q.  WHY WERE YOU CONCERNED?

A.  BECAUSE I DIDN'T WANT NOTHING TO HAPPEN TO HIM.

Q.  "CHIN"?

A.  RIGHT.

Q.  DID "CHIN" SAY WHAT HE WANTED TO DO TO LOU?

A.  HE SAID THAT IF I SEE LOU ON THAT SIDE -- ON THE SIDE WHERE -- ON THE 203 SIDE OF SOUTHWEST -- I'M GOING TO PUT IT LIKE THAT.  THAT'S THE BEST WAY I COULD PUT IT.

Q.  OKAY.

A.  THAT LOU DIDN'T HAVE NO REASON TO BE AROUND THERE.  THAT

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 360 of 443
Case 1:98-cr-00329-RCL   Document 711   Filed 07/19/01   Page 27 of 78

27

HE DIDN'T FUCK WITH NOBODY AROUND THERE.  AND IF I SEE HIM AROUND THERE, TO LET HIM KNOW, OR IF I SEE HIM IN A GOOD POSITION, TO HIT HIM.

Q.  AND WHEN YOU SAY "HIT HIM," WHAT DOES THAT MEAN?

A.  KILL HIM.

Q.  AND WOULD YOU HAVE DONE THAT?

A.  MORE THAN LIKELY, YES.

Q.  NOW, I WANT TO DIRECT YOUR ATTENTION TO -- DO YOU REMEMBER THE EVENING IN THE SUMMER OF '94 WHEN LOU GOT SHOT?  I AM NOT ASKING WHAT THE DATE WAS, BUT DO YOU REMEMBER THE OCCASION -- THE INCIDENT ITSELF?

A.  YES.

Q.  AND CAN YOU TELL US WHAT YOU REMEMBER ABOUT THAT EVENING PRIOR TO THE SHOOTING?

A.  WELL, NOT LONG -- I HAD JUST GOT FINISHED SELLING WEED.

Q.  WHERE WERE YOU SELLING YOUR WEED THAT NIGHT?

A.  K STREET IN THE COURT.  IN THE COURTYARD WHERE K STREET IS AT.

Q.  WHAT HAPPENED WHEN YOU FINISHED SELLING YOUR WEED?

A. I WAS OUT THERE.  THERE WAS A FEW OTHER PEOPLE OUT THERE.  I DON'T REMEMBER EVERYONE.  I DON'T REMEMBER EVERY INDIVIDUAL THAT WAS OUT THERE.  "CHIN" AND "POO POO" WASN'T OUT THERE AT FIRST.  THEY CAME OUT THERE.  SO "CHIN" ASKED ME WHAT WAS I DOING.  SO I TOLD HIM, "NOTHING."  AND HE SAID THAT SOMETHING WAS ABOUT TO HAPPEN.

Q.   SOMETHING WAS ABOUT TO HAPPEN?

A.   RIGHT.

Q.   DID HE SAY WHAT IT WAS THAT WAS ABOUT TO HAPPEN?

A.   NO.

Q.   WHAT DID YOU SAY WHEN HE TOLD YOU SOMETHING WAS ABOUT TO HAPPEN?

A.   SO I ASKED HIM WAS HE ALL RIGHT.  HE SAID, "YEAH."  I SAID, "YOU DON'T NEED ME?"  AND HE SAID, "NO."

Q.   SO WHAT DID YOU DO?

A.   SO I LEFT.

Q.   WHERE DID YOU GO?

A.   I WENT UP TO THE GRAND CHINA AND GOT ME SOMETHING TO EAT.

Q.   GRAND CHINA IS A RESTAURANT?

A.   YES.

Q.   HOW DID YOU GET THE GRAND CHINA?

A.   I DROVE UP THERE.

Q.   NOW, DID YOU RETURN BACK TO K STREET A SHORT TIME LATER?

A.   I CAME BACK -- I CAME BACK DOWN K STREET.  I PARKED -- I CAME DOWN.  I PARKED BACK IN THE ALLEY WHERE I NORMALLY PARKED AT.

Q.   AND WHEN YOU GOT OUT THERE, CAN YOU TELL US WHAT YOU SAW?

A.   THE POLICE AND PARAMEDICS AND STUFF WAS OUT THERE, AND LOU WAS LAYING ON THE GROUND, AND THEY WERE WORKING ON HIM.

Q. DID YOU SEE ANY SIGN OF SAM CARSON OR "CHIN" WHEN YOU GOT BACK THERE?

A. NO. NOBODY WASN'T OUT THERE REALLY. THERE WAS LIKE PEOPLE THAT LIVED AROUND THERE. I'M TALKING ABOUT LIKE PEOPLE THAT LIVED IN THE HOUSES -- LIKE OLDER PEOPLE OR WHATEVER.

Q. OKAY.

NOW, THE FOLLOWING DAY DID YOU HAVE A CONVERSATION WITH "CHIN" AND "POO POO" ABOUT WHAT HAD HAPPENED TO LOU ENGLISH?

A. I WAS TAKING "CHIN" AND "POO POO" BACK AROUND TO THE OTHER SIDE -- AROUND TO THE P STREET SIDE IN SOUTHWEST.

Q. THIS IS THE DAY AFTER?

A. RIGHT.

Q. WHAT HAPPENED?

A. AND BASICALLY THEY WERE TALKING ABOUT THAT LOU DIDN'T DIE. AND "POO POO" SAID SOMETHING ABOUT LOU SNITCHING, AND "CHIN" SAID THAT HE DON'T THINK LOU WAS GOING TO SNITCH, BUT HE SAID THAT LOU WAS GOOD AT CREEPING. THAT HE WAS SNEAKY.

Q. AND WHAT DID "CHIN" SAY ABOUT THE FACT THAT HE THOUGHT THAT LOU WAS GOOD AT CREEPING?

A. THAT THERE WAS A POSSIBILITY --

THE COURT: GOOD AT WHAT?

MR. ZEIDENBERG: HE'S GOOD AT CREEPING. C-R-E-E-P-I-N-G.

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 363 of 443

THE COURT: LOU WAS GOOD AT CREEPING?

MR. ZEIDENBERG: AND HE WAS SNEAKY.

BY MR. ZEIDENBERG:

Q. IS THAT CORRECT, MR. MONTGOMERY?

A. RIGHT. YES.

Q. AND WHAT WAS "CHIN'S" CONCERN ABOUT THAT?

A. THAT LOU MIGHT TRY TO RETALIATE BECAUSE OF WHAT THEY HAD DONE TO HIM.

Q. WHAT DID "CHIN" SAY, IF ANYTHING, SHOULD BE DONE ABOUT LOU?

A. I AM NOT SURE IF HE SAID ANYTHING, BUT I KNEW THAT -- I KNEW THAT FROM HIS CONCERN THAT, WITHOUT SAYING IT, IF I AM ABLE TO CATCH LOU -- IT WAS, I MEAN, UNSPOKEN.

MR. BESHOURI: OBJECTION. OBJECTION.

MR. ZEIDENBERG: LET ME ASK A DIFFERENT QUESTION, IF I MAY, YOUR HONOR.

THE COURT: I THINK HE HAS FINISHED HIS ANSWER. GO AHEAD.

BY MR. ZEIDENBERG:

Q. IF YOU HAD SEEN LOU AFTER THAT CONVERSATION WITH "CHIN", WHAT WOULD YOU HAVE DONE TO HIM?

A. IF HE WAS IN A GOOD POSITION, MORE THAN LIKELY -- I AM ALMOST A HUNDRED PERCENT SURE THAT I WOULD HAVE GOT WITH HIM.

Q. WHEN YOU SAY "GOT WITH HIM"?

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 364 of 443
Case 1:98-cr-00329-RCL    Document 711    Filed 07/19/01    Page 31 of 78

31

A. I WOULD HAVE KILLED HIM.

Q. FOR WHAT REASON?

A. TO MAKE SURE HE DON'T TRY TO GET BACK AT "CHIN" OR TO MAKE SURE HE DON'T TRY TO GET AT ME BECAUSE HE KNEW ME AND "CHIN" WAS COOL.

Q. AND WHY WOULD YOU BE CONCERNED THAT LOU WOULD RETALIATE AGAINST YOU? DID YOU HAVE ANYTHING TO DO WITH HIS SHOOTING?

A. NO, BUT HE KNEW ME AND "CHIN" WAS COOL. SO HE WOULD VIEW ME AS HE VIEWED "CHIN", AS A THREAT.

Q. NOW, I WANT TO TURN YOUR ATTENTION, MR. MONTGOMERY, TO ANOTHER INCIDENT THE FOLLOWING SUMMER -- LATE SUMMER OF 1996. DO YOU REMEMBER BEING APPROACHED BY "CHIN" IN THE LATE SUMMER OF 1996, WHERE HE ASKED YOU ABOUT WHERE YOU HAD BEEN THE PREVIOUS DAY BECAUSE HE HAD NEEDED YOU?

A. YES.

Q. ALL RIGHT. CAN YOU TELL US ABOUT THAT CONVERSATION? WHERE DID IT TAKE PLACE AND HOW DID IT START?

A. I WAS AROUND SECOND STREET, AND ON THE PARTICULAR DAY WHEN IT HAPPENED, I DIDN'T KNOW NOTHING ABOUT IT AT ALL. THE NEXT DAY WHEN I SEE "CHIN," HE ASKED ME WHERE WAS I AT YESTERDAY. I DON'T RECALL AT THIS TIME WHERE I WAS AT. BUT HE SAID THAT HE NEEDED ME BECAUSE SOME "JAKES" HAD GOT HIM FOR HIS MONEY.

Q. AND THE TERM "JAKES" -- WHAT DOES THAT MEAN?

A. SOME JAMAICANS.

Case 1:98-cr-00329-RCL   Document 972   Filed 03/11/03   Page 1 of 65

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              . Docket No. CR 98-329
                                       .
          Government,                  . Washington, D.C.
                                       . May 23, 2001
   vs.                                 . 2:43 p.m.
                                       .
VINCENT HILL,                          . (AFTERNOON SESSION)
JEROME MARTIN,                         .
SAMUEL CARSON,                         .
WILLIAM K. SWEENEY,                    .
SEAN COATES,                           .
                                       .
          Defendants                   .
                                       .
. . . . . . . . . . . . . . . . . . .  .
                                       .
UNITED STATES OF AMERICA,              .
                                       .
          Government,                  .
                                       . Docket No. CR 99-348
   vs.                                 .
                                       .
GARY PRICE,                            .
                                       .
          Defendant.                   .
                                       .
. . . . . . . . . . . . . . . . . . .  .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

3

P R O C E E D I N G S

THE COURT:  Mr. Kiersh.

MR. KIERSH:  Thank you, Your Honor.  Your Honor, I want to raise a Brady violation and move for sanctions.  I don't know if you want to take it up now or -- well, actually I'd like to do it before Mr. Montgomery resumes his testimony, because it relates to Mr. Montgomery.

THE COURT:  Go ahead.

MR. KIERSH:  The Brady violation is this.  For the first time today I was informed through the testimony of Mr. Montgomery that Mr. Montgomery had cooperated with Mr. Switzer in planning to kill Robocop, aka Donnell Whitfield.  It's my client, Mr. Sweeney, who is the only one charged with the murder of Donnell Whitfield.

And this -- I had never heard this before.  I had never been given notice of this before, and I'll go through my analysis and explain why it's Brady.

It's Brady, and I gave the Court a copy of Strickler versus Green, a Supreme Court decision from 1999.  I think it's the most recent Supreme Court interpretation of Brady. And on page 5 of the opinion, the Supreme Court says there are three essential components of a true Brady violation.  The evidence at issue must be favorable to the accused either because it is exculpatory or because it is impeaching.  The evidence must have been suppressed by the state either

4

willfully or inadvertently, and prejudice must have ensued.

I would submit to the Court we've satisfied all of the criteria as set forth in Strickler.  My whole theory of defense with respect to murder of Donnell Whitfield, as the Court will recall, is that Reginald Switzer perpetrated that murder.  It was Mr. Whitfield and Mr. Seabrooks who Mr. Switzer testified to who had assaulted him in the '80s.

Mr. Switzer very clearly testified that he murdered George Seabrooks in retaliation for an assault that Seabrooks and Whitfield committed against him, and he said that, yeah, he wanted to kill Whitfield, but then he denies doing it.  And he also said at one point, he said, I went up to his window.  I was looking.  I was taking that many steps to actually look in and follow him, but I decided not to shoot him because there were other people around, and I did not want to alert anyone else that I was involved in the planning and the formulation and intent to kill Robocop.

And Mr. Montgomery tells us this morning that he spoke with Mr. Switzer.  That Mr. Montgomery was going to retaliate for Mr. Switzer.  The term that Mr. Montgomery said was, I will bust his ass, and that they had planned together to kill Robocop, and that's completely consistent with my theory that it was Switzer and not Mr. Sweeney who killed Robocop.

THE COURT:  All right.  That having been said, show

5

me where the prejudice is.

MR. KIERSH:  The prejudice is here.  I've been deprived of the opportunity to cross Mr. Switzer on whether or not he had these conversations and took these actions with Mr. Montgomery.

THE COURT:  Call him back.

MR. KIERSH:  And anticipating that the Court was going to say that, I'm going to respond to the Court that I have no interest in calling Mr. Switzer back.  I'm not interested in sponsoring his testimony, even though it would be an adverse witness.  I believe I spent a great deal of time impeaching his credibility.  I believe that he has lied in this court.  I believe he has lied on other occasions.

I have been prohibited from speaking with him directly by his counsel, and I do not want to be put in the position where to clarify my record, my theory of defense based on new information that was brought out for the first time today by having to put this witness on who I have no faith in the truthfulness of his answers.

And my cross-examination of Mr. Switzer would have been different, and my cross-examination of Mr. Montgomery today would have been different.  Mr. Montgomery's testimony today completely contradicts Mr. Switzer's denial of complicity in that murder.  It shows that, in fact, not only did Mr. Switzer said he had the motive, he had the intent.

Here we have Mr. Montgomery saying he took the next step. He talked to me about doing it for him. And it also contradicts Mr. Switzer's testimony when he said he went up to the window to track this guy down, and then I backed off of it because I didn't want to alert anybody. Here he is alerting another person to the fact that he wanted to commit this murder.

I believe we've satisfied all of the criteria set forth by the Supreme Court in Strickler, and I've also given the Court a copy, and counsel for the government copies of cases from our Circuit, the D.C. Circuit, in which United States versus Smith, Appeal Number 923220, where our Court of Appeals says where there is a Brady violation, it says, we do not lightly excuse Brady violations.

Because the government's non-disclosures in this case significantly impaired defense counsel's ability to impeach the credibility of a principal prosecution witness. We reverse and remand for a new trial. Now, that's exactly what we have here is that I have been impaired in my ability to impeach the credibility of Mr. Switzer and maybe impeach the credibility of Mr. Montgomery.

And that this is a clear violation because it is exculpatory testimony because it completely -- it not only is impeachment, but the testimony of Mr. Montgomery perfectly fits within the defense theory of someone other than Mr.

7

Sweeney committing this key murder in this indictment.    And that if this case were to go all the way to verdict, and if Mr. Sweeney were to be found guilty of the murder of Mr. Whitfield, I would submit to the Court it would require reversal because of the failure of the government to disclose the information.

I would suggest to the Court that the appropriate sanction now is to strike the testimony of Mr. Montgomery on this issue as it relates to Mr. Sweeney and to strike the entire testimony of Bernard Switzer as it relates to Mr. Sweeney in the context of the Donnell Whitfield murder.

THE COURT:  I've got your point.

MR. DAVIS:  Your Honor, I hate to disrupt your proceedings, but I need to go outside for a meeting.  I'm not feeling very good.

THE COURT:  You don't look well.

MR. DAVIS:  No.  Actually I feel like I'm about ready to go under.  If I may go out for a moment and get some water.

THE COURT:  Sure.

MR. JONES:  Need some help?  May I help him?

THE COURT:  Yes.

(Whereupon, Mr. Davis and Mr. Jones exited the courtroom.)

MR. KIERSH:  Just a -- I think I referred to Mr.

23

information on it, but it wouldn't have been accepted by --
probably by that jail thing.

Q.    So did you go to see Draper at the jail?

A.    No.

Q.    Did Chin go?

A.    Yes.

Q.    And after he went, did he tell you about his conversation
with Draper?

A.    Chin say that him and Draper father went to see him,
and --

THE COURT:    Him and Draper what?

THE WITNESS:    Him and Draper father.  Chin and
Draper's father went to see Draper.

THE COURT:    Oh, I see.  Draper's father.  All right.

THE WITNESS:    And said that he asked Draper
distinctively who did you tell anybody about what had
happened?  And he said that Draper admitted to him that he
told Butchie, and that Butchie was cooperating with the Feds.

BY MR. ZEIDENBERG:

Q.    Did Chin say what had to be done or what should be done
about Butchie?

A.    So Chin told me that if they had no Butchie -- without
Butchie, they don't have no case.  They wouldn't have no case.

Q.    And when you were talking about a case, what case was it
that you were all concerned about?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

24

A.    The triple murder.

Q.    Now, did you and Chin make attempts together to find and kill Butchie?

A.    Yes.

Q.    Can you tell the ladies and gentlemen about that?

A.    Sometimes when we used to -- when we would go to this carry-out, Leo's --

Q.    Where is that located?

A.    It's on N Street.

Q.    I'm sorry?

A.    South Capitol and N.

Q.    N as in Nancy?

A.    Yes.  South Capitol and N.

Q.    Okay.

A.    That's near the area where Butchie would more than likely be, as far as when he was in Southwest.  So sometimes when we walked to Leo's we would -- we would already be going to Leo's anyhow, but we would try to see if we see Butchie out there as we are going or coming from there, and sometimes we would drive through, through there.

Q.    What were you going to do if you saw Butchie?

A.    Well, we saw him numerous amount of times, but we couldn't do nothing to him in front of like everybody just like that, do you know what I mean.  We're from Southwest and he is -- he knowed the same people we know, so we couldn't

25

just walk right up to him just like that and do anything to him.

Q.    What were you hoping to find?  What were you hoping to do?

A.    To catch him in a nice position.

Q.    What is a nice position?

A.    To catch him in a position where we could get up on him without a person knowing who we are or without him seeing us coming.

Q.    Now, was there an occasion when you and Chin were in a car and you happened to see Butchie?

A.    We was in my car.

Q.    Can you tell us about that?

A.    We rode through housing -- I mean, through Half Street, and Butchie was out there.  He was sitting on the steps that lead to Syphax playground. So we hurried up and went to Chin house, I stayed in the car.  And he got out and he went and got his sweatsuit, and the gun, and his gut-buster.

Q.    What's a gut-buster?

A.    Like elastic velcro, like a waistband.

Q.    And what's the purpose of that?

A.    To hold the gun.

Q.    What did Chin do with his sweatsuit -- what kind of a sweatsuit did he get?

A.    It was a black sweatsuit.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 506

26

Q.    What did he do with it?

A.    He was putting in on while I was driving.

Q.    Where was he putting it on?

A.    In the car.

Q.    What car did you have?

A.    Oldsmobile 98.

Q.    Where did you go once Chin got back in the car with his gun and his sweatsuit?

A.    We went down Canal Street, and then got on -- got onto First Street, and then hit M Street, and then hit South Capitol Street.  And I pulled on -- he told me to pull on the side -- on the side of -- like the sidewalk.  It's like a little car dealership thing right there.

        So I stayed right there, and Chin got out to go -- to go through the alley to try to catch him from behind.

Q.    Now, was there a discussion between you and Chin about an escape route you were going to take?

A.    When he came back to the car then I was suppose to pull straight over the curb and go straight across South Capitol Street Bridge so he could throw the pistol out while we were going over the river, and go around 37th.  And that was going to be our alibi.

Q.    And that was a plan you discussed before Chin got out of the car?

A.    Right.

27

Q.   And again, the purpose in going up and ending up at 37th Place was going to be what?

A.   Our alibi.

Q.   What happened when Chin got out of the car?

A.   He went around there, and he came back, and he said that Butchie was gone.  When he got back in the car the first thing I said, I said, what happened?  Because I didn't hear the gunshots or nothing.  So I said, what happened?  And he said that Butchie wasn't there, that he was gone, he said he left that quick.

Q.   Now, I want to talk to you about the day that Butchie was actually killed, do you remember that day?

A.   Yes.

Q.   Where were you the day that Butchie was killed, starting in the afternoon?

A.   On Second Street.

Q.   Second Street, Southwest?

A.   Yes.

Q.   And what were you doing there?

A.   Selling weed.

        THE COURT:  What was the date?

        MR. ZEIDENBERG:  I'm sorry?

        THE COURT:  What was the date?

        MR. ZEIDENBERG:  I didn't refer to the date.  It is June 16, 1997.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

28

THE COURT:  June 16th?

MR. ZEIDENBERG:  Yes.

THE COURT:  All right.  Go ahead.  I'm sorry.

BY MR. ZEIDENBERG:

Q.   Where were you -- you were on Second Street?

A.   Yes.

Q.   And what were you doing?

A.   Selling weed.

Q.   Now, at some point did you see Chin?

A.   Chin came out of his house and came and got my car keys.

Q.   Did you give it to him?

A.   Yes.

Q.   Did you ask him why he needed your car?

A.   No.

Q.   Was it uncommon for Chin to come by and take your car?

A.   No.  I mean, he would get it all the time, whenever.

Q.   Now, did he tell you where he was going?

A.   No.

Q.   Now, sometime later, after Chin -- did he leave with your car?

A.   Yes.

Q.   Okay.  Sometime later did you come to find out that there had been a shooting over on Half Street?

A.   Yes.

Q.   And at some point did you learn that that was Butchie?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

29

A.    Yes.

Q.    What did you do when you found out that Butchie had been killed?

A.    I got somebody's -- I got a bicycle from somebody and I rode up there, I rode the bicycle up there.

Q.    And where did you ride to?

A.    To the corner of Half and O Street.

Q.    What did you see when you got there?

A.    There was a lot of marked and unmarked police cars and a lot of people was out there.

Q.    Was Butchie's body still on the ground?

A.    I didn't see his body.  I seen like the crime scene tape and stuff like that.  I didn't go all the way down there because it was a lot of polices down there.

Q.    I take it you heard -- you had heard from people out there that it had been Butchie that was killed?

A.    Yes.

Q.    How did you feel when you heard that Butchie was killed?

A.    I was happy.

Q.    How concerned were you, prior to Butchie being killed, how concerned were you about the fact that he was still alive?

A.    It was of great concern.

Q.    Why is that?

A.    Because Draper had told him about what had happened, and I knew that if they pick us up for it that he could be a

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

App 510

30

witness as to what Draper told him.

Q.    Now, after you went to the scene did you return back to Second Street?

A.    Yes.

Q.    And at some point later that evening did Chin return?

A.    Yes.

Q.    Can you tell us about that?

A.    He came -- I was standing on the corner of Second and P Street and he came from the direction -- I'm not sure if he came straight down P Street or if he turned off of First Street, but I seen him on P Street turning into the alley where I normally -- where I had my car parked at at first. So when I seen him going into the alley, so I was walking down -- I was walking down towards that direction.  So no soon as I seen him, so I told him, I said, you know them peoples got hit.

Q.    Your term was what?

A.    I said, you know them peoples got hit.

Q.    You used the term peoples?

A.    That's what I said.  I said, you know them peoples got hit.  He was like, yeah, I know.  So he was like, we're all right.  So I said, yeah.  He said, -- so I said, you know who I'm talking about?  He was like, yeah.  He said, man, trust me, we're all right, just like that.  And then he was like, oh, here are your keys, and gave me my keys.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 972   Filed 03/11/03   Page 31 of 65

31

Q.    Did he seem at all surprised when you told him about that?

A.    No.  And he told me to stay from up Half Street with my car and not to drive it if I didn't have to.

Q.    I'm sorry?

A.    He told me to stay from up Half Street with my car and to not drive it that much if I didn't have to.

Q.    Now, had there been a previous occasion when Mr. Carson, Chin, took your car and then later told you not to drive it in a particular neighborhood?

A.    Yes.

Q.    Can you tell us about that?

A.    In '94, when I had my Caddie, I let Chin keep it, him and Poo-Poo had it, and they shot at Craig out of my car at Capers.

Q.    How do you know that?

A.    Because Chin told me.  He told me to stay from up Capers in my car, and he told me that they had took my car to get it washed and wiped down because they had shot out of it.

Q.    Talking about in 1994 now, did Chin tell you why it was that you should not drive your car up to Capers?

A.    No, that was all he said.

Q.    What did you understand that to mean, why you shouldn't go up to Capers?

A.    My knowledge would be that Craig might be able to

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

32

identify my car and may think that I was the person who was shooting at him and shoot at me, or somebody else might have seen it and be able to identify my car, and they might not have known who was shooting out of it and may have been thinking that I was the one who was shooting or whatever.

Q.    Mr. Montgomery, after you had learned that Butchie had been killed what did you think -- how were you feeling in terms about that triple murder and your possibly being implicated in it?

A.    Would you repeat your question?

Q.    After you learned that Butchie had been killed how were you feeling about the fact about your chances of being implicated in the triple murder?

A.    I was feeling good pretty much.  To a certain extent I was feeling good.

Q.    Did you think you were in the clear?

A.    To a certain extent I felt as though I was in the clear.

MR. ZEIDENBERG:  I have no further questions, Your Honor.

MR. KIERSH:  May I proceed, Your Honor?

THE COURT:  You may.

MR. KIERSH:  Good afternoon, ladies and gentlemen.

THE JURORS:  Good afternoon.

CROSS EXAMINATION

BY MR. KIERSH:

57

cold outside.

Q. You were arrested in July of that year.

A. It was cold outside during that period.

Q. So it would have had to have been in the early part of the year? Because you were arrested July 30 of that year, correct?

A. I agree that I was arrested at the end of July, and I know that it was cold outside during the time when we was trying to get at Boo, when we was trying to get a lot of those guys.

Q. If you're not certain, that's fine, Mr. Montgomery. Let me move to the next question. Are you clear or not about --

A. I'm trying to be certain. I mean, I'm trying to be as clear to you as possible. Let me put it like this. I know it was a cold season. It probably was like cold from '96 going to '97. Let me put it to you like that.

Q. And when was it that you wanted to do harm to Ronnie Horns, the testimony you gave today about that?

A. It was after Chin got shot.

Q. And Chin got shot in -- Sam Carson got shot January of 1997, right?

A. I'm not sure. I know it was cold outside.

Q. Now, Mr. Montgomery, it wasn't until a few months after you admitted to the first degree murder of Chrishauna Gladden that you first mentioned to Agent Lisi anything about the

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. CR 98-329 |
| Government, | Washington, D.C. |
| | May 29, 2001 |
| vs. | 2:20 p.m. |
| VINCENT HILL, | (AFTERNOON SESSION) |
| JEROME MARTIN, | |
| SAMUEL CARSON, | |
| WILLIAM K. SWEENEY, | |
| SEAN COATES, | |
| Defendants | |

. . . . . . . . . . . . . . . .

| | |
|---|---|
| UNITED STATES OF AMERICA, | |
| Government, | |
| | Docket No. CR 99-348 |
| vs. | |
| GARY PRICE, | |
| Defendant. | |

. . . . . . . . . . . . . . . .

FILED

MAR 11 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

### TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Government: | PETER ZEIDENBERG, AUSA |
| | ANJALI CHATURVEDI, AUSA |
| | U.S. Attorney's Office |
| | 555 Fourth Street, N.W. |
| | Washington, D.C.  20001 |
| | |
| For the Defendant Hill: | CHRISTOPHER DAVIS, ESQ. |
| | 601 Indiana Avenue, N.W. |
| | Suite 910 |
| | Washington, D.C.  20004 |
| | |
| For the Defendant Martin: | JOANNE HEPWORTH, ESQ. |
| | 305 H Street, N.W. |
| | Second Floor |
| | Washington, D.C.  20001 |



App 515

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

12

under which he would be speaking with you, did he continue then after hearing that to tell you about conversations he had with a number of people, but specifically William Sweeney?

A.   Yes, he did.  At first we started talking about drug things, his sources of supply of marijuana, how he got into selling marijuana.  We went through, you know, how his drug operation worked, and then he told me that he knew about quite a few murders and crimes of violence that had been committed by Mr. Sweeney and some of his associates.

Q.   When you -- well, at that point were you interested in hearing about what Mr. Smith knew that Mr. Sweeney had told him?

A.   Yes.  It was kind of -- while I was talking to him, he didn't want to come out and tell me everything he knew.  He wanted to give me --

MR. ZUCKER:  Objection.  The witness can say what the person he's speaking with said.  He cannot say what he was thinking.

THE COURT:  Well, that's correct.

BY MS. CHATURVEDI:

Q.   Did Mr. Smith tell you -- well, what did Mr. Smith tell you?

A.   He told me of crimes that had been committed and gave me kind of a thumbnail sketch of the crimes.  For instance, he would say something to the effect that, well, the triple,

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

13

Donnell Mack's murder. He said Shorty and them did that.

I said, what do you mean by Shorty and them? And he said Shorty and James Montgomery. And I said, okay, what else about it. And he says, well, I know about that. So he let me know that he knew the details about that murder, and he did that with several different murders.

Q.   Did you press him at that moment to go through --

A.   No.

Q.   -- to identify the other people or other facts that he knew about those crimes of violence?

A.   No, it wasn't the time. It was kind of feeling each other out. Although, he, as I said, showed that he was willing to provide this information. He was still -- he wasn't very comfortable in doing so, so I didn't push him on it.

Q.   Now, while you were speaking with Mr. Smith this first night upon his arrest, can you tell the ladies and gentlemen and of the jury how you were recording, if you will, what information Mr. Smith was providing you?

A.   The first night, the first time that we sat down and talked, when we were talking about the drug things, I would sit and ask him some questions, and he would go through it, and I would sit and listen. Then I would say, well, let me go back and make sure I understand this and take some notes regarding the drug matters.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

14

And then when it got time for the violence, he was a little more uneasy, and he told me about them. I didn't want to take any notes or make him feel more uneasy about it that might quiet him down. So regarding the violence, I don't think I took many notes, if at all, about the violence when I was talking to him.

Q. December 5, 1996, when Mr. Smith was arrested, was he released on his own at that point?

A. The following day he was released.

Q. Did there come a time then on December 12, 1996 when his case was called into court, into U.S. District Court?

A. Yes, it was.

Q. What happened at that court hearing?

A. One of our main concerns, and his main concern was trying to make sure that nobody on the street thought that he was cooperating. And we tried to figure out a way to best do it so that any suspicions would be alleviated, that nobody would think that he was, in fact, cooperating.

So on that date he came into court with his lawyer, and the government dismissed in open court the charges against him, and the Court from what -- I wasn't in the courtroom, but it was with the idea that the person who made the undercover purchases wasn't willing to testify against him; therefore, the charges were dropped.

So the charges were dropped. He agreed to that with the

wasn't certain as to what rental car company was used.

Q.   Now, that name, Kirk Ivory Newton, did that name later assist you in, in fact, arresting Mr. Sweeney when he was arrested and charged in connection with the kidnapping of Wysocki and the triple murder?

A.   Yes, because we knew that the name Kirk Ivory Newton was being used by Mr. Sweeney as an alias.  There were various jails in the area that we believed he might be visiting, so that information was given to the jails, and they were told that if somebody comes in with this name, detain them, and that the FBI would be there to see if that was, in fact, William Sweeney, and that's how we ultimately arrested him.

Q.   Did Mr. Smith tell you about conversations he had with Mr. Sweeney involving the shooting of an individual by the name of Michael Jones?

A.   Yes, but he didn't know the name Michael Jones.  What he told me was that, he said that back in 1992, Meechie, and that's just the name he gave me, Meechie was charged with shooting somebody from Condon Terrace.

Q.   Let me just stop you for a second.  When you say he told you, this is what Mr. Smith told you?

A.   Yes, ma'am.

Q.   And the source of his knowledge was what?

A.   Mr. Sweeney.

Q.   All right.  I'm sorry to interrupt.

30

A.    That's okay.  So Mr. Smith is telling me that Mr. Sweeney told him that Meechie got charged with shooting a person from Condon Terrace, and that one of the persons or the victims was cooperating against Mr. -- was cooperating against Meechie. So that Mr. Sweeney went to an area in Southeast near Mississippi Avenue to kill the person who was testifying or who was going to testify against Meechie.

And Mr. Smith was under the impression that the person did die, that there actually was a murder.  And he said that Mr. Sweeney went down there, chased a person through the alley and it was some place near Mississippi Avenue, caught up with him, shot him, and stood over him and shot him some more.  And it was Mr. Smith's understanding that the person died.

And I tried going back and finding this crime, and this is an example of where I'd call him and ask him a question, and I'm trying to find -- I said, hey, you know, tell me about that again.  And then he told me that, yeah, he said, it was Draper or Shorty are the words he used and Birdy and he knew Birdy.

He said Birdy was with Draper when they went down there, and he said Birdy also shot somebody during the same event. So we looked back through and based on what he had told us, it matched up exactly with the shooting of Michael Jones. However, Michael Jones did not die.  Let me back up.  Match exactly.

31

It matched up -- all the facts matched up with the shooting of Michael Jones.  However, there was only one victim.  So, you know, he was trying to recount to me the conversation that was relayed to him, and he told me that he thought that two people were shot, but he said that Draper and Birdy were the two that went down there to do the shooting.

Q.    In the course of speaking with Robert Smith, did he also inform you about a conversation that he had had with William Sweeney about a witness by the name of Kenny Adams?

A.    Yes.  This is whenever I was away in 1997.  I was speaking to him on the phone.  And he was -- I don't want to use -- he was excited telling me about a witness named Little Wayne.  He said, man, there's this dude, Little Wayne, that's testifying against Poo-Poo.  He said, you better move that guy, because Draper and those guys found out where he's at.  He said, supposedly they got him hiding out in Centreville, Virginia, and those guys have been clocking him.

That's what he used clocking.  He said, Draper and them been clocking him, and he said, they're going to kill that little dude.  You better move him real quick before they get to him.

Q.    Had anyone told you about any effort to get, well, Wayne Wayne or Little Wayne?  What's his real name?

A.    Kenny Adams.

Q.    At that point had you had any information that efforts

32

were being made to locate and harm Kenny Adams?

A.   No, and I knew that Kenny Adams was cooperating.  I knew he'd been released.  I didn't know where he was staying at that time.  I called another FBI agent who was dealing directly with Kenny Adams.  I said, hey, is Little Wayne out in Centreville?

He said, yeah, he's out in Centreville.  And then I relayed the information to him that Mr. Smith told me.  So then they made the appropriate or took the appropriate steps to have Little Wayne moved.

Q.   In that same conversation you had with Robert Smith about Draper and them, the phrase you used, clocking Little Wayne, did Mr. Smith tell you anything that William Sweeney had told him about an employee at Superior Court?

A.   Yes.  He told me that there was a female at the Superior Court who would get information and pass it along to Mr. Sweeney and that this female had access to computers and it was Mr. Smith's understanding that she could even manipulate the computer system to make charges disappear.  I don't know how that could happen, but that was his understanding.

And whenever I asked him, do you know how they got -- found Little Wayne out there?  He said, I'm not sure, maybe it's the female, but he had no idea if it was the female or not, but he knew that there was a female with access to sensitive information in Superior Court.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

33

Q.   Did Mr. Smith tell you about conversations he had with William Sweeney about the kidnapping of Wysocki, Anthony Pryor?

A.   Yes, he did.

Q.   What did Mr. Smith tell you that Mr. Sweeney had told him?

A.   He said that Mr. Sweeney, and these are the words that Mr. Hill used, he said, Draper, Vito, Birdy, Poo-Poo and Sam went to kidnap Wysocki.  And he said that they were waiting for him out in Maryland.  I think he said Montgomery County, Maryland, but he said they were sitting waiting for him to come out of the house, and as they were coming out of the house, they went to grab him, and he fought with them and struggled and started to get away and they shot him in the back with a .45.

After they shot him in the back with a .45, they threw him in the trunk of a car, and he says, they're driving away and the trunk of the car caved in somehow, and Wysocki was able to escape.

And he said that Draper and the others were very upset with Birdy because it was his car that was used when the trunk caved in.  So they blamed him for that.  And he said because of that and he said other things that happened over the years, that they wanted to kill Birdy for.

Q.   Did Mr. Sweeney indicate to Mr. Smith whether or not he,

34

Mr. Sweeney, knew that he was wanted for that kidnapping?

A.   Yes.   There came a time in 1997 when an arrest warrant was obtained for Mr. Sweeney for that kidnapping of Wysocki, Anthony Pryor.  Mr. Sweeney had told Mr. Smith that, yeah, he found out that he was wanted, that they had a warrant for him for Wysocki's kidnapping.  But he said he wasn't worried, because he sent his investigator to interview Wysocki and that, I think he said he saw him twice maybe and got a statement from him, and that Wysocki said that he didn't know who shot him.  They were wearing masks and he couldn't identify them.

So Mr. Sweeney told Mr. Smith that he wasn't very concerned about that, but he did know that he was wanted.

Q.   Did Mr. Sweeney tell Mr. Smith about Mr. Sweeney's involvement in the murder of Donnell, Robocop, Whitfield?

A.   Yes.  He told us that Mr. Sweeney had bumped into Robocop while they were at the Mirage nightclub one night.

Q.   I'm going to interrupt you again just one second.  This is what Mr. Sweeney told Mr. Smith?

A.   Yes.

Q.   Mr. Smith didn't observe this himself?

A.   No.

Q.   Okay.

A.   I don't think he observed any of this.  This is just what he was told by Mr. Sweeney.

35

Q. All right.

A. Mr. Sweeney said that he was at the Mirage nightclub and had somehow bumped into Robocop and they had got into some kind of altercation. Sometime after that Mr. Smith said that he was at 211 I Street, and he saw Mr. Sweeney and Erik Jones in the house.

They were talking. Mr. Smith left. He came back sometime later to 211 I Street, and he said those two were there again. They told him how they had just come back from killing Robocop. And they said that they went up there together. That Draper got out of the car, shot Robocop, and then left the area.

And then he told us that what happened was the gun that he had used to shoot Robocop --

Q. The gun that who used?

A. Draper or Mr. Sweeney had used to kill Robocop, he was worried about it, that it would come back to the murder. So there is an individual named -- they call him Colonel Klink. His real name I think is William Howard Young.

Anyway, he said that Colonel Klink, everybody on the streets has used him as an expert on guns. He knows all about guns. So Mr. Sweeney gave the gun to Colonel Klink and said, hey, can you fix this for me so it won't come back as being the murder weapon. So he said that he changed the barrel in it, but he didn't change all the parts, and therefore, the

38

(End of bench conference.)

THE COURT:  Please rephrase your question.

BY MS. CHATURVEDI:

Q.    Agent Lisi, did Mr. Sweeney tell Mr. Smith where it was that Robocop had been murdered?

A.    Yes, in Sursum Corda.

Q.    Did Mr. Sweeney, Draper, talk to Robert Smith about the triple murder that happened out in PG County?

A.    Yes, he did.

Q.    What did Mr. Sweeney tell Mr. Smith about that?

A.    He told him that the whole plan started after Mr. Sweeney had gone to Las Vegas to see the Tyson-Holyfield fight.  While he was there he had seen Lonnie or Alonzo Gaskins, with a lot of money.

And to back up a little bit, we asked Mr. Smith a little bit about the trip, and Mr. Smith told us that he was the one who even introduced somehow Mr. Sweeney to the real estate agent who booked the trip for them.

Q.    The real estate agent?

A.    I'm sorry, travel agent.  The travel agent.  He said he introduced Mr. Sweeney to the travel agent and the travel agent was able to book the trip for Mr. Sweeney and others who went to Las Vegas to see the fight.

As I said, while they were there, Mr. Sweeney saw Lonnie win quite a bit of money.  So when he came home, he decided he

39

was going to try to kidnap him and rob him for his money.  He said on the night that they went out there, Mr. Sweeney, James Montgomery, Sam Carson, and Sean Coates went in a minivan.

They sat on the house for several hours.  At some point they went in the house.  He said they only had one gun, and that Draper was the one who had the gun.  He said it was a Glock .40 caliber that was used.

I think he said that there's a laser sight on it, too.  And he said Mr. Sweeney had the Glock .40 caliber and James Montgomery had a stun gun that he was going to use to try to stun one of the people inside the house.

They went in the house to try to kidnap Lonnie, and something went bad, and Mr. Sweeney said that Darnell Mack mouthed off, and that he had to kill him.  So he said he shot the two guys inside the house, and then on the way out of the house, he said there was a female standing there, and he said, she was just like frozen, like she was in shock and she couldn't move.  And he said he walked out and looked at her and just shot her in the head and left her there.

Q.   In the course of speaking with Robert Smith, from the time you first talked to him on December 5, 1996, until he was murdered in June of 1997, did Mr. Smith ever tell you that he was in fear with respect to his safety?

A.   Yes.  There was nothing specific.

THE COURT:  Let me interrupt you for a minute.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

41

(Jury Out.)

THE COURT:  Did you have something you wanted to bring up?

(Recess.)

THE COURT:  All set?  Bring them in.

(Jury In.)

THE DEPUTY CLERK:  Jury panel is all present, Your Honor.

THE COURT:  All right.  Thank you, Marshal.  You might want to start your line of inquiry again.  I interrupted you.

MS. CHATURVEDI:  Yes, sir.

BY MS. CHATURVEDI:

Q.   Agent Lisi, in the course of speaking with Mr. Smith starting in December of 1996 up until the time he was murdered, did Mr. Smith ever express to you any fears he had about his safety?

A.   Yes.  There was nothing specific, no specific threats that were ever made to him, but he told me many times, he said, man, I'm telling you, he said, if anything ever happens to me, it's Shorty.  He said, anything happens, if he ever found out what I was doing, he'd have no problem killing me, and he told me that many times.  If anything ever happens to me, it's Shorty.  Just look at him first.

Q.   Shorty being, of course?

)

42

A.   Draper or Mr. Sweeney.

Q.   And can you tell the ladies and gentlemen of the jury if there was a time that Mr. Smith's cooperation was acknowledged in a public document?

A.   His information, the information that he -- the information about the triple murder was put in the charging document in PG County.  His name wasn't put in there, but all of the information that he had provided us was put in there, and they also put in there something to the fact that it was an FBI confidential informant, FBI Washington Field Office, things of that nature.

Q.   I neglected to ask you this.  Other than saying to you that if anything happened to him, to look to Shorty, did Mr. Smith ever express to you any fears about anyone else who Mr. Smith told you about in the course of your six months speaking with him?

A.   No, he never expressed any problems or problems with anybody else or concerns about anybody else.

Q.   On June 16, 1997, Agent Lisi, did you receive a call about a shooting done in broad daylight in the 1300 block of Half Street, Southwest?

A.   Yes, ma'am.

Q.   How many times had that victim been shot in that shooting?

A.   I believe 11.

43

Q.   Who was it that was murdered?

A.   Robert Smith.

MS. CHATURVEDI:   No further questions, Your Honor.

MR. KIERSH:   Your Honor, may I inquire?

THE COURT:   You certainly may.

CROSS-EXAMINATION

BY MR. KIERSH:

Q.   Good afternoon, Agent.

A.   Good afternoon.

Q.   Agent Lisi, you said that Butchie was not known as a violent person; is that right?

A.   Yes, sir.

Q.   You said that you had no problem letting him out on the street?

A.   Correct.

Q.   Is that right?

A.   I said correct.

Q.   Okay.  That was what distinguished him from someone else in terms of your agreeing not to ask that he be held without bond pending trial?

A.   I think that's one of the factors that's considered.

Q.   Okay.  Now, --

A.   I mean, yeah, it's one of the factors that's considered.

Q.   And just to remind the jury, because we'll go back and forth on this, Robert Smith was also known as Butchie,

*Clerks File*

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,                    :

  VS.                                          :    CR. NO. 98-329 ✓

VINCENT HILL,                              :
JEROME MARTIN,                          :
SAMUEL CARSON,                         :
WILLIAM K. SWEENEY,               :
SEAN COATES,                             :
        DEFENDANTS.                     :

UNITED STATES                          :
        GOVERNMENT,                    :

  VS.                                          :    CR. NO. 99-348

GARY PRICE,                                :
        DEFENDANT                       :

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MAY 30, 2001
(10:37 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                    PHYLLIS MERANA
                                     6816 U. S. DISTRICT COURT
                                   3RD & CONSTITUTION AVE., N.W.
                                   WASHINGTON, D. C. 20001

Case 1:98-cr-00329-RCL   Document 713   Filed 07/19/01   Page 2 of 115

FOR THE GOVERNMENT:            PETER ZEIDENBERG, AUSA
                              ANJALI CHATURVEDI, AUSA
                              555 4TH ST., N.W.
                              WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:        CHRISTOPHER DAVIS, ESQ.
                              601 INDIANA AVE., N.W.
                              #910
                              WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:      JOANNE HEPWORTH, ESQ.
                              305 H STREET, N.W.
                              2ND FLOOR
                              WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:      JOSEPH BESHOURI, ESQ.
                              LEXI NEGIN-CHRIST, ESQ.
                              419 7TH STREET, N.W.
                              WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:     STEVEN R. KIERSH, ESQ.
                              717 D STREET, N.W.
                              SUITE 400
                              WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:      FREDERICK JONES, ESQ.
                              901 6TH STREET, S.W.
                              #409
                              WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:       JONATHAN ZUCKER, ESQ.
                              601 INDIANA AVE., N.W.
                              #901
                              WASHINGTON, D. C.  20004

3

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SP. AGT. VINCENT LISI | | | | |
| BY MR. KIERSH | 7 | | | 109 |
| BY MR. DAVIS | 57 | | | |
| BY MR. ZUCKER | 98 | | | 110 |
| BY MS. CHATURVEDI | | | 106 | |

19

THE COURT:  I SUPPOSE HIS THESIS IS THAT MICHAEL FARRAR MIGHT HAVE BEEN A SUSPECT IN "BUTCHIE'S" MURDER.

MS. CHATURVEDI:  I WILL LET THE AGENT ANSWER, YOUR HONOR.

THE COURT:  I BEG YOUR PARDON?

MS. CHATURVEDI:  I WILL LET THE AGENT ANSWER.

BY MR. KIERSH:

Q.  YOU DON'T RECALL PICKING HIM UP AND QUESTIONING HIM?

A.  NO, SIR, I DON'T.

Q.  OKAY.

HOW ABOUT PETEY JOHNSON?

A.  I WILL TELL YOU RIGHT NOW, I NEVER AFTER "BUTCHIE'S" MURDER, PICKED UP MICHAEL FARRAR AND INTERVIEWED HIM.

Q.  HOW ABOUT PETEY JOHNSON?  DID YOU PICK HIM UP?

A.  YES, SIR, BECAUSE IT WAS BELIEVED HE WAS A WITNESS.

Q.  TO ROBERT SMITH'S MURDER?

A. YES, SIR.

Q.  OKAY.  AND YOU QUESTIONED PETEY JOHNSON ABOUT ROBERT SMITH'S MURDER?

A.  YES, SIR.

Q.  OKAY.  AND YOU QUESTIONED HIM NOT JUST AS A WITNESS, BUT AS A POSSIBLE SUSPECT?

A.  I WOULD SAY AS A WITNESS AND MAYBE SOMEBODY -- IT WAS JUST A HUNCH THAT HE WAS THERE AND THEN HE WALKED AWAY, WE BELIEVED, AT THE TIME "BUTCHIE" WAS KILLED.  SO HE MAY HAVE

UA 2340

20

CALLED SOMEBODY TO ALERT THEM THAT "BUTCHIE" WAS THERE.

Q. AND YOU DON'T SEE PETEY JOHNSON'S FACE UP ON THAT PHOTO BOARD, DO YOU?

A. NO, SIR.

Q. AND YOU DIDN'T SEE PETEY JOHNSON COME INTO THIS COURTROOM TO TESTIFY IN THIS CASE, DID YOU?

A. NO, SIR.

Q. OKAY.

NOW, WHEN YOU WENT OUT TO THIS HOUSE IN MARYLAND THAT BOTH ROBERT SMITH AND MICHAEL FARRAR WERE EITHER LIVING AT OR HAD ACCESS TO, DID YOU RECOVER THE CASH FROM THE HOUSE?

A. NO. WHAT HAPPENED WAS MYSELF AND ANOTHER AGENT DROVE TO THE GENERAL AREA AND LET MR. SMITH OUT. HE WENT TO THE HOUSE, RECOVERED THE ITEMS AND BROUGHT THEM BACK TO US. I NEVER WENT INSIDE THE HOUSE BECAUSE WE DIDN'T WANT ANYBODY IN THE HOUSE TO SEE US OR KNOW THAT WE WERE THERE.

Q. WHO RECOVERED THE EVIDENCE?

A. ROBERT SMITH.

Q. OKAY. AND HE BROUGHT IT BACK OUT TO YOU?

A. YES, SIR.

Q. OKAY. DID HE BRING YOU THE CASH?

A. YES, SIR.

Q. ALL OF THE $5,000.00?

A. I THINK IT WAS $5,005.00.

LIA 2241

45

MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  IT'S BEYOND THE SCOPE.

THE COURT:  SUSTAINED.

BY MR. KIRSCH:

Q.  NOW, OTHER THAN -- AFTER ROBERT SMITH WAS SHOT AND KILLED IN JUNE OF '97, OTHER THAN PETEY JOHNSON, DID YOU SPEAK WITH ANYONE ELSE, EITHER AS A SUSPECT OR AS A POTENTIAL WITNESS, REGARDING THIS EVENT?

A.  YES, SIR.

Q.  WHO WAS THAT?

A.  RICHARD --

MS. CHATURVEDI:  OBJECTION, YOUR HONOR.  THIS IS BEYOND THE SCOPE AGAIN AS TO WHO HE SPOKE WITH TO SOLVE THAT CRIME.  THE MURDER IS NOT CHARGED IN THIS CASE, YOUR HONOR.

THE COURT:  ALL RIGHT.  IT'S PROBABLY BEYOND THE SCOPE.

MR. KIERSH:  MAY I APPROACH THE BENCH?

THE COURT:  YES, YOU MAY.  YOU CAN COME FORWARD AND TELL ME WHY YOU THINK IT'S WITHIN THE SCOPE.

(BENCH CONFERENCE.)

LLA 2366

46

(BENCH CONFERENCE.)

MR. KIERSH:  THE LAST PIECE OF EVIDENCE OR INFORMATION ELICITED FROM THIS WITNESS ON DIRECT WAS THAT ROBERT SMITH SAID, "I WAS AFRAID OF WILLIAM SWEENEY."

THE COURT:  OKAY.

MR. KIERSH:  SO THIS IS DIRECTLY RELEVANT.  THE FACT THAT THEY ARE ARRESTING OTHER PEOPLE OR QUESTIONING OTHER PEOPLE, IT CONTRADICTS THIS FEAR OF WILLIAM SWEENEY. THEY ARE LOOKING AT OTHER PEOPLE FOR HAVING COMMITTED THIS OFFENSE.

THE COURT:  YOU ALREADY DEALT WITH PETEY JOHNSON AND MICHAEL FARRAR AND ALL OF THESE OTHER PEOPLE.

MR. KIERSH:  THERE ARE OTHER PEOPLE WHO HE SPOKE TO AS BEING POSSIBLE SUSPECTS.  SO IT IS DIRECTLY RELEVANT TO CONTRADICTING THIS SUPPOSED FEAR OF WILLIAM SWEENEY.  HE SAID THAT'S THE ONLY PERSON WHO ROBERT SMITH EXPRESSED FEAR ABOUT.  THEN WHY ARE THEY ARRESTING OTHER PEOPLE?  THERE MUST BE A REASON.

THE COURT:  WHAT DO YOU MEAN ARRESTING OTHER PEOPLE?

MR. KIERSH:  HE IS QUESTIONING OTHER PEOPLE ABOUT SMITH'S MURDER.  IF SMITH IS TO BE BELIEVED THAT THE ONLY PERSON HE FEARED WAS WILLIAM SWEENEY, YOU DON'T NEED TO TALK TO ANYBODY ELSE.

THE COURT:  IT DOESN'T PRECLUDE HIS QUESTIONING

UA 2267

OTHER PEOPLE.

MR. KIERSH:  IT CONTRADICTS THE VERACITY OF THAT STATEMENT, JUDGE.  IT IS TOTALLY RELEVANT AND IT'S COMPLETELY ON POINT.

MS. CHATURVEDI:  YOUR HONOR, I THINK MR. KIERSH IS MAYBE MISUNDERSTANDING WHAT AGENT LISI IS SAYING.  AND I THINK WE'RE GOING TO JUST GET INTO A LINE OF INQUIRY THAT IS INAPPROPRIATE.  HE WAS QUESTIONING OTHER PEOPLE ABOUT WILLIAM SWEENEY DOING THE MURDER.  IT WASN'T THAT THERE WERE OTHER SUSPECTS.

THE COURT:  WHY CAN'T YOU BRING THAT OUT ON REDIRECT?

MS.  CHATURVEDI:  YOUR HONOR, WE COULD, BUT THE CASE IS --

MR. KIERSH:  WHY DON'T I JUST REPHRASE THE QUESTION:  WERE THESE OTHER PEOPLE QUESTIONED AS SUSPECTS?

MS. CHATURVEDI:  THAT'S FINE.  IF HE SAYS THEY WERE NOT QUESTIONED AS SUSPECTS, YOUR HONOR, I THINK THEN WE SHOULD GET OFF OF THIS POINT.

THE ONLY SUSPECT -- IF MR. KIERSH WANTS TO HEAR IT AGAIN -- THE ONLY SUSPECT IN AGENT LISI'S MIND THAT ORDERED THAT MURDER WAS WILLIAM SWEENEY.  IF MR. KIERSH WANTS HIM TO REPEAT IT, THAT IS FINE, BUT TO IDENTIFY WITNESSES BY NAME -- POTENTIAL WITNESSES IN THE MURDER OF ROBERT SMITH, WHEN THAT MURDER IS NOT CHARGED, IT PUTS THOSE PEOPLE

LLA 2368

48

AT RISK TREMENDOUSLY, I THINK, IF THEY ARE WITNESSES TO THAT MURDER.

THE COURT: WHY ARE THEY AT RISK CERTAINLY FROM ANYBODY RELATED TO THIS CASE?

MS. CHATURVEDI: WELL, IF THAT MURDER GETS CLOSED, YOUR HONOR -- IT IS STILL AN OPEN CASE. NO ONE HAS BEEN CHARGED WITH THE MURDER ITSELF. FOR AGENT LISI TO SAY WHO HE TALKED WITH AND WHAT THOSE PEOPLE TOLD HIM ABOUT WHY THEY THINK WILLIAM SWEENEY WAS INVOLVED IN THAT MURDER I THINK PUTS THEM AT RISK. AND IT IS NOT CHARGED. IT'S AN UNCHARGED MURDER.

THE COURT: ALL RIGHT. YOU SAID THAT.

MR. KIERSH: A CONSPIRACY TO MURDER. I MEAN I AGREE WITH MS. CHATURVEDI THAT THE ACTUAL MURDER IS NOT CHARGED.

THE COURT: ALL RIGHT.

MR. KIERSH: YOU KNOW WHAT? I AM NOT GOING TO SPEND A LONG TIME ON THIS. I WILL JUST ASK HIM IF THERE ARE OTHER SUSPECTS.

THE COURT: ASK HIM IF THERE ARE OTHER SUSPECTS.

MR. KIERSH: THAT'S IT.

(END OF BENCH CONFERENCE.)

LLA 2369

49

(END OF BENCH CONFERENCE.)

BY MR. KIRSCH:

Q. AGENT LISI, THE QUESTION IS AFTER ROBERT SMITH WAS MURDERED, DID YOU QUESTION OTHER SUSPECTS IN HIS MURDER?

A. SUSPECTS? YES.

Q. AND HOW MANY OTHER SUSPECTS?

A. ONE.

Q. OKAY. IS THAT OTHER SUSPECT DEPICTED ON THE PHOTO BOARD?

A. NO, SIR.

Q. NOW, IN YOUR NOTES THAT YOU WROTE -- AND, AGAIN, IF YOU NEED TO TAKE A LOOK AT IT, JUST LET ME KNOW. YOU TALKED ABOUT STEPHON'S COUSIN SAYING HE GOT A GUN FROM DRAPER THAT WAS USED IN THE TRIPLE, A .40 CALIBER WITH A LASER SIGHT. DO YOU REMEMBER THAT?

A. YES, SIR.

Q. OKAY. NOW, STEPHON'S COUSIN, WHO YOU'RE REFERENCING IN THIS NOTE, IS JOHNNIE PROCTOR, ISN'T THAT RIGHT?

A. I CAME TO LEARN IT WAS JOHNNIE PROCTOR, YES.

Q. OKAY. NOW, JOHNNIE PROCTOR -- REMINDING THE LADIES AND GENTLEMEN OF THE JURY -- IS THE SAME JOHNNIE PROCTOR WHO JAMES MONTGOMERY HAD FALSELY ACCUSED OF BEING INVOLVED IN THE TRIPLE MURDER WHEN HE SPOKE TO THE PRINCE GEORGE'S COUNTY POLICE, ISN'T THAT RIGHT?

        MS. CHATURVEDI: OBJECTION. IT'S BEYOND THE

UA 2270

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Docket No. CR 98-329 |
| Government, | . | Washington, D.C. |
| | . | June 14, 2001 |
| vs. | . | 2:30 p.m. |
| | . | |
| VINCENT HILL, | . | (AFTERNOON SESSION) |
| JEROME MARTIN, | . | |
| SAMUEL CARSON, | . | |
| WILLIAM K. SWEENEY, | . | |
| SEAN COATES, | . | |
| | . | |
| Defendants | . | |
| | . | |

. . . . . . . . . . . . . .

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | |
| Government, | . | |
| | . | Docket No. CR 99-348 |
| vs. | . | |
| GARY PRICE, | . | |
| Defendant. | . | |
| | . | |

. . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

29

Q.    You wouldn't quibble with that?

A.    No.

Q.    Was she being -- that is, Ms. Wilson, Ms. Wilson-Wise, was she being paid in exchange for information?

A.    She was being paid for information.

Q.    Is that, yes?

A.    That's correct.

Q.    Agent Warrener,  if you'd be kind enough to speak up or move to the microphone just a little bit more, a little bit closer.

      And was she given to understand that she was being paid for information?

A.    I believe she came to have that understanding, but initially when I met with her, she voluntarily provided information, and I paid her for that information because it was valuable to the investigations that we had.

Q.    All right.  Now, did you have any knowledge yourself about the status of her personal finances at the time?

A.    Yes, I did.  I believe that she was struggling.  She had two children, and I know that she had a tough financial situation.

Q.    All right.  Now, at some point, did she talk to you about the murder of Anthony Fortune?

A.    Yes.

Q.    And was that before or was that after the FBI began to

30

pay her money?

A.    I believe I paid her prior to the information she gave me about the Tony Fortune murder.

Q.    Was Ms. Wilson given to understand that some information would be more valuable than other?

A.    I think that she probably could get that impression after, you know, dealing with me for a period of time.

Q.    And at any time did you impose or did you tell her that there would be a limit to how much money you could pay her?

A.    No.

Q.    Is that, no?

A.    That's a, no.

Q.    All right.  So, again, the information that was provided about the shooting murder of Anthony Fortune, that was after the FBI began to pay her money, pay Ms. Wilson money?

A.    Yes.

Q.    Could you approximate the number of meetings you had, Agent Warrener, with Ms. Wilson prior to when she gave information about Anthony Fortune?

A.    Without seeing the records, it would be difficult for me to recall how many times I had meetings with her prior to that.

Q.    Would you agree that some three or four months time passed between when she first started providing information and when she first spoke about Anthony Fortune?

31

A.    Yes.

Q.    During the course of your conversations with her, with Ms. Wilson, Agent Warrener, did you have the benefit of any crime scene reports from the Anthony Fortune shooting?

A.    I don't believe so.  It's difficult for me to recall.  It was a long time ago.  I probably was aware of the murder because it was an investigation that was associated with a case that we had on the squad.  I don't recall if I saw reports or not, because it wasn't an investigation that I was working.

Q.    All right.  That information that she gave you, did you turn that over to somebody?

A.    Yes.

Q.    And who did you turn that over to?

A.    I turned it over to police officers and agents on the squad that were looking at this particular group.

Q.    And did that group of agents on the squad, was that the group to which Agent Vincent Lisi belonged?

A.    Yes.

Q.    Now, during the course of your conversations with Ms. Wilson, Agent Warrener, did you ever come to believe that she had any experience with firearms or with the working mechanics of a firearm, a handgun?

            MR. ZEIDENBERG:  Objection.

            THE COURT:  You want to approach the bench?

Case 1:98-cr-00329-RCL   Document 978   Filed 03/11/03   Page 55 of 97

55

you.

MS. HEPWORTH:  May I inquire, Your Honor?

THE COURT:  Yes.

CROSS-EXAMINATION

BY MS. HEPWORTH:

Q.   Good afternoon, Agent Warrener.

A.   Good afternoon.

Q.   Agent Warrener, isn't it true that Charlene Wilson told you that she heard this information?

A.   That's what I wrote in my report, but that's a style of writing that we use to protect the identity of an informant.

Q.   This is a lie, right?

A.   This was never intended to be -- when she gave me this information, it was given to me on a confidential basis, and in order to protect the informant's identity, we might say that the informant heard when the informant was actually there.

Q.   And that's to mislead the defense; is that right?

A.   No, because it was never intended to go to trial.

Q.   Who is it intended to mislead?

A.   It's not intended to mislead anyone.  It's intended to protect the identity of the informant.

Q.   So who is it protecting the identity from?

A.   Protecting the identity from anybody who might try to harm the confidential nature of the relationship.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

56

Q.   You said yourself that this report was not intended to be revealed to anyone; isn't that right?

A.   It was intended to be disseminated to the appropriate law enforcement personnel, but as I stated earlier, we never anticipated calling her as a witness, because I didn't want to put her in that situation because she had young children.

Q.   But your report does say that the source heard this information; isn't that right?

A.   That's correct.

Q.   This information -- Charlene Wilson allegedly gave this information to you on January 28, 1993, correct?

A.   Correct.

Q.   That was more than six months after the death of Tony Fortune, correct?

A.   I don't know actually.

Q.   No, make that more than 16 months after the death of Tony Fortune?

A.   Yeah, I don't really actually have a knowledge of when actually the shooting took place.  At the time she told me about it, like I said, I was not investigating it, so I don't -- I'm not that familiar with the case.

Q.   And you had previously talked to this witness; is that right?

A.   Correct.

Q.   And she had previously provided you other information,

59

Tony Fortune for many years after this information was provided?

A.   I think I'm aware of that.

MS. HEPWORTH:  I have nothing more at this time, Your Honor.

MR. BESHOURI:  Your Honor, will the Court permit me one or two additional questions?

THE COURT:  Of course.

FURTHER REDIRECT EXAMINATION

BY MR. BESHOURI:

Q.   Agent Warrener, this insert to your report that I'm looking at is essentially -- after the introductory paragraph, essentially two paragraphs; am I right?

A.   Yes.

Q.   In the first paragraph, you've explained that you used the word heard, that the source heard something --

A.   Right.

Q.   -- and that this was a protective technique?

A.   Yes.

Q.   Is there a reason you don't use that same technique in the second paragraph where we're talking about Anthony Fortune and his shooting?

A.   Well, again, I don't think she -- in the second paragraph it really says that she witnessed it.  It says, source advised, and then it goes into a description of what happened.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

60

So she doesn't -- in that second paragraph, it doesn't state that she actually witnessed this.  It's as if she's relaying facts which she could have, you know, received secondhand.

But at the time that I interviewed her, it was clear -- I mean, she provided to me the information as an eyewitness.

Q.    Was it not equally clear what she was telling you she saw about the events in the apartment?  Wasn't she saying to you she was an eyewitness to that as well?

A.    That's correct.

Q.    Yet in the first paragraph you use the phrase, the source heard?

A.    That's correct.

Q.    Believing her to be an eyewitness to that?

A.    It bears no significance, I can tell you, that she told me that she witnessed both events, and it really bears no significance in terms of -- in both cases I did not state that she witnessed this or she was an eyewitness.  It was just two different ways of protecting her identity.

Q.    All right.  So that I can get over my confusion, the first paragraph, you say the source heard, although you believed her to be an eyewitness?

A.    She was.

Q.    And in the second paragraph -- well, you weren't there, sir, were you?

A.    That's correct.

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 419 of 443



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
                GOVERNMENT,                    :
                                               :
  VS.                                          :     CR. NO. 98-329
                                               :
VINCENT HILL,                              .   :
JEROME MARTIN,                                 :
SAMUEL CARSON,                                 :
WILLIAM K. SWEENEY,  .                         :
SEAN COATES,                                   :
                DEFENDANTS.                    :

UNITED STATES                                  :
                GOVERNMENT,                    :
                                               :
  VS.                                          :     CR. NO. 99-348
                                               :
GARY PRICE,                                    :
                DEFENDANT                      :

**FILED**

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JUNE 26, 2001
(9:43 A.M.)
(A. M. SESSION)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001



(Page 419 of Total)

2

| FOR THE GOVERNMENT: | PETER ZEIDENBERG, AUSA |
| | ANJALI CHATURVEDI, AUSA |
| | 555 4TH ST., N.W. |
| | WASHINGTON, D. C. 20001 |

FOR THE DEFENDANT HILL:              CHRISTOPHER DAVIS, ESQ.
                                     601 INDIANA AVE., N.W.
                                     #910
                                     WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:            JOANNE HEPWORTH, ESQ.
                                     305 H STREET, N.W.
                                     2ND FLOOR
                                     WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:            JOSEPH BESHOURI, ESQ.
                                     LEXI NEGIN-CHRIST, ESQ.
                                     419 7TH STREET, N.W.
                                     WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:           STEVEN R. KIERSH, ESQ.
                                     717 D STREET, N.W.
                                     SUITE 400
                                     WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:            FREDERICK JONES, ESQ.
                                     901 6TH STREET, S.W.
                                     #409
                                     WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:             JONATHAN ZUCKER, ESQ.
                                     601 INDIANA AVE., N.W.
                                     #901
                                     WASHINGTON, D. C.  20004

(Page 420 of Total)

IF ROBERT SMITH HAD BEEN PERMITTED TO TESTIFY -- IF HE HAD NOT BEEN MURDERED, HE WOULD HAVE TOLD YOU ABOUT A LOT OF THINGS THAT HIS NEPHEW, WILLIAM SWEENEY, "DRAPER," TOLD HIM.

ROBERT SMITH COULD HAVE COME INTO THIS COURTROOM, AND HE WOULD HAVE TOLD YOU THAT HIS NEPHEW, "DRAPER," CONFESSED TO HIM THAT DRAPER WAS RESPONSIBLE FOR THE TRIPLE MURDER, THAT DRAPER WAS RESPONSIBLE FOR THE MURDER OF "ROBOCOP," AND THAT DRAPER WAS RESPONSIBLE FOR THE KILLING OF "WHITEY," THAT "DRAPER" WAS RESPONSIBLE FOR ASSISTING IN LOCATING AND TRYING TO KILL WITNESSES IN THE CASE AGAINST CLIFTON EDWARDS, "MEECHIE", AND THAT DRAPER CONFESSED TO "BUTCHIE" THAT, IN FACT, "DRAPER" HAD PARTICIPATED IN THE KIDNAPPING OF "WYSOCKI."

AND "BUTCHIE" WOULD HAVE TOLD YOU HIMSELF THAT "DRAPER" MADE EFFORTS TO TRY TO KILL KENNETH ADAMS, YET ANOTHER GOVERNMENT WITNESS. BUT THE REASON YOU DIDN'T HEAR THE WORDS FROM THEM IS BECAUSE THOSE WITNESSES WERE MURDERED.

FOR OVER TEN YEARS THE VIOLENCE CONTINUED ON AND ON. THE EFFORTS TO OBSTRUCT JUSTICE WENT ON AND ON. FOR SO MANY YEARS, LADIES AND GENTLEMEN, THESE MEN REMAINED LARGELY UNTOUCHED.

AND BECAUSE OF WHO THEY WERE, AND PERHAPS EVEN BECAUSE OF WHO THEY BELIEVE THEY STILL ARE, THEY MAY THINK

OPPOSED TO THEIR FULL NAME.

NOW, IN TERMS OF THE WITNESSES THAT TESTIFIED, WE BROUGHT YOU IN THIS COURTROOM THEIR FRIENDS.  WE BROUGHT YOU THEIR ASSOCIATES.  WE BROUGHT YOU THEIR FAMILY.

WHAT DO I MEAN WHEN I SAY THAT?  YOU HEARD ON THAT WITNESS STAND FROM MEMBERS OF THE K STREET CREW -- MEMBERS OF THE K STREET CREW, WHO THEMSELVES HAVE PLED GUILTY AND ADMITTED THEIR INVOLVEMENT IN CRIMINAL ACTIVITY.

NOW, THERE'S NO DOUBT ABOUT IT.  PEOPLE WITH PLEA AGREEMENTS ARE CRIMINALS.  THEY HAVE, BY THEIR NATURE, COMMITTED CRIMES.

BUT, LADIES AND GENTLEMEN, THOSE PEOPLE -- THOSE CRIMINALS THAT YOU HEARD FROM ARE THE PEOPLE WHO WERE IN THE BEST POSITION TO TELL YOU HOW THIS CREW OPERATED BECAUSE THEY WERE WITH THE DEFENDANTS WHEN THE PLANS WERE MADE.  THEY WERE WITH THE DEFENDANTS WHEN THE CRIMES WERE COMMITTED.  AND THEY ARE THE TYPE OF PEOPLE THAT THESE MEN CONFIDED IN AFTER CRIMES WERE COMMITTED AND CONFIDED IN AS TO WHAT HAD HAPPENED DURING THE COURSE OF THE CRIME.

JUDGE JACKSON WILL BE GIVING YOU AN INSTRUCTION ABOUT HOW TO CONSIDER THE TESTIMONY OF A WITNESS WITH A PLEA AGREEMENT.  THE LAW REFERS TO THOSE TYPES OF PEOPLE AS CO-CONSPIRATORS OR ACCOMPLICES.

YOU HAVE HEARD A LOT OF WORDS USED TO DESCRIBE PEOPLE WITH PLEA AGREEMENTS:  "SNITCHES" AND "HOT."  YOU CAN

BEING LOCATED WAS SO THAT THEY COULD BE KILLED.

THESE PLEA AGREEMENTS, LADIES AND GENTLEMEN, ARE NOT JUST A SLAP ON THE WRIST.  FOR THOSE FOUR MEN I JUST DESCRIBED FOR YOU, EACH AND EVERY ONE OF THEM IS LOOKING AT A SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE.

EACH OF THOSE COOPERATING WITNESSES KNOWS THAT IF THEY LIE, THEY LOSE THAT PLEA AGREEMENT, AND THEY GO IMMEDIATELY TO SENTENCING BEFORE THE JUDGE THAT HEARD THEIR TESTIMONY.

THOSE COOPERATING WITNESSES KNOW THAT IF THEY LIE, THEY LOSE WHAT YOU HAVE HEARD REPEATEDLY IN THIS COURTROOM, THAT 5K LETTER, ANY CHANCE THAT THEY WOULD HAVE A BREAK ON SENTENCING.  THEY LOSE THAT.

SO FOR THEM, THE STAKES ARE HIGH BECAUSE EACH AND EVERY ONE OF THEM IS LOOKING AT A POTENTIAL SENTENCE OF LIFE WITHOUT THE POSSIBILITY OF PAROLE.

NOW, WITH RESPECT TO HAVING COOPERATING WITNESSES TESTIFY, IN THIS INSTRUCTION THAT JUDGE JACKSON WILL BE GIVING YOU, YOU WILL BE TOLD THAT YOU CAN DECIDE THIS CASE BASED SOLELY ON WHAT THE COOPERATING WITNESSES TOLD YOU -- THE CREW MEMBERS.

YOU CAN JUST STOP AND REFLECT ON WHAT THEY SAID IN THIS COURTROOM AND DECIDE THAT'S ENOUGH.  JUST THOSE FOUR MEN ALONE, THAT'S ENOUGH.  THESE DEFENDANTS ARE GUILTY.

YOU CAN DO THAT.  WE GAVE YOU MORE.  WE GAVE YOU

EVIDENCE WHICH I AM GOING TO REFER TO YOU THROUGHOUT THIS CLOSING ARGUMENT AS JUST CORROBORATION -- SUPPORT -- EVIDENCE WHICH YOU CAN LOOK AT AND CONSIDER AND DECIDE WHETHER OR NOT THESE COOPERATING WITNESSES HAVE TOLD YOU THE TRUTH.

NOW, SOMETIMES THE CORROBORATION OR THE SUPPORT COMES FROM ANOTHER COOPERATING WITNESS. TWO PEOPLE THAT WERE INVOLVED IN THE SAME INCIDENT OR HEARD ABOUT THE SAME INCIDENT, AND THEY BOTH DESCRIBE IT -- THAT'S CORROBORATION.

SOMETIMES, OF COURSE, YOU HEARD FROM JUST ORDINARY CITIZENS, PEOPLE WHO JUST, QUITE FRANKLY, HAPPENED TO BE IN THE WRONG PLACE AT THE WRONG TIME. THEY SAW SOMETHING AND REPORTED IT -- PEOPLE LIKE DORENE KEY.

DO YOU REMEMBER HER? SHE IS THE WOMAN WHO BACK IN OCTOBER OF 1993 WAS LOOKING OUT HER SECOND-STORY BEDROOM WINDOW AND SAW DRAPER, WHO SHE KNEW FOR MANY YEARS FROM THE NEIGHBORHOOD. SHE SAW "DRAPER" TRYING TO GET RID OF THINGS IN THE BACK OF A CAR THAT HAD NO TRUNK. DO YOU REMEMBER HER?

CHARLENE WILSON, BACK IN 1991, WHILE LIVING ON 58TH PLACE -- 58TH STREET -- EXCUSE ME -- NORTHEAST, WAS OUTSIDE AND SAW SAM CARSON KILL TONY FORTUNE.

YOU HAVE SUPPORT, LADIES AND GENTLEMEN, FROM PEOPLE LIKE CINAMA HAWKINS, WHO TO THIS DAY DOES NOT KNOW WHO MURDERED HER BEST FRIEND. BUT THE TESTIMONY THAT SHE

37

AN ATTACK ON ONE OF THEM WAS AN ATTACK ON ALL OF THEM.  THEY WOULD COME TOGETHER WHEN ANY ONE OF THEM NEEDED HELP.  THEY WOULD COME TOGETHER TO ENRICH THEMSELVES, AND THEY WOULD COME TOGETHER TO ATTACK.

NOW, WHEN I SAY THAT THEY WANTED TO ENRICH THEMSELVES, I MENTIONED EARLIER THAT THE WAY THIS CREW ENRICHED THEMSELVES -- THE ONE THAT YOU HEARD ABOUT THE MOST -- THE MOST REGULAR ONE WAS SELLING MARIJUANA.

YOU KNOW FOR OTHERS IT INVOLVED SELLING COCAINE AND P.C.P.  AND ALSO FOR SOME OF THEM IT INVOLVED KIDNAPPING AND ROBBERIES.

I AM GOING TO START WITH THE DISTRIBUTION OF MARIJUANA.  I AM GOING TO START WITH THE DISTRIBUTION OF NARCOTICS BECAUSE THAT WAS THE BREAD AND BUTTER OF THIS GROUP.  THAT IS HOW THEY MADE THEIR MONEY REGULARLY FROM 1989 TO THE TIME THAT THEY WERE TAKEN OFF THE STREET.

AND WHEN I TAKE YOU BACK TO THE 1980'S WHERE THIS STARTED, REMEMBER 203 N STREET, THE BUILDING THAT WAS DESCRIBED TO YOU.  YOU HAVE SEEN IT IN A NUMBER OF PHOTOGRAPHS.

IN THAT BUILDING, THERE WAS A TUNNEL.  AND INSIDE OF THAT TUNNEL, YOU'VE HEARD THAT THERE WAS AN OPERATION THAT WAS FOCUSED AND THAT WAS CENTERED AND THAT WAS PROFITABLE.  AND THAT OPERATION WAS STARTED BY AND CONTROLLED BY TWO MEN:  VINCENT HILL AND WAYNE PERRY.

WAYNE PERRY, YOU KNOW, IS PRESENTLY SERVING FIVE CONSECUTIVE LIFE SENTENCES IN THE FEDERAL CORRECTIONS INSTITUTION IN FLORENCE, COLORADO.  AND BACK IN THE LATE '80'S, WAYNE PERRY AND VINCENT HILL GOT TOGETHER.  AND THEY GOT TOGETHER AND THEY TOOK ADVANTAGE OF SOMETHING.  THEY TOOK ADVANTAGE OF THEIR REPUTATION.

YOU KNOW THAT BOTH OF THEM, VINCENT HILL AND WAYNE PERRY, HAD THE REPUTATION.  THEY HAD THE MONEY.  THEY HAD THE POWER.  THEY HAD THE GIRLS.  THEY HAD THE CARS.  THEY HAD IT ALL.

AND THE YOUNG MEN THAT CAME UP BEHIND THEM, PEOPLE LIKE REGINALD SWITZER AND PAUL FRANKLIN -- THEY LOOKED UP TO THEM.  AND SO VINCENT HILL AND WAYNE PERRY TOOK ADVANTAGE OF THAT.  AND WHAT THEY DID IS THEY ENLISTED THESE MEN TO WORK FOR THEM.

VINCENT HILL, YOU MAY RECALL, EMPLOYED OR CONTROLLED REGINALD SWITZER, PAUL FRANKLIN, AND EUGENE BYARS AT A VERY YOUNG AGE, 11, 12 AND 13 YEARS OLD.

THESE YOUNG BOYS WORKED FOR VINCENT HILL.  THEY WOULD BE THE LOOKOUTS.  THEY WOULD BE OUT ON THE STREET MAKING SURE THAT IF THE POLICE CAME BY, SELLERS WERE NOTIFIED.

THESE YOUNG BOYS CARRIED WALKIE-TALKIES AROUND WITH THEM, SUPPLIED BY VINCENT HILL, SO THAT THEY COULD ALERT ONE ANOTHER AS TO THE ACTIVITY THAT WAS GOING ON DOWN

AND AROUND 203 N STREET.

BUT AS HAPPENS OVER LIFE, PEOPLE GROW UP. REGINALD SWITZER, PAUL FRANKLIN AND THE OTHERS, WHILE THEY CONTINUED TO SELL WITH VINCENT HILL, THEY DIDN'T SELL FOR VINCENT HILL.  AND THEY EXPANDED.

YOU KNOW THAT AT THE BEGINNING, IN THE LATE 1980'S, WHAT WAS BEING SOLD MOST REGULARLY WAS SOMETHING CALLED "LOVE BOAT," MARIJUANA LACED WITH P.C.P.  IT WAS BEING SOLD IN LITTLE TINFOILS.

BUT AS THIS OPERATION OR THIS ENTERPRISE DEVELOPED, IT EXPANDED, AND COCAINE BECAME THE NEXT DRUG OF CHOICE.

AND HEARING ABOUT WHO IT WAS THAT WAS INVOLVED WITH THE COCAINE SALES, YOU NEED LOOK NO FURTHER THAN THE TABLE TO MY RIGHT.

YOU HEARD THAT STARTING IN THE 1990'S AND CONTINUING, ALTHOUGH DIMINISHING OVER TIME, THE DEFENDANTS WERE ENGAGED IN THE SALE OF COCAINE.  THEY SOLD THE COCAINE AT 203 N STREET.  THEY SOLD THE COCAINE AT FIRST AND P AND SECOND AND P, SOUTHWEST.  AND SOME OF THEM WENT OVER ON THE OTHER SIDE OF N STREET AND SOLD COCAINE AT THE CORNER OF DELAWARE AND L AND DELAWARE AND K.

AND, AGAIN, THE OPERATION ROLLED ON.  YOU LEARNED THAT AS THE DEFENDANTS MOVED FROM 203 N STREET OVER TO THE OTHER SIDE, TOWARDS DELAWARE AND K, THERE WAS ALREADY AN

JEROME MARTIN AND VINCENT HILL WOULD BE OUT THERE THE SAME DAY.  YOU SAW A NUMBER OF TAPES THAT SHOWED THEM BOTH OUT THERE THE SAME DAY.

THINK ABOUT A DAY LIKE THAT.  VINCENT HILL IS MAKING SOME SALES.  JEROME MARTIN IS MAKING OTHER SALES.  "REASON FORESEEABILITY" COMES INTO PLAY HERE.

MY FRIEND, STANDING TO MY LEFT, IS MAKING MONEY SELLING MARIJUANA.  IS IT REASONABLY FORESEEABLE TO ME THAT I AM GOING TO KNOW THAT HE IS SELLING?  YES.  AND AS A RESULT OF THAT, LADIES AND GENTLEMEN, THE LAW SAYS THAT I AM RESPONSIBLE FOR WHAT HE SOLD.

JEROME MARTIN IS RESPONSIBLE FOR WHAT VINCENT HILL SOLD.  VINCENT HILL IS RESPONSIBLE FOR WHAT JEROME MARTIN SOLD.  HAND-IN-HAND.  THEY'RE A TEAM.

THE SAME IS TRUE WITH DRAPER AND SEAN COATES.  BOTH OF THOSE MEN WERE PART OF THE ROTATION BACK IN THE I STREET ALLEY.  BOTH OF THEM WERE OUT THERE ON K STREET SELLING MARIJUANA HAND-TO-HAND.

BOTH OF THEM WERE PART OF THIS CREW -- THIS CREW, WHERE BEING A MEMBER OF IT ALLOWED YOU TO PROFIT.  IT ALLOWED YOU TO STAND WHERE YOU WANTED TO STAND AND SELL MARIJUANA.

SO FOR EACH AND EVERY ONE OF THEM, THEY ARE RESPONSIBLE FOR WHAT THE OTHER MEMBERS SOLD, AND THEY ARE ALSO RESPONSIBLE FOR WHAT OTHER CO-CONSPIRATORS -- OTHER

50

PEOPLE -- OTHER MEMBERS OF THIS CREW SOLD.

MR. ZUCKER: OBJECTION.

MS. CHATURVEDI: THERE IS AN OBJECTION, YOUR HONOR.

MR. ZUCKER: I OBJECTED, JUDGE.

THE COURT: OVERRULED.

MS. CHATURVEDI: REGINALD SWITZER, JAMES MONTGOMERY, DONALD NICHOLS, PAUL FRANKLIN, BILL HILL, ANTON GETHERS AND PAUL TAYLOR -- ALL OF THEM WERE MEMBERS OF THIS CREW, THIS K STREET CONSPIRACY.

SO THAT CONCEPT OF "REASONABLE FORESEEABILITY" GOES OUTSIDE OF THIS ROOM. IT GOES TO EACH AND EVERY MEMBER OF THAT CONSPIRACY. THAT'S WHAT WE'RE TALKING ABOUT WHEN WE SAY "REASONABLE FORESEEABILITY."

IN 1992 THROUGH 1994, YOU KNOW THAT MOST OF THE DRUG SALES OCCURRED BACK IN THE I STREET ALLEY. AND I WANT YOU TO THINK ABOUT HOW MANY POUNDS OF MARIJUANA WE'RE TALKING ABOUT WHEN THESE CONSPIRATORS, WHEN THESE CO-DEFENDANTS, WHEN THESE COOPERATING WITNESSES CAME INTO THE COURTROOM AND TOLD YOU ABOUT THE NUMBERS.

YOU HEARD THAT IN 1992 TO 1993 -- THOSE TWO YEARS ALONE -- PEOPLE WERE SELLING IN THE I STREET ALLEY.

NOW, I JUST MENTIONED THE NAMES OF THE MEN WHO YOU HEARD ABOUT WHO SOLD IN THE I STREET ALLEY. BY MY COUNT, I MENTIONED 13. BUT I AM GOING TO LIMIT IT TO TEN BECAUSE THE

CONSPIRACY SOLD OVER A THOUSAND KILOGRAMS OF MARIJUANA. A THOUSAND KILOGRAMS IS 2200 POUNDS. WE HAVE PROVED THAT.

I WANT TO USE ONE MORE MATH EXAMPLE JUST TO MAKE MY POINT COMPLETELY CLEAR. 1994 TO 1996 -- THAT IS THE YEARS WHERE THE VIDEOTAPE WAS INVOLVED. LET'S SAY YOU GO BACK AND WHEN YOU DELIBERATE, YOU THINK, "BOY, THOSE NUMBERS MS. CHATURVEDI GAVE ME, THOSE ARE HUGE."

I AM GOING TO CUT IT ALL IN HALF. 1994 TO 1996, CUT IT IN HALF. AS OPPOSED TO TEN PEOPLE SELLING MARIJUANA, LET'S MAKE IT FIVE. AND AS OPPOSED TO IT BEING A POUND AND HALF OF MARIJUANA EACH PERSON WAS SELLING, LET'S JUST MAKE IT THREE-QUARTERS OF A POUND. AND RATHER THAN SAYING THESE PEOPLE WERE SELLING SEVEN DAYS A WEEK, LET'S CUT IT DOWN TO FIVE.

WHEN YOU TAKE THOSE NUMBERS, FIVE PEOPLE, THREE-QUARTERS OF A POUND A DAY, THAT'S 3 3/4 POUNDS A DAY TOTAL FOR THE GROUP. OVER A WEEK, THAT'S 18.75 POUNDS. OVER A MONTH, THAT'S 75 POUNDS. 75 POUNDS TIMES 12 MONTHS, THAT'S 900 POUNDS PER YEAR. AND IF WE JUST LIMIT OURSELVES TO '94, '95 AND '96, THAT'S 2700 POUNDS RIGHT THERE ALONE.

THAT'S THREE YEARS THAT WE'RE TALKING ABOUT. ALL WE HAVE TO SHOW IS 2200 POUNDS. AND BY THIS ESTIMATION, WE HAVE EXCEEDED THAT. WE HAVE SURPASSED IT.

SO WHEN YOU'RE DELIBERATING ABOUT THE AMOUNTS OF

AND IN THE COURSE OF DISCUSSING THIS PLAN, SAM CARSON TOLD JAMES MONTGOMERY EXACTLY WHAT HAD HAPPENED UP AT THAT CRAPS GAME.  SAM CARSON TOLD JAMES MONTGOMERY THAT HE, SAM CARSON, HAD SHOT AND KILLED JEROME MARTIN. (SIC.)

LET ME USE THIS INCIDENT TO DISCUSS ANOTHER TOPIC THAT I HAVE ON HERE, AIDING AND ABETTING.  YOU WILL SEE WHEN YOU DELIBERATE THAT BOTH JEROME MARTIN AND SAM CARSON ARE BOTH CHARGED WITH THE MURDER OF TONY FORTUNE.

NOW, THE EVIDENCE HAS BEEN THROUGHOUT THIS TRIAL THAT IT WAS SAM CARSON THAT ACTUALLY PULLED THE TRIGGER. HE'S THE ONE THAT ACTUALLY PUT THE BULLETS INTO TONY FORTUNE.  HE'S THE ONE THAT ACTUALLY DID THE ACT -- THE DIRECT ACT THAT CAUSED THE DEATH OF TONY FORTUNE.

BUT UNDER THE LAW, LADIES AND GENTLEMEN, THERE IS SOMETHING CALLED AIDING AND ABETTING.  AIDING AND ABETTING -- A PERSON THAT IS AN AIDER AND ABETTOR IS A PERSON THAT HELPS MAKE THE CRIME SUCCEED.  IT'S THE PERSON WHO MAKES SURE THAT EVERYONE ELSE AROUND THE SHOOTER IS TAKEN CARE OF.  IT'S THE PERSON WHO OFTENTIMES THINKS OF A PLAN, APPROVES THE PLAN, DRIVES THE SHOOTER THERE, AND DRIVES THE SHOOTER AWAY.

THAT PERSON ISN'T PULLING THE TRIGGER, BUT THE LAW SAYS THAT IF YOU ARE WITH A CRIME -- IF YOU, BY YOUR ACTIONS, WANT THAT CRIME TO SUCCEED, YOU ARE JUST AS GUILTY AS THE PERSON WHO PULLED THE TRIGGER.  THE LAW MAKES NO

DISTINCTION. NONE.

THE WORDS THAT WE USE ARE AIDER AND ABETTOR AND PRINCIPAL. A PRINCIPAL IS A PERSON THAT PULLS THE TRIGGER. THE AIDER AND ABETTOR IS THE PERSON THAT HELPS.

AND YOU KNOW BACK IN AUGUST OF 1991 THAT JEROME MARTIN WAS THE AIDER AND ABETTOR. AND I USE THAT WORD AND I AM GOING TO REPEAT THAT WORD BECAUSE YOU HAVE AIDING AND ABETTING COMING UP A NUMBER OF TIMES DURING THE COURSE OF THIS TRIAL, BUT THAT DOESN'T LESSEN FOR A MOMENT THE RESPONSIBILITY THAT RESTS ON JEROME MARTIN'S SHOULDERS.

HE WAS THE ONE THAT WAS UPSET WITH TONY FORTUNE AT THAT CRAPS GAME. HE WAS THE ONE THAT WHEN SAM CARSON SAYS TO JEROME MARTIN, "DO YOU WANT ME TO TAKE CARE OF THIS PIECE OF SHIT?" YOU KNOW THAT JEROME MARTIN WANTED HIM TO, OF COURSE.

JEROME MARTIN WAS THE ONE TO BENEFIT FROM THAT CONDUCT, AND JEROME MARTIN MADE SURE THAT SAM CARSON GOT AWAY. HE DROVE HIM FROM THAT SCENE.

SO SAM CARSON AND JEROME MARTIN, ARE LIKE THIS. (CROSSING FINGERS.) AND IT IS THOSE RELATIONSHIPS -- THOSE BONDS BETWEEN THOSE TWO MEN THAT IF SOMEBODY STEPS TO JEROME MARTIN, SAM CARSON IS GOING TO BE RIGHT THERE. IT IS THAT BOND THAT YOU HEARD OF DURING THE COURSE OF THIS TRIAL THAT THESE MEN RELIED ON. THEIR BOND.

AND LET ME GO BACK JUST A LITTLE BIT AND A LITTLE

83

THE MEMBERS OF THE K STREET CREW WENT LOOKING -- THEY WENT HUNTING FOR GUYS BY THE NAME OF "PEE-WEE." YOU HEARD "SUGARSPOON," YOU HEARD KEITH HOLMES, AND YOU HEARD "BLOCK." YOU HEARD A NUMBER OF NAMES OF MEN ASSOCIATED WITH 58TH.

ON SEPTEMBER 10TH, 1991, ANOTHER EFFORT WAS MADE. ON SEPTEMBER 10TH, 1991, YOU HEARD THAT JAMES MONTGOMERY, JEROME MARTIN, SAM CARSON, AND OTHER GUYS FROM 37TH GOT TOGETHER, WENT OVER TO 58TH AND GOT IN A SHOOT-OUT. THEY WERE SHOOTING AT GUYS FROM 58TH, BUT WHEN THE POLICE CAME UP AND WERE TRYING TO DO THEIR JOB, THEY SHOT AT THE POLICE.

SEPTEMBER 10TH, 1991. HOW DID YOU LEARN ABOUT WHAT HAPPENED OUT IN THE AREA OF 58TH AND 60TH AND EAST CAPITOL AND BLAINE THAT DAY?

WELL, YOU LEARNED WHAT HAPPENED THAT DAY BECAUSE ONE OF THE PARTICIPANTS OF THAT CRIME TOLD YOU ALL ABOUT IT, JAMES MONTGOMERY -- JAMES MONTGOMERY, WHO HAS ADMITTED HIS GUILT TO HIS ROLE IN THE SHOOTING ON SEPTEMBER 10TH, 1991. JAMES MONTGOMERY CAME TO THE COURTROOM AND HE TOLD YOU THAT ON SEPTEMBER 10TH, THEY HAD A PLAN TO GO UP TO 58TH LOOKING FOR "SUGARSPOON" AND "PEE-WEE" OR WHOEVER ELSE THEY COULD FIND.

THERE WAS A VAN, AN MPV VAN THAT JEROME MARTIN HAD. SAM CARSON WAS IN THE VAN. JEROME MARTIN AND JAMES MONTGOMERY WERE ON A MOTORCYCLE. JAMES MONTGOMERY, DRIVING. JEROME MARTIN, "PIMP," ON THE BACK.



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | Docket No. CR 98-329 |
| Government, | Washington, D.C.<br>June 26, 2001<br>2:18 p.m. |
| vs. | |
| VINCENT HILL,<br>JEROME MARTIN,<br>SAMUEL CARSON,<br>WILLIAM K. SWEENEY,<br>SEAN COATES, | (AFTERNOON SESSION) |
| Defendants | **FILED**<br>MAR 1 1 2003<br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |
| . . . . . . . . . . . . . . . . . . | |
| UNITED STATES OF AMERICA, | |
| Government, | |
| | Docket No. CR 99-348 |
| vs. | |
| GARY PRICE, | |
| Defendant. | |

. . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Government: | PETER ZEIDENBERG, AUSA<br>ANJALI CHATURVEDI, AUSA<br>U.S. Attorney's Office<br>555 Fourth Street, N.W.<br>Washington, D.C.  20001 |
| For the Defendant Hill: | CHRISTOPHER DAVIS, ESQ.<br>601 Indiana Avenue, N.W.<br>Suite 910<br>Washington, D.C.  20004 |
| For the Defendant Martin: | JOANNE HEPWORTH, ESQ.<br>305 H Street, N.W.<br>Second Floor<br>Washington, D.C.  20001 |



2

```
For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               Suite 409
                               Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               Suite 901
                               Washington, D.C.  20024

Court Reporter:                BEVERLY J. BYRNE
                               Official Court Reporter
                               Room 6810 U.S. Courthouse
                               Washington, D.C.  20001
                               (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

LLA 2626

29

cousin, T.T. She sees the blood, and she sees a baby, and no one is moving.

Crystal turns and runs down the hallway, grabs her child, runs out that door, and she's thinking, they must be playing, they must be playing, they must be playing, can't be happening. But it was. Because when the police showed up and wanted to find out what was going on, they took Crystal back.

Crystal goes into the apartment with them, and she's thinking T.T. is down in the living room, her bedroom, and one of the officers goes into Terita and Crystal's bedroom, that bedroom with the door open, and the officer comes out holding baby, C.J., and says, there's a body in there, Terita.

Both girls dead. You heard from the officers that came to process that crime scene that the children, the babies, had blood all over them. They had brain matter in their hair. But amazingly enough, they were fine. They were just left there overnight in their mother's blood.

From that crime scene, ladies and gentlemen, and in speaking with Wanda Edwards and Crystal Bobbitt and Renee Brown, the police had some evidence. But that case you heard remained open for several years. Not until James Montgomery came forward were the police able to fit those clues and find the support needed to come to the conclusion which the evidence supports, which is that Sam Carson murdered those girls.

46

And you also heard from Arthur Rice that Arthur Rice was involved in a conversation with Erik Jones where they saw Wysocki. And when they saw Wysocki, Erik Jones, Irky Berk, said, you know, the way that Vito can get at Wysocki is try to get some girls involved, because Wysocki, he likes young girls.

So this was part of their way of operating. This was their job. This was the way in which they enriched themselves, to plan and then carry out efforts to kidnap and rob people.

And like I've said before, with respect to the charge of this kidnapping, we don't know who physically got Wysocki up and put him in that trunk. We don't know which of these defendants actually shot him. But it doesn't matter.

They were all in the plan to kidnap Wysocki. They were all there. They wanted quite desperately for that plan to succeed, and they tried to get away. And you know that they tried to get away, ladies and gentlemen, because of what Dorene Key described for you from October 22, 1993.

You know they tried to get away, because what Dorene saw them doing, Draper and them doing, was taking pieces of evidence that they had from this crime and trying to destroy it.

Pieces of evidence, ladies and gentlemen, includes these three sets of gloves and the duct tape. Because how are

# ORIGINAL

1

sm

PRB

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

- - - - - - - - - - - - - - - - x
                  :
UNITED STATES OF AMERICA,    :
                  :
       Government,      :
                  :   Case No.
      v.            :   CR 98-329
                  :
VINCENT HILL,         :
JEROME MARTIN,       :
SAMUEL CARSON,       :
WILLIAM K. SWEENEY,  :
SEAN COATES,         :
                  :
       Defendants.    :
                  :
- - - - - - - - - - - - - - - - x
                  :
UNITED STATES OF AMERICA,    :
                  :
       Government,      :
                  :
      v.            :   Case No.
                  :   CR 99-348
GARY PRICE,          :
                  :
       Defendant.     :
                  :
- - - - - - - - - - - - - - - - x

             Washington, D.C.
             Tuesday, July 2, 2001
             2:15 p.m.
             (P.M. SESSION)

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury

COURT REPORTER:       PAMELA BRIGGLE
                     Miller Reporting Company
                     735-8th Street, S.E.
                     Washington, D.C.  20003
                     (202)  546-6666

727

sm                                                                              2

For the Government:            PETER ZEIDENBERG, AUSA
                               ANJALI CHATURVEDI, AUSA
                               555 4th Street, N.W.
                               Washington, D.C. 20001

For the Defendant Hill:        CHRISTOPHER DAVIS, ESQ.
                               601 Indiana Ave., N.W.
                               Washington, D.C. 20004

For the Defendant Martin:      JOANNE HEPWORTH, ESQ.
                               305 H Street, N.W.
                               2nd Floor
                               Washington, D.C. 20001

For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                               LEXI NEGIN-CHRIST, ESQ.
                               419 7th Street, N.W.
                               Washington, D.C. 20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                               717 D Street, N.W.
                               Suite 400
                               Washington, D.C. 20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                               901 6th Street, S.W.
                               #409
                               Washington, D.C. 20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                               601 Indiana Ave., N.W.
                               #901
                               Washington, D.C. 20004

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

(Page 439 of Total)

App 571

sm                                                                           3

# C O N T E N T S

Closing argument:                                                        PAGE

 by counsel for Defendant Carson (Cont.)                                    4

 by counsel for Defendant Martin                                            8

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

pab                                                                    36

So, members of the jury, there has to exist in your mind a substantial doubt as to whether or not Mr. Martin can be held responsible for those weapons, even though it clearly was an apartment on which he had a lease. And one of the most telling things is he was never charged with them until today, until this case.

And, again, this is not a substantive count. It is an alleged overt act of the drug conspiracy, which has no relationship to the K Street marijuana. So, again, on these two charges and this, we have to have a not guilty.

Now, we come to the AWIK of James Coulter, "Creeko." Now this case is remarkable for the evidence you have not been presented with by the government. The government has presented no police evidence. There have been no police reports. There have been no police diagrams. There's been no crime scene officer, no ballistics evidence, no crime scene photographs, no charts or diagrams, none.

The civilian evidence that you have not been presented, the complainant, who is alive and well, did not come in to testify for you.

MR. ZEIDENBERG: Objection.

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

(Page 441 of Total)

App 573

USCA Case #23-3015    Document #2077668    Filed: 10/01/2024    Page 442 of 443

pab                                                                37

THE COURT:  I'm sorry.  I didn't hear what she said.

MS. HEPWORTH:  The complainant did not--

THE COURT:  Approach the bench.

[Bench conference.]

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

(Page 442 of Total)

App 574

Case 1:98-cr-00329-RCL   Document 727   Filed 07/19/01   Page 38 of 80

pab                                                                    38

[Bench conference begins.]

THE COURT:  I've asked you several times to move out from behind that chart, and I cannot hear you.  It muffles your voice.  Now what was it that you said?

MR. ZEIDENBERG:  I objected, Your Honor, because she stated that Creeko is alive and well, of which there is no evidence on the record, and that the government could have called him.  And I think that's inviting the jury to make a missing witness instruction.  She could call him as well.

MS. HEPWORTH:  This is the same situation that we had--

THE COURT:  Is he alive and well?

MS. HEPWORTH:  Of course he is, yes.

THE COURT:  Then why didn't you call him?

MS. HEPWORTH:  Because I can't get him in here.  I couldn't serve him.  The government has the power to--and they have the burden.  I don't have any obligation to bring him in.  He's the complainant in an alleged shooting of my client.  I have no burden to bring him in.  They have the burden.

MR. ZEIDENBERG:  The point is, Your Honor, he's equally available to both sides.  There's no

App 575