ORAL ARGUMENT NOT YET SCHEDULED

SUPPLEMENTAL APPENDIX FOR APPELLEE

———————————

UNITED STATES COURT OF APPEALS
FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

Nos. 21-3072, 21-3073, 21-3078, 22-3016, 23-3015

———————————

UNITED STATES OF AMERICA,                                    Appellee,

v.

SEAN COATES, WILLIAM SWEENEY,
JEROME MARTIN,JR., and SAMUEL CARSON,        Appellants.


———————————

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

———————————

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
*  ELIZABETH GABRIEL
MD Bar
Assistant United States Attorneys
*  Counsel for Oral Argument
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Gabriel@usdoj.gov
(202) 252-6829

Cr. Nos. 98-cr-00329 (RCL)

# UNITED STATES COURT OF APPEALS
# FOR THE DISTRICT OF COLUMBIA CIRCUIT

———————————

Nos. 21-3072, 21-3073, 21-3078, 22-3016, 23-3015

———————————

UNITED STATES OF AMERICA,                    Appellee,

v.

SEAN COATES, WILLIAM SWEENEY,
JEROME MARTIN,JR., and SAMUEL CARSON,       Appellants.

———————————

## APPEAL FROM THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

———————————

## SUPPLEMENTAL APPENDIX FOR APPELLEE

———————————

In accordance with D.C. Circuit Rule 30, appellee hereby submits

the following materials in its supplemental appendix.

### INDEX

Addendum to Motion Compel Discover…………………….……SA001-012

Government's Notice of Filing……………………………….…….SA013-018

Memorandum and Order, July 13, 2000………………………...SA019-020

Third to Motion Compel Discover………………………………...SA021-028

Order – Sep. 28, 2000…………………………………………….SA030-034

Govt's Submission Regarding Kevin Hart and
    Robert B. Smith...…..............……..............................….SA035-041

Govt's Supp. Submission Regarding Shooting of
    Robert Smith at Hope Village..….....…...............….… SA042-077

Motion for Production of Documents Relating to
    James Montgomery…….....…...................................… SA078-088

Order – Oct. 02, 2002..……..............….................…. SA090-091

Motion to Allow Counsel to Review Specific Sealed Portions
    Of the Trial Record……....…...................................… SA092-110

Emer. Motion for Access to Entire Court Docket and Points
    Points And Authorities in Support Thereof
.........................................................................… SA111-114

Order – Feb. 15, 2008……......…...................................……SA116

Order – Nov. 23, 2010..……..............…......................…….SA117

Order – Feb. 2, 2011……….................…......................…..SA118

Order – Dec. 6, 2011………..............…......................…..SA119

Affidavit of Dale Vaughan...…..................................…… SA120-122

Court Exhibit List……....…....................................…..SA123

Second Unopposed Supp. to Prior Supp. Motion to
    Vacate ……...............…......….............................… SA124-126

Defendant, William K Sweeney's Motion for
    Discovery ……...............…......….......................… SA127-132

2

Unopposed Supp. to Prior Supplemental Motion to
  Vacate ................................................................................ SA133-134

United States' Omnibus Opposition to Defendants' Sweeney, Carson,
Coates and Martin's § 2255 Motions to Vacate, Set Aside and Correct
  Sentence .............................................................SA135-261

Excerpts of Status Hearing Transcript - Jun. 16, 2000
.......................................................................................SA262-277

Excerpts of Motions Hearing Transcript - Sep. 27, 2000
.......................................................................................SA278-301

Excerpts of Trial Transcript – Jan. 09, 2001 ........................SA302-312

Excerpts of Trial Transcript – Feb. 01, 2001(AM) ..................SA313-317

Excerpts of Trial Transcript – Feb. 05, 2001(AM) ..................SA318-325

Excerpts of Trial Transcript – Feb. 05, 2001(PM) ..................SA326-339

Excerpts of Trial Transcript – Feb. 06, 2001(AM) ..................SA340-341

Excerpts of Trial Transcript – Feb. 08, 2001(PM) ..................SA342-352

Excerpts of Trial Transcript – Feb. 12, 2001 (AM) .................SA353-377

Excerpts of Trial Transcript – Feb. 12, 2001(PM) ..................SA378-404

Excerpts of Trial Transcript – Feb. 13, 2001(AM) ..................SA405-410

Excerpts of Trial Transcript – Mar. 7, 2001(PM) ..................SA411-423

Excerpts of Trial Transcript – Mar. 12, 2001(AM) ................SA424-428

Excerpts of Trial Transcript – Mar. 15, 2001(AM) ……………SA429-454

Excerpts of Trial Transcript – Mar. 15, 2001(PM) ……………SA455-480

Excerpts of Trial Transcript – Mar. 19, 2001(PM) ……………SA481-494

Excerpts of Trial Transcript – Apr. 02, 2001(AM) ……………SA495-502

Excerpts of Trial Transcript – Apr. 02, 2001(PM) ……………SA503-510

Excerpts of Trial Transcript – Apr. 03, 2001(PM) ……………SA511-514

Excerpts of Trial Transcript – Apr. 04, 2001(AM) ……………SA515-519

Excerpts of Trial Transcript – Apr. 05, 2001(PM) ……………SA520-527

Excerpts of Trial Transcript – Apr. 09, 2001(PM) ……………SA528-535

Excerpts of Trial Transcript – Apr. 25, 2001(AM) ……………SA536-541

Excerpts of Trial Transcript – Apr. 26, 2001(AM) ……………SA542-543

Excerpts of Trial Transcript – May 14, 2001(AM) ……………SA544-550

Excerpts of Trial Transcript – May 14, 2001(PM) ……………SA551-554

Excerpts of Trial Transcript – May 15, 2001(PM) ……………SA555-557

Excerpts of Trial Transcript – May 23, 2001(AM) ……………SA558-563

Excerpts of Trial Transcript – May 29, 2001(AM) ……………SA564-568

Excerpts of Trial Transcript – May 29, 2001(PM) ……………SA569-613

Excerpts of Trial Transcript – May 30, 2001(AM) ……………SA614-622

Excerpts of Trial Transcript – Jun. 21, 2001(AM) …………….SA623-624

Excerpts of Trial Transcript – Jul. 05, 2001(PM) ……………...SA625-631

Excerpts of Trial Transcript – Aug. 14, 2001(PM) …………….SA632-641

Excerpts of Trial Transcript – Aug. 15, 2001(AM) …………….SA642-649

Excerpts of Status Conference – May 17, 2013 ………………..SA650-652

Excerpts of Status Hearing - Aug. 29, 2013 …………………….SA653-657

Excerpts of Status Conference - Aug. 03, 2018 ………………..SA658-660

Respectfully submitted,

EDWARD R. MARTIN, JR.
United States Attorney

CHRISELLEN R. KOLB
JOHN P. MANNARINO
Assistant United States Attorneys

_____/s/_____
ELIZABETH GABRIEL
MD Bar
Assistant United States Attorney
601 D Street, NW, Room 6.232
Washington, D.C. 20530
Elizabeth.Gabriel@usdoj.gov
(202) 252-6829

5

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that, on this 4th day of April, 2025, I have caused

a copy of the foregoing brief for appellee to be served by electronic means,

through the Court's CM/ECF system, upon counsel for appellants:

John Longstreth
Jonathan M. Cohen
Tre Holloway
K&L Gates LLP
1601 K Street NW
Washington, DC 20006
john.longstreth@klgates.com
jonathan.cohen@klgates.com
tre.holloway@klgates.com

Mark Lanpher
Allen Overy
Shearman Sterling US LLP
1101 New York Avenue NW
Washington, D.C. 20005
mark.lanpher@aoshearman.com

Katherine Stoller
Allen Overy
Shearman Sterling US LLP
599 Lexington Avenue
New York, NY 10022
katherine.stoller@aoshearman.com

Eric Hans Kirchman
15 West Montgomery Avenue
Suite 205
Rockville, MD 20850
kirchlaw@cs.com

David B. Smith
108 North Alfred Street
Alexandria, VA 22314
dbs@davidbsmithpllc.com

/s/
ELIZABETH GABRIEL
Assistant United States Attorney

7

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 9 of 668

**FILED**

**MAY 1 8 2000**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **WILLIAM SWEENEY** | ) | |
| | ) | |

### ADDENDUM TO MOTION TO
### COMPEL DISCOVERY

Defendant, by and through undersigned counsel, Steven R. Kiersh and Paul DeWolfe, respectfully sets forth as follows:

1.) On February 9, 1999 defendant filed a Motion to Compel Discovery. On March 4, 1999 the United States filed its response to defendant's Motion to Compel Discovery. On May 4, 2000, defendant filed his Reply to the Response of the United States to his Motion to Compel Discovery.

2.) Defendant adds additional matters identified herein to his Motion to Compel Discovery. These matters are material, relevant and potentially exculpatory. The United States has been advised of these requests and has declined to voluntarily disclose the requested information.

### 1.) Information in the possession of Assistant United States Attorneys Oscar Mayer, Jr. and Lynn C. Leibovitz

a.) <u>Oscar S. Mayer, Jr.</u>: Mr. Mayer was the lead prosecutor in D.C. Superior Court Criminal Case No. F-13463-91. That case was a prosecution of James Montgomery for armed robbery, armed kidnaping and other serious felonies. As has

1

SA-1

previously been brought to the attention of this Court, James Montgomery is the foundation upon which the United States seeks to base its theory of prosecution of the triple murder in Temple Hills, Maryland against William Sweeney.

James Montgomery is a career criminal with a reputation for dishonesty, lack of credibility and bizarre behavior. It is obvious that the defense will spend considerable time at trial demonstrating to the jury that Montgomery is an unreliable individual and thus his testimony should be evaluated with a great deal of skepticism.

In 1991 James Montgomery was arrested and charged in the Superior Court of the District of Columbia with Armed Robbery. On January 27, 1992, Montgomery was indicted for Armed Robbery, Armed Kidnaping and Possession of a Firearm During a Crime of Violence. Montgomery's case number was F-13463-91.

At the time of Montgomery's arrest for the charges identified in the preceding paragraph, he was on escape status having walked away from a halfway house. That act resulted in Montgomery's indictment for Prison Breach in Superior Court Case No. F-1765-92.

In Criminal Case No. F-13463-91, Montgomery sought to modify his conditions of release pending trial. The United States opposed the motion. The Assistant United States Attorney prosecuting the matter was Oscar S. Mayers, Jr. In his pleading to the Honorable Frederick Weisberg, Mr. Mayers wrote in relevant part as follows:

**"Moreover, the totality of the circumstances indicates that the defendant (James Montgomery) is unreliable and that there is a substantial likelihood of flight".**

There is absolutely nothing to suggest that Montgomery has become a more

2

SA-2

reliable person since 1991. Indeed, the evidence suggests that since 1991 Montgomery has become even less reliable and has continued this practice of engaging in very serious and violent criminal activity.

In a 1991 pleading the United States announced that Montgomery was an unreliable individual. This characterization <u>must</u> be brought to the attention of the jury considering the indictment herein as it is material and relevant to William Sweeney's defense. In addition, the pronouncement of Montgomery's unreliability by the United States unquestionably exculpates William Sweeney from involvement with the triple homicide.

Defendant submits that <u>any</u> information in the possession of the United States which tends to establish or corroborate the unreliability of James Montgomery is exculpatory and must be immediately disclosed for review and investigation.

The purpose of disclosing the evidence of James Montgomery's unreliability is to impeach his credibility at trial. The Supreme Court has held that **"impeachment evidence . . . as well as exculpatory evidence, falls within the <u>Brady</u> rule." <u>United States v. Bagley</u>**, 473 U.S. 667, 676 (1985) (quoting **<u>Giglio v. United States</u>**, 405 U.S. 150, 154 (1972)). More recently, the Supreme Court held that the <u>Brady</u> rule includes evidence **"known to police investigators and not only to the prosecutor." <u>Kyles v. Whitley</u>**, 514 U.S. 419, 438 (1995). Thus, in order to comply with <u>Brady</u>, **"the individual prosecutor has a duty to learn of any favorable evidence known to others acting on the government's behalf in the case, including the police"** <u>Id.</u> At

3

SA-3

437.

b.) <u>Lynn C. Leibovitz</u>: William Sweeney is charged herein with the murder of Donnell Whitfield.  This act was previously prosecuted in the Superior Court of the District of Columbia.  The case was handled by Assistant United States Attorney Lynn C. Leibovitz.

It is the government's present theory of prosecution that William Sweeney is the actual shooter of Mr. Whitfield.  However, when the case was prosecuted in Superior Court it was the government's theory of prosecution that someone other than William Sweeney was the shooter of Donnell Whitfield.  In fact, Ms. Leibovitz presented testimony to the grand jury that someone other than William Sweeney actually shot Donnell Whitfield.

William Sweeney must present to the jury hearing this case <u>all</u> of the evidence in the possession of the United States that someone other than he shot and killed Donnell Whitfield.  For very obvious reasons, the evidence is material, relevant and certainly exculpatory.

The only means for William Sweeney to fully inform the jury of the existence of this fully exculpatory evidence is through the disclosure of all information presented to the grand jury which suggests that someone other than William Sweeney was the actual shooter of Donnell Whitfield.

The right to suggest, through the introduction of testimony, evidence tending to show that a person other than the defendant committed the charged offense is guaranteed by the Due Process Clause.  <u>See</u> **Brown v. United States**, 409 A.2d 1093,

4

SA-4

1097 (D.C. App. 1979).  However, in this context, the evidence is only relevant at trial if it **"tend[s] to indicate some reasonable possibility that a person other than the defendant committed the charged offense." Johnson v. United States**, 552 A.2d 513, 516 (D.C. 1989), adopted by the en banc court in **Winfield v. United States**, 676 A.2d 1,5 (D.C. App. 1996) (emphasis added in **Winfield**).  **"The focus of the standard is not on the third party's guilt or innocence, but on the effect the evidence has upon the defendant's culpability, and in this regard it need only tend to create a reasonable doubt that the defendant committed the offense." Winfield**, 676 A.2d at 4 (citation and internal quotations omitted); see **Freeland v. United States**, 631 A.2d 1186, 1189 (D.C. 1993) (**"The focus is properly on the reasonable possibility that someone else might have committed the crime for which the defendant stands charged and not on whether the defendant can produce proof beyond a reasonable doubt that a third person is guilty."**) Finally, to substantiate a third-party perpetrator defense, an accused must "proffer some evidence, either circumstantial or direct, of a third-party's actions, motives, opportunity, statements [or] declarations against penal interest." **Boykin v. United States**, 1999 D.C. App. LEXIS 219, at *18 (Sept. 23, 1999).

It may be an argument of the defense that persons other than William Sweeney had both the motive and opportunity to commit the Whitfield murder.  However, as stated above, in order to suggest evidence through testimony that someone else had such motivation, the defendant must have evidence that **"tends to indicate some**

SA-5

**reasonable possibility that a person other than the defendant committed the charged offense." <u>Whitfield v. United States</u>, 676 A.2d at 5.**

The only means for defendant to pursue his defense that someone else actually shot Donnell Whitfield , William Sweeney must have all such evidence known by the government immediately disclosed to him.

### III.) All investigative files pertaining to other suspects in the commission of the <u>triple homicide in Temple Hills, Maryland</u>

It is beyond dispute that numerous individuals other than William Sweeney were the subject of investigation on behalf of law enforcement pertaining to the commission of the triple homicide which is a prominent aspect of this indictment.

The United States has declined to provide the defense with information contained in the investigative files of those persons investigated as suspects with respect to the triple murder in Temple Hills, Maryland.

It will be an argument of the defense that law enforcement actively investigated persons other than William Sweeney for the Maryland triple murder. To substantiate this third-party defense, Mr. Sweeney plans to introduce evidence at trial that individuals have provided law enforcement with evidence that contradicts the government's theory. The defense further desires to introduce evidence that law enforcement actively investigated persons other than William Sweeney as having committed the triple murders.

Disclosure of this information would allow the defense to conduct its own

SA-6

investigation to develop further evidence and effectively present Mr. Sweeney's third-party defense.  See **United States v. Frank**, 11 F.Supp. 2d 322, 325 (S.D.N.Y. 1998). While **Brady "does not create a right to information concerning all possible suspects, particularly if the number of such suspects is large and evidence of their involvement is slight,"** United States v. Whitehorn, 710 F.Supp. 803, 827 (D.D.C.), rev'd on other grounds, **United States v. Rosenberg**, 888 F.2d 1406 (D.C. Cir. 1989), disclosure of this limited information concerning all individuals who have been investigated for the triple homicide would hardly include a very large number of suspects.  Moreover, **"any evidence of their involvement"** cannot be **"slight"** since such evidence would corroborate the theory of the defense that others had the motives and means to commit the triple murders.  Thus, this evidence would be relevant and admissible or would lead to discovery of admissible evidence, and thus would be material under **Brady**.  See **Bartholomew**, 516 U.S. at 6-7; **Lewis**, 408 A.2 at 308.

The information requested herein will also be used to cast reasonable doubt upon the government's theory of prosecution of the Temple Hills, Maryland triple murder.  This entirely proper use of evidence can only be accomplished if the information is immediately made available to counsel.

**a.) Disclosure should be compelled immediately to ensure that the defense has a significant opportunity to put the exculpatory information to use**

The defense seeks the Court compel the government to disclose the information contained in the requests herein immediately.  As a general matter, a defendant has no constitutional right to receive either Brady or Giglio material prior to trial.  See **Kyles**,

7

SA-7

514 U.S. at 437. Exculpatory material must be discovered, however, **"at such a time as to allow the defense to use the favorable material effectively in the preparation and presentation of its case."** <u>United States v. Pollack</u>, 543 F.2d 964, 973 (D.C. Cir.), <u>cert. denied</u>, 429 U.S. 924 (1976); <u>See</u> also <u>Frank</u>, 11 F.Supp.2d 964, 973 (D.C. Cir.), <u>cert. denied</u>, 429 U.S. 924 (1976); <u>See</u> also <u>Frank</u>, 11 F.Supp.2d at 324 (citing <u>Grant v. Alldredge</u>, 498 F.2d 376, 382-83 & n.7 (2nd Cir. 1974)). In an immensely complex case such as Mr. Sweeney's, the need for exhaustive investigation and thorough trial preparation by the defense is of paramount importance, given the potential consequences of the litigation. Every effort must be made to disclose exculpatory information at a sufficiently early point in the proceedings to afford the defense a meaningful opportunity to investigate it and evaluate its application to its strategy at trial, or the fundamental fairness required by due process may be lacking. See <u>McVeigh</u>, 923 F.Supp. At 1315; <u>see</u> <u>also</u> <u>Dean v. United States</u>, 55 F.3d 640, 663 (D.C. Cir. 1995) (finding due process satisfied so long as the ultimate disclosure is made at a sufficiently early point so that defendant may make use of any benefits of the evidence).

Therefore, with trial only three months away, the defense must have the information sought herein immediately so that it may have a meaningful opportunity to conduct its own investigation and to put the exculpatory information effectively to use in Mr. Sweeney's defense. Postponing disclosure of such information puts the strategic planning of the defense in the hands of the government to the same extent as a total failure to disclose, making the government the architect of the defense's case, a circumstance that does not comport with the minimal standards of justice. See **Brady**,

8

SA-8

373 U.S. at 88. Furthermore, any speculative danger might deprive Mr. Sweeney of effective use of the material and right to a fair trial. See **Pollack**, 534 F.2d at 973. Thus, the Court should compel the immediate disclosure of the materials identified herein.

Respectfully submitted,

Steven R. Kiersh #323329
717 D Street, NW
Suite 400
Washington, D.C. 20004
(202)347-0200

Paul DeWolfe
20 Courthouse Square
Suite 214
Rockville Maryland, 20850

SA-9

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **WILLIAM SWEENEY** | ) | |
| | ) | |

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of defendant's Addendum to Motion to Compel Discovery was mailed, postage prepaid, on this the _18th_ day of May, 2000 to:


Anjali Chaturvedi, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, D.C. 20001

Peter Zeidenberg, Esquire
Assistant U.S. Attorney
555 4th Street, NW
Washington, D.C. 20001

Paul DeWolfe, Esquire
20 Courthouse Square
Suite 214
Rockville, Maryland 20850

Christopher Davis, Esquire
601 Indiana Avenue, NW
#910
Washington, D.C. 20004

Joanne Hepworth, Esquire
305 H Street, NW 2nd Floor
Washington, D.C. 20001

SA-10

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 19 of 668

Joseph Beshouri, Esquire
419 7th Street, NW
Suite 201
Washington, D.C. 20004

Gerald Fisher, Esquire
419 7th Street, NW
Suite 201
Washington, D.C. 20004

Frederick Sullivan, Esquire
12427 Sadler Lane
Bowie, Maryland 20715

Frederick Jones, Esquire
901 6th Street, SW
#409
Washington, D.C. 20024

John Carney, Esquire
601 Pennsylvania Avenue, NW
#900
South Building
Washington, D.C. 20004

Joseph Conte, Esquire
601 Pennsylvania Avenue, NW
#400
Washington, D.C. 20004

Steven R. Kiersh

SA-11

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

'00 MAY 18  PM 2: 38

NANCY M.
MAYER-WHITTINGTON
CLERK

SA-12

FILED

MAY 3 0 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :
        v.                         :          Criminal No. 98-329(TPJ)
VINCENT HILL, ET. AL               :

### GOVERNMENT'S NOTICE OF FILING

The United States of America, by and through its attorney, the United States Attorney for the

District of Columbia, respectfully requests that the Court file as part of the record in this case the

attached correspondence to Stephen R. Kiersh, Esquire, Christopher M. Davis, Esquire, Frederick

Jones, Esquire, Joanne Hepworth, Esquire, Joseph Beshouri, Esquire, Joseph Conte, Esquire,

Howard Bramson, Esquire, John J. Carney, Esquire, Paul DeWolfe, Esquire, and Gerald Fisher,

Esquire served by mail upon counsel as reflected in the certificate of service of this notice.

Respectfully submitted,

WILMA A. LEWIS
United States Attorney

_____
Peter Zeidenberg
Assistant United States Attorney
Bar No. 440-803
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8831

SA-13

## CERTIFICATE OF SERVICE

I hereby certify that a copy of the foregoing correspondence was mailed, first class, postage prepaid, on the 30th day of May, 2000 to the following:

Christopher M. Davis, Esquire
601 Indiana Avenue, N.W.
#910
Washington, D.C.  20004

Frederick Jones, Esquire
901 6th Street, S.W.
#409
Washington, D.C.  20024

Joanne Hepworth, Esquire
305 H Street, N.W. 2nd Floor
Washington, D.C.  20001

Joseph Beshouri, Esquire
419 7th Street, N.W.
Suite 201
Washington, D.C.  20004

Joseph Conte, Esquire
601 Pennsylvania Avenue, N.W.
#900
Washington, D.C.  20004

Howard Bramson, Esquire
400 7th Street, N.W.
#400
Washington, D.C.  20004

John Carney, Esquire
601 Pennsylvania Avenue, N.W.
#900 South Building
Washington, D.C.  20004

Paul DeWolf, Esquire
20 Courthouse Square
Suite 214
Rockville, Maryland 20850

SA-14

Gerald Fisher, Esquire
419 7th Street, N.W.
Suite 201
Washington, D.C.  20004 ·

_____

PETER ZEIDENBERG
Assistant United States Attorney

SA-15



United States Attorney

*District of Columbia*

_____

*Judiciary Center*
*555 Fourth St. N.W.*
*Washington, D.C. 20001*

May 30, 2000

**FILED**

**MAY 3 0 2000**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Stephen R. Kiersh              Joseph Conte
Christopher Davis             Howard Bramson
Frederick Jones               John J. Carney
Joanne Hepworth               Paul DeWolfe
Joseph Beshouri               Gerald Fisher

Re:    **United States v. Vincent Hill, et. al** (Criminal No. 98-329)

Dear Counsel,

Enclosed please find the following evidence which we disclose pursuant to our obligations

under Brady:

Re: the murder of Maurice Hallman and Leonard Hyson on December 19, 1989 (Overt

Act 3), please find:

1.      1-page resume by Off. Whalen & Det. Daniel dated 1/4/90, bate-stamped

00902435.

2.      1-page resume by Det. Bob Vacin, dated 12/19/89, bate-stamped 00902436.

Re: the murder of Teresa Thomas and Terita Lucas on March 22, 1991 (Overt Act 7),

please find:

1) 1-page resume by Pearson/Queen, dated June 11, 1991, bate-stamped 00902433;

2) the last page of a resume by Det. Garry P. Queen re: an interview with a Ms. Yvette

Young, bate-stamped 00902434;

SA-16

USCA Case #23-3015  Document #2109460  Filed: 04/04/2025  Page 25 of 668

Re: the murder of Timothy Benton on June 22, 1994 (Overt Act 35), please find:

1) a two-page resume by Detective Timothy Doughty dated July 1, 1994 and bate-stamped 902431-902432.

If you have any questions regarding this or any other matters, please feel to call.

Sincerely,

Peter R. Zeidenberg
Assistant United States Attorney

cc:  court file

SA-17

RECEIVED
U.S. DISTRICT COURT
DISTRICT OF COLUMBIA

'00 MAY 30  PM 3: 21

NANCY M.
MAYER-WHITTINGTON
CLERK

SA-18

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA )<br><br>v. )<br><br>VINCENT HILL, et al., )<br><br>Defendants. ) | Cr. No. 98-329 (TPJ)<br><br>**FILED**<br><br>JUL 1 3 2000<br><br>NANCY MAYER WHITTINGTON, CLERK<br>U.S. DISTRICT COURT |

MEMORANDUM AND ORDER

In accordance with the proceedings at the hearing on the "motion to compel discovery, number 1," of June 16, 2000, the Court has reviewed in camera the government's ex parte submission of its "investigative files" respecting the witness James Montgomery. The file consists of eleven FBI 302s dating from January, 1992, through March, 1999, summarizing information imparted by Montgomery to the FBI; four transcripts of grand jury testimony given by Montgomery in the District of Columbia and Prince George's County; notes from six interviews of Montgomery by various AUSAs and one FBI Special Agent; one debriefing agreement and two plea agreements with Montgomery; several criminal history printouts; miscellaneous court pleadings respecting Montgomery; and documents relating to Montgomery's application for admission to the Witness Security Program.

Some of the materials have been disclosed or will become be discoverable in due course under Fed. R. Civ. P. 16 or as Jencks or Giglio materials. Defendant Sweeney's motion is primarily addressed, however, to matters which might be considered Brady information; specifically, that which might constitute or lead to evidence exculpatory of the defendant, in

SA-19

particular with reference to the so-called "triple homicide" in Prince George's County, Maryland, on November 17, 1996. Sweeney asserts that James Montgomery was once a suspect in the investigation of that crime, for which Sweeney presently stands charged here. Sweeney is in quest of evidence in possession of the government that Montgomery (or third party or parties) committed the killings.

The government's "investigative files" reveal – and the Court deems it to be <u>Brady</u> information to which defendant Sweeney is presently entitled – that the source of suspicion on the part of Prince George's County authorities that James Montgomery ( and not William Sweeney) committed the "triple homicides" was one Robert ("Butchie") Smith who was himself murdered in the summer of 1997. No other <u>Brady</u> materials were found, and the remainder of the files contains no other evidence producible to defendant at this time.

It is, therefore, this 13th day of July, 2000,

ORDERED, that the defendant Sweeney's "motion to compel discovery, number 1," is granted to the extent set forth above and otherwise denied, without prejudice; and it is

FURTHER ORDERED, that the government retain in its possession, intact, one copy of the compilation of its "investigative files" examined by the Court <u>in camera</u> for use in connection with any appeal of this case.

Thomas Penfield Jackson
U.S. District Judge

SA-20

**FILED**

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

JUL 1 7 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

)
)
UNITED STATES OF AMERICA        )
)
V.                              )        **Criminal No. 98-329**
)        **(TPJ)**
WILLIAM SWEENEY                 )
)

### THIRD MOTION TO COMPEL DISCOVERY

Defendant, by and through undersigned counsel, Steven R. Kiersh and Paul DeWolfe, respectfully sets forth to this Honorable Court as follows:

Defendant incorporates by reference all previous legal arguments pertaining to his need to investigate this complex case and to establish that persons other than William Sweeney had the motive, means and opportunity to commit the crimes alleged in this indictment.

### I.) Information Pertaining to Robert Smith

The United States has charged Mr. Sweeney with conspiracy to murder Robert Smith. Of greater significance is that is that the United States is seeking admission of hearsay statements of Robert Smith in an effort to prove other allegations of criminal activity as set forth in the indictment against William Sweeney.

Defendant submits that Robert Smith was an unreliable individual with a lengthy criminal history. Smith was engaged in narcotics trafficking in the District of Columbia and Maryland. At the time of his death, Smith was working as an F.B.I. informant providing information related to criminal activity of many people other than William

1

SA-21

Sweeney.  It is believed that many persons involved in criminal activity had the motive to kill Smith.

In order to both rebut the substantive count of conspiracy to murder Robert Smith, and to argue against the admissibility of Smith's out of court hearsay statements, defendant seeks an Order form the Court compelling the United States to provide the following information.

### a.) **All statements of Robert Smith made to law enforcement**

The United States had provided versions of F.B.I. 302 forms pertaining to Smith. It is known that Smith has provided other statements to law enforcement.  <u>All</u> of Smith's statements need to be evaluated by the defense in order to effectively assess his credibility and reliability.

### b.) **The name and address of each individual who was the subject of information privided to law enforcement by Robert Smith**

Every person whose criminal conduct was being investigated as a result of information offered by Robert Smith had a motive to commit his murder.  It is essential that the defense obtain the identities of each such individual in advance of trial to establish whether a third party had a motive to kill Smith and whether they acted on such motive.

### c.) **All information pertaining to a prior shooting of Robert Smith**

Upon information and belief, Robert Smith was shot multiple times in the early 1990's.  William Sweeney was never investigated for this shooting and there is

2

SA-22

absolutely nothing to suggest that he was involved with this shooting.

Defendant seeks all information in the possession of law enforcement pertaining to the prior shooting of Robert Smith for the obvious reason of firmly establishing the motives of others to harm Mr. Smith.

### d.) All benefits received or promised to Robert Smith in return for information provided to law enforcement

For reasons discussed herein and addressed in other pleadings, the credibility of each civilian government witness will be at the heart of Mr. Sweeney's defense. Accordingly, if hearsay statements of Smith are to be introduced for the jury to consider, all benefits or promises of benefits that Smith received in return for his statements must be brought to the attention of the jury in order to adequately assess bias and credibility.

### II.) Information Pertaining to James Montgomery

As this Court is well aware, the United States is placing extraordinary reliance on the testimony of James Montgomery in its effort to prosecute William Sweeney for the crimes in the indictment. Montgomery is a career criminal who apparently has implicated himself in the triple murder in Temple Hills, Maryland which is a part of this indictment. Montgomery has a history of mental difficulties and has in the past been characterized by the United States as "unreliable".

It is imperative that the defense be able to fully explore all aspects of Montgomery's mental disease and unreliability in order to effectively argue to the jury

3

SA-23

that he lacks adequate credibility. In order to fully investigate this essential information and to enable Mr. Sweeney to present a complete defense, an Order compelling the United States to disclose the following information is requested.

### a.) Notes of Special Agent Yow concerning conversations with <u>James Montgomery</u>

It is known that James Montgomery accused an individual by the name Wayne Perry of two of the murders alleged in this indictment. He made these false allegations to Special Agent Yow. Defendant seeks all notes taken by Yow, or any other member of law enforcement, pertaining to this false allegation or any other false or exaggerated representations.

The purpose of this request is to fully investigate the lack of credibility of James Montgomery. Defendant seeks to educate the jury about Montgomery's penchant for falsely accusing people of murder. The fact that Montgomery falsely accused Wayne Perry of two murders is clearly relevant to whether his accusations against William Sweeney are credible.

### b.) <u>Medical records of James Montgomery</u>

The institutional files of James Montgomery reveal an enormous amount information which the defendant prefers to address under seal.

Counsel is prepared to make further representations under seal concerning Mr. Montgomery's health history. Counsel seeks to make these representations under seal so as to avoid an unnecessary invasion of Mr. Montgomery's privacy.

4

SA-24

A photograph of James Montgomery depicts a scar that appears to be from a craniotomy. It appears that Mr. Montgomery has had brain surgery which could have an effect on his competency to testify.

Defendant seeks to have all of the medical records of James Montgomery evaluated by a defense expert in an entirely confidential manner. If, after expert review, counsel believe that there is a medical basis for further evaluation of Mr. Montgomery to assess his competency to testify, this information will be brought to the attention of the Court. The Court can then consider whether to permit further assessment in the form of an independant medical examination to determine the competency of this witness to testify.

District of Columbia Code Section 14-307 creates a statutory doctor-patient privilege in the District of Columbia. Notwithstanding the creation of the privilege, there are legislatively created exceptions, one of which being directly applicable to this case. D.C. Code Section 14-307(b)(1) states as follows:

**This section does not apply to: criminal cases where the accused is charged with causing the death of, or inflicting injuries upon, human being, and the disclosure is required in the interests of public justice . . .**

Section(b)(1) of the relevant portion of the District of Columbia Code clearly recognizes that a defendant's right of confrontation can tale priority over the privacy interests of another individual provided that the interests of the public are served. With respect to the facts herein, the public's interest in securing the rights of an individual pursuant to the Confrontation Clause is certainly a very strong consideration in

5

SA-25

suggesting that disclosure should be made. This is particularly true in light of defendant's suggestion that disclosure be made pursuant to a Protective Order. This method would have allowed review of the records without violating the privacy interests of the witness. The records would only have been part of the public record if the contents suggested a lack of competence on the part of the witness.

The interests of public justice mandates that William Sweeney be afforded due process of law. The interests that he has as a person charged with first degree murder in simply evaluating the records in a confidential manner with strict conditions as imposed by a Protective Order far outweigh the privacy interests of the witness.

In **United States v. Wright**, 114 D.W.L.R. 1205, Judge Rufus King addressed the issue of disclosure of psychiatric records. Therein, the defendant was charged with robbery. The sole witness was the complainant who had been a resident of the District of Columbia's institution for the mentally retarded. At the time of the incident the complainant was in a community program and not residing on the grounds of the institution.

The defense sought to review psychiatric records of the complainant and served a subpoena for their production. The District of Columbia sought to quash the subpoena.

Judge King analyzed a number of factually analogous cases from courts in other jurisdictions and ultimately ruled as follows:

> **The right to cross-examination in the area of mental capacity of the complaint means the right to effective and informed cross-examination.**

6

SA-26

**Other trial courts have concluded on facts similar to those here that a defendant clearly is entitled to discovery and inspection of the psychiatric, psychological and medical records of a complaining witness which contain information which may have some bearing on the witness' credibility and ability to perceive events in issue. 114 D.W.L.R. at 121, citations omitted.**

Procedurally, in an effort to protect the privacy interests of the complainant, the Trial Court ordered that all of the records were to be made available to all counsel and then each party was to file motions seeking admission on the relevant portions.

It is exactly the procedure suggested by Judge King that defendant seeks to be employed in this case. An evaluation of the medical records in a confidential manner by a competent psychiatric expert would have either revealed that there was no basis to challenge the mental competency of Mr. Montgomery or would have identified the relevant portions of the records which could have formed the basis for an adequate inquiry.

### III.) Information pertaining to Reginald Switzer

William Sweeney is charged with the murder of Donnell Whitfield. The United States has informed counsel that Donnell Whitfield had in the pat been shot by Reginald Switzer (Mr. Switzer is a former co-defendant herein and it is expected that he will be called at trial to testify against Mr Sweeney). It was also revealed that Mr. Whitfield believed that Switzer had taken out a contract on his life.

Defendant seeks the name and address of each person who has knowledge about the violent animosity which had existed between Donnell Whitfield and Reginald Switzer. This information is needed immediately in order to conduct an investigation to

SA-27

demonstrate that a person other than William Sweeney had reason to kill Mr. Whitfield and to probe the bias and motive to fabricate testimony on the part of Reginald Switzer.

**WHEREFORE**, for the reasons stated herein, for those reasons outlined in prior pleadings, and for those reasons to be articulated at an oral hearing, defendant prays this Honorable Court to require the government to provide the documentation outlined herein.

Respectfully submitted,

Steven R. Kiersh #323329
717 D Street, NW
Suite 400
Washington, D.C. 20004
(202)347-0200

Paul DeWolfe
20 Courthouse Square
Suite 214
Rockville, Maryland 20850

8

SA-28

**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

|  |  |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| | ) |
| | ) |
| **V.** | ) **Criminal No. 98-329** |
| | ) **(TPJ)** |
| **WILLIAM SWEENEY** | ) |
| | ) |

## CERTIFICATION OF COUNSEL

We, Steven R. Kiersh and Paul DeWolfe, counsel for William Sweeney, do hereby certify that we have informally requested to United States to provide the information identified herein. The United States has informed counsel that it will not provide the information without an Order from the Court.

_Steven R. Kiersh_

Steven R. Kiersh

_Paul DeWolfe_

Paul DeWolfe

SA-29

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,                          )
                                        )
                                        )
                                        )
    v.                                  )  Criminal No. 98-329-01 (TPJ)
                                        )
VINCENT K. HILL, et al.,                )
                                        )
          Defendants.                   )
                                        )
_____        )
                                        )
UNITED STATES,                          )
                                        )
                                        )
                                        )
    v.                                  )  Criminal No. 99-348-03 (TPJ)
                                        )
GARY PRICE,                             )
                                        )
          Defendant.                    )
                                        )
_____        )

FILED

SEP 2 8 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

ORDER

In accordance with the proceedings in open court at the motions hearing of September 26

and 27, 2000, and upon consideration of the evidence taken and the representations of counsel,

for the reasons advanced by the government or set forth on the record, it is this 28th day of

September, 2000,

ORDERED, that the government's motions to quash defendant Carson's subpoenas duces

tecum addressed to the acting chief of human resources at the U.S. Department of Agriculture

and to the medical examiners office [#197, #193] are denied as moot; and it is

FURTHER ORDERED, that the government's motion for an anonymous jury [#289] is

granted, subject to conditions to be determined at a later date; and it is

FURTHER ORDERED, that the government's motion to admit out-of-court statements of

murdered witnesses [#314] is granted as to the statements of Robert Smith and Kevin Hart,

subject to the condition that the government disclose any and all evidence in its possession which

SA-30

may impeach the out-of-court statements of Smith and/or Hart or may indicate that persons other than defendants attempted or had reason to murder Smith and/or Hart, and is denied as moot as to the statements of Chrishuana Gladden; and it is

FURTHER ORDERED, the defendants' joint motion to strike all racketeering counts and counts under the Violent Crime in Aid of Racketeering Statute, 18 U.S.C. § 1959 et seq., [#338] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Sweeney's motion to dismiss counts 48, 49, and 50, and to strike overt acts and racketeering act 70(a)-(g) of Count 2 and to strike all references to the triple murder in Maryland [#307] is denied without prejudice; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss the indictment for prejudicial pre-accusatorial delay, violations of the statute of limitations, and Speedy Trial Act provisions [#337] is granted as to Counts 10, 11, 12, 13, 14, 15, 16, 18, and 19, on statute of limitations grounds only, and denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to dismiss Counts 1 and 2 on Fifth and Sixth Amendment grounds [#336] is denied; and it is

FURTHER ORDERED, the defendant Carson's motion for dismissal of counts, to compel disclosure of exculpatory evidence, and for sanctions [#329] is denied; and it is

FURTHER ORDERED, that defendant Carson's and Martin's motions to strike all aliases from the indictment [#330, #335] are denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to identify witnesses with juvenile adjudications and pending juvenile proceedings and to inspect juvenile files [#311] is denied without prejudice as moot; and it is

SA-31

2

FURTHER ORDERED, that defendant Sweeney's motion to disclose identities of each confidential informant regardless of whether the informant will be called as a witness at trial [#303] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial identification and production of <u>Jencks</u> material [#302] is denied as moot, provided that the government shall disclose <u>Jencks</u> and <u>Giglio</u> materials relating to a witness the Friday before the week in which the witness testifies; and it is

FURTHER ORDERED, that defendant Sweeney's motion for pretrial production of statements of persons who will not be called as witnesses at trial [#308] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion for discovery of statements of co-defendants and co-conspirators [#326] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order directing the government to give notice of its intention to rely upon other crimes evidence [#310] is denied without prejudice, to the extent that notice has not otherwise been furnished; and it is

FURTHER ORDERED, that defendant Carson's motion for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 807 [#325] and defendant Sweeney's motions for notice of government's intention to use the residual hearsay exception under Fed. R. Evid. 804(b)(5) [#304] and 803(24) [#309] are denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine the admissibility of the testimony of each of the government's proposed expert witnesses [#230] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for <u>in camera</u> review of grand jury testimony to determine existence of racketeering enterprise [#301] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for a pretrial hearing to determine existence of conspiracy and admissibility of co-conspirators' statements [#312] is denied; and it is

FURTHER ORDERED, that defendant Carson's motion to compel disclosure of evidence subject to suppression under Fed. R. Crim. P. 12(b)(3) [#328] is denied as moot; and it is

FURTHER ORDERED, that defendant Carson's motion for bill of particulars [#327] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's third motion to compel discovery [#340] is granted to the extent that the government must disclose the above-mentioned evidence regarding Robert Smith and is denied in all other respects; and it is

FURTHER ORDERED, that defendant Martin's motion to suppress evidence from the seizure that occurred on or about September 14, 1991, [#334] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress physical evidence seized from the November 1, 1994, search at 211 I Street, SE, [#306] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress identification testimony from February 19, 1997, [#344] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's second motion to suppress identification testimony [#378] is denied as moot; and it is

FURTHER ORDERED, that defendant Sweeney's motion to suppress custodial statements made on or about April 20, 1997, [#305] is denied; and it is

FURTHER ORDERED, defendant Martin's motion to suppress statements [#333] is denied as moot as to the statements made January 24, 1992, October 27, 1992, and June 9, 1994,

**SA-33**                                                   4

and denied on the merits as to the statements made on or about August 7, 1991, and September 16, 1997; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress evidence and statements from the April 21, 1992, search [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Hill's motion to suppress identification from February 3, 1997 [#374 exhibits] is denied; and it is

FURTHER ORDERED, that defendant Sweeney's motion for change in location pending trial [#296] is granted to the extent that defendant will be incarcerated in D.C. Jail or elsewhere in the metropolitan area during trial; and it is

FURTHER ORDERED, that defendant Sweeney's motion for an order granting leave to serve subpoenas on two assistant United States attorneys [#291] is denied; and it is

FURTHER ORDERED, that defendant Coates' motion for reconsideration of motion for severance [#366] and all other defendants' oral renewed motions for severance are denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion to compel disclosure of exculpatory evidence (filed September 26, 2000) is denied; and it is

FURTHER ORDERED, that defendant Carson's supplemental motion for bill of particulars of unindicted crimes which the government intends to prove at trial (filed September 27, 2000) is denied; and it is

FURTHER ORDERED, that defendant Proctor's motion to compel discovery (filed September 27, 2000) is denied without prejudice.


_____
Thomas Penfield Jackson
U.S. District Judge

SA-34

**IN THE UNITED STATES DISTRICT COURT FOR THE
DISTRICT OF COLUMBIA**

SEP 2 9 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| v. | )   Cr. No. 98-329-01-06 (TPJ) |
| | ) |
| VINCENT HILL, aka Vito, | ) |
| JEROME MARTIN, aka Pimp, | ) |
| SEAN COATES, aka Birdie, | ) |
| WILLIAM SWEENEY, aka Draper | ) |
| SAM CARSON, aka Chin | ) |
| MAURICE PROCTOR, aka Poo-Poo | ) |

----------------------------------------------------------------

| | |
|---|---|
| GARY PRICE, aka Harry-O | )   Cr. No. 99-348-01 (TPJ) |
| | ) |
| Defendants. | ) |

**Government's Submission Regarding Kevin Hart and Robert B. Smith**

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, hereby submits the following information regarding Robert Smith and Kevin Hart.

Pursuant to the Court's oral ruling on September 27, 2000, the government will seek to

introduce statements made by Smith and Hart at trial under Fed. R. Evid. 804(b)(6).

**Robert B. Smith**

1. The following is background information regarding Robert Smith which the

government would elicit from the Agent who will testify regarding the statements made by Robert

Smith.

-prior convictions:(1) 1982 misdemeanor petit larceny, (2) 1992 shoplifting, and (3) 1990 PWID
Cocaine (on supervised release at time of arrest)
-indictment dismissed on 12/12/96
-On April 30, 1997, Robert "Butchie" Smith, a member of the organization, pled guilty to
conspiracy to distribute and possess with intent to distribute 100 kilograms or more of cannabis,
50 grams or more of cocaine and cocaine base, and heroin.[1]

---

[1] Prior to eliciting testimony regarding the statements made by Robert Smith, the
government will provide to defense counsel a copy of the plea letter and transcript of plea

SA-35

-Smith was "opened up" as a confidential informant on 12/17/96. From that date until the date of his murder, the FBI provided financial assistance in the amount of $12,744.19. This money went to pay rent, a car, living expenses, hotel rooms used to debrief Smith, cellular phone bills.

2. In terms of statements by Smith which the government would seek to introduce, we hereby reiterate the testifying agent would speak about the following statements made by Smith:

### The Triple Murder

Sweeney confessed his role in the triple murder in which Lonnie Gaskins, Darnell Mack, and Melody Anderson were murdered in November 1996. Smith recounted in detail to law enforcement on more than one occasion that Sweeney told him that Sweeney, Carson, Coates, and James Montgomery participated in the triple murder. In addition, Sweeney told Smith the events which led to the triple murder. As recounted by Sweeney to Smith, Gaskins and Sweeney both were in Las Vegas to watch a boxing match involving Evander Holyfield. Sweeney even detailed from where it was that he got the airline tickets in order to attend the boxing match – the Dream Shop in Georgetown. Sweeney had seen Gaskins win money at the casino in Las Vegas. Sweeney stated that the intention was to rob Gaskins, whom Sweeney knew had recently won a lot of money from gambling in Las Vegas, Nevada at the casinos. Sweeney knew to find Gaskins at a "craps joint" that Darnell Mack ran in Prince George's County. According to Smith, Sweeney indicated that Montgomery and Sweeney were the two who entered the house, while Carson and Coates remained outside in the van – a van which was rented under William Sweeney's aunt's name. Sweeney stated that he had a .40 caliber Glock semi-automatic pistol, while Montgomery carried a stun gun. Sweeney acknowledged that he shot and killed Gaskins, Mack, and Anderson, and that they got no money. In addition, Sweeney stated that they could not leave any witnesses – and thus he had to murder all three victims.

### The Murder of Donnell "Robocop" Whitfield

Sweeney also told Smith about his September 1994 role in shooting and killing Donnell "Robocop" Whitfield. On the day that Whitfield was killed, Smith was with Sweeney and Jones at Ethel Sweeney's house in Arthur Cappers. Sweeney said words to the effect that he and Jones were going to kill Whitfield because Whitfield had smacked Sweeney previously. The same day, Sweeney reported to Smith that he and Jones killed Whitfield in Sursum Corda. Erik Jones drove the car to the location. After the shooting, Sweeney told Smith that he (Sweeney) had given the gun which was used to "Clink" (William Howard Young) who knew how to change the barrel of the weapon. In addition, Sweeney told Smith that Clink had not changed all the necessary parts in order to avoid a ballistics comparison, so the gun came back as the murder weapon. Sweeney informed Smith that he killed Robocop because of a dispute between him and Robocop which resulted in Robocop smacking Sweeney at a nightclub.

---

proceedings.

SA-36

## The Kidnapping of Anthony "Wysocki" Pryor

With respect to the Pryor kidnapping, Sweeney told Smith that he, Vincent Hill, Coates, Proctor, and Carson tried to abduct and rob "Wysocki" (Anthony Pryor), but he refused to cooperate and was therefore shot. According to Sweeney, Wysocki was leaving a residence in Montgomery Co., Maryland, and they were waiting for him. When they tried to abduct him, he fought and ran and was shot in the back with a .45 caliber pistol. The group then took him and placed him in the trunk of Coates's car, but the car was old and beat up, so the trunk flew open and Wysocki escaped. Sweeney told Smith that they were very upset about Wysocki getting away and blamed Coates for it. Sweeney indicated that because of this mishap, as well as others committed by Coates, Sweeney and others wanted to kill Coates on several occasions. Sweeney also informed Smith that he knew that he was wanted by the FBI for kidnapping Wysocki. Sweeney told Smith that he was not worried about the case because his investigators had visited Wysocki at the Petersburg prison twice and obtained statements from Wysocki in which Wysocki claimed that he could not identify the people who kidnapped him because they were wearing masks. Sweeney stated that he knew that Wysocki also told his investigators that he did not think that Sweeney was involved.

## The Murder of Keith "Whitey" Johnson

Sweeney also told Smith about another murder for which he is not presently charged in the indictment. Regarding the murder of Keith "Whitey" Johnson, Sweeney told Smith that he and two others – whom he identified -- were responsible for that murder. Sweeney stated that the perpetrators were driving a green rental van at the time, which had been rented by a sister of the one of the co-conspirators. Sweeney indicated that he was listed as an extra driver on the rental agreement, and he used an alias on that form – the alias of Kirk Ivory Newton.

## The Shooting of Michael Jones

Another incident for which Sweeney has not been charged, but where others have been is the shooting of Michael Jones on August 28, 1992. Sweeney told Smith that Clifton "Meechie" Edwards shot someone and was arrested for this shooting. Subsequent to Edwards' arrest, Sweeney and Coates chased down an individual off Mississippi Avenue, S.E. who was a witness to the shooting that Clifton Edwards was charged with into an alley where Sweeney shot at the witness and struck him. Smith thought that Sweeney had killed this person in this attack. In addition, Sweeney told Smith that the witness against Edwards was targeted because it was believed that he was cooperating with law enforcement.

## The Murder of Steve Dunbar

Smith also had a conversation with Erik Jones regarding the murder of Steven Dunbar. Jones told Smith that he and Arthur Rice killed Steven Dunbar because Dunbar owed him money from a gun or a drug deal. According to Jones, Dunbar was telling people that he (Dunbar) was

3

SA-37

USCA Case #23-3015   Document #2109460      Filed: 04/04/2025   Page 46 of 668

not worried about Jones, so Jones and Rice killed him.

<u>Statements About Narcotics Activity</u>

Smith also recounted to law enforcement information about drug activity in which he was engaged. Smith indicated that among other people, he conducted drug transactions involving marijuana, cocaine, and heroin with co-conspirators Sweeney, Jones, Coates, Reginald Switzer, Gary Price, Paul Taylor, Jerome Martin, and Arthur Rice.

<u>Statements Regarding Fears on the Part of Robert Smith</u>

On more than one occasion, Smith informed law enforcement that if anything ever happened to him, that William Sweeney (whom Smith referred to often as "Shorty" or "Draper") did it. The government would seek to elicit this statement should the defense suggest that a third party was responsible for Smith's murder.

3. In terms of the witnesses who will speak about the murder of Robert Smith, those

witnesses will be called at trial prior to eliciting the statements made by Robert Smith.

4. In terms of information regarding the 1990 shooting of Robert Smith, the government

will turn over such information at the time it is located and reviewed.

**Kevin Hart**

5. The government will introduce the statement made by Hart to law enforcement. On

June 3, 1992, at 10:30 p.m., Det. Hooper interviewed Hart at D.C. General Hospital. He stated

that his assailant is known to as Pimp, who drives a gold 1992 Legend. Hill no longer has her

notes of this interview, but will testify that she did her write-up the same evening she spoke to

Hart, and that the write-up was taken from her notes. At the time of this interview, Hart had no

prior convictions and had no cooperation agreement with the United States.

6. In addition to the statement made to law enforcement, Kevin Hart made statements to

at least 3 civilians regarding the identity of the people who shot him in June 1992. Those

SA-38

individuals include the following:

### (W8)

W8 has no impeachable convictions and no cooperation agreement with the govenrnment. W8 will testify that Hart told it that it owed Martin several hundred dollars. W8 stated that it and Hart were walking down the street when they saw Vincent Willis sitting on a stoop. Hart pointed to Willis and stated PooPoo's gonna kill him. Several days later, W8 recalls, Hart stated that he and PooPoo were going to make a move. Later that night, Hart returned and said that PooPoo and somebody else punished the dude. Hart later said that Vincent Willis was the person who was punished. That next day, W8 heard that Willis was found dead on Half Street, S.W. with his head literally beaten to pieces.

A few days later, W8 and Kevin Hart were driving a white sports car when the police pulled them over, which was seized by police as being connected to the murder of Vincent Willis. Two days later, Kevin Hart was shot six times in Southeast. After his recovery, he told W8 that he had been shot by PooPoo and them as punishment for losing the car.

### (W10)

W10 has two prior misdemeanor convictions. W10 has no cooperation agreement with the government. W10 stated that Hart told it that "PooPoo and them" had shot him because he had lost a car of theirs. Hart told W10 he had been stopped by the police in reference to the car. Hart told W10 that the car had belonged to a guy who was killed, and they wanted Kevin to take care of it. They were mad when he lost the car, and they shot him. Hart also said that Proctor had "barred" him from Southwest, but that he had every intention of continuing to visit Southwest.

SA-39

(W11)

W11 has an outstanding misdemeanor bench warrant. W11 has no cooperation agreement with the government. W11 will testify that after Hart was shot in June 3, 1992, he told W11 that he had been shot by PooPoo and Pimp, and that the shooting was over a car and that PooPoo and Pimp wanted to take the car from him.

Sincerely,

WILMA A. LEWIS
United States Attorney

Peter R. Zeidenberg
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8831
Bar No. 440-803

Anjali Chaturvedi
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8827
Bar No. 446-177

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing notice was mailed to defense counsel listed below, this 29th day of September, 2000.

Anjali Chaturvedi
Assistant United States Attorney

Steven R. Kiersh, Esq.
717 D Street, N.W.
Suite 400
Washington, D.C. 20004

6

SA-40

Leonard Long, Esq.
1818 Eleventh Street, N.W.
Washington, D.C. 20001

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Gerald Fisher, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Howard Bramson, Esq.
717 D Street, N.W.
3rd Floor
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C. 20004

SA-41

FILED

NOV - 1 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,     )
                  )
       v.            )     Cr. No. 98-329-01-06 (TPJ)
                  )
VINCENT HILL, et. al.      )
                  )
      Defendants.    )

### Government's Supplemental Submission Regarding Shooting of Robert Smith at Hope Village

The United States, by and through its attorney, the United States Attorney for the District of Columbia, hereby responds to defendant Sweeney's letter dated October 23, 2000, in which he has requested that the government provide certain information.

Specifically, defendant Sweeney has posited four questions of the United States, which we will address below. In addition, the government submits a redacted copy of Special Agent Vincent B. Lisi's notes of conversations with Robert Smith (Appendix A). We submit this information in conjunction with the information previously provided regarding statements made by Smith to law enforcement and prosecutors prior to his murder. We draw your attention to two statements made by Smith: (1) that Sweeney was taking affirmative steps to locate and kill Kenneth Adams in reference to the murder of Philip Clayborne in which Maurice Proctor was charged; and (2) that Sweeney had a cellphone and that the cellphone number was 210-4126. Finally, we also are providing you with (1) the copy of the PD 251 and PD 252s (2 of them) for the shooting of Robert Smith at Hope Village (Appendix B); and (2) the copy of the notice from the Metropolitan Police Department indicating that the files pertaining to the murder of Melvin Hill cannot be located (Appendix C).

As to the questions raised by defendant Sweeney, they are as follows:

SA-42

1.    Request:  Is the information of the government that Robert Smith was a target of the individuals who murdered Melvin Hill in 1987?  If the government has such information, I will not (sic) to know the source of the information provided that we can stipulate that Smith was a target.

Response:  Smith believed that he may have been a target of the 1987 shooting.  We will not stipulate to that information.

2.    Request:  What is the source of the unconfirmed information that William Douglas Brown a/k/a Dickie was the shooter of Mr. Smith at Hope Village?

Response:  The source of that information was Robert Philson whose date of birth is 12/1/68.  His PDID number is 449-784.  His FBI# is 625599LA4.  Another possible source of information is Maurice Philson.  His PDID number is 410-486.

3.    Request:  What is the source of the information that Dickie may have worked with Mookie (Darryl Coles)?

Response:  Coles told people that Dickie worked with him.  Coles date of birth is 7/24/63, PDID 345-276, and FBI# 59623X4.

4.    Request:  Did Robert Smith provide information to law enforcement regarding the murder of Melvin Hill?

SA-43

Response: Yes.

Sincerely,

WILMA A. LEWIS
United States Attorney

Peter R. Zeidenberg
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8831
Bar No. 440-803

Anjali Chaturvedi
Assistant United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001
(202) 353-8827
Bar No. 446-177

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that a copy of the foregoing notice was mailed to defense counsel listed below, this _____ day of November, 2000.

Anjali Chaturvedi
Assistant United States Attorney

Steven R. Kiersh, Esq.
717 D Street, N.W.
Suite 400
Washington, D.C. 20004

3

SA-44

Leonard Long, Esq.
1818 Eleventh Street, N.W.
Washington, D.C. 20001

Christopher M. Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Joseph Beshouri, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Gerald Fisher, Esq.
419 7th Street, N.W.
Suite 201
Washington, D.C. 20004

Howard Bramson, Esq.
717 D Street, N.W.
3rd Floor
Washington, D.C. 20004

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Jonathan Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C. 20004

SA-45

RECEIVED

NOV - 1 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

SA-46

# Appendix A

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 56 of 668

FILED

NOV - 1 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

12/5 R5.

JAMAICANS supply the weed + the coke
they haven't had coke for months.

JAMAICAN Solomon   24 YOA
          would front 50 lbs at a time
          would pay 850 a pound

Come home in 93   starts hustling early
'94
Son's Touse business already have the credit
with Solomon   He never B on to
Solomon

B started going to Solomon's - started
with 1/2 pounds - break it down - give
it into pipe heads + to hustlers S.W.
Kept doubling the weight.
Got to 4-5 pounds. convinced Sol to front 2
additional #'s - then broke it down into 1/4's
Gave it to Poonie, Pete Johnson, Billy Doe
Jenkins - he's dead.
Took 3-4 months to get to 20 lbs.
After 20#'s it spread.

When I took the 20 #'s Sol stopped
fronting because that was his #.
When I took the $16,000.00, B got scared
Gave Poonie $5,000.00 to start selling

SA-48

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 57 of 668

whiles a month after I took the 20#'s then Started back with the other Jakes

Clothes ÷ that was it. - After I took the

Backed up for a minute Then Started back up with Billy Joe ÷ Petey ÷ Poonie went to the Jakes up town.

THE OTHER JAKES    near TUCKERMA

car phone

PEDRO 41 he's in JAMAICA now.
Lee 34-35 his Partner    not the other Lee
first dealing with these 2    met them through othe Jak

met them ÷ went to 100 lbs. Stayed there f

850.00    #

for 3-4 months they were pumping 12-15 #' A DAY - DURING the summer of 95.

After B dropped Poonie, dealt w/ Billy ÷ Petey. Billy Joe Got killed ÷ thin Slowed down eventually slowed to 3-4 #'s per DAY.

Started back up with Solomon in June. 4-5 #'s every 3 DAYS flip it Quickly

Solomon 23-24

"GENE" EUGENE ALLEN

SA-49

MOOKIE came with MIKE FARRAR

21 BRYANT - DRAPER's G.F's father Lee.
Vernello.

Geo PRIZM - PAID moe to put the car in h
name.

RICHARD
133 is Solomons cousin
they were partners the whole time
B dealt with Sol.

Lee

B but pulled
for 50-60 K
~ 1 year ago.

All the Jakes know B
B Rob or Ammari never
Butch.

Get 3
A
At
they
Solon
when
Califa
DORA

Arthur Rice took 5 #'s from B.
B went to

ERIC SAID Steve Dunbar owes him
some # for weed on a gun ; sold
Steve was bugging About what he was going
to DO Sue Eric ; Art killes him.

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 59 of 668

Bill Hill - wholesale, row with him
for ≈ 3 weeks

Pin - Tries to get something from Bud
Switzon

545

SA-51

RICARDO DICKERSON → RAGS    channel Source

J-John  JOHN FENNER - thinks Vito was dealing with.

Grey VAN - parked by old folks home - IN S.E.
                                    N.J. TAGS

D - never called while Lincoln solo t
      he said they Snatched it because of tickets.

Butt - wholesale ? weight.
                                            Recently
Stopped serving  Wink - wholesale ? weight.    3-4 month
Because he was
lost.

Carlos knows     ED ?  Had a house in Oxon hill  He wo
G.F. ALOT           Serving  CARLOS  E  Boo ; Bam from Fres
                                        DRAPER SAW THEM GAMBLING ?
                    Bam was HITTING CARLOS

Jake  Who Sold the coke → from Lee

        B/w new Hampshire ; GA Ave.

        Solando

SA-52



12/9/96

MARINE.

~~[redacted]~~

12/9

DIANE LEE    DIEAN   V   S.R.

12/9/4 - Carol - Ethel lives here

homes of
maybe dealt with

CARL PURVIS - met through Poonie

Poonie - Grew up together

When R came home in

'93 - waited 4-5 months

was going strong w/ Poonie

when P was DRIVING the car

that got stolen

SA-53

Whitey _ maybe.
SOUTH personally twice.
he went to Petey

Bill Hill     couple of times
recently - wholesale.
Petey

Just stinks coming to S.w
in the last 5 - 6 months.
VANCE

wholesale + resold.

Icky Buck - mostly coke

George Richardson - Poonie

said they were getting
3.5 #'s per DAY.

CAR - James Wysoki-kund
        SAM + BIRDIE VAN

Wysoki - owner VITO, BIRDY
          SAM         POO-POO

SA-54



SA-55

12/10

S. R.

MURDER w/ WHITEY & IRKY BULK's

[redacted] RENTED the
truck, it was rented
for 2-DAYS.

killed on a MONDAY — rented
it for 2-DAYS.

EXTRA DRIVER on LEASE. or KIRK.
KURT IVORY
NEWTON.

ENTERPRISE RENTAL:

Got ANOTHER the other DAY. went to
A.C.

S¼

KENNY RAY. killed Bucky Hill.

LARRY: PURKELL HAVE A House
ON R.I. Ave

SHOP TO Get BUGS & RADIO equip.

SA-56



S.E.

2 OTHER CARS: 1010 PARKING lot.

his sister lives near there.

2 CARS OLD BLACK one.
'62 corvette or something
Steffan trying to sell it
a
Buick Century - rust 2/tone
Brown.

white 240 - NISSAN
Green 300 ?

▮▮▮▮▮▮▮▮  SISTER
▮▮▮▮▮▮▮▮
▮▮▮▮
▮▮  works

▮▮▮  called from

they keep stuff in Steffan's
sister's house that is near
1010
Keeps stuff in Bryant St.

they are supposed

SA-57

they are dealing with someone
named John for the phones.

60k sent cousin to get
it — Andre Smith,
went to California.
Dealt with the dude before.
Same guy that Lawrence;
Reggie dealt with.
Did a move with 35 + 25.
or in CA + one in D.C.

SA-58

12/13/96

S. R.

10-30 YRS
DID 10          38-39

CORNELL JONES      MIKE WAS

WITH HIM IN FED'S

HIM ? MIKE ARE COOL

DID 6-7  18 YRS  39 YDA
HIS PEOPLE ?      PERRELL  TURNER WITH HIM AT
                                              FAIRINGTON.
SAW THEM AT THE BULLETS GAME.

DRAPER IS GOING W/ THE DUDE
UP TOWN.

THEY HAVE A BEAUTY SALON UPTOWN.
_____ IS A BAR TENDER AT

SA-59



12/17

~~[crossed out]~~

12/17  Cha Cha

Tear the car up

Car is in G.F name.

Stephen Got locked up on

Sunday with a Gun.

there is 50 grams of pipe

in the car that the police

didn't get.

The girlfriend is going to

Texas for week. Getting

30 #'s. Sending the $ there.

SA-60



Heroin Suppliers rob Kurz went to London today. Draper supposed to get 150 grams today. It takes an 8.

He saw Gooch in A.C.

Gooch owes Draper $3,500.00



Choo Choo  12/23/96

19 YOA          PAGER.
Poo - 206-5549

5714   FLINT HILL DRIVE
       LANDOVER

                    Draper G.F.

         Knows  Alot

Still  beefing   with  MOTOR.

Purcell  1/2 Key  UP

they  have  A metal Detector
At  their house.

them  32-33

1986
          on  the  car,  with
Samuel Giles    big case in
Paradise

              working  At  A
         on         too.

On  the  day  of  the Ripped
Bove  field  whan killed  the   has had this #
Heroin  copped @ 3:00 P.M.            for a while
Drapers  PH # : 210-4126
                        2 months

SA-62

Glock .40 + Draggin Two and
Trades 2 guns for a Glock.
Stephon's cousin got the guns
Traded - after the murder.

Wysocki → shot him in the back
with a .45.
They Threw Wysocki in the trunk.
The Trunk could in it
was Birdie's car. They were
pissed at Birdie -
Birdie, Vito, Drager, Sam Carson,
Poo-poo

They were planning to
kill Birdie at one time.
≈ 12 yrs Ago
Kim + Drager went to A.C.
B. won some $
Car Broke Down. had to Get
the car towed



12/30    Cha Cha

████  ████  FLINT RIDGE DR.

LANDOVER

████████████
████████████  ████████████
████████

Purvell - █████████  ~~████~~

SAID you CAN is Contact
with him at that #
Asked him for some coke 1.5 Yrs
he wouldn't DO it.                    AGO-

they have a house with a
Metal Detector.  Sometime Corwell
will tell people to Go to A
SWIMMING pool,

Roy Cobb is DOING the Dope with
DRACOR. Uptown.

SA-64



Gooch still getting Dope
from Draper.

Draper killed someone for
Gooch. killed the wrong guy
by Chamberlaw H.S. near
the Gardens.

Phone # to Bryant st 518·9038 ?

It's Stephon's connect with the Dope
/

Condon Terrace — Dude supposed to
Cooperate Against Meechie
Him, & Birdie ~~~~~ Dude was
running & fell in an alley
Birdie shot someone else.
6'2"  250  33
~~~~~
Ernd can go directly to
Carrell. That's his man.
→ on the '86 case in Kenilworth.
Drives a 87-88 white Maxima.
Sunny Redd — 6'2"  185  33
Erno
was workin at a group home



1/2 Choo Choo
5'5" - 6"  165
22 yom
Light skin Dude who's

on the run from CARLOS case.

saw him uptown in a

Burg. Eldorado x95

has 2 guys riding around.

USCA Case #23-3015     Document #2109460          Filed: 04/04/2025     Page 75 of 668

Delta   Tues / Wed   8.22.95

1/28/97

Get A phone for HIM

Choo. Choo.

Michael ~~Tiller~~ - Boxes.

Draper Did A Condor Terrace murder.

▬▬▬▬▬▬▬▬▬▬▬

▬▬▬▬▬▬▬▬▬▬

▬▬▬   on   Federal   Probation.

▬▬▬▬

Knows all About the murder: wants to t[...]
the police.

caught a charge

- "Reo Arrie"

Girl who works in Superior Ct ~~tak~~ [...]
charges Disappear from the computer
She did it for ▬▬▬ Might Be th[...]
who found out where little wayne is. Draper
knows where he lives –
Centerville VA - Beer clock
▬▬▬ → Pou. Poo
move little wayne - THEY'RE
going to kill San S[...]

Full amount (left margin)

8904 (left margin)

3/4 (left margin)

Got 500,00 from [...] (left margin)

SA-67

Ask about RAGS.

5/15/15

Steffen's cousin got
the Gun from Draper
that was used in the
triple - .40 with A
laser sight.

████████ Got the cell
phones - lives ic ████████
████ Goes to ████
PAY ████ $200 $300

SA-68

# Appendix B

SA-69

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 78 of 668

| 1. TYPE OF REPORT | METROPOLITAN POLICE DEPARTMENT WASHINGTON, D.C. EVENT REPORT | 2. COMPLAINT NUMBER |
|---|---|---|
| ● OFFENSE ☐ INCIDENT | | 638774 |

| 3. EVENT CLASSIFICATION | 4. EVENT LOCATION | 5. BEAT | 6. DIST | 7. RA |
|---|---|---|---|---|
| A.W.I.K.    0401 | 2912 Langston Pl. S.E. | 176 | 7D | 9c4 |

| 8. DATE/TIME OF EVENT | 9. DATE/TIME OF REPORT | 10. RADIO RUN RECEIVED | 11. ☐ PUBLIC PROPERTY ☑ PRIVATE PROPERTY |
|---|---|---|---|
| 1750 hrs  11/16/91 | 11/16/91  1917 | ☐ NO ☑ YES TIME 1755 | |

| 12. DESCRIBE LOCATION | 13. WHERE ENTERED | 14. TOOLS, WEAPONS USED | 15. METHOD |
|---|---|---|---|
| Half-way house | N/A | Gun | Shot |

| 16. COMPLAINANT/MISSING PERSON/FIRM | SEX/RACE/DOB | 16. COMPLAINANT/MISSING PERSON | SEX/RACE/DOB |
|---|---|---|---|
| 1. Smith, Robert | B/M 2/5/62 | 2. N/A | |

| 17. HOME ADDRESS | 18. HOME PHONE | 17. HOME ADDRESS | 18. HOME PHONE |
|---|---|---|---|
| 2912 Langston Pl. #103 S.E. | UNK | N/A | |

| 19. BUSINESS ADDRESS/SCHOOL | 20. BUS. PHONE | 19. BUSINESS ADDRESS/SCHOOL | 20. BUS. PHONE |
|---|---|---|---|
| N/A | UNK | | |

| 21. ADDITIONAL MEANS TO CONTACT COMPLAINANTS OR REPORTING PERSON | 22. REPORTED BY | 23. RELATION TO COMPLAINANT |
|---|---|---|
| N/A | C-1 | C-1 |
| | 24. ADDRESS | 25. PHONE NUMBERS  Hm:  Bus: |

| 26. SICK/INJURED PERSON | 27. DESCRIBE INJURY | 28. WHERE TAKEN/BY WHOM | 29. |
|---|---|---|---|
| 1. C-1 | Gunshot wound to left buttocks, left elbow, right lower back | D.C. Gen. Med #22 | ☑ ADMITTED ☐ RELEASED |
| 2. | | | ☐ ADMITTED ☐ RELEASED |

| 30. PROPERTY | | | 31. PROPERTY BOOK AND PAGE NO. |
|---|---|---|---|
| (V) VEHICLE FROM WHICH THEFT OCCURRED | | | |
| CODE: (S) STOLEN  (R) RECOVERED  (L) LOST  (I) IMPOUNDED  (E) EVIDENCE  (F) FOUND  (O) OTHER | | | |

| CD | ITEMS | SER. NO./OP. I.D. NO. | COMP. VALUE | AGE | MPDC VALUE |
|---|---|---|---|---|---|
| E | 7 expended rounds | | | | |
| E | (2) Broken windows | | | | |
| E | Venetian blinds | | | | |
| | | | | | |
| | | | | | |

| YEAR | MAKE | MODEL | COLOR | BODY | TAG/STATE/YEAR | VIN NO. |
|---|---|---|---|---|---|---|
| | | | | | | |

| 32. EVID. TECH. NOTIFIED/CSES # | 33. INVESTIGATOR NOTIFIED | 34. SUPERVISOR NOTIFIED | 35. TELETYPE NOTIFIED | 36. TOTAL VALUE |
|---|---|---|---|---|
| White   975 | Johnson   777 | Cummings   297 | | |

| 37. ☑ SUSPECT ☐ MISS. PERS. | RACE | SEX | AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPLX | SCARS | HAT | COAT | JACKET | PANTS | SHIRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | B | M | | | | | | | | | | | Gold | Gold |
| 37. ☑ SUSPECT ☐ MISS. PERS. | B | M | | | | | | | | | | | Blue | Blue |

38. NARRATIVE: DESCRIBE THE EVENT AND STATE POLICE ACTION TAKEN

37 (1) Goatee beard; swede boots

C-1 states that while at the above location, unknown subject(s) shot at him through his window, which sustained the above injuries. C-1 was transported to D.C. General Hosp. where he was treated by DR Hunter and admitted. (7) Seven shell casings were found outside window of above location.

☐ See Missing Person Information On Reverse    ☐ See Continuation On Reverse

| 39. REPORTING OFFICER | BADGE/ORG ELM | 40. SECOND OFFICER | BADGE/ORG ELM | 41. TELETYPE NUMBER |
|---|---|---|---|---|
| | 4225/7D | | | |

42. STATUS ☑ OPEN  ☐ UNFOUNDED (EXPLAIN IN ITEM 38)  ☐ SUSPENDED (EXPLAIN IN ITEM 38)   Note: if closed by arrest attach P.D. 252
☐ CLOSED  (IF CLOSED BY ARREST LIST UNIT AND ARREST NUMBER)

| 43. REPORT REVIEW OFFICER | 44. SUPERVISOR | BADGE/ORG ELM | 45. REVIEWER | 46. DISTRIBUTION |
|---|---|---|---|---|
| | | 9512 7D | | |

HAGGERTY, JOSEPH B JR    Page 1 of 1 Pages

| MISSING PERSON INFORMATION | | 1. COMPLAINT NUMBER |
|---|---|---|

**2. PROBABLE CAUSE OF ABSENCE AND DESTINATION** | **3. PHYSICAL/MENTAL CONDITION - DIABETIC, SUICIDAL, ETC.**

**4. IF SUBJECT HAS RUN AWAY OR LEFT HOME BEFORE GIVE DATE AND WHERE LOCATED** | **5. DESCRIBE ARTICLES OF JEWELRY WORN AND IDENTIFICATION CARRIED**

| 6. CLASSIFICATION ☐ CRITICAL ☐ NON-CRITICAL | 7. CLASSIFIED BY | 8. MISSING PERSONS SECTION NOTIFIED |
|---|---|---|

| 9. PARENT/GUARDIAN'S NAME | 10. ADDRESS | 11. HOME PHONE | 12. BUS. PHONE |
|---|---|---|---|
| 9. PARENT/GUARDIAN'S NAME | 10. ADDRESS | 11. HOME PHONE | 12. BUS. PHONE |

## CONTINUATION REPORT

**13. NARRATIVE CONTINUED**

| 14. REPORTING OFFICER | BADGE/ORG ELM | 15. SECOND OFFICER | BADGE/ORG ELM | 16. SUPERVISOR | BADGE/ORG ELM |
|---|---|---|---|---|---|

SA-71

Page _____ of _____ Pages

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 80 of 668

O-2146

P.D. 252 Rev. 7/86    Metropolitan Police Department    **SUPPLEMENT REPORT**    Washington, D.C.

| | |
|---|---|
| ☐ Classification Change | ▨ Additional Information |

| 1. DISTRICT | 2. BEAT | 3. RA | 4. ORIGINAL CLASSIFICATION | 5. COMPLAINT NUMBER |
|---|---|---|---|---|
| 7D | 176 | | A.W.I.K. | 638774 |

| 6. DATE OF THIS REPORT | 7. REPORTING ELEM. | 8. CLASSIFICATION OF REPORT CHANGED TO: |
|---|---|---|
| 11/16/91 | 7D | N/A |

| 9. DATE AND TIME OF EVENT | 10. DATE AND TIME OF ORIG. RPT. | 11. EVENT LOCATION | 12. PROPERTY TYPE |
|---|---|---|---|
| 1750 hrs 11/16/91 | 11/16/91 1917 | 2912 Langston PL. S.E | ☐ PUBLIC  ▉ PRIVATE |

| 13. RADIO RUN RECEIVED | 14. DESCRIBE LOCATION | 15. WHERE ENTERED | 16. TOOLS/WEAPONS | 17. METHODS |
|---|---|---|---|---|
| ☐ YES ☐ NO  TIME RECEIVED | Halfway house | N/A | Gun | shot |

| 18. COMPLAINANT/MISSING PERSON/FIRM | SEX | RACE | DATE OF BIRTH | COMPLAINANT/MISSING PERSON/FIRM | SEX | RACE | DATE OF BIRTH |
|---|---|---|---|---|---|---|---|
| A) Smith, Robert | M | B | 2/5/62 | B) N/A | | | |

| 19. | RACE | SEX | AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPLEXION | SCARS | HAT | COAT | JACKET | PANTS | SHIRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ▉ SUSPECT ☐ MISSING PERSON | B | M | | | | | | | | | | | Gold | Gold |
| ▉ SUSPECT ☐ MISSING PERSON | B | M | | | | | | | | | | | Blu | Blu |

**20. SOLVABILITY FACTORS** → Complete each item below. If additional space is needed, use the narrative section. If necessary, use the PD 252 Continuation Sheet. Refer to the specific item numbers when continuing information in the narrative section or on the Continuation Sheet.

| | | | |
|---|---|---|---|
| IS THERE A WITNESS? | ☐ YES ▉ NO | If yes, enter name(s), address(es), phone number(s), hours of availability and brief account. | |
| IS A SUSPECT NAMED? | ▉ YES ☐ NO | Enter the name and include any nickname used. SAM WISE OR Rick Spraggs | |
| IS THE STOLEN PROPERTY TRACEABLE? | ☐ YES ▉ NO | Include reason why or why not. | |
| IS PHYSICAL EVIDENCE PRESENT? | ▉ YES ☐ NO | Describe it. Gunshot wounds; expended rounds; broken glass | |
| IS THE PERPETRATOR KNOWN TO THE VICTIM? | ▉ YES ☐ NO | If yes, describe the relationship. Friend | |
| WAS A REFERRAL FORM GIVEN TO COMPLAINANT? | ☐ YES ▉ NO | Give any address, place of employment, or hangout known for the perpetrator(s). | |
| DURING WHAT HOURS IS COMPLAINANT AVAILABLE FOR INTERVIEW N/A | | List the name, address, phone number and any information provided when the area was canvassed. | |
| completed | IS AN MO OR PATTERN INDICATED? ☐ YES ☐ NO | DESCRIBE MO OR PATTERN | |

**21. ADDITIONAL STOLEN PROPERTY**          Property Book

| CODE | ITEM | Qty | SERIAL NO./OPERATION ID NO. | MODEL NO. | COMP. VALUE | AGE | M'DC VALUE | |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | BOOK/PAGE NO. |
| | | | | | | | | ADDITIONAL VALUE |
| | | | | | | | | ORIGINAL VALUE |

| YEAR | MAKE | MODEL | COLOR | BODY | TAG/STATE/YEAR | VEHICLE IDENTIFICATION NO. | • • • | TOTAL PROP. VALUE |
|---|---|---|---|---|---|---|---|---|
| | | | | | | | | |

**22. NARRATIVE:** Record your activity and all developments in the case subsequent to your last report. List the names, addresses, sex, race, age, and arrest numbers of all arrested persons. Explain any change in classification. List the names, addresses, and telephone numbers of all witnesses and suspects.

Area canvassed with negative results. C-1 states possible suspects, Sam Wise and Rick Spraggs, had left his room 15 minutes earlier.

☐ Check here if continuation report is made.

| 23. STATUS | | | | 24. TELETYPE NO. | 25. SOLVABILITY RATING | 26. SOLVABILITY CLASSIFICA. |
|---|---|---|---|---|---|---|
| ▉ OPEN ☐ PRIOR CLOSED ☐ CLOSED | ☐ UNFOUNDED (EXPLAIN IN NO. 22) ☐ SUSPENDED (EXPLAIN IN NO. 22) | | | | | |

| 27. INVESTIGATIVE OFFICER'S RECOMMENDATION | 28. SUPERVISOR'S RECOMMENDATION |
|---|---|
| ☐ SUSPEND ☐ INVESTIGATE FURTHER | ☐ SUSPEND ☐ INVESTIGATE FURTHER |

| 29. REPORTING MEMBER'S SIGNATURE | BADGE/ELEM. | 30. INVESTIGATOR'S SIGNATURE | BADGE/ELEM | 31. SUPERVISOR'S SIGNATURE | BADGE/ELEM |
|---|---|---|---|---|---|
| Josh B Hogarth | 4225/7D | | | | 5J12 7i |

| 32. INVESTIGATIVE REVIEW OFFICER | 33. SUPERVISOR | 34. REVIEWER | 35. DISTRIBUTION |
|---|---|---|---|
| SA-72 | | | |

* * Value of vehicles will be entered by the Information Processing Section.

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 81 of 668

**CONTINUATION REPORT**

1. COMPLAINT NUMBER

2. NARRATIVE CONTINUED

| 3. REPORTING OFFICER | BADGE/ORG ELM | 4. INVESTIGATOR | BADGE/ORG ELM | 5. SUPERVISOR | BADGE/ORG ELM |
|---|---|---|---|---|---|

SA-73

J-01919

Page_____of_____Pages

USCA Case #23-3015    Document #2109469    Filed: 04/04/2025    Page 82 of 668

P.E. 252 Rev. 7/86    Metropolitan Department SUPPLEMENT REPORT

| | | | 2. BEAT/AREA | 3. AREA | 4. ORIGINAL CLASSIFICATION | 5. COMPLAINT NUMBER |
|---|---|---|---|---|---|---|
| ☐ Classification Change | ☒ Additional Information | | 7TH | 176 | A.W.I.K | 638-774 |

| 6. DATE OF THIS REPORT | 7. REPORTNG ELEM. | 8. CLASSIFICATION OF REPORT CHANGED TO: |
|---|---|---|
| 12-12-91 | SEVENTH | |

| 9. DATE AND TIME OF EVENT | 10. DATE AND TIME OF ORIG. RPT. | 11. EVENT LOCATION | 12. PROPERTY TYPE |
|---|---|---|---|
| 11-16-91 1750 | 11-16-91 1917 | 2912 LANGSTON PLACE S.E. | ☐ PUBLIC  ☒ PRIVATE |

| 13. RADIO RUN RECEIVED | 14. DESCRIBE LOCATION | 15. WHERE ENTERED | 16. TOOLS/WEAPONS | 17. METHODS |
|---|---|---|---|---|
| ☐ YES  ☐ NO   TIME RECEIVED | HALF-WAY HOUSE | N/A | UNKNOWN | BRUISED |

| 18. COMPLAINANT/MISSING PERSON/FIRM | SEX | RACE | DATE OF BIRTH | COMPLAINANT/MISSING PERSON/FIRM | SEX | RACE | DATE OF BIRTH |
|---|---|---|---|---|---|---|---|
| SMITH, ROBERT | M | B | 02-05-62 | | | | |

**19. Suspect/Missing Person**

| | RACE | SEX | AGE | HEIGHT | WEIGHT | EYES | HAIR | COMPLEXION | SCARS | HAT | COAT | JACKET | PANTS | SHIRT |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| ☐ SUSPECT  ☐ MISSING PERSON | | | | | | | | | | | | | | |
| ☐ SUSPECT  ☐ MISSING PERSON | | | | | | | | | | | | | | |

**20. SOLVABILITY FACTORS** → Complete each item below. If additional space is needed, use the narrative section. If necessary, use the PD 252 Continuation Sheet. Refer to the specific item numbers when continuing information in the narrative section or on the Continuation Sheet.

| | | | |
|---|---|---|---|
| IS THERE A WITNESS? | ☐ YES  ☐ NO | If yes, enter name(s), address(es), phone number(s), hours of availability and brief account. | |
| IS A SUSPECT NAMED? | ☐ YES  ☐ NO | Enter the name and include any nickname used. | |
| IS THE STOLEN PROPERTY TRACEABLE? | ☐ YES  ☐ NO | Include reason why or why not. | |
| IS PHYSICAL EVIDENCE PRESENT? | ☐ YES  ☐ NO | Describe it. | |
| IS THE PERPETRATOR KNOWN TO THE VICTIM? | ☐ YES  ☐ NO | If yes, describe the relationship. | |
| WAS A REFERRAL FORM GIVEN TO COMPLAINANT? | ☐ YES  ☐ NO | Give any address, place of employment, or hangout known for the perpetrator(s). | |
| DURING WHAT HOURS IS COMPLAINANT AVAILABLE FOR INTERVIEW | | List the name, address, phone number and any information provided when the area was canvassed. | |
| IS AN MO OR PATTERN INDICATED? | ☐ YES  ☐ NO | DESCRIBE MO OR PATTERN | |

**21. ADDITIONAL STOLEN PROPERTY**  — Property Book

| CODE | ITEM | SERIAL NO./OPERATION ID NO. | MODEL NO. | COMP. VALUE | AGE | MI'DC VALUE | |
|---|---|---|---|---|---|---|---|
| | | | | | | | BOOK/PAGE NO. |
| | | | | | | | ADDITIONAL VALUE |
| | | | | | | | ORIGINAL VALUE |

| YEAR | MAKE | MODEL | COLOR | BODY | TAG/STATE/YEAR | VEHICLE IDENTIFICATION NO. | TOTAL PROP. VALUE |
|---|---|---|---|---|---|---|---|
| | | | | | | | |

**22. NARRATIVE:** Record your activity and all developments in the case subsequent to your last report. List the names, addresses, sex, race, age, and arrest numbers of all arrested persons. Explain any change in classification. List the names, addresses, and telephone numbers of all witnesses and suspects.

MCI# 9012: On numberous occasions the below undersigned, attempted to locate the complainant and interview him in reference to the above mentioned case. However, the complainant has not been able to be contacted, and according to the 252 report there are no witnesses and no confirmed suspect(s). Therefore this case will be suspended until a possible witness and suspect(s) can be developed.

. . . . .

☐ Check here if continuation report is made.

| 23. STATUS | 24. TELETYPE NO. | 25. SOLVABILITY RATING | 26. SOLVABILITY CLASSIFICA. |
|---|---|---|---|
| ☒ OPEN  ☐ PRIOR CLOSED  ☐ CLOSED  ☐ UNFOUNDED (EXPLAIN IN NO. 22)  ☐ SUSPENDED (EXPLAIN IN NO. 22) | | | |

| 27. INVESTIGATIVE OFFICER'S RECOMMENDATION | 28. SUPERVISOR'S RECOMMENDATION |
|---|---|
| ☒ SUSPEND  ☐ INVESTIGATE FURTHER | ☒ SUSPEND  ☐ INVESTIGATE FURTHER |

| 29. REPORTING MEMBER'S SIGNATURE | BADGE/ELEM. | 30. INVESTIGATOR'S SIGNATURE | BADGE/ELEM. | 31. SUPERVISOR'S SIGNATURE | BADGE/ELEM |
|---|---|---|---|---|---|
| | | ELIOT M. WASHINGTON; 3429/7D | 3429/7D | | |

| 32. INVESTIGATIVE REVIEW OFFICER | 33. SUPERVISOR | BADGE/ELEM | 34. REVIEWER | 35. DISTRIBUTIO |
|---|---|---|---|---|
| | | | | |

Value of vehicles will be entered by the Information Processing Section, Data Processing Division.

PAGE ___ OF ___ PAGES

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 83 of 668

## CONTINUATION REPORT

1. COMPLAINT NUMBER

2. NARRATIVE CONTINUED

| 3. REPORTING OFFICER | BADGE/ORG ELM | 4. INVESTIGATOR | BADGE/ORG ELM | 5. SUPERVISOR | BADGE/ORG ELM |
|---|---|---|---|---|---|

SA-75

J-01018

# Appendix C

SA-76

# REFERENCE REQUEST—FEDERAL RECORDS CENTERS

**NOTE: Use a separate form for each request.**

## SECTION I—TO BE COMPLETED BY REQUESTING AGENCY

| ACCESSION NO. | AGENCY BOX NUMBER | RECORDS CENTER LOCATION NUMBER |
|---|---|---|
| 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 | 1 OF | 2-2-35-09-6-5 |

### DESCRIPTION OF RECORD(S) OR INFORMATION REQUESTED

☐ BOX

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

open

☑ FOLDER (include file number and title)

REMARKS

### NATURE OF SERVICE

☐ FURNISH COPY OF RECORD(S) ONLY   ☐ PERMANENT WITHDRAWAL   ☑ TEMPORARY LOAN OF RECORD(S)   ☐ REVIEW   ☐ OTHER (Specify)

## SECTION II—FOR USE BY RECORDS CENTER

| | REMARKS |
|---|---|
| ☐ RECORDS NOT IN CENTER CUSTODY    ☐ RECORDS DESTROYED | pick up on 10-19-00 |
| ☐ WRONG ACCESSION NUMBER—PLEASE RECHECK | |
| ☐ WRONG BOX NUMBER—PLEASE RECHECK | |
| ☐ WRONG CENTER LOCATION—PLEASE RECHECK | Thank you |
| ☐ ADDITIONAL INFORMATION REQUIRED TO IDENTIFY RECORDS REQUESTED | |
| ☑ MISSING (Neither record(s), information nor charge card found in container(s) specified) | |
| ☐ RECORDS PREVIOUSLY CHARGED OUT TO (Name, agency and date): | |

| | DATE | SERVICE | TIME REQUIRED | SEARCHER'S INITIALS |
|---|---|---|---|---|
| | 10-17-00 | | | |

## SECTION III—TO BE COMPLETED BY REQUESTING AGENCY

| NAME OF REQUESTER | TELEPHONE NO. 7-4185  ☐ FTS | DATE 10-17-00 | RECEIPT OF RECORDS |
|---|---|---|---|

NAME AND ADDRESS OF AGENCY

(Include street address, building, room no. and ZIP Code)

M.P.D.

Requester please sign, date and return this form, for file item(s) listed above; ONLY if the block to right has been checked by the Records Center.    ☐

| SIGNATURE | DATE |
|---|---|

NSN 7540-00-682-6423
5011-108

PREVIOUS EDITION USABLE

OPTIONAL FORM 11 (Rev. 7-
NATIONAL ARCHIVES AI
RECORDS ADMINISTRATI(
36 CFR 1228.1

SA-77

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

FILED

MAR 1 2 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES          )
                       )
    v.                 )        **Criminal No. 98-329**
                       )        **(TPJ)**
SAMUEL CARSON          )
                       )
                       )

**MOTION FOR PRODUCTION OF DOCUMENTS RELATING TO**
**JAMES MONTGOMERY**

Samuel Carson, through undersigned counsel, respectfully moves this Court for

production of documents relating to James Montgomery. In support of his motion the defendant

states:

1. Several months prior to trial, and in response to a motion from defendant William

Sweeney which was joined by Mr. Carson, the Court undertook an *in camera* inspection of

materials relating to government witness James Montgomery. The Court reviewed the materials

to determine if any exculpatory or impeachment materials existed pursuant to Brady and its

progeny. According to the Court's Order filed July 13, 2000, the Court reviewed eleven FBI

302s; four transcripts of grand jury testimony; notes from six interviews; one debriefing

agreement; two plea agreements; several criminal history printouts; miscellaneous court

pleadings; and documents relating to Montgomery's application to the Witness Security Program.

(See Attachment A).

2. After a review of the materials, the Court revealed Brady information contained in the

materials and noted that "some of the materials have been disclosed or will become be [sic]

discoverable in due course under Fed. R. Civ. [sic] P. 16 or as Jencks or Giglio materials."

1

SA-78

554

3. As of the writing of this motion the defense has received the following materials relating to James Montgomery (See Attachment B):

- 3 plea agreements (8/12/97, 11/4/97, 11/20/00)
- 2 proffers of evidence (11/4/97, 11/7/00)
- Government's ex parte Motion to Revoke Bond (3/00)
- PG County Statement of Witness (8/5/97)
- 8 pages of miscellaneous writings
- 5 transcripts of proceedings before Honorable Thomas P. Jackson (8/13/97, 11/5/97, 11/7/00, 2/24/00, 3/15/00)
- Prince George's County Grand Jury proceedings transcript for James Montgomery (8/5/97)
- 3 Washington, D.C. Grand Jury proceedings transcripts for James Montgomery (8/12/97, 11/4/97, 9/11/98)
- 5 Washington, D.C. Grand Jury proceedings transcripts for Agent Lisi (9/2/98, 9/9/98, 9/10/98, 3/22/99, 3/25/99)

4. The government has **not** provided the defense with any FBI 302 reports related to interviews with Mr. Montgomery dating from the time he became a cooperating witness in August of 1997. Mr. Carson now respectfully moves for the production of the FBI 302 reports as representing both <u>Jencks</u> and <u>Brady</u> material.

## MEMORANDUM OF POINTS AND AUTHORITIES

**I.    The Portions of the FBI 302s which Reflect Statements that are Substantially Verbatim of the Witness, James Montgomery, must be Produced as <u>Jencks</u> Material**

The Jencks Act requires the government to produce all prior statements of a government witness which relate to the subject matter of the testimony of the witness. 18 U.S.C. § 3500 (b). The Jencks Act defines three different types of statements which must be produced: (1) a written statement made by the witness and signed or otherwise adopted or approved by him; (2) **a substantially verbatim recital of an oral statement** made by the witness; or (3) a statement made to a grand jury. 18 U.S.C § 3500(e)(emphasis added). As defined by the Jencks Act, the

2

SA-79

statement need not be completely verbatim, nor authored by the witness to qualify as a Jencks Act statement.

The FBI Interview Report Form FD-302 (hereinafter "FBI 302") is an FBI agent's account of a witness interview. See, United States v. Harris, 543 F.2d 1247, 1249 (9th Cir. 1976). In Goldberg v. United States, 425 U.S. 94 (1976), the Supreme Court rejected the argument that work product of government agents is excluded from Jencks Act production. In a concurring opinion, Justice Stevens noted that one important factor in determining whether a writing is a Jencks Act statement is why the document was made. Reports by investigative agents, or by the prosecution itself, are made in part so that the prosecution may "confront recalcitrant, forgetful, or perjurious witness with a prior statement in order to induce him to tell the whole truth and nothing but the truth." 425 U.S. at 113 n. 3.

The Seventh Circuit has noted that FBI reports of witness interviews are usually reliable accountings of the witness' actual words. See, United States v. Allen, 798 F.2d 985 (1986)(remanding for in camera review of FBI 302s to determine if they contained Jencks Act material). Indeed, one would not expect an FBI agent to make a distorted or unreliable report of a witness interview. Quite the opposite, one expects an FBI agent to document an interview accurately so that if necessary, at a later date, the FBI agent can accurately testify to, or otherwise rely upon, the information that has been provided. This is particularly so in a case where some of the crimes are alleged to have occurred over ten years ago.

Whether a particular recounting of an interview is a "substantially verbatim recital" is a factual question that turns on whether the "statement can be fairly said to be the witness' own so that it would not be unfair to allow the defense to use it to impeach the witness." (Issac) Williams

SA-80

v. United States, 119 U.S. App. D.C. 177, 179, 338 F.2d 286, 288 (1964). The words in the writing need not be identical to those of the witness interviewed. The standard is a flexible one, turning on a combination of factors: (1) the extent to which the writing conforms to the witness' language; (2) the relative length of the statement; (3) the lapse of time between the interview and the recordation; (4) the appearance of the witness' remarks; (5) the use of quotation marks; (6) the presence of the interviewer's comments or ideas; and (7) the purpose for which the statement was taken. See, Williams, 119 U.S. App. D.C. at 179-80, 338 F.2d at 288-89.

In the instant case, the Court has undertaken a pretrial *in camera* Brady review of the eleven FBI 302s dating from January, 1992, through March, 1999. Because the purpose of the review was to determine whether Brady material existed and not to determine whether they contained any "substantially verbatim" statements of Mr. Montgomery, the defendant respectfully moves this Court to again examine the FBI 302s to determine whether any portion of one or more of them contain "substantially verbatim" statements of Mr. Montgomery.

**II.     The FBI 302s must be Produced pursuant to Brady, Giglio, Bagley and Kyles**

From the materials produced to the defendant to date, it is beyond debate that Mr. Montgomery, contrary to the express terms of his first plea agreement, dated August 5, 1997, withheld information from, and materially misrepresented facts to, the government. As the Court will recall from having presided, Mr. Montgomery's 'reticence' resulted in two subsequent plea agreements and two subsequent guilty pleas during the more than three years he has been cooperating with the government. It is impossible for the defense to expose how the sequence of disclosures which followed Mr. Montgomery's omissions/misrepresentations temporally related to any motive and/or bias that may have existed at the time of each of his successive disclosures

4

SA-81

if the defense is not in possession of the materials that demonstrate **exactly when, and under what circumstances,** those disclosures were made. For example, it is expected that the FBI 302s will reveal that one or more of Montgomery's successive disclosures or 'corrections' was preceded by a statement made to him, either by an FBI agent or by a prosecutor in the presence of an FBI agent, that it was suspected that he was not being completely truthful about his complicity in one crime or another, or that his version of events was not consistent with credible information that the FBI or United States Attorney's office had otherwise obtained. If true, and if Mr. Montgomery thereafter 'corrected' a prior false statement as to a crime in which he participated while at the same time disclosing new information about a theretofore unreported crime allegedly committed by Mr. Carson, such a juxtaposition of disclosure and motive would be relevant to an effort to expose Montgomery's motive and/or interest in making any such new allegation.

Any such juxtaposition, if revealed, would reflect deeply on Montgomery's credibility. Counsel believes that Mr. Montgomery will be the primary or sole witness against Mr. Carson with respect to many of the serious violent crimes of which he is accused. Because of his importance as a witness in many of the alleged crimes, the reliability or unreliability of his testimony will be largely determinative of Mr. Carson's guilt or innocence. With Mr. Montgomery's credibility so crucial to the government's case against Mr. Carson, all materials which would legitimately serve to impeach his credibility, expose his biases, or demonstrate inconsistencies in the information he has provided are material and should be disclosed. Accordingly, the defendant respectfully requests that the Court order the production of the FBI 302s. If the Court declines to do so, the defendant requests that the Court undertake an *ex parte* review of the FBI 302s at the conclusion of Mr. Montgomery's direct testimony to determine (1)

SA-82

whether any aspect of his nondisclosures/disclosures would arguably effect his credibility, and if so provide it to the defense, and (2) whether any information reflected in Montgomery's 302s is inconsistent with his trial testimony.

WHEREFORE, for the above-stated reasons and any other that the Court deems just and proper, the defendant first moves this Court for production of all FBI 302's relating to FBI interviews with Mr. James Montgomery dating from August 5, 1997.  Failing that, the defendant would move this Court to undertake an *in camera* review to determine (1) whether any individual FBI 302 or part thereof constitutes Jencks;  (2) whether any aspect of the timing of Montgomery's nondisclosures/disclosures as revealed in the FBI 302s could be used to impeach his credibility; and (3) whether any information reflected in Montgomery's 302s is inconsistent with his trial testimony.

Respectfully submitted,

Joseph E. Beshouri
419 Seventh St., N.W., Suite 201
Washington, D.C.  20004
(202) 842-0420

Lexi Negin Christ
Hansen & Christ, P.C.
419 Seventh St., N.W., Suite 201
Washington, D.C.  20004
(202) 638-6700

Counsel for Samuel Carson

6

SA-83

**FILED**

MAR 1 2 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) |
| | ) |
| VINCENT HILL, et al., | ) |
| | ) |
| Defendants. | ) |

Cr. No. 98-329 (TPJ)

**FILED**

JUL 1 3 2000

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

MEMORANDUM AND ORDER

In accordance with the proceedings at the hearing on the "motion to compel discovery, number 1," of June 16, 2000, the Court has reviewed in camera the government's ex parte submission of its "investigative files" respecting the witness James Montgomery. The file consists of eleven FBI 302s dating from January, 1992, through March, 1999, summarizing information imparted by Montgomery to the FBI; four transcripts of grand jury testimony given by Montgomery in the District of Columbia and Prince George's County; notes from six interviews of Montgomery by various AUSAs and one FBI Special Agent; one debriefing agreement and two plea agreements with Montgomery; several criminal history printouts; miscellaneous court pleadings respecting Montgomery; and documents relating to Montgomery's application for admission to the Witness Security Program.

Some of the materials have been disclosed or will become be discoverable in due course under Fed. R. Civ. P. 16 or as Jencks or Giglio materials. Defendant Sweeney's motion is primarily addressed, however, to matters which might be considered Brady information; specifically, that which might constitute or lead to evidence exculpatory of the defendant, in

SA-84                                ATTACHMENT A

particular with reference to the so-called "triple homicide" in Prince George's County, Maryland, on November 17, 1996. Sweeney asserts that James Montgomery was once a suspect in the investigation of that crime, for which Sweeney presently stands charged here. Sweeney is in quest of evidence in possession of the government that Montgomery (or third party or parties) committed the killings.

The government's "investigative files" reveal – and the Court deems it to be <u>Brady</u> information to which defendant Sweeney is presently entitled – that the source of suspicion on the part of Prince George's County authorities that James Montgomery ( and not William Sweeney) committed the "triple homicides" was one Robert ("Butchie") Smith who was himself murdered in the summer of 1997. No other <u>Brady</u> materials were found, and the remainder of the files contains no other evidence producible to defendant at this time.

It is, therefore, this /3<u>th</u> day of July, 2000,

ORDERED, that the defendant Sweeney's "motion to compel discovery, number 1," is granted to the extent set forth above and otherwise denied, without prejudice; and it is

FURTHER ORDERED, that the government retain in its possession, intact, one copy of the compilation of its "investigative files" examined by the Court <u>in camera</u> for use in connection with any appeal of this case.

Thomas Penfield Jackson
U.S. District Judge

SA-85

# JENCKS AND GIGLIO INFORMATION

WITNESS: James Montgomery (G42)

☑ Grand Jury Dated ___8-12-97___

☑ Grand Jury Dated ___8-5-97___

☑ Grand Jury Dated ___9-11-98; 11-4-97___

G42a ☑ Plea Agreement Dated ___11-2-00___

G42b ☑ Proffer Dated ___11-7-00___

G42c ☑ Plea Agreement Dated ___8-12-97___

G42d ☑ Proffer Dated ___11-4-97___

G42e ☑ Plea Agreement Dated ___11-4-97___

☐ Proffer Dated _____

☑ Plea Transcript Dated ___8-13-97___

☑ Plea Transcript Dated ___11-5-97___

☑ Plea Transcript Dated ___11-7-00___

☐ Sentencing Transcript Dated _____

☑ Witness Statement Dated ___8/5/97; other statements___

☐ Witness Statement Dated _____

☐ 302s/PD 123/Notes Dated _____

(See Reverse for Additional Information)

SA-86                          ATTACHMENT B

☐    302s/PD 123/Notes Dated _____

☐    Criminal History (see attached)

☐    Financial Assistance/Witness Protection _____

_____

_____

_____

☐    Other Benefits _____

_____

_____

☑    Additional Material Provided: _____

1. Status hearing transcript 3/15/00

2. Status hearing transcript 2/24/00

3. Grand Jury testimony of Agent Vince Lisi 9-2-98, 9-9-98, 9-10-98, 3-22-99 & 3-25-99

4. Government's Ex Parte Motion to Revoke Bond

SA-87

**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

|  |  |  |
|---|---|---|
| **UNITED STATES** | ) | |
| | ) | |
| | ) | |
| **v.** | ) | **Criminal No. 98-329** |
| | ) | **(TPJ)** |
| **SAMUEL CARSON** | ) | |

### CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of Defendants Carson's Motion for production of Documents was hand delivered on this the _12th_ day of _March_, 2001 to:

Assistant United States Attorney Anjali Chaturvedi
Office of the United States Attorney
555 4th Street, N.W.
Washington D.C. 20001

Assistant United States Attorney Peter Zeidenberg
Office of the United States Attorney
555 4th Street, N.W.
Washington, D.C. 20001

Christopher Davis, Esq.
601 Indiana Avenue, N.W. #910
Washington, D.C. 20004

Joanne Hepworth, Esq.
305 H Street, N.W., 2nd Floor
Washington, D.C. 20001

Frederick Jones, Esq.
901 6th Street, S.W., #409
Washington, D.C. 20024

Steven R. Kiersh, Esq.
717 D Street, NW
Fourth Floor
Washington, D.C. 20004

SA-88

Jonathan S. Zucker, Esq.
601 Indiana Avenue, N.W.
Suite 910
Washington, D.C.

Lexi Negin Christ

SA-89

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

**No. 02-3015**

**September Term, 2002**

98cr00329-01
98cr00329-02
98cr00329-03
98cr00329-04
98cr00329-06

**Filed On: October 2, 2002** [705475]

United States of America,
       Appellee

    v.

Samuel Carson, *a/k/a* Chin,
       Appellant

---

Consolidated with 02-3016, 02-3017, 02-3018,
02-3019, 02-3046

     **BEFORE:**   Edwards, Rogers, and Tatel, Circuit Judges

## O R D E R

Upon consideration of the motion to review all sealed portions of the trial record, the opposition thereto, and the reply, it is

**ORDERED** that the motion be denied. Appellant is not entitled to access to any of the evidence reviewed by the district court in camera to assist in his argument that the district court erred in ruling that neither the Jencks Act, 18 U.S.C. § 3500, nor Brady v. Maryland, 373 U.S. 83 (1963), requires disclosure of such evidence. See United States v. North American Reporting, Inc., 761 F.2d 735, 740 (D.C. Cir. 1985) (it would "defeat this design [of the Jencks Act] to hold that the defense may see statements in order to argue whether it should be allowed to see them") (quoting Palermo v. United States, 360 U.S. 343, 354 (1959)); see also Pennsylvania v. Ritchie, 480 U.S. 39, 59 (1987) ("A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the [government's] files."). Should appellant identify on appeal specific evidentiary rulings of the district court appellant claims were erroneous, this court may undertake its own in camera review of the materials in dispute. See 18 U.S.C. § 3500(c) (statements reviewed by the district court in camera, but held not subject to production under the Jencks Act "shall be preserved by the United States and, in the event the defendant appeals, shall be made available to the appellate court for the purpose of determining the correctness of the ruling of the trial judge"). However, this court will generally not review alleged Brady material in camera unless appellant "raise[s] at least a colorable claim that the [disputed material] contained evidence favorable to [him] and

SA-90

# United States Court of Appeals

FOR THE DISTRICT OF COLUMBIA CIRCUIT

---

## No. 02-3015                          September Term, 2002

material to his claim of innocence or to the applicable punishment." United States v. Williams-Davis, 90 F.3d 490, 514 (D.C. Cir. 1996) (citing United States v. Ramos, 27 F.3d 65, 71 (3d Cir. 1994)); see also United States v. Brooks, 966 F.2d 1500, 1505 (D.C. Cir. 1992) (in camera review of alleged Brady material by district court unnecessary unless defendant identifies specific "exculpatory evidence [that the prosecution] withheld") (citing Ritchie, 480 U.S. at 59).

**Per Curiam**

SA-91

2

UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

MAY 2 9 2003

RECEIVED



UNITED STATES COURT OF APPEALS
FOR DISTRICT OF COLUMBIA CIRCUIT

FILED    MAY 2 9 2003

CLERK

# UNITED STATES COURT OF APPEALS FOR THE DISTRICT OF COLUMBIA CIRCUIT

| | | |
|---|---|---|
| United States of America, Appellee, | : | 02-3015, et Al. |
| | : | **Appeal No. 02-3018** |
| v. | : | |
| | : | |
| William Sweeney *et al.*, Appellants. | : | |
| | : | |

## MOTION TO ALLOW COUNSEL TO REVIEW SPECIFIC SEALED PORTIONS OF THE TRIAL RECORD

Defendants, by and through undersigned counsel, respectfully requests this Honorable Court to review the specific erroneous evidentiary rulings of the district court, enumerated by defendants, and subsequently allow defense counsel to review certain requested material enumerated herein. This pleading is in response to an Order of this Court dated October 2, 2002.

## I. INTRODUCTION

Throughout the course of the trial, as well as during the pretrial stages of the proceedings, defendants argued that the government did not adequately turn over exculpatory evidence pursuant to *Brady v. Maryland*, 373 U.S. 83 (1963). Defendants identified numerous *Brady* materials, which the government subsequently turned over to the court to review *in camera*. After reviewing the material *in camera* the court ruled that the information was not exculpatory. Thus, the district court determined that the government was not required to provide the material to the defense. Further, the materials were sealed and no findings have been released to the defendants regarding the material actually presented to the court. Moreover, the trial court did not make specific findings in support of its determinations.

SA-92

In order to adequately appeal the decision to not release *Brady* material, it is imperative that defendants be permitted to review those portions of the trial record which have been sealed. The heart of this argument is the materiality of the undisclosed evidence. The entire defense may very well be within the FBI 302's that were not released prior to or during trial. Therefore, an effective appeal can only be made if the identified evidence is reviewed by this Court and subsequently disclosed to the defendants.

This Court advised defendants to identify specific 'erroneous' evidentiary rulings of the district court so that the Court may undertake its own *in camera* review of the materials in dispute. *See* 18 U.S.C. § 3500(c). Defendants, in this Motion, have identified the specific evidentiary rulings perceived to be erroneous and have set forth the reasons for which the specific evidence is material to defendants' claim of innocence.

## II.     LEGAL BASIS FOR DEFENDANTS' REQUEST

The Supreme Court held in *Brady* that "suppression by the prosecution of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. Application of the *Brady* doctrine was extended to testimonial impeachment in *Giglio v. United States*, 405 U.S. 150 (1972). A *Brady* violation is demonstrated by showing that the undisclosed evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict. *Kyles v. Whitley*, 514 U.S. 419, 435 (1995).

The government has long been under the obligation to disclose both exculpatory evidence and evidence that might tend to impeach the credibility of a key government witness. *See Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150. In holding that favorable evidence is material if there is

**SA-93**

2

a reasonable probability that had the evidence been disclosed to the defense the result of the proceeding would have been different, the Supreme Court in *United States v. Bagley*, 473 U.S. 667 (1985) disavowed any difference between exculpatory and impeachment evidence for *Brady* purposes. Furthermore, disclosure of documents and tangible objects which are 'material' to the preparation of the defense may be required under the rule of *Brady* without an additional showing that the request is reasonable. *United States v. McVeigh*, 954 F.Supp. 1441, 1446 (D.Colo. 1997).

*Bagley's* touchstone of materiality is the reasonable probability of a different result. *Kyles*, 514 U.S. at 434. The critical question is not whether the defendant would more likely than not have received a different verdict with the evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence. *Id.* Materiality in terms of suppressed evidence should be considered collectively, not item by item. *Id.* at 436. Once there has been *Bagley* error, it cannot subsequently be found harmless. *Id.* at 435.

Defendants do not contend that the government failed to abide by the district court's orders in regard to the production of evidence. Instead, defendants contend that the process that the district court undertook was improper.

First of all, the *Jencks Act* provides that if the United States claims that any statement ordered to be produced under this section contains matter which does not relate to the subject matter of the testimony of the witness, the **court** shall order the United States to deliver such statement for the inspection of the court *in camera*, and the **court "shall excise the portions of such statement which does not relate to the subject matter of the testimony of the witness."** U.S.C. § 3500(c). Moreover, it is the function of the trial judge to decide, in light of the

3

SA-94

circumstances of the case, what, if any, evidence extrinsic to the statement itself may be offered to prove the nature of the statement. *Palermo v. United States*, 360 U.S. 343, 355 (1959). In the instant case, the government, not the court, redacted the documents that were subsequently provided to the defense. By the very terms of the Jencks Act, this procedure was improper.

Second, although the trial court properly viewed the evidence in question *in camera*, the court failed to keep a transcribed record of the *in camera* proceedings. *In re Sealed Case*, 151 F.2d 1059 (D.D.C. 1998). Furthermore, the trial court failed to articulate a compelling interest for reviewing the *Brady* material *in camera* and subsequently sealing the material. No findings were made regarding the requested material, and no record has been released to the defense indexing the material presented to the court. Accordingly, the trial court failed to follow the proper procedure in regard to *in camera* review of *Brady* material.

In the instant case, defendants' entire focus was the lack of credibility of the government's witnesses. The Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the "reliability of a given witness may well be determinative of guilt or innocence." *Giglio*, 405 U.S. at 150. The information requested by defendants precisely encompasses the issues of credibility and impeachment. Therefore, defendants' requests for statements made by witnesses for the prosecution are entirely proper.

The requested FBI 302's qualify as statements of witnesses producible under the Jencks Act if they have been adopted or approved by the witnesses, or if they are substantially verbatim accounts of the witnesses' interviews. 18 U.S.C. § 3500(e)(1) and (2). Furthermore, the Supreme Court in *Goldberg v. United States*, 425 U.S. 94, 105-08 (1976), squarely held that the work product doctrine does not bar the production of government attorney's or their agents'

4

SA-95

notes that otherwise qualify as Jencks Act material. Accordingly, defendants' specific requests for the FBI 302's should be granted.

### III.    SPECIFIC DISPUTED MATERIALS AND MATERIALITY

1.)    On January 9, 2001, defense requested Jencks material in regard to Agent Lisi's testimony. (TR. 1/9/01 pm, pgs. 21, 22-26). Defendants contended that the material was needed for context and bias. The government stated it would turn over Agent Lisi's Jencks material after it had completed opening statements. Upon conclusion of the government's opening, it produced volumes of Grand Jury transcripts to the defense, all of which were redacted. On January 11, 2001, the district judge examined the redacted material and ruled that the redactions were material which was not relevant to the testimony that Agent Lisi had given to date. (TR. 1/11/01 am, pg. 7, ln. 2-7). Subsequently, the request to review the redacted material was denied.

Defendants contend that the district court's ruling to exclude the redacted portions of Agent Lisi's FBI 302's was in error. It was imperative that defendants have access to all information regarding the credibility and potential bias of the government's witnesses. This Court has often stated that bias evidence is always relevant. *Williams v. United States*, 642 A.2d 1317, 1322 (D.C. 1994). Moreover, Agent Lisi offered his testimony in the form of a narrative. The *McVeigh* court held it impermissible for the government to suppress or secrete information known to them which does not fit into the narrative, or which may diminish the credibility of the evidence relied on to tell the story. *McVeigh*, 954 F.Supp. at 1449. Further, the prosecutor must disclose to the defense the information known to, or available to, them which may develop doubt

5

SA-96

about the truth of the government's narrative. *Id.* Accordingly, defendants should be permitted to view this material.

2.)    On January 11, 2001, defendants requested the government to produce both the Jencks and Grand Jury material in regard to the statements made by Robert Smith. (TR. 1/11/01 am, pg. 56, ln. 16). The trial court first stated that all the information with regard to Smith be provided unredacted if the government wished to use his extrajudicial statements. *Id.* at 56, ln. 16-19. The government argued that the redacted portions had nothing to do with K Street and were therefore irrelevant. *Id.* at 58, ln. 9-19. After hearing the government's argument, the trial court changed its position and adopted the position of the government. *Id.* In light of the court's ruling, defendant argued that the other information is relevant because it contradicts other testimony. *Id.* at 59, ln. 1-7.

Defendants contend that the redacted portions of Agent Lisi's testimony regarding Robert Smith's extrajudicial statements in the Grand Jury and Jencks material are imperative for impeachment purposes. Because Robert Smith died prior to trial, defendant did not have the opportunity to cross-examine him. Defendants asserts that due to the lack of opportunity to cross-examine Mr. Smith to demonstrate that he was biased, or that his statements were exaggerated or unbelievable, defendants are entitled to the statements that Mr. Smith made. *See Davis v. Alaska*, 415 U.S. 308 (1974). Furthermore, the Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the "reliability of a given witness may well be determinative of guilt or innocence." *Ritchie*, 480 U.S. at 66. Robert Smith was an essential government witness and the lack of opportunity for defendant to cross-examine him or view the statements he gave to the government was fatal. Defendants contended that Mr. Smith was an unreliable witness. In order to support this

6

SA-97

contention, it was imperative for defense counsel to view the redacted material in question. This Court has the ability to cure the defect by allowing defense counsel to view the redacted portions of the FBI 302's and Grand Jury transcript.

3.)     On January 30, 2001, while government witness Reginald Switzer was on the stand, defendants requested *Brady* material, specifically, the handwritten notes of AUSA Zeidenberg and AUSA Chaturvedi, for the three witness to the George Mayrant murder. (TR. 1/30/01 pm, pgs. 4-5). The government obtained the requested information during its examination of Mr. Switzer, and referenced the three witnesses as providing testimony which materially contradicted the testimony of Reginald Switzer. *Id.* at 5. The court ruled that no Jencks material had been redacted. *Id.* at 5. Counsel for defense reiterated, "Mr. Switzer said other people were taking notes." *Id.* The district judge again stated that the notes taken during the interview of Mr. Switzer was not Jencks. *Id.*

Defendants assert that it was imperative to his defense, which focused on the lack of credibility of the government's witnesses, that the names of the three witnesses referenced in George Mayrant's murder be made available to defense counsel. Disclosure of documents and tangible objects which are 'material' to the preparation of the defense are required under the rule in *Brady*. *McVeigh*, 954 F.Supp. at 1446. Furthermore, the government is obligated to disclose both exculpatory evidence and evidence that might tend to impeach the credibility of a key government witness. *See generally Giglio*, 405 U.S. 150 (1972). In light of the fact that the identity of the three witnesses to Mr. Mayrant's murder would tend to impeach the credibility of Mr. Switzer, the government is obligated to disclose the information to the defense. Accordingly, it was error for the trial court to deny defendants access to this information. Therefore, the identity of the three witnesses should now be disclosed.

7

SA-98

4.)    On February 1, 2001, defendants requested material from Detective Fulton regarding the reliability of Andre Murray, witness for the government, as an informant. (TR. 2/1/01 am, pg. 65-66.) The trial court ruled that the information could not be considered Jencks unless it concerned events about which Andre Murray testified. *Id.*

Defendants contend that information regarding the reliability of one of the government's 'star' witnesses is inherently material to his defense. The Supreme Court has noted that nondisclosure of impeachment evidence falls within the general rule of *Brady* "when the 'reliability of a given witness may well be determinative of guilt or innocence.'" *Pennsylvania v. Ritchie*, 480 U.S. 39, 66 (1997) *citing Giglio*, 405 U.S. at 150. In the instant case, demonstrating the reliability, or lack thereof, of Andre Murray was imperative. As evidenced by his own testimony regarding his drug use and extensive criminal history, Mr. Murray's character was put into question. The trial court, in failing to disclose information pertaining to Mr. Murray's reliability, deprived defendants of a fair trial. *See e.g. Ritchie*, 480 U.S. at 60 (the court is obligated to release information material to the fairness of the trial). Furthermore, the notes of Officer Fulton qualify as statements of Andre Murray, producible under the Jencks Act if they have been adopted or approved by Mr. Murray, or if they are substantially verbatim accounts of his interview. 18 U.S.C. § 3500(e)(1), and (e)(2). Accordingly, defense counsel should be granted access to the notes of Officer Fulton regarding the reliability of Andre Murray as an informant.

5.)    On February 1, 2001, defendants requested the letters written to AUSA Wainstein from Andre Murray, asserting that it consisted of Jencks material. (TR. 2/1/01 am, pg. 66). The letters contained statements by Mr. Murray that he did not want any 'help' from Mr. Zeidenberg.

8

SA-99

*Id.* Defendants asserted that the information contained in the letter was needed for impeachment and bias purposes. The trial court ruled that the information was not Jencks, but that it would be reviewed *in camera*. *Id.* at 67. Subsequently, the court denied defendants access to the letter.

Further, defendants requested the notes taken by AUSA Wainstein during his interview of Mr. Murray. (TR. 2/1/01 pm, pg. 63). The trial court stated that although the notes included some suggestion that Mr. Murray and "Lop" were responsible for Patcho's murder, which is conceivably *Brady* material, the source of the information was defendant Vincent Hill, not Mr. Murray. *Id.* Thereafter, AUSA Wainstein's notes were placed under seal.

On February 5, 2001, defense counsel reiterated their request for the letters written by Andre Murray to AUSA Wainstein. Defendants asserted that the letters were needed to impeach Mr. Murray regarding the number of letters written and the content of those letters. (TR. 2/5/01 am, pg. 88-92). The court stated that the letters had become relevant and material and that they therefore were admissible. *Id.* at 88. The court allowed the government to provide defense counsel with redacted letters, holding that the redactions related to other offenses not pertinent to the instant case. *Id.* at 89. Defense counsel argued that the letters could be used to impeach Mr. Murray because he had denied cooperating with the government in relation to other offenses. *Id.* The court maintained its position that the redactions were only marginally relevant. *Id.* at 90. Therefore, the unredacted copies of the letters were placed under seal.

Defendants contend that the trial court erred in ruling that the letters and notes were not Jencks material. When the reliability of a witness is at issue, nondisclosure of impeachment evidence falls within the general rule of *Brady*. *See Ritchie*, 480 U.S. at 66; *Giglio*, 405 U.S. 150 (1972). The government is obligated to disclose information tending to impeach or show bias of the witness. In not allowing defense counsel access to this information, which was pertinent to

9

SA-100

the issue of credibility, defendants were denied a fair trial. Because the letters from Mr. Murray to AUSA Wainstein are pertinent to the issue of credibility, they must be disclosed to defense counsel.

6.)     On February 12, 2001, defendants requested the *Brady* material generated by the Assistant United States Attorney in the District of Maryland regarding government witness, Theodore Watson. (TR. 2/12/01 am, pg. 8). Further, counsel for defendants filed a motion for *in camera* review of Mr. Kenneth Robinson's, Mr. Watson's attorney in Maryland, file. The government asserted that disclosing the information would violate Mr. Watson's attorney-client privilege. Defendants contended that their constitutional right of due process overrides the witnesses' attorney-client privilege, and requested that the material in question be reviewed *in camera*. *Id*. The court denied defendants' request to review the material in question. *Id*.

Defendants assert that the trial court's refusal to review the material generated by the AUSA in the District of Maryland regarding Theodore Watson was erroneous. The government is not permitted to suppress or secrete information known to them which does not fit into their narrative, or which contradicts the evidence used to support that narrative, or which may diminish the credibility of the evidence relied on to tell the story. *McVeigh*, 954 F.Supp. at 1449. Prosecutors must disclose to the defense the information known to, or available to, them which may develop doubt about the truth of the government's narrative. *Id*.

Theodore Watson was a main witness for the government. It was imperative for defendants to have access to all material information relevant to his defense. *McVeigh*, 954 F.Supp. at 1446. Nondisclosure of information that goes directly to Mr. Watson's credibility constitutes a *Brady* violation. *Kyles*, 514 U.S. at 435. The government is not excused from

10

SA-101

disclosing this information by any inconvenience, expense, annoyance or delay. *McVeigh*, 954 F.Supp. at 1450. Accordingly, the government has no excuse for nondisclosure of the *Brady* material generated by the AUSA in the District of Maryland. Therefore, in light of the materiality of the undisclosed information, defense counsel is entitled to view this portion of the trial record.

7.)    As stated above, Theodore Watson was one of the government's main witnesses. Throughout the course of his testimony, Mr. Watson implicated defendants in the commission of a number of crimes. Defendants asserted prior to, and during trial, that evidence of the existence of, and substance of, any promises, agreements, understandings and arrangements, between the government and Mr. Watson, in which the government agreed to recommend leniency in sentencing or to recommend a certain sentence for any of the crimes for which Mr. Watson has been, is, or will be convicted, or to advise the court of any cooperation with the government, should be turned over to the defense, as it is *Brady* material. Mr. Watson testified that he had been convicted of receiving stolen property, possession with the intent to distribute heroin, escape from Alexandria City Jail, and conspiracy to distribute a controlled substance. Further, Mr. Watson stated that as part of his plea bargain for conspiracy to distribute a dangerous substance, he was obligated to give substantial assistance to the United States. In light of Mr. Watson's plea agreement, defendants requested Jencks and *Brady* material in regard to communications between the prosecutors and Mr. Watson regarding cooperation and leniency. (TR. 2/12/01 pm, p. 32). The trial court denied defendants' request to view this material. *Id.* Further, on February 13, 2001, defendants requested to view the letters addressed to the prosecutor from Mr. Watson. (TR. 2/13/01 am, pg. 5-6, 9). The trial court denied defendants'

11

SA-102

request to view the letters, and subsequently marked them "Courts Exhibit 5," and placed them under seal. *Id.* at 6.

Defendants contend that the trial court's denial of access to communications between the government and Mr. Watson regarding cooperation and leniency was in error. Evidence that shows bias or motivation of a witness is relevant in assessing the witness' credibility. *Mercer v. United States*, 724 A.2d 1176, 1184 (D.C. 1999) *citing Springer v. United States*, 388 A.2d 846, 855 (D.C. 1978). In the instant case, the reliability of Mr. Watson was directly at issue. Further, it was imperative for the defense to offer evidence tending to show that Mr. Watson was biased and that he was motivated to testify against defendants by either the explicit or implicit promise of leniency. Accordingly, the government was obligated to disclose the requested letters to the defense. Therefore, defendants were denied the opportunity to effectively cross-examine Mr. Watson. Accordingly, the sealed letters, marked Court's Exhibit 5, should be disclosed to the defense.

8.)    On February 13, 2001, defendants requested the notes of Officer Marc Little, which had allegedly been destroyed. (TR. 2/13/01 pm, pg. 31). The trial court denied defendants' request for Officer Little's notes. *Id.* In *Goldberg v. United States*, 425 U.S. 94, 105-08 (1976), the Supreme Court held that the work product doctrine does not bar the production of government attorney's or their agents' notes that otherwise qualify as Jencks material. Officer Little's notes qualify as material producible under the Jencks Act because they are substantially verbatim accounts of the witnesses' interviews. 18 U.S.C. § 3500(e)(2). Furthermore, Officer Little's notes should have been disclosed to the defense because they were material to the preparation of the defense. *See generally Brady*, 373 U.S. 83 (1963).

12

SA-103

9.)    On February 5, 2001, defendants requested the court to review the 302's in regard to government witness Charles Bender. Defendants wanted to know whether the testimony that Mr. Bender gave on the stand was consistent with the statements he gave to the government. Further, defendants inquired as to whether the mental incapacity of Mr. Bender was disclosed in the 302's. (TR. 4/5/01 pm, pg. 84). The information was needed to impeach Mr. Bender on the ground of ability to discern and state the truth. The trial court ruled that nothing in the 302's related to the mental incapacity of Mr. Bender, and that Mr. Bender's testimony was consistent with the information in the 302's. *Id.*

Suppression by the government of evidence favorable to the defendants upon request violates due process where the evidence is material to guilt. *Brady*, 373 U.S. at 87. The government was under an obligation to disclose evidence that might tend to impeach the credibility of Mr. Bender. *See Brady*, 373 U.S. at 83; *Giglio*, 405 U.S. at 150. Clearly, evidence of Mr. Bender's mental incapacity is *Brady* material. Therefore, the 302's regarding Mr. Bender should have been disclosed to the defense.

10.)    Numerous *Brady*, *Giglio* and Jencks disputes took place in regard to government witness James Montgomery. Mr. Montgomery was an essential witness for the government. His testimony implicated the defendants in a number of criminal acts. Again, as with the majority of the government witnesses, the defense questioned the credibility of Mr. Montgomery. Mr. Montgomery, himself, had admitted to, had been implicated in, and had been convicted of a number of heinous crimes, including, but not limited to assault with a deadly weapon, numerous murders, assault on a police officer while armed. Mr. Montgomery also testified that he had

13

been charged with escape, and various drug offenses, including, but not limited to possession with the intent to distribute. Further, Mr. Montgomery testified that he had lied to the FBI before regarding the murder of T.T. and Terita Thomas in order to evade punishment for assaulting a police officer. (TR. 3/12/01 pm, pg. 39). Moreover, the government had guaranteed Mr. Montgomery leniency in his sentencing in exchange for his testimony. The leniency promise was fulfilled, and Mr. Montgomery is now serving 5 years for the commission of 7 murders. Moreover, Mr. Montgomery and his family were given a substantial amount of money in order to relocate from this area.

On March 6, 2001, defendants requested *Brady* and Jencks material regarding Mr. Montgomery. The trial court reviewed the material and stated that there was no *Brady* material and that the first eight pages were Jencks. (TR. 3/6/01, pg. 3). Thereafter, the first eight pages were Bates stamped 905140 – 905147. *Id.*

On March 7, 2001, defendants requested Mr. Montgomery's witness protection file. (TR. 3/7/01, pg. 85). Defendants stressed the importance of viewing Mr. Montgomery's medical records which were part and parcel of his witness protection file. The medical records were imperative because they include records of a brain abscess which may have caused brain damage. (TR 3/12/01 am, pg. 11). The court reviewed the file *in camera* and ruled that it did not contain *Brady* material. *Id.*

Further, on March 7, 2001, defendants requested the FBI 302's for Mr. Montgomery and Jencks material regarding Agent Lisi. (TR. 3/7/01, pg. 52). The government turned over the information that pertained to statements made by Robert Smith. *Id.* The court stated on March 12, 2001 that all of the FBI 302's in regard to James Montgomery are properly characterized as Jencks, therefore the government must turn them over to the defense. (TR. 3/12/01 am, pg. 3-7).

14

SA-105

Subsequently the government provided the defense with redacted versions of the FBI 302's. The court stated that it would stand on its previous ruling that the material did not contain information that the government was required to disclose. (TR.3/7/01 at 54). Further, the court ruled that Agent Lisi's notes did not contain either *Brady* or Jencks material. *Id.* at 91.

On March 14, 2001, defendants requested *Giglio* material in regard to the monies paid to Mr. Montgomery. (TR. 3/14/01 pm, pg. 50).

11.)    On April 5, 2001, defendants requested notes, FBI 302's, and Jencks material consisting of conversations between Charles Bender and the FBI. (TR. 4/5/01, pg. 65-66). Mr. Bender testified that Agent Lisi, AUSA Chaturvedi, and AUSA Wainstein were taking notes during their interview of him. *Id.* Accordingly, defendants requested the notes of Agent Lisi, AUSA Chaturvedi, and AUSA Wainstein, which were taken during their interview of Mr. Bender. The trial court reviewed the notes and stated that because the notes were consistent with Mr. Bender's testimony, the government was not under any obligation to disclose them to the defense. *Id.* at 79.

The trial court's ruling that Agent Lisi, AUSA Chaturvedi, and AUSA Wainstein's notes did not constitute Jencks material was erroneous. The notes qualify as notes producible under the Jencks Act if they have been adopted or approved by the witnesses, or if they are substantially verbatim accounts of the witnesses' interviews. 18 U.S.C. §3500(e)(1) and (e)(2). The trial court conceded that the notes were consistent with Mr. Bender's testimony, therefore under the very terms of the Jencks Act, the government was obligated to disclose them to the defense.

SA-106

12.)   On April 24, 2001, defendants requested the FBI 302's in regard to government witness Arthur Rice.  The trial court reviewed the FBI 302, dated January 27, 1999, and stated that it contained no information that would permit it to be characterized as *Brady* material, and that it was clearly not a *Jencks* statement.  (TR. 4/24/01 pm, p. 3).

The requested FBI 302 qualifies as a statement producible under the Jencks Act if it has been adopted or approved by Mr. Rice, or if it is a substantially verbatim account of Mr. Rice's interview.  18 U.S.C. sec. 3500(e)(1) and (2).  In light of the fact that the trial court failed to state a reason why the 302 did not constitute a Jencks statement, the information should be disclosed to defense counsel.

13.)   On May 20, 2001, defendants requested the court to review government witness, Paul Franklin's, paternity and support record.  In chambers, the trial court examined Mr. Franklin's Superior Court of the District of Columbia Family Division file, Case Number 92PS00177.  (TR. 5/20/01 pm, pg. 50).  The defendants contended that the file was needed in order to examine and impeach Mr. Franklin on the issues of bias and his motivation to testify.  The trial court stated that there was no useful information in the file.  *Id.*

The Supreme Court noted in *Giglio* that nondisclosure of impeachment evidence falls within the general rule of *Brady* when the reliability of a given witness may well be determinative of guilt or innocence.  *Giglio*, 405 U.S. at 150.  The information requested by the defendants precisely encompasses the issues of credibility and impeachment.  Therefore, defendants should have been provided Paul Franklin's paternity and support record.

SA-107

## IV.    CONCLUSION

Defendants' not guilty plea put in issue all of essential elements of each charge in the indictment. *See McVeigh*, 954 F.Supp. at 1447. Further, materiality in terms of suppressed evidence should be considered collectively, not item by item. *Kyles*, 514 U.S. at 436. Due to the quantity of the requests enumerated in this Motion, the cumulative effect is substantial enough to warrant review of the requested sealed portions of the trial record. Accordingly, disclosure of the suppressed evidence to competent counsel would have made a different result reasonably probable. Appellants pray this Honorable court for access to the sealed portions of the trial record identified herein.

Respectfully submitted,

Steven R. Kiersh #323329
717 D Street N.W., Suite 400
Washington, D.C. 20004
(202) 347-0200

/s/ SRK
Reita P. Pendry #327775
P.O. Box 42249
Charlotte, NC 28215

/s/ SRK
Stephen C. Leckar
Buthera & Andrews
1301 Pennsylvania Ave, N.W., Suite 500
Washington, D.C. 20004-1701
(202) 347-6875

17

SA-108

/s/ SCK

Paul Rosenzweig
c/o The Heritage Foundation
214 Massachusetts Avenue, N.E.
Washington, D.C. 20002-4999
(202) 608-6190

/s/ SRY

Mary E. Davis
Davis & Davis
10th Street, N.W., 9th Floor
Washington, D.C. 20004
(202) 234-7300

18

SA-109

## UNITED STATES COURT OF APPEALS FOR
## THE DISTRICT OF COLUMBIA CIRCUIT

United States of America,  : 
      Appellee,  : 
   :     **Appeal No. 02-3018**
      v.  : 
   : 
William Sweeney *et al.*,  : 
      Appellants.  : 

## CERTIFICATE OF SERVICE

I hereby certify that a true and accurate copy of the foregoing **MOTION TO ALLOW COUNSEL TO REVIEW SPECIFIC SEALED PORTIONS OF THE TRIAL RECORD** was sent regular U.S. Mail to John R. Fischer, Esquire, Assistant United States Attorney, 555 4<sup>th</sup> Street, N.W., Washington, D.C. 20001 on this the _29 th_ day of May, 2003.

Steven R. Kiersh

19

SA-110

# IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES            :

                         :     98-cr-329-4 (TFH)

V.                       :

                         :

WILLIAM SWEENEY          :

                         :
_____

## EMERGENCY MOTION FOR ACCESS TO ENTIRE COURT DOCKET
## AND POINTS AND AUTHORITIES IN SUPPORT THEREOF

William Sweeney, by and through undersigned counsel, respectfully moves this Court to order that **all** court papers and proceedings of the above captioned matter be unsealed to allow counsel to be provided with a copy, as needed for effective representation of Mr. Sweeney on his post conviction proceeding, for which counsel was appointed. In support of this Motion, Petitioner upon information and belief states the following:

1.      Mr. Sweeney was a defendant in this matter.

2.      Undersigned counsel was appointed to represent Mr. Sweeney in petitioning the Court pursuant to 18 U.S.C 2255 for relief. Counsel has been provided with materials by trial and appellate counsel but upon review of the docket, there are many other documents counsel needed to copy. Counsel therefore also needs access to have copies of various ex parte and/or sealed pleadings to adequately represent Mr. Sweeney in this matter. His 2255 petition is due February 20, 2008.

3.      In the alternative, counsel requests that the Court allow counsel access and copies of the two pleadings filed by Kenneth Robinson on October 29, 1998 (motion to seal and entry of limited appearance and motion for appointment of counsel and motion to recuse) as well as the December 15, 1998 response filed by A.J. Kramer, the December 16, 1998

SA-111

response by the government and the December 31, 1998 order from Judge Roberts. While the docket reflects that these were filed and the matter referred to Judge Roberts, the matters appear to be sealed.

4.      Mr. Sweeney also has an historic First Amendment right of access which should not be abridged under the circumstances. The courts of our nation are presumptively open." *Richmond Newspapers, Inc. v. Virginia*, 448 U.S. 555, 569 (1980); *see also Press Enterprise Co. v. Superior Court*, 464 U.S. 501, 508 (1984); *Craig v. Harney*, 331 U.S. 367 (1947). This right of public access is derived not only from the common law but is guaranteed by the First Amendment to the United States Constitution. *Richmond Newspapers*, 448 U.S. at 576 ("The First Amendment guarantees of speech and press . . . prohibit the government from summarily closing courtroom doors.").

Since *Richmond Newspapers*, our courts have made it abundantly clear that the right of public access extends not only to trials but to pretrial proceedings as well. *See, e.g., Press Enterprise Co. v. Superior Court*, 478 U.S. 1 (1986) (preliminary hearings); *Press Enterprise Co. v. Superior Court*, 464 U.S. 501 (1984) (voir dire examinations); *In re Knight Publishing Co.*, 743 F.2d 231, 233-34 (4th Cir. 1984) (pretrial motions, affidavit and hearings). The right of access is never more important than in criminal hearings. *See Press Enterprise Co. v. Superior Court*, 464 U.S. at 508.

The right of access to pretrial criminal proceedings traces not only the right to attend but also the right to copy related court records. *See, e.g., Nixon v. Warner Communications*, 435 U.S. 589, 597 (1978) (longstanding common law right to access to court records); *In re Globe Newspaper Co.*, 729 F.2d 47, 52 (lst Cir. 1984) (recognizing First Amendment right of access to pretrial criminal documents); *Associated Press v. United States District Court*, 705

SA-112

F.2d 1143 (9th Cir. 1983) ("There can be no dispute that the press and public have historically had a common law right of access to most pretrial documents . . . ."); *In re National Broadcasting Co.,,* 653 F2d 609, 612 (D.C. Cir. 1981) ("[Tlhe existence of the common law right to inspect and copy judicial records is indisputable.")

Although this Court may impose reasonable limitations on public access in very limited circumstances, restrictive orders are tolerated only to the extent that "the denial is necessitated by a compelling governmental interest, and is narrowly tailored to serve that interest." *Globe Newspaper Co.,* 457 U.S. at 606-7. Here, however, there is nothing in the record that suggests that any compelling governmental interest necessitate the sealing of the transcript and court papers. Without a showing of compelling governmental interest, the sealing order should no longer stand.

This matter should be unsealed from the Court pursuant to Mr. Sweeney's right to effective assistance of counsel.

Finally, the public's right of access is protected by strict procedural rules.[1] As far as Mr Sweeney knows, none of these procedures were followed in this case. Thus, at a minimum Mr. Sweeney requests hearing on the matter, affording the public and Mr. Sweeney an opportunity to state why further sealing is impermissible unless the Court finds that sealing is necessary to serve a compelling governmental interest.

Because Mr. Sweeney has at issue crucial constitutional rights under the First, Fifth and

---

[1] The party seeking closure must make a showing, on the public record, as to why access must be denied. *Globe Newspaper Co,* 457 U.S. at 608. The court must then make findings in the public record to support closure and inquire whether alternatives to closure are available. *Richmond Newspapers,* 448 U.S. at 508-11. The findings must be specific enough "that a reviewing court can determine whether the closure order was properly entered." *Press Enterprise Co.,* 464 U.S. at 510. Finally, in advance of the sealing order, the public is entitled to notice and an opportunity to object. *Gannet Co. v. DePasquale,* 443 U.S. 368, 401 (1979) (Powell, J., concurring in part and dissenting in part); *Globe Newspaper Co.,* 457 U.S. at 609 n.24.

SA-113

Sixth Amendments to the United States Constitution, comprehending his rights to public access, to a fair trial, to effective assistance of counsel, and to the due process of law, counterbalanced by no substantial governmental interest of record, and certainly by none sufficient to outweigh Petitioner's vital trial rights, he respectfully requests that this Court grant the instant motion and unseal the specific proceedings in this matter.

WHEREFORE, for the foregoing reasons, and any others which may appear to the Court at a hearing on this motion, Mr. Sweeney respectfully requests that this Court grant the motion for access to entire court docket.

Respectfully submitted,

_____
JENIFER WICKS
Bar No. 465476

Law Offices of Jenifer Wicks
The Webster Building
503 D Street, N.W.
Suite 250A
Washington, D.C.  20001
(202) 326-7100

SA-114

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 123 of 668

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES

              V.

WILLIAM SWEENEY

:
:
:
:
:
:
:

98-cr-329-4 (TFH)

## ORDER

Upon consideration of the Petitioner William Sweeney's Motion for Access to Entire

Court Docket and the record herein, it is this _____ day of _____, 2008 hereby

ORDERED that the motion is GRANTED and that the Clerk's Office shall provide

copies of any necessary sealed pleadings in this matter to counsel for Mr. William Sweeney.

_____

C:

Clerk's Office,

Jenifer Wicks
Counsel for William Sweeney

USAO

SA-115

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES        :

       :      98-cr-329-4 (TFH)

V.        :

       :

WILLIAM SWEENEY        :

_____ :

## ORDER

Upon consideration of the Petitioner William Sweeney's Motion for Access to Entire Court Docket and the record herein, it is this **15** day of _Zehru_, 2008 hereby ORDERED that the motion is GRANTED and that the Clerk's Office shall provide copies of any necessary sealed pleadings in this matter to counsel for Mr. William Sweeney.

_Thomas F. Hogan_

C:

Clerk's Office,

Jenifer Wicks
Counsel for William Sweeney

USAO

SA-116

## UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | * |
| | * Criminal No. 98-329 (RCL) |
| | * |
| v. | * |
| | * |
| SAMUEL CARSON, | * |
| WILLIAM SWEENEY, and | * |
| SEAN COATES, | * |
| | * |

### ORDER

Upon consideration of the Mr. Sweeney's Unopposed Motion for Extension of Time to File His Supplement to Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255, it is hereby:

**ORDERED** that the motion is granted, and it is:

**FURTHER ORDERED** that defendant Sweeney file any supplement to his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than February 22, 2011, and that United States files its Response to the Section 2255 motions and supplements thereto filed by defendants Carson, Sweeney and Coates by no later than May 23, 2011.

SO ORDERED this 23rd day of _November_ 2010.

_Royce C. Lamberth_
ROYCE C. LAMBERTH
Chief Judge
United States District Court

- 3 -

SA-117

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 126 of 668

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA        §

§

V.                            §             CASE NO. 1:98-CR-329 (RCL)

§

SAMUEL CARSON,              §

WILLIAM SWEENEY          §

## O R D E R

Upon consideration of Defendants Carson and Sweeney's Joint Unopposed Motion for Extension of Time to File Supplements to Motions to Vacate, it is hereby:

ORDERED that the Motion is granted, and it is:

FURTHER ORDERED that Defendants Carson and Sweeney file any supplements to their respective Motions to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than May 30, 2011, and that the United States file its Response to the Section 2255 motions and supplements thereto filed by Defendants Carson and Sweeney no later than August 30, 2011.

SO ORDERED this _2nd_ day of __February__ , 2011.

_____
ROYCE C. LAMBERTH
Chief Judge
United States District Court

-4-

SA-118

## IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA    :

V    :    Cr. No. 98-CR-00329-3-RCL

    :    Cr. No. 98-CR-00329-4-RCL

SAMUEL CARSON    :    Cr. No. 98-CR-00329-6-RCL

WILLIAM SWEENEY    :

SEAN COATES    :

_____:

**FILED**

**DEC - 6 2011**

### ORDER

Clerk, U.S. District & Bankruptcy
Courts for the District of Columbia

Upon consideration of the Consent Motion for Extension of Time to Supplement to Motion to Vacate, it is hereby:

**ORDERED** that the motion is granted, and it is:

**FURTHER ORDERED** that defendants Carson, Sweeney and Coates file any supplement to his Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. § 2255 by no later than July 30, 2012, and that United States files its Response to the Section 2255 motions and supplements thereto filed by defendants Carson, Sweeney and Coates by no later than January 30, 2013.

**SO ORDERED** this 5th day of ___December___ 2011.

Royce C. Lamberth

ROYCE C. LAMBERTH
Chief Judge
United States District Court

- 4 -

SA-119

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES           :

                           :        98-cr-329

V.                        :

                           :

SAMUEL CARSON       :

                           :

## AFFIDAVIT OF DALE VAUGHAN

Personally appeared before me, DALE VAUGHAN, and being duly sworn, swears and affirms the following:

1.     That I am a licensed investigator in the District of Columbia and interviewed a witness, Ms. Cheree Owens, in the above numbered case, on May 29, 2014, at the request of counsel for Mr. Sam Carson, Kira Anne West.

2.     During that interview, Ms. Owens told me that she lived with John Pickney in Temple Hills, Maryland on or about December 1996 when she was questioned by the police about a triple murder that happened in Temple Hills, Maryland.

3.     I have determined that this is the same triple murder that Mr. Carson was charged with and found guilty of in the above numbered cause.

4.     Ms. Owens told me that John Pinkney, who is now deceased, testified in the Prince Georges County Grand Jury about this triple murder soon after it happened and about a man named Dennis Green. After Pickney testified,

SA-120

the FBI moved Ms. Owens' mother to Suitland, Maryland so that Mr. Pinkney and Ms. Owens could live with her so that Mr. Green couldn't find them. Ms. Owens didn't recall how much they paid her mother but she remembered that she was, in fact, paid for this move. After two weeks at her mother's home, the FBI moved Pickney and Owens again at least ten times in the six months that followed his testimony. She could not remember all the places she and Pickney lived during that time. The FBI paid for their moving expenses and housing during this time. Ms. Owens recalled that the FBI paid Pickney, not her.

5.    Ms. Owens told me that about seven months after Pickney testified, the FBI put them in the Witness Protection Program and moved them to Tampa, Florida to an apartment in Hillsborough County. The address was 127 East 17th St, Apt. 105, Tampa, Florida 33605. The FBI chose the location in Tampa. Again, they paid Pickney the money for the move and paid for the apartment rent, the U-haul and all moving expenses. She did not know how much they paid Pickney. They stayed there a short time and then moved to a house on their own.

6.    Pickney and Owens never heard from anyone in the FBI or Prince Georges County after they moved to Florida. No one from the federal or state government ever contacted them to testify in the triple murder trial. They were never contacted by anyone at the U.S. Attorney's Office in the District of

**SA-121**

Columbia to testify in a federal case.

7.    Ms. Owens told me that she didn't want to get involved in this case and she refused to execute an affidavit that Ms. West prepared for her signature.

Further your Affiant sayeth not.

_____
Dale Vaughan

Subscribed and sworn to before me this __5th__ day of __August 2014__, 2014, by Dale Vaughan, in the District of Columbia.

Dehn Eightel M Salvosa
Notary Public 7527305
Commonwealth of Virginia

My Commission Expires August 31, 2018

_____
Notary Public

My Commission Expires: __08/31/2016__

SA-122

USCA Case #23-3015 Document #2109460

Page 1

Criminal No. 98-329 & 99-348-3

United States vs Hill
United States vs Price

COURT EXHIBIT

| | DESCRIPTION AND REMARKS | MARKED | RECEIVED | WITNESS | SENT TO JURY |
|---|---|---|---|---|---|
| 1 | Notebook by Gov't for Jurors to use. | 2-1-01 | | | |
| 4 | Notes of AUSA's on Andre Murray | 2-1-01 | | Sealed | |
| 3 | Letters from Andre Murray to AUSA Ken Wainstein | 2-5-01 | | Sealed | |
| 2 | Notes of AUSA's on Reginald Switzer | 2-1-01 | | Sealed | |
| 5 | File of Theodore Watson 99-069 Southern Dist Md | 2-13-01 | | | |
| 6 | Def't Carson Proposed Stips | 3-1-01 | | | |
| 7 | AUSA Notes of James Montgomery | 3-6-01 | | Sealed | |
| 8 | Charles Bender's 302 | 4-9-01 | | Sealed | |
| 9 | Eugene Byars 302 | 4-10-01 | | Sealed | |
| 10 | Ronald Sowells 302 | 4-18-01 | | Sealed | |
| 11 | Arthur Rice 302 | 5-2-01 | | Sealed | |
| 12 | Case 92ps001770 P Family Div, Sup Ct. | 5-2-01 | | Sealed | |
| 13 | Affidavit in Support of an App. for Search W | 5-14-01 | | | |
| 14 | James Rochester - Criminal Convictions | 5-22-01 | | | |
| 15-A | Report of Investigation 9-23-94 | 6-6-01 | | | |
| 15-B | MPD Crime scene Examination Evid Rept. | 6-6-01 | | | |
| 15-C | FBI Report of Examination | 6-6-01 | | | |
| 15-D | Results of Examination 9-19-00 | 6-6-01 | | | |
| 16 | 4 documents Re: James Rochester (Davis Contempt) | 6-21-01 | | | |

DEFENDANT'S EXHIBIT
CASE NO. Carson 2255
EXHIBIT NO. 1

SA-123

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | § | |
| | § | |
| V. | § | CASE NO. 1:98-CR-329-03 (RCL) |
| | § | |
| SAMUEL CARSON | § | |

## SECOND UNOPPOSED SUPPLEMENT TO PRIOR SUPPLEMENTAL MOTION TO VACATE

Pursuant to the Rules Governing Section 2255 cases, through his counsel, Kira Anne West, Defendant Samuel Carson hereby files this SECOND SUPPLEMENT to his previously filed supplemental motion to vacate and hereby supplements his previously filed motion pursuant to 28 U.S.C. §2255. Mr. Carson respectfully requests that he be allowed to join and adopt any and all arguments in any filing by co-defendant Jerome Martin.

This motion is filed in accordance with the representations undersigned counsel made on the record at the October 5th, 2018 hearing before this Court.

Respectfully submitted,


_____/s/_____
Kira Anne West
1325 G Street, NW
Suite 500

1

SA-124

Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

Certificate of Service

I hereby certify that on this 31st[th] day of October. 2018, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter:

/s/_____
Kira Anne West

2

SA-125

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 134 of 668

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA                §
                                        §
V.                                      §          CASE NO. 1:98-CR-329 (RCL)
                                        §
SAMUEL CARSON, et. al.                  §
                                        §

## **O R D E R**

Upon consideration of Defendant Carson's  Second Unopposed Motion to supplement his prior 2255 supplements, the Court finds the motion meritorious.  It is therefore ORDERED that the Motion is GRANTED.

SO ORDERED this _____ day of _____, 2018.

_____
ROYCE C. LAMBERTH
United States District Judge

SA-126

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 135 of 668

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLUMBIA**

UNITED STATES OF AMERICA                    :

            v.                                         :            Criminal. No. 98-CR-00329-4 (RCL)

                                                      :

WILLIAM KYLE SWEENEY,                       :

            Defendant                              :

**DEFENDANT, WILLIAM K. SWEENEY'S MOTION FOR DISCOVERY**

Defendant, William Sweeney, ("Sweeney"), by his attorney Eric H. Kirchman, moves the court

pursuant to Rule 6 of the Rules Governing Section 2225 proceedings to enter an order permitting

discovery in this case, and for reasons states as follows:

1. Rule 6(a) provides in part that a court may, for good cause, authorize a party to

conduct discovery.

2. Good cause is shown "where specific allegations before the court show reason to

believe that the petitioner may, if facts are fully developed, be able to demonstrate that he is . . .

entitled to relief." *Bracy v. Gramley,* 520 U.S. 899, 908-09 (1997) (internal quotation marks

omitted).  Good cause is shown even if the movant's allegations support "only a theory . . . [that]

is not supported by any solid evidence" at the time of the discovery request. *Id.* at 908.  Indeed,

"[i]t may well be  . . . that [the movant] will be unable to obtain evidence sufficient to" establish

the claim, but if specific allegations are made which suggest that the movant may be able to

demonstrate a right to relief, "good cause" is established, and the district court has a duty to

allow discovery. *Id.* at 908-09.

3. On August 15, 2001, after a trial that lasted 7 months, Sweeny was convicted of 14

counts including Count 2, Rico Conspiracy.  In convicting Sweeney of this count the jury found

**SA-127**

Racketeering Act 50, a conspiracy to murder Robert Smith a/k/a Butchie, ("Smith") between on or about April 1997, and on or about June 17, 1997, to have been proven. The murder of Smith was one of the cornerstones of the government's theory of Sweeny's alleged liability in the conspiracy.

4. At the time of Smith's murder, Sweeny was in confined at the Prince George's County Detention Center. The government's theory was Sweeney arranged for the murder of Smith, a paid government informant, because of he suspected that Smith was providing the police about criminal activity allegedly involving Sweeney.

4. Prior to the trial of this case, the parties conducted extensive discovery. In addition to all material subject to disclosure under Fed. R. Crim. P. 16(1), Sweeney further requested that the government produce all material in its possession to which he was entitled under *Brady, Jencks* and *Giglio.*

5. Sweeny's Third Motion to Compel Discovery [340], filed on July 17, 2000, sought the information pertaining to Smith to which he was entitled under Brady. At a pretrial hearing on September 27, 2000, the court heard argument on that motion. (Transcript 123-38, September 27, 2000) At the hearing Sweeney argued that as a paid informant, Smith had provided the government with information about the criminal activity of a wide range of people, many of whom could have had no connection to Sweeney or the other people or events involved in this case. All of those people would have had the same motive that the government attributed to Sweeney to murder Smith. The court's response to this argument was that "I think that if the government has any evidence – any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as Brady material. The court went on to grant part of Sweeny's motion with regard to Smith. Moreover at this

SA-128

hearing the government represented that it had no evidence that implicated someone other than the defendants in this case (Transcript 125-137, September 27, 2000)

6. One week prior before the statute of limitations on Sweeny's post-conviction motion was set to expire, on February 13, 2008, prior counsel for Sweeney filed an Emergency Motion for Access to the Entire Court Docket (1015). In the motion, counsel asked the the court to order all court papers and proceedings in this matter be unsealed to allow counsel to be provided with a copy, as needed for effective representation of Sweeny in his post-conviction proceeding. On February 15, 2008, the court granted the motion, and ordered the Clerk to provide copies of any necessary sealed pleadings in the matter to counsel for Sweeney. (Order dated February 15, 2008 1016).

7. On February 19, 2008, counsel filed Sweeney's Motion to Vacate under 28 U.S.C. 2255, in order to preserve his claims, without having had the benefit of time to review the large volume of material that had been unsealed by the court's order.

8. One of the previously sealed documents in this matter obtained by counsel is the government's Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, dated April 12, 1999, which was placed under seal, by the court, on April 6, 1999. This ex parte pleading addressed safety concerns alleged by the government as the basis for moving defendants Hill, Martin, Carson, Sweeney and Proctor from the pretrial confinement at the D.C. Jail to the Northern Neck Regional Jail on or about March 9, 1999.

9. The reason given by the government in its motion was that "Investigation of [the Smith] murder has identified Andre Chappell and Anthony Ricardo Hawkins, a known associate of Samuel Carson, as having murdered Smith." Contrary to the government's representation to

SA-129

the court at the hearing on the motion during September 2000, it appears that the government had evidence as early as 1999, that pointed to 2 people other than Sweeney in the murder of Smith.

10. The government has never produced to the defense any material related to Chappell or Hawkins, disregarding the court's admonition that if the government "has any evidence – any evidence that someone other than a named defendant was responsible for Robert Smith's death, then that evidence would be producible as Brady material."

11. Sweeny is entitled to the information that the government has with regard to Andre Chappell and Anthony Ricardo Hawkins related to the murder of Smith.

12. The facts set forth herein demonstrate the good cause necessary to permit discovery of the requested material. If the government had evidence that Chappell and Hawkins were involved in the murder of Smith, as it claimed in its motion, Sweeny could use this evidence to show that entitled to relief to relief in his post-conviction proceeding, to show that the government violated its obligations under Brady.

13. Sweeney's attorney emailed the attorney for the Government seeking the Government's position on this motion but did not receive a reply.

**WHEREFORE,** Sweeney prays that the court enter an order requiring the government to produce all the information that it has that relates to Chappell and Hawkins involvement in the murder of Smith, and for such other and further relief as is just and proper.

_____/s/_____
Eric Kirchman
D.C. Fed Bar No. MD09002
Attorney for William K. Sweeney
15 West Montgomery Avenue, Suite 205
Rockville, Maryland 20850
(301) 762-2909
Kirchlaw@cs.com

## CERTIFICATE OF SERVICE

I hereby certify, on this 9th day of November 2019, that a copy of the foregoing was served on all parties entitled to notice in this case by the court's filing system and to:

**Pamela S. Satterfield, Esquire**
U.S. ATTORNEY'S OFFICE
555 Fourth Street, NW
Washington, DC 20530-0001

_____/s/_____
Eric H. Kirchman

SA-131

### IN THE UNITED STATES DISTRICT COURT
### FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA     :

    v.           :   Criminal. No. 98-CR-00329-4 (RCL)

                :

WILLIAM KYLE SWEENEY,

                :

    Defendant

### ORDER

**Upon consideration** of William K. Sweeney's Motion For Discovery, good cause having been shown, it is by the court this _____ day of _____, 2015:

**ORDERED,** that William K. Sweeny be, and the same hereby is granted leave to file an Amended Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 28 U.S.C. **§2255.**

             _____
             Royce C. Lamberth
             JUDGE, United States District Court

SA-132

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA      §
     §
V.      §      CASE NO. 1:98-CR-329-03 (RCL)
     §
SAMUEL CARSON      §

## UNOPPOSED SUPPLEMENT TO PRIOR SUPPLEMENTAL MOTION TO VACATE

Pursuant to the Rules Governing Section 2255 cases, through his counsel, Kira Anne West, Defendant Samuel Carson hereby files this SUPPLEMENT to his previously filed supplemental motion to vacate and hereby supplements his previously filed motion pursuant to 28 U.S.C. §2255. Mr. Carson respectfully requests that this Honorable Court consider the holding in Napue v. Illinois, 360 U.S. 264 (1959), when considering certain issues previously raised by Mr. Carson and undersigned counsel in previous filings.

This motion is filed in accordance with the representations undersigned counsel made on the record at the October 5th, 2018 hearing before this Court.

Respectfully submitted,

_____/s/_____
Kira Anne West

SA-133

1

1325 G Street, NW
Suite 500
Washington, D.C. 20005
D.C. Bar No. 993523
202-236-2042
kiraannewest@gmail.com
Attorney for Samuel Carson

Certificate of Service

I hereby certify that on this 28th day of October. 2018, a true and correct copy of the foregoing Defendant's Motion was served via the ECF system on the other counsel registered with ECF in this matter:


/s/_____
Kira Anne West

SA-134

2

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| **v.** | ) | **Case No. 1:98-cr-00329-RCL** |
| | ) | |
| **WILLIAM SWEENEY** | ) | |
| **SAMUEL CARSON** | ) | **FILED UNDER SEAL** |
| **SEAN COATES** | ) | |
| **JEROME MARTIN** | ) | |

### <u>UNITED STATES' OMNIBUS OPPOSITION TO DEFENDANTS'<br>SWEENEY, CARSON, COATES AND MARTIN'S § 2255 MOTIONS<br>TO VACATE, SET ASIDE AND CORRECT SENTENCES</u>

The United States, by and through its attorney, the United States Attorney for the District

of Columbia, respectfully files this Omnibus Opposition to the defendants' motions filed pursuant

to 28 U.S.C. § 2255 to vacate, set aside, or correct their sentences and their supplements to those

motions.  Many of the claims raised by the defendants in their § 2255 motions and supplements

are time barred and/or procedurally barred.  The defendants largely ignore the time and procedural

bars and do not attempt to explain why these bars do not apply.  Further, the defendants' remaining

claims are meritless.  In sum, the Court should summarily deny the defendants' motions for relief.

### PROCEDURAL BACKGROUND

On September 18, 1998, the defendants William Sweeney, Samuel Carson, Sean Coates,

Jerome Martin and several others were charged in a multi-count indictment with narcotics and

racketeer influenced corrupt organization ("RICO") conspiracies, murder and other violent crimes

and violent crime in aid of racketeering ("VICAR") offenses, narcotics trafficking, and weapons

possession [Dkt. 1].[1]  The case became known as the K Street case because much of the criminal

---

[1]   On March 25, 1999, the government filed a superseding indictment [Dkt. 142].  On July 2, 2001, the
government filed a 64-count Second Re-Typed Superseding Indictment [Dkt. 760].

SA-135

activity took place near K Street, S.W. in the District of Columbia. The defendants, alone or collectively, were charged with the murders of 11 people and with conspiring to distribute large amounts of marijuana in the District of Columbia. In its opinion, the United States Court of Appeals for the District of Columbia Circuit ("D.C. Circuit") described the K Street case as a "story of mayhem and disorder in and around the 200 block of K Street, Southwest, in the District of Columbia from the 1980s until 1998." See United States v. Carson, 455 F.3d 336, 339-47 (D.C. Cir. 2006). The D.C. Circuit also observed that the defendants' "drug business led to an astonishing amount of violence and seemingly complete repudiation of civil society and human life." Id. at 339.

Trial began in November 2000 before the Honorable Thomas P. Jackson. The trial lasted more than eight months. The jury began its deliberations in July 2001. In July and August 2001, the jury returned guilty verdicts against the defendants on numerous counts, and not guilty verdicts on several other counts; the jury also found several of the charged racketeering acts proven and some not proven. Between January and February 2002, the Court sentenced each of the defendants to terms of life imprisonment on the narcotics, the RICO conspiracies and the VICAR counts involving murder, as well as lengthy terms of incarceration on the other counts.

The defendants noted timely appeals. On July 21, 2006, the D.C. Circuit affirmed the defendants' convictions. Carson, 455 F.3d 336. On October 23, 2006, the D.C. Circuit denied the defendants' petition for rehearing and for rehearing en banc. On February 20, 2007, the U.S. Supreme Court denied the defendants' petitions for a writ of certiorari. Carson v. United States, 549 U.S. 1246 (2007).

Starting in 2007, the Court began appointing counsel to each of defendants to represent them in these collateral proceedings. On February 5, 2008, Sweeney, through counsel, filed

SA-136

several motions for access to sealed court documents from the trial, noting that his § 2255 motion was due on February 20, 2008 [Dkts. 1013, 1015].[2]  On February 15, 2008, then Chief Judge Thomas Hogan granted Sweeney's motions and ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this matter to counsel for Mr. William Sweeney" [Dkt. 1016]. Between February 18 and 28, 2008, Sweeney, Carson, Coates and Martin filed motions to vacate their convictions pursuant to 28 U.S.C. § 2255 [Dkts. 1017, 1020, 1021, 1023].[3]

In 2010, the government sought additional time to respond to the defendants' § 2255 motions [Dkts. 1050; 1053; 1057].  Between 2010 and 2012, the defendants sought extensions of time in which to file supplements to their respective § 2255 motions, which the Court granted. The government did not oppose the defendants' requests for extensions of time to file their § 2255 supplements, but reserved its right to challenge these filings on timeliness grounds.

On December 20, 2012, the Court held a status hearing with respect to the § 2255 motions filed by Martin, Carson and Sweeney; counsel for defendant Coates was unable to attend.  The Court and the parties discussed the pending motions, the efforts defense counsel had taken to gain access to the voluminous record in this case (from prior § 2255 counsel, appellate counsel and the government), and defense counsels' intent to file supplements to their clients' original § 2255 motions.  The prosecutor informed the Court that the government's trial file consisted of more than

_____

[2]   In those motions, Sweeney requested access to the government's ex parte motion to disqualify trial counsel, Leonard Long, Esquire, and Mr. Long's opposition [Dkt. 1013].  He also requested access to copies of "many other documents" that were filed ex parte or under seal, as well as two motions filed by Kenneth Robinson, Esquire, on October 29, 1998, and a response filed by the Federal Public Defender, A.J. Kramer, Esquire, on December 15, 1998 [Dkt. 1015].

[3]   These filing dates are discussed in more detail infra.  We also note that on May 9, 2013, co-defendant Vincent Hill filed two pro se motions for fair trial in which he claimed that his trial counsel, Christopher Davis, Esquire, was ineffective for failing to advise him to accept the government's plea offer [Dkts. 1116; 1121].  The Court, construing the motions as made pursuant to 28 U.S.C. § 2255, denied them as time-barred in a Memorandum and Order issued November 5, 2013 [Dkt. 1126].

SA-137

100 boxes, but that some of the boxes were missing, and that she was working with counsel to provide them with informal discovery (12/20/12 Tr. 18). The Court also discussed Judge Hogan's Order from February 15, 2008, and noted that while the Order was not an unsealing order, it did have the effect of providing defense counsel with access to the sealed materials in this case (12/20/12 Tr. 24-26).

The Court convened another status hearing on August 29, 2013. At that hearing, defense counsel asked the Court to allow them nine additional months to file any supplements to their original § 2255 motions. Consequently, the Court ordered supplements to be filed by May 29, 2014. Subsequent to that, the Court granted several additional motions for extension of time filed by the defendants. The government did not oppose the defendants' requests, but again reserved the right to make timeliness arguments [Dkt. 1053]. The Court also granted the government's request to file a single omnibus response to the defendants' § 2255 motions and supplements [Dkt. 1057].

Between November 2014 and June 2017, Sweeney, Carson, Coates and Martin filed, through counsel, supplements to their original § 2255 motions.[4] On October 22, 2018, the Court conducted a status hearing during which counsel for the defendants indicated their intention to file additional supplements. Carson filed supplements to his § 2255 motion on October 28, and 31, 2018 [Dkts. 1227; 1230]. Coates filed a motion to join Carson's supplement on October 30, 2018 [Dkt. 1228]. Sweeney filed a supplemental § 2255 motion on October 31, 2018 [Dkt. 1229]. Martin filed a supplement to his § 2255 motion on November 21, 2018 [Dkt. 1233]. On November 9, 2019, Sweeney filed a motion for discovery [Dkt. 1242], and motion for access to his case materials and access to law library [Dkt. 1244].

---

[4] Some of the defendants' supplemental motions were filed under seal and, therefore, do not appear on the docket. Here, the government has filed its opposition under seal for that reason.

SA-138

The government presents a summary of the evidence introduced during the course of this lengthy trial, addresses the timeliness of the claims the defendants raise in their respective § 2255 motions and supplements, explains which claims are procedurally barred, and/or responds to the merits of the claims the defendants raise. For the reasons set forth below, the Court should summarily deny all of the defendants' claims.

## THE GOVERNMENT'S EVIDENCE AT TRIAL

The D.C. Circuit summarized the evidence the government introduced at trial as follows:

> This story begins with the criminal actions of [defendant] Vincent Hill. Several associates of [defendant]s, cooperating with the government either voluntarily or pursuant to plea agreements, testified at trial that they grew up learning to sell drugs from Hill beginning as early as ages eleven to fourteen. One cooperating witness described it as a "big brother/little brother relationship," where he would beat up others at age eleven, get congratulated by Hill, be promoted to the role of "lookout" where he could protect Hill's drug activity, and eventually "graduat[e] into [dealing] drugs as the other guys" did. Hill would sell drugs in Southwest D.C. and have other individuals sell drugs for him, providing binoculars and walkie-talkies so that his underlings could warn him if police were approaching.
>
> By the 1990s, [defendants] and a number of individuals (collectively, the "K Street dealers" or "K Street members"), were selling marijuana in and around the 200 block of K Street, Southwest, which continued through 1998. Over time, the K Street dealers developed an increasingly large and loosely organized drug-selling network. For example, as one seller described it, the group would "go in a sequence," with each seller taking a turn in serving the next arriving buyer. If a buyer "was to pull off with somebody's bag" and without paying, the dealers would "yell down the street" and "before that car could get out of the area somebody would have thrown a brick ... [or] bottle" and, "[i]f someone had a gun at night ... they would actually fire at the car."
>
> The K Street dealers sold marijuana in and around K Street throughout the morning, afternoon, and evening. During 1994 and 1995, [defendant] Hill made the most money out of the group, taking in approximately $200 to $1,000 per day selling drugs. By 1996, [defendant] Hill made roughly $3,000 to $4,000 in illicit profits per week, while [defendants] Coates, Martin, and Sweeney made a little less. In addition to dealing marijuana, [defendants] Carson and Sweeney would help supply other members of the group. Perhaps predictably, [defendants'] drug-dealing was surrounded by a culture of violence and intimidation, which, according to the evidence introduced at trial, grew each year.

i. 1989.

5

SA-139

The widespread violence that runs through this case begins in 1989 with the murder of Larry Wright, a victim in a drug-dealing turf war. A local dealer, Andre Murray, testified at trial that he and Tyrone Brawner sold drugs together at First and P Streets, Southwest, while [defendant] Hill, along with Wayne Perry, sold drugs in another part of the K Street neighborhood. In the beginning of the summer of 1989, Murray testified, Wright was released from prison and resumed dealing drugs, but did so on what Murray and Hill viewed as the wrong side of K Street. A short time later, on the evening of June 29, 1989, Murray heard gunshots fired and saw Hill at the corner of First and O Streets, Southwest, running away. Larry Wright had been murdered.[5]

Several murders followed. In late 1989, Carson, along with another K Street dealer who cooperated with the government, James Montgomery, murdered Maurice Hallman as revenge for a previous fight. According to Montgomery, while Montgomery was "hustling" on Delaware Avenue, Southwest, Hallman punched him, at first in a playful manner and in an effort to show off to [defendant] Hill. Montgomery asked Hallman to stop. When he did not, Montgomery "put [his] stash down and ... came back and ... hit him ... to the body hard." Hallman, Montgomery testified, "got mad" and hit Montgomery on the head with a gun. That altercation prompted Montgomery to tell Hallman, in front of several witnesses, that he was "going to get him." [Defendant] Carson chided Montgomery for having "threatened [Hallman] in front of other people" and suggested that "if something happened to [Hallman], then [Montgomery] would be the first one they would come and get." Montgomery then apologized to Hallman in front of "everybody" so "everybody could see that [they] made up."

That apology did not go far. Montgomery killed Hallman on December 19, 1989. According to his own testimony, Montgomery was in possession of Hallman's gun and used it to lure him to an alley-"somewhere where [he] could kill him." Carson accompanied Montgomery. Another individual, Leonard Hyson, was present and would not leave, despite Carson's request that Hyson "go ahead about his business." Montgomery shot Hallman until he ran out of bullets. When he was done, he saw Hyson lying on the ground, with Carson walking away. Montgomery later told Carson that when he was shooting Hallman, he had not heard Carson's gun go off. Carson told him "that's because he's sharp" and that "he hit [Hyson] in the head six times before he hit the ground."[6]

ii. 1990.

---

[5]   An eyewitness, Reginald Switzer, testified to seeing Hill stand behind Wright just before Wright was shot. Another individual recounted that shortly after the shooting, Hill had blood on the lower part of his leg, and remarked, "if anybody come looking for me, I was right here gambling with you all." In threatening people in the neighborhood in later years, Hill made various statements suggesting he had killed Wright.

[6]   Another individual, Raymond Washington, repeatedly discussed with others the death of Hallman and Hyson. Montgomery told Carson that Washington was "running his mouth about that situation." Montgomery thought "that [they] should kill" Washington, which Carson did not initially want to do himself. But one day, when Montgomery believed Washington was "in a good position" such that he could "hit him where he is now," Carson told Montgomery: "[i]f you can do it, then do it." When Montgomery got his gun, Washington was gone, and Montgomery "just left it alone" after that.

Norman Yusuf Simmons, then only fifteen years-old, was kidnapped by [defendant] Coates and other individuals on April 28, 1990. Simmons was riding a bike in a park when two individuals approached him with semi-automatic weapons. They forced Simmons into a car, drove him to a mall, and eventually to an apartment complex. Simmons was placed into a trunk, and then into a second car. He was driven to another apartment, asked at gunpoint for contact information from his family, and then put in a closet. Simmons was eventually taken to a wooded area and bound with black electrical tape. Thereafter, his captors brought him to a parking lot, where he was informed that his family had paid a ransom.

iii. 1991.

In 1991, [defendant] Carson stored an AK-47 and other guns at the home of Teresa Thomas, with whom he was in a romantic relationship. Seventeen year-old Teresa lived with two infant daughters, her eighteen year-old sister Terita Lucas, and another woman, Crystal Bobbitt. Carson asked Thomas to return the AK-47, but according to Montgomery, Thomas "kept giving [Carson] excuses" about the gun. [defendant] Martin accused Carson of "going soft over a broad" and suggested that Thomas was "going to end up letting [Carson] get killed by his own gun." The father of one of Thomas's daughters was a man from the 5th and O Street neighborhood, and apparently Martin was concerned that this man would take Carson's guns from Thomas's apartment and use them against him. Carson told Bobbitt that he did not "trust" the man having "a gun on him" and thus "had to stay strapped" when he visited. Bobbitt saw about five guns stored in a bag under Thomas's bed.[7]

On March 22, 1991, Bobbitt returned to the apartment after having spent the previous night with family in Maryland. Entering with her child, she saw what appeared to be "all this juice in the room," and soon discovered that she was, in fact, seeing not juice, but blood. Bobbitt found Thomas dead, with Thomas's daughter still alive under Thomas's body. Bobbitt ran to seek help. Police officers arrived to find Thomas and Lucas dead, with three young children alive in the apartment. There were no signs of a forced entry. Pictures of Carson that had been in the apartment were missing.

According to Montgomery, Carson initially denied being responsible for the double murder. Later, Carson described to Montgomery what happened. Carson went to Thomas's apartment and "kept asking her about the gun," and Thomas "kept on saying that she'll get the gun for him, but she couldn't get it right now because it was behind a lot of stuff, and she didn't want to wake her kids up." Thomas "kept giving him excuses," and so Carson went to the bathroom, came out, and "shot her in the head." Next, he murdered Lucas. Lucas was in her bed, and as she was "lifting up, and before she opened her eyes," Carson "shot her in the head, and she just laid back down." Carson then fled to a waiting car driven by Clifton Edwards.

---

[7]   One of Thomas's friends testified that she spoke with Thomas the night Thomas was killed. Thomas appeared to be "very fussy" and "frantic." Thomas had recently broken up with Carson, and the friend recalled seeing Thomas, a week earlier, take a "quite heavy" gym bag from under her bed and run with it downstairs.

7

**SA-141**

Carson shot and killed Anthony Fortune in August 1991, after a dispute between Martin, Carson, and Fortune in a craps game. Carson described the killing to Montgomery, recalling that he had shot Fortune and after Fortune fell Carson "went over top of him [sic] and hit him some more." A witness saw Martin and Carson earlier, and heard Martin talking about how he "didn't like Tony Fortune robbing people, and [how Fortune] would kill your mother." Later that evening, the witness saw Carson "walking towards Tony Fortune, shooting." Carson "then stood over [the] top of him and shot him."[8]

Curtis Buchmon, a friend and associate of [defendant]s Martin and Carson, was murdered on September 3, 1991. [Defendants] Martin and Carson, along with others, believed that Buchmon was killed in retaliation for Fortune's murder. Martin, Montgomery, and others engaged in an initial unsuccessful attempt to, from Montgomery's perspective, go "shoot somebody" and "get some get-back for them killing" Buchmon. They ended up shooting at a white minivan, but fled after the van sped off. On September 10, 1991, their next attempt to seek revenge ended in a shootout with the MPD. The group found two people they were looking for, but their targets began to run away. Soon thereafter, a car passed the group's van, and began shooting at them. But Montgomery saw more shots coming at them from another direction. Someone who looked like a security guard was shooting at Martin, and Martin, along with other occupants of the van, returned fire.

The "security guard" was one of four MPD officers who witnessed the shoot-out and returned fire into the van. Police found the van abandoned in the 1300 block of 45th Place, Southeast, riddled with bullet holes. A D.C. driver's permit issued to "Jerome Martle," apparently belonging to [defendant] Jerome Martin, was found in the driver's side door. Police found six sets of fingerprints in the van, three of which matched the known fingerprints of Montgomery and [defendants] Martin and Carson.

iv. *1992.*

Several months later, there was yet another shooting. When [defendant] Coates heard that a man named Michael Jones was planning to testify against one of Coates's associates, Coates told others that "we need to get him." Coates, along with other individuals, shot Jones multiple times on June 28, 1992. Jones survived.

v. *1993.*

Coates, Sweeney, and others continued to engage in violent acts during 1993. At about 2:00 a.m. in the early morning hours of a day in October 1993, a resident of Oxon Hill, Maryland was awakened to the sound of four individuals outside. When she looked out her window, she saw four men arguing with Anthony Pryor, who was in a truck. The men demanded that Pryor get out of the truck. When Pryor complied, the men began to fight him. Pryor started to run, until he was shot twice by one of the assailants and kidnapped. The witness did not know the identity of the kidnappers, but saw the door to the trunk of the assailants' car left in the street after they fled with the victim. A witness

---

[8]   Years later, Arthur Rice indicated to Carson that he had always thought Martin shot Fortune and had recently heard that it was Carson. Carson laughed, and responded: "well, now you know."

SA-142

living at the Arthur Cappers housing complex in the District of Columbia testified that at around 3:00 a.m. he heard noises outside. He saw a car pull up with [defendant] Sweeney and other individuals in it. The car "had no trunk." Sweeney and others got out, took off their clothes, and tossed them into a trash can. Police arrived to find the car without a trunk door and various items around it. There were bloodstains on the rear bumper, and clothing items, car parts, and duct tape were scattered all around. Fingerprints from [defendant] Coates were found on the car. Coates later told Montgomery that he and others "had robbed ... somebody ... and ... put them in the trunk" and "the person they kidnapped" had "ended up breaking the trunk off the car."[9]

vi. 1994.

On September 26, 1994, a witness heard several gunshots fired outside his home on K Street and saw [defendant] Sweeney running away from a craps game with a gun in his hand. The witness went outside and saw Donnell Whitfield dying. Another government witness talked to Sweeney prior to Whitfield's death, and Sweeney indicated that Whitfield had "smacked him" at a club and that he planned to kill Whitfield because of that incident. Sweeney told the witness after the shooting that he had, in fact, killed Whitfield.[10]

vii. 1995.

K Street member Donald Nichols testified that in 1995 [defendant] Hill informed [defendant] Martin, along with Nichols, Switzer, Paul Franklin, and Gary Price, that James Coulter "needed to be killed because he was hot." Coulter was shot in May 1995. After Coulter was shot, Nichols heard Hill tell Martin that Martin "should have used two guns" and lament the fact that Martin's gun had jammed. Montgomery later heard Martin telling Coates and Carson, "they keep trying to push it on me," and that "they [were] trying to say that [Martin] had something to do with [Coulter] getting shot." Martin claimed, however, that "they can't prove it" because he "had a mask on." Martin attempted to discourage witnesses from testifying about the shooting of Coulter. Later, Hill told an MPD Detective that "all your snitches are going to die, including your little buddy who is over at the hospital now with four holes in him under the name of John Doe ... in Room 2299." Coulter

---

[9] Another witness testified that, before Pryor's kidnapping, he had heard of a plan, led by appellant Hill, to kidnap Pryor because "[h]e had plenty of money" and "[t]hey wanted the money." Sweeney later suggested to a cell-mate that Hill "kept playing him all the time," promising assailants in the Pryor kidnapping, for example, $5,000 for their participation, yet they received nothing.

[10] Montgomery recounted that Sweeney later bragged to Montgomery and appellants Carson and Coates about having "hit [Whitfield] a few times" and having gone "over top of him and hit him some more," after Whitfield previously "smacked [Sweeney] in the face." The term "hit," Montgomery explained, was usually used by the group to mean that someone "shot" someone. Two other witnesses recounted that Sweeney made substantially the same admission to them. A firearms expert testified that ammunition casings recovered from the scene of the Whitfield murder matched a gun recovered from Sweeney's grandmother's house. The expert concluded that bullets recovered from the scene and Whitfield's body "could have been fired" from that gun, but was not able to "positively determine" that this had been the case. The expert noted that the serial number on the barrel of the gun did not match the serial number on the frame of the gun, which "suggests that this barrel ... could have been replaced."

9

**SA-143**

was in the hospital, registered under the name of John Doe, in what was supposed to have been an undisclosed room.

### viii. 1996.

On June 26, 1996, a witness for the government standing in the 200 block of K Street saw Carson shoot Ulysses English. Another witness heard shots fired, saw English fall, and saw Carson running away. Carson was upset, Montgomery recounted at trial, that English told Buchmon's killers where Carson's mother resided. Carson told Montgomery that if Montgomery saw English in the K Street neighborhood, he should let him know, or, "if [Montgomery] s [aw] him in a good position, to hit him"-that is, to "kill him." When English survived, Carson told Montgomery that he did not think English "was going to snitch."

A few months later, on August 30, 1996, Demetrius Hunter was approached by Carson and Coates about where they could buy approximately seven pounds of marijuana. Hunter took Carson and Coates, along with Ronald Horns, to an apartment in Northeast Washington, D.C. The four went into the apartment and met individuals Hunter referred to as "a Jamaican named Mark" and "a Jamaican named Joe." Joe informed the group that he did not have all the marijuana they needed in the apartment and offered to get it from another location. Carson gave Joe $5,000 and left with Joe to retrieve the marijuana. The residents of the apartment started "playing" with firearms, according to Hunter, when Coates received a call from Carson. Carson informed Coates that he had been sitting in front of another apartment building waiting for Joe to return, but Joe was nowhere to be found. Carson returned with Raymond Washington, and Mark asked Carson and Washington to come back the next day. Mark, whose real name was Popa Mark Phillip, did not "know what's up with Joe" because Joe had "never do [ne] that before." But as the group began to head out, Carson pulled out a gun and opened fire on Mark and, Hunter recounted, "another Jamaican." Washington pulled out a gun as well. The group fled the building, but Washington continued to chase Mark outside and then shot him.

A robbery that year by K Street members resulted in the triple murders of Alonzo Gaskins, Darnell Mack, and Melody Anderson. Carson, Sweeney, and other K Street members went to Las Vegas in 1996 to see the Evander Holyfield/Mike Tyson boxing match. Carson saw Gaskins win about $50,000 in Las Vegas. Carson, Montgomery, and Sweeney discussed robbing Gaskins, hoping to get $250,000 and divide it three ways. They planned to use money from the Gaskins robbery to kill Thomas Fields and others from a nearby neighborhood on L Street.

Montgomery explained that the group conducted significant surveillance on Gaskins in Temple Hills, Maryland. Then, on the day of the attempted robbery, Sweeney brought a .40 caliber Glock firearm and a stun gun, and after further preparation, the group arrived at Gaskins's craps house. Montgomery and Sweeney jumped out of the group's van, but Coates stayed behind. Without attempting to rob Gaskins, Sweeney shot Gaskins, shot Mack, and then shot Anderson on his way out. When confronted by Montgomery as to why

SA-144

he started shooting everyone, Sweeney claimed that Gaskins was reaching for a weapon, which Montgomery disputed.[11]

A feud with individuals from L Street also developed in 1996. K Street member Charles Edwards was killed by L Street member Joey Simmons in July 1996 because Edwards had publicly expressed, according to a government witness, "where he could sell his weed," telling others that "nobody runs no blocks" and he "can sell this weed anywhere." Simmons and Ronald Sowells, another L Street member, were shot in response to Edwards's shooting. [Defendants] Hill and Carson, along with other K Street members, were also shot during the feud.

On October 30, 1996, Coates shot Sowells at the Anacostia Metro Station. An associate of Sowells, Eric Gordon, previously shot Coates's associate and co-defendant, Hill, and Sowells was now in the same car that he had used to drive Gordon to and from that shooting. Carson pulled up to Sowells's car and Coates began firing. Sowells returned fire until his gun jammed. Coates later admitted to Montgomery that he shot Sowells with Montgomery's gun.[12]

The year 1996 continued to be violent. K Street members attempted to kill several witnesses, resulting in one murder. During this time period, [defendant] Martin, along with Antonio Knight, had been arrested for murdering Curtis Edwards, who had been in a car with Keith Jones and Richard Burton. While in jail pending trial, Martin kept in contact with Paul Franklin. According to Franklin, in discussing the Edwards murder, Martin spoke "of two people, a female by the name of Robin, and a guy by the name of Flip." Martin wanted to know where Robin lived and wanted Franklin to pass that information on to Carson, which he did. Although Franklin was aware that Martin "wanted Robin dead" and that Robin was a witness at Martin's trial, Franklin testified that he showed Carson where Robin's home was. Montgomery also testified that Franklin told him Martin was trying to get in contact with Montgomery and needed Montgomery "to get on top of some witnesses for him."[13] Carson enlisted Montgomery's help in murdering Flip, but they were ultimately unsuccessful.[14]

---

[11]  Police recovered twelve .40-caliber shell casings from the scene. Sweeney's fingerprint was found on the storm door of the house. Sweeney later complained to another inmate that Montgomery "was telling on them" about "a case that he was in in [sic] Maryland, a triple homicide." Sweeney threatened to kill Montgomery if he encountered him. Carson later complained to another that the triple murders were about "a money issue, a robbery" and if Montgomery "would never have opened up his mouth," they "would have beat the case."

[12]  Coates believed that he had killed Sowells because Sowells stopped returning fire. Coates and Montgomery fought over who would get rid of the gun, but eventually Coates showed Montgomery where the gun was, and Montgomery threw it in the Potomac River by Fort McNair. Police recovered the gun from where Montgomery disposed of it.

[13]  An inmate incarcerated with Martin testified that Martin "said he wasn't concerned about [the murder case against him], because he had someone that was going to take care of that."

**SA-145**

[Defendant] Carson was concerned, Montgomery recounted, that they "needed to stay on top" of "getting at these witnesses" and needed to "approach it like a full time job." One day, Carson picked up Montgomery, bought some gardening gloves at Safeway so they would not leave fingerprints, got his gun, and left to find Robin and one other witness, Chrissy. Carson and Montgomery went to 37th Place, where they heard Robin and Chrissy would be at a party, and went inside a vacant house to wait for their arrival. Chrissy, whose real name was Chrishauna Gladden, arrived with several friends. According to Montgomery, about an hour later when Chrissy left the party, Carson ran out, put his hood on, and fired several shots into Chrissy. Chrishauna Gladden died that night of October 5, 1996. An FBI Special Agent working on the Edwards case testified that other witnesses "were scared to death" after the murder of Gladden and several refused to testify. Martin and Knight were acquitted.

Around the same time, Maurice Proctor, indicted with [defendant]s in this case, and Kenneth Adams were charged for a 1994 murder of Phil Clayborne, who was believed to be testifying against two K Street members. According to Arthur Rice, an inmate incarcerated with Proctor, Proctor suspected that now Adams "was cooperating [with the police] because he kept leaving the jail for no reason." After Adams was released from prison, Rice and Proctor got on the phone with Carson, who believed Adams was living in Northern Virginia.

As described by Montgomery, Carson eventually got Adams's phone number and was able to retrieve his address in Centreville, Virginia. Carson and Montgomery made six to eight trips to Centreville in planning and attempting to murder Adams, sometimes accompanied by Sweeney and Coates. Montgomery testified at trial about various attempts being thwarted.[15] The K Street members' attempt on Adams's life eventually ended when a cooperating witness informed the government that the K Street group knew Adams was in Centreville and was planning to kill him.

ix. 1997.

K Street members sought to kill yet another government witness in 1997, but this time proved successful. When the FBI opened its investigation in 1995, Robert Smith, one of the main suppliers of marijuana to Southwest, was immediately a focus of the Bureau's inquiry. Smith was arrested after a sting operation and agreed to cooperate, describing for the FBI his drug-related activities and several crimes of violence committed by [defendant] Sweeney, his relative, and Sweeney's associates. An FBI Special Agent conducting the investigation testified that Smith and the Bureau tried "to make sure that nobody on the

---

[14]   After "three or four" attempts to find Flip, they gave up during their last attempt because they found a crowd of people at the location Flip was reported to be at, and, according to Montgomery, they "didn't know exactly how many people in the crowd had guns." Carson was concerned that they "might be outgunned."

[15]   For example, because the group was concerned about driving into and out of Virginia carrying a gun, they buried a gun in the woods near Adams's home. But when they returned one day to use it, it was missing.

SA-146

street thought that [Smith] was cooperating." That effort proved unsuccessful. After Sweeney was arrested for the triple murders in Temple Hills, he realized, according to Montgomery's testimony, that Smith was the only person he told about the murders. Carson told Montgomery that if the group "hit [Smith], then [the government] don't have no case, but eventually, they was going to come and get us, if we don't hit" Smith. After that, Carson and Montgomery would look for Smith when they were out and about in Southwest. Although they saw him a number of times, he was never alone.

On June 16, 1997, Carson borrowed Montgomery's car. Later, Montgomery heard that Smith had been shot on Half Street, Southwest. Carson returned that evening and, after discussing the fact that Smith had been killed, told Montgomery, "man, trust me, we're all right," and returned Montgomery's car keys. Carson directed Montgomery to stay away "from up Half Street" and "not to drive" the car if he "didn't have to." Smith was shot eleven times, seven of which were in the head.

Carson, 455 F.3d at 339-47.

## THE DEFENSE EVIDENCE AT TRIAL

The defense strategy was to discredit the government's witnesses and, in particular, the cooperating witnesses. To this end, the defendants called witnesses who offered testimony intended to suggest that the government's witnesses were liars. For example, cooperating witness Arthur Rice had testified in the government's case-in-chief that when he was arrested for the murder of Steve Dunbar, his lawyer was paid for by Sweeney, Eric Jones, Robert Smith, and possibly Hill (Rice 4/24/01PM Tr. 90-91). Sweeney sought to impeach Rice's credibility by calling Rice's attorney, Thomas Farquhar, who testified that Rice's aunt or grandmother paid his fee (Farquhar 6/6/01PM Tr. 17-19). Rice had also testified about two times that he, Sweeney, and Clifton Edwards had gotten into a shoot-out at Kentucky Courts (Rice 4/24/01PM Tr. 33-42). Sweeney called two witnesses who had been associated with Kentucky Courts and who denied having ever been shot at in the circumstances about which Rice testified (Winston 6/6/01PM Tr. 24-25; Mason 6/6/01PM Tr. 36-38).

Sweeney also sought to explain the presence of his fingerprint on the door of the craps house in Temple Hills, Maryland, where the murders of Gaskins, Mack, and Anderson occurred

13

in 1996, by calling his uncle, Sean Owens, to testify that Sweeney had taken Owens to that craps house on an earlier occasion (Owens 6/6/01PM Tr. 52-55). Sweeney also called the police officer who first responded to the scene and took a lookout from a hysterical Cinama Hawkins (Taylor 6/12/01PM Tr. 60, 61, 70-72). At that time, the officer put in his notes that Hawkins described both assailants as about six feet tall, although Sweeney is much shorter than that (Taylor 6/12/01PM Tr. 65, 70-72).

Coates sought to impeach the credibility of cooperating witness Ronald Sowells, who had identified Coates as the person who shot him at the Anacostia metro station in 1996 (Sowells 4/18/01AM Tr. 15), by calling an FBI agent to testify that when he interviewed Sowells, Sowells did not know who shot him (McCauley 6/6/01PM Tr. 30). Coates also called an MPD officer who had been on the scene after the shooting and had filled out a police report stating "no" in response to the question whether the perpetrator was known to the victim (Powell 6/18/01AM Tr. 75, 88). Likewise, the defendants charged with the Pryor kidnapping in 1993 called Pryor himself to deny that he knew the identity of any of his kidnapers and, specifically, to say that Sweeney could not have been among them because they were all tall and Sweeney is short (Pryor 6/11/01AM Tr. 19, 25, 27).

Carson and Martin attacked the credibility of Charlene Wilson, an FBI informant who testified that she saw Carson shoot Anthony Fortune in 1991 and then drive away with Martin, by showing that the shell casings found on the scene could not have come from a firearm shooting from the direction in which Wilson placed Carson (Holmes 6/14/01PM Tr. 72-76). Carson also called the FBI agent responsible for working with Wilson, who testified that Wilson had been paid for information before she told the FBI about the Fortune shooting (Warrener 6/14/01PM Tr. 28, 30).

14

**SA-148**

The defense also called witnesses to suggest that the cooperating witnesses had committed crimes charged to the defendants.  Carson called former drug addict Deborah Cloutterbuck to testify that she saw James Montgomery pulling a sweathood over his head and walking toward Robert "Butchie" Smith on Half Street in Southwest just moments before Smith was killed in 1997 (Cloutterbuck 6/13/01AM Tr. 13-19).[16]

As an alibi, Martin called Curtis Buchmon's sister, Tonya Varner, to testify that Martin was with her, reminiscing about their childhood with Buchmon, on the night of the shoot-out with police at 60th and East Capitol Streets in 1991 (Varner 6/21/01PM Tr. 84-88).

None of the defendants testified.

## ARGUMENT

### A.    Legal Principles For § 2255 Proceedings

Under 28 U.S.C. § 2255, a defendant may move the sentencing court to vacate, set aside, or correct its sentence if the defendant believes that his sentence was imposed "in violation of the Constitution or laws of the United States, or that the court was without jurisdiction to impose such sentence, or that the sentence was in excess of the maximum authorized by law, or is otherwise subject to collateral attack." 28 U.S.C. § 2255(a). "The circumstances under which such a motion will be granted are limited due to the premium placed on the finality of judgments and the opportunities that defendants have to raise most of their objections during trial or on direct appeal. 'To obtain collateral relief a prisoner must clear a significantly higher hurdle than would exist on

---

[16]    The defense also sought to impeach James Montgomery by showing that he had lied previously to law enforcement.  Carson called an FBI agent who had interviewed Montgomery in 1991, long before his arrest in this case, and to whom Montgomery had reported that Wayne Perry had murdered Teresa Thomas and Terita Lucas (Yow 6/18/01PM Tr. 19-20).  The government and the defense questioned both Agent Lisi and Montgomery about the timing of Montgomery's disclosures and his failure to truthfully disclose his participation in the triple murder and the murders of Hallman and Hyson the first time he was debriefed by the FBI (Montgomery 3/14/01PM Tr. 29, 34-35, 40-41; Lisi 6/21/01AM 41-49, 54-55, 65-72).

15

SA-149

direct appeal.'" United States v. Burwell, 160 F. Supp.3d 301, 303 (D.D.C. 2016) (quoting United States v. Frady, 456 U.S. 152, 166 (1982)); see also United States v. Pollard, 959 F.2d 1011, 1020 (D.C. Cir. 1992). It is the defendant's burden to show that he is entitled to relief under § 2255. See, e.g., United States v. Bell, 65 F. Supp.3d 229, 231 (D.D.C. 2014).

**B.      Section 2255 Generally Has a One-Year Period of Limitations.**

In 1996, as part of the Antiterrorism and Effective Death Penalty Act of 1996 ("AEDPA"), Congress enacted a one-year period of limitations on the filing of § 2255 motions. See Mayle v. Felix, 545 U.S. 644, 654 (2005) ("In enacting the AEDPA in 1996, Congress imposed for the first time a fixed [one year] time limit for collateral attacks in federal courts on a judgment of conviction."). Under § 2255(f), a defendant generally must file a § 2255 motion within one year of the date on which his conviction becomes final. See Dodd v. United States, 454 U.S. 353, 357 (2005) (recognizing that "[i]In most cases, the operative date from which the limitation period is measured will be. . . the date on which the judgment of conviction becomes final"). "Finality attaches when [the Supreme] Court affirms a conviction on the merits on direct review or denies a petition for a writ of certiorari, or when the time for filing a certiorari petition expires." Clay v. United States, 537 U.S. 522, 527 (2003).

Here, the Supreme Court denied the defendants' petitions for a writ of certiorari on February 20, 2007. Carson v. United States, 549 U.S. 1246 (2007). **Thus, the defendants had one year from that date – until February 20, 2008 – to timely file their § 2255 motions.** Where an incarcerated defendant files a § 2255 motion pro se, the operative filing date is the date on which the defendant placed his motion in the prison mail system to be sent to the court. See Houston v. Lack, 487 U.S. 266, 270-71 (1988) (articulating "prisoner mailbox rule").

16

SA-150

The one-year limitations period also can commence from the date on which the Supreme Court "initially recognize[s]" a new right and that right was "made retroactively applicable to cases on collateral review." Section 2255(f)(3). In that situation, a defendant has one year to file a § 2255 motion from the date on which the Supreme Court recognized the new right. See Dodd, 454 U.S. at 357 (clarifying that the limitations period under § 2255(f)(3) begins on the date the right was initially recognized by the Supreme Court, not the date on which the new right was made retroactive to cases on collateral review).

In addition, the one year limitations period in § 2255 can commence from "the date on which the facts supporting the claim or claims presented could have been discovered through the exercise of due diligence." Section 2255(f)(4).

Otherwise untimely claims can be considered if they "relate back" to the claims raised by the defendants in their original and timely filed § 2255 motions. Fed. R. Civ. P. 15 prescribes the manner in which civil pleadings, like § 2255 motions, may be amended and supplemented. See United States v. Hicks, 283 F.3d 380, 383 (D.C. Cir. 2002) (holding that a § 2255 motion may be amended under the terms of Rule 15); see also Mayle, 545 U.S. at 655 (applying Rule 15 in the § 2254 context). "An amendment of a pleading relates back to the date of the original pleading when. . . the claim. . . asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading..." Fed. R. Civ. P. 15 (c) (2).

SA-151

However, "[a]n amended habeas petition. . . does not relate back (and thereby escape AEDPA's one-year time limit for filing pleadings) <u>when it asserts a new ground for relief supported by facts that differ in both time and type from those the original pleading set forth.</u>" <u>Mayle</u>, 545 U.S. at 650 (emphasis added). The AEDPA's one-year limitation period would have "slim significance" if relation back was permitted "simply because [the newly-asserted claims] relate to the same trial, conviction, or sentence as a timely filed claim." <u>Id.</u>, at 662. Hence, claims raised in an amendment to a § 2255 motion will be considered timely "only [if] the claims added. . . arise from the same core facts as the timely filed claims, and not [if] the new claims depend on events separate in 'both time and type' from the originally raised episodes." <u>Id.</u>, at 659. Here, as explained in more detail below, many of the claims the defendants raise in their supplemental filings are new grounds for relief and, therefore, should be denied as time-barred because they do not relate back to any of the claims raised in their original (and timely-filed) § 2255 motions.

There is an exception to AEDPA's statute of limitations based upon "actual innocence" if the defendant can show that "a fundamental miscarriage of justice would result from a failure to entertain the claim." <u>See</u> <u>McQuiggen v. Perkins</u>, 569 U.S. 383, 396 (2013) (quoting <u>McCleskey v. Zant</u>, 499 U.S. 467, 495 (1991)). To satisfy the miscarriage of justice exception, the defendant "must show that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." <u>Id.</u> at 399 (quoting <u>Schlup v. Delo</u>, 513 U.S. 298, 327 (1995)).

## C.   Claims Not Raised On Appeal are Procedurally Barred.

Where a defendant fails to raise an available challenge on direct appeal, he is procedurally barred from raising that claim in a subsequent collateral attack unless he shows cause for his failure to do so and prejudice as a result of his failure. <u>Bousley v. United States</u>, 523 U.S. 614, 622 (1998); <u>McCleskey v. Zant</u>, 499 U.S. at 493-94; <u>United States v. Frady</u>, 456 U.S. 152, 168 (1982); <u>United</u>

18

SA-152

States v. Pettigrew, 346 F.3d 1139, 1144 (D.C. Cir. 2003). To establish cause, a defendant must demonstrate "some objective factor external to the defense [that] impeded counsel's efforts to raise the claim," such as government interference or that the factual or legal basis for the claim was not reasonably available. McCleskey, 499 U.S. at 493-94 (internal quotation omitted). Once the defendant has established cause, he must show "'actual prejudice' resulting from the errors of which [he] complains." Frady, 456 U.S. at 168. That is, the defendant must show "not merely that the errors at his trial created a possibility of prejudice, but that they worked to his actual and substantial disadvantage, infecting his entire trial with error of constitutional dimensions." Id. at 170 (emphasis in original).[17]

## D.   The General Standard for Assessing Ineffective Assistance of Counsel Claims

### 1.   The Standard as It Applies to Trial Counsel's Performance.

To succeed on an ineffective assistance of counsel claim, a defendant must prove that: (1) his counsel's performance was deficient, and (2) his counsel's deficient performance prejudiced his defense. Strickland v. Washington, 466 U.S. 668, 687 (1984).

To establish "deficient performance," defendant must show that his attorney "made errors so serious that counsel was not functioning as the 'counsel' guaranteed by the Sixth Amendment." Strickland, 466 U.S. at 687. To meet this standard, the defendant must show that, in light of all

---

[17]   As an exception to this rule, a defendant may raise an ineffective assistance of counsel claim after the appeal is concluded, regardless of whether he could have raised that claim on direct appeal. Massaro v. United States, 538 U.S. 500, 504 (2003).

In addition, there is an exception to procedural bar based upon "actual innocence." Bousley, 523 U.S. at 616, 623-24. This exception is "designed to excuse procedural barriers to relief in only a 'narrow class' of 'extraordinary instances when a constitutional violation probably has caused the conviction of one innocent of the crime.'" United States v. Baxter, 761 F.3d 17, 28 (D.C. Cir. 2014) (quoting McClesky v. Zant, 499 U.S. at 494). In this context, "actual innocence" means factual innocence, not mere legal insufficiency. Bousley, 523 U.S. at 623 (citation omitted). None of the K Street defendants asserts "actual innocence" as a means to overcome procedural bar so the government does not discuss this further.

the circumstances as they appeared at the time of the conduct, "counsel's representations fell below an objective standard of reasonableness," or "prevailing professional norms." Id. at 688, 690; Nix v. Whiteside, 475 U.S. 157, 165 (1986). "'Surmounting [this] high bar is never an easy task.'" United States v. Brinson-Scott, 714 F.3d 616, 623 (D.C. Cir. 2014) (quoting Padilla v. Kentucky, 559 U.S. 356, 371 (2010)). In other words, the defendant must establish that his "counsel's representation fell below an objective standard of reasonableness," i.e., "prevailing professional norms." Strickland, 466 U.S. at 688, 690; see also Hinton v. Alabama, 571 U.S. 263, 273 (2014); Nix, 475 U.S. at 165; United States v. McDade, 699 F.3d 499, 506 (D.C. Cir. 2012). "As a general matter, the bar of objective reasonableness is set rather low." United States v. Hurt, 527 F.3d 1347, 1356 (D.C. Cir. 2008); see also Yarborough v. Gentry, 540 U.S. 1, 8 (2003) (per curiam) ("The Sixth Amendment guarantees reasonable competence, not perfect advocacy judged with the benefit of hindsight."). The Sixth Amendment thus does not require perfection. Hurt, 527 F.3d at 1357.

Because "it is all too tempting for a defendant to second guess counsel's assistance after conviction or adverse sentence," courts must "indulge a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance; that is, the defendant must overcome the presumption that, under the circumstances, the challenged action 'might be considered sound trial strategy.'" Strickland, at 689 (quoting Michael v. Louisiana, 350 U.S. 91, 101 (1955)); accord Bell v. Cone, 535 U.S. 685, 698 (2002); United States v. Vyner, 846 F.3d 1224, 1227 (D.C. Cir. 2017). Indeed,

> Judicial scrutiny of counsel's performance must be highly deferential. . . . A fair assessment of attorney performance requires that every effort be made to eliminate the distorting effects of hindsight, to reconstruct the circumstances of counsel's challenged conduct, and to evaluate the conduct from counsel's perspective at the time.

SA-154

Strickland, 466 U.S. at 689; Vyner, 846 F.3d at 1227; United States v. Curry, 494 F.3d 1124, 1130 (D.C. Cir. 2007).

"Even the best criminal defense attorneys would not defend a particular client in the same way." Strickland, 466 U.S. at 689 (citations omitted). There are ultimately "countless ways to provide effective assistance in any given case." United States v. Morrison, 98 F.3d 619, 623 (D.C. Cir. 1996) (citing Strickland, 466 U.S. at 689-90).

In addition to proving "deficient performance," defendant must also affirmatively satisfy the second prong of Strickland, and prove that this deficiency caused prejudice "so serious as to deprive the defendant of fair trial, a trial whose result is reliable." Strickland, 466 U.S. at 687, 693; see also Lockhart v. Fretwell, 506 U.S. 364, 369-70 (1993) (defendant must demonstrate that counsel's deficient performance rendered the proceeding "fundamentally unfair or unreliable"). To meet this standard, the defendant must show that there is a "reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." United States v. Udo, 795 F.3d 24, 30 (D.C. Cir. 2015) (quoting Strickland, 466 U.S. at 694); see also Payne v. Stansberry, 760 F.3d 10, 13 (D.C. Cir. 2014); United States v. Cassell, 530 F.3d 1009, 1011 (D.C. Cir. 2008). "It is not enough for the defendant to show that the errors had some conceivable effect on the outcome of the proceeding." Strickland, 466 U.S. at 693. Rather, establishing a "reasonable probability" requires that "the likelihood of a different result must be substantial, not just conceivable." Harrington v. Richter, 562 U.S. 86, 112 (2011); see also Brinson-Scott, 714 F.3d at 624.

"Failure to make the required showing of either deficient performance or sufficient prejudice defeats an ineffectiveness claim." Strickland, 466 U.S. at 700 (emphasis added). Consequently, the reviewing court need not even "address both components of the inquiry if the

defendant makes an insufficient showing on one." Id. at 697. "If it is easier to dispose of an ineffectiveness claim on the ground of lack of sufficient prejudice, which we expect will often be so, that course should be followed." Id.; see also Brinson-Scott, 714 F.3d at 623.

### 2.   The Standard as It Applies to Appellate Counsel's Performance.

Appellate counsel is not required to raise all non-frivolous arguments on appeal if he determines, using his professional judgment, not to do so. Jones v. Barnes, 463 U.S. 745, 751 (1983). As the Jones Court pointed out, "[e]xperienced advocates since time beyond memory have emphasized the importance of winnowing out weaker arguments on appeal and focusing on one central issue if possible or at most on a few key issues." Id. at 751.

Indeed, appellate counsel "need not (and should not) raise every non-frivolous claim" on appeal, and may instead select among those claims "in order to maximize the likelihood of success on appeal." Smith v. Robbins, 528 U.S. at 288. "This process of winnowing out weaker arguments on appeal and focusing on those more likely to prevail, far from being evidence of incompetence, is the hallmark of effective appellate advocacy." Smith v. Murray, 477 U.S. 527, 536 (1986) (quoting Jones, 463 U.S. at 751-52); Sellan v. Kuhlman, 261 F.3d 303, 317 (2d Cir. 2001); see also Bell v. Jarvis, 236 F.3d at 164 ("reviewing courts must accord appellate counsel the presumption that he decided which issues were most likely to afford relief on appeal") (internal quotation marks omitted). A defendant may establish constitutionally inadequate performance only by showing that appellate counsel "omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker." United States v. Fox, 1996 WL 359574, *2 (4th Cir. 1996); Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994); Lawrence v. Branker, 517 F.3d 700, 709 (4th Cir. 2008) ("Generally, only when ignored [appellate] issues are clearly stronger than those presented, will the presumption of effective assistance of counsel be overcome.")

SA-156

(internal citation omitted).   Even if a defendant succeeds in showing that his appellate counsel was objectively unreasonable, the defendant must still "show a reasonable probability that, but for his counsel's unreasonable failure to [raise a particular issue], he would have prevailed on his appeal." Smith v. Robbins, 528 U.S. at 285.

**E.    Summary Denial is Appropriate Where the Defendants' Claims are Vague and Conclusory.**

The Court can summarily deny claims that are vague and conclusory. See United States v. Taylor, 139 F.3d 924, 933 (D.C. Cir. 1988) (stating that "some claims of ineffective assistance of counsel can be resolved on the basis of the trial transcripts and pleadings alone" and noting that "the motion may fail to allege facts or circumstances upon which the elements of constitutionally deficient performance might properly be found") (internal quotation marks and citation omitted); United States v. Smith, 172 F.3d 922, 1998 WL 939501, *2 (D.C. Cir. Dec. 14, 1998) (upholding summary denial of § 2255 claims because the claims were conclusory and lacked "any factual predicate"); Mitchell v. United States, 841 F. Supp.2d 322, 328 (D.D.C. 2012) ("district courts have the power to deny § 2255 motions on the grounds that they offer only bald legal conclusions with no supporting factual allegations"); see also United States v. Fisher, 38 F.3d 1144, 1147 (10th Cir. 1994) (noting that although defendant's pro se allegations must be liberally construed, court is "not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments").

SA-157

## THE DEFENDANTS' § 2255 CLAIMS AND THE GOVERNMENT'S RESPONSE

### A.      William Sweeney

#### 1.      Sweeney's § 2255 Claims

At trial, Steven Kiersh, Esquire, represented Sweeney.  Mr. Kiersh also represented the defendant on appeal.  On February 19, 2008, Sweeney, now represented by Jenifer Wicks, Esquire, filed a motion to vacate conviction pursuant to 28 U.S.C. § 2255 [Dkt. 1017].  This motion was timely.

In his § 2255 motion, Sweeney raises the following 17 claims, which relate to the alleged ineffective assistance of his trial and appellate counsel, trial court error, and prosecutorial error:

**A.1.**      trial counsel was ineffective for failing to call an expert witness to testify about Sweeney's Tourette's syndrome (p.7);

**A.2**      trial counsel was ineffective for failing to call an alibi witness, Anthea Henry, relating to the murder of Donnell Whitfield (pp. 7-8);

**A.3**      trial counsel was ineffective for failing to recall in the defense case government witnesses, Reginald Switzer, Charlene Wilson and Ronald Sowells (pp. 8-10);

**A.4**      trial counsel was ineffective for failing to impeach government witness James Montgomery with alleged and unspecified prior inconsistent statements and bias material (p. 10);

**A.5**      trial counsel was ineffective for failing to provide the trial court with legal authority to cross-examine government witness John Venable about dismissed charges against him and the fact that Venable allegedly matched the description of a suspect in an unrelated murder (p. 10);

**A.6**      trial counsel was ineffective for failing to seek admission of evidence that consisted of alleged admissions by a party opponent in the form of a pleading filed by the government, Grand Jury testimony of witnesses, and the testimony of potential defense witnesses Wesley Smith and Frederick Miller (pp. 10-11);

**A.7**      trial counsel was ineffective for failing to make a Massiah demand and to litigate issues related to alleged "jailhouse confessions" of certain government witnesses, including Charles Bender, Donald Nichols, Eugene Byars, Theodore Watson, Reginald Switzer and Arthur Rice (p. 11);

SA-158

**A.8** trial counsel was ineffective for failing to object to the Court's _ex parte_ communication with Juror No. 3 and appellate counsel was ineffective for failing to raise this issue on appeal (p. 11);

**A.9** trial counsel was ineffective for failing to deliver an opening statement at the beginning of the trial (p. 11);

**A.10** trial counsel was ineffective for failing "to corroborate [unspecified] jail records with [unspecified] Court records that allegedly show[ed] the same time period of detention, after the government counsel crossed the business records custodian on the alleged unreliability of the records" (pp. 11-12);

**A.11** counsel was ineffective for failing to object to and appeal the trial court's ruling with respect to certain testimony and hearsay statements from the medical examiner, a police officer about fingerprint evidence in the 1996 Maryland triple murder, reputation evidence about Wayne Perry, SA Lisi's testimony about statements by Robert Smith, and alleged "constant hearsay testimony, material to the government's case and never proven by competent evidence that Lil Ty kill[ed] Dihru" (p. 12);

**A.12** appellate counsel was ineffective for failing "to note sections of sealed matters for the [appellate] court to review" on appeal (pp. 12-13);

**A.13** counsel was ineffective for failing to challenge at sentencing and on appeal the defendant's consecutive sentences for violations of 18 U.S.C. § 924(c) on grounds that the sentences were in violation of the Double Jeopardy Clause (pp. 13-14);

**A.14** the trial court erred when it failed to appoint a second attorney to represent Sweeney at trial and counsel was ineffective for failing to appeal this issue (pp. 14-15);

**A.15** trial counsel was ineffective in his attempts to introduce alleged exculpatory evidence about the 1994 Donnell Whitfield murder, alleged exculpatory evidence in the form of grand jury testimony from Cheree Owens and John Pinkney implicating Dennis Green and others in the 1996 Maryland triple homicide, the testimony of Wesley Smith (to whom Robert Smith allegedly confessed his involvement in the triple homicide), and the testimony of Frederick Miller regarding "Little Ty's confession to killing Glenn Jenkins" (p. 15);

**A.16** Sweeney was denied his right to counsel due to his trial counsel failure to retain portions of the trial and appellate file (including some discovery and materials provided by the government during trial) in preparation for the filing of this motion (p. 15);

**A.17** the government allegedly "engaged in deliberate misrepresentations and other prosecutorial misconduct, including but not limited to the nondisclosure and late disclosure of _Brady_ information and the use of perjured testimony" relating to James Montgomery, Arthur Rice and "jailhouse confessions" (pp. 16-17).

SA-159

Sweeney's § 2255 Motion, at 7-16. Also in his § 2255 motion, Sweeney incorporates by reference the claims raised by his co-defendants in their post-conviction filings related to their trial and appellate counsel's ineffectiveness. Id. at 17. This is designated Claim **A.18**. He also requests discovery and an evidentiary hearing. Id. at 17.

In December 2012, more than four years after Ms. Wicks filed Sweeney's § 2255 motion, Eric Kirchman, Esquire, and Shana Madigan, Esquire, entered their appearances on behalf of Sweeney [Dkts. 1105; 1110].[18]

Approximately two years later, on November 28, 2014, Sweeney, through new § 2255 counsel, filed a supplement to his original § 2255 motion.[19] This supplement is timely. Therein, Sweeney raises the following 20 claims, asserting alleged Brady/Giglio violations by the government, trial court error, and ineffectiveness of trial/appellate counsel:

**A.19**      the government violated Brady/Giglio by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding. This claim involves information about cooperating witness Theodore Watson that was contained in the prosecution file of Watson in another jurisdiction (pp. 11-24, 52-55);

**A.20**      the government violated Brady/Giglio by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding. This claim involves information about cooperating witness James Montgomery that was contained in Special Agent Lisi's notes relating to FBI interviews of Montgomery about the murder of Timothy Benton or, alternatively, the trial court abused its discretion in failing to order the material it reviewed ex parte turned over to the defense (pp. 24-25, 52-55);

**A.21**      the government violated Brady/Giglio by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February

---

[18]   On December 16, 2011, the Court granted Ms. Wicks' motion to withdraw and appointed the Federal Public Defender ("FPD") to represent the defendant [Dkt. 1083]. The FPD later withdrew.

[19]   This pleading does not appear on the docket because it was filed under seal. The motion and attachments relied on sealed materials to which defendant's § 2255 counsel had been granted access through court order issued February 15, 2008 [Dkt. 1016]. While this Court later granted Sweeney's motion to unseal his supplement and attachments by Order dated October 5, 2018 [Dkt. 1224], these documents do not appear on the public docket.

SA-160

18, 2008, during the course of this § 2255 proceeding. This claim involves information about cooperating witness Charles Bender that was contained in FBI 302's relating to Bender's statements to agents that Martin confessed to the murder of Anthony Fortune in 1991 (that Carson was charged with). Alternatively, the trial court abused its discretion in failing to order the material it reviewed ex parte turned over to the defense (pp. 25-26, 52-55);

**A.22** the government violated Brady/Giglio by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding. This claim involves information about cooperating witness Arthur Rice that was contained in FBI 302's relating to Rice's statements to law enforcement that he was present when Martin and Carson killed Leonard Hyson and Maurice Hallman where James Montgomery testified at trial that he and Carson killed Hallman and Hyson. Alternatively, the trial court abused its discretion in failing to order the material it reviewed ex parte turned over to the defense (pp. 26-27, 52-55);

**A.23** the government violated Brady/Giglio by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding. This claim involves information about cooperating witness, Andre Murray, that was contained in a detective's notes that Murray told law enforcement that Petey Johnson killed Robert Smith in 1997 to get back at Sweeney, who allegedly killed Keith Johnson (Petey Johnson's brother). Alternatively, the trial court abused its discretion in failing to order the material it reviewed ex parte turned over to the defense (pp. 27-28, 52-55);

**A.24** the government violated Brady/Giglio by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding. This claim involves information about the murder of Robert "Butchie" Smith in 1997. Alternatively, the trial court abused its discretion in failing to order the material it reviewed ex parte turned over to the defense (pp. 28-46, 52-55);

**A.25** the trial court abused its discretion in sealing a government pleading (Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, filed by the government on April 2, 1999), and law enforcement notes that showed others had a motive to kill, or killed, Robert Smith. This information was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding (pp. 46-55);

**A.26 (relates back to A.12)** appellate counsel was ineffective for failing to challenge the D.C. Circuit's denial of appellate counsel's motion to gain access to sealed portions of the trial record (pp. 55-57);

**A.27** trial counsel was ineffective for failing to request that the trial court review the government's file concerning Theodore Watson (pp. 57-62);

SA-161

**A.28 (relates back to A.12)**      appellate counsel was ineffective for failing to challenge on appeal the trial court's rulings with respect to its review of sealed materials (pp. 62-64);

**A.29**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to James Montgomery (pp. 64-65);

**A.30**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to Arthur Rice (pp. 65-66);

**A.31**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to Andre Murray (pp. 66-67);

**A.32 (relates back to A.1)**      trial counsel was ineffective for failing to call an expert witness at trial concerning Sweeney's alleged diagnosis of Tourette's syndrome (pp. 67-69);

**A.33 (relates back to A.14)**      the trial court erred in failing to appoint second counsel to represent Sweeney at trial and trial counsel was ineffective for failing to retain co-counsel and to argue that Sweeney was entitled to be represented by two attorneys at trial (pp. 69-76);

**A.34 (relates back to A.14)**      trial counsel was ineffective for failing to request a continuance after his second counsel was removed by the trial court (pp. 76-77);

**A.35 (relates back to A.14)**      trial counsel was ineffective for failing to argue that Sweeney was entitled to two attorneys pursuant to 18 U.S.C. § 3500 (pp. 78-79);

**A.36**      counsel was ineffective for failing to object at trial and challenge on appeal the trial court's in camera procedure with respect to sealed materials (pp. 79-80);

**A.37**      trial counsel was ineffective under the "cumulative error" doctrine (pp. 80-82);

**A.38 (relates back to A.14)**      the trial court violated Sweeney's right to be represented by two attorneys pursuant to 18 U.S.C. § 3500 (pp. 82-83).

On February 25, 2015, Sweeney filed a second and amended supplement raising, for the most part, the same claims that he raised in his first supplemental November 28, 2014, pleading.[20] This supplement is untimely. The second supplement appears to be substantially the same as Sweeney's first supplement, but contains different section headings, numbering, pagination and several additional exhibits (Exhibits 7 to 12). Sweeney does not explain the reason for the two

---

20    Counsel filed this pleading under seal and it does not appear on the docket.

28

filings and any differences between the two.  The claims Sweeney raises in his second supplement are as follows:

**A.39 (same as A.19)**      the government violated <u>Brady/Giglio</u> by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding.  This claim involves information about government witness, Theodore Watson, that was contained in the government's prosecution file of Watson (pp. 14-27, 57-60);

**A.40 (same as A.20)**      the government violated <u>Brady/Giglio</u> by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding.  This claim involves information about government witness, James Montgomery, that was contained in Special Agent Lisi's notes relating to the FBI's interviews of Montgomery about the murder of Timothy Benton.  Alternatively, the trial court abused its discretion in failing to order the material it reviewed <u>ex parte</u> turned over to the defense (pp. 27-28, 57-60);

**A.41 (same as A.21)**      the government violated <u>Brady/Giglio</u> by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding.  This claim involves information about government witness, Charles Bender, that was contained in FBI 302's relating to Bender's statements to agents that Martin confessed to the murder of Anthony Fortune (that Carson was charged with).  Alternatively, the trial court abused its discretion in failing to order the material it reviewed <u>ex parte</u> turned over to the defense (pp. 28-30, 57-60);

**A.42 (same as A.22)**      the government violated <u>Brady/Giglio</u> by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding.  This claim involves information about government witness, Arthur Rice, that was contained in FBI 302's relating to Rice's statements to law enforcement that he was present when Martin and Carson killed Leonard Hyson and Maurice Hallman, where James Montgomery testified at trial that he and Carson killed Hallman and Hyson.  Alternatively, the trial court abused its discretion in failing to order the material it reviewed <u>ex parte</u> turned over to the defense (pp. 30-31, 57-60);

**A.43 (same as A.23)**      the government violated <u>Brady/Giglio</u> by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding.  This claim involves information about government witness, Andre Murray, that was contained in a detective's notes that Murray told law enforcement that Petey Johnson killed Robert Smith to get back at Sweeney, who allegedly killed Keith Johnson (Petey Johnson's brother).  Alternatively, the trial court abused its discretion in failing to order the material it reviewed <u>ex parte</u> turned over to the defense (pp. 31-32, 57-60);

**A.44 (same as A.24)**      the government violated <u>Brady/Giglio</u> by failing to disclose information that was sealed during the trial, but was later released to the defendants pursuant

29

SA-163

to an order on February 18, 2008, during the course of this § 2255 proceeding.  This claim involves information about the murder of Robert "Butchie" Smith.  Alternatively, the trial court abused its discretion in failing to order the material it reviewed <u>ex parte</u> turned over to the defense (pp. 32-51, 57-60);

**A.45 (same as A.25)**      the trial court abused its discretion in sealing a government pleading (Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants, filed by the government on April 2, 1999, and law enforcement notes that showed others had a motive to kill, or killed, Robert Smith.  This information was sealed during the trial, but was later released to the defendants pursuant to an order on February 18, 2008, during the course of this § 2255 proceeding (pp. 51-57);

**A.46 (relates back to A.12, same as A.26)**      appellate counsel was ineffective for failing to challenge the D.C. Circuit's ruling with respect to its denial of appellate counsel's motion to gain access to sealed portions of the trial record (pp. 60-62);

**A.47 (same as A.27)**      trial counsel was ineffective for failing to seek permission from the trial court to review the government's file concerning Theodore Watson (pp. 62-67);

**A.48 (same as A.28)**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to James Montgomery (pp. 67-68);

**A.49 (same as A.29)**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to Charles Bender (pp. 68-69);

**A.50 (relates back to A.30)**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to Arthur Rice (pp. 69-70);

**A.51 (relates back to A.31)**      appellate counsel was ineffective for failing to seek appellate review of the trial court's review of sealed material relating to Andre Murray (pp. 70-71);

**A.52**      trial and appellate counsel were ineffective for failing to challenge the trial court's <u>in camera</u> procedure with respect to its review of sealed material (pp. 71-73);

**A.53 (relates back to A.1 and A.32)**      trial counsel was ineffective for failing to call an expert witness at trial concerning Sweeney's alleged diagnosis of Tourette's syndrome (pp. 73-75);

**A.54 (relates back to A. 14, A.33-A.35, A.38)**      trial counsel was ineffective for failing to argue that Sweeney was entitled to be represented by two attorneys at trial (pp. 75-82);

**A.55 (relates back to A. 14, A.33-A.35, A.38)**  trial counsel was ineffective for failing to request a continuance after his second counsel was removed by the trial court (pp. 82-83);

**A.56 (relates back to A. 14, A.33-A.35, A.38)**  trial counsel was ineffective for failing to argue that Sweeney was entitled to two attorneys pursuant to 18 U.S.C. § 3500 (pp. 83-85);

SA-164

**A.57 (relates back to A. 14, A.33-A.35, A.38)**   the trial court violated Sweeney's right to be represented by two attorneys pursuant to 18 U.S.C. § 3500 (pp. 85-86);

**A.58 (relates back to A. 14, A.33-A.35, A.38)**   appellate counsel was ineffective for failing to challenge the trial court's ruling that he was not entitled to two attorneys at trial (pp. 86-87);

**A.59 (same as A.37)**      Sweeney was denied effective assistance of counsel, at trial and on appeal, under the cumulative error doctrine (pp. 87-89);

**A.60 (relates back to A.13)**      Sweeney adopts arguments raised by co-defendant Coates relating to the stacking of his § 924(c) sentences (p. 89);

**A.61**      Sweeney adopts arguments raised by co-defendant Carson in his § 2255 motion and supplements in their entirety (p. 89).

On October 31, 2018, Sweeney filed a third supplement to his § 2255 motion [Dkt. 1229].

This supplement is untimely.  He raises the following two new claims:

**A.62**      his sentences on the drug conspiracy counts violate the 8th Amendment because he was a minor during some of the time of the RICO conspiracy (pp. 1-3);

**A.63**      Sweeney adopts the arguments raised by Martin in his supplemental § 2255 motion, which is a Johnson claim (p. 3).

On November 9, 2019, Sweeney filed a motion for discovery seeking materials from the government relating to the murder of Robert "Butchie" Smith [Dkt. 1242].  The defendant's motion is based upon counsel's access to previously sealed documents, including an ex parte notice filed by the government on April 12, 1999 (Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants), in which the government represented that persons other than Sweeney and Carson -- Andre Chappell and Anthony Ricardo Hawkins -- murdered Smith.  The defendants gained access to this sealed materials when then Chief Judge Hogan ordered it released to them on February 18, 2008.

31

**SA-165**

## 2.    The Government's Response to Sweeney's § 2255 Claims

As noted, on February 19, 2008, Sweeney (through Ms. Wicks) filed his motion to vacate conviction pursuant to 28 U.S.C. § 2255 [Dkt. 1017].  Thus, this motion is timely because it was filed before the one-year limitations period ended on February 20, 2008.  The government addresses the 18 claims he raises in that motion, infra.

On November 28, 2014, and February 25, 2015, Sweeney untimely filed supplements to his § 2255 motion [filed under seal, not on docket].  The 43 claims raised by Sweeney in his first and second supplements fall into three categories:  1) claims duplicative of those that he raised in his timely-filed § 2255 motion; 2) claims based upon materials that were unsealed by Chief Judge Hogan on February 15, 2008; and 3) entirely new claims.  The government will address Sweeney's duplicative claims because they essentially re-state his timely claims.  Sweeney's claims in his November 28, 2014 and February 25, 2015 supplements that are based upon access to previously sealed materials claims are untimely because they were filed more than one year after the defendant gained access to this material on February 15, 2008.[21]  See § 2255(f)(4).  The new claims Sweeney raises in his first and second supplements are also time-barred because they do not "relate back," that is, they do not arise from the same core facts as his timely filed claims.

---

[21]    On February 15, 2008, Chief Judge Thomas Hogan granted Sweeney's motion to unseal certain documents and ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this matter to counsel for Mr. William Sweeney."  Based upon their pleadings, counsel for the other defendants also gained access to this material.  None of the defendants or their counsel set forth the date or dates on which they actually obtained the materials.  Under a strict reading of the one-year limitation period, the defendants had until February 15, 2009 to file timely § 2255 motions based upon their access to material that was sealed at the time of the trial, but later unsealed during this course of these § 2255 proceedings.

Without the actual dates on which the defendants obtained access to the sealed materials, the government submits that it may be reasonable to build in an additional 90 or 120 days from the date of Chief Judge Hogan's February 15, 2008, Order.  Therefore, the limitations period would run on May 15, 2009 (90 days), or June 15, 2009 (120 days), respectively.  However, Sweeney filed his claims based upon this material more than five and six years after these dates.  Thus, even erring on the side of caution in terms of determining the end of the limitations period, Sweeney's supplemental filings are time-barred.

SA-166

On October 31, 2018, Sweeney filed a third supplement in which he raises an Eighth Amendment claim, based upon the Supreme Court's decision in Miller v. Alabama, 567 U.S. 460 (2012), and seeks to adopt Martin's Johnson claim [Dkt. 1229]. The 8th Amendment claim is untimely because it should have been filed on or before June 25, 2013, one year after Miller v. Alabama was decided on June 25, 2012. The Johnson claim is meritless. See infra, pp. 120-26.

### a.     Claims A.1, A.32 and A.53– Trial Counsel Was Not Ineffective for Failing to Call a Tourette's Syndrome Expert Witness.

Sweeney claims that his trial counsel was ineffective for failing to call an expert witness, Dr. Jonathan Pincus, to explain to the jury that Sweeney suffered from Tourette's Syndrome. Sweeney's § 2255 Motion, at 7; Sweeney's First Supplement, at 67-69, Exhibit 11 (Pincus Affidavit); Sweeney's Second Supplement, at 73-75, Exhibit 10 (Pincus Affidavit). In his Affidavit dated February 17, 2008, Dr. Pincus states that he examined Sweeney on December 10, 1999, at the request of trial counsel and that he "recalled" that Sweeney suffered from Tourette's Syndrome. He further states that if he had testified, he would have explained to the jury about Tourette's Syndrome and the "individual characteristics" in Sweeney's case, that he would have opined that Sweeney's tic symptoms during trial would have been less pronounced than five to ten years earlier, and that the tic symptoms Sweeney displayed "during a moderately low stress event such as a trial would be less than those displayed by him during a high stress event, such as a violent incident." According to Sweeney, Dr. Pincus' opinion that a "high-stress event," such as the 1996 triple murder in Maryland, would have produced "more pronounced tic symptoms" would have contradicted government witness Cinama Hawkins' testimony that none of the assailants

33

SA-167

displayed "physical or verbal tics" during the triple murder and that there was a reasonably probability of a different result at trial. Id.[22]

Preliminarily, we note that Sweeney fails to identify any portions in the record that substantiate his claim that he displayed "tic symptoms" in front of the jury. Therefore, Sweeney has failed to meet his burden of proving that trial counsel's performance was deficient for failing to call an expert to explain how Sweeney's "tic symptoms," if any, were less pronounced in 2001 (during the trial) than five to ten years earlier (the triple murder occurred in 1996). Moreover, without any support in the record that Sweeney was displaying "tic symptoms" in front of the jury, he has failed to show a reasonable probability that the outcome of the trial would have been different had Dr. Pincus been called as an expert witness. Finally, the defendant has failed to overcome the presumption that his counsel's actions were sound trial strategy. See United States v. Vyner, 846 F.3d 1224, 1227 (D.C. Cir. 2017) (citing Strickland, 466 U.S. at 489, and holding that the defendant must overcome the presumption that defense counsel's actions were not sound trial strategy).

---

[22] Cinama Hawkins was an eyewitness to the 1996 triple murder in Maryland. Hawkins testified that on the night of the triple homicide, she was with Gaskins, Mack and Anderson at Gaskins' home. As the foursome stood outside Gaskins' front door, Gaskins "fidgeted" with his keys (Hawkins 4/2/01AM Tr. 37). Hawkins turned to her right and saw "two gentlemen with ski masks and guns" (Hawkins 4/2/01AM Tr. 37-38). She went "straight in and kneeled down or squatted down by the T.V. and covered [her] face with [her] hands" (Hawkins 4/2/01AM Tr. 39). Hawkins heard "muffled voices," but "couldn't hear exactly what they were saying" (Hawkins 4/2/01AM Tr. 40). Then, she heard gunshots; her ears were "ringing" (id.). After the shots stopped and she heard the assailants leave, she got up and saw Anderson lying dead on the porch outside the front door (Hawkins 4/2/01AM Tr. 41). Prince George's County Police Corporal Robert Taylor encountered Hawkins shortly after the murders and described her as "very distraught" and "emotional" (Taylor 6/12/01PM Tr. 69). Hawkins told Corporal Taylor that "her friends had been shot" by assailants with black guns, wearing black clothing and black ski masks (Taylor 6/12/01PM Tr. 70, 72). When trial counsel asked Ms. Hawkins on cross-examination whether she heard any of assailants making a "barking sound" or "a sound like he was clearing his throat," during the event, she responded, "No. My ears were just ringing from the gunshots" (4/2/01AM 75). When counsel asked whether she heard those type of sounds before the gunshots, she also responded, "No" (id.).

34

SA-168

Further, Sweeney acknowledges that trial counsel elicited from several lay witnesses descriptions of Sweeney's alleged "disorder" to the jury. He argues that Dr. Pincus' testimony would have corroborated these witnesses' testimony and, thus, refuted Hawkins' testimony, creating reasonable doubt with respect to the triple murder charges. This argument fails. Some witnesses did so testify; however, other witnesses did not notice Sweeney manifesting any symptoms of Tourette's syndrome or a "nervous order," under a presumably stressful situation.

Thus, Anthony Pryor, who was kidnapped by Sweeney, Coates and others in October 1993, testified for the defense that Sweeney was <u>not</u> one of his kidnappers because none of Pryor's assailants exhibited any tics:

> Q: That night when you were struggling with those people outside your house who were trying to kidnap you, was William Sweeney out there?
>
> A: He couldn't have been because he has got a little – what do you call it? He make a noise every five seconds. He has a disorder (demonstrating.) He does that all the time. So I would have picked him out immediately when I was trying to go around the circle trying to figure out a voice or whatever. . . and, plus, the guys were all tall and fat. There were no small guys like that.[23]
>
> Q: Was there anybody out there who matched Mr. Sweeney's physical condition or who made that noise that you said he made?
>
> A: No, sir.

(Pryor 6/11/01AM Tr. 25). In closing, trial counsel argued that Pryor's testimony showed that Sweeney was "not the guy who did it" because Pryor knew Sweeney and knew "he's got Tourette's" (6/27/01 Tr. 16). The jury nonetheless convicted the defendant on this count.

Dorene Key, a government witness who had known Sweeney for a couple years, testified on cross-examination that he had a "nervous condition" and that, in describing him to a police

---

[23]   Pryor testified that Sweeney "has always been short and stocky" (Pryor 6/11/01AM Tr. 25).

35

**SA-169**

officer, she said that Sweeney "cleared his throat a lot" (Key 4/23/01PM Tr. 50; Deloatch 4/23/01PM Tr. 95; Deloatch 4/24/01AM Tr. 23).[24]

James Montgomery, a government cooperator, testified that when he was in the van with Sweeney, Coates and Carson before the triple homicide, Sweeney "kept making that noise [from] his Tourette's" and Carson "kept telling him, 'not now. Not now, man, not now'" (Montgomery 3/14/01AM Tr. 45-46; Montgomery 3/14/01PM 74-75, 81-82).

Defense witness Shaheem Johnson testified he saw Sweeney at a craps game at Gaskins' house a week or two before the triple homicide (Johnson 6/12/01PM Tr. 85). Sweeney "stood out in [his] mind [] because he [had] this little repetitious. .. thing that he make[s] with. . . himself" (Johnson 6/12/01PM Tr. 86).

On the other hand, Prince George's County Police Inspector Charles Fobbs testified that after he arrested Sweeney in April 1997 on a warrant charging him with the triple homicide, Sweeney was "very cool and calm" during an interview, and said, "Detective, do I look like a murderer to you" (Fobbs 4/3/01 Tr. 18). According to Inspector Fobbs, Sweeney did not "bark" (Fobbs 4/3/01 Tr. 19). Sergeant Dwight Deloatch also interviewed Sweeney the same evening and noted that Sweeney was "very relaxed and calm" and showed no signs of nervousness (Deloatch 4/3/01AM Tr. 43).[25]

Thus, as shown above, the jury heard conflicting evidence about whether Sweeney's alleged disorder manifested itself during "high-stress events." Moreover, Sweeney's trial counsel

---

[24] Key's testimony at trial involved the 1993 Pryor kidnapping.

[25] Contrary to Sweeney's assertion, Sgt. Deloatch did not testify that Sweeney's Tourette's syndrome symptoms were noticeable. First Supplement, at 69. Rather, Sgt. Deloatch testified that when he interviewed a witness, Dorene Key, **she** described Sweeney as someone who "cleared his throat a lot" and that Sweeney had told her that he had a "nervous condition" (Deloatch 4/24/01AM Tr. 23-24).

did ask Hawkins on cross-examination whether she heard any barking or throat clearing noises from any of the assailants before or during the event, to which she responded, "No." Sweeney has not shown that if trial counsel had attempted to impeach Hawkins' denial with testimony from Dr. Pincus, that Dr. Pincus' expert opinion would have had any impact on the jury. As Hawkins described the events before and during the murders, she was kneeling down, with her hands covering her face. While she could hear the two gunman talking, they were wearing masks and their voices were muffled. She then heard a number of gunshots. Under these circumstances, her "failure" to detect "throat clearing" or other noises from Sweeney, one of the gunman, was understandable and reasonable.[26] Furthermore, the evidence was mixed that Sweeney had verbal tics during times of stress. Hence, Sweeney has not shown that it is reasonably probable that the jury would have acquitted him of the triple murders had Dr. Pincus been presented to impeach Hawkins' account that she heard no unusual noises from one of the gunman either before or during the event.

Moreover, the government's evidence of Sweeney's involvement in the triple homicide was strong and confirms that Dr. Pincus' proffered testimony would not have made a different outcome reasonably probable. Government cooperating witness James Montgomery, the primary witness, was an eyewitness to the three murders. Montgomery testified that in the fall of 1996, Sweeney, Carson, and a couple of other K Street members went to Las Vegas to see the Evander

---

[26] Sweeney also alleges that Dr. Pincus' testimony would have "bolstered" Hawkins' original description to police that the assailants were six feet tall. Sweeney's First Supplement, at 69 n. 20. While Deloatch testified that when he asked Hawkins, "how tall were they?, she said "just said about six feet," but she "didn't say both" (Deloatch 6/12/01PM Tr. 65). At trial, Hawkins described one of the men described as "very short," "about 5'5" or 5'6," while the other man was "taller" (Hawkins 4/2/01AM Tr. 39). The government introduced other evidence of Sweeney's height, that is, his identification, seized from his girlfriend's apartment, which stated that his height was 5'6" (Lisi 4/3/01AM Tr. 60). In addition, of course, the jury would have seen Sweeney in court and been able to ascertain his height for themselves.

SA-171

USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 180 of 668

Holyfield/Mike Tyson fight (Montgomery 3/14/01AM Tr. 16).   After the trip, Carson told Montgomery that they had seen someone they knew as "Lonnie" (Gaskins) win about $50,000 in Las Vegas (Montgomery 3/14/01AM Tr. 16).   Knowing that Gaskins lived in Temple Hills, Maryland, and had a craps house there, Carson, Montgomery, and Sweeney discussed robbing Gaskins and sharing the proceeds (Montgomery 3/14/01AM Tr. 17-18).   Carson, Montgomery, and Sweeney planned to use some of the money from the robbery to buy guns and go after the L Street leader, Thomas Fields (Montgomery 3/14/01AM Tr. 19).

After spending some time surveilling the craps house, eventually the group gathered up one .40-caliber Glock and one stun gun and took off for Temple Hills in a rental van, with Carson driving (Montgomery 3/14/01AM Tr. 23-24, 26, 28).   When they did not see Gaskins's car, they went to pick up Coates, who knew Gaskins and would be able to go into the craps house to see if he was there (Montgomery 3/14/01AM Tr. 34).   When they returned to the craps house with Coates, they saw Gaskins and Mack leave the house with Anderson and Hawkins, get into a gray car, and drive away (Montgomery 3/14/01AM Tr. 39-40).   The group went to Montgomery's mother's house and made some face masks, then stole a license plate from another car to put on the rental van, before returning to the craps house (Montgomery 3/14/01AM Tr. 42, 45).   Gaskins, Mack, and the two women returned in the gray car and parked (Montgomery 3/14/01AM Tr. 46). The plan was for Montgomery, Sweeney, and Coates to jump out and go in, but when Montgomery and Sweeney left the van, Coates did not (Montgomery 3/14/01AM Tr. 48).   Sweeney had the Glock, while Montgomery had the stun gun (id.).   They ran up on the group as the group was entering the house, pushing everyone inside except for one of the women, Anderson, who remained outside the front door (Montgomery 3/14/01AM Tr. 49-50).   Before even attempting to rob

Gaskins, Sweeney shot Gaskins, then shot Mack, and fled out the door, shooting Anderson, who had remained outside (Montgomery 3/14/01AM Tr. 51-53).

Once back in the van, Montgomery began arguing with Sweeney about the shooting, while Sweeney claimed that Gaskins had been reaching for something (Montgomery 3/14/01AM Tr. 62). Carson told the group that it should go no further than them, because Hill was friends with Mack and would have them all "hit" if he found out (Montgomery 3/14/01AM Tr. 68). Later, Carson mentioned that the newspaper had reported that Gaskins had seventy $100 bills in his pocket, which Carson guessed was probably what he was reaching for (Montgomery 3/14/01AM Tr. 70).

Other evidence corroborated Montgomery's account. From the scene, police recovered twelve .40-caliber shell casings, which a firearms identification expert opined had all been fired by one .40-caliber handgun, and which bore markings consistent with having been fired by a Glock (Clelland 4/2/01PM Tr. 46; Casper 4/3/01PM Tr. 32-33). Police also lifted a latent print from the inside of the storm door of the house, which matched the known prints of Sweeney (Clelland 4/2/01PM Tr. 17, 49; Clark 4/2/01PM Tr. 72).

After Sweeney was arrested for the triple murder, he admitted to Charles Bender that Montgomery "was telling on a case that he was in in Maryland, a triple homicide," and that he would kill Montgomery if he saw him (Bender 4/4/01AM Tr. 70-71). Similarly, after Carson's arrest on the triple murder, Carson admitted to Eugene Byars that the murders were the result of a robbery, and if it were not for Montgomery, they would have beaten the case (Byars 4/9/01PM Tr. 33-34).

In sum, Sweeney has failed to show that his trial counsel's performance was deficient for failing to call a Tourette's syndrome expert, in part, because Sweeney has not even established that he was displaying "tic symptoms" to the jury during trial. Moreover, even if counsel had

39

SA-173

called an expert witness, Sweeney has not shown how impeaching Hawkins' assertion that she did not hear barking or throat clearing noises before or during the murders of her friends would have made a not guilty verdict reasonably probable, given that Hawkins testified that she covered her face and only heard the assailants' "muffled voices" during the event, thus making it unlikely that she would have been able to perceive any tics from Sweeney. In addition, there was no evidence that Hawkins knew Sweeney and was aware of his tics. Further, the record reflects that the government adduced strong evidence of Sweeney's guilt. See Strickland, 466 U.S. at 695-96 (in assessing prejudice, the court "must consider the totality of the evidence;" "a verdict. . . only weakly supported by the record is more likely to have been affected by errors than one with overwhelming record support"). Therefore, this claim should be denied.

### b.      Claim A.2 – Trial Counsel Was Not Ineffective for Failing to Call Alibi Witness, Anthea Henry.

Sweeney claims that his trial counsel was ineffective for failing to call an alleged alibi witness, Anthea Henry, to exculpate him of the September 24, 1994 murder of Donnell Whitfield, aka "Robocop." Sweeney's § 2255 Motion, at 7-8. This claim should be summarily denied.

At trial, John Venable testified that on September 24, 1994, he heard several gunshots fired outside his home on K Street and saw Sweeney running away from a craps game with a gun. Carson, 455 F.3d at 343. Sweeney later admitted to several witnesses, including James Montgomery and Reginald Switzer, that he killed Whitfield. Id. Sweeney now claims he was with Henry during the Whitfield murder. Notably, however, Sweeney has not submitted an affidavit or declaration from Henry proffering what she would have said. See United States v. Ransom, 947 A.2d 1127, 1136 (D.C. 2008) (in asserting his counsel was ineffective for failing to call witnesses, "Ransom failed to submit an affidavit or other credible proffer from any of his proposed witnesses, and thus his 'witness' argument has no traction"). Nor has he submitted an affidavit or declaration

40

from his trial counsel to show that Sweeney told counsel about Henry, or that counsel knew about Henry from another source. The government notes that Sweeney mistakenly asserts in his § 2255 motion that the defense "announced [Henry] as a potential witness" before trial, but Henry's name does not appear as one of 574 potential witnesses listed on the jury questionnaire used in this case. In addition, Sweeney does not elaborate on this claim in subsequent filings.

The Court thus should deny this claim because it is vague and conclusory. Sweeney has failed to proffer what, if anything, Henry would have testified about at trial. See David v. United States, 134 F.3d 470, 478 (1st Cir. 1998) ("a habeas petitioner must do more than proffer gauzy generalities or drop self-serving hints that a constitutional violation lurks in the wings."). Moreover, Sweeney has failed to establish that he told his trial counsel about Henry, or that his counsel was even aware of this potential witness. He has failed to prove deficient performance on the part of his trial counsel and he has failed to establish how he was prejudiced. Therefore, this unsupported claim should be summarily denied.

### c.   Claim A.3 – Trial Counsel Was Not Ineffective For Failing to Recall Government Witnesses Reginald Switzer, Charlene Wilson and Ronald Sowells.

Sweeney alleges that his trial counsel was ineffective for failing to recall in the defense case government witnesses Reginald Switzer, Charlene Wilson and Ronald Sowells, after the government allegedly disclosed Brady material relating to these witnesses. Sweeney's § 2255 Motion, at 8-9. This claim should be summarily denied because it is without merit.

Sweeney has not submitted affidavits or declarations from any of these witnesses proffering what their testimony would have been had they been recalled to testify in the defense case, nor does Sweeney elaborate on this claim in any of his supplemental filings. On this cursory and undeveloped record, it is clear that the defendant has not carried his burden of showing that

41

defense counsel was deficient, nor has he shown that but for this alleged deficiency, it is reasonably probable that the jury would have reached a different result.

These claims also fail for the reasons that follow.

### i.      Reginald Switzer

Switzer's testimony concerned Sweeney's murder of Donnell Whitfield, also known as Robocop, in 1994.[27] Sweeney confessed to Switzer that he shot and killed Whitfield. Switzer admitted on direct examination that he had wanted to kill Whitfield, and had in fact taken steps to do so, because he believed Whitfield (and George Seabrooks) had shot him (Switzer) on an earlier occasion (Switzer 5/15/01PM Tr. 7-8, 31-35, 40). After Switzer told Sweeney that he wanted to kill Whitfield, Sweeney told him that he also wanted to kill Whitfield because Whitfield had "smacked him" at a club (Switzer 5/15/01PM Tr. 8-9 ). When Sweeney told Switzer he had killed Whitfield, Switzer was "upset" because Switzer had "wanted to do it [him]self" (Switzer 5/15/01PM Tr. 9).

James Montgomery, who took the stand after Switzer, testified that he was aware that Whitfield had shot at Switzer. Montgomery also testified that one day, while he and Switzer were riding in a car together by an area where Whitfield was "hustling," Switzer told Montgomery that he wanted to kill Whitfield (5/23/01AM Tr. 53). Montgomery then offered to "go up there and blast his ass off right now" (Montgomery 5/23/01AM Tr. 53-54). According to Montgomery, Switzer told him that he did not have a weapon, but Montgomery did not believe him (Montgomery 5/23/01AM Tr. 54). Later, when Montgomery told Carson that he (Montgomery) had offered to kill Whitfield on Switzer's behalf, Carson told him, "don't do it" and "let [Switzer] handle it" (Montgomery 5/23/01AM Tr. 54).

---

[27]   Switzer testified pursuant to a plea agreement in which he admitted to killing two men, George Mayrant and George Seabrooks (Switzer 5/15/01PM Tr. 6).

After Montgomery testified, Sweeney's counsel claimed a <u>Brady</u> violation, asserting that Montgomery's testimony revealed that he "had cooperated with Mr. Switzer in planning to kill ... Whitfield" and "that's completely consistent with [the defense] theory that it was Switzer and not Mr. Sweeney who killed Robocop" (5/23/01PM Tr. 3-4).  Sweeney's counsel further argued that this information was exculpatory because Sweeney's defense was that Switzer "perpetrated that murder" (5/23/01PM Tr. 4).  Counsel indicated that he had "no interest in calling Mr. Switzer back," because he did not want to sponsor his testimony and he had already "spent a great deal of time impeaching his credibility" (5/23/01PM Tr. 5).  The government argued that Montgomery's testimony that he "volunteered his own assistance" in helping Switzer kill Whitfield (but Switzer was not successful) was neither exculpatory, nor prejudicial, and, in fact, Montgomery's testimony corroborated Switzer's testimony (5/23/01PM Tr. 8-9).  The trial court agreed, ruling that Montgomery's testimony was neither exculpatory, nor prejudicial (5/23/01PM Tr. 12).

Sweeney now argues that his trial counsel should have recalled Switzer after Montgomery testified to "cross him on this subject" and "impeach the individual the defense was accusing of the crime." Sweeney's § 2255 Motion, at 9.  This claim fails.

Before Montgomery testified, Sweeney's counsel cross-examined Switzer at length about Switzer's motive to kill Whitfield:

> Q:  And you thought you had a good reason for murdering him, and that's because it was retaliation against his shooting you, correct?
> A:  Yes.
> Q:  And you wanted him dead?
> A:  Yes.

(Switzer 5/15/01PM Tr. 34); <u>see</u> <u>also</u> (Switzer 5/15/01PM Tr. 35, 40).

Sweeney has failed to show how further examination of Switzer about his conversation with Montgomery that Switzer wanted to kill Whitfield – where Switzer had already admitted to

43

the jury that he did want Whitfield dead — would have made a different outcome reasonably probable. See United States v. Mitchell, 216 F.3d 1126, 1131 n.2 (D.C. Cir. 2000) (no prejudice where witness' testimony would have been cumulative). Furthermore, because counsel cross-examined Switzer on this point and was able to elicit Switzer's admission that he wanted to kill Whitfield, Sweeney has not established that defense counsel was deficient for not recalling Switzer. See Vyner, 846 F.3d at 1227 (citing Strickland's holding that the defendant must overcome the presumption that defense counsel's actions were not sound trial strategy). Moreover, when the trial court offered that counsel could "[c]all him back," counsel declined, stating that he did not want to sponsor Switzer's testimony and that he had sufficiently impeached Switzer's credibility (5/23/01PM Tr. 5). The defendant has not established that counsel's decision was not "sound trial strategy," nor has he shown prejudice.

### ii.    Charlene Wilson

Charlene Wilson was an eyewitness to Carson's murder of Anthony Fortune. She testified that in August 1991, she saw Carson "walking towards Tony Fortune, shooting" and then he "stood over top of him and shot him" (Wilson 2/13/01AM Tr. 25). Martin was the driver. Both Carson and Martin were convicted of murdering Fortune. Sweeney was not charged or implicated in the murder of Fortune. See Indictment, Racketeering Act 33 and Count 9 (First-Degree Murder of Anthony Fortune). Sweeney has neither explained nor established how his trial counsel's failure to recall Wilson in the defense case was either deficient performance or prejudice as to the crimes for which Sweeney was convicted. This claim should be summarily denied.

### iii.    Ronald Sowells

Ronald Sowells was a drug dealer who testified pursuant to a plea agreement. He explained that he was associated with the L Street group, but had socialized with K Street members and sold

SA-178

drugs on K Street in order to "rock them to sleep," while plotting with his L Street associates to kill K Street members (Sowells 4/17/01PM Tr. 51-52). On October 30, 1996, in retaliation for Sowell's shooting of Vincent Hill, Coates shot Sowells while Sowells was in his car at the Anacostia Metro Station (Sowells 4/18/01AM Tr. 15-18). Coates was in the passenger seat of another car (Sowells 4/18/01AM Tr. 15). Although Sowells was unable to identify who was driving the car that Coates was in, other evidence indicated that Carson was the driver (Sowells 4/18/01AM Tr. 15; Montgomery 3/12/01PM Tr. 89).

Sweeney was not charged with or implicated in the shooting of Sowells. See Indictment, Racketeering Act, 47, 49, Count 46 (Assault With Intent to Kill While Armed of Ronald Sowells) and Count 47 (Attempted Murder in Aid of Racketeering Activity of Ronald Sowells). Coates and Carson were charged, but only Coates was convicted. Sweeney has not explained how his trial counsel's failure to recall Sowells was either deficient performance or prejudice where Sweeney was not charged with nor convicted of shooting Sowells. This claim should be summarily denied.

### d.     Claim A.4 – Trial Counsel Was Not Ineffective for Failing to Further Impeach Government Witness James Montgomery.

In one sentence, Sweeney alleges that his trial counsel was ineffective for "fail[ing] to impeach government witness, James Montgomery, with prior inconsistent statements made to a defense investigator as well as cross examine him regarding additional bias material." Sweeney's § 2255 Motion, at 10. Notably, Sweeney fails to divulge the prior inconsistent statements or the bias material to which he refers, nor does he raise this claim or supplement it in subsequent filings. Thus, even after being provided with counsel and opportunities to expand this claim, the defendant has failed to meet his burden of proving deficient performance and prejudice. Without more, this claim fails because it is vague and conclusory.

SA-179

### e.    Claim A.5 – Trial Counsel Was Not Ineffective For Failing to Provide Trial Court with Authority to Cross Examine Government Witness, John Venable.

John Venable was an eyewitness to Sweeney's murder of Donnell Whitfield in 1994. Venable did not testify pursuant to a plea agreement with the government, but he did receive financial assistance from the government to move from his home due to threats he and his family had received (Venable 5/14/01AM Tr. 52-54).[28] Sweeney now argues that his trial counsel was constitutionally ineffective for failing to provide the trial court with "authority" to cross-examine Venable about Venable's prior arrest and the fact that Venable matched the description of the person who killed Morris Hallman.  Sweeney's § 2255 Motion, at 10.  Notably, Sweeney does not elaborate on this conclusory claim in any of his subsequent filings.  The Court should summarily deny this claim on the merits.

Venable testified that on September 26, 1994, he was with Whitfield, his cousin, in a house in Sursum Corda when Whitfield left to go outside (Venable 5/14/01AM Tr. 55, 58-59).  Venable heard gunshots and went to the window, where he saw Sweeney run away from a craps game with a gun in his hand (Venable 5/14/01AM Tr. 60).[29]  Venable went outside and found Whitfield lying on the ground, dying (Venable 5/14/01AM Tr. 61).

On cross-examination, Sweeney's counsel attempted to question Venable about his November 1995 arrest for carrying a pistol without a license and related charges (Venable

---

[28]    At the time he testified, Venable had been arrested and charged in a misdemeanor case with possession of marijuana and cocaine, but had not yet been sentenced (Venable 5/14/01AM Tr. 52-53).

[29]    In his first interview with police and during his first appearance before the Grand Jury on April 11, 1995, Venable identified Sweeney as the driver of the getaway car, not the shooter (Venable 5/14/01AM Tr. 73-74, 78-79).  He explained that he did so because he was scared and he and his family had received threats (Venable 5/14/01AM Tr. 74-75, 79).  Venable, who was 25 years old when he testified, had known Sweeney from the Boys and Girls Club in Southwest since he was "about eight or nine years old" (Venable 5/14/01AM Tr. 57).  When Venable later testified in the Grand Jury on September 17, 1995, he did identify Sweeney as the shooter.

5/14/01PM Tr. 30-31). Counsel proffered that he had a copy of an affidavit in support of a search warrant in which Venable was identified as the person who murdered Morris Hallman and that he wanted to elicit the information so that the "jury can decide why didn't this guy get charged with murder when he matches the description" (5/14/01PM Tr. 31-32, 43-44). Counsel argued that it was "entirely appropriate for the jury to consider it to see whether or not he was. . . getting a benefit from the government in return for his testimony" (5/14/01PM Tr. 44). The prosecutor proffered that he knew "nothing about the case" (id.). The Court did not permit counsel to question Venable, ruling that it was "pure speculation" and "a quantum leap" that "[Venable] committed a murder and he's in here testifying, and because he's testifying, he's not going to be prosecuted for it" (5/14/01PM Tr. 47). The trial court sustained the government's objection to this line of examination, ruling that counsel's proffer was based upon "pure speculation" (id.).

On collateral attack, Sweeney has not shored up this claim with a proffer, much less any evidence, to support his bare allegation that Venable was a cooperator. Therefore, the Court should deny this ineffective assistance of counsel claim because it is vague, conclusory and Sweeney has failed to meet his burden of proof.

### f.  Claim A.6 – Trial Counsel Was Not Ineffective For Failing to Seek the Admission of Certain Evidence.

Sweeney argues that his trial counsel was ineffective for failing to request the admission of certain evidence, namely: 1) an unspecified "party opponent (pleading by USA re unreliability of James Montgomery);" 2) unspecified "Grand Jury witnesses' transcripts;" and, 3) the testimony of Wesley Smith and Frederick Miller. Sweeney's § 2255 Motion, at 10-11. Citing to Chambers v. Mississippi, 410 U.S. 284 (1973) (finding due process violation where defendant denied opportunity to cross-examine witness about prior statement against penal interest where hearsay statements had indicia of trustworthiness), Sweeney asserts that his counsel's failures "implicated

47

SA-181

[his] right to present a defense." Id. at 11. Sweeney does not elaborate on any of these cursory claims in subsequent filings. The Court should summarily deny these claims.

As for his claims relating to trial counsel's alleged failure to request admission of party opponent evidence and the transcripts of Grand Jury witnesses, Sweeney does not explain or attach copies of the documents to which he refers. With such scant information, it is clear that Sweeney has shown neither deficient performance nor prejudice. See, e.g., Smith v. United States, 203 A.3d 790, 798 (D.C. 2019) ("Strickland places the burden [on the defendant] to explain how he was prejudiced, not on the court to intuit the answer to that question"). The Court should summarily deny this claim because it is vague and conclusory.

As for his claim regarding trial counsel's alleged failure to present the testimony of Wesley Smith and Frederick Miller, the record shows that Sweeney's counsel sought to admit the testimony of both of these witnesses. He simply did not prevail.

With respect to Wesley Smith, the record reflects that Sweeney's counsel sought to present Wesley Smith's testimony in order to show that Robert "Butchie" Smith committed the triple murder in Maryland in 1996. Specifically, counsel proffered that Wesley Smith was "going to say that Robert Smith told him he was beaten out of $60,000.00, and he was going to go back one day and take care of the guys in that house. And then at Thanksgiving dinner, a week after the triple murders, he went up to Weslie [sic] Smith and said, "I took care of Darnell Mack and those guys." (6/6/01AM Tr. 29). Counsel argued extensively that Robert Smith's statements to Wesley Smith were admissible as exceptions to the hearsay rules, including the state of mind exception, and the exceptions for co-conspirator statements and statements against penal interest (6/6/01AM Tr. 29-32; 6/11/01PM Tr. 9-15). Other government evidence presented at the trial, however, established

48

SA-182

that Carson and Montgomery had murdered Robert Smith in 1997 after Sweeney realized that Robert Smith was cooperating with law enforcement.

Ultimately, the trial court ruled that based upon its previous "finding of probable cause to believe that Sweeney caused the murder of Butchie Smith precludes use by Sweeney of any out-of-court statements by Butchie Smith, whether favorable or unfavorable, upon any theory, and that, therefore any hearsay exception is irrelevant" (6/11/01PM Tr. 19). The trial court went on to explain that Robert Smith's alleged statements to Wesley Smith were "simply not available to the defendant by reason of his complicity in the unavailability of the witness" (id.).

With respect to Frederick Miller, counsel proffered that Miller "would get up and say that [as] this relates to the Glen Jenkins murder, and [Miller] is going to get up and say about a week after the Jenkins' murder in July, 1993, [Miller] spoke to someone named Little Ty who is now deceased. . . . And Little Ty said to [Miller] I did the murder" (6/25/01PM Tr. 3). Counsel argued that Little Ty's hearsay statement to Miller was admissible as a statement against Little Ty's penal interest (id.). The trial court, after hearing argument from both parties, ruled that Little Ty's purported statements to Miller were inadmissible (6/25/01PM Tr. 5).

In sum, Sweeney's claim that trial counsel failed to seek admission of Wesley Smith's and Frederick Miller's testimony is conclusively refuted by the record. Therefore, counsel's performance was not deficient. Furthermore, the jury found Sweeney not guilty of the murder of Jenkins and found the racketeering act with respect to Jenkins' murder not proven. See Sweeney Verdict Form, Racketeering Act 29 and Count 10. Therefore, Sweeney has failed to show how he was prejudiced. Accordingly, the Court should summarily deny this claim on the merits.

SA-183

**g.      Claim A.7 – Trial Counsel Was Not Ineffective For Failing to Make a Massiah Claim With Respect to Certain Government Witnesses.**

Under Massiah v. United States, 377 U.S. 201 (1964), a criminal defendant's Sixth Amendment right to counsel is violated when government agents expressly or implicitly use an informant as their agent to take some deliberate action, beyond mere passive listening, to elicit incriminating statements from a person whose right to counsel has attached.  377 U.S. at 206; see also United States v. Henry, 447 U.S. 264 (1980).

Sweeney claims that his trial counsel was ineffective for failing to make a Massiah claim with respect to jail house confessions heard by government witnesses Charles Bender, Donald Nichols, Eugene Byars, Theodore Watson, Reginald Switzer and Arthur Rice.  Sweeney's § 2255 Motion, at 11.  The Court should summarily deny this claim on the merits.

Sweeney fails to provide any factual basis for this argument with respect to Nichols, Byars, Watson, Switzer and Rice; it is not incumbent on the government to ferret out portions of the record that support it.  See Sweeney's § 2255 Motion, at 11.

The government addresses Sweeney's Massiah claim with respect to Charles Bender because Sweeney has cited a published opinion relating to this particular witness.  See Id. (citing Watson v. United States, 940 A.2d 182 (D.C. 2008) (Watson I) (remanding for an evidentiary hearing on whether Charles Bender was acting as a government agent when he elicited incrimination statements from Watson)).

**i.      Charles Bender's Testimony in K Street**

Bender testified in the K Street trial on April 4 and 5, 2001; he identified five of the named defendants as individuals he knew, and discussed his plea agreement (Bender 4/4/01AM Tr. 41-52).  Bender testified at length about the marijuana distribution networks on L and K Streets, Southwest, in which he had participated along with some of the defendants (Bender 4/4/01AM Tr.

54-67).  In addition, Bender testified about conversations he had with Sweeney and co-defendant Martin.

Shortly after Bender was released from Oak Hill near the end of 1994, Bender had a conversation with Sweeney about the murder of Donnell Whitfield that had occurred earlier that year (Bender 4/4/01AM Tr. 48, 67-68).  Sweeney told Bender that he had "punished" (i.e., killed) Whitfield during a craps game because Whitfield had assaulted Sweeney (Bender 4/4/01AM Tr. 68-69).  In a different conversation occurring after Bender was incarcerated in 1995, Sweeney told Bender that James Montgomery was "telling on them" for a triple murder in Maryland, and that if Sweeney saw Montgomery, he would kill him (Bender 4/4/01AM Tr. 70-72).  Bender explained that Sweeney implied that persons on the government's witness list in the Maryland triple murder or their families could be killed (Bender 4/4/01AM Tr. 72).  Sweeney also told Bender that Sweeney's uncle (Robert "Butchie" Smith) deserved to die because he was "snitching" (Bender 4/4/01AM Tr. 75-76).

### ii.   Subsequent Proceedings in an Unrelated Case, United States v. Watson, Involving the Same Witness, Charles Bender.

In Watson I, decided in 2008, the District of Columbia Court of Appeals ("DCCA") remanded Watson's case to the trial court to conduct an evidentiary hearing on Watson's Massiah claim that Bender was acting as a government agent when he elicited incriminating statements from Watson about the fatal shooting of Tyrus "Mink" Hunt.  Watson's murder of Hunt was unrelated to the K Street investigation.  Bender was a cooperator in the K Street investigation, so some of the facts elicited at Watson's remand hearing involved Sweeney's jailhouse admissions to Bender.  See Watson I, 940 A.2d 182.

Watson's remand hearing took place in 2008.  Both Bender and FBI Special Agent Kristen Ashby, one of the agents involved with debriefing Bender, testified at that hearing.  Testimony at

the hearing established that Bender met Watson at the D.C. Jail while the two were waiting to be transported to Superior Court. Watson v. United States, 66 A.3d 542, 543 (D.C. 2013) (Watson II). During the same time, Bender met Sweeney, while they were being transported to Superior Court. Id. at 545. During Bender's encounter with Sweeney, Sweeney admitted his role in several homicides, which Bender then reported to SA Ashby when he met her later that day.

SA Ashby testified that the government never asked Bender to get information from Watson, from Sweeney, or from anyone else. In fact, SA Ashby testified that she was "distressed to learn that Bender had been in contact with [Sweeney]" because the K Street targets "had shown a pattern of witness intimidation and also killing witnesses" and she believed that if Sweeney "had any belief that Mr. Bender was cooperating, Mr. Bender's – his life could have been—he would—it would have been a safety concern." Id., at 548 n.7.

At the conclusion of Watson's remand hearing, the trial judge credited the uncontroverted testimony of Bender and SA Ashby that Bender was not acting as a government agent when he spoke to Watson. Id. at 546-47. Five years later, the DCCA affirmed, finding that the record amply supported the trial court's finding. Watson II, 66 A.3d 542. As the DCCA outlined, evidence adduced at the 2008 evidentiary hearing established that Bender was a cooperating witness in the K Street investigation at the time he spoke to Watson. The K Street investigation and Watson's murder of Hunt were unrelated. However, because Bender was cooperating in K Street, testimony about K Street necessarily was elicited. Id. at 544 ("Bender's debriefings and grand jury testimony focused on the persons and activities targeted in the Southwest crew investigation" and stating that Watson was not a target of that investigation).

The DCCA noted that the government specifically told Bender to avoid contact with the targets of the K Street investigation, that the government never countermanded that instruction,

52

SA-186

and that the government did not reward Bender for obtaining Sweeney's admissions and did not encourage him to repeat his contact with Sweeney. Id. at 547. The DCCA concluded that the record from the evidentiary hearing showed that "[n]either [Bender] nor the government acted as if [Bender] had been deputized to procure incriminating information from anyone" and that this case fell squarely within the category of cases where "an inmate acted on his own accord to elicit admissions from an unwary fellow detainee." Id. at 547-48.

In sum, although Sweeney has cited Watson as support, he has failed to refute the facts adduced in the Watson evidentiary hearing that Bender was not acting as a government agent when he spoke to anyone, including Sweeney, when Bender was cooperating with the government. Thus, the Court should summarily deny this claim.

> ### h.      Claim A.8 – Counsel Was Not Ineffective For Failing to Object to the Trial Court's Ex Parte Communication with Juror No. 3.

Sweeney argues that his counsel was constitutionally ineffective, at trial and on appeal, for failing to object to or challenge the Court's ex parte communication with Juror No. 3, which he alleges resulted in dismissal of that juror during deliberations. Sweeney's § 2255 Motion, at 11. As stated earlier, Mr. Kiersh represented Sweeney at trial and on appeal. For the reasons set forth, the Court should summarily deny this claim on the merits.

The trial court's ex parte contact with Juror No. 3 occurred only once. Following that communication, the trial court memorialized the content of the conversation on the record and in the presence of counsel:

> I will interrupt here and relate that I inquired of Juror Number 3 whether he had, in fact, had chest pains and tingling in his arm when he went to the hospital. He announced that he did not. That really he had personal problems and that his personal problems were, to a certain extent, being exacerbated by pressure from his supervisor to work when he was not on jury service and had been disciplined, in fact, for not being present when he was not on jury service and was being pressured to return to work.

SA-187

I then asked Marshal Adams to ascertain from him – so that I would not know – the identity of his supervisor and a phone number for her, and obtained a phone number for her.

When we placed a call to her to inquire about her interaction with Juror Number 3, the supervisor did not answer the phone. We had only a voice mail, and I left a message, via my law clerk, generally that we were concerned that Juror Number 3 was having difficulty in completing his juror service, and if there were any difficulty in his doing so insofar as his employment was concerned, would she please call me. I have not yet had any contact from that employer.

Juror Number 3, nevertheless, assured me that he was prepared to return to his job as a juror, would do so on Monday morning, and that he felt that he would have no difficulty in fulfilling his obligation as a juror.

(7/24/01PM Tr. 7-8). None of the defense counsel lodged an objection to the trial court's method of handling this issue. Later, during deliberations, Juror No. 3 was dismissed from the jury.

Sweeney now alleges that the trial court's initial ex parte contact with Juror No. 3 resulted in the dismissal of that juror and that trial counsel was ineffective for not objecting to this contact. The defendant is mistaken. The trial court did not dismiss Juror No. 3 based solely on its ex parte contact with that juror. Rather, as the D.C. Circuit noted, the trial court relied on "a combination of factors –including that Juror No. 3 had lied about his symptoms before visiting the hospital, provided inaccurate voir dire responses about mental health treatment and was, according to Juror No. 1 and Juror No. 17, distracted and unfocused (and even threatening) during deliberations." 455 F.3d at 352. The D.C. Circuit held that these findings were "amply supported by the evidence." Id.

As for trial counsel's failure to object, the D.C. Circuit held that even if defense counsel had objected to the ex parte nature of the trial court's contact with Juror No. 3, there would be no reversible error because a defendant has no constitutional right to be present during every interaction between a judge and a juror and, further, the conversations were "unrelated to the merits of the case and their substance was reported in open court in the presence of the defendants and

54

**SA-188**

their counsel." Id. at 354. Hence, even if counsel had objected, the objection plainly would have been overruled. Thus, Sweeney's trial counsel was not deficient for failing to raise a meritless objection. See United States v. Islam, 932 F.3d 957, 964 (D.C. Cir. 2019) ("The failure to raise a meritless objection is not deficient performance."); United States v. Watson, 717 F.3d 196, 198 (D.C. Cir. 2013) ("counsel does not perform deficiently by declining to pursue a losing argument"); United States v. Kelly, 552 F.3d 824, 831 (D.C. Cir. 2009) (counsel was not deficient because "counsel was not obliged to raise a meritless defense").[30]

On appeal, each of the five defendants' appellate counsel, including Sweeney's, challenged the trial court's dismissal of Juror No. 3 during deliberations and the trial court's decision to permit the remaining eleven jurors to deliberate to verdict pursuant to Federal Rule of Criminal Procedure 23(b).[31] The defendants collectively offered six grounds for reversing the trial court's decision, each of which the D.C. Circuit addressed and rejected. See Carson, 435 F.3d at 347-54. One of the defendants' claims of error involved an assertion that the trial court's and the Deputy U.S. Marshal's ex parte contact with jurors, including Juror No. 3, violated their constitutional rights.

---

[30]    The cases cited by Sweeney are inapposite. See Sweeney's § 2255 Motion, at 11-12, n.3. In Rogers v. United States, 422 U.S. 35, 39-40 (1975), the Supreme Court held that communication from the jury with the trial judge about its verdict was "tantamount to a request for further instructions;" thus, the jury's message to the court regarding its verdict should have been answered in open court and in the presence of counsel. Here, the trial court's communication with one of the jurors did not involve the verdict. And, in United States v. Gypsum Co., 438 U.S. 422, 460-61 (1978), the Supreme Court noted that defense counsel had acquiesced to trial court's ex parte contact with the jury foreman but, afterwards, counsel did not receive a full report from the trial judge and was not aware of the scope of the conversation. Here, the trial court gave a full report regarding the extent of its ex parte conversation with Juror No. 3.

[31]    The defendants also filed motions for a mistrial based upon the dismissal of Juror No. 3. The trial court denied the defendants' motions by written order [Dkt. 779]. In its Order, the trial court described its ex parte contact with Juror No. 3 as follows: "In a brief in camera conversation with the Court, Juror No. 3 admitted that he had not had the cardiac symptoms he had reported to the deputy; that his reason for being absent was related to a long-term dispute with his supervisor over his working hours when not on jury service; and that he might be able to continue with jury deliberations on Monday if the Court would intercede with his supervisor." Order, at 2 [Dkt. 779].

Thus, on appeal, counsel clearly raised the issue of the trial court's ex parte communication with Juror No. 3 on appeal; consequently, his performance was not deficient. See, e.g., Peete v. United States, 942 F. Supp.2d 51, 55 (D.D.C. 2013) (finding appellate counsel's performance not deficient where she raised on direct appeal the very issues of which the defendant complained); United States v. Geraldo, 523 F. Supp.2d 14, 22 (D.D.C. 2007) (finding that defendant "fail[ed] to show precisely what his counsel should have done differently, and fail[ed] to refute the record" that showed counsel's "substantial efforts" on behalf of client).

In sum, Sweeney has failed to meet his burden of proving that trial counsel was constitutionally ineffective for failing to object to the trial court's ex parte contact with Juror No. 3, nor has he proven that his same counsel should be faulted for not raising the issue of Juror No. 3 on appeal because counsel actually did so, albeit unsuccessfully. Accordingly, this claim should be summarily denied.

### i. Claim A.9 – Trial Counsel Was Not Ineffective for Reserving His Right to Deliver His Opening Statement After the Government Rested.

Sweeney complains that his trial counsel was constitutionally ineffective for "fail[ing] to provide an opening statement at the beginning of the case." Sweeney's § 2255 Motion, at 11. Sweeney does not elaborate on this claim in his § 2255 motion or in any of his supplemental filings. The Court should summarily deny this claim on the merits.

At the beginning of trial, trial counsel for Sweeney and Hill reserved their right to make opening statements on behalf of their clients, while counsel for the remaining co-defendants delivered opening statements (1/9/01AM Tr. 9). At that time, the trial court instructed the jury, "Mr. Kiersh has reserved on behalf of Mr. Sweeney and, and Mr. Davis is reserving on behalf of Mr. Hill. That means that they are not, at this time, contemplating making opening statements, but will, at some later stage in the case, be given an opportunity to do so, if they wish" (id.).

56

**SA-190**

After the government rested, Sweeney's trial counsel delivered an opening statement, telling the jury at the outset:

> . . . a number of my very well qualified and very able co-counsel made opening statements right after Mr. Zeidenberg's opening statement. The other option that – whether it is Mr. Sweeney or anyone else – has is to wait until the government finishes its case, and before you present your case, you then can make an opening statement, <u>which is exactly what Mr. Sweeney and I have chosen to do in this case.</u>

(6/06/01AM Tr. 15-16) (emphasis added). Over the course of 20 transcript pages, trial counsel then outlined for the jury the evidence Sweeney intended to introduce in the defense case (6/01/01AM Tr. 15-39).

The decision to waive an opening statement is essentially tactical in nature and not objectively unreasonable. <u>See</u> <u>United States v. Decoster</u>, 624 F.2d 196, 214 (D.C. Cir. 1976); <u>see also</u> <u>Huffington v. Nuth</u>, 140 F.3d 572, 583 (4th Cir. 1998); <u>Nguyen v. Reynolds</u>, 131 F.3d 1340, 1350 (10th Cir. 1997); <u>United States v. Rodriguez-Ramirez</u>, 777 F.2d 454, 458 (9th Cir. 1985). Therefore, this claim should be summarily denied. The defendant has utterly failed to show how his trial counsel performed deficiently or prejudiced him where his trial counsel did deliver a detailed opening statement not at the beginning of trial, but after the government had rested its case. Sweeney presumably concurred with this tactical decision involving timing (not substance), according to counsel's statements on the record.

### j.     Claim A.10 – Trial Counsel Was Not Ineffective for Failing to Corroborate Jail Records.

Sweeney asserts that his trial counsel was ineffective for failing "to corroborate jail records with court records which show the same period of detention, after the government counsel crossed the business records custodian on the alleged unreliability of the records." Sweeney's § 2255 Motion, at 11-12.

SA-191

The government is unable to understand this claim. Sweeney does not cite to relevant portions of the transcript that shed light on this claim, fails to cite any legal authority, and does not elaborate on this claim in later supplemental filings. Therefore, the Court should deny this claim because such bare assertions, without more, are vague and conclusory. See United States v. Taylor, 139 F.3d 924, 933 (D.C. Cir. 1988) (stating that "some claims of ineffective assistance of counsel can be resolved on the basis of the trial transcripts and pleadings alone" and noting that "the motion may fail to allege facts or circumstances upon which the elements of constitutionally deficient performance might properly be found") (internal quotation marks and citation omitted); Mitchell v. United States, 841 F. Supp.2d 322, 328 (D.D.C. 2012) ("district courts have the power to deny § 2255 motions on the grounds that they offer only bald legal conclusions with no supporting factual allegations"); see also United States v. Fisher, 38 F.3d 1144, 1147 (10th Cir. 1994) (court is "not required to fashion Defendant's arguments for him where his allegations are merely conclusory in nature and without supporting factual averments").

### k.     Claim A.11 – Counsel Was Not Ineffective For Failing to Object to Allegedly Inadmissible Hearsay Evidence.

Sweeney argues that his counsel was constitutionally ineffective for failing to object at trial to, and later appeal, the trial court's ruling with respect to "voluminous [] inadmissible and/or hearsay evidence to establish material facts." Sweeney's § 2255 Motion, at 12. The Court should summarily deny this claim on the merits.

In setting forth this claim, Sweeney refers to:  1) the testimony of Medical Examiner Jonathan Arden, who testified about autopsies he had not conducted; 2) the testimony of a police officer regarding fingerprint evidence he had not lifted or examined; 3) "reputation evidence" related to Wayne Perry; 4) statements of Robert "Butchie" Smith to Special Agent Vincent Lisi; and, 5) "constant hearsay" that "Lil Ty kill[ed] Dihru." Id. Sweeney does not cite to relevant

58

SA-192

portions of the transcript that support his claims, fails to cite any legal authority, and does not elaborate on these claims in later supplemental filings.  Nevertheless, to the extent the claims can be understood, the government responds as follows:

With respect to Sweeney's first hearsay claim, Dr. Jonathan Arden was qualified as an expert in the area of forensic pathology (2/8/01AM Tr. 19).  Dr. Arden testified throughout the trial that took place in 2001 about autopsies that he did not perform and offered his opinion, to a reasonable degree of medical certainty, that the manner of death of the decedents referred to in those autopsy reports was homicide.  Prior to the Supreme Court's 2004 decision in Crawford v. Washington, 541 U.S. 36 (2004), this practice was permitted.  See United States v. Bostick, 791 F.3d 127, 149-50 (D.C. Cir. 2015) (assuming without deciding post-Crawford that autopsy reports were "testimonial" for purposes of the Confrontation Clause and that such reports and accompanying expert testimony from a medical examiner would be inadmissible unless the witness was unavailable and the defendant had had a prior opportunity to cross-examine).  Counsel was not ineffective in 2001 for failing to predict Crawford and, later, for not raising a meritless claim on appeal.  See, e.g., United States v. Williams, 374 F. Supp.2d 173, 175-76 (D.D.C. 2005) ("counsel is not generally considered ineffective for failing to foresee a change in the law") (citing cases); see generally Rompilla v. Beard, 545 U.S. 374, 375 (2005) ("in applying Strickland generally, hindsight is discounted by pegging adequacy to 'counsel's perspective at the time'").

With respect to Sweeney's second hearsay claim, Elores Clark was qualified as an expert in the area of fingerprint examination (Clark 4/2/01PM Tr. 70).  Clark examined a fingerprint recovered by evidence technician William McClellan from a storm door of the house where the 1996 triple murder in Maryland occurred.  She determined that the fingerprint matched Sweeney's left middle finger (McClellan 4/2/01PM 17, 49; Clark 4/2/01PM Tr. 72; Government's Exhibit

SA-193

M52). Because this is the only fingerprint evidence introduced at trial that inculpated Sweeney, the government assumes that this is the focus of Sweeney's complaint. However, Sweeney's assertion that an (unnamed) police officer testified about fingerprint evidence "he had not lifted or examine[d] or compared" is refuted by the record. McClellan, the evidence technician who lifted the fingerprint, and Clark, the fingerprint examiner who examined the fingerprint, compared it to Sweeney's known print, and determined that it was a match to Sweeney's print, both testified. Counsel was not ineffective for failing to raise clearly meritless arguments at trial and on appeal.

With respect to Sweeney's fifth hearsay claim, Sweeney is mistaken that his trial counsel did nothing to object to, or appeal, the admission of statements made by Robert "Butchie" Smith to Agent Lisi. Smith, initially a main target of the K Street conspiracy, pled guilty and cooperated with the government after his arrest in December 1996 (Lisi 5/29/01PM Tr. 8-9). Smith told Agent Lisi about his interactions with the members of the conspiracy and, in particular, his conversations with Sweeney about various kidnappings, murders, attempts to intimidate witnesses, and other acts of violence committed by conspiracy members. After Sweeney learned that Smith was cooperating, Sweeney told Carson and Carson murdered Smith in 1997.

Prior to trial, the government filed a Motion to Admit Out of Court Statements Made by Murdered Witness [Dkt. 314]. Sweeney's trial counsel lodged an opposition and later filed a supplement to that opposition [Dkts. 341, 491]. The trial court held that Smith was a co-conspirator and that Sweeney's statements to him were made in furtherance of the conspiracy; the trial court also ruled that the defendants waived their hearsay objections because Carson's murder of Smith, "either alone or in conjunction with others," made Smith unavailable as a witness to the government (5/29/01AM Tr. 88-89).

SA-194

On appeal, Sweeney (and Carson and Coates) challenged the trial court's ruling on Smith's hearsay statements to Agent Lisi. The D.C. Circuit upheld the trial court's ruling. See Carson, 455 F.3d at 360-67. The Court should summarily deny this claim because, contrary to Sweeney's allegations, his counsel did challenge the government's introduction of Smith's statements, both pre-trial and on appeal. Therefore, Sweeney has failed to show how his counsel's representation fell below an objective standard of reasonableness where his counsel took the very actions he accuses him of failing to do. Strickland, 466 U.S. at 688.

Sweeney's third and fourth claims -- "reputation evidence" related to Wayne Perry and "constant hearsay" that "Lil Ty kill[ed] Dihru" -- should be denied because they are vague and conclusory.[32]

### l.      Claims A.12, A.26 and A.46 – Appellate Counsel Was Not Ineffective For Failing to Cite to Sealed Matters for the D.C. Circuit to Review.

Sweeney contends that his trial counsel, who also served as his appellate counsel, was ineffective for failing to "note sections of sealed matters for the [D.C. Circuit] to review and to cite authority for those requests." Sweeney's § 2255 Motion, at 12-13. The Court can summarily deny this claim on the merits because the record shows that appellate counsel did precisely what Sweeney claims that counsel failed to do.

---

[32]   SA Lisi testified that before he began the K Street investigation, he was assigned to investigate Wayne Perry, who had a reputation for violence. The Perry investigation focused on neighborhoods in Southwest D.C. (1/10/01AM Tr. 25-26). Perry pled guilty in Maryland in 1993 to five murders and drug related offenses (1/10/01AM Tr. 26). Sweeney has failed to explain how evidence of Perry's reputation harmed him.

Arthur Rice testified that a person known as Dihru was murdered as a result of a "beef" between Southwest and Condon Terrace, and that Rice thought that Little Ty (from Condon Terrace) was responsible (Rice 4/24/01PM Tr. 45-46). Sweeney has utterly failed to explain how Rice's fleeting reference to this murder prejudiced him.

SA-195

On June 28, 2002, before any of the defendants had filed their appellate briefs, Sweeney's appellate counsel filed a Motion to Allow Counsel to Review All Sealed Portions of the Trial Record with the D.C. Circuit.[33]   In that motion, counsel represented that during the trial, the district court had "reviewed volumes of documents *in camera* and then made rulings regarding the government's obligation [under Brady and the Jencks Act] to turn the material over to the defense counsel for review."   Appellate counsel asserted in his motion that he needed access to the sealed material in order to "formulate an argument" on appeal that the trial court committed error.   On July 19, 2002, the government filed an opposition, arguing that the defense's request was overly broad and amounted to a "fishing expedition.   On July 31, 2002, Sweeney's appellate counsel filed a Reply.

On October 2, 2002, the D.C. Circuit denied Sweeney's motion on grounds that Sweeney had not made a "colorable claim" that the material he wanted reviewed contained evidence favorable to him.   The D.C. Circuit noted that it would undertake in camera review of materials if Sweeney "identif[ied] on appeal specific evidentiary rulings of the district court [he] claim[ed] were erroneous."

On May 29, 2003, Sweeney's appellate counsel tried again.   He, along with the other appellate counsel, filed a joint Motion to Allow Counsel to Review Specific Sealed Portions of the Trial Record.   In that 17-page pleading, appellate counsel made arguments with respect to materials relating to numerous named government witnesses, including SA Lisi, Robert "Butchie" Smith, Reginald Switzer, Andre Murray, Theodore Watson, Charles Bender, James Montgomery, Arthur Rice, Paul Franklin and others.   On June 25, 2003, the government filed an opposition, asserting that appellants' proposed approach – first, appellants identify the claims of error; second, the D.C.

---

33    The government can provide copies of all the appellate documents referred to in this section upon request.

SA-196

Circuit review the sealed materials; third, the D.C. Circuit issue unsealing orders with respect to all or a portion of the materials; and, fourth, appellants file their appellate briefs – was "unwieldy."

On August 28, 2003, the D.C. Circuit denied the appellants' joint motion, ruling that the appellants "must identify the specific rulings that they believe are erroneous" and instructing that any "future arguments concerning the district court's application of Brady and/or the Jencks Act should be presented in the appellants' brief, rather than by motion." While none of the defendants raised issues related to trial court's rulings on the sealed materials directly on appeal, they did to the extent it supported their argument of judicial bias. See Carson, 455 F.3d at 355 ("appellants object to discrete allegedly biased rulings by the trial judge which (1) set the timing of disclosure of exculpatory material under Brady, . . . and of witness statements under the Jencks Act...").

As the appellate record shows above, Sweeney's complaint about his appellate counsel's performance is not justified. Counsel filed pleadings and advanced arguments seeking to unseal specific matters reviewed by the trial court; he simply was not successful. Under these circumstances, appellate counsel's performance did not fall below an objective standard of reasonableness and Sweeney's claim should be denied.[34]

---

[34]   As noted, on February 5, 2008, Sweeney's first § 2255 counsel, Ms. Wicks, filed several motions for access to the sealed documents from the trial, stating that Sweeney's § 2255 motion was due 15 days later, on February 20, 2008 [Dkts. 1013, 1015]. On February 15, 2008, then Chief Judge Thomas Hogan granted Sweeney's motions and ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this matter to counsel for Mr. William Sweeney" [Dkt. 1016]. On February 19, 2008, Ms. Wicks filed a § 2255 motion on behalf of Sweeney, but did not refer to any of the sealed documents or assert any claims based upon information in those documents. Later, in supplements filed in 2014 and 2015, Sweeney acknowledges that he gained access to the sealed material, but does not state when. Sweeney's First Supplement, at 1; Second Supplement, at 3. As also noted, even generously construing the end of the limitations period, Sweeney's claims based on these sealed materials are time-barred by a number of years.

SA-197

**m.     Claim A.13 – Sweeney's Trial and Appellate Counsel Were Not Ineffective For Failing to Challenge His Consecutive Sentences on His Firearms Convictions Under § 924(c) on Double Jeopardy Grounds.**

Sweeney claims that his counsel was ineffective for failing to challenge on Double Jeopardy grounds his consecutive § 924(c) sentences, both at sentencing and on appeal. Coates raises the same claim. For the reasons explained infra, pp. 114-20, this claim is meritless. Consequently, counsel was not constitutionally ineffective for failing to raise a losing argument at sentencing, or on appeal. Therefore, the Court should summarily deny this claim.

**n.     Claims A.14, A.33 through A.35, A.38, A.54 through A.58 - The Trial Court Did Not Err and Trial/Appellate Counsel Was Not Ineffective for Failing to Appoint/Request/Challenge the Trial Court's Ruling That the Defendant Was Not Entitled to Two Attorneys to Represent Him at Trial in this Non-Capital Case.**

Sweeney alleges that his constitutional rights were violated by: 1) the trial court's refusal to appoint his "counsel of choice," Kenneth Robinson, Esquire;[35] 2) the trial court's disqualification of Leonard Long, Esquire, based upon an assertion by the government that Mr. Long had a conflict of interest; 3) counsel's failure to challenge on appeal these two rulings; and, 4) counsel's failure to request a second counsel or request a continuance after Mr. Long was disqualified. Sweeney's § 2255 Motion, at 14-15. In his First and Second Supplements, Sweeney adds that trial counsel was ineffective for failing to argue that 18 U.S.C. § 3005 entitled him to two attorneys at trial. Sweeney's First Supplement, at 75-87; Sweeney's Second Supplement, at 69-79.

To the extent Sweeney frames this claim as trial court error, it is procedurally barred because he failed to challenge the trial court's "refusal" to appoint Mr. Robinson and the trial

---

[35]   Sweeney refers to the trial court's denial of a Motion for Appointment of Counsel (Mr. Robinson); however, there is no such motion on the docket, the government cannot locate a copy in its files and the defense has not provided a copy as an exhibit.

64

SA-198

court's disqualification of Mr. Long on direct appeal. The defendant does not argue that he has established cause and prejudice to excuse his procedural default.[36] With respect to this claim, framed as ineffective assistance of trial and appellate counsel, it is meritless as is explained below.

18 U.S.C. § 3005 provides, in relevant part:

Whoever is indicted for treason or other capital crime shall be allowed to make his full defense by counsel; and the court before which the defendant is to be tried, or a judge thereof, shall promptly, upon the defendant's request, assign 2 such counsel, of whom at least 1 shall be learned in the law applicable to capital cases. . .

Sweeney was represented by two counsel, Messieurs Kiersh and Paul DeWolfe, Esquire, from November 1998 through August 2000.[37] During that time period, at a status hearing held on December 16, 1999, the government informed defense counsel and the Court that it had decided not to seek the death penalty. Less than two weeks later, on December 28, 1999, counsel for Carson and Sweeney filed a letter requesting that the trial court continue to authorize the appointment of two attorneys for each defendant due to the complexity of the case, notwithstanding the government's decision to forego the death penalty [Dkt. 851]. Sweeney's First Supplement, Exhibit 11. Consequently, on January 4, 2000, the trial court ordered Mr. DeWolfe, described as "previously 'learned' capital counsel" in the docket entry, to continue as co-counsel for Mr. Sweeney [Dkt. 252]. Later that year, on August 21, 2000, Mr. DeWolfe filed a motion to withdraw [Dkt. 356].

On September 25, 2000, the trial court appointed Leonard Long, Esquire, as co-counsel for Sweeney [Dkts. 408; 425]. On October 24, 2000, the government filed, under seal, a motion to

---

[36] Presumably, Sweeney could establish "cause" for his failure to raise this issue on appeal because his trial counsel also represented him on direct appeal; however, because the defendant has no statutory right to a second attorney at trial, as explained above, Sweeney cannot establish prejudice.

[37] Mr. Kiersh was appointed to represent Sweeney on November 3, 1998 (Dkt. 37]. On November 14, 1998, Mr. DeWolfe was appointed pro hac vice [Dkt. 45].

disqualify Mr. Long based upon his prior representation of at least one government witness and unindicted coconspirators in the K Street case [under seal; not on docket]. After hearing argument from counsel on November 13, 2000 (11/30/00 Tr. 10-13), the trial court granted the government's motion and issued a written order [under seal; not on docket]. Sweeney's counsel stated that the removal of Mr. Long "create[d] a very significant prejudice to [him] and [his] ability to go forward," but that he was "not moving for a continuance right now" (11/13/00 Tr. 13). Instead, counsel requested permission for his investigator to sit at counsel table during the trial (11/13/00 Tr. 14-15). The trial court denied that request without prejudice, allowing trial counsel to "bring it up at an appropriate time in the future" (11/13/00 Tr. 15). Voir dire began two days later on November 15, 2000. At that point, Mr. Kiersh was sole counsel.

Sweeney now argues that trial counsel was ineffective for failing to appeal trial court rulings regarding the appointment of his "counsel of choice," Mr. Robinson, for failing to seek a continuance after Mr. Long was disqualified, for failing to ask the trial court to appoint a second attorney to assist him at trial, and for failing to argue that 18 U.S.C. § 3005 entitled him to two attorneys at trial because Sweeney had been indicted for a capital offense. All of these arguments fail. Sweeney was not entitled to two government-funded lawyers because when this case went to trial, it was not a capital case. It is well settled that the government's decision not to seek death penalty extinguishes a defendant's statutory right to have a second court-appointed counsel. See United States v. Cordova, 806 F.3d 1085, 1097-1102 (D.C. Cir. 2015) (once government formally informed the court and defendants of its intention not to seek the death penalty, the matter was no longer a capital case); see also United States v. Douglas, 525 F.3d 225, 236 (2d Cir. 2008) ("once the government has announced that it does not seek the death penalty, the case is no longer a capital case, and the appointment of counsel learned in death penalty law may be terminated."); United

States v. Waggoner, 339 F.3d 915, 918-19 (9th Cir. 2003) (no error in court's appointing death-penalty-qualified counsel on an interim basis and terminating the appointment when the government decided not to seek the death penalty because when the "threat that the death penalty will be imposed has been eliminated," "a defendant is no longer subject to 'indictment' for a 'capital crime'"); United States v. Sterling-Suarez, 306 F.3d 1170, 1174-75 (1st Cir. 2002) (requiring appointment of death-penalty-qualified second counsel promptly, rather than waiting for a decision by the government as to whether to seek the death penalty, stating that "there are practical reasons to treat the case as capital from indictment forward . . . until it becomes clear that the death penalty is no longer an option" and the matter is no longer a "capital case") (emphasis added); United States v. Casseus, 282 F.3d 253, 256 (3d Cir. 2002) (holding that any error in the district court's refusal to appoint death-penalty-qualified second counsel was harmless in light of the fact that "after the government declared that it would not seek the death penalty, the appellants were no longer capital defendants"); United States v. Grimes, 142 F.3d 1342, 1347 (11th Cir. 1998) (defendant "was properly denied benefits afforded to a capital defendant because the Government stipulated that it would not seek the death penalty and thereby transformed this case into a non-capital proceeding").

Thus, based upon well-settled case law, Sweeney's counsel's alleged failures at trial and on appeal regarding the appointment of a second attorney at trial cannot constitute ineffective assistance of counsel. United States v. Sayan, 968 F.2d 55, 65 (D.C. Cir. 1992) ("[A] lawyer is not 'ineffective' when he fails to file a meritless motion.") (citing United States v. Wood, 879 F.2d 927, 933 (D.C. Cir. 1989)). Accordingly, this ineffectiveness claim must be summarily denied because it is meritless.

67

SA-201

### o.   Claim A.15 – Sweeney Has Failed to Prove That His Trial and Appellate Counsel Was Ineffective For Failing to Present Certain Allegedly Exculpatory Evidence.

Sweeney argues that due to his trial counsel's "ineffective attempts," the government's opposition, and the trial court's rulings, he was unable to present evidence that purportedly exculpated him of the Donnell Whitfield murder in 1994, the Glenn Jenkins murder in 1993 (for which the jury acquitted him), and the triple homicide in Maryland in 1996. Sweeney's § 2255 Motion, at 15. Sweeney alleges that this evidence consisted of: 1) grand jury testimony of Cheree Owens and John Pinkney implicating Dennis Green and his friends, not Sweeney, in the triple murder; testimony from Wesley Smith, to whom Robert "Butchie" Smith purportedly confessed his involvement in the triple murder; and the testimony of Frederick Miller regarding Little Ty's confession to killing Glenn Jenkins. Id. Sweeney also claims that his appellate counsel "compounded the problem" by not raising any of these issues on appeal. Id. Sweeney fails to elaborate on any of these claims in later-filed supplements.

To the extent Sweeney claims government misconduct or trial court error, two of his claims (involving the Whitfield and Jenkins murders) are procedurally barred because he failed to raise them on direct appeal. The defendant does not argue that he has established cause and prejudice to excuse his procedural default. His third claim involving alleged exculpatory evidence relating to the triple murder fails because this issue was already litigated on direct appeal. To the extent Sweeney claims his counsel was ineffective at trial and on appeal, these claims should be summarily denied, as discussed below.

### 1.   Donnell Whitfield Murder

Sweeney fails to articulate what allegedly exculpatory evidence his counsel failed to present with respect to the Donnell Whitfield murder. See Sweeney's § 2255 Motion, at 15 ("the

68

SA-202

testimony that exculpated Mr. Sweeney from [] the Donnell Whitfield murder"). Without more, this claim should be denied as vague and conclusory.

### 2.   Glenn Jenkins Murder

Sweeney proffers that his trial counsel was ineffective for failing to procure "the testimony of Frederick Miller, regarding Little Ty's confession to killing Glenn Jenkins." Id. This claim is the same as A.6, which the government addressed, supra, pp 47-49. As the record shows, trial counsel did what Sweeney accuses him of failing to do and therefore counsel's performance clearly was not deficient. Moreover, the jury acquitted Sweeney of Jenkins' murder and found the racketeering act not proven. See Sweeney's Verdict Form, Racketeering Act 29 and Count 10. Sweeney has utterly failed to explain how he suffered any prejudice where he was not convicted of the murder about which Miller was to testify.

For the same reason, appellate counsel was not ineffective for failing to appeal an issue related to a charge that did not result in Sweeney's conviction. Clearly, such an issue was neither significant nor obvious. See Mayo v. Henderson, 13 F.3d 528, 533 (2d Cir. 1994) (a defendant may establish constitutionally inadequate performance only by showing that appellate counsel omitted significant and obvious issues while pursuing issues that were clearly and significantly weaker).

### 3.   The Triple Murder in Maryland

Sweeney makes two arguments about allegedly exculpatory evidence relating to the triple murder in Maryland. Sweeney's § 2255 Motion, at 15. First, he claims that his counsel failed to seek admission of grand jury transcripts from Cheree Owens and John Pinkney who implicated another person, Dennis Green, in the triple murder. This claim fails for the reasons set forth below. Sweeney also complains that he was prevented from presenting the testimony of Wesley Smith, to

69

SA-203

whom Robert "Butchie" Smith allegedly admitted his guilt in the triple homicide. This is the same claim as A.3, which the government addressed, supra, pp. 41-45.

On November 2, 2000, Sweeney's counsel filed a motion to admit into evidence the Maryland grand jury testimony of Owens and Pinkney in which these witnesses implicated someone other than Sweeney in the triple murder [Dkt. 450]. The government filed an opposition, and Sweeney's counsel filed a reply [Dkts. 481-1; 507]. The trial court denied the motion.

On appeal, counsel challenged the trial court's ruling on the admissibility of the grand jury transcripts of Owens and Pinkney. See Carson, 433 F.3d at 376-81. The D.C. Circuit upheld the trial court's ruling that the transcripts of these witnesses, who were unavailable to testify at trial, were inadmissible under Fed. R. Evid. 804(b)(1) because the federal government, who was prosecuting the K Street defendants, did not have a "similar motive" as the Maryland prosecutor in developing these witnesses' testimony. Id. at 378-80. Sweeney has failed to show how this issue merits reconsideration by this Court on collateral attack. See United States v. Thomas, 572 F.3d 945, 948 (D.C. Cir. 2009) (under law of the case doctrine, trial court should not "reconsider issues already decided on appeal "in the absence of extraordinary circumstances such as where the initial decision was "clearly erroneous and would work a manifest injustice") (internal citations omitted). In addition, Sweeney has failed to show ineffectiveness of counsel, at either the trial or appellate level, where counsel raised the issue by filing a pre-trial motion and challenged the trial court's adverse ruling on appeal.

### p.    Claim A.16 – Sweeney's Claim That His Counsel Was Ineffective For Failing to Provide Portions of the Trial and Appellate File to his § 2255 Counsel is Vague and Conclusory.

Sweeney claims that his counsel was ineffective because "great portions of the trial file and appellate file [were] unavailable" to his collateral attack attorney. Sweeney's § 2255 Motion,

at 15.  Sweeney also alleges that "apparently defense work product has also been lost."  Id.

Sweeney fails to describe the materials that his § 2255 counsel lacked, nor does he elaborate on

this claim in supplemental filings.  Therefore, this claim should be summarily denied because it is

vague and conclusory.

### q.    Claim A.17 – Sweeney Is Procedurally Barred from Raising His Brady and Massiah Claims.

Sweeney alleges that the government engaged in misconduct and violated Brady by failing

to disclose or by late-disclosing information about government witnesses James Montgomery and

Arthur Rice, and the government violated Massiah by procuring jail house confessions.  Sweeney's

§ 2255 Motion, at 16-17.  These claims are procedurally barred because Sweeney failed to raise

them on direct appeal.  Sweeney does not elaborate on or further develop these arguments in any

of his supplemental filings, nor does he argue that he has established cause and prejudice to excuse

his procedural default.  If the Court were to entertain these claims on the merits, they should be

summarily denied for the reasons that follow.

Sweeney first claims that the government suppressed impeaching information about James

Montgomery.  The defendant's claim is set forth in one short paragraph.  Sweeney's § 2255

Motion, at 16, ¶16.(i). To the extent the government is able understand this claim, the government

believes it relates to information that arose in an unrelated case in the Superior Court of the District

of Columbia, United States v. Steven Dewitt, 1991 FEL 5548, after the conclusion of the K Street

trial.  In that case, Dewitt was convicted of the murder of Paul Ridley.  The murder was unrelated

to the K Street investigation.  After Dewitt's conviction, Dewitt pursued a claim under the District

of Columbia's Innocence Protection Act, D.C. Code § 22-4135, alleging that he was innocent of

the Ridley murder because Samuel Carson was, in fact, responsible for that murder.  The

Honorable Franklin Burgess conducted evidentiary hearings on Dewitt's claim in 2003.  At those

SA-205

hearings, SA Vincent Lisi, James Montgomery and others testified for the defense. Montgomery testified that Carson had admitted to him that he (Carson) had killed Ridley. [38] SA Lisi confirmed that Montgomery gave him this information, at some point during Montgomery's cooperation with the FBI, but SA Lisi never memorialized it in a report. On December 17, 2004, Judge Burgess issued an opinion in which he granted Dewitt's motion, finding that Dewitt had proven his innocence by preponderance of the evidence.[39] Judge Burgess noted in his opinion that the government "sought to undermine" Montgomery's testimony in the 2003 Dewitt hearing that Carson had actually confessed the Ridley murder to him.[40]

The K Street trial took place in 2001 and the D.C. Circuit decided the appeal in 2006. The information that purportedly forms the basis for Sweeney's claim involving Montgomery did not became available to him during the K Street trial. However, because Judge Burgess decided the Dewitt motion in 2004, the information was available to Sweeney during his direct appeal. Sweeney has not provided any reason, or cause, for his failure to pursue this claim on appeal, nor has he articulated how he was prejudiced.[41] Moreover, he has failed to invoke the "actual innocence" exception to procedural bar. Accordingly, the Court should deny this claim.

---

[38]    Carson was never charged with the murder of Ridley.

[39]    Judge Burgess' opinion is 94 pages long. The government can provide copies to counsel and the Court upon request.

[40]    Sweeney seems to suggest that Judge Burgess' statement in his Order that the government sought to "undermine" Montgomery's testimony in the Dewitt hearing that Carson admitted the Ridley murder to him meant that "the government learned but did not believe James Montgomery's information that Sam Carson had confessed the murder [of Ridley] to him." Sweeney's § 2255 Motion, at 16.

[41]    Even if Montgomery had been impeached on this point, the defendant offers no argument for why this one additional impeachment topic would have made a different outcome reasonably probable. See United States v. Bagley, 473 U.S. 667, 682 (1985) (to satisfy the prejudice component, the defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different").

Sweeney also claims that the government engaged in misconduct by obtaining testimony "by any means necessary" with respect to Arthur Rice ("by misrepresentation and bending of the procedural rules in [Rice's] rule 35 motion of reduction") and James Montgomery (his initial and two subsequent plea agreements "after [Montgomery] lied and violated previous plea agreements"). These claims are procedurally barred because Sweeney could have raised them on direct appeal and because Sweeney has not established cause and prejudice to excuse his procedural default. Moreover, Sweeney fails to offer any factual basis for these bare bones assertions and it is not incumbent on the government to decipher and to make his arguments for him. Therefore, this claim can be denied, as well, on grounds that it is vague and conclusory.

Sweeney's third claim is that the government violated his Sixth Amendment rights by procuring "jailhouse confessions" in violation of Massiah. This appears to be similar to Claim A.7. Yet, here, Sweeney does not name any of the government witnesses on which he bases this claim, does not elaborate on this claim in supplemental filings, and fails to explain why he did not raise it on appeal. Thus, this claim should be summarily denied because it is procedurally barred and because it is vague and conclusory.

### r.  Claim A.18 – Sweeney's Adoption of Ineffective Assistance of Counsel Claims Filed by His Co-Defendants Should Be Denied.

Sweeney incorporates by reference the claims raised by his co-defendants related to their own claims of trial and appellate counsel's ineffectiveness. Sweeney has not identified which arguments made by his co-defendants are applicable to him. Therefore, the Court should summarily deny these claims because they are vague and conclusory. See, e.g., United States v. Stoddard, 103 F. Supp.3d 28, 30-31 (D.D.C. 2015) (where defendant incorporated ineffectiveness claims made by his co-defendants, court refused to act as defendant's "advocate by sifting through his codefendants' arguments to determine which claims raised by the codefendants might have

73

SA-207

been applicable to the [defendant]" and noting that because each co-defendant was represented by different counsel, each claim for ineffectiveness "is unique to each codefendant and his own counsel").

### s.   Claims A.19 through A.25, A.27, A.29 through A.31, A.36, A.39 through A.45, A.47 through A.52 are Untimely.

The Court should deny Sweeney's remaining claims that he raises in his first and second supplemental filings because they are untimely and do not relate back to previously-filed (timely) claims. Sweeney filed supplements to his timely filed § 2255 motion on November 28, 2014, and February 25, 2015 [both filed under seal, not on docket]. The claims raised in these pleadings are based upon materials that were unsealed by Chief Judge Hogan on February 15, 2008, and, for the most part, do not relate back to any of the claims Sweeney raised in his timely-filed § 2255 motion. Therefore, to be considered timely, these claims should have been raised and filed on or before February 15, 2009.[42] As stated earlier, see Note 21, even if the Court were to allow an additional 120 days, Sweeney is more than five years too late. Therefore, these claims should be summarily denied as untimely.

### t.   Claim A.60 – Sweeney's Adoption of Coates' Argument Regarding His § 924(c) Convictions is Meritless.

In this claim, Sweeney adopts Coates' arguments regarding the constitutionality of his § 924(c) convictions. This claim is timely because it relates back to Sweeney's Claim No. 13 and it is not procedurally barred because it is framed as an ineffective assistance of counsel claim. However, this § 924(c) claim should be denied on the merits for the reasons stated infra, pp. 120-26.

---

[42]   In Sweeney's Second Supplement, Sweeney's current counsel represents that upon entering his appearance on behalf of the defendant on December 20, 2012, he obtained approximately 15 boxes of material, including "some of the previously sealed material from the case that had been obtained pursuant to the Court's February 15, 2008 Order." Second Supplement, at 13.

SA-208

### u.    Claim A.61 – Sweeney's Adoption of All Claims Raised By Carson Should be Denied Because It is Untimely and Procedurally Barred.

In one sentence, in his second supplemental filing, Sweeney adopts Carson's "arguments and issues raised in his 2255 motion and supplements thereto, in their entirety." Sweeney's Second Supplemental § 2255 Motion, at 89.  Sweeney filed his supplemental § 2255 on February 25, 2015. As explained infra, pp. 80-85, the claims Carson raised in his pro se § 2255 motion and his April 9, 2015 supplement are untimely and/or procedurally barred.  Therefore, Sweeney's claims should be denied for the same reasons.  In addition, Sweeney has not identified which arguments and issues Carson raised in his motion and supplements are applicable to him (Sweeney).  Therefore, the Court should summarily deny these claims because they are vague and conclusory.

### v.    Claim A.62 – Sweeney's 8th Amendment Claim is Untimely.

On October 31, 2018, Sweeney filed a third supplement in which he raises an Eighth Amendment claim, based upon the Supreme Court's decision in Miller v. Alabama, 567 U.S. 460 (2012) (invalidating mandatory sentences of life without parole for juvenile homicide offenders) [Dkt. 1229].  Specifically, Sweeney claims that his conviction for the narcotics conspiracy, Count 1, should be vacated because he was a juvenile during some of the years of the conspiracy. This 8th Amendment claim is untimely because it should have been filed on or before June 25, 2013, one year after Miller v. Alabama was decided on June 25, 2012.  Accordingly, the Court should summarily deny this claim.

### w.    Claim A.63 – Sweeney's Adoption of Martin's Johnson Claim is Meritless.

On October 18, 2018, Sweeney asserted in his third supplement that he was adopting all arguments raised by Martin in Martin's supplement to his § 2255 motion.  The only supplement

75

Martin had filed by that date was his supplement based upon <u>Johnson</u>, which he filed on June 23, 2016 [Dkt.1182].  As explained <u>infra</u>, pp. 120-26, this claim is timely, but meritless.

<div align="center"><b>x.      Sweeney's Motion for Discovery Should be Denied.</b></div>

On November 9, 2019, Sweeney filed a motion for discovery pursuant to Rule 6 of the Rules Governing Section 2255 Proceedings [Dkt. 1242].   In his motion, Sweeney seeks information from the government concerning the murder of Robert "Butchie" Smith that Sweeney obtained from a government filing titled, Ex Parte Notice to the Court Regarding Change in Location of Confinement of Above-Named Defendants.  Sweeney acknowledges that the defense gained access to this document via Chief Judge Hogan's February 15, 2008 Order, which ordered the Clerk's Office to provide "copies of any necessary sealed pleadings in this matter to counsel for Mr. William Sweeney" [Dkt. 1016]. <u>See</u> Motion for Discovery, ¶ 6.  As the government argues, <u>supra</u>, p.74, all of Sweeney's claims based upon access to the previously sealed materials are time-barred.  Sweeney has not argued, much less, established "good cause," as Rule 6 requires, where is his request for discovery is based upon a time-barred claim and where he has waited more than 11 years to file this motion.  Accordingly, his motion for discovery should be denied.

**B.      Samuel Carson**

**1.      Carson's § 2255 Claims**

At trial, Joseph Beshouri, Esquire, and Lexi Negin-Christ, Esquire, represented Carson. On appeal, Paul Rosenzweig, Esquire, represented Carson.  On February 28, 2008, Carson's <u>pro se</u> motion to vacate conviction pursuant to 28 U.S.C. § 2255 was docketed by the Court [Dkt. 1023].

SA-210

In his pro se § 2255 motion, Carson raises three claims, which he states as follows:

**B.1**   "The Petitioner Was Deprived His Sixth Amendment Right To Effective Assistance of Counsel" for "A) Failure to Investigate; B) Failure to Object to Inadmissible Evidence (p. 4);

**B.2**   "Sentence Imposed in Violation of The United States Constitution" (p. 4);

**B.3**   "Newly Discovered Evidence Establishes That The Petitioner Was Denied his Fifth Amendment Right to Due Process" (p. 4).

For each of these claims, Carson refers to an "Attached Memorandum of Law and Facts;" however, no such document was attached to his pro se § 2255 motion and is not available on ECF or PACER.  The government has requested a copy of Carson's Memorandum of Law and Facts, but current § 2255 counsel does not have a copy.  Carson's pro se § 2255 motion thus presents, at best, three cursory and unsupported claims.

On May 13, 2009, the Court granted a motion filed by Edward Sussman, Esquire, to appoint him as counsel to represent Carson [Dkts. 1025; 1039].  On November 5, 2010, after Mr. Sussman filed a motion to withdraw, Kira West, Esquire, entered her appearance on behalf of Carson [Dkts. 1058; 1060].  On April 18, 2012, Ms. West filed a motion for discovery, seeking material related to investigations by law enforcement in Maryland and the FBI into the 1996 triple murder in Prince George's County, including the witnesses to those murders, Cheree Owens and John Pinkney [Dkt. 1088].  On December 18, 2012, and June 17, 2013, the government filed Notices of Filing, providing certain discovery to Carson's counsel in response to her motion for discovery [Dkts. 1108; 1118].[43]

---

[43]   The December 18, 2012, Notice of Filing memorialized a discovery conference that took place on October 25, 2012, during which government counsel provided Ms. West with: 1) access to some, but not all, of the government's trial exhibits; 2) a copy of a defense exhibit that had been admitted at trial; and, 3) other documents and portions of a transcript [Dkt. 1108].  The June 17, 2013, Notice of Filing memorialized the government's continuing effort to locate the trial exhibits and an offer to provide Ms. West with copies of a defense motion and attachments that were filed prior to trial [Dkt. 1118].

77

SA-211

On September 23, 2013, the Court issued an Order and Memorandum Opinion granting in part, and denying in part, Carson's motion for discovery [Dkts. 1123; 1124]. See United States v. Carson, 978 F. Supp.2d 34 (D.D.C. 2013). The Court found that Carson had failed to establish good cause for his discovery requests related to the triple murder because he had no constitutional or statutory right to that material. The Court did order the government to provide the defense with copies of FBI Special Agent Vincent Lisi's Grand Jury, which was previously provided to trial counsel. In addition, the Court granted Carson's discovery request for the trial exhibits and the exhibit list, because the government had not objected and noted that it was working with providing defense counsel with access to this material.

On March 30, 2015, the government filed a third Notice of Filing, memorializing government's counsel's unsuccessful efforts to locate a particular government trial exhibit, a fingerprint card [Dkt. 1168].[44]

On April 9, 2015, Carson, through counsel, filed a supplement to his § 2255 motion under seal. In that pleading, Carson raises the following claims:

> **B.4**    The government violated Brady/Giglio by withholding or failing to disclose documents to the defense that were filed with and/or submitted to the trial court ex parte and/or in camera before and during trial. These documents were made available to the defense during these § 2255 proceedings via Chief Judge Hogan's February 15, 2008 Order (pp. 6- 20);

> **B.5**    The government engaged in misconduct by paying benefits to John Pinckney and Cheree Owens, witnesses who testified in a Maryland Grand Jury about the 1996 triple murder, but who did not testify in the K Street trial, "in a manner designed to encourage them to improve their testimony," paying these witnesses "knowing that the funds were not being used in the manner in which they were intended," and not disclosing the payments to the defense (pp. 1-2, 21-29);

> **B.6**    The government failed to maintain the trial exhibits, including a fingerprint card (pp. 29-30);

---

[44]    The exhibit was a card containing a fingerprint lifted from the scene of the Maryland triple homicide (Government's Exhibit M52).

**SA-212**

**B.7**    Trial counsel were ineffective for failing to represent Carson zealously because of an alleged conflict between trial counsel and the trial judge (pp. 30-36);

**B.8**    Trial counsel was ineffective for failing to cross examine the government's fingerprint expert regarding other alleged suspects in the 1996 triple murder in Prince George's County (pp. 36-39);

**B.9**    Trial counsel was ineffective for failing to re-call government witness, Charlene Wilson, to testify that she heard that Carson committed the 1991 murder of Anthony Fortune, not that she saw the murder (p. 39);

**B.10**    Trial counsel was ineffective for failing to cross-examine witnesses Ronald Switzer, Cinema Hawkins, Charlene Wilson and Eugene Byars about payments they (or their family members) received from the government (pp. 39-41);

**B.11**    Trial counsel was ineffective for failing to follow-up about Carson's claim that he had a rental car during the time Carson was accused of borrowing a car to murder Robert Smith in 1997 which would have rebutted testimony that he needed to borrow a car on the day of the murder (p. 41);

**B.12**    Trial counsel was ineffective for failing to use an expert witness to show that government witness, James Montgomery, was "an individual who, due to mental slowness, was easily manipulated by people who showed him attention, friendship or who held a position of power over him" (pp. 41-42);

**B.13**    Trial counsel was ineffective for failing to object to the trial court's in camera inspection procedure used for reviewing alleged Brady material (p. 42);

**B.14**    Appellate counsel was ineffective for failing to seek appellate review of the trial court's rulings regarding sealed materials (p. 43);

**B.15**    Carson adopts the claims raised by his co-defendants in their § 2255 motions and supplements (p. 1 n.3 & p. 43 n.25).

On June 24, 2016, Carson filed another supplement to his § 2255 motion in which he asserted a claim in light of the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015) (hereinafter, "Johnson") [Dkt. 1183].  On June 14, 2017, Carson filed a supplemental § 2255 motion, addressing the Johnson issue on the merits, challenging his convictions under 18 U.S.C. § 924(c) [Dkt. 1192].  This argument is designated Carson's Claim B.16.

SA-213

On October 28, 2018, Carson filed a pleading in which he requested the Court to consider the holding in Napue v. United States, 360 U.S. 264 (1959), when considering the issues raised by him in his previous filings [Dkt. 1227]. On October 31, 2018, Carson filed a pleading in which he requested permission to join and adopt all arguments contained in Martin's filings [Dkt. 1230]. This claim is designated Claim B.17.

### 2.  The Government's Response to Carson's § 2255 Claims

### a.  Claims B.1 through B.3 Should be Denied Because They are Untimely.

Carson's pro se § 2255 motion was docketed on February 28, 2008 [Dkt. 1023]. Under the "prisoner mailbox rule," the operative filing date for a pro se can motion is the date on which the defendant places his motion in the prison mail system to be sent to the court. See Houston v. Lack, 487 U.S. at 270-71. Rule 3(d) of the Rules Governing Section 2255 Proceedings for the United States District Courts provides that:

> A paper filed by an inmate confined in an institution is timely if deposited in the institution's internal mailing system on or before the last day for filing. If an institution has a system designed for legal mail, the inmate must use that system to receive the benefit of this rule. Timely filing may be shown by a declaration in compliance with 28 U.S.C. §1746 or by a notarized statement, either of which must set forth the date of deposit and state that first-class postage has been prepaid.

Some courts have held that the burden is on the inmate to show that he has complied with Rule 3(d) by averring by declaration or notarized statement that he delivered his filing to prison officials within the pertinent deadline. See Allen v. Culliver, 471 F.3d 1196, 1198-99 (11th Cir. 2006); Price v. Philpot, 420 F.3d 1158, 1165 (10th Cir. 2005).

Here, Carson purportedly signed his initial § 2255 motion on February 18, 2008, but he has failed to show by declaration or notarized statement the date he deposited his motion in the prison

80

SA-214

mail system.[45]   Therefore, the Court should summarily deny Carson's pro se § 2255 motion because it is time-barred. See Allen, 471 F.3d at 1198-99; Price, 420 F.3d at 1165.

Alternatively, if the Court determines that Carson's pro se motion was timely filed, it should be denied because it is vague and conclusory. While prisoners' pro se pleadings are to be "liberally construed," Erickson v. Pardus, 551 U.S. 89, 94 (2007), the Court is not required to construct a defendant's legal arguments for him. See Small v. Endicott, 998 F.32d 411, 417-18 (7th Cir. 1993). Here, Carson makes three conclusory claims, each alleged in a single phrase: 1) he was "Deprived His Sixth Amendment Right to Effective Assistance of Counsel" based upon "Failure to Investigate and "Failure to Object to Inadmissible Evidence;" 2) his sentence was "imposed in Violation of the United States Constitution;" and, 3) "Newly Discovered Evidence Establishes That the Petitioner was Denied his Fifth Amendment Right to Due Process." See [Dkt. 1023, p. 4]. While Carson refers to an attached "Memorandum of Law and Facts," he filed no such document with his motion. Even now, more than 12 years after the defendant's pro se motion was filed, the defendant has not provided a copy of his memorandum. Moreover, he proffers no facts or details to support his claims.   Accordingly, the Court should summarily deny Carson's pro se claims. See, e.g., United States v. Zannino, 895 F.2d 1, 17 (1st Cir. 1990) ("issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived"); Johnson v. Panetta, 953 F. Supp.2d 244, 250 (D.D.C. 2013) (it is clear that "perfunctory and undeveloped arguments . . . are deemed waived").

If the Court were to determine that Carson's pro se motion was timely filed and a placeholder § 2255 motion, it must be summarily denied because, with one possible exception,

---

[45]   In Carson's Supplemental Motion to Vacate, Set Aside or Correct Sentence Pursuant to 18 U.S.C. Section 2255, filed by counsel on filed April 9, 2015, counsel asserts without explanation that Carson's initial pro se motion was timely filed. See p. 4, ¶10.

81

SA-215

none of his later-raised claims relate back to his alleged "placeholder" claims.  In the context of §

2255 motions, a "placeholder" motion is a "skeletal document [filed] to satisfy the period of

limitations, with the plan of filing a real petition later." Ellzey v. United States, 324 F.3d 521, 523

(7th Cir. 2003); Wyche v. United States, 317 F. Supp.2d 1, 14 n.1 (D.D.C. 2004).  Although the

D.C. Circuit has not ruled on this issue, other courts have held that claims raised in a placeholder

motion may entertained if claims raised in a later § 2255 motion relate back to the original claims.

See Vega-Figueroa v. United States, 206 F.R.D. 524, 525 (D. Puerto Rico 2002) (district court has

discretion to allow a prisoner to amend a § 2255 motion as long as the original petition was timely

filed and the petitioner does not seek to add a new claim or new theory of relief).

### b.  Claim B.4 Should be Denied Because It is Untimely.

On April 9, 2015, Carson, through counsel, filed a supplement to his § 2255 motion.  His

first claim is that the government violated Brady/Giglio by withholding or failing to disclose

documents to the defense that were filed with and/or submitted to the trial court ex parte and/or in

camera before and during trial.  The documents that the form the basis of this claim consist of:  1)

the government's Ex Parte Notice to Change Confinement of All Defendants; 2) interview notes

of Andre Murray; 3) interview notes of James Montgomery about Timothy Benton murder; 4)

302's of Charles Bender relating to Anthony Fortune murder; 5) notes that Charles Bender told

law enforcement that "Art" killed Steve Dunbar; 6) Theodore Watson case file from Maryland.

See Carson's § 2255 Supplement, at 6-20.

This claim is untimely because it arises out of documents provided to the defense during

these § 2255 proceedings via Chief Judge Hogan's February 15, 2008 Order.  See id. at 7 n.5, p. 9

n.6 & p. 20 (where defense counsel acknowledges that the documents  were "discovered by 2255

counsel in 2008," "turned over by the clerk in 2008," and "remained under seal until 2008").  To

SA-216

be considered timely, this claim should have been raised and filed on or before February 15, 2009, one year from the date of Chief Judge Hogan's February 15, 2008 Order. Counsel has failed to address why these claims were not raised until 2015. Even generously construing the end of the § 2255(f)(4) limitations period, see Note 21, supra, Carson's claims based on these sealed materials are time-barred by a number of years. Accordingly, Carson's Brady/Giglio claim should be summarily denied.

### c.    Claim B.5 Should be Denied Because It is Meritless.

Carson claims that the government engaged in misconduct for failing to disclose alleged payments to John Pinkney and Cheree Owens, who testified in a Maryland Grand Jury about the 1996 triple murder, but did not testify in the K Street trial. See Carson, 455 F.3d at 377 (the U.S. Marshals Service and an investigator hired by Sweeney were not able to locate Pinkney and Owens to testify at trial). On April 18, 2012, Carson filed a Motion for Discovery in this § 2255 proceeding seeking, among other things, a record of payments made to Pinkney and Owens by the federal government [Dkt. 1088]. On September 13, 2012, the Court denied the portion of Carson's motion relating to alleged payments to Pinkney and Owens [Dkt. 1124].

On October 9, 2014, Carson filed a Motion to Reconsider Motion for Discovery Based Upon New Evidence [Dkt. 1132]. The new evidence cited by Carson pertained to a May 29, 2014, interview of Owens, conducted by Carson's § 2255 counsel and an investigator, Mr. Vaughan. During that interview, Owens purportedly told them that "the Federal Bureau of Investigation moved her and Mr. Pinckney [sic] to numerous locations and paid them money after the testimony in the Prince George's County Grand Jury relating to the triple murder" [Dkt. 1132, at 2]. Owens refused to signed an affidavit. Vaughan apparently executed an affidavit, but that affidavit was

83

**SA-217**

not attached to Carson's October 9, 2014, motion, his April 9, 2015 supplement, or any other document filed by Carson.

In his April 9, 2015 supplement, Carson asserts that the interview of Owens is new evidence "that the federal government participated in, paid for and facilitated the 'disappearance' of these two witnesses." Carson's § 2255 Supplement, p. 24. While this claim is timely filed based upon Carson's proffer that the interview with Owens took place on May 29, 2014, the claim nonetheless fails for several reasons. First, Carson has not substantiated his claim by filing an affidavit from the investigator, Mr. Vaughan. Second, and importantly, Carson has not provided an affidavit from Owens. Third, Carson's assertion that new evidence from Owens shows that the government made Pinkney and Owens "disappear" is a mischaracterization of her purported statements to counsel and Mr. Vaughan that the FBI moved her and Pinkney and paid them after they testified in the Maryland Grand Jury, where there could have been other reasons, such as their safety, for any alleged government payments. Fourth, the evidence of Carson's guilt in the triple murder was strong. Finally, as this Court noted in its September 13, 2012 Order, disclosure of Giglio material to the defense, such as witness payments, was not required where Pinkney and Owens did not testify at trial [Dkt. 1168]. For all these reasons, Carson has not shown that the government had information in its possession that should have been disclosed to the defense or that any such information was material. Accordingly, this claim fails and should be summarily denied.

**d.      Claim B.6 Should be Denied Because It is Untimely.**

Carson claims that he was denied effective assistance of collateral attack counsel by the government's failure to maintain the trial exhibit list and trial exhibits, including a piece of evidence consisting of a fingerprint card containing Sweeney's fingerprint that was lifted from the

SA-218

scene of the 1996 triple murder. Carson's § 2255 Supplement, p. 29-30. This claim is untimely because it should have been filed on or before February 20, 2008.[46] In addition, this claim is vague and speculative. Carson has failed to explain how his § 2255 counsel's failure to obtain a copy of the government's exhibit list or failure to review unspecified trial exhibits amounts to a claim; rather, his assertion is more akin to a request for discovery to determine what, if any claims, to file. Moreover, the government's trial exhibits were referred to on the record, to which § 2255 counsel clearly had access. Finally, with respect to the fingerprint card, Carson has failed to explain how access to this item of evidence would assist § 2255 counsel's determination as to whether trial counsel was constitutionally ineffective. Accordingly, this claim should be summarily denied because it is untimely and vague and speculative.

e.      **Claims B.7 through B.14 Should be Denied Because They are Untimely.**

Carson raises a number of claims in his April 9, 2015 supplement -- B.7 through B.14 -- alleging that his trial counsel and appellate counsel were constitutionally ineffective. All of these claims should be summarily denied as time-barred because Carson should have filed them on or before February 20, 2008. Moreover, because Carson's pro se § 2255 motion was untimely filed, the Court need not determine whether any of Carson's supplemental claims relate back to his initial claims -- which would be difficult to do, in any event, given their skeletal nature.[47]

---

[46]   Had Carson timely filed this claim in 2008, closer to the conclusion of the trial in 2001, the items he seeks may have been available.

[47]   One of Carson's supplemental claims involves an allegation that his trial counsel was ineffective for failing to follow up on information that Carson allegedly gave him that he (Carson) had a rental car during the time of Robert "Butchie" Smith's murder. Construed generously, this claim arguably relates back to Carson's pro se claim that counsel "failed to investigate" and thus would be timely. Nonetheless, the claim fails. The government's evidence showed that Carson borrowed Montgomery's car to commit the murder. In raising this claim, Carson essentially argues that there is a reasonable probability that the jury would have acquitted him of this murder if the jury had learned that Carson had a rental car at the time of the murder, apparently because Carson then would not have needed to borrow Montgomery's car. It is, at the very least, unlikely that Carson would have used a rental car that would be traced back to him when he

85

SA-219

**f.    Claim A.15 – Carson's Adoption of All Claims Raised By his Co-Defendants Should be Denied Because It is Untimely.**

In his § 2255 supplement filed on April 9, 2015, Carson adopts the claims raised by his co-defendants in their § 2255 motions and supplements. See Carson's § 2255 Supplement, p. 1 n.3 & p. 43 n.25. This claim should be denied at untimely. At the very latest, to the extent the claims he seeks to adopt are based upon materials released pursuant to Chief Judge Hogan's February 15, 2008 Order, these claims should have been filed in 2009 – not six years later in 2015.

**g.    Claim A.16 – Carson's Johnson Claim is Meritless.**

On June 24, 2016, Carson filed his § 2255 supplement based upon Johnson on June 24, 2016, and he supplemented that claim on June 14, 2017 [Dkts. 1183; 1192]. The government addresses the merits of this claim, infra, pp. 120-26.

**h.    Claim A.17 – Carson's Adoption of All Claims Raised By Martin Should be Denied Because It is Untimely.**

On October 31, 2018, Carson filed a supplement to his § 2255 in which he seeks to join and adopt any and all arguments filed by Martin [Dkt. 1230]. This supplement is untimely as it should have been filed on or before February 20, 2008. Hence, the Court should summarily deny Carson's request to join and adopt Martin's arguments.

**C.    Sean Coates**

**1.    Coates' § 2255 Claims**

At trial, Frederick Jones, Esquire, represented Coates.[48]   On appeal, Stephen Leckar, Esquire, represented Coates. On February 19, 2008, Coates filed, through new counsel, Veronice

---

committed the murder. Thus, Carson has failed to show prejudice because his claim on this point is not at all persuasive.

[48]    According to Coates' counsel, Mr. Jones is now deceased.

SA-220

Holt, Esquire, a motion to vacate conviction pursuant to 28 U.S.C. § 2255 [Dkt. 1020]. This motion is timely. In his § 2255 motion, Coates raises the following four claims:

C.1    trial counsel was "totally ineffective throughout the entire proceeding," including failing to cross-examine witnesses, "blundering" the cross-examination of other witnesses, making promises in his opening statement that "he did not keep," filing only one-pretrial pleading, and not making any discovery requests (pp. 1-3, 9-45);

C.2    the government violated Brady by allegedly withholding information about James Montgomery's credibility; and, engaged in allegedly willful and deliberate misconduct when it elicited fingerprint evidence related to the 1993 kidnapping of Anthony Pryor and elicited testimony about Coates' involvement in the 1992 shooting of Michael Jones (pp. 2, 4-5, 24, 47-50);

C.3    appellate counsel was ineffective for failing to appeal the admission of fingerprint evidence relating to the 1993 kidnapping of Anthony Pryor, for failing to "obey" the D.C. Circuit's order regarding sealed portions of the record, and for failing to raise ineffectiveness of trial counsel on appeal (pp. 2, 45-46);

C.4    trial and appellate counsel were ineffective for failing to raise with the trial court and the D.C. Circuit that Coates' three convictions for possession of a firearm during a crime of violence in violation of 18 U.S.C. § 924(c) merged (pp. 2, 5-6).

On February 24, 2015, Coates filed a pro se supplement to his § 2255 motion [Dkt. 1166].

In that pleading, Coates asserts the following four new claims:

C.5    trial counsel was ineffective for failing to call Coates' sister, Dakeisha Ruffin, as an alibi witness to testify about Coates' whereabouts on the night of November 17, 1996, the night Coates and his co-defendants committed the triple murder in Temple Hills, Maryland (pp. 1-3; Exhibits 1 and 2);

C.6    trial counsel was ineffective for not advising Coates to testify on his own behalf about his alibi to the triple homicide (pp. 3-5);

C.7    the trial court's aiding and abetting instruction was erroneous and trial counsel was ineffective for failing to object to it (pp. 5-7);

C.8 (relates back to C.4)    the defendant's consecutive sentences relating to his convictions for § 924(c) were unconstitutionally stacked (pp. 7-9).

On June 27, 2016, Coates, through counsel, filed a one-page supplement to his § 2255 motion in which he asserted a Johnson claim, challenging his convictions under 18 U.S.C. § 924(c)

87

SA-221

[Dkt. 1184]. This is designated Coates' Claim C.9. On that same day, June 27, 2016, Coates filed a second pleading [Dkt. 1185], in which he sought to join Carson's Supplemental § 2255 motion [filed under seal on April 9, 2015]. This is designated Coates' Claim C.10. On October 30, 2018, Coates filed a pleading [Dkt. 1228] seeking permission to join Carson's Unopposed Supplement to Prior Supplemental Motion to Vacate. In Carson's pleading [Dkt.1227], which Coates seeks to join, Carson asks the Court to consider the Supreme Court's decision in Napue v. Illinois, 360 US. 264 (1959), in making its ruling. This is designated Coates' Claim C.11.

### 2. The Government's Response to Coates' § 2255 Claims

#### a. Claim C.1 – Coates Has Failed to Meet His Burden of Proving That His Trial Counsel Was Constitutionally Ineffective.

Coates asserts that his trial counsel was "totally ineffective throughout the entire proceeding." Coates' § 2255 Motion, at 1. In support of this sweeping assertion, Coates alleges in conclusory fashion that his trial counsel: 1) did not cross-examine witnesses for the most part, and when he did, he "simply winged it;" 2) made promises in his opening statement that he did not keep; 3) failed to make a hearsay objection to certain fingerprint evidence; 4) allowed hearsay to be put before the jury without objection; 5) failed to make (unspecified) legal and factual arguments "that any competent lawyer would have recognized the need to make;" 6) filed only one pre-trial pleading; 7) did not introduce any exhibits and completed impeachment on only one occasion; 8) failed to make discovery requests; and, 9) failed to preserve his client's files and records. Coates' § 2255 Motion, at 3-4.

Most of Coates' claims of ineffective assistance are conclusory and lack the necessary detail that would permit the government to respond. In other words, although Coates has devoted more than 30 pages to writing about these claims, he has failed to explain with specificity how any of these claims amount to deficient performance or how he was prejudiced. For example, Coates

SA-222

lumps together a myriad of claims under the heading, "trial counsel's failure to confront evidence," that include allegations that trial counsel failed to cross-examine certain witnesses (pp. 9-15); allegations that trial counsel made errors with respect to witnesses who testified about specific crimes and racketeering acts (kidnapping of Yusef Simmons, attempted murder of Ronald Sowells, kidnapping of Anthony Pryor, murder of Gaskins, Mack and Anderson, and feud with Condon Terrace) (pp. 15-32): and, trial counsel's "other failures" (opening statement, trial preparation, statements made by Robert "Butchie" Smith, failure to object to "continuous hearsay," and closing argument) (pp. 33-45). The government attempts to address each of these categories in turn.

### i.      Trial Counsel's Alleged Failure to Conduct Cross-Examination

Coates claims that his trial counsel was ineffective for failing to cross-examine certain government witnesses and for failing to properly cross-examine other witnesses. All these witnesses testified about Coates' drug dealing. Coates' complaints are as follows:

- Trial counsel did not properly cross-examine SA Lisi about Lisi's testimony identifying Coates in a videotape "reaching down into the weeds and pull[ing] out a white bag" (1/23/01PM Tr. 34-35). Coates claims he had told his counsel that the person in the video was someone else, and asserted that he would submit a sworn statement to that effect, but Coates never did (pp. 9-10 and p. 10 n.6);[49]

- Trial counsel failed to cross-examine Ronald Switzer, who testified that Coates was making money selling drugs in 1996 and 1997 (1/25/01PM Tr. 5-6) (p. 11);

- Trial counsel failed to cross-examine Donald Nichols, who testified that Coates was one of the people who sold marijuana on a typical day (2/15/01AM Tr. 31-32) (p. 11);

- Trial counsel failed to properly cross-examine James Montgomery about Montgomery's testimony that Coates was selling drugs in 1989 (3/12/01AM Tr. 38) (p. 11-13);

---

[49]   Of course, trial counsel could not have presented a sworn statement from Coates as evidence at trial, so it is irrelevant that Coates volunteered to present such a statement and that he never actually did so.

SA-223

- Trial counsel failed to cross-examine Charles Bender, who testified that in 1994 and 1995, he sold drugs with Coates in the 200 block of K Street (4/4/01AM Tr. 56) (p. 13);

- Trial counsel failed to properly cross-examine Ronald Sowells about his testimony that in 1992 and 1993, around 30 to 40 people, including Coates, were selling marijuana in an alley behind Delaware Avenue and K Streets, and that Sowells frequently sold marijuana with Coates (4/17/01PM Tr. 23-25, 40) (p. 13);

- Trial counsel failed to properly cross-examine Paul Franklin about his testimony that Coates was selling marijuana in the alley behind Delaware Avenue and K Street and that he had bagged marijuana at Coates' mother's house (5/1/01AM Tr. 70, 81) (p. 14);

- Trial counsel failed to properly cross-examine Demetrius Hunter about his testimony that he (Hunter) sold marijuana for Coates in 1994 and 1995 (5/3/01PM Tr. 77) (p. 15).

Notably, Coates has failed to explain how his trial counsel should have cross-examined these witnesses about Coates' involvement in selling marijuana in and around K Street in the late 1980's and early 1990's and also has failed to explain what the witnesses would have said had they been so cross-examined. In sum, these claims are vague and conclusory and should be summarily denied because Coates has failed to describe, much less prove, deficient performance and prejudice.

### ii. Trial Counsel's Alleged Errors With Respect to Specific Crimes or Racketeering Acts.

Coates makes the following five claims regarding his trial counsel's alleged errors with respect to certain crimes or racketeering acts:

- Trial counsel appeared "to be caught off guard" when the government called kidnapping victim, Norman Yusef Simmons (pp. 15-18);

- Trial counsel failed to make use of "rich fodder for cross-examination" of government witness, Ronald Sowells (pp. 18-23);

- Trial counsel lodged a "non specific objection" to fingerprint evidence involving the kidnaping of Anthony Pryor (p. 24);

SA-224

- Trial counsel "sat down without laying a finger on [government witness James] Montgomery" after Montgomery testified about Coates' involvement in the triple homicide (pp. 24-27);

- Trial counsel failed to conduct any cross-examination with respect to the Condon Terrace feud (pp. 27-32).

Similarly, as argued above, Coates has failed to explain what, if anything, trial counsel should have done differently with respect to each of these categories of alleged deficiencies. Nor has he shown what, if anything, cross-examination of witnesses would have revealed and how that cross-examination would have created a reasonable probability of a different outcome. Accordingly, these claims should be denied because the defendant has failed to meet his burden of proving deficient performance or prejudice.

### iii.    Trial Counsel's Alleged Other Failures

Coates makes the following five claims regarding his trial counsel's alleged "other failures":

- Trial counsel delivered an opening statement that was "obviously off the cuff" and made unspecified promises (p. 33);

- Trial counsel failed to conduct adequate pretrial preparation (pp. 34-40);

- Trial counsel "misunderstood the nature of the evidence that the government intended to present" with respect to the statements made by Robert "Butchie" Smith to SA Lisi (pp. 40-41);

- Trial counsel "continuously failed to object to hearsay solicitations by the Government" (pp. 41-42);

- Trial counsel delivered a closing argument that "barely passed the giggle test given the seriousness of the allegations" (pp. 43-45).

These claims of ineffective assistance of trial counsel are vague and conclusory and should be denied on this basis. Coates has failed to explain how trial counsel should have performed differently in these areas, and has not shown that had counsel done so, it is reasonably probable

91

SA-225

that the result would have been different.  Accordingly, the Court should summarily deny these claims.

### b.   Claim C.2 – Coates' Brady/Government Misconduct Claims are Procedurally Barred.

Coates raises three claims in which he alleges that the government either violated Brady or engaged in willful misconduct.  These claims should be denied because they are procedurally barred because Coates failed to raise them on direct appeal.  Moreover, he has failed to alleged, much less meet, his burden of establishing cause for his failure to do so, and has failed to describe any prejudice he has suffered.  Further, and as explained in more detail below, these claims also may be denied on the merits.

First, Coates claims that the government violated Brady by withholding information about James Montgomery.  Coates' § 2255 Motion, at 4, 50.  Specifically, Coates alleges that the government knew "at all times" that Montgomery had accused Carson of a murder for which another person, Steven Dewitt, had been convicted and was serving time.  Coates' § 2255 Motion, at 4.  This is, in essence, the same argument Sweeney raises.  For the reasons Sweeney's claim fails, Coates' claim fails as well.  See supra, pp. 71-73.

Second, Coates asserts that the government engaged in "willful misconduct" by eliciting fingerprint evidence relating to the Anthony Pryor kidnapping "through rank hearsay" and "did not put on any foundational evidence or a fingerprint expert to testify to whether the fingerprint matched."  Coates' § 2255 Motion, at 4.  Again, Coates waived his right make this argument because he failed to demonstrate cause and prejudice for his failure to raise it on direct appeal.  However, the government addresses this claim on the merits because Coates has framed it as a claim involving ineffective assistance of appellate counsel.  See infra, pp. 94-95.  Accordingly, the Court should deny this claim as procedurally barred and because it is without merit.

SA-226

Third, Coates argues that the government knowingly elicited false testimony regarding Coates' involvement in the June 20, 1992 shooting of Michael Jones. Coates' § 2255 Motion, at 5, 48-49. Coates asserts that "Jones was neither shot nor shot at" and that "the government did not have a good faith basis for suggesting that Michael Jones was a victim of the [] shooting." Id. at 5. This claim is also procedurally barred because Coates did not raise the claim on direct appeal. He has failed to demonstrate cause and prejudice for his failure to do so. In addition, he has failed to invoke the "actual innocence" exception to procedural bar.

The Court can also deny Coates' claim on the merits because, contrary to Coates' assertion, the government did present evidence at trial that Coates shot Michael Jones. The jury found, with respect to Coates, that the government had proven the racketeering act of conspiracy to murder Michael Jones (Racketeering Act No. 27). Coates was not charged with a substantive offense involving the shooting of Jones. At trial, Arthur Rice testified that he was with Coates and others when Coates and "Gus" "rode up on [Michael Jones], walked up on him," Jones "tried to run," and "[t]hey shot at him" (4/24/01PM Tr. 54). Rice believed that Jones "got hit because he stumbled" (id.). The government presented actual eyewitness testimony that Coates was involved in the shooting of Jones and not, as Coates casts it, a mere "suggestion" that Jones was the victim of a shooting. Accordingly, this claim should be denied on procedural grounds, but also can be denied on the merits.

### c.   Claim C.3 – Coates Has Failed to Show That His Appellate Counsel Was Constitutionally Ineffective.

Coates argues that his appellate counsel was constitutionally ineffective in three respects: failing to appeal the admission of fingerprint evidence relating to the kidnapping of Anthony Pryor, failing to "obey" the D.C. Circuit's order regarding sealed portions of the record, and failing to

93

SA-227

raise ineffectiveness of trial counsel on appeal. Coates' § 2255 Motion, at 2, 45-46. The Court should summarily deny these claims because they lack merit for the reasons explained below.

First, Coates claims that his appellate counsel was ineffective for failing to appeal the trial court's ruling with respect to the fingerprint evidence, namely, that "the admission of the fingerprint was readily recognizable as rank hearsay that did not fit within any exception of the hearsay rule." Coates' § 2255 Motion, at 45. The jury convicted Coates of the 1993 attempted murder of Anthony Pryor and the related firearms offense (Counts 11 and 28). Police recovered a latent fingerprint from the "right rear chrome taillight [sic] molding, the exterior side" of the brown Cadillac used in the Pryor kidnapping (Eaton 4/23/01PM Tr. 66, 78-80). The car was found in the parking lot behind 310 I Street, S.E. (Eaton 4/23/01PM Tr. 62). The car was missing its trunk and there were bloodstains on the left rear quarter panel of the vehicle (Eaton 4/23/01 Tr. 64). From in and around the car, as well as from a nearby dumpster, police recovered items of clothing and shoes, work gloves, a pair of sneakers with bloodstains and duct tape (Eaton 4/23/01PM Tr. 68-74).

On cross-examination, Sweeney's counsel elicited from Sergeant Deloatch that he, as the lead investigator, "submitted a lot of names" with whom to compare the fingerprint that was recovered from the Cadillac and that the fingerprint did not match any of Sweeney's prints (Deloatch 4/24/01AM Tr. 17). On redirect, the prosecutor asked Sergeant Deloatch whose known prints were found on the car (Deloatch 4/24/01AM Tr. 30-31). Coates' trial counsel objected; the trial court overruled the objection (Deloatch 4/24/01AM Tr. 31). Sergeant Deloatch then answered that the fingerprint belonged to Coates (id.). On re-cross examination, Coates' trial counsel elicited that the fingerprint was found on the outside of the vehicle, on the right rear taillight (id.).

94

While the fingerprint examiner who determined that the fingerprint recovered from the Cadillac matched the known print of Coates did not testify, Coates has failed to establish how he was prejudiced, given that there was ample evidence that Coates was involved in the kidnapping of Pryor.  First, James Montgomery testified that he had spoken to Coates about the Pryor kidnapping (Montgomery 3/13/01AM Tr. 20).  Coates told Montgomery that he and others had robbed someone and put him in the trunk of Coates' Cadillac, but that the victim had broken out of the trunk – thus breaking the trunk off of the car – and had gotten away (Montgomery 3/13/01AM Tr. 20-22).  Coates also told Montgomery that he had taken the car to Arthur Cappers to burn it, at Hill's direction, but the police had gotten there before he could burn it (Montgomery 3/13/01AM Tr. 22).

In addition, Sweeney's admissions to Theodore Watson corroborated Coates' admissions to Montgomery.  Sweeney told Watson that when they threw Pryor in the trunk, he kicked the car trunk open and got away, even though they shot him as he was running (Watson 2/8/01PM Tr. 60-61).  Thus, in light of Coates' and Sweeney's admissions that corroborated the unusual circumstances of the kidnapping (that the victim had kicked off the trunk), Coates has failed to establish a reasonable probability that the proceeding would have been different, even if Sergeant Deloatch's testimony had not been admitted.

Second, Coates asserts that his appellate counsel was ineffective for his "failure to obey [D.C. Circuit's] order relating to sealed portions of the record." Coates' § 2255 Motion, at 45.  As explained more fully, supra, pp. 61-63, the D.C. Circuit ordered the appellants to raise any future arguments concerning the trial court's application of Brady and the Jencks Act in their brief, not by motion.  On April 25, 2005, Sweeney, Carson, Coates, Martin and Hill filed a consolidated appellate brief.  In that brief, as Coates acknowledges, the defendants raised an argument on appeal

Case 1:98-cr-00329-RCL   Document 1255   Filed 03/18/20   Page 96 of 127

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 238 of 668

under the heading, "The Court's response to <u>Brady</u> and <u>Jencks</u> requests was lacksadaisical." Coates has failed to explain how appellate counsel's performance was deficient, where counsel, acting in concert with the other appellate counsel, did what Coates accuses him of failing to do. Further, Coates has failed to allege in any way how he was prejudiced. Accordingly, this claim should be denied because Coates has failed to meet his burden of proof under both prongs of <u>Strickland</u>.

Third, Coates claims that his appellate counsel was ineffective for failing to raise on appeal "the glowing deficiencies of trial counsel" regarding the admissibility of the fingerprint evidence, discussed above, and the admissibility of statements of Robert "Butchie" Smith. Coates' § 2255 Motion, at 46. With respect to the fingerprint evidence and given the strength of the non-fingerprint evidence, Coates has not overcome the presumption that appellate counsel raised the issues on which he thought Coates was most likely to prevail. <u>See</u> <u>Bell v. Jarvis</u>, 236 F.3d at 164 ("reviewing courts must accord appellate counsel the presumption that he decided which issues were most likely to afford relief on appeal") (internal quotation marks omitted). With respect to the admissibility of Robert "Butchie" Smith's statements to Special Agent Lisi, all of the appellants raised this issue on appeal, albeit unsuccessfully. <u>Carson</u>, 455 F.3d at 360-67. Therefore, Coates has failed to show deficient performance and prejudice. Accordingly, this claim should be denied.

### d.    Claims C.4 and C.8 – Trial Counsel and Appellate Counsel Were Not Ineffective for Their Failure to Challenge Coates' Consecutive Sentences for Violations of § 924(c) Because His Merger Argument is Meritless.

Coates asserts that his trial counsel and appellate counsel were constitutionally ineffective for failing to challenge his three § 924(c) convictions arising out of the Maryland triple murder based upon merger grounds. Coates' § 2255 Motion, at 5-6, 47; Coates' First Supplement, at 7-9.

SA-230

Sweeney raises this same claim, to which the government responds, infra, pp. 114-20. For the reasons stated therein, the Court should deny Coates' claim because it is meritless.

### e. Claims C.5, C.6 and C.7 Are Untimely or Procedurally Barred; Claim C.8 Relates Back to Claim C.4.

On February 24, 2015, Coates filed a supplement to his original § 2255 motion in which he raised four issues [Dkt. 1166]. These claims are as follows: 1) his trial counsel was ineffective for failing to call his sister as an alibi witness (C.5); 2) his trial counsel was ineffective for giving him faulty advice which led him not to testify (C.6); 3) the trial court's aiding and abetting instruction was erroneous and trial counsel was ineffective for failing to lodge an objection (C.7); and, 4) his consecutive sentences for § 924(c) violations were unconstitutionally "stacked" and some of these convictions should be vacated (C.8). The first three claims are untimely or procedurally barred, for the reasons explained below. The fourth claim relates back to a timely filed claim (C.4).

Coates' first two claims involve allegations that his trial counsel was constitutionally ineffective with respect to Coates' alleged alibi defense for the 1996 triple murder in Maryland. To support this claim, the defendant attaches an affidavit from his sister, Dakeisha Ruffin-Borders, dated March 3, 2014, and his own affidavit dated February 9, 2015. Coates' Supplemental § 2255, Exhibits 1 and 2. In her affidavit, Ms. Ruffin-Borders states that she met her brother, Coates, at USP Allenwood on October 13, 2013. During that meeting, she told Coates that in January 1999, prior to the K Street trial, she told Coates' trial counsel that she was with Coates on the night of the triple murder. According to Ms. Ruffin-Borders, Coates' trial counsel told her he would call her back in a few days to see if he could use her in Coates' trial. After the telephone conversation, Ms. Ruffin-Borders "became frightened that [she] would be falsely accused of crimes in [her] brother's case." Id., Exhibit 2, ¶4. When Coates told her during their meeting at Allenwood that

97

SA-231

his trial counsel told him that she did not want to get involved in his case and "end up being charged with the murders too." Id. at ¶5. Ms. Ruffin-Borders told Coates that "that was a lie" and that she "would have come to testify but that [trial counsel] never called [her] back after [she] told him what happened and where [they] were on the night of November 17, 1996." Id. In Coates' affidavit, he asserts that his trial counsel "continuously told [him] that he had spoken to [Coates'] sister but that she had told him that she did not want to come forward and testify about [Coates] being with her on the night of the tripple [sic] murders, that the prosecutor may also charge her." Exhibit 2, ¶ 6. Coates also asserted that at no time prior to their "October 13, 2013, visiting hall revelations" was he aware of his trial counsel's conversations with his sister. Id. at ¶ 7.

This claim is untimely, even assuming the factual allegations made by Coates and his sister are true about the date when Coates became aware that his sister was willing to be an alibi witness for him. Under Section 2255(f)(4), Coates had to file within one year from October 13, 2013, the date on which he allegedly discovered the facts supporting this claim. He filed his supplemental § 2255 motion on February 24, 2015, more than four months too late. Moreover, Coates has failed to establish that the miscarriage of justice exception applies because he has not shown "that it is more likely than not that no reasonable juror would have convicted him in the light of the new evidence." McQuiggen v. Perkins, 569 U.S. at 399 (quoting Schlup v. Delo, 513 U.S. at 327). This is because the government's evidence of Coates' involvement in the triple murder, along with Sweeney and Carson, was strong. See supra, pp. 37-39.

Coates' Claim C.7, involving alleged jury instruction error, is procedurally barred because he should have raised this challenge on direct appeal and he has failed to allege, much less, establish cause and prejudice for failing to raise it.

98

SA-232

Coates' Claim C.8, involving a challenge to his § 924(c) convictions based upon stacking, is untimely, but relates back to timely-filed claim C.4, involving the same issue. The government responds to this claim on the merits, infra, pp. 114-20.

### f.        Claim C.9 Coates' Johnson Claim is Vague and Conclusory.

On June 27, 2016, Coates filed a second supplement to his original § 2255 motion in which he states, in one paragraph, his intention to raise a Johnson claim by filing a supplement by October 26, 2016 [Dkt. 1184]. Coates did not do so. This claim should be denied because it is vague and conclusory.

### g.        Claim C.10 in Which Coates Adopts Carson's Claims is Untimely.

On June 27, 2016, Coates filed a second supplement to his original § 2255 motion in which he asks the Court to allow him to adopt the arguments raised by Carson in Carson's supplement to his § 2255 motion filed on April 9, 2015 [Dkt. 1228]. This is designated Coates' Claim C.10. Because Carson's claims are untimely, Coates' attempt to bootstrap to these claims is also untimely. Moreover, Coates' claim is also untimely on its own accord, having been filed more than eight years after February 20, 2008 (one year after his convictions became final).

## D.    Jerome Martin

### 1.    Martin's § 2255 Claims

At trial, Joanne Hepworth, Esquire, represented Martin. On appeal, Reita Pendry, Esquire, represented Martin. On February 18, 2008, Martin filed a timely pro se motion to vacate conviction pursuant to 28 U.S.C. § 2255 [Dkt. 1021]. In his motion, Martin raises the following two claims:

> **D.1**        the government violated Brady by withholding exculpatory evidence with respect to the 1991 killing of Anthony Fortune; that is, the government did not disclose information that an eyewitness, Steven Thomas, was interviewed by the police and purportedly described the shooter as someone other than Martin and Carson (pp. 6, 8-11);

99

SA-233

**D.2**　　　the government violated Martin's due process rights by impeding his ability to call shooting victim James Coulter by representing to the Court that Coulter could not be found or was perhaps deceased (pp. 6-7, 11-12).

On May 7, 2008, Martin filed a pro se motion to stay the Court's ruling on his § 2255 motion [Dkt. 1028]. On January 2, 2009, Frances D'Antuono, Esquire, entered her appearance on behalf of Martin [Dkt. 1038]. On April 20, 2011, the Court denied Martin's motion for a stay and ordered Martin to file his supplement [Dkt. 1069].

On March 8, 2012, Michael Lawlor, Esquire, and Gwendolyn Waters, Esquire, entered their appearances on behalf of Martin [Dkts. 1086; 1087]. On June 23, 2016, Martin filed a supplement to his § 2255 motion, raising a Johnson claim [Dkt. 1182]. This is designated Martin Claim D.3.

On November 21, 2018, Martin filed a second supplement to his § 2255 motion in which he provides additional detail and argument pertaining to his two original claims about the murder of Anthony Fortune and the shooting of James Coulter, and adds three new claims [Dkt. 1233]. The claims Martin raises are as follows:

> **D.4 (relates back to D.1)**　　the government violated Brady by withholding exculpatory evidence with respect to the 1991 killing of Anthony Fortune; that is, the government did not disclose information to the defense that an eyewitness, Steven Thomas, was purportedly interviewed by the police and described the shooter as someone other than Martin and Carson (pp. 19-24);

> **D.5 (relates back to D.2)**　　the government violated Martin's due process rights by impeding his ability to call as a witness shooting victim, James Coulter, by representing that Coulter could not be found or was perhaps deceased (pp. 24-29);

> **D.6**　　trial counsel was ineffective for failing to re-call government witness, Charlene Wilson, an eyewitness to Fortune's murder, to impeach her (pp. 29-34);

> **D.7**　　trial counsel was ineffective for failing to investigate and present testimony from Michael Floyd and Juan Floyd who allegedly were present when Coulter was shot and would have testified that Martin was not the shooter (pp. 34-36);

SA-234

**D.8 (relates back to D.1 and D.2)**   due to government's alleged violations, a new trial on the narcotics and RICO conspiracy counts is required because Martin's convictions for narcotics and RICO conspiracy are based upon the Fortune murder and Coulter shooting (pp. 36-37).

2.       **The Government's Response to Martin's § 2255 Claims**

a.       **Claims D.1 and D.4 – Martin's Brady Claim is Procedurally Barred and Meritless.**

As background, both Martin and Carson were convicted of the 1991 murder of Anthony Fortune.  The government's theory at trial was that Carson was the shooter, while Martin was the aider and abettor.  See Carson 455 F.3d at 342.  Martin alleges that the government withheld information about Steven Thomas, who purportedly had exculpatory informant about the murder of Fortune.  According to Martin, sometime before February 18, 2008, Thomas told Martin's investigator that shortly after Fortune's murder on August 6, 1991, Thomas told police that the shooters were neither Martin nor Carson, and that he had described the shooter to the police.  Martin's § 2255 Motion, at 6, 14-15; Martin's Second Supplement, at 21-22.  Martin has attached an affidavit dated February 18, 2008.  Notably, however, the affidavit is not from Thomas; rather it is from defense investigator, George Steel, who purportedly interviewed Thomas.

This claim fails because it is procedurally barred and meritless.  Martin did not raise this claim on direct appeal and has not alleged, much less shown, "cause" and "prejudice" to excuse his failure to do so.  The investigator's February 18, 2008 affidavit does not state when he interviewed Thomas.  Thus, Martin has not shown that he lacked this information when his direct appeal was pending – that is, from 2002 to 2007.  Moreover, even if Martin did not learn about Steel until February 2008, Martin cannot show prejudice because this claim is meritless.

According to Steel's February 18, 2008 affidavit, Thomas told him (Steel) during an interview that he (Thomas) knew Martin and Fortune, that he was present when Fortune was killed,

101

that he saw the person who shot Fortune and it was not Martin, that the person who shot Fortune was "very dark-complected, stocky and taller than Martin, that police interviewed him after the shooting and he described the shooter to the officers the same way he described the shooter to Steel, and that Thomas was "never called by the government to testify about Fortune's killing." Martin's § 2255, at 14-15. Martin argues that the information Thomas provided to Steel was in the government's possession and shows that he and Carson "were innocent of the shooting." Id. at 10.

The Due Process Clause of the Fifth Amendment to the U.S. Constitution requires the government to turn over any information in the government's possession that is "materially favorable to the criminal defendant." United States v. Sitzmann, 893 F.3d 811, 826 (D.C. Cir. 2018) (citing Brady, 373 U.S. 83, 87 (1963)). There are three components of a Brady claim: 1) the evidence at issue must be favorable to the accused, either because it is exculpatory, or because it is impeaching; 2) the evidence must have been suppressed by the government, either willfully or inadvertently; and 3) prejudice must have ensued. Id. (citing Strickler v. Greene, 527 U.S. 263, 281-82 (1999)).

To satisfy the prejudice component, the defendant must show that "there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different." United States v. Bagley, 473 U.S. 667, 682 (1985). Hence, to prevail on his Brady claim, the defendant must establish that "the favorable [suppressed] evidence could reasonably be taken to put the whole case in such a different light as to undermine confidence in the verdict." Kyles v. Whitley, 514 U.S. 419, 434 (1995). The omitted evidence must create a reasonable doubt that did not otherwise exist and "must be evaluated in the context of the entire record." United States v. Agurs, 427 U.S. 97, 112 (1976).

102

SA-236

The record conclusively establishes that Martin has not established a violation of Brady. The materials in the government's possession do not show that Thomas ever provided the government with a description of the shooter. In response to Martin's claim, the undersigned reviewed the contents of the prosecution's trial file and MPD's file relating to the murder of Anthony Fortune. There are two documents relevant to Martin's claim:  1) MPD Form PD-119 (Complainant/Witness Statement) that memorializes Thomas' August 6, 1991 interview with police; and, 2) Thomas' June 19, 1998 Grand Jury testimony about the Fortune murder. Both were disclosed to the defense in this proceeding.[50]

As these materials show, Thomas did not describe the shooter to the police or to the Grand Jury. Rather, according to the PD 119, police interviewed Thomas on the morning of the murder, at 4:50 a.m. (the Fortune murder occurred at approximately 1:00 a.m.).  Thomas told police that he was sitting in a car with his friend, Regina, when he heard about seven gunshots from behind him. He was not asked nor did he tell police whether he saw the shooter. He also did not provide any description of the shooter.

According to Thomas' Grand Jury testimony, Thomas heard between seven and ten gunshots at the time of the Fortune shooting, looked through the mirror (of his car), and saw "two men running in the street, and one was holding his waist side and he fell, and it was another dude on top of him." When asked what the "dude over top of him" was doing, Thomas responded, "I guess he was shooting him." Thomas testified that he did not see a gun, but that he just saw "the spark." When asked if he got a "good look" at the shooter, Thomas responded no. Thomas did not provide any description of the shooter to the Grand Jury.

---

[50]   On June 6, 2019, government disclosed Thomas' Grand Jury testimony to the defense after receiving permission from the Court.  The government also provided with defense with a copy of the MPD Form PD-119.  The government can provide the Court with copies upon request.

Therefore, Martin's <u>Brady</u> claim is meritless and procedurally barred because Martin has not proffered anything from Thomas himself to show that Thomas described the shooter to the police and that the shooter was not Martin. Rather, Martin has proffered an affidavit – now more than 12 years old – from a defense investigator about what Thomas purportedly told him. This affidavit from someone other than Steven Thomas is insufficient to establish that the government suppressed exculpatory information. Further, the materials in in the government's files refute the defendant's claim that Thomas described the shooter to the police or to the Grand Jury, or further, that he described someone other than Martin (or Carson).

Even if Martin met his burden of proving that the government had information in its possession that Thomas told police that the shooter was "very dark-complected, stocky and taller than Martin"[51] and the government suppressed that information, Martin has not established materiality under <u>Brady</u> because the evidence proving his (Martin's) and Carson's role in the murder of Anthony Fortune was very strong.[52]

On August 6, 1991, Carson shot Fortune after a dispute over a craps game. Fortune was from the 58th Street, N.E., neighborhood and his killing triggered a "beef" between the K Street/37th Place organization and 58th Street, N.E. (Montgomery 3/12/01PM Tr. 33-35). On the day Fortune was killed, Charlene Wilson, who lived on 58th Street, N.E., was at her neighbor Regina Knight's house (Wilson 2/13/01AM Tr. 9, 14-15). She saw Martin and Carson there, and heard Martin talking about Fortune and how they did not like him because he would rob "your mother" (Wilson

---

[51]   According to Martin's PSR, prepared in late 2001/early 2002, he is 5'8" and weighed 168 lbs. According to Carson's PSR, he is 5'11" and weighed 147 lbs. Neither PSR describes the men's complexions.

[52]   For these same reasons, Martin has failed to establish prejudice under the cause/prejudice standard for failing to file a claim during the pendency of his direct appeal.

SA-238

2/13/01AM Tr. 19-22). Later that night, Wilson was outside in front of her building when she heard gunshots, looked to her left, and saw Carson walk toward Fortune, shooting him (Wilson 2/13/01AM Tr. 22-26, 72; 2/13/01PM Tr. 13-14). Carson then stood over Fortune and continued to shoot him (id.). After the shooting stopped, Wilson saw Carson run down the street and get into a white van, driven by Martin (Wilson 2/13/01AM Tr. 26-28). Wilson knew Martin and Carson from Knight's apartment and they were "always together" (Wilson 2/13/01AM Tr. 29-30). She also knew them because she attended junior high with both of them (Wilson 2/13/01AM Tr. 30-31).[53]

Later, Carson told James Montgomery that Martin and Fortune had gotten into an argument during a craps game and Carson had whispered into Martin's ear, "do you want me to kill this piece of shit?" (Montgomery 3/12/01PM Tr. 34). Carson told Montgomery that he went to the car, got a gun, and shot Fortune (Montgomery 3/12/01PM Tr. 34-35). Carson said that when Fortune fell, he stood over the top of Fortune and "hit him some more" (Montgomery 3/12/01PM Tr. 35). The autopsy report of Fortune showed that he died from seven gunshot wounds to the head and torso (Arden 4/9/01AM Tr. 27).

Others testified that Martin admitted to them that he was the shooter. Martin admitted the shooting to Eugene Byars, whom he saw while they were both incarcerated (Byars 4/9/01PM Tr. 11-14). Martin told Byars that he (Martin) shot Fortune because Fortune was trying to take advantage of him at a craps game (Byars 4/9/01PM Tr. 13-14). Martin also said that the murder

---

[53]  Wilson did not report the shooting of Fortune to the FBI until sometime later (Wilson 2/13/01AM Tr. 34-35, 42, 44; 2/13/01PM Tr. 26-27). The FBI then moved her and her family due to safety concerns (Wilson 2/13/01AM Tr. 35-36, 46). Special Agent Chris Warrener interviewed Wilson about the Fortune murder and it was "clear" to him that she was an eyewitness, although he wrote in his report that she had "heard" about the murder (Warrener 6/14/01PM Tr. 55-56, 60). SA Warrener explained that he wrote it in that fashion to protect the informant's identity (Warrener 6/14/01PM Tr. 55, 59-63).

105

SA-239

started a turf war between 58th and Paradise and Southwest and Ridge Road (Byars 4/9/01PM Tr. 14).

Charles Bender testified that Martin told him that he killed Fortune because Fortune "was making motions like he was going to try to rob the crap game" (4/4/01PM Tr. 85)-86). Martin said he "punished" Fortune, which Bender took to mean that Martin killed him (4/4/01PM Tr. 86). Donald Nichols testified that Martin told him that Fortune tried to rob, or actually robbed, the craps game and Martin "wasn't going to let him get away with it" and so he shot Fortune (2/15/01PM Tr. 58-59).

Arthur Rice testified that he believed for a while that Martin had shot Fortune but later found out that Carson had killed Fortune (4/25/01AM Tr. 36-40). He testified that during a conversation with Carson at a Chinese carry-out, he said to Carson, "Man, all the time I thought it was [Martin], and come to find out it was you, man" (4/25/01AM Tr. 40). Carson responded by laughing and saying, "well, now you know" (4/25/01AM Tr. 41). In closing, the prosecutor argued that the government's evidence showed that Carson "actually pulled the trigger" and that Martin was equally responsible for the murder of Fortune as an aider and abettor (6/26/01AM Tr. 73-80).

Given that the government's theory was that Carson was the shooter and that Martin aided and abetted Carson by driving the getaway vehicle, Thomas' purported statements to Martin's investigator that Martin was not the shooter is not Brady material.[54] Moreover, the evidence of Carson and Martin's roles in the murder of Fortune was very strong. On this record and given that Martin has failed to proffer anything from Thomas to support his claim that Thomas gave a description of the shooter when Thomas spoke to the police within hours of the shooting, Martin

---

[54] Thomas' purported statements to Martin's investigator that Martin (and Carson) were not the shooters is arguably Brady material to the extent Byars and Bender testified that Martin admitted to them on separate occasions that he shot Fortune. However, that was not the government's theory and was not how the prosecutor argued the evidence in closing.

has not shown prejudice. That is, Martin has not shown that there is reasonable probability that the jury would have acquitted him of Fortune's murder (as an aider and abettor to Carson) had the jury heard Thomas state that he knew Martin and Carson and Martin was not the shooter.

### b.　Claims D.2 and D.5– The Government Did Not Violate Martin's Due Process Rights Regarding James Coulter.

Martin claims that the government violated his due process rights by impeding his ability to call shooting victim, James Coulter aka "Creeko," as a witness for the defense. Martin's § 2255 Motion, at 11-12 [Dkt. 1021]; Martin's Third Supplement, at 24-29 [Dkt. 1233]. The jury convicted Martin of the May 31, 1995, attempted murder of Coulter, and a related firearms offense (Counts 18 and 42). The government obtained these convictions through the testimony of other witnesses; Coulter did not testify.

The issue of Coulter's whereabouts surfaced when the government sought to admit Coulter's medical records to prove that Coulter was shot, and Martin's trial counsel objected (5/24/01PM Tr. 70). Martin's counsel argued that, "there has been no testimony that Coulter was shot" (5/24/01PM Tr. 71). The government responded that it had presented "a fair amount of testimony about Mr. Coulter being shot, it's corroborative evidence to that effect" (5/24/01PM Tr. 71-72). When the Court stated, "[Coulter] is not around to testify to it," defense counsel proffered to the Court, "Sure he is. He is on the street every day" and "He is around. He is living, he is fine . . ." (5/24/01PM Tr. 72).

Later, during Martin's closing argument, trial counsel argued:

Now, we come to the AWIK of James Coulter, "Creeko." Now this case is remarkable for the evidence you have not been presented with by the government. The government has presented no police evidence. There have been no police reports. There have been no police diagrams. There's been no crime scene officer, no ballistics evidence, no crime scene photographs, no charts or diagrams, none.

The civilian evidence that you have not been presented, the complainant, who is alive and well, did not come in to testify for you.

(7/02/01PM Tr. 36).

The prosecutor objected, asserting that there was no evidence on the record that Coulter was "alive and well" and no evidence on the record that "the government could have called him" (7/02/01PM Tr. 36, 38). The prosecutor noted that defense counsel "could call him as well" and that defense counsel's argument was akin to a missing witness argument (7/02/01PM Tr. 38). When the Court inquired of defense counsel why she did not call him, defense counsel responded, "I can't get him in here. I couldn't serve him" (id.). She also stated that the government had the burden and obligation "to bring him in" (id.). The prosecutor responded that Coulter was "equally available to both sides" and "there is no evidence on the record that he is alive or well" (7/02/01PM Tr. 38-39). When defense counsel inquired, "Are you referring that he's dead?," the prosecutor reiterated, "I'm simply saying there is no record, there's no evidence on the record from which [defense counsel] can make that argument" (7/02/01PM Tr. 39). The Court sustained the government's objection "to the extent that [defense counsel has] said that there is evidence of record that he is alive and well" (id.). Defense counsel responded that government witnesses Paul Franklin and Donald Nichols had testified that they had seen Coulter (id.). The prosecutor responded, "He was alive and well before he was shot" and that he did not believe Franklin and Nichols testified that "they ever saw him or testified that they had seen him after he had been shot" (7/02/01PM Tr. 39-40).[55] The Court then overruled the remainder of the government's objection and nothing more was said about Coulter being a witness for either party.

---

[55] Both Nichols and Franklin testified about Martin's efforts to enlist them, individually, in dissuading Coulter from testifying that Martin shot him. Thus, it was clear from the record that Coulter was "alive and well" sometime after he was shot, and sometime during the time Martin was incarcerated.

SA-242

Martin now claims that Coulter was a "crucial witness" for the defense, that his trial counsel sought the government's assistance in serving a subpoena on him, and that the government misrepresented that it had "no knowledge of Coulter's whereabouts." Martin's Third Supplement, at 27-28.  Martin also asserts that Coulter gave his trial counsel a "signed, witnessed statement that Martin did not shoot him," Martin's § 2255 Motion, at 12, and that Coulter told a defense investigator that "Martin did not shoot him or that he did not know who shot him." Martin's Third Supplement, at 26.

Martin's claim is procedurally barred because he did not raise this claim on direct appeal. He has not attempted to show or even allege cause or prejudice.  Moreover, Martin cannot establish prejudice because he has not attached affidavits or declarations from either Coulter, trial counsel, or a defense investigator to substantiate his claim that Coulter was a "crucial witness" for him. Finally, even if the Court were to find that this claim is not procedurally barred, it should be denied because the record shows that the claim is meritless.

---

Nichols testified that he had a conversation with Martin while Martin was in jail (and Nichols was not in jail) in which Martin wanted Nichols to ask Coulter to talk to Martin's investigator and give him a statement (Nichols 2/15/01PM Tr. 63).  Nichols rode around with Martin's investigator and spoke to Coulter who told him, "I'm not going to get involved in it. . . I'm not coming to court and testifying period, so I ain't going to get involved in it" (Nichols 2/15/01PM Tr. 64).  Nichols relayed what Coulter said to Martin (id.).  On cross-examination by Martin's trial counsel, Nichols admitted the following:

> Q: And when you talked to Creeko, Creeko said that he didn't know who shot him, didn't he?
> A: Yes.
> Q: And he said he wasn't going to testify, didn't he?
> A: Yes.
> Q: And he said there was no reason to give a statement, right?
> A: Yes.

(2/27/01PM Tr. 23).

Franklin testified that he spoke to Martin about Coulter when Martin was incarcerated.  Martin told Franklin to "go see Creeko, see if he was coming to court" (Franklin 5/1/01PM Tr. 49, 54).  Franklin took that to mean that Martin was responsible for shooting Creeko (Franklin 5/1/01PM Tr. 54).

SA-243

The government did not thwart the defense's ability to call Coulter as a witness in Martin's case. Rather, the defense had equal access to Coulter and could have subpoenaed him to testify at the K Street trial. Moreover, the government was not required to call Coulter as a witness in its own case and, instead, proved Martin's shooting of Coulter by other means as outlined above. As Martin's trial counsel acknowledged, she had information that Coulter was "on the street every day," and that he was "around" and "living" and "fine" (5/24/01PM Tr. 72). She also acknowledged that she had tried to subpoena him, but that she could not "get him in here" and that she could not "serve him" ((7/02/01PM Tr. 38). Despite the defense's inability to procure Coulter's presence, Martin's counsel was able to elicit similar testimony from another witness. Nichols testified that Coulter told him (Nichols) that he (Coulter) did not know who shot him (2/27/01PM Tr. 23).

Further, as stated above, the government proved that Martin shot Coulter without calling Coulter as a witness. Thus, the government established that in 1995, co-defendant Hill complained to Donald Nichols, co-defendant Martin, Reginald Switzer and others that Coulter was "hot" and needed to be killed (Nichols 2/15/01PM Tr. 60). On May 30, 1995, Coulter was shot (Perkins 1/30/01PM Tr. 54-55). Nichols was on the corner of Delaware and K Street when he heard Hill and Martin talking about Coulter's shooting (Nichols 2/15/01PM Tr. 62). Nichols heard Hill tell Martin that he should have used two guns and asked why the gun jammed (Nichols 2/15/01PM Tr. 62). Martin also complained to Eugene Byars that he had gone after Coulter at a craps game but his gun had jammed (Byars 4/9/01PM Tr. 23).

Sometime later, James Montgomery overheard Martin talking about Coulter's shooting with Coates and Carson (Montgomery 5/23/01AM Tr. 46-47). Martin said that "they" were trying to say he had something to do with Coulter getting shot but "they" could not prove it because he

110

SA-244

had a mask on (Montgomery 5/23/01AM Tr. 47). After Martin was arrested for the shooting, he asked Nichols to talk to Coulter and have Coulter give his investigator a statement about the shooting (Nichols 2/15/01PM Tr. 63). Nichols talked to Coulter twice at Martin's request; Coulter refused to give a statement, but said that he was not going to come to court on the case (Nichols 2/15/01PM Tr. 64). Martin also asked Nichols to contact a witness to the shooting, Michael Floyd, which Nichols did (Nichols 2/15/01PM Tr. 65). When neither man would give a statement, at Martin's request, Nichols showed Martin's uncle where Coulter and Floyd lived (Nichols 2/15/01PM Tr. 65-66).

Martin also enlisted Michael Smith, who was in jail at the same time as Martin, to contact Floyd and ask Floyd "to testify on his behalf" and say that he (Floyd) did not know who shot Coulter, but that it was someone with a "drawstring" (sweatshirt) and a pistol at a craps game (Smith 5/22/01PM Tr. 17-19). Although Smith told Martin he would contact Floyd, he did not because "it wasn't even [his] concern at that time" (Smith 5/22/01PM Tr. 21). A week or so later, Martin saw Smith and complained that he (Martin) had spoken with Floyd on the phone and Floyd had hung up on him (Smith 5/22/01PM Tr. 22). Martin said that Floyd owed him a favor because his head was in the way when Martin shot Coulter, and if it were not for Floyd, Coulter would be dead (id.). Martin said, "I should have just went on and hit [Floyd's] head because he was in the way" (id.).

A few days after Coulter was shot, Hill got into an altercation on K Street with Cindy Perkins, Coulter's girlfriend and the mother of Coulter's child (Perkins 1/30/01PM 55-67; Nichols 2/15/01PM Tr. 61-62). Hill called Perkins a "little hot bitch" "just like her boyfriend" (Perkins 1/30/01PM Tr. 57). Hill also got into an altercation with MPD Detective Trugman, who drove through K Street the same day with Agent Lisi and another detective (Perkins 1/30/01PM Tr. 56;

111

**SA-245**

Lisi 5/23/01AM Tr. 7-8).  Hill yelled to Trugman that "all your snitches are going to die" (Lisi 5/23/01AM Tr. 8).  When Trugman said, "what?" Hill responded, "You heard me.  All your snitches are going to die, including your little buddy who is over at the hospital now with four holes in him under the name of John Doe, whose [sic] in room 2299." (Lisi 5/23/01AM Tr. 8.)  At that time, Coulter was in the hospital under the name John Doe, in a supposedly undisclosed room, for his protection (Lisi 5/23/01AM Tr. 9, 11).  Later that same day, after Agent Lisi got a frantic phone call from Cindy Perkins, the government relocated her and her family away from the area (Lisi 5/23/01AM Tr. 10).

For the reasons set forth above, this claim should be summarily denied because Martin has failed to prove that government interference impeded his ability to call Coulter given that his trial counsel acknowledged that she was aware that Coulter was "around" and "living" and "fine," but she was simply unable to subpoena him.  Moreover, Martin has failed to show how he was prejudiced where he has not shown what Coulter would have said, had he testified at trial for the defense, and Martin was able to elicit from another witness that Coulter told that witness that he did not know who shot him.

### c.    Claim D.3, Martin's Johnson Claim is Meritless.

The government responds to Martin's Johnson claim, infra, pp. 120-26.

### d.    Claims D.6 and D.7 Are Untimely.

In his November 21, 2018, supplement to his § 2255 motion, Martin alleges that his trial counsel was ineffective for failing to re-call government witness, Charlene Wilson, to impeach her testimony that she was an eyewitness to the 1991 murder of Anthony Fortune.[56]  Martin's Second

---

[56]   This claim is also meritless.  As set forth above, Charlene Wilson was an eyewitness to the Fortune murder.  She testified that she was outside in front of her building when she heard gunshots, looked to her left, and saw Carson walk toward Fortune, shooting him (Wilson 2/13/01AM Tr. 22-26, 72; 2/13/01PM Tr. 13-14).  Carson then stood over Fortune and continued to shoot him (id.).  After the shooting stopped,

SA-246

Supplement, at 29-34. Martin also claims that his trial counsel was ineffective for failing to investigate and locate witnesses, Michael Floyd and Juan Floyd; Martin asserts that they would have testified that they were present when Coulter was shot and that Martin was not the shooter.[57] Martin's Second Supplement, at 34-36. These ineffective assistance claims were filed more than nine years too late, do not relate back to any timely claims, and should be summarily denied as untimely. Furthermore, Martin does not invoke the actual innocence exception to excuse his untimeliness.

###### e.      Claim D.8 Should Be Denied Because Claims D.1 and D.2, to Which it Relates, are Meritless.

Martin asserts that he is deserving of a new trial on the narcotics and RICO conspiracy counts because the government allegedly violated his rights with respect to his claims relating to the Fortune murder (D.1 and D.4) and Coulter (D.2 and D.5) shooting. While this claim is untimely filed, it relates back to timely filed claims (D.1 and D.2) because it involves the same subject matter. For the reasons those claims are meritless, this claim also fails and should be denied.

---

Wilson saw Carson run down the street and get into a white van, driven by Martin (Wilson 2/13/01 AM Tr. 26-28).

After Wilson testified, FBI Agent Warrener, who had interviewed Wilson about the Fortune murder, was confronted on cross-examination with a 302 in which he had written that Wilson "heard" information about the Fortune murder. As Martin acknowledges in his pleading, Warrener explained that he "phrased the report in that way to protect Wilson's identity." Martin's Supplement, at 31-32; see (6/14/01 PM Tr. 55) ("that's a style of writing that we use to protect the identity of an informant"). Warrener further explained that at the time he interviewed Wilson about what she saw during the Fortune murder, he did not anticipate that she would be a witness (6/14/01 PM Tr. 56). Thus, contrary to Martin's claim, this issue was aired out by his trial counsel. Moreover, Martin does not offer an affidavit from Wilson as to what she would have stated on cross-examination on this point, had she been asked.

[57] Noticeably absent from Martin's supplement are any affidavits from Michael Floyd, Juan Floyd, or the investigator who purportedly interviewed them on an unspecified date "[a]fter Martin's trial." Martin's Second Supplement, at 34.

SA-247

## THE GOVERNMENT'S RESPONSE TO CLAIMS
## RAISED BY MORE THAN ONE DEFENDANT

**A.    Sweeney's Claims A.13 and A.62 and Coates' Claims C.4 and C.8:   Trial and Appellate Counsel Were Not Ineffective in Failing to Challenge Their Consecutive Sentences for § 924(c) Violations Because These Convictions Do Not Merge.**

Sweeney and Coates claim that their trial and appellate counsel were ineffective for failing to challenge their consecutive sentences for multiple counts of possession of a firearm during a crime of violence  in violation of 18 U.S.C. § 924(c).[58]  Sweeney's § 2255 Motion, at 13 [Dkt. 1017]; Coates' § 2255 Motion, at 47 [Dkt. 1020].   These claims should be summarily denied because they are without merit.   As explained below, Sweeney and Coates' multiple § 924(c) convictions do not merge; therefore, Sweeney and Coates cannot establish that their trial and appellate counsel were constitutionally ineffective for failing to raise a meritless claim.  See United States v. Watson, 717 F.3d 196, 198 (D.C. Cir. 2013) ("counsel does not perform deficiently by declining to pursue a losing argument"); United States v. Kelly, 552 F.3d 824, 831 (D.C. Cir. 2009) (counsel was not deficient because "counsel was not obliged to raise a meritless defense"); United States v. Hanley, 906 F.2d 1116, 1121 (6th Cir. 1990) (failure of defense counsel to pursue frivolous motions and objections cannot constitute ineffective assistance of counsel).

The trial court sentenced Sweeney to concurrent life sentences on each of his convictions for narcotics conspiracy, RICO conspiracy and four counts of murder in aid of racketeering (Whitfield, Gaskins, Mack and Anderson).   Coates was sentenced to concurrent life sentences on his convictions for narcotics conspiracy, RICO conspiracy and three counts of murder in aid of racketeering (Gaskins, Mack and Anderson).   Each also received a 20-year concurrent sentence

---

[58]    In his placeholder § 2255 motion, Carson claims that his sentence was "imposed in violation of the U.S. Constitution."  Carson's § 2255 Motion, at 1 [Dkt. 1023].  Due to the vagueness of this claim, it is unclear whether Carson is challenging his convictions under § 924(c), or making another constitutional claim.   If the Court deems this placeholder motion timely and involves a constitutional challenge to Carson's § 924(c) convictions, this claim can be summarily denied for the reasons stated above.

114

SA-248

for their convictions for the attempted murder in aid of racketeering (Pryor), as well as a 5-year consecutive sentence for their convictions for use of a firearm during and in relation to Pryor's attempted murder in violation of § 924(c). Coates was also sentenced to 20 years, concurrent, for attempted murder (Sowells) and 20 years consecutive for the related § 924(c) offense. In addition, each was sentenced to 20 years, consecutive, for the § 924(c) offense related to each murder. Thus, both Sweeney and Coates received a life sentence, followed by 85 years of statutorily mandated consecutive time. See Carson, 455 F.3d at 382 & n.38.

For purposes of this discussion, the relevant counts, predicate offenses, dates and locations of the offenses, and sentences that were imposed by the trial court are set forth below:

| Count in Indictment, corresponding to J&C | Defendant(s) | Predicate Offense and Corresponding § 924(c) Offense | Victim/Decedent | Sentence Imposed |
|---|---|---|---|---|
| 11 | Sweeney Coates | Attempted Murder Oct. 22, 1993 Oxon Hill, MD | Anthony Pryor | 20 years, concurrent |
| 28 | Sweeney Coates | § 924(c) | Anthony Pryor | 5 years, consecutive to all other counts |
| 16 | Sweeney | Murder Sept. 26, 1994 K Street, S.W. | Donnell Whitfield | Life, concurrent |
| 30 | Sweeney | § 924(c) | Donnell Whitfield | 20 years, consecutive to all other counts |
| 24 | Coates | Attempted Murder Aug. 16, 1996 Anacostia Metro Station | Ronald Sowells | 20 years, concurrent |
| 34 | Coates | § 924(c) | Ronald Sowells | 20 years, consecutive |
| 25 | Sweeney Coates | Murder Nov. 17, 1996 Temple Hills, MD | Alonzo Gaskins | Life, concurrent |

**SA-249**

| Count in Indictment, corresponding to J&C | Defendant(s) | Predicate Offense and Corresponding § 924(c) Offense | Victim/Decedent | Sentence Imposed |
|---|---|---|---|---|
| 35 | Sweeney Coates | § 924(c) | Alonzo Gaskins | 20 years, consecutive to all other counts |
| 26 | Sweeney Coates | Murder Nov. 17, 1996 Temple Hills, MD | Darnell Mack | Life, concurrent |
| 36 | Sweeney Coates | § 924(c) | Darnell Mack | 20 years, consecutive to all other counts |
| 27 | Sweeney Coates | Murder Nov. 17, 1996 Temple Hills, MD | Melody Anderson | Life, concurrent |
| 37 | Sweeney Coates | § 924(c) | Melody Anderson | 20 years, consecutive to all other counts |

At the time Sweeney and Coates were sentenced, § 924(c) provided for a 5-year mandatory-minimum sentence for the use of a firearm during and in relation to a crime of violence, and a 20-year mandatory-minimum sentence for second or subsequent convictions under that subsection. Thus, in cases where a defendant was charged in the same indictment with more than one offense qualifying for punishment under § 924(c), all convictions after the first conviction rank as "second or subsequent." Deal v. United States, 508 U.S. 129, 132-37 (1993).

Sweeney and Coates claim that their multiple § 924(c) convictions related to the murders of Gaskins, Mack and Anderson (Counts 35, 36 and 37) merge because they arise out of

SA-250

"uninterrupted" gun possession. As for that triple murder, Sweeney was charged as a principal, while Coates was an aider and abettor.[59]

The D.C. Circuit has addressed this legal issue of merger of § 924(c) convictions on several occasions. In United States v. Anderson, 59 F.3d 1323 (D.C. Cir. 1995), the defendant was charged with one count of conspiracy to distribute and possess with intent to distribute cocaine and four counts of violating § 924(c) for his possession of multiple weapons seized from him at different times. Sitting en banc, the D.C. Circuit found that § 924(c)(1) was ambiguous, that the rule of lenity applied, and that only one § 924(c) violation could be charged in relation to one predicate crime. Later, in United States v. Wilson, 160 F.3d 732, 749-50 (D.C. Cir. 1998), the D.C. Circuit vacated one of Wilson's § 924(c) convictions where he possessed and used only one firearm, but simultaneously committed two predicate offenses (killing a witness with intent to prevent that person from testifying and killing that same witness with intent to retaliate against that witness for cooperating with law enforcement). See 160 F.3d at 749 ("It is undisputed that [the defendant] used his firearm only one time."). The D.C. Circuit noted in Wilson that "there may be circumstances in which such offenses could support more than one § 924(c) charge – as where, for example the evidence shows distinct uses of the firearm." Id.[60]

This is that case. Here, the facts adduced at trial unequivocally show Sweeney's distinct uses of one firearm to kill three people -- Alonzo Gaskins, Darnell Mack and Melody Anderson –

---

[59] Sweeney and Coates do not challenge their first § 924(c) convictions related to the attempted murder of Pryor (Count 28) or their second (and separate) § 924(c) convictions related to Sweeney's murder of Whitfield (Count 30) and Coates' attempted murder of Sowells (Count 34).

[60] The Wilson court noted that although multiple § 924(c) charges may be proper where the evidence shows distinct uses of a firearm – such as first to intimidate a witness, then to kill that witness – there was "no such distinction in time or place" involved in Wilson. 160 F.3d at 749. The D.C. Circuit also noted that its decision was consistent with its prior holding in United States v. Anderson, 59 F.3d 1323 (D.C. 1995).

117

SA-251

on November 17, 1996, in Temple Hills, MD.  According to Montgomery's testimony, Sweeney, Carson and Montgomery discussed a plan to rob Gaskins of money that Gaskins had won at a boxing match.  Coates stayed behind in the group's van.  Sweeney entered Gaskins' house armed with a Glock; Montgomery had a stun gun.  Without robbing Gaskins, Sweeney shot Gaskins, then he shot Mack, and then he shot Anderson.  According to the autopsies, Gaskins and Mack were each shot four times, including several shots to the head, and Anderson was shot once in the head (Fowler 5/22/01AM Tr. 68-89).  The firearms examiner determined that the 12 shell casings recovered from the scene were fired from the same .40 caliber handgun, which was consistent with a Glock (Casper 4/4/01PM Tr. 30-33).

Under these circumstances, separate § 924(c) convictions are proper because the predicate offenses do not merge and Sweeney's use of his Glock .40 caliber weapon constituted three distinct uses of that firearm, albeit during a single criminal episode.  That is, he shot Gaskins four times, he shot Mack four times, and he shot Anderson once.  Coates, as an aider and abettor, also was guilty of each of these three murders.  See, e.g., United States v. Nabors, 901 F.2d 1351, 1357–58 (6th Cir. 1990) (defendant used weapons in his home for the purpose of trafficking drugs and used a weapon to shoot a federal agent who entered the apartment to execute a search warrant (two separate predicate offenses); two § 924(c) convictions resulted from these distinct uses of firearms); United States v. Romero, 122 F.3d 1334, 1344 (10th Cir. 1997) (upholding two § 924(c) convictions for distinct uses of a firearm during a carjacking and robbery; where both predicate offenses occurred during the same criminal episode); United States v. Casiano, 113 F.3d 420 (3d Cir. 1997) (upholding two § 924(c) convictions for distinct uses of a firearm during a carjacking and kidnapping of same victim); United States v. Floyd, 81 F.3d 1517 (10th Cir. 1996) (upholding

two § 924(c) convictions for distinct uses of a firearm during a carjacking and kidnapping of different victims).

None of the cases cited by the defendants are persuasive or controlling. See, e.g., Matthews v. United States, 892 A.2d 1100, 1106-07 (D.C. 2006) (District's PFCV statute; citing general rule that when convictions for predicate offenses do not merge, the associated PFCV convictions do not merge, but recognizing a "limited exception" where even if the predicate offenses do not merge, the multiple PFCV convictions will merge "if they arise of a defendant's uninterrupted possession of a single weapon during a single act of violence" – here, armed robbery of victim's purse and carjacking of her car – court found the PFCV convictions merged because the "predicate robbery and carjacking began at the same time and were committed together by means of the same act of violence involving the same weapon."); Monroe v. United States, 600 A.2d 98, 99-100 (D.C. 1991) (District's CPWL statute; holding that two convictions for carrying a pistol without a license merged where armed robbery and kidnapping offenses of the same victim occurred during the same episode); Nixon v. United States, 730 A.2d 145 (D.C. 1999) (District's PFCV statute); Bruce v. United States, 471 A.2d 1005 (D.C. 1984) (District's CPWL statute); United States v. Chalan, 812 F.2d 1302, 1316 (10th Cir. 1987) (where convictions for felony murder and robbery constituted a single crime of violence and therefore merged, convictions for PFCV merged).

For these reasons explained above, because none of Sweeney's and Coates' § 924(c) convictions merge, imposition of five consecutive sentences (totaling 85 years – five years for the first § 924(c) conviction, and 20 years each on the second, third, fourth and fifth § 924(c) convictions) was proper. Therefore, neither trial nor appellate counsel was ineffective for failing

119

to raise a meritless issue at sentencing or on appeal and the Court should summarily deny this claim.

**B.     The Defendants' Challenges to Their § 924(c) Convictions Based Upon Johnson/Davis Are Meritless.**

All of the defendants filed supplemental pleadings to their § 2255 motions in which they assert that their § 924(c) convictions should be vacated in light of the Supreme Court's decision in Johnson v. United States, 135 S. Ct. 2551 (2015) (holding that the residual clause in the Armed Career Criminal Act ("ACCA") was void for vagueness).  [Martin, Dkt. 1182; Carson, Dkts. 1183, 1192; Coates, Dkt. 1184; Sweeney, Dkt. 1229].  The Court, however, need only address two of the defendant's claims on the merits – those of Martin and Carson.

Coates' supplement consists of a one-paragraph assertion that he challenges his § 924(c) convictions based upon Johnson [Dkt. 1184].  In that pleading, he states that he will supplement his pleading by October 26, 2016, but he did not.  The government is unable to respond to his alleged Johnson claim because it is vague and conclusory.  Therefore, Coates' claim should be summarily denied.[61]   Sweeney's supplement includes the assertion that he adopts all arguments raised by Martin in Martin's supplement to his § 2255 motion [Dkt. 1229].  Martin's supplement [Dkt. 1182] is a substantive claim that his conviction for the attempted murder of James Coulter (Count 18) should be vacated based upon Johnson [Dkt. 1182].  Sweeney was not charged with this attempted murder; therefore, his adoption of Martin's argument with respect to this charge fails.  Therefore, the Court should summarily deny Sweeney's claim.[62]

---

[61]   The government reserves its right to respond to Coates' claim on the merits, if and when he offers a legal argument explaining why his § 924(c) convictions should be vacated in light of Johnson/Davis.

[62]   The government reserves its right to respond to Sweeney's claim on the merits, if and when he offers a legal argument explaining why his § 924(c) convictions should be vacated in light of Johnson/Davis.

120

SA-254

Accordingly, for the reasons explained above, the government only responds to Martin and Carson's claims on the merits. It is not disputed that Johnson recognizes a "new right" under the limitations period found in Section 2255(f)(3). After Johnson was decided, the Supreme Court issued its opinion in Davis v. United States, 139 S. Ct. 2319 (June 24, 2019), holding that the definition of "crime of violence" in 18 U.S.C. § 924(c)(3)(B), the residual clause, is constitutionally vague.[63] Thus, while none of the defendants supplemented their Johnson motions based upon Davis, it appears that they would have until June 24, 2020, to raise their challenges to their § 924(c) convictions based upon this decision. For ease of reference, the government thus refers to these claims as "Johnson/Davis" claims. As explained below, the defendants' claims are meritless.

Section 924(c) generally penalizes using, carrying or possessing a firearm "during and in relation to any crime of violence or drug trafficking crime." 18 U.S.C. § 924(c)(1)(A). A "crime of violence" is defined in § 924(c)(3) as a felony offense that:

> (A) has as an element the use, attempted use, or threatened use of physical force against the person or property of another, or
>
> (B) that by its nature, involves a substantial risk that physical force against the person or property of another may be used in the course of committing the offense.

§ 924(c)(3). The first clause is known as the "force" or "elements clause," while the second clause is referred to as the "residual clause." See United States v. McDaniels, 147 F. Supp. 3d 427, 429 (E.D. Va. 2015).

In Davis, the Supreme Court struck down § 924(c)'s residual clause, § 924(c)(3)(B), as unconstitutionally vague. United States v. Davis, 139 S. Ct. 2319 (2019). Davis follows on heels of other Supreme Court decisions finding similarly worded residual clauses unconstitutionally

---

[63]   None of the defendants sentences were enhanced by ACCA; however, all have § 924(c) convictions.

SA-255

vague. See Johnson (striking down as void for vagueness the residual clause found in 18 U.S.C. § 924(e), which defines in part a "violent felony" under the Armed Career Criminal Act ("ACCA")); Dimaya v. Sessions, 138 S. Ct. 1204 (2018) (striking down as void for vagueness the residual clause found in 18 U.S.C. § 16, which defines in part an "aggravated felony" for the purposes of several federal statutes). However, Davis did not invalidate § 924(c)'s force or elements clause, § 924(c)(3)(A). Davis, 139 S. Ct. at 2336

Here, Martin claims that his § 924(c) conviction based upon the predicate offense of the attempted murder of James Coulter, a Violent Crime in Aid of Racketeering Activity ("VICAR") offense (Count 18),[64] should be vacated because he claims that D.C. Code attempted murder is a "crime of violence" only under the constitutionally vague residual clause. Similarly, Carson claims that his § 924(c) convictions based upon the predicate offenses of the murders of Alonzo Gaskins, Darnell Mack and Melody Anderson (Counts 35, 36 and 37) should be vacated because the Maryland murder statute, which forms the basis of the VICAR offenses, is a "crime of violence" only under the constitutionally vague residual clause. Neither Martin nor Carson's arguments have merit because, as explained below, the predicate offenses for these § 924(c) convictions are "crimes of violence" under the constitutionally sound force or elements clause, § 924(c)(3)(A).

To determine whether an offense is a "crime of violence" under the force clause of § 924(c), courts use the "categorical approach" established in Taylor v. United States, 495 U.S. 575 (1990). The categorical approach "focuses solely on the elements of the offense, rather than the facts of the case." United States v. McNeal, 818 F.3d 141, 152 (4th Cir. 2016); see also United States v. Evans, 848 F.3d 242, 245-46 (4th Cir. 2017) ("[W]e apply the elements-based categorical

---

[64]   The indictment was re-numbered more than once. For the sake of simplicity, the government uses the count numbers that correspond to the count numbers in the verdict forms.

SA-256

approach" to § 924(c) and "analyze only the elements of the offense in question, rather than the specific means by which the defendant committed the crime").

A VICAR conviction requires proof of five elements: 1) the organization is a Racketeer Influenced and Corrupt Organizations Act ("RICO") enterprise; 2) the enterprise was engaged in racketeering activity as defined in RICO; 3) the defendant had a position in that enterprise; 4) the defendant committed the alleged crime of violence in violation of federal or state law; and 5) the defendant's general purpose in doing so was to maintain or increase position in the enterprise. 18 U.S.C. § 1959. The fourth element is the key conduct element in determining if the VICAR offense has as an element the use, attempted use, or threatened use of physical force as set forth in § 924(c)(3)(A)'s force clause. The VICAR statute does not define murder or attempted murder. See § 1959(a)(1), (5).

Here, Martin and Carson's VICAR charges are based upon state law crimes of violence. Thus, in Carson's case, the indictment charges that the VICAR murders of Gaskins, Hall and Anderson (Counts 25, 26 and 27) were committed in violation of Maryland Code, Criminal Law § 27-407 (first-degree premediated murder) and § 27-410 (felony murder).[65] In Martin's case, the indictment charges that the VICAR attempted murder of Coulter (Count 18) was committed in violation of D.C. Code §§ 22-501 and 3202 (assault with intent to kill while armed, or "AWIK while armed").[66]

---

[65] The trial court instructed the jury on the elements of both first-degree premeditated murder and felony murder under Maryland law (7/9/01 Tr. 9-12) and the elements of the VICAR offenses relating to the murders of Gaskins, Mack and Anderson (7/9/01 Tr. 19-21). The verdict form relating to Counts 25, 26 and 27 lists the charges as VICAR murder and does not indicate whether the jury found that the government had proven first-degree premeditated murder and/or felony murder.

[66] Martin was also charged in the indictment with the separate offense of AWIK while armed in violation of the same D.C. Code sections (Count 17). While the jury convicted Martin of both counts (Counts 17 and 18), the trial court only imposed a sentence on Count 18 due to merger.

SA-257

Where the predicate offenses involve violations of state statutes, the Court must "compare the elements of the statute forming the basis of the defendant's [charge or] conviction with the elements of the 'generic' crime—i.e., the offense as commonly understood." Descamps v. United States, 570 U.S. 254, 257 (2013). If the generic crime is a "crime of violence," as it is defined in § 924(c), the statute of conviction also will qualify as a "crime of violence," if the statute's elements are substantially the same or narrower than those in the generic crime. See id.

As for Carson's argument, generic murder is a crime of violence under the force or elements clause of § 924(c), not the residual clause. Umana v. United States, 229 F. Supp.3d 388, 395 (W.D. N.C. 2017). The next step, however, is to compare the elements of generic murder to the elements of the statutes forming the basis of Carson's VICAR murder convictions, Maryland Code, Criminal Law, §§ 27-407 and 410. Both Maryland statutes were repealed in 2002.

Maryland Code, Criminal Law, § 27-407 (first-degree premeditated murder) provided:

All murder which shall be perpetrated by means of poison, or lying in wait, or by any kind of willful, deliberate and premeditated killing shall be murder in the first degree.

Maryland Code, Criminal Law, § 27-410 (felony murder) provided:

All murder which shall be committed in the perpetration of, or attempt to perpetrate, any rape in any degree, sexual offense in the first or second degree, sodomy, mayhem, robbery, carjacking or armed carjacking, burglary in the first, second, or third degree, kidnapping as defined in §§ 337 and 338 of this article, or in the escape or attempt to escape from the Maryland Penitentiary, the house of correction, the Baltimore City Detention Center, or from any jail or penal institution in any of the counties of this State, shall be murder in the first degree.

Maryland Code, Criminal Law, § 2-201, now combines § 27-407 and § 27-410 in that it defines first-degree murder as both first degree premediated murder, as well as felony murder.[67]

---

[67]  Maryland Code, Criminal Law, § 2-201 reads as follows:

(a) A murder is in the first degree if it is:
        (1) a deliberate, premeditated, and willful killing;

124

First-degree murder in Maryland, as defined in Maryland Code, Criminal Law, § 2-201, is a "crime of violence" under § 924(c)'s force or elements clause. See United States v. Moreno-Aguilar, 198 F. Supp.3d 548, 551-54 (D. Maryland 2016) (finding that first-degree murder, as defined in Maryland Code, Criminal Law, § 2-201, necessarily involves the use of physical force against another and thus is a crime of violence under the force clause of § 924(c)). Indeed, the Moreno-Aguilar court noted that "finding that murder is not a crime of violence under the force clause of § 924(c) strains common sense." Id. at 554 (citing United States v. Checora, 155 F. Supp.3d 1192, 1197 (D. Utah 2015) ("In a murder case, the defendant is charged with some physical conduct that actually kills another person. It is hard to imagine conduct that can cause another to die that does not involve physical force against the body of the person killed.")). Accordingly, because Maryland statute § 2-201 includes the definition of first-degree murder found in former Maryland statute § 27-407 (the basis for Carson's VICAR murder convictions), and Maryland statute § 2-

---

(2) committed by lying in wait;

(3) committed by poising; or

(4) committed in the perpetration of or an attempt to perpetrate:

    (i) arson in the first degree;

    (ii) burning a barn, stable, tobacco house, warehouse, or other outbuilding that:

        1. is not parcel to a dwelling; and

        2. contains cattle, goods, wares, merchandise, horses, grain, hay or tobacco;

    (iii) burglary in the first, second or third degree;

    (iv) carjacking or armed carjacking;

    (v) escape in the first degree from a State correctional facility or a local correctional facility;

    (vi) kidnapping under § 3-502 or § 3-503(a)(2) of this article;

    (vii) mayhem;

    (viii) rape;

    (ix) robbery under § 3-402 or § 3-403 of this article;

    (x) sexual offense in the first or second degree;

    (xi) sodomy; or

    (xii) a violation of § 4-503 of this article concerning destructive devices.

SA-259

201 is a crime of violence under § 924(c)'s force or elements clause, Carson's challenge to his § 924(c) convictions based on Johnson/Davis fails.

The Court need not engage in the same analysis with respect to Martin's conviction for AWIK while armed, which forms the basis of his VICAR attempted murder conviction. In United States v. Haight, 892 F.3d 1271, 1279 (D.C. Cir. 2018), the D.C. Circuit held that the D.C. Code offense of assault with a dangerous weapon ("ADW") qualifies as a violent felony under ACCA's force or elements clause. Because ADW is a lesser-included offense of AWIK while armed, see Blades v. United States, 200 A.3d 230, 236, 245 (D.C. 2019), a fortiori, AWIK while armed is a crime of violence as well. For this reason, Martin's challenge to his § 924(c) conviction based upon Johnson/Davis also fails.

SA-260

## CONCLUSION

For the above stated reasons, the Court should summarily deny the defendants' § 2255 motions and supplements.[68]

Respectfully submitted,

TIMOTHY J. SHEA
United States Attorney
D.C. Bar Number 437-437

MARGARET J. CHRISS
Chief, Special Proceedings Division
D.C. Bar Number 452-403

_____/s/_____
PAMELA S. SATTERFIELD
Assistant United States Attorney
Special Proceedings Division
555 4th Street, N.W.
Washington, D.C. 20530
D.C. Bar Number 421-247
Pamela.satterfield@usdoj.gov
202-252-7578

## CERTIFICATE OF SERVICE

**I HEREBY CERTIFY** that, this 18th day of March, 2020, I caused a copy of the foregoing Omnibus Opposition to the Defendants' § 2255 Motions and Supplements to be served via email and first-class mail to counsel of record.

_____/s/_____
Pamela S. Satterfield
Assistant United States Attorney

---

[68] In this pleading, the government has sought to identify accurately the many claims brought by the defendants in their numerous motions and supplements. To the extent the government has overlooked, through inadvertence, any of the defendants' claims, the government respectfully requests the opportunity to respond to those claims in a subsequent pleading. Similarly, if the Court rejects the government's time bar and procedural defense arguments in whole or in part, or would like further briefing on any claims raised by the defendants, the government would request the opportunity to provide further briefing, including addressing those claims on the merits.

127

SA-261

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
      GOVERNMENT,     :

  VS.          :    CR. NO. 98-329

WILLIAM K. SWEENEY,  :
MAURICE PROCTOR,    :
SAM CARSON,       :
      DEFENDANTS.   :

**FILED**

JUL  3 2002

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JUNE 16, 2000

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:         PHYLLIS MERANA
                      6816 U. S. DISTRICT COURT
                      3RD & CONSTITUTION AVE., N.W.
                      WASHINGTON, D. C. 20001

FOR THE GOVERNMENT:     PETER ZEIDENBERG, AUSA
                      ANJALI CHATURVEDI, AUSA

FOR THE DEFENDANTS:     STEVEN KIERSH, ESQ.
                      FRED SULLIVAN, ESQ.
                      JOE BESHOURI, ESQ.

879

BEEN THAT WE HAD AGREED ON SEVERAL DISCRETE POINTS ON WHICH WE WERE IN DISAGREEMENT. IN OTHER WORDS, THERE ARE ONLY TWO DISCRETE ISSUES, I THINK, THAT WE NEED THE COURT TO RESOLVE. I MAY BE TOTALLY OPTIMISTIC. I DIDN'T MEAN TO MISLEAD THE COURT ABOUT THE DEGREE OF COOPERATION.

MR. KIERSH: MAYBE WE HAVE AGREED TO DISAGREE, BUT I THINK THAT THE COURT STILL NEEDS TO INTERVENE AND RULE ON SOME MATTERS.

THE COURT: ALL RIGHT. I WILL HEAR YOU, MR. KIERSH. GO AHEAD.

MR. KIERSH: OKAY.

A LOT OF OUR DISPUTES RELATE TO THE TRIPLE MURDER WHICH OCCURRED IN TEMPLE HILLS, MARYLAND. AS THE COURT IS WELL AWARE, WE HAVE LITIGATED A LOT OF ISSUE RELATED TO THE TRIPLE MURDER, BUT JUST IN TERMS OF PROVIDING A FACTUAL CONTEXT, BECAUSE IT'S IMPORTANT IN UNDERSTANDING OUR POSITION, WE ARE NOT ON A FISHING EXPEDITION HERE. WHAT OCCURRED WITH RESPECT --

THE COURT: WELL, EVEN IF YOU ARE, LET ME SEE IF I CAN CUT TO THE CHASE HERE.

MR. KIERSH: OKAY.

THE COURT: YOU THINK THAT THERE IS A LOT OF INVESTIGATORY MATERIAL OUT THERE WHICH MAY IMPLICATE MR. MONTGOMERY AND/OR OTHERS --

MR. KIERSH: THAT'S CORRECT.

SA-263

THE COURT:  -- IN THE TRIPLE HOMICIDE.

THERE PROBABLY IS SOME INVESTIGATORY MATERIAL. THE GOVERNMENT HAS TOLD YOU THAT NONE OF IT CONSTITUTES BRADY MATERIAL.  WHAT WOULD BE YOUR POSITION WITH RESPECT TO MY SIMPLY TAKING AN IN CAMERA EX PARTE LOOK AT SUCH MATERIALS AS THEY HAVE AND MAKING MY OWN INDEPENDENT JUDGMENT AS TO WHETHER OR NOT THERE IS BRADY MATERIAL TO WHICH YOU ARE ENTITLED AT THIS POINT, AS DISTINGUISHED FROM JENCKS MATERIAL AND GIGLIO MATERIAL, WHICH YOU WILL BE ENTITLED TO IN DUE COURSE?

MR. KIERSH:  WELL, LET ME REMOVE MR. MONTGOMERY FROM THE FORMULA FOR THE TIME BEING.

THE COURT:  ALL RIGHT.

MR. KIERSH:  THE PROBLEM THAT WE HAVE WITH THE COURT DOING THAT IS THAT THE COURT DOESN'T KNOW THE SCOPE AND THE NATURE OF OUR INVESTIGATION AND THAT WE NEED TO LOOK AT THE FILES.  I NEED TO SEE THEM TO SEE WHO WAS INVESTIGATED.

FOR INSTANCE, A PERSON BY THE NAME OF DENNIS GREEN, WHO HAS NO AFFILIATION WITH MR. SWEENEY OR, FOR THAT MATTER, ANYBODY ELSE IN THE INDICTMENT -- HE WAS ARRESTED AND CHARGED INITIALLY FOR THAT TRIPLE MURDER.

THE COURT:  WHY DO I NEED TO KNOW WHAT THE SCOPE OF YOUR INVESTIGATION IS?  IT'S EITHER BRADY MATERIAL OR IT ISN'T.

SA-264

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 273 of 668

MR. KIERSH:  WELL, WE INTEND TO PUT ON A THIRD-PARTY PERPETRATED DEFENSE.

THE COURT: OKAY.

MR. KIERSH:  WE WANT TO SUGGEST THAT SOMEONE ELSE OTHER THAN MR. SWEENEY --

THE COURT:  ALL RIGHT.  THE ONLY THING I CAN COMPEL THE GOVERNMENT TO DIVULGE AT THIS POINT IS BRADY MATERIAL.

MR. KIERSH:  IF THAT FILE SUGGESTS THAT DENNIS GREEN OR ANYBODY ELSE -- TEN OR FIFTEEN OTHER PEOPLE WERE INVESTIGATED FOR COMMITTING THAT TRIPLE HOMICIDE, OUR POSITION IS THAT'S BRADY BECAUSE WE WANT TO INTRODUCE THAT TO THE JURY TO SUGGEST THAT THERE IS A THIRD-PARTY PERPETRATOR, AND MR. SWEENEY HAD NOTHING TO DO WITH THIS.

THE COURT:  WELL, THEN I WILL MAKE A JUDGMENT AS TO WHETHER OR NOT IT'S BRADY MATERIAL.

MR. KIERSH:  OKAY.  SO WE JUST WANT OUR POSITION CLEAR THAT WE BELIEVE THAT THAT, IN FACT, IS BRADY.  IF THEY LOOKED AT -- NOT EVEN IF THEY MADE AN ARREST, BUT IF THEY INVESTIGATED ANOTHER PERSON, BECAUSE THE POLICE WOULDN'T HAVE INVESTED THE TIME AND RESOURCES UNLESS THERE WAS A GOOD-FAITH BASIS FOR THEM TO DO IT.

THE COURT:  THAT DOESN'T MAKE IT BRADY MATERIAL.

MR. KIERSH:  WELL, WE SUBMIT IT DOES BECAUSE WE CAN'T SATISFY THE BROWN-BEALE STANDARD OF PUTTING ON A

THIRD-PARTY PERPETRATED DEFENSE UNLESS WE CAN ESTABLISH THE FACTUAL PREDICATE.

THE COURT: WHAT YOU ARE ASKING IS TO HAVE THE POLICE INVESTIGATION, IN EFFECT, MADE AVAILABLE TO YOU -- TO HAVE THE PRINCE GEORGE'S COUNTY POLICE DO YOUR INVESTIGATIVE WORK.

MR. KIERSH: NOT DO IT. I JUST WANT TO LEARN WHAT THEY DID SO THAT I CAN TAKE IT AND FURTHER INVESTIGATE IT SO THAT I CAN SATISFY THE BROWN-BEAL FACTUAL PREDICATE.

THE COURT: YOU MAY BE ENTITLED TO LEARN THAT FROM INDEPENDENT SOURCES, BUT I CAN'T DIRECT THE UNITED STATES TO TURN IT OVER UNLESS IT IS BRADY MATERIAL.

MR. KIERSH: AND, AGAIN, IT'S BRADY IF IN ANY WAY IT SUGGESTS, UNDER KYLES VERSUS WHITLEY, THAT THERE IS A REASONABLE PROBABILITY THAT WE CAN USE IT FOR OUR INVESTIGATIVE PURPOSES TO SUGGEST SOMEONE ELSE, OTHER THAN MR. SWEENEY, DID IT.

THE COURT: REASONABLE PROBABILITY THAT IT'S EXCULPATORY.

MR. KIERSH: EXACTLY. AND IF THEY LOOKED AT SOMEONE ELSE -- IF THE POLICE LOOKED AT DENNIS GREEN, THEY HAD TO HAVE A REASON. IF THEY ARRESTED HIM AND TOOK THE MAN INTO CUSTODY AND THEY CHARGED HIM, THEY HAD TO HAVE REASONS FOR DOING IT. AND THOSE REASONS WE WANT TO USE. WE WANT TO INVESTIGATE THEM, AND WE WANT TO BRING THEM TO THE ATTENTION

SA-266

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 275 of 668

OF THE JURY -- SOMETHING FOR THE JURY TO CONSIDER -- WHAT WAS GOING ON THERE.

THIS WAS A MASSIVE INVESTIGATION.  IT WAS THE F.B.I.  IT WAS D. C.  IT WAS MONTGOMERY COUNTY.  IT WAS P.G. COUNTY.  THEY WOULDN'T HAVE FOCUSED IN ON SOMEONE AND TAKEN THEM INTO CUSTODY ON A LARK.  THEY HAD TO HAVE IT, AND THAT'S WHAT WE WANT TO FIND OUT, AS WELL AS ANYBODY ELSE WHO WE DON'T KNOW.  THAT'S WHY WE FEEL WE NEED THAT INFORMATION.  AND WE NEED IT NOW, NOT AT TRIAL.  WE NEED IT NOW SO WE CAN INVESTIGATE IT.

THE COURT:  I AGREE THAT YOU NEED BRADY MATERIAL.

MR. KIERSH:  RIGHT.

THE COURT:  AND YOU NEED IT AS IT BECOMES AVAILABLE TO THE GOVERNMENT.

MR. KIERSH:  WELL, IT'S AVAILABLE NOW.  THE GOVERNMENT HAS THIS.  AND THE OTHER PART OF THIS IS THAT -- THAT'S WHY I WANT TO REMOVE MR. MONTGOMERY FROM THE FORMULA FOR THE TIME BEING.

THE GOVERNMENT IS GOING TO COME IN, I'M SURE, AND SAY, "WE HAVE GOT SECURITY CONCERNS ABOUT MR. MONTGOMERY."  AND I UNDERSTAND WHAT THEY ARE SAYING ABOUT THAT.  BUT WITH RESPECT TO, FOR INSTANCE, DENNIS GREEN OR ANYONE ELSE, THERE HAS NEVER BEEN AN ARGUMENT THAT THEY HAVE SECURITY CONCERNS ABOUT THESE PEOPLE.  SO THERE IS NO REASON WHY THAT INFORMATION SHOULDN'T BE TURNED OVER TO US -- SOMETHING WE

SA-267

SHOULD SEE AND SOMETHING WE ARE ENTITLED TO SEE.

AND I AM HAPPY TO LOOK AT IT UNDER SEAL MYSELF JUST SO THAT I CAN SEE IT AND SATISFY MYSELF AS TO WHETHER OR NOT I HAVE A NEED FOR IT.  AND THEN I WILL COME BACK TO THE COURT AND I CAN POINT OUT X, Y AND Z AND SAY, "THIS IS WHAT I NEED," AND THEN WE CAN MAKE IT OFFICIALLY A PART OF THE RECORD AND UNSEAL IT.

BUT I HAVE NO PROBLEM WITH LOOKING AT IT INITIALLY UNDER SEAL.  SO THAT PERTAINS TO THE GENERAL INVESTIGATIVE FILES.

THE COURT:  ALL RIGHT.

MR. KIERSH:  I DON'T KNOW IF YOU WANT THE GOVERNMENT TO RESPOND ON THIS ISSUE.

THE COURT:  I SUPPOSE I DO TO SEE WHAT THEY ARE WILLING TO DO VOLUNTARILY.

MR. ZEIDENBERG:  THANK YOU, YOUR HONOR.  PETER ZEIDENBERG FOR THE UNITED STATES.

I HAVE NO OBJECTION TO TURNING OVER THE INFORMATION, SPECIFICALLY ABOUT THE SO-CALLED THIRD PARTY. IN FACT, AS FAR AS I AM AWARE, COUNSEL HAS ALL OF THAT MATERIAL.  IF IT'S THE INDIVIDUAL OF WHOM I AM THINKING -- AND I DON'T RECALL THE NAME OFFHAND -- INITIALLY IN THE INVESTIGATION, THERE WERE SEVERAL WITNESSES WHO CAME TO P. G. COUNTY POLICE.  THEY SAID THEY OVERHEARD A TELEPHONE CONVERSATION IN WHICH AN INDIVIDUAL WAS TALKING.  I DON'T

SA-268

RECALL OFFHAND IF THAT INDIVIDUAL'S NAME IS DENNIS GREEN, BUT I HAVE A FEELING THAT THAT IS THE PERSON WE ARE TALKING ABOUT.

THEY SAID THAT HE WAS MAKING STATEMENTS WHICH, IN THEIR MIND, SUGGESTED THAT HE HAD DONE THE TRIPLE MURDER DOWN THE STREET. THE POLICE INVESTIGATED THAT. THEY EVENTUALLY DECIDED THESE PEOPLE WEREN'T BEING TRUTHFUL.

NEVERTHELESS, ALL THAT INFORMATION THAT WE HAVE IN OUR FILES CONCERNING THAT -- AND I WILL DOUBLE-CHECK THAT, BUT, IN FACT, THE GRAND JURY TESTIMONY AND THE STATEMENTS OF THOSE WITNESSES THAT I AM REFERRING TO THAT SAID, "WE HEARD THIS CONVERSATION," WERE TURNED OVER TO MR. SWEENEY'S FIRST COUNSEL IN P. G. COUNTY, KENNETH ROBINSON. AND THEN, SUBSEQUENTLY, I BELIEVE I TURNED THEM OVER, AND MR. KIERSH INDICATED THAT HE HAD GOTTEN THOSE FILES BECAUSE WE HAVE TALKED ABOUT LOCATING THOSE INDIVIDUALS. THEY HAVE SINCE MADE THEMSELVES SCARCE. BUT THERE IS NO QUESTION THAT WE ARE NOT DISPUTING THAT THAT IS BRADY EVIDENCE, AND WE ARE NOT DISPUTING OUR OBLIGATION TO TURN IT OVER. I GUESS THERE IS A QUESTION ABOUT WHETHER WE HAVE OR NOT.

THE COURT: IS THERE SOME MATERIAL RELATING TO JAMES MONTGOMERY OR DENNIS GREEN WHICH YOU HAVE NOT TURNED OVER?

MR. ZEIDENBERG: JAMES MONTGOMERY, YES. DENNIS GREEN, NO, AT LEAST TO MY MEMORY.

SA-269

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 278 of 668

1

AS TO JAMES MONTGOMERY, IT IS A TOTALLY DIFFERENT SITUATION. JAMES MONTGOMERY, YOUR HONOR, AS THE GOVERNMENT MADE CLEAR IN A RECENT PLEADING, CAME TO THE ATTENTION OF PRINCE GEORGE'S COUNTY POLICE AS A RESULT OF WILLIAM SWEENEY. WILLIAM SWEENEY TALKED TO AN INDIVIDUAL NAMED ROBERT SMITH, WHO WAS HIS UNCLE, AND TOLD ROBERT SMITH THAT HE, WILLIAM SWEENEY, ALONG WITH SAM CARSON, JAMES MONTGOMERY AND SEAN COATES COMMITTED THE TRIPLE MURDER IN TEMPLE HILLS, MARYLAND.

HE TOLD THEM CHAPTER AND VERSE HOW IT HAPPENED, AND THAT HE, IN FACT, WAS THE SHOOTER.

IT TURNS OUT ROBERT SMITH WAS WORKING WITH THE F.B.I. AT THAT TIME OR SHORTLY THEREAFTER BECAME A COOPERATOR WITH THE F.B.I. HE HAD HIS OWN CASE.

HE WAS SPOKEN TO BY P. G. COUNTY POLICE, AND, AS A RESULT, THEY ARRESTED JAMES MONTGOMERY.

NOW, OUR DISPUTE WITH MR. KIERSH IS THAT THAT IS NOT BRADY. THE FACT THAT JAMES MONTGOMERY WAS INVESTIGATED -- OF COURSE, YES, HE WAS INVESTIGATED. HE WAS CHARGED AND, IN FACT, WAS INVOLVED IN THAT TRIPLE HOMICIDE.

IT IS OUR CONTENTION THAT IN NO WAY CONSTITUTES BRADY AS TO WILLIAM SWEENEY. IT HAS BEEN OUR CONTENTION ALL ALONG THAT THERE WERE FOUR INDIVIDUALS WHO PARTICIPATED IN THAT MURDER. AND THE FACT THAT THE POLICE FIRST ARRESTED JAMES MONTGOMERY AND LATER ARRESTED THE OTHERS IS IN NO WAY

1

BRADY EVIDENCE.

WE HAVE INDICATED TO MR. KIERSH THAT ALL OF MR. MONTGOMERY'S STATEMENTS THAT HE HAS MADE IN CONNECTION WITH THIS TRIPLE HOMICIDE WILL BE DISCLOSED TO THE DEFENSE PRIOR TO MR. MONTGOMERY TESTIFYING.

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  HE WILL HAVE AN OPPORTUNITY TO USE THAT.  WE WILL PROVIDE IT IN AMPLE TIME FOR HIM TO MAKE EFFECTIVE USE OF IT IN CROSS-EXAMINATION OF MR. MONTGOMERY, BUT CONCEPTUALLY WE VIEW IT AS A TOTALLY DIFFERENT ISSUE THAN THAT CONCERNING ANOTHER PERPETRATOR.

MR. MONTGOMERY WAS A PERPETRATOR.  HE WAS INVOLVED IN THIS.  AND THAT FACT, AGAIN, DOES NOT IN ANY WAY EXONERATE OR EXCULPATE MR. SWEENEY.

THE COURT:  THAT MAKES EMINENT GOOD SENSE TO ME. WHAT IS IT THAT YOU THINK YOU WANT?

MR. KIERSH:  I CAN EXPLAIN WHY IT IS BRADY WITH RESPECT TO MONTGOMERY.

THE COURT:  I'M SORRY?

MR. KIERSH:  I CAN EXPLAIN WHY THE INVESTIGATIVE FILE OF JAMES MONTGOMERY IS BRADY.  IT'S NOT SIMPLY MATERIAL THAT WE WOULD USE TO TRY TO IMPEACH HIM AT TRIAL.

NUMBER ONE, WE KNOW NOW, AS A MATTER OF FACT, THAT JAMES MONTGOMERY HAS FALSELY ACCUSED PEOPLE NOT INDICTED IN THIS CASE AS COMMITTING SOME OF THE MURDERS IN THIS CASE.

SA-271

1

SO THAT'S A FACT.  THE GOVERNMENT IS NOT GOING TO DISPUTE THAT.

THE COURT:  YOU ALREADY KNOW THAT.

MR. KIERSH:  WELL, WE LEARNED IT JUST RECENTLY BECAUSE THE GOVERNMENT GAVE IT TO US AS BRADY DISCLOSURE.

I COULD BUILD MY ENTIRE -- IF I CHOSE TO -- DEFENSE OF MR. SWEENEY BASED JUST ON THAT.  THAT IS INCREDIBLY DAMAGING TESTIMONY, THAT WE NOW KNOW THAT HE HAS COME FORWARD TO THE POLICE, ON HIS OWN, AND FALSELY ACCUSED PEOPLE OF COMMITTING MURDERS THEY DIDN'T DO.

SO THE BIAS OF THIS WITNESS AND THE MOTIVES OF THIS WITNESS ARE ABSOLUTELY ESSENTIAL FOR US TO FULLY INVESTIGATE FAR IN ADVANCE OF TRIAL.

NOW, JUST A COUPLE OF OTHER POINTS.  MONTGOMERY CAME INTO THE POLICE AND SAID, "WELL, I COMMITTED THIS MULTIPLE MURDER."  AND THE POLICE WERE INVESTIGATING HIM FOR THAT.  NOW, IF THE POLICE INVESTIGATIVE FILE OF MR. MONTGOMERY REVEALS THAT MR. MONTGOMERY AND SOME OTHER PERSON, OTHER THAN MR. SWEENEY, IS THE ONE THAT HE COMMITTED THIS MURDER WITH, THAT IS CLEARLY BRADY.  I DON'T KNOW ABOUT THE INVESTIGATIVE FILE ON JAMES MONTGOMERY.  MAYBE THEY WERE LOOKING FOR JAMES MONTGOMERY AND SOMEONE ELSE.

THE COURT:  WHAT YOU THINK MIGHT BE BRADY MATERIAL IS, QUOTE, INVESTIGATIVE FILE OF JAMES MONTGOMERY"? IS THAT CORRECT?

SA-272

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 281 of 668

1

MR. KIERSH: IT MAY BE. THAT'S CORRECT. AND NOT KNOWING WHAT'S IN THERE, BUT KNOWING THIS MAN'S HISTORY --

THE COURT: IS THERE ANY REASON WHY I CAN'T LOOK AT ANYTHING KNOWN AS THE INVESTIGATIVE FILE OF JAMES MONTGOMERY AND THEN CONDUCT A SECOND HEARING ON WHETHER OR NOT ANYTHING THAT I FIND IN THERE MIGHT BE BRADY MATERIAL?

MR. ZEIDENBERG: NO, YOUR HONOR.

THE COURT: DOES THAT RESOLVE THE MATTER? I KNOW YOU WOULD RATHER DO IT YOURSELF.

MR. KIERSH: I WOULD RATHER DO IT MYSELF.

THE COURT: BUT I AM NOT GOING TO LET YOU DO IT BEFORE I HAVE LOOKED AT IT.

MR. KIERSH: I WOULD JUST ASK THAT -- I CONTINUE MY OBJECTION AND CONTINUE MY REQUEST, BUT I WOULD ASK THAT AFTER THE COURT REVIEW IT, BEFORE THE COURT MAKES A FINDING, THAT I BE ALLOWED ALSO TO REVIEW IT IN CAMERA UNDER SEAL.

THE COURT: I HAVE GOT YOUR REQUEST. I WILL TAKE IT UNDER ADVISEMENT.

MR. KIERSH: VERY WELL.

THE COURT: ALL RIGHT.

MR. KIERSH: THERE ARE A COUPLE OF OTHER MATTERS THAT ARE IN OUR MOTION. WE FILED A PLEADING ASKING THE COURT FOR LEAVE TO SERVE SUBPOENAS ON TWO ASSISTANT UNITED STATES ATTORNEYS. THAT MOTION IS NOT RIPE YET BECAUSE THE GOVERNMENT HAS NOT RESPONDED TO IT, BUT WE HAVE ALSO MADE A

SA-273

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 282 of 668

1

A SUPERIOR COURT GRAND JURY UNDER AN ENTIRELY DIFFERENT THEORY OF CULPABILITY THAN THE WAY IT'S BEING PRESENTED IN THIS COURT UNDER THE RACKETEERING INDICTMENT.

THE COURT:  SO?

MR. KIERSH:  SO IF THEY HAVE INFORMATION -- THE GOVERNMENT HAS TO HAVE INFORMATION WHICH CONTRADICTS THEIR THEORY THAT THEY ARE GOING TO PRESENT TO THIS JURY.  THEY HAVE TO BECAUSE THEY PRESENTED IT TO A SUPERIOR COURT GRAND JURY.  SO WE WANT THAT INFORMATION.  IN THE SUPERIOR COURT --

THE COURT:  WHAT INFORMATION?

MR. KIERSH:  IN THE SUPERIOR COURT, WITH RESPECT TO THE MURDER OF DONNELL WHITFIELD, THEY WENT TO THE GRAND JURY AND SAID, "WILLIAM SWEENEY DID NOT SHOOT THIS MAN." THEY SAID, "SOMEBODY ELSE SHOT HIM."  HE IS AN ACCESSORY AFTER THE FACT.

WELL, TO THIS JURY, THE GOVERNMENT IS GOING TO COME IN AND SAY, "WILLIAM SWEENEY SHOT THE MAN."  SO SOMEWHERE THERE HAS TO BE EVIDENCE THAT WILLIAM SWEENEY DID NOT SHOOT THE MAN.  THERE HAS TO BE.  MS. LEIBOVITZ WASN'T GOING TO GO TO A GRAND JURY AND OFFER FALSE INFORMATION. SHE WAS SIMPLY NOT GOING TO DO THAT.  SO SHE HAD TO HAVE SOMEONE COME IN AND SAY --

THE COURT:  IF THERE IS INFORMATION IN THE GOVERNMENT'S POSSESSION WHICH SUGGESTS THAT MR. SWEENEY WAS

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 283 of 668

2

NOT THE SHOOTER, THEN THAT IS BRADY MATERIAL, AND IT COULD BE AND SHOULD BE TURNED OVER.

MR. KIERSH:  THE GOVERNMENT TO DATE HAS REFUSED TO TURN THAT OVER.  THAT'S WHY I NEED AN ORDER FROM THE COURT COMPELLING THAT DISCLOSURE.

THE COURT:  I DON'T KNOW WHETHER THERE IS ANY.

MR. ZEIDENBERG:  YOUR HONOR, AGAIN, I BELIEVE I MADE REPRESENTATIONS REGARDING THIS AT AN EARLIER HEARING, BUT, IF NOT, I WILL REITERATE IT.

THIS IS NOT, AGAIN, A PARTICULARLY COMPLICATED SCENARIO.  WHAT HAPPENED IS THIS.  A WITNESS PREVIOUSLY IDENTIFIED -- AN EYEWITNESS TO THE MURDER PREVIOUSLY IDENTIFIED MR. SWEENEY AS THE DRIVER OF THE CAR AND NOT THE SHOOTER.

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  THAT WITNESS LATER CAME TO US, AFTER SPEAKING WITH HIM, AND SAID, "IN FACT, MR. SWEENEY WAS ACTUALLY THE SHOOTER.  I WAS AFRAID TO IDENTIFY HIM AS THE SHOOTER BECAUSE I WAS AFRAID FOR MY SAFETY AND THE SAFETY OF MY FAMILY, BUT, IN FACT, HE WAS THE GUNMAN -- THE KILLER" --

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  -- "NOT THE DRIVER, AS I PREVIOUSLY SAID."  AND IT'S OUR CONTENTION THAT THAT INFORMATION, WHICH IS NOW KNOWN TO THE COUNSEL -- HE CAN USE IT -- AND THOSE STATEMENTS WILL BE PROVIDED TO COUNSEL.  THE

SA-275

2

FIRST STATEMENTS TO THE POLICE, THE GRAND JURY STATEMENTS IN WHICH HE IDENTIFIED MR. SWEENEY AS THE DRIVER, AND THE STATEMENT IN THE GRAND JURY WHERE HE LATER IDENTIFIED MR. SWEENEY AS THE SHOOTER WILL ALL BE DISCLOSED TO COUNSEL AT A TIME AT WHICH HE WILL BE ABLE TO MAKE EFFECTIVE USE OF IT ON CROSS-EXAMINATION.

THERE IS NO OTHER WITNESS OR INFORMATION REGARDING HIS ROLE.  OBVIOUSLY, MR. SWEENEY MADE A NUMBER OF STATEMENTS TO A NUMBER OF WITNESSES INDICATING HE WAS THE SHOOTER.  ALL OF IT IS GOING TO BE PRESENTED AT TRIAL.  BUT WE CONTEND THERE IS NO BRADY EVIDENCE.  THERE IS IMPEACHMENT EVIDENCE, AND THAT IMPEACHMENT EVIDENCE, TO THE EXTENT THAT -- I AM NOT SAYING THAT IMPEACHMENT EVIDENCE ISN'T BRADY, BUT IT WILL BE TURNED OVER IN TIME FOR EFFECTIVE USE AT TRIAL.

THE COURT:  NOW YOU HAVE GOT YOUR EXPLANATION FOR AN INCONSISTENT THEORY OF PROSECUTION.

MR. KIERSH:  BUT THAT'S WHERE WE DISAGREE.  IT'S NOT JUST IMPEACHMENT.  IT'S CLEARLY --

THE COURT:  WHAT YOU'RE SAYING IS SIMPLY THAT YOU DON'T BELIEVE HIM.

MR. KIERSH:  NO.  I AM SAYING IT'S BRADY.  I WANT TO TALK TO THIS WITNESS.  I WANT THE NAME AND ADDRESS OF THIS PERSON.

THE COURT:  YOU WILL GET IT IN DUE COURSE.

SA-276

2

MR. KIERSH: WELL, MR. ZEIDENBERG SAYS I WILL GET IT SO I CAN EFFECTIVELY CROSS-EXAMINE THE WITNESS. I THINK MR. ZEIDENBERG IS SUGGESTING I WILL GET IT AT TRIAL. THAT DOES NOT GIVE ME ENOUGH TIME.

THE COURT: I AM GOING TO REQUIRE A TURN-OVER OF JENCKS MATERIAL, AS WELL AS GIGLIO MATERIAL, WELL IN ADVANCE OF YOUR HAVING TO CONFRONT THESE WITNESSES. I AM NOT GOING TO REQUIRE IT TO BE TURNED OVER RIGHT NOW, AND I DON'T REGARD IT AS BRADY MATERIAL.

MR. KIERSH: VERY WELL.

THE COURT: CLEAR?

MR. KIERSH: I UNDERSTAND THE COURT'S RULING.

THE COURT: ALL RIGHT.

MR. KIERSH: ALL RIGHT.

THE COURT: NOW, WITH RESPECT TO JAMES MONTGOMERY, I WOULD LIKE TO TAKE A LOOK AT THAT INVESTIGATIVE FILE EX PARTE AND IN CAMERA.

MR. KIERSH: VERY WELL.

THE COURT: AND IF A FURTHER HEARING IS REQUIRED, I WILL NOTIFY YOU.

IS THERE ANYTHING FURTHER?

MR. ZUCKER: YOUR HONOR, MAY I CHIME IN?

THE COURT: SURE.

MR. ZUCKER: I HAVE HAD THIS ISSUE WITH PROSECUTORS AND SOME OF THE PROSECUTORS IN THIS CASE BEFORE.

**SA-277**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

_____

UNITED STATES,
     GOVERNMENT,                    :

  VS.                                 :    CR. NO. 98-329

VINCENT HILL,                          :
JEROME MARTIN,                         :
SAMUEL CARSON,                         :
WILLIAM K. SWEENEY,                    :
MAURICE PROCTOR,                       :
SEAN COATES,                           :
     DEFENDANTS.                   :
_____        :

UNITED STATES                          :
     GOVERNMENT,                   :
                                       :
  VS.                                 :    CR. NO. 99-348
                                       :
GARY PRICE,                            :
     DEFENDANT                     :
_____        :

                             WASHINGTON, D. C.
                             SEPTEMBER 27, 2000

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

FOR THE GOVERNMENT:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             555 4TH ST., N.W.
                             WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:      CHRISTOPHER DAVIS, ESQ.
                             601 INDIANA AVE., N.W.
                             #901
                             WASHINGTON, D. C.  20001

FOR THE DEFENDANT MARTIN:    JOANNE HEPWORTH, ESQ.
                             305 H STREET, N.W.
                             2ND FLOOR
                             WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:    JOSEPH BESHOURI, ESQ.
                             LEXI NEGIN CHRIST, ESQ.
                             419 7TH STREET, N.W.
                             WASHINGTON, D. C.  20004

**SA-278**

FOR THE DEFENDANT SWEENEY:          STEVEN R. KIERSH, ESQ.
                                    717 D STREET, N.W.
                                    SUITE 400
                                    WASHINGTON, D. C.  20004

                                    LEONARD LONG, ESQ.
                                    1818 11TH ST., N.W.
                                    WASHINGTON, D.C.  20001

FOR THE DEFENDANT PROCTOR:          HOWARD BRAMSON, ESQ.
                                    717 D STREET, N.W.
                                    THIRD FLOOR
                                    WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:           FREDERICK JONES, ESQ.
                                    901 6TH STREET, S.W.
                                    #409
                                    WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:            JONATHAN ZUCKER, ESQ.
                                    601 INDIANA AVE., N.W.
                                    #901
                                    WASHINGTON, D. C.  20004

COURT REPORTER:                     PHYLLIS MERANA
                                    6816 U. S. COURTHOUSE
                                    3RD & CONSTITUTION AVE., N.W.
                                    WASHINGTON, D. C.  20001

SA-279

THINK IF MS. HEPWORTH AND I DON'T AGREE ON THE ACTUAL COUNTS, IF IT'S NECESSARY, WE WILL COME BACK BEFORE THE COURT. I DON'T IMAGINE THAT WOULD BE NECESSARY.

THE COURT: ALL RIGHT. WILL YOU RECITE THOSE COUNTS AGAIN?

MR. HEPWORTH: YES, YOUR HONOR. 10, 11, 12, 13, 14, 15, 16, 18, AND 19.

THE COURT: 10, 11, 12, 13, 14, 15, 16, 18 AND 19.

MR. HEPWORTH: RIGHT. ALL BUT COUNT 17.

THE COURT: ALL RIGHT. AND THOSE COUNTS ARE DISMISSED ON STATUTE-OF-LIMITATIONS GROUNDS ONLY.

MR. HEPWORTH: THANK YOU, YOUR HONOR.

THE COURT: MARTIN'S MOTION TO DISMISS COUNTS ONE AND TWO OF THE INDICTMENT ON FIFTH AND SIXTH AMENDMENT GROUNDS.

MR. HEPWORTH: WE SUBMIT ON THE PAPERS ON THAT, YOUR HONOR.

THE COURT: ALL RIGHT. THAT MOTION IS DENIED.

CARSON'S MOTION FOR DISMISSAL OF COUNTS, TO COMPEL DISCLOSURE OF EXCULPATORY EVIDENCE, AND FOR ADDITIONAL SANCTIONS DUE TO VIOLATIONS OF BRADY.

MR. BESHOURI: JOSEPH BESHOURI ON BEHALF OF MR. CARSON.

THE COURT: ALL RIGHT.

MR. BESHOURI: YOUR HONOR, WE HAVE ASKED FOR

SA-280

79

SEVERAL TYPES OF RELIEF IN THAT MOTION.  TODAY I WANT TO PRESS REALLY JUST THE ONE AND SUBMIT ON THE OTHERS.  AND THE ONE WOULD BE THE REQUEST FOR AN ORDER TO COMPEL PRODUCTION.

BRIEFLY BY WAY OF BACKDROP, YOUR HONOR, THERE ARE A NUMBER OF PIECES OF INFORMATION THAT HAVE BEEN PROVIDED TO US THAT WOULD FALL UNDER THE UMBRELLA OF BRADY.  A LOT OF THIS INFORMATION, FRANKLY, IS FIVE YEARS OLD.  SOME OF IT AS OLD AS TEN YEARS OLD.

THE GOVERNMENT ONLY BEGAN TO DOLE IT OUT TO US IN APRIL OF THIS YEAR.  AND A LOT OF THAT INFORMATION, FRANKLY, WAS ONLY PROVIDED BY WAY OF INFORMATION WITHOUT ATTACHING AN IDENTITY TO THE INFORMATION ITSELF.

ONE OF THOSE BITS OF INFORMATION RELATES TO JEROME MARTIN -- A STATEMENT HE ALLEGEDLY MADE RELATING TO THE KILLING OF ANTHONY FORTUNE.

NOW, I HAVE ASKED -- THE GOVERNMENT HAS ADVISED THAT THE PERSON HEARD MR. MARTIN SAY THAT HE WAS RESPONSIBLE FOR THE KILLING OF ANTHONY FORTUNE.  I HAVE ASKED THE GOVERNMENT TO IDENTIFY WHO THAT PERSON IS, AND MR. ZEIDENBERG HAS DECLINED TO DO SO.  HIS POSITION IS THAT BECAUSE HE INTENDS TO CALL THIS WITNESS AT TRIAL, I WILL BE IN A POSITION THEN TO CROSS-EXAMINE THIS WITNESS AND TO ELICIT AS I MAY.

MR. ZEIDENBERG -- I GUESS HE JOINS THAT WITH THE FACT THAT THERE WILL BE OTHER PERSONS WHO WILL TESTIFY THAT

**SA-281**

MR. MARTIN WAS HEARD TO SAY THAT BOTH HE AND SAM CARSON KILLED ANTHONY FORTUNE.  THIS WOULD BE ANOTHER WITNESS OR WITNESSES.

I WOULD SUBMIT TO THE COURT THAT ON THIS PARTICULAR POINT, IF THERE WAS A WITNESS, FOR EXAMPLE, WHO TOOK CREDIT FOR A MURDER, OBVIOUSLY THE GOVERNMENT WOULD HAVE TO PROVIDE THAT INFORMATION TO ME.  SIMPLY BECAUSE THERE IS ANOTHER WITNESS WHO WILL SAY THAT MR. MARTIN AND MR. CARSON BOTH TOOK CREDIT FOR IT DOESN'T DILUTE THE FACT THAT THIS IS BRADY INFORMATION AS TO THE FIRST WITNESS THAT HEARD MR. MARTIN SAY THAT HE IS THE ONE WHO IS RESPONSIBLE. AND I OUGHT NOT BE IN A POSITION -- I OUGHT NOT BE FORCED TO BE IN POSITION TO ONLY ELICIT THAT INFORMATION THROUGH CROSS-EXAMINATION.  I OUGHT TO BE ABLE TO INVESTIGATE IT.  I OUGHT TO BE ABLE TO BE IN A POSITION TO PRESENT IT.  THAT MEANS I NEED TO BE ABLE TO TALK TO THAT WITNESS -- THAT WITNESS WHO HEARD MR. MARTIN.

THE COURT:  I DON'T KNOW WHAT MORE YOU NEED TO BE GIVEN IN THE WAY OF BRADY INFORMATION.  THE GOVERNMENT HAS INFORMED YOU -- HAS ACKNOWLEDGED THERE IS A WITNESS WHO WILL BE CALLED AT TRIAL AND WHO WILL TESTIFY THAT AT ONE POINT -- OR WHO IS ALLEGED TO HAVE SAID, WHETHER HE TESTIFIES TO IT OR NOT, AT ONE POINT THAT HE WAS RESPONSIBLE FOR A PARTICULAR HOMICIDE.

NOW, IF THEY HAD FURTHER EVIDENCE OF SOME

SA-282

81

DESCRIPTION CORROBORATIVE THAT THAT INDIVIDUAL WAS, IN FACT, RESPONSIBLE FOR THAT HOMICIDE, THEN I SUPPOSE THAT COULD QUALIFY AS BRADY MATERIAL, BUT YOU ALREADY KNOW ALL THAT BRADY REQUIRES IN THE ABSENCE OF THE EXISTENCE OF ANY SUCH OTHER EVIDENCE.

MR. BESHOURI:  THERE IS SUCH OTHER EVIDENCE.  THE COURT HEARD YESTERDAY FROM THE DETECTIVE WHO SAID THAT WHEN HE WENT TO INTERVIEW MR. MARTIN, MR. MARTIN HAD SLIDE MARKS -- SLIDE INJURIES ON HIS HAND WITHIN A DAY OR TWO OF THE KILLING OF MR. FORTUNE -- SLIDE MARKS THAT COME ABOUT BECAUSE THE HAND IS RISING TOO HIGH ON A SEMI-AUTOMATIC WEAPON.

THE COURT:  SURE.  WELL, NOW YOU KNOW THAT.

MR. BESHOURI:  I KNOW THAT, BUT IF I AM IN A POSITION TO SPEAK TO THE WITNESS TO WHOM MR. MARTIN ADMITTED COMPLICITY, I AM IN A POSITION TO FIND OUT WAS MR. MARTIN SPEAKING IN A MANNER TO SUGGEST HE ALONE, WAS HE SPEAKING GENERALLY ABOUT HE OR WE, DID HE SAY IT MORE THAN ONE TIME, AND WHAT WERE THE CIRCUMSTANCES OF HIM SAYING IT, SO I CAN BE IN A POSITION TO JUDGE HOW VALUABLE THIS IS TO MY CASE, SO THAT I CAN BE IN A POSITION TO PRESENT THIS IN MY CASE. THAT, I THINK, IS WHAT BRADY AND THE CASES THAT FOLLOW REQUIRE.

THE COURT:  ALL THAT BRADY REQUIRES IN THE CIRCUMSTANCES IS THAT YOU ARE AWARE THAT THERE IS A WITNESS

**SA-283**

82

WHO IS ALLEGED TO HAVE ACKNOWLEDGED THAT SOMEONE ELSE CLAIMED RESPONSIBILITY FOR A HOMICIDE WITH WHICH YOUR CLIENT IS CHARGED.  IF THERE IS OTHER EVIDENCE TO CORROBORATE IT, POSSIBLY THAT WOULD QUALIFY AS BRADY MATERIAL AS WELL. BEYOND THAT, I DO NOT THINK THAT THE GOVERNMENT NEEDS TO REVEAL THE IDENTITY OF THAT WITNESS.

MR. BESHOURI:  YOUR HONOR, I HEAR THE COURT'S POSITION ON IT.  I WILL ADD THAT THE LOGICAL EXTENSION OF THAT IS THAT I WOULD ALWAYS BE AT THE MERCY OF THE GOVERNMENT AND THEIR DECISION ABOUT TACTICS AND STRATEGY AND HOW THEY WANT TO PRESENT THEIR CASE.  I AM AT THE MERCY OF THAT IN TERMS OF HOW THIS BRADY ISSUE PLAYS OUT.

THE COURT:  TO A CERTAIN EXTENT, THAT IS INEVITABLE.

MR. BESHOURI:  IT IS NOT INEVITABLE IF THE INFORMATION IS TURNED OVER TO ME.  I AM IN CONTROL OF MY OWN FATE AND MY CLIENT'S FATE, NOT AT THE MERCY OF THE GOVERNMENT'S DECISIONS.

THE COURT:  IT IS INCUMBENT UPON THE GOVERNMENT TO REVEAL EVIDENCE WHICH IS EXCULPATORY OF YOUR CLIENT, BUT THE GOVERNMENT IS IN CONTROL OF THAT EVIDENCE.  AND YOU WOULD NOT KNOW ABOUT IT BUT FOR THE FACT THAT THE GOVERNMENT MAKES YOU PRIVY TO THAT INFORMATION.

MR. BESHOURI:  WHICH THE LAW REQUIRES THEM TO DO. THEY ARE NOT DOING ME ANY FAVORS.

**SA-284**

83

THE COURT:  I UNDERSTAND THAT.

MR. BESHOURI:  THEY ARE OBLIGED TO DO THAT.

THE COURT:  I UNDERSTAND THAT, BUT THE GOVERNMENT IS IN CONTROL OF IT.

MR. BESHOURI:  THE SECOND ISSUE I HAVE ALONG THESE SAME LINES, YOUR HONOR, RELATES TO THE MURDER OF KEVIN HART. I HAVE BEEN PROVIDED INFORMATION, AND THERE IS A POLICE REPORT DOCUMENT ATTACHED TO MY SUPPLEMENT ON THIS PLEADING. I SHOULD ADD HERE TO FLESH THIS OUT, MR. CARSON ISN'T CHARGED WITH THE KILLING OF KEVIN HART, ALTHOUGH I HAVE BEEN ADVISED RECENTLY FROM ONE OF THE GOVERNMENT'S PLEADINGS THAT THEY WILL INTRODUCE THE GOVERNMENT INFORMATION THAT MR. CARSON HAD COMPLICITY.

THERE IS A DOCUMENT ATTACHED TO MY SUPPLEMENTAL MOTION THAT AN INFORMANT PROVIDED INFORMATION TO THE POLICE THAT THREE INDIVIDUALS -- SOME OF THESE NAMES THE COURT HAS ALREADY HEARD OR WHO HAVE ALREADY BEEN BEFORE THE COURT -- ANTHONY CHANDLER, ERIC JONES AND ANTON GETHERS -- WERE INVOLVED IN THE KILLING OF MR. HART AND THAT MR. GETHERS, IN FACT, WAS THE PERSON WHO SHOT AND KILLED MR. HART.

NOW, I HAVE REQUESTED THIS INFORMATION, THE IDENTITY OF THIS INFORMANT.  AND I SHOULD ADD THAT THIS INFORMANT TOLD THE POLICE OFFICER OR THE DETECTIVE TO WHOM HE SPOKE THAT THIS INFORMATION WAS SOUND.  THIS WAS VERY GOOD INFORMATION.  THE GOVERNMENT, IN SPITE OF MY REPEATED

**SA-285**

REQUEST, HAS NOT PROVIDED --

MR. ZEIDENBERG:  IF I COULD, YOUR HONOR, JUST TO SPEED THINGS UP.  WE CAN PROVIDE THAT INFORMATION -- THE SOURCE OF THAT INFORMATION.

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  AND WE'LL DO SO.

MR. BESHOURI:  YOUR HONOR, I ACCEPT IT, AND I APPRECIATE THAT, BUT WE'RE A MONTH AND A HALF AWAY FROM TRIAL.  AND I WANT THE COURT TO KNOW I HAVE BEEN REQUESTING THIS INFORMATION.  THIS CASE IS TWO YEARS OLD ALREADY.

THE COURT:  WHAT DO YOU WANT ME TO DO ABOUT IT? YOU'RE NOW GOING TO GET THE INFORMATION.

MR. BESHOURI:  AS A PRACTICAL MATTER --

THE COURT:  ARE YOU ASKING FOR A CONTINUANCE?

MR. BESHOURI:  I DON'T KNOW, YOUR HONOR.  I DON'T KNOW.  I WILL LOOK AT THIS INFORMATION TO MAKE THAT DECISION.  BUT AS A PRACTICAL MATTER, THE COURT -- I KNOW THE COURT IS NOT GOING TO DO ANYTHING ABOUT IT, BUT I WANT THE COURT TO UNDERSTAND I HAVE BEEN MAKING THESE REQUESTS. WE'RE A MONTH AND A HALF AWAY.  I SHOULDN'T BE IN THIS POSITION NOW WHERE I HAVE TO COME BEFORE THE COURT TO ASK FOR IT.

THE COURT:  I DON'T THINK IT'S UNTIMELY ALTHOUGH YOU'RE ONLY A MONTH AND A HALF FROM TRIAL.

MR. BESHOURI:  AS A THIRD REQUEST, YOUR HONOR, I

HAVE ASKED THE GOVERNMENT -- AND I NEED TO FLESH THIS OUT A LITTLE BIT FACTUALLY. MR. PROCTOR WAS CHARGED ORIGINALLY WITH THE MURDER OF MR. HART. HE WAS CHARGED ALONE. THERE WAS NO ALLEGATION IN THE FIRST INDICTMENT THAT THERE WERE CO-CONSPIRATORS ALONG WITH HIM IN THE KILLING OF MR. HART.

IN THE SUPERSEDING INDICTMENT, MR. MARTIN WAS CHARGED, ALONG WITH MR. PROCTOR, IN THE KILLING OF MR. HART. AS I SAID, IN A RECENT GOVERNMENT PLEADING, I HAVE BEEN ADVISED THAT THE GOVERNMENT WILL INTRODUCE EVIDENCE THAT MR. CARSON HAD COMPLICITY AS WELL.

NOW, I THINK IT'S LOGICAL -- IT'S IMPLICIT IN THE WAY THE GOVERNMENT CHARGED THE CASE INITIALLY THAT THERE IS EVIDENCE OUT THERE THAT THE GOVERNMENT HAS THAT EITHER THERE WERE NOT THREE PEOPLE ORIGINALLY -- THERE WAS NOT MORE THAN ONE PERSON ORIGINALLY OBSERVED TO BE INVOLVED IN THE KILLING OF MR. HART. AND I HAVE MADE A BRADY REQUEST TO THE GOVERNMENT FOR INFORMATION THAT SUGGESTS THAT MR. CARSON WAS NOT INVOLVED. THAT IS TO SAY THAT THERE WERE LESS THAN THREE PEOPLE, THAT IS, LESS THAN MR. MARTIN AND MR. PROCTOR ALONE, OR A DESCRIPTION THAT DIDN'T INCLUDE MR. CARSON -- ALONG THOSE LINES.

NOW, THE GOVERNMENT DOESN'T SAY THAT THAT INFORMATION DOESN'T EXIST. ALL THEY HAVE SAID IN THEIR PLEADING IS THAT THEY DON'T INTEND TO PROVIDE THAT INFORMATION PRIOR TO TRIAL.

**SA-287**

86

SO THE FIRST REQUEST IS THAT THE GOVERNMENT PROFFER TO THIS COURT WHETHER SUCH INFORMATION EXISTS. AND IF IT DOES, THEN I THINK IT IS A LEGITIMATE BRADY REQUEST TO BE MADE. NOW, I HAVE ONE MORE, YOUR HONOR, IF THE COURT WANTS ME TO COVER THAT FIRST.

THE COURT: ALL RIGHT.

MR. BESHOURI: I SAID AT THE OUTSET THAT SOME OF THE INFORMATION THAT WAS PROVIDED DID NOT HAVE IDENTITIES ATTACHED TO IT. AND THAT IS ESPECIALLY TRUE IN THE MURDERS OF TERESA THOMAS AND TERITA LUCAS, WITH WHICH MR. CARSON IS CHARGED ALONE.

THERE WERE A NUMBER OF WITNESSES WHO HAVE BEEN ENTIRELY EXCULPATING AS TO MR. CARSON. AGAIN, I HAVE ONLY RECEIVED THOSE AS OF AUGUST OF 2000, BUT I DIDN'T RECEIVE NAMES AS TO CERTAIN OF THOSE.

NOW, THE GOVERNMENT TOLD ME THAT THEY WOULD PROVIDE THESE WITNESSES SO THAT I COULD HAVE A MEETING WITH THEM. SO THAT EVENTUALLY DID COME TO PASS, ALTHOUGH THAT HAS ONLY HAPPENED SINCE THE 15TH OF LAST MONTH.

ONE WITNESS, WHO IS IMPORTANT, IS STILL BEING WITHHELD BY THE GOVERNMENT. AND THE WAY THIS IS PLAYING OUT IS THIS. THE GOVERNMENT LOCATES THE WITNESSES. OBVIOUSLY, THESE WITNESSES ARE NOT HELPFUL TO THEIR CASE IN TERMS OF THE INFORMATION THAT WE HAVE IN HAND. THE GOVERNMENT INSISTS ON MEETING WITH THE WITNESSES FIRST, AND THEN WE ARE

**SA-288**

ALLOWED TO MEET WITH THESE WITNESSES WITH AN F.B.I. AGENT PRESENT.

NOW, THE GOVERNMENT TOLD ME THAT -- I WENT ALONG WITH MOST OF THIS ARRANGEMENT BECAUSE I DIDN'T FEEL I HAD ANY CHOICE, ALTHOUGH I DIDN'T AGREE WITH THE IDEA THAT THE GOVERNMENT SHOULD BE ABLE TO HAVE AN INTERVIEW OR DEBRIEF THESE WITNESSES FIRST.  THIS LAST WITNESS -- THE GOVERNMENT TOLD ME THEY WOULD TURN OVER INFORMATION AS TO WHO THIS PERSON WAS -- THIS PERSON'S IDENTITY AS OF LAST WEEK, IF THEY COULDN'T LOCATE THIS PERSON.

NOW, THE GOVERNMENT HASN'T BEEN ABLE TO LOCATE THIS PERSON.  AND THE GOVERNMENT, FOR REASONS WHICH IT KNOWS, HAS CHANGED COURSE ON ITS INTENT TO PROVIDE THIS INFORMATION TO ME.

NOW, I DON'T THINK THE GOVERNMENT WILL DISPUTE THAT THIS IS VERY IMPORTANT INFORMATION.  BUT BECAUSE THEY HAVEN'T HAD A CHANCE TO CONTACT THIS WITNESS AND THEY HAVEN'T HAD A CHANCE TO DEBRIEF THE PERSON FIRST, THEY DON'T WANT TO TURN OVER THE INFORMATION TO ME.  AND THAT'S A VIOLATION -- I THINK A STRAIGHT VIOLATION OF THE BRADY RESPONSIBILITIES.  AND I WOULD ASK THE COURT TO COMPEL THEM TO DELIVER THAT AS WELL.

MR. ZEIDENBERG:  IF MAY, YOUR HONOR, I WOULD LIKE TO FIRST ADDRESS THE KEVIN HART MATTER.  ACTUALLY, I WILL ADDRESS BRIEFLY THE TONY FORTUNE MATTER AND THEN KEVIN HART,

SA-289

127

KILL ROBERT SMITH.  AND WE ALSO WANT ALL THE RECORDS, FOR INSTANCE, FROM THE HOPE VILLAGE SHOOTING, TO SHOW TO THE JURY TO SAY, "SOMEONE ELSE WAS OUT THERE, NOT EVEN JUST WITH A MOTIVE TO KILL HIM, BUT SOMEONE ELSE TRIED TO KILL HIM."

AND THIS ALL COMES WITHIN THE THIRD-PARTY DEFENSE THAT THE D. C. COURT OF APPEALS UNDER THE BROWN BEALE STANDARD HAS SET FORTH.  THAT WE HAVE TO SHOW TO THE JURY THAT THERE IS A FACTUAL BASIS TO ASSERT A THIRD-PARTY DEFENSE -- A THIRD-PARTY PERPETRATED DEFENSE.

THE COURT:  I WOULD THINK THAT IF THE GOVERNMENT HAS ANY EVIDENCE -- ANY EVIDENCE THAT SOMEONE OTHER THAN A NAMED DEFENDANT WAS RESPONSIBLE FOR ROBERT SMITH'S DEATH, THEN THAT EVIDENCE WOULD BE PRODUCIBLE AS BRADY MATERIAL.

MR. KIERSH:  THAT'S OUR POSITION.

THE COURT:  ALL RIGHT.

MR. KIERSH:  BUT I JUST WANT TO MAKE THE RECORD CLEAR, TOO, THAT THE GOVERNMENT MAY LOOK AT SOME EVIDENCE AND SAY, "WELL, WE DON'T THINK -- HERE IS SOME EVIDENCE THAT HE WAS SHOT."

THE COURT:  THAT'S TRUE OF ANY EVIDENCE.

MR. KIERSH:  BUT I WOULD SUBMIT TO THE COURT IT'S BRADY.  IF THERE IS ANY EVIDENCE WHATSOEVER THAT ANYBODY ON THIS PLANET, OTHER THAN WILLIAM SWEENEY, TRIED TO KILL ROBERT SMITH, IT IS BRADY.  AND ANY RECORD THAT THE GOVERNMENT HAS RELATED TO THE SHOOTING, FOR INSTANCE, AT

SA-290

128

HOPE VILLAGE, AUTOMATICALLY IS BRADY.

AND I WOULD ASK THAT THE RECORD REFLECT THAT SO THAT I DON'T HAVE TO KEEP GOING BACK AND FORTH WITH THE GOVERNMENT ABOUT OBTAINING THAT INFORMATION BECAUSE THEY HAVE ALREADY DENIED MY REQUEST TO RECEIVE THAT INFORMATION.

I NEED TO INVESTIGATE THAT. I NEED IT TO BRING TO THE ATTENTION OF THE JURY. THIS TESTIMONY OF ROBERT SMITH COMING IN AS HEARSAY THAT I CAN'T CHALLENGE HAS AN INCREDIBLE POTENTIAL FOR PREJUDICE. AND I NEED TO ALERT THE JURY THAT THERE IS ANOTHER SIDE TO THIS STORY.

THE COURT: WELL, I WOULD AGREE WITH YOU TO THIS EXTENT. IF THOSE STATEMENTS ARE TO COME IN, THEN I WOULD REGARD THE REQUIREMENTS OF BRADY AS PARTICULARLY STRINGENT AND THAT ANYTHING WHICH MIGHT SUGGEST A BASIS FOR DISCREDITING THOSE STATEMENTS WOULD BE PRODUCIBLE AS BRADY MATERIAL. THAT WOULD BE A CONDITION THAT I WOULD ATTACH TO THEIR USE OF THOSE STATEMENTS.

THAT WOULD EXTEND, FOR EXAMPLE, TO IMPEACHMENT MATERIAL THAT MIGHT NOT OTHERWISE BE PRODUCIBLE AS BRADY MATERIAL.

MR. KIERSH: VERY WELL.

THE COURT: AND I WOULD BE INCLINED AT THIS POINT -- I AM GOING TO HEAR FROM THE GOVERNMENT, BUT I WOULD BE INCLINED AT THIS POINT IN ADDRESSING ONLY ROBERT SMITH -- WELL, ADDRESSING ANY WITNESS WHOSE HEARSAY STATEMENTS ARE

129

ADMITTED POSTMORTEM WOULD REQUIRE THAT A DISCLOSURE BE MADE OF MATERIAL WHICH WOULD BE OTHERWISE REGARDED AS MERE IMPEACHMENT MATERIAL AND NOT NECESSARILY PRODUCIBLE UNDER BRADY.

NOW, DOES THAT ADDRESS YOUR CONCERN?  I KNOW, OBVIOUSLY, YOU WOULD LIKE ABOUT TWO WEEKS FREE TIME IN THE GOVERNMENT'S FILES, BUT THAT'S NOT GOING TO BE FORTHCOMING.

MR. KIERSH:  WELL, IN RESPONSE TO THE COURT'S QUESTION, WE'RE GETTING THERE ON THIS.  I WOULD ASK THE COURT TO ORDER THE GOVERNMENT TO DISCLOSE THIS INFORMATION IMMEDIATELY BECAUSE WE'RE JUST SIX WEEKS --

THE COURT:  WELL, LET'S SEE WHAT THE GOVERNMENT HAS TO SAY.

MR. KIERSH:  VERY WELL.

THE COURT:  WE HAVE NOT GOTTEN TO YOUR MOTION, MS. CHATURVEDI, TO ADMIT POSTMORTEM THESE PREMORTEM HEARSAY STATEMENTS OF MURDER VICTIMS THAT YOU CLAIM THE DEFENDANTS HAVE WAIVED THEIR SIXTH AMENDMENTS RIGHTS WITH RESPECT TO. BUT MY INCLINATION WOULD BE TO GRANT THEM, SUBJECT TO THE CONDITION THAT I HAVE JUST ARTICULATED.

NOW, IN THAT CONTEXT, I WILL HEAR FROM YOU.

MS. CHATURVEDI:  YOUR HONOR, WE ARE IN FULL AGREEMENT WITH YOUR HONOR'S VIEW ABOUT WHAT NEEDS TO BE DISCLOSED WITH RESPECT TO THE STATEMENTS OF ROBERT SMITH -- AND WE CAN DISCUSS IT NOW OR LATER -- AND KEVIN HART.  THOSE

SA-292

137

NOTHING THAT LINKS ANYTHING BACK FROM 1990 TO 1997. FROM THE GOVERNMENT'S PERSPECTIVE, THE INDICTMENT --

THE COURT: WELL, I AM NOT GOING TO RULE ON THE ADMISSIBILITY OF THAT RIGHT NOW, BUT I CAN TELL YOU RIGHT NOW IF SOMEBODY TOOK A SHOT AT SMITH IN 1991, AND IT CANNOT BE ATTRIBUTED TO THESE DEFENDANTS, THEN THEY ARE ENTITLED TO ASK ABOUT IT. IT DOES SHOW THAT SOMEBODY ELSE WANTED HIM DEAD.

MS. CHATURVEDI: I UNDERSTAND --

THE COURT: OKAY.

MS. CHATURVEDI: -- AND RESPECTFULLY DISAGREE, BUT I UNDERSTAND.

THE COURT: ALL RIGHT.

SWEENEY'S THIRD MOTION TO COMPEL DISCOVERY, I WILL HAVE TO THINK ABOUT THE LANGUAGE ON IT. BUT I AM GOING TO REQUIRE THAT THEY DISCLOSE ANY INFORMATION HAVING IMPEACHMENT QUALITY WITH RESPECT TO THOSE WITNESSES -- THOSE OUT-OF-COURT DECLARANTS, NOW DECEASED, WHOSE HEARSAY OUT-OF-COURT STATEMENTS ARE SOUGHT TO BE INTRODUCED UPON THE THEORY THAT THESE DEFENDANTS HAVE WAIVED THEIR CONFRONTATION RIGHTS BY ENDEAVORING TO PROCURE THEIR DEATH.

MR. KIERSH: AND WE WOULD ASK FOR IMMEDIATE DISCLOSURE.

THE COURT: I WILL ORDER THAT, YES.

MR. KIERSH: VERY WELL.

138

THERE ARE TWO OTHER SUBSTANTIVE AREAS IN THE THIRD MOTION TO COMPEL DISCOVERY THAT I WOULD LIKE TO ADDRESS.

SA-293

AND ADDRESSES WILL BE KEPT CONFIDENTIAL.

THE COURT:  DOES ANYBODY ELSE WANT TO BE HEARD?

MR. DAVIS:  YOUR HONOR, I JOIN IN MR. BESHOURI'S REPRESENTATIONS AND NOTE THAT THOUGH THERE HAVE BEEN ALLEGATIONS OF WITNESS INTIMIDATION -- AND I THINK MR. JONES TOUCHED UPON THIS -- IN THE PAST, THERE HAVE BEEN NO ALLEGATIONS OF JURY-TAMPERING OR THREATS ON JURORS BY ANY OF THESE MEN, WHO I DARE SAY HAVE ALL BEEN THROUGH THE JUDICIAL SYSTEM AT ONE POINT OR ANOTHER.

THE COURT:  ALL RIGHT.

I AM GRANTING THE MOTION FOR AN ANONYMOUS JURY SUBJECT TO CONDITIONS YET TO BE ESTABLISHED.

AND THE GOVERNMENT'S MOTION TO ADMIT OUT-OF-COURT STATEMENTS MADE BY MURDERED WITNESSES -- IT IS MY TENTATIVE INCLINATION TO GRANT THAT MOTION, ONCE AGAIN SUBJECT TO THE CONDITIONS THAT WERE ALLUDED TO EARLIER IN THE HEARINGS HERE, NAMELY THAT THERE BE ABSOLUTELY FULL DISCLOSURE WITH RESPECT TO THE OUT-OF-COURT DECLARANTS -- NOT ONLY BRADY DISCLOSURES, BUT DISCLOSURES OF ANY ADVERSE INFORMATION WHICH COULD PROPERLY BE USED FOR IMPEACHMENT, WERE THE WITNESS TESTIFYING IN OPEN COURT, AND WITH AN ASSURANCE THAT TO THE EXTENT THAT THE GOVERNMENT KNOWS OR OUGHT TO KNOW THAT THAT INFORMATION IS TRUE, THE DISCLOSURE OF THAT INFORMATION DURING THE COURSE OF DIRECT EXAMINATION OR THE WITNESS BY WHOM THE DECLARATION IS INTRODUCED ACKNOWLEDGING

194

THE EXISTENCE OF THESE IMPEACHING FACTS.

MS. CHATURVEDI:  WE HAVE NO OBJECTION TO THAT PROPOSAL, YOUR HONOR.

THE COURT:  ALL RIGHT.

MS. CHATURVEDI:  I HAVE WITH ME TODAY THAT INFORMATION, BUT I AM PREPARED, IF IT WOULD BE MORE EXPEDIENT, TO PREPARE A WRITTEN PLEADING IN WHICH I WILL DISCLOSE THE IMPEACHABLE CONVICTIONS OF THE MURDERED WITNESSES.

THE COURT:  ALL RIGHT.  NOT JUST THE CONVICTIONS.

MS. CHATURVEDI:  I UNDERSTAND THAT.  PLEA AGREEMENTS, THE CIRCUMSTANCES UNDER WHICH THEY WERE BROUGHT TO LAW ENFORCEMENT, ET CETERA.

THE COURT:  ALL RIGHT.

MS. CHATURVEDI:  I CAN HAVE THAT FILED BY FRIDAY. AND UPON REVIEW OF THE COURT, IF THERE IS OTHER INFORMATION THAT YOUR HONOR BELIEVES --

THE COURT:  WELL, I DON'T THINK YOU NEED TO FILE IT WITH ME.  I JUST WANT TO MAKE SURE THAT IT'S AVAILABLE TO ALL DEFENSE COUNSEL.

MS. CHATURVEDI:  THAT IS ABSOLUTELY NO PROBLEM, YOUR HONOR.  I WILL JUST SUBMIT IT AS A PLEADING TO THE COURT.

THE COURT:  ALL RIGHT.

MS. CHATURVEDI:  I WILL CERTAINLY FILE IT WITH ALL

**SA-295**

198

BUT A HEARING --

THE COURT:  ALL RIGHT.

MR. KIERSH:  -- OUTSIDE THE PRESENCE OF THE JURY, AND IN THE SUPPLEMENTAL PLEADING WE FILED, WE ASKED FOR IT TO BE DONE PRETRIAL.  IT JUST SEEMS TO MAKE SENSE IN TERMS OF JUDICIAL ECONOMY TO DO THIS BEFORE WE GET INVOLVED IN TRIAL.

THE COURT:  I DON'T PLAN TO DO IT PRETRIAL.

MR. KIERSH:  VERY WELL.

THE COURT:  WE WILL DO IT DURING THE HIATUS IN THE COURSE OF THE TRIAL.

MR. KIERSH:  OKAY.  AND I BELIEVE THAT THERE IS A SPLIT IN THE CIRCUITS AS TO WHAT STANDARD OF PROOF APPLIES. I KNOW THE TENTH CIRCUIT TALKED ABOUT A PREPONDERANCE OF THE EVIDENCE.  SOME OF THE OTHER CIRCUITS TALK ABOUT CLEAR AND CONVINCING EVIDENCE BEING THE STANDARD.  THE SUPREME COURT HAS NOT HAD OCCASION TO DECIDE WITH FINALITY WHAT THE STANDARD IS.  AND IT'S OUR POSITION THAT THE STANDARD SHOULD BE CLEAR AND CONVINCING EVIDENCE.

THE COURT:  ALL RIGHT.  I WILL PONDER ON THAT.

MR. KIERSH:  VERY WELL.

AND THE FINAL REMARK I WANT TO MAKE WITH RESPECT TO THIS IS I DON'T BELIEVE THE COURT RULED ON MY REQUEST REGARDING MR. SMITH'S STATEMENTS.  AGAIN, THERE ARE A LOT OF WRITTEN STATEMENTS.  THE GOVERNMENT GAVE US REDACTED 302'S.

SA-296

199

WE'RE ASKING FOR ALL OF HIS WRITTEN STATEMENTS, INCLUDING THE 302'S WITHOUT REDACTIONS AND ANY OTHER STATEMENTS HE MADE BEFORE TRIAL SO WE CAN INVESTIGATE THE SUBSTANCE OF THOSE.

THE COURT: WHAT ARE YOU REDACTING, OTHER THAN THE IDENTITIES OF WITNESSES WHOSE SECURITY ARE MATTERS OF CONCERN?

MS. CHATURVEDI: YOUR HONOR, THERE ARE A NUMBER OF MATTERS THAT MR. SMITH SPOKE ABOUT TO LAW ENFORCEMENT THAT HAVE NO CONNECTION WHATSOEVER WITH THE DEFENDANTS -- INFORMATION WHICH THE F.B.I. USED IN CONNECTION WITH INVESTIGATIONS, SOME OF WHICH ARE ONGOING.

I DON'T SEE THE RELEVANCE IN DISCLOSING THAT INFORMATION. IF MR. SMITH WERE ALIVE AND WERE PERMITTED TO TESTIFY AT THIS TRIAL, WHETHER OR NOT HE HAD COOPERATED IN UNRELATED CRIMINAL INVESTIGATIONS WOULD NOT BE PROVIDED TO COUNSEL. AND THEY SHOULD NOT BE IN A BETTER POSITION NOW SIMPLY BECAUSE MR. SMITH HAS BEEN MURDERED.

MR. KIERSH: I WOULD DISAGREE WITH THAT ENTIRELY. IF MR. SMITH WERE ALIVE AND HE WERE A COOPERATING WITNESS WITH THE GOVERNMENT, ANYTHING -- ANY BENEFIT HE IS GETTING FROM THE GOVERNMENT IS CERTAINLY SOMETHING THAT WOULD BE SUBJECTED TO CROSS-EXAMINATION.

THE COURT: I DON'T KNOW IF THERE WERE ANY BENEFITS HE WAS GETTING.

SA-297

200

MR. KIERSH:  WELL, SURE HE WAS.

THE COURT:  HOW ABOUT UNRELATED ONGOING INVESTIGATIONS?

MR. KIERSH:  HE WAS GETTING A BENEFIT FOR IT. THERE ARE TWO REASONS WHY THAT INFORMATION SHOULD BE TURNED OVER.  NUMBER ONE IS TO SHOW THAT MR. SMITH WAS TRYING TO CURRY FAVOR WITH THE GOVERNMENT BECAUSE HE WAS GETTING HUGE BENEFITS FROM THE GOVERNMENT.

AGAIN, THIS MAN IS A CAREER CRIMINAL WHO IS OUT ON THE STREET ONLY BY VIRTUE OF THE FACT THAT HE IS COOPERATING WITH THE GOVERNMENT.  BUT THE OTHER REASON IS WHAT WE TALKED ABOUT BEFORE.  THE FACT THAT MR. SMITH WAS GIVING INFORMATION IN UNRELATED CASES, THOSE INDIVIDUALS, IF THEY KNEW ABOUT HIS COOPERATION, HAD A MOTIVE TO KILL HIM.  AND THAT'S EXACTLY WHAT WE WANT TO OFFER TO THE JURY.  THAT THERE WAS MOTIVATION BEYOND THESE PEOPLE TO KILL HIM.  SO THERE ARE TWO VERY SOUND REASONS.

THE COURT:  LET ME TAKE A LOOK AT THE 302'S UNREDACTED IN CAMERA.

MS. CHATURVEDI:  CERTAINLY, YOUR HONOR.  IF I COULD JUST ADDRESS THIS BRIEFLY.  AGAIN, IT IS SORT OF A LEAP OF FAITH.  IF THE OTHER PEOPLE WHO MR. SMITH IMPLICATED -- IF THEY KNEW THAT HE WAS COOPERATING WITH LAW ENFORCEMENT, PERHAPS THEY HAD A MOTIVE.  THAT IS ONE LEAP OF FAITH.

SA-298

201

THE COURT:  SURE.

MS. CHATURVEDI:  AND THE SECOND ONE IS IS THERE ANY EVIDENCE TO SUGGEST ANY OF THOSE PEOPLE, ASSUMING THEY DID KNOW ABOUT THE COOPERATION, TOOK ANY STEPS TO HARM MR. SMITH.

THERE IS NO SUCH EVIDENCE.  IF THE DEFENSE IS TRYING TO RAISE THIRD-PARTY CULPABILITY, THERE HAS TO BE MORE THAN MERE SPECULATION.

MR. KIERSH CITED TO THE BROWN BEALE CASE FROM THE D. C. COURT OF APPEALS.  THE WINFIELD CASE, WHICH IS THE MOST MOST RECENT CASE ON THAT POINT, SAYS YOU CAN'T JUST DRAW A BLANK.  YOU CAN'T JUST PULL AT STRAWS SPECULATING THAT SOMEONE ELSE MAY HAVE WANTED TO HAVE THIS PERSON KILLED AND WE SHOULD BE ENTITLED TO KNOW THAT.  I WILL PROVIDE --

THE COURT:  I AGREE.  THERE HAS TO BE SOME EVIDENCE THAT THERE WERE OTHERS WHO HAD A REASON TO -- THAT THERE WAS A MOTIVE FOR COMMITTING THE HOMICIDE KNOWN TO THOSE WHO WERE IN A POSITION TO EFFECT IT.

MS. CHATURVEDI:  RIGHT.  AND WE DON'T HAVE ANY SUCH INFORMATION.  AND WE RECOGNIZE THAT IF WE DID HAVE SUCH INFORMATION AND THAT STEPS HAD BEEN TAKEN TO GIVE THAT, THAT WOULD BE BRADY INFORMATION.  THAT WOULD HAVE BEEN DISCLOSED AS BRADY INFORMATION.

THE COURT:  YES.

SA-299

202

MS. CHATURVEDI: YOUR HONOR, I WOULD LIKE TO JUST BRIEFLY ADDRESS ONE OTHER MATTER. IN TERMS OF THE MANNER IN WHICH YOUR HONOR EXPECTS TO HEAR THIS PROFFER, IT'S OUR POSITION THAT AN EVIDENTIARY HEARING ON THE ISSUE IS NOT NEEDED. THAT IS PROFFERED EVIDENCE -- WHAT WE HAVE PRIMARILY SUBMITTED IN OUR PAPERS, COMBINED WITH THE GIGLIO INFORMATION, INCLUDING IMPEACHMENTS --

THE COURT: YOU MEAN THE EVIDENTIARY PREDICATE FOR ADMITTING THE STATEMENT?

MS. CHATURVEDI: RIGHT.

THE COURT: IT MAY BE THAT I WILL BE SATISFIED WITH THE PROFFER. I DON'T KNOW. LET'S SEE.

MS. CHATURVEDI: THE PROFFER -- I WOULD JUST LIKE TO CLARIFY -- IS WHAT WE HAVE PRESENTED IN OUR PAPERS THUS FAR.

THE COURT: ALL RIGHT.

MS. CHATURVEDI: I AM PREPARED TO SUPPLEMENT THAT BY INFORMATION CONCERNING PRIOR CONVICTIONS AND PLEA AGREEMENTS OF THE WITNESSES. AND WHAT I BELIEVE I SHOULD FILE BY FRIDAY WOULD BE A SUBMISSION TO THE COURT TO TAKE THAT INFORMATION INTO ACCOUNT.

THE COURT: ALL RIGHT.

MS. CHATURVEDI: BUT IT'S NOT OUR INTENTION TO PUT ON WITNESSES OUTSIDE THE PRESENCE OF THE JURY ON THE ISSUE.

THE COURT: LET'S RESERVE ON THAT AND SEE WHETHER

**SA-300**

203

OR NOT THE PROFFER IS, IN MY JUDGMENT, SUFFICIENT.

MS. CHATURVEDI:  YES, SIR.

MR. KIERSH:  WE WOULD ASK THAT THE GOVERNMENT PROVIDE THE COURT WITH MR. SMITH'S -- NOT JUST HIS 302'S, BUT ANY WRITTEN STATEMENT, WHETHER IT'S NOTES OR IN OTHER POLICE FORM, FOR THE COURT TO REVIEW IN CAMERA.

THE COURT:  I HAVE ALREADY REVIEWED A VOLUMINOUS PRODUCTION OF, QUOTE, INVESTIGATIVE FILES RELATING TO MR. SMITH.  I DON'T KNOW WHAT ELSE THERE IS OUT THERE.

MR. KIERSH:  THERE'S MORE.  THERE'S MORE.  ALL THE NOTES THAT LAW ENFORCEMENT TOOK.  AND I BELIEVE IT WAS F.B.I. AND M.P.D. THAT INTERVIEWED HIM.  AND THEY WOULD EACH GENERATE --

THE COURT:  WELL, HOW DO YOU KNOW WHAT I HAVE REVIEWED?

MR. KIERSH:  BECAUSE I DON'T BELIEVE THIS INFORMATION -- WELL, NO ONE HAS TOLD ME THAT YOU REVIEWED ROBERT SMITH'S MATERIALS.  I MEAN I KNOW YOU HAVE REVIEWED JAMES MONTGOMERY.

THE COURT:  OH, JAMES MONTGOMERY.

MR. KIERSH:  RIGHT.

THE COURT:  I REVIEWED JAMES MONTGOMERY.

MR. KIERSH:  RIGHT, BUT NOT ROBERT SMITH, AS FAR AS I KNOW.

THE COURT:  CAN YOU GIVE ME THE SAME MATERIAL FOR

204

SMITH?

MS. CHATURVEDI: YOUR HONOR, I THOUGHT THIS MIGHT BE AN ISSUE.

THE COURT: I'M SORRY.

MS. CHATURVEDI: I THOUGHT THIS MIGHT BE AN ISSUE. I HAVE THE REDACTED VERSION THAT I PROVIDED TO DEFENSE COUNSEL AND THE UNREDACTED VERSION TO PROVIDE TO THE COURT.

THE COURT: OKAY.

(PASSING UP TO COURT.)

THE COURT: VERY GOOD.

MS. HEPWORTH: YOUR HONOR, I AM NOT AWARE OF ANYTHING ON BEHALF OF MR. HART WHICH HAS BEEN PROVIDED TO ME, OR TO THE COURT, OR ANYONE. AND I'D ASK THAT THE SAME BE PROVIDED.

THE COURT: MR. BESHOURI?

MR. BESHOURI: YOUR HONOR, I AM AWARE OF THE HOUR, BUT I HAVE A SEPARATE ISSUE. I WANT TO ALERT THE COURT TO IT AT LEAST.

ROBERT SMITH, IF HE WAS ALIVE AND WAS ABLE TO TAKE THE STAND, HE WOULD TESTIFY, APPARENTLY, THAT MR. SWEENEY TOLD HIM THINGS ABOUT WHAT MR. SWEENEY DID, BUT ALSO THAT MR. SWEENEY TOLD HIM THINGS ABOUT WHAT MR. CARSON DID.

AND SURELY, AT THAT POINT, I WOULD INTERJECT AN OBJECTION ON A BRUTON THEORY THAT BECAUSE I AM UNABLE TO CROSS-EXAMINE MR. SWEENEY, THAT MR. SMITH OUGHT NOT TO BE

1



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA


UNITED STATES OF AMERICA,              .  Docket No. CR 98-329
                                       .
            Government,                 .  Washington, D.C.
                                       .  January 9, 2001
      vs.                              .  2:15 p.m.
                                       .
VINCENT HILL,                          .  (AFTERNOON SESSION)
JEROME MARTIN,                         .
SAMUEL CARSON,                         .
WILLIAM K. SWEENEY,                    .
MAURICE PROCTOR,                       .        FILED
SEAN COATES,                           .
                                       .      MAR 1 1 2003
            Defendants                 .
                                       .   NANCY MAYER WHITTINGTON, CLERK
. . . . . . . . . . . . . . . . . . .  .       U.S. DISTRICT COURT

UNITED STATES OF AMERICA,              .
                                       .
            Government,                 .
                                       .
                                       .  Docket No. CR 99-348
      vs.                              .
                                       .
GARY PRICE,                            .
                                       .
            Defendant.                 .
                                       .
. . . . . . . . . . . . . . . . . . .  .


                TRANSCRIPT OF TRIAL
      BEFORE THE HONORABLE THOMAS P. JACKSON
      UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:              PETER ZEIDENBERG, AUSA
                                 ANJALI CHATURVEDI, AUSA
                                 U.S. Attorney's Office
                                 555 Fourth Street, N.W.
                                 Washington, D.C.  20001

For the Defendant Hill:          CHRISTOPHER DAVIS, ESQ.
                                 601 Indiana Avenue, N.W.
                                 Suite 910
                                 Washington, D.C.  20004

For the Defendant Martin:        JOANNE HEPWORTH, ESQ.
                                 305 H Street, N.W.
                                 Second Floor
                                 Washington, D.C.  20001



SA-303

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Proctor:       HOWARD BRAMSON, ESQ.
                                 717 D Street, N.W.
                                 Third Floor
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-304

21

THE COURT: May as well hear it now. What's your objection?

MR. KIERSH: Well, it's not an objection. It's a concern I have about the Jencks material. Last week the Court -- well, the Court in -- well, strike that.

The government suggested that it would provide us with Agent Lisi's Jencks material after the government completed its opening statement. Yesterday afternoon at the close of business government counsel provided each defense lawyer with volumes of Grand Jury transcripts.

Now, there's two problems with that. The first problem is that the transcripts are redacted. So throughout the transcripts, there are markings covering up witness statements, very important information. So I would object to receiving the Jencks information that way.

We're entitled under the Jencks Act to the complete unredacted Grand Jury transcript, and if the government is seeking to redact any part, they can only do it on motion to this Court so that we have an opportunity to be heard as to why we would oppose any such redaction.

The other issue is that I'm confident that there are additional Jencks materials of Agent Lisi. He's the main case agent on this case for years and years and years. He's testified before the Grand Jury a dozen times probably. He's generated police reports. We can't begin the process of even

**SA-305**

22

thinking about cross-examining Agent Lisi until we have all the Grand Jury transcripts, all the Jencks materials in its totality in unredacted fashion.

So I raise that with the Court --

THE COURT:  Do you have his 302's?

MR. KIERSH:  We have redacted 302's that were given to us in another context.

THE COURT:  What was the redacting of, Mr. Zeidenberg?

MR. ZUCKER:  Excuse me, Your Honor.  I don't think -- I don't know if Mr. Kiersh got them, but I didn't get any 302's last night.

MR. KIERSH:  Well, I got 302's related to Robert Smith, but that's it.  I assume that there are others.

MR. ZUCKER:  We received -- I don't know about the rest of us -- I have not seen any of the 302's of Agent Lisi nor any handwritten notes.

THE COURT:  Grand Jury transcripts?

MR. ZUCKER:  That's what I got, but some of them, many of which are heavily redacted.  I haven't read them through obviously.

MR. ZEIDENBERG:  Your Honor, the Grand Jury transcripts are redacted where they inquire of Agent Lisi what specific individuals told him.  That information which he recites such-and-such a witness told me X is redacted.

SA-306

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

23

They're entitled to Agent Lisi's Grand Jury, his actions, what his statements are. He will not be testifying from this stand to what any individual told him.

They are redacted for security purposes. Those witnesses at the time they testify will be provided -- the defense counsel will be provided with the exact verbatim, those redacted pages for that witness so they can be -- those witnesses can be cross-examined with Agent Lisi's Grand Jury testimony. And then if they wish to call Agent Lisi to complete an impeachment, they can call him.

But there are witness names of individuals who have testified and may -- either won't testify in this case at all or who are -- we have security concerns about their identities. Their addresses are known in the Grand Jury, and, frankly, Your Honor, we believe it's a violation of the Grand Jury secrecy to provide it in that fashion when the witness very well may not be called to the stand.

Anyone who is -- any of that redacted portion -- those redacted portions will be provided at the time the witness testifies. So they will have meaningful use of it. Agent Lisi can't be cross-examined with it, and I can't properly inquire of him regarding those statements.

THE COURT: All right. Do you have any authority for that proposition? That that's an appropriate procedure under the Jencks Act?

**SA-307**

24

MR. ZEIDENBERG:  I believe under the Jencks Act itself.  I don't know if we have case law.  I can certainly provide it for the Court in the morning.

THE COURT:  I'll tell you what I'm going to do.  If Agent Lisi is going to be the first witness, and we have this issue, I'm going to hear Mr. Zucker's opening statement, and then I'm going to recess until tomorrow.

MR. ZEIDENBERG:  Well, we certainly could call Agent Lisi.  I mean, whatever the Court wishes, but I mean for time purposes we could certainly begin his testimony.  It's not going to -- we're not going to get through it today.  I can assure the Court it's a lengthy presentation, and then at the time, if the Court wishes to revisit it --

THE COURT:  Well, what you're telling me is that you're not going to be getting into any matter as to which he testified before the Grand Jury today?

MR. ZEIDENBERG:  We are not going to be eliciting from Agent Lisi the testimony of what any particular individual told him.  In other words, --

THE COURT:  What do you mean by that?

MR. ZEIDENBERG:  He testified as a summary witness in the Grand Jury, and these are witnesses that in many cases he never even spoke to, but he is reading from police reports and other summaries from other agents.

THE COURT:  I understand.

25

MR. ZEIDENBERG:  So that he can't be -- the long answer to the Court's question is he will not be asked and will not be inquired of -- he can't be, because it would be hearsay, what any of these people told him.

I mean, there's the whole separate issue about the murdered witnesses, but obviously we're not at that juncture yet.

THE COURT:  No.  Well, we'll get started with him and see what it is that he will be testifying to and address any problem raised by redacted Jencks material at the time that the event occurs.

MS. HEPWORTH:  Your Honor, if I may, I don't see how we can do that since we won't know.  It's redacted so that we don't really even know what it is that he's said.

And one of the issues that I don't see how the government is going to get around, how are we to determine whether or not the Grand Jury was informed correctly as to what Agent Lisi says that these other people said?  I mean, I think all of this is clearly Jencks material that we're entitled to.

THE COURT:  Well, have you got some authority?

MS. HEPWORTH:  I just now confronted the issue.  I will certainly try to get it.

THE COURT:  I would love to have some authority from somebody.  In the absence of that, I've got to make a decision

SA-309

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 318 of 668

26

here.

MS. HEPWORTH:  Only 20 years experience, Your Honor. I've never received redacted Grand Jury before.

MR. KIERSH:  The very terms --

THE COURT:  Do you have some authority?

MR. KIERSH:  Yeah, well, the Jencks Act is 18 United States Code 3500.  The very terms of the Act itself place a burden on the government to justify --

THE COURT:  I know what the Act says, Mr. Kiersh. Would you get me some case authority as to how it has been applied by courts?

MR. KIERSH:  We will try.

THE COURT:  All right.

MR. KIERSH:  But, again, I would submit to the Court that if there -- in the absence of any specific case authority on point, the Act itself, the terms of the Act, the legislative history of the Act, the purposes of the Act that Congress found to be necessary by their terms require the government to take these actions.

And what we would need to do is go through this page by page by page, because I can show it to you.  We have whole pages of Grand Jury testimony just crossed out, and it's probably 25 percent of these probably thousands of pages of materials that are crossed out.

And I don't know what --

**SA-310**

27

THE COURT:  Well, what I'm being told by Mr. Zeidenberg is that as to the matters which are redacted in the Grand Jury transcripts, Agent Lisi will not be testifying.  So it is not in truth a Jencks Act statement.

MR. KIERSH:  It is in truth, because there are two other issues other than just Agent Lisi and what he says. There is context.  He's a summary witness.  He comes into the Grand Jury and gives this in summary fashion, testifies sort of about this whole event.  So we need the rest of the transcript for context.  The jury needs it -- to hear about it for purposes of context.  We also need it for purposes of establishing a bias.

THE COURT:  I would like some authority.

MR. KIERSH:  Very well.  I'll endeavor to get some. The other issue which the government hasn't raised yet or hasn't responded to is whether or not there are other Jencks materials of Agent Lisi's that we have not yet been provided with, and we would ask the government to make a specific proffer?

THE COURT:  Are there other 302's?

MR. ZEIDENBERG:  Your Honor, the 302's that Agent Lisi has compiled in the course of this investigation are of the nature of witness summaries, an interview of a particular witness.

It is our contention, given that Agent Lisi is not

SA-311

28

going to be inquired of as to what any witness -- that particular witness told him, and he will not be testifying, with the exception of Butchie, Robert Smith, and those 302's have been provided.

He's not going to be asked what any other witness told him.  So, therefore, it is not Jencks as to Agent Lisi.

THE COURT:  It may or may not be.  I would like to see some authority on the subject.  It's a rather critical question at this point, and it seems to me it ought to have arisen in some other case, and I'd like to see how our Court of Appeals or any Court of Appeals or for that matter any other District Court may have interpreted the Jencks Act.

MR. ZEIDENBERG:  Very well.

THE COURT:  In other words, does the Jencks Act -- do Jencks Act statements consist of the statements of the witness in toto or is it producible Jencks Act material only to the extent of the testimony given by the witness in court, with the other material being extraneous and, therefore, irrelevant as to its being redacted or not?  That's what I understand the issue to be.

MR. ZEIDENBERG:  I think that's precisely the issue.

THE COURT:  Okay.  All right.  Why don't you take a few minutes to talk about the authentication issue.  A stipulation I'm sure would be greatly appreciated by me, and I'm sure by the jury.  But if it's not possible, then we'll do

SA-312

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
                GOVERNMENT,

  VS.                                    CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
MAURICE PROCTOR,
SEAN COATES,
                DEFENDANTS.

UNITED STATES
                GOVERNMENT,

  VS.                                    CR. NO. 99-348

GARY PRICE,
                DEFENDANT

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 1, 2001
(MORNING SESSION)
(10:24 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                  PHYLLIS MERANA
                                 6816 U. S. DISTRICT COURT
                                 3RD & CONSTITUTION AVE., N.W.
                                 WASHINGTON, D. C. 20001

SA-313

16

OCCASIONS, RIGHT, AND HE'S ALWAYS BEEN FAIR TO ME.  HE NEVER LET THE PROSECUTOR OR ANYTHING TRUMP THE CHARGES UP.

Q.  WHERE IS IT THAT YOU KNOW DETECTIVE FULTON FROM?

A.  FROM THE SOUTHWEST AREA.

Q.  DO YOU KNOW HOW MANY TIMES HE HAS ARRESTED YOU?

A.  MANY TIMES.  I CAN'T NAME THEM.  MANY TIMES.

Q.  AND WHAT WAS YOUR RELATIONSHIP LIKE WITH DETECTIVE FULTON?

A.  IT WAS PRETTY FAIR.  IT WAS PRETTY FAIR.

Q.  NOW, DO YOU --

A.  ONLY UNTIL IF I BUCK HIM, HE'S GOING TO WHIP MY ASS, YOU KNOW, BUT, YES.

I AM SORRY, YOUR HONOR, ABOUT THE PROFANITY.

THE COURT:  THAT'S ALL RIGHT.

BY MR. ZEIDENBERG:

Q.  WAS THERE A TIME, PRIOR TO YOUR MOST RECENT INCARCERATION, THAT YOU BEGAN TO PROVIDE INFORMATION ABOUT CRIMINAL ACTIVITY TO DETECTIVE FULTON?

A.  CRIMINAL ACTIVITY LIKE --

Q.  GUNS --

A.  YES.

Q.  -- AND THEIR WHEREABOUTS?

A.  YES.

Q.  CAN YOU TELL THE LADIES AND GENTLEMEN HOW IT IS THAT YOU BEGAN TO PROVIDE INFORMATION TO DETECTIVE FULTON AND HOW

SA-314

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 323 of 668

17

THAT CAME ABOUT?

A.  WELL, I THINK IT WAS THE YEAR OF '95, HE PULLED UP ON ME.  HE SAID, "GOD DAMN IT.  YOUR ASS IS GOING TO BE THE NEXT ONE ON THIS STREET LAYING ON THE GROUND."

SO, YOU KNOW, I THOUGHT ABOUT IT.  THERE WAS A LOT OF VIOLENCE GOING ON WITH THE GUNS.  SO I STARTED TELLING HIM, "WELL, LOOK, I AM GOING TO HELP YOU GET THE GUNS OUT, MAN."

Q.  WELL, DID HE ASK YOU FOR YOUR HELP?

A.  NO, HE DIDN'T.

Q.  WHAT DID YOU DO?  WHEN YOU SAY YOU PROVIDED HIM INFORMATION, WHAT WAS IT YOU WERE TELLING HIM ABOUT?

A.  WELL, TELLING HIM WHERE THE GUNS WERE STASHED AT AND WHO HAD THEM ON THEM AND SO FORTH.

Q.  WERE YOU BEING PROVIDED ANY MONEY FOR THAT?

A.  NO, SIR.

Q.  NOW, AFTER YOU WERE INCARCERATED THIS LAST TIME AND CHARGED WITH A.D.W., DID YOU BEGIN -- DID YOU CONTACT DETECTIVE FULTON?

A.  YES, I DID.

Q.  AND AFTER DETECTIVE -- AFTER TALKING TO DETECTIVE FULTON, DID YOU -- WERE YOU INTRODUCED TO A PROSECUTOR NAMED KEN WAINSTEIN?

A.  YES, I WAS.

Q.  DID YOU TALK TO MR. WAINSTEIN?

SA-315

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 324 of 668

66

HAD A RELATIONSHIP WITH DETECTIVE OR OFFICER FULTON, WHO I KNOW IS IN THE COURTROOM, AND THAT HE HAD, ON SEVERAL OCCASIONS, INFORMED OFFICER FULTON ABOUT PLACES THAT HE COULD -- THAT OFFICER FULTON COULD RECOVER GUNS.  AND TO THE EXTENT THAT OFFICER FULTON WOULD HAVE ANY DOCUMENTATION OF THIS PERSON BEING A RELIABLE INFORMANT, OR, ON THE OTHER HAND, BEING AN UNRELIABLE INFORMANT, THAT WOULD BE JENCKS AND POTENTIALLY BRADY MATERIAL.

THE SECOND JENCKS REQUEST I HAVE IS FOR THE GOVERNMENT TO PROVIDE US WITH THE LETTER THAT MR. MURRAY WROTE TO ASSISTANT UNITED STATES ATTORNEY WAINSTEIN AT THE TIME THAT HE WAS ASKING FOR HELP WITH PAROLE, BECAUSE THIS WITNESS HAS BASICALLY SAID IN HIS DIRECT TESTIMONY THAT, YOU KNOW, HE DIDN'T -- HE DOESN'T WANT ANY HELP FROM MR. ZEIDENBERG.

HE DIDN'T WANT ANY HELP.  HE DID THIS BECAUSE HE WAS CONCERNED FOR THE COMMUNITY.  BUT, ON THE OTHER HAND, THERE IS THIS LETTER TO MR. WAINSTEIN, AND I WOULD ASK THE GOVERNMENT TO PRODUCE THAT, IF THEY HAVE IT IN THEIR POSSESSION.

THE COURT:  MR. ZEIDENBERG.

MR. ZEIDENBERG:  WELL, ON THE FIRST ISSUE, I WOULD DISAGREE RESPECTFULLY THAT ANYTHING HE TALKED ABOUT TO OFFICER FULTON WOULD BE JENCKS.  IT WOULDN'T BE JENCKS UNLESS IT CONCERNED THE EVENTS ABOUT WHICH HE TESTIFIED.

SA-316

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 325 of 668

67

AND HE DIDN'T TALK TO DETECTIVE FULTON ABOUT THESE EVENTS.

I WOULD AGREE THAT IF HE HAD INFORMATION -- IF DETECTIVE FULTON HAD INFORMATION THAT HE WAS UNRELIABLE, THAT WOULD BE BRADY, AND WE SHOULD DISCLOSE IT.

WE DON'T HAVE THAT INFORMATION THAT HE WAS UNRELIABLE.

ON THE ISSUE OF A LETTER TO MR. WAINSTEIN, I WOULD SAY THAT I WOULD DISAGREE THAT IT'S JENCKS FOR THE WITNESS. HE INDICATED THAT HE WROTE TO MR. WAINSTEIN REQUESTING HELP AT THE PAROLE BOARD AND THAT HE NEVER RECEIVED IT.

I GUESS I AM AT A LOSS TO SEE HOW THAT CONSTITUTES JENCKS.

THE COURT:  SO AM I.

MS. NEGIN-CHRIST:  YOUR HONOR, ACTUALLY, IF I MAY, ASIDE FROM BEING JENCKS BECAUSE HE TESTIFIED ABOUT IT AND IT APPEARED TO BE STATEMENTS OF HIS SEEKING THE HELP OF THE GOVERNMENT, IT ALSO GOES TO HIS BIAS.  AND IT'S IMPEACHMENT MATERIAL WITH RESPECT TO CONTRADICTING THIS WITNESS ABOUT WHAT HE SAID HIS MOTIVES WERE TO WORK WITH THE GOVERNMENT -- TO COME IN HERE AND TESTIFY.

AND SO TO THAT EXTENT, I WOULD ASK THAT THE GOVERNMENT PRODUCE THE LETTER, AT LEAST TO YOUR HONOR FOR IMPEACHMENT AND BIAS.

THE COURT:  IF YOU CAN GET THE LETTER, I WOULD LIKE TO LOOK AT IT IN CAMERA.

SA-317



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,

   VS.                                   :   CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
MAURICE PROCTOR,
SEAN COATES,
          DEFENDANTS.

UNITED STATES
          GOVERNMENT,

   VS.                                   :   CR. NO. 99-348

GARY PRICE,
          DEFENDANT

**FILED**

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 5, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:          PHYLLIS MERANA
                         6816 U. S. DISTRICT COURT
                         3RD & CONSTITUTION AVE., N.W.
                         WASHINGTON, D. C. 20001

SA-318

Case 1:98-cr-00329-RCL    Document 673    Filed 07/19/01    Page 85 of 92
USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 327 of 668

85

A.  NOT THAT I KNOW OF HAVE THEY AGREED WITH ANYTHING.

Q.  SIR, I WANT TO BE CLEAR WE'RE TALKING ABOUT THE SAME THING.  I AM NOT TALKING ABOUT AT THE TIME OF SENTENCING.  I AM TALKING ABOUT THE DAY OF THE PLEA, FIVE DAYS AFTER YOU TESTIFIED.  THEY AGREED TO YOUR BEING RELEASED FROM JAIL, NO LONGER BEING HELD WITHOUT BOND, AND GOING INTO A WORK RELEASE PROGRAM, DIDN'T THEY?

A.  NOT THAT I KNOW OF.  I KNOW I WAS SENT TO A HALFWAY HOUSE, BUT AS FAR AS ME KNOWING THEM AGREEING TO IT, NO, I DON'T KNOW THAT.

Q.  THAT'S BECAUSE SOMEBODY WROTE "WAIVED STEPBACK" ON THE FORM AFTER IT WAS FILED WITH THE COURT, RIGHT?

A.  YES, BECAUSE I HAVE NEVER SEEN THAT.

MR. ZEIDENBERG:  OBJECTION.

THE COURT:  SUSTAINED.

BY MR. ZUCKER:

Q.  INCIDENTALLY, YOU ACKNOWLEDGE THAT YOU WROTE TO MR. WAINSTEIN TO ASK HIM FOR HELP WITH THE PAROLE BOARD; ISN'T THAT CORRECT?

A.  SIR?

Q.  I SAID YOU ACKNOWLEDGE THAT YOU DID WRITE TO MR. WAINSTEIN, THE PRIOR PROSECUTOR, AND ASK HIM FOR HELP WITH THE PAROLE BOARD; ISN'T THAT CORRECT?

A.  NO.  I ASKED HIM FOR HELP FOR RECEIVING DRUG TREATMENT.

Q.  YOU NEVER ASKED MR. WAINSTEIN -- YOU NEVER WROTE TO

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 328 of 668

86

MR. WAINSTEIN AND ASKED HIM TO WRITE A LETTER ON YOUR BEHALF TO THE PAROLE BOARD?

A.  TO SEND ME TO A DRUG TREATMENT PROGRAM.

Q.  THAT IS ALL YOU ASKED MR. WAINSTEIN TO DO?

A.  YES, SIR.

Q.  HOW MANY TIMES DID YOU WRITE TO HIM?

A.  A COUPLE OF TIMES.

Q.  DO YOU RECALL HOW MANY?

A.  NO, I CAN'T.

Q.  ISN'T IT A FACT YOU WROTE TO HIM SEVEN TIMES TO REQUEST LETTERS TO THE PAROLE BOARD?

A.  I CANNOT REMEMBER THAT.

Q.  YOU CANNOT REMEMBER THE NUMBER?

A.  NO, SIR.

Q.  IS THAT AN INACCURATE NUMBER?

A.  SEVEN LETTERS?

Q.  YES.

A.  YES.  THAT'S INACCURATE TO MY KNOWLEDGE.

Q.  YOU'RE CERTAIN NOW, AREN'T YOU, SIR?

A.  I AM NOT THAT CERTAIN, BUT NOT NO SEVEN LETTERS ASKING FOR HIM TO WRITE TO THE PAROLE BOARD.

Q.  YOU ARE CERTAIN -- I WANT TO BE SURE I UNDERSTAND.  YOU ARE CERTAIN YOU DID NOT WRITE SEVEN LETTERS TO MR. WAINSTEIN, RIGHT?

A.  I AM NOT GOING TO SIT HERE AND TRY TO ESTIMATE.  I KNOW

SA-320

Case 1:98-cr-00329-RCL     Document 673     Filed 07/19/01     Page 87 of 92
USCA Case #23-3015     Document #2109460     Filed: 04/04/2025     Page 329 of 668

87

I HAVE WRITTEN HIM SEVERAL TIMES, BUT I CAN'T SAY WHAT EXACT NUMBER.

Q.  I SAID SEVEN, AND YOU SAID, NO, THERE COULDN'T HAVE BEEN SEVEN, RIGHT?

A.  I KNOW IT WASN'T THAT MANY.

Q.  AGAIN, YOU'RE POSITIVE OF THAT, AREN'T YOU?

A.  I AM NOT POSITIVE, BUT I KNOW IT'S NOT NO SEVEN.  NO.

MR. ZUCKER:  I ASK THE COURT TO TAKE JUDICIAL NOTICE.

THE COURT:  TAKE JUDICIAL NOTICE?  COUNSEL, APPROACH THE BENCH.

(BENCH CONFERENCE.)

SA-321

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 330 of 668

88

(BENCH CONFERENCE.)

THE COURT:  HE IS ENTITLED TO IMPEACH HIM WITH IT NOW.

MR. ZEIDENBERG:  I'LL STIPULATE, YOUR HONOR, THAT THERE WERE SEVEN LETTERS WRITTEN.

THE COURT:  WELL, ALSO THAT HE WAS ASKING FOR HELP WITH THE PAROLE BOARD.

MR. ZEIDENBERG:  I WASN'T ABLE TO HEAR WHAT HIS ANSWER WAS -- WHETHER IT WAS SPECIFICALLY HELP WITH THE PAROLE BOARD.  I COULDN'T TELL WHAT HE SAID.

MR. ZUCKER:  THE SPECIFIC ANSWER WAS, HE SAID, "NO, I WROTE TO HIM AND ASKED FOR HELP WITH A DRUG PROGRAM."

THE COURT:  THAT'S WHAT I UNDERSTOOD HIM TO SAY.

SO I THINK THOSE LETTERS HAVE BECOME RELEVANT AND MATERIAL.  THEY ARE ADMISSIBLE.

MR. ZEIDENBERG:  VERY WELL.

MR. ZUCKER:  IF THEY ARE ADMISSIBLE, CAN I SEE THEM BEFORE I REST?

THE COURT:  SURE.

MR. ZUCKER: THERE MAY BE MORE, BASED ON THOSE LETTERS.  I DON'T KNOW.

THE COURT:  I THINK WE'LL TAKE OUR NOONTIME RECESS.  YOU CAN LOOK AT THE LETTERS OVER THE NOONTIME.

MR. ZUCKER:  THAT'S FINE.

MR. ZEIDENBERG:  THAT'S FINE.  WE NEED TO

SA-322

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 331 of 668

89

PHOTOCOPY THE LETTERS BECAUSE THERE ARE PORTIONS THAT WERE REDACTED.

THE COURT:  ALL RIGHT.

MR. ZUCKER:  I'M SORRY?  AM I GOING TO BE GIVEN THE REDACTED ONES?

THE COURT:  YES, BECAUSE I HAVE LOOKED AT THE REDACTED ONES.  THE REDACTIONS RELATE TO OTHER OFFENSES HAVING NOTHING TO DO WITH THIS ONE.

MR. ZUCKER:  THOSE WILL BE REDACTED FROM OURS?

THE COURT:  YES.

MR. ZUCKER:  OKAY.

YOUR HONOR, I BELIEVE THAT HE HAS DENIED PROVIDING COOPERATION IN ANYTHING EXCEPT TELLING FULTON ABOUT SOME GUNS WHEN I ASKED HIM.  HE SAID HE DIDN'T COOPERATE IN OTHER CASES.  SO I THINK THERE IS ADDITIONAL IMPEACHMENT THERE.

THE COURT:  HAVE YOU GOT THE UNREDACTED ONES?

MR. ZEIDENBERG:  YOUR HONOR, WE DO.  IN FACT, THE COPIES THAT THE COURT HAS, THEY ARE REDACTED IN SUCH A FASHION, IF YOU LOOK, WITHOUT TOO MUCH DIFFICULTY, YOU CAN SEE THROUGH THEM.

THE COURT:  I KNEW THAT THEY RELATED TO OTHER OFFENSES.

MR. ZEIDENBERG:  BUT HE CLEARLY TESTIFIED THAT HE NOT ONLY COOPERATED IN OTHER MATTERS, BUT THAT HE TESTIFIED IN THE GRAND JURY PERTAINING TO ANOTHER MATTER.  HE RELATES

SA-323

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 332 of 668

90

NAMES OF PARTICULAR WITNESSES THAT HE HAS BEEN INCARCERATED WITH.  HE HAS PHONE NUMBERS OF DIFFERENT PEOPLE THAT HE KNOWS ABOUT.  GIVEN THE ISSUE, I THOUGHT VERY LIBERALLY --

THE COURT:  I THINK THIS IS ONLY MARGINALLY RELEVANT.

MR. ZUCKER, YOU TAKE A LOOK AT THE REDACTED ONES AND SEE WHAT YOU WANT TO USE THEM FOR.

MR. ZUCKER:  MAY I --

THE COURT:  THAT'S WHAT YOU WERE GOING TO DO.

MR. ZUCKER:  I WILL, OF COURSE, ABIDE BY YOUR RULING.  I WANT TO MAKE A SUGGESTION.  IF IT CONCERNS WITNESSES' SAFETY, I HAVE NO OBJECTION TO DELETING THE NAMES OF THE WITNESSES, BUT THIS MAN HAS TESTIFIED THAT THE ONLY COOPERATION HE GAVE WAS TO FULTON IN RELATION TO GUNS.

THE COURT:  IF YOU CAN IMPEACH HIM ON THAT BASIS, YOU MAY DO SO.

MR. ZUCKER:  BUT I CAN'T DO IT IF YOU REDACT ALL THE INFORMATION ABOUT OTHER CASES HE HAS TESTIFIED --

THE COURT:  AT THE MOMENT, THE ISSUE IS WHETHER OR NOT HE HAS WRITTEN TO MR. WAINSTEIN TO ASK FOR HELP WITH RESPECT TO THE PAROLE BOARD.  THAT IS THE ISSUE.

MR. ZUCKER:  I'LL ASK, AS WE HAVE BEEN DOING ALL ALONG, THAT UNREDACTED COPIES BE MADE A PART OF THE RECORD.

THE COURT:  I THINK THE UNREDACTED COPIES SHOULD BE MADE PART OF THE RECORD.

SA-324

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 333 of 668

91

MR. ZEIDENBERG:  VERY WELL.

THE COURT:  THEY WILL GO IN IN LIEU OF THE ONES THAT ARE NOW UNDER SEAL.

MR. ZEIDENBERG:  WELL, THE SET THAT THE COURT HAS ARE THE ONLY REDACTED COPIES I HAVE.  SO I WILL MAKE A COPY OF THOSE AND PROVIDE THEM TO COUNSEL AND PROVIDE THOSE BACK TO THE COURT.

THE COURT:  THAT'S FINE.

MR. ZUCKER:  I'LL WAIT HERE.

(END OF BENCH CONFERENCE.)

SA-325

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .  Docket No. CR 98-329

        Government,                .  Washington, D.C.
                              .  February 5, 2001
  vs.                               .  2:10 p.m.

VINCENT HILL,                      .  (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,               .
MAURICE PROCTOR,                   .
SEAN COATES,                       .

        Defendants                 .

. . . . . . . . . . . . . . .     .

UNITED STATES OF AMERICA,          .

        Government,                .

                              .  Docket No. CR 99-348
  vs.                               .

GARY PRICE,                        .

        Defendant.                 .

. . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

SA-326

945

USCA Case #23-3015      Document #2109460          Filed: 04/04/2025      Page 335 of 668

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Proctor:       HOWARD BRAMSON, ESQ.
                                 717 D Street, N.W.
                                 Third Floor
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 336 of 668

4

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel, Your Honor.  Jury panel is all present, Your Honor.

THE COURT:  Thank you, Marshal.  Afternoon, ladies and gentlemen.  Let's bring Mr. Murray back out.

MR. ZUCKER:  May I proceed, Your Honor?

THE COURT:  You may.

MR. ZUCKER:  Thank you.

ANDRE MURRAY, GOVERNMENT'S WITNESS, RESUMED THE STAND

CROSS-EXAMINATION (Cont.)

BY MR. ZUCKER:

Q.   Mr. Murray, I'm going to be handing you, if you would, take a look at these, and it might be easier if I move those out of your way.  I'm not going to ask any questions about these documents right now.

A.   I still want to see them.

(Whereupon, Defendant Price Exhibit No. 10 was marked for identification.)

Q.   Okay.  I'll leave them up here so you can see them.  But I am going to ask you questions about these (indicating).  It's Defendant's 10.  Let me make sure I have the right number.  Yeah, Defendant Price 10.  Take a look at that.  Let me know when you've had a chance to look through them.  Do you recognize them, sir?  If you need more time, I'll give it to you.

SA-328

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 337 of 668

5

A.    Yes, sir, I recognize them.

Q.    These are, in fact, the series of letters that you wrote to Mr. Wainstein; isn't that correct?

A.    Yes, sir.

Q.    Or copies of them, right?  Is that correct?

A.    Yes, sir.

Q.    And let's start off with the number.  In fact, there are seven of them, are there not, in that pile?

A.    Yes, sir.

Q.    Okay.  Very well.  If you would, turn your attention to the first one in that pile.  It's dated the 14th of December, '97; isn't that correct?

A.    Yes, sir.

Q.    Okay.  That would have been less than eight weeks after your sentencing in the underlying ADW case on October 20 something, '97, right?

A.    Yes, sir.

Q.    And the first line of that letter is, Mr. Wainstein, again, I write; is that correct?

A.    Yes, sir.

Q.    So apparently you wrote another letter that preceded this one; isn't that correct?

A.    Yes, sir.

Q.    You don't have any idea whatever happened to that letter, do you or letters?

USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 338 of 668

6

A.   Or letters?   What do you mean?

Q.   Well, it says, again, I write.   Do you know if you wrote more than once before that or only once before that?

A.   Pertaining to these letters?

Q.   Well, if you take a look at them, you'll see that they're in chronological order.   The first one --

A.   I understand that.   I've written all of these.

Q.   And they're in chronological order.   The first line of the one from April -- I'm sorry -- December 17, '97, some six, seven weeks after your sentence, the first line is, again, I write, and then there's three dots, four dots, right?

A.   Yes, sir.

Q.   So apparently you wrote at least one, if not more, letters to Mr. Wainstein before this, right?

A.   Yes, sir.

Q.   But we don't know how many or where they are, do we?

        MR. ZEIDENBERG:   Objection, Your Honor.

        THE WITNESS:   I can't say that.

BY MR. ZUCKER:

Q.   But do you know?

A.   No, sir.   These are seven letters that you have shown me.

        MR. ZEIDENBERG:   Your Honor, I object to the question, the phrasing of that question.

        THE COURT:   It was an objectionable phrasing, but he's already answered it.

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 339 of 668

7

BY MR. ZUCKER:

Q.   If you could, skip down -- well, the second line talks about after reviewing the news on 7, and that's circled, apparently Channel 7, on the 9th day of December, '97, I become stun, transfixed, etc. hearing about the D.C. Government's proposal to --

THE COURT:  Are you going to offer them into evidence?

MR. ZUCKER:  No, I'm just asking him about --

THE COURT:  Well, then don't read him about it.

MR. ZUCKER:  What?

THE COURT:  Don't read them into the record.

MR. ZUCKER:  All right.

BY MR. ZUCKER:

Q.   You talk in there about your learning on the news that D.C. Government had a proposal to change parole and require a defendant to serve 85 percent of their sentence; isn't that correct?

A.   Yes, sir.

Q.   Okay.  And you say, therefore, can my sudden plea and request is as urgent as a need to breathe, and you underline the --

MR. ZEIDENBERG:  Objection, Your Honor.

THE COURT:  Sustained.

BY MR. ZUCKER:

8

Q.    And you underline and you ask for help, don't you, sir?

A.    Yes, sir.

THE COURT:  They're all asking for help, aren't they, Mr. Murray?

THE WITNESS:  Yes, sir.

THE COURT:  And they're all asking for help -- all ask with respect to the Parole Board?

THE WITNESS:  Yes, in pertaining to drug treatment.

THE COURT:  Okay.  Now, let's move on.

MR. ZUCKER:  Well, if I could, Your Honor, --

THE COURT:  Let's move on.

BY MR. ZUCKER:

Q.    Well, your testimony before was all you went to Wainstein was about help with drug treatment, correct?

A.    Yes, sir.

Q.    Turn to the last page of that letter, if you would.

THE COURT:  No, we are not going to go through these letters one at a time, Mr. Zucker.

THE WITNESS:  -- considered one.

THE COURT:  Mr. Murray, there is no question pending at the moment.

MR. ZUCKER:  Your Honor, I --

THE COURT:  Don't interrupt me.  Mr. Zucker, don't interrupt me.  There is no question pending.  We are not going to go through these letters one at a time.  The point has been

SA-332

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015    Document #2109460        Filed: 04/04/2025      Page 341 of 668

14

(End of bench conference.)

BY MR. ZUCKER:

Q.   Do you have the last page of the April 17 -- I'm sorry, 14th of December, '97 letter?

A.   I've read it.

Q.   Okay.  In that letter there's a request for assistance to a drug treatment program as one option you're requesting from Mr. Wainstein, correct?

A.   Yes, sir.

Q.   And just for clarification, Wainstein is the prosecutor who had this case before, right?

A.   Yes, sir.

Q.   Regarding K Street, right?

A.   Yes, sir.

Q.   And the second request is that I be given time served and placed under the supervision of your office?

A.   Yes, sir.

Q.   So six weeks after you are sentenced, six, seven weeks after you are sentenced in this case, you are writing to Mr. Wainstein asking him to grant you time served and placed under the supervision of his office, correct?

A.   D.A.'s Office cannot grant time served anyway.

Q.   Is that not your request to Mr. Wainstein, that I be given time served and placed under the supervision of your office?

**SA-333**

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 342 of 668

15

A.    Yes.

Q.    Okay.

THE COURT:   It was the last line you wanted to ask him about, Mr. Zucker, before you conclude.

BY MR. ZUCKER:

Q.    And just for clarification, Mr. Wainstein was the prosecutor on the K Street case.  He was not the prosecutor in the case in which you pled guilty; isn't that correct?

A.    Explain that again.

Q.    Mr. Wainstein, the person you're writing to and asking to give you time served was the prosecutor in the case you cooperated in, the case on trial here now.  You were not writing to the prosecutor who prosecuted you in your ADW case, right?

A.    No, no.

Q.    No what?

A.    No.

Q.    Is the no, yes, you agree with me, or, no, you weren't writing to --

A.    I agree with you.

Q.    Okay.

A.    Excuse me.  What was your name?

Q.    Zucker, John Zucker.

A.    Zucker?

Q.    Yes.

SA-334

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025       Page 343 of 668

16

A.   Ain't no one tells the truth in all that they say, but, damn, man, you told the jury that there was children in the house when I was in there.

THE COURT:  Mr. Murray, there is no question pending.

BY MR. ZUCKER:

Q.   You also put a p.s. in that letter where you ask Mr. Wainstein to quote, "put something in my account."  That was your prison account, wasn't it, sir, canteen account?

A.   Yes, sir.

Q.   You were asking him not only to give you time served, but also to give you money; isn't that correct, sir?

THE COURT:  Do you understand his question?

THE WITNESS:  Judge, this ain't right.

THE COURT:  It's a proper question.  You have to answer it.

THE WITNESS:  Say it again.

BY MR. ZUCKER:

Q.   You were not only asking the prosecutor to give you time served, you also asked him for money.  You asked him to put something in your account, your prison account, correct?

A.   Yes, sir.  I was poor as hell.

Q.   Okay.

A.   Sir, why are you telling people this here, man?

THE COURT:  There is no question pending, Mr.

USCA Case #23-3015      Document #2109460        Filed: 04/04/2025      Page 344 of 668

17

Murray. I'm sure the government is going to have some more questions for you on redirect examination. But there are no questions pending right now.

THE WITNESS: But he's the lawyer, Judge. He lied.

THE COURT: I think that was your last question, Mr. Zucker; isn't it?

MR. ZUCKER: Given the Court's ruling, it's my last question, Your Honor.

THE COURT: It's with the Court's ruling.

MR. ZUCKER: I would ask to address the Court later on the other issue.

THE COURT: I am sure you will.

MR. KIERSH: Your Honor, may I approach the bench for a moment.

THE COURT: Yes.

(Bench conference on the record.)

**SA-336**

18

(Bench conference on the record.)

MR. KIERSH:  I didn't want to interrupt Mr. Zucker and that's consistent with the Court's ruling as to when we should speak up.  I do want to make a couple of representations briefly about these letters.  I'm very concerned about these letters not having been turned over.  This is classic Giglio material, Giglio versus United States.

THE COURT:  It is not Giglio material at all.

MR. KIERSH:  Well, in my view it is.

THE COURT:  It might be if Mr. Wainstein had responded to them.

MR. KIERSH:  Well, I think even without a response, and so, but I didn't have a chance to examine this.  I would like to move in evidence these letters.  I think the jury should have them, and I'm looking at one dated September 27, '98.  Mr. Zucker was not able to question on it, but Mr. Murray writes to Ken Wainstein.  He says, my question to you, my friend, is quote, "where are my rewards?"

THE COURT:  You want to move them into evidence?

MR. KIERSH:  Yes, I do.  And I can do it now or I an do it --

THE COURT:  You're going to do it right now.  We're going to get this witness off the stand and get the rest of this case in.

MR. KIERSH:  Very well.  Can I confront him on this

**SA-337**

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 346 of 668

letter, the 27th of September, 1998?

THE COURT: No, no.

MR. KIERSH: Then I'll just simply -- well, I would object to that. I would ask for leave to do that.

THE COURT: You can offer them into evidence and you can argue it to the jury.

MR. KIERSH: Well, then I would just -- well, they've already been authenticated, so I'll just stand up and move them in.

THE COURT: You can move them in. Are you going to renumber them as a Sweeney exhibit?

MR. KIERSH: Yes, I will.

MR. DAVIS: On behalf of Mr. Hill, I'm going to object to the September 27, 1998 letter being moved into evidence. It's hearsay.

MR. ZEIDENBERG: Respectfully I think this is an issue that we can resolve at a time when the witness is not on the stand, so that we can at least finish --

THE COURT: I would heartily concur. I want to conclude Mr. Zucker's examination and get --

MR. KIERSH: I can move them in at the next recess. I don't have to do it now.

THE COURT: That's fine.

MR. DAVIS: He doesn't need to do it in front of the jury.

SA-338

20

MR. ZUCKER: I think we need to do it in front of the jury.

MR. KIERSH: But let the jury know. I'll move them in. I can go through the formality outside --

THE COURT: The fact that they are being admitted before the jury.

MR. DAVIS: Right now, Your Honor?

THE COURT: No. I'm going to finish Mr. Zucker's examination.

MR. ZUCKER: I'm done, given the --

THE COURT: Then announce that you're through.

MR. KIERSH: Then you want me to move these in?

THE COURT: Not at the moment. We'll finish redirect.

MR. KIERSH: Very well.

(End of bench conference.)

**SA-339**

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,

  VS.                                    :   CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
MAURICE PROCTOR,
SEAN COATES,
        DEFENDANTS.

UNITED STATES
        GOVERNMENT,

  VS.                                    :   CR. NO. 99-348

GARY PRICE,
        DEFENDANT

FILED

JUL 19 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 6, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                PHYLLIS MERANA
                               6816 U. S. DISTRICT COURT
                               3RD & CONSTITUTION AVE., N.W.
                               WASHINGTON, D. C. 20001

SA-340

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 349 of 668

90

(JURY OUT.)

MR. ZUCKER:  MAY I ADDRESS THE COURT BEFORE WE LEAVE?

THE COURT:  NO, YOU MAY NOT.

MR. ZUCKER, YOU WERE WARNED.  I FIND YOU IN CONTEMPT OF COURT.  YOU ARE FINED THE SUM OF $500.00.

WE WILL RECONVENE AT 2:00 O'CLOCK.

MR. ZUCKER:  YOUR HONOR, I'D ASK TO ADDRESS THE COURT ON RECONSIDERATION EITHER AFTER LUNCH OR RIGHT NOW.

THE COURT:  I BEG YOUR PARDON?

MR. ZUCKER:  I'D ASK FOR A RECONSIDERATION EITHER RIGHT NOW OR AFTER LUNCH.

THE COURT:  I WILL RECONSIDER PERHAPS AT THE END OF THE CASE, DEPENDING UPON HOW YOU COMPORT YOURSELF.  YOU HAVE BEEN FOUND IN CONTEMPT OF COURT.  YOU ARE FINED THE SUM OF $500.00.

(WHEREUPON, AT 12:30 P.M., THE ABOVE-ENTITLED MATTER WAS RECESSED FOR LUNCH.)


CERTIFICATE OF REPORTER

THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.

PHYLLIS MERANA

SA-341

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .   Docket No. CR 98-329
                                   .
        Government,                .   Washington, D.C.
                                   .   February 8, 2001
   vs.                             .   2:20 p.m.
                                   .
VINCENT HILL,                      .   (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
MAURICE PROCTOR,                   .
SEAN COATES,                       .
                                   .
        Defendants                 .
                                   .
. . . . . . . . . . . . . . .  . . .
                                   .
UNITED STATES OF AMERICA,          .
                                   .
        Government,                .
                                   .   Docket No. CR 99-348
   vs.                             .
                                   .
GARY PRICE,                        .
                                   .
        Defendant.                 .
                                   .
. . . . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:            PETER ZEIDENBERG, AUSA
                              ANJALI CHATURVEDI, AUSA
                              U.S. Attorney's Office
                              555 Fourth Street, N.W.
                              Washington, D.C.  20001

For the Defendant Hill:       CHRISTOPHER DAVIS, ESQ.
                              601 Indiana Avenue, N.W.
                              Suite 910
                              Washington, D.C.  20004

For the Defendant Martin:     JOANNE HEPWORTH, ESQ.
                              305 H Street, N.W.
                              Second Floor
                              Washington, D.C.  20001

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 351 of 668

2

For the Defendant Carson: JOSEPH BESHOURI, ESQ.
 LEXI NEGIN-CHRIST, ESQ.
 419 7th Street, N.W.
 Washington, D.C.  20004

For the Defendant Sweeney: STEVEN R. KIERSH, ESQ.
 717 D Street, N.W.
 Suite 400
 Washington, D.C.  20004

For the Defendant Proctor: HOWARD BRAMSON, ESQ.
 717 D Street, N.W.
 Third Floor
 Washington, D.C.  20004

For the Defendant Coates: FREDERICK JONES, ESQ.
 901 6th Street, S.W.
 Suite 409
 Washington, D.C.  20024

For the Defendant Price: JONATHAN ZUCKER, ESQ.
 601 Indiana Ave., N.W.
 Suite 901
 Washington, D.C.  20024

Court Reporter: BEVERLY J. BYRNE
 Official Court Reporter
 Room 6810 U.S. Courthouse
 Washington, D.C.  20001
 (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-343

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 352 of 668

43

Q.    You have to, if you can, --

A.    '63.

Q.    Directing your attention to 1973, 10 years later, did you pick up your second criminal conviction in 1973?

A.    Yes.

Q.    What was that for?

A.    Possession with the intent to distribute heroin.

Q.    Then in 1976, did you have another conviction?

A.    Yes.

Q.    What was that for?

A.    For the same thing, possession with intent to distribute heroin.

Q.    1977?

A.    Escape.

Q.    That was a conviction for escape in 1977?

A.    Yes.

Q.    Directing your attention to 1988, did you get another conviction at that time?

A.    Yes.

Q.    What was that for?

A.    Conspiracy to distribute controlled substance.

Q.    And finally, Mr. Watson, did you have a conviction in the year 2000?

A.    Yes.

Q.    What was that for?

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 353 of 668

44

A.   Possession with the intent to distribute pharmaceutical drugs.

Q.   Where was that conviction out of?

A.   Greenbelt, Maryland.

Q.   Is that the United States District Court?

A.   Yes, it was.

Q.   What type of sentence did you receive from that conviction last year?

A.   105 months.

Q.   Of that 105 months, how much of that sentence approximately have you served?

A.   Two years.

Q.   So you have approximately how much to go?

A.   About -- a little over six.

Q.   Six what?

A.   Years.

Q.   Now, after you were sentenced on your charge out of Greenbelt, where did you go?

A.   Charles County Detention Center.

Q.   What month were you -- do you remember the date that you were sentenced?

A.   February 4, 2000.

Q.   And after you went to -- approximately how long were you in Charles County?

A.   After my sentence?

SA-345

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 354 of 668

45

Q.   Yes.

A.   Maybe a few weeks.

Q.   And after you were in Charles County, where did you go?

A.   I was transferred from Charles County to Northern Neck Virginia Regional Jail, Warsaw County.

Q.   Approximately when did you get to Northern Neck?

A.   Sometime in March

Q.   That would be March of what year?

A.   2000.

Q.   How long were you at Northern Neck?

A.   Oh, about three weeks.

Q.   Now, while you were at Northern Neck Regional Jail, did you meet someone there by the name of Draper?

A.   Yes.

Q.   Did you ever get to know his true name?

A.   Yes.

Q.   What was that?

A.   William Sweeney.

Q.   Do you see Mr. Sweeney in court today?

A.   Yes.

Q.   Could you point him out please?

A.   The gentleman sitting there with the yellow shirt on and the glasses.

        MR. ZEIDENBERG:  Your Honor, may the record reflect the identification of William Sweeney?

**SA-346**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015      Document #2109460          Filed: 04/04/2025      Page 355 of 668

59

(End of bench conference.)

THE COURT:   The objection is overruled.   What's your question again?

BY MR. ZEIDENBERG:

Q.    I think my question was what questions, if any, did you ask Mr. Sweeney about the kidnappings he had been involved with, and what was his response?

A.    I asked was kidnapping profitable?   He said, yes.

Q.    Did he elaborate?

A.    Yes.

Q.    What did he say?

A.    He told me that he kidnapped one person twice, and he kidnapped another person.

Q.    What was your reaction when he said that he kidnapped one person two times?

A.    I wanted to know why?

MR. KIERSH:   Objection, Your Honor.

THE COURT:   Overruled.

BY MR. ZEIDENBERG:

Q.    What was your reaction?

A.    I was kind of stunned, you know, at the fact he had hit the same person twice.   And I asked him, I said, so you all must have had masks or something on?   He said, yeah.

Sorry.   I was talking too fast.   I asked him did they have masks or something one when they kidnapped him, and he

**SA-347**

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 356 of 668

60

said, yes.

The first time he said he kidnapped this guy, his name was Kenneth or Keith Johnson, Whitey, something like that. And they got a big chunk of money from somebody by the name of Gooch. I don't know him either.

I said, well, what happened on the second time? He said, second time we snatched him at Potomac Gardens, and he tried to jump out the car and run, and I shot him.

Q. Did Mr. Sweeney indicate whether or not the person lived or died?

A. No.

Q. This was one particular kidnapping he described to you involving Whitey?

A. Yes.

Q. And he said Whitey was kidnapped two times, is that your testimony?

A. Yes.

Q. Now, did he tell you about another kidnapping involving another individual?

A. Yes, but it wasn't any name.

Q. What did Mr. Sweeney tell you about the second kidnapping? And when I say second kidnapping I mean other victim.

A. He said they had snatched him and threw him in the trunk of the car, and while they were driving the guy kicked the car

**SA-348**

USCA Case #23-3015      Document #2109460        Filed: 04/04/2025       Page 357 of 668

61

trunk open and got out and started running, and they jumped out of the car and shot him in his hip or his ass and he still got away. I said, that's kind of preposterous. I said you shot him and he still got away? And he said yes.

Q.   Did you believe that story?

A.   No, I still don't.

Q.   What was Mr. Sweeney's tone of voice when he was describing these events to you?

A.   As a matter of fact, he, you know, -- just an every day thing, it wasn't no big deal about it.

Q.   Now, did you talk to Mr. Sweeney about his pending case that he was awaiting trial on?

A.   Yes.

Q.   What did Mr. Sweeney tell you about that?

A.   Well, at different intervals he said that he didn't think the government had anything on him. And I said -- my response to that, I said, Draper, I said, generally when the feds, meaning the federal government, put their hands on you they generally are right. They don't just grab you up and don't have anything. I said, either you did it, you're deeply involved, or you know a whole lot about it.

Q.   What was Mr. Sweeney's response when you said that?

A.   You know, I still don't think they have anything on me, you know.

Q.   Did he tell you what his concerns were about the case

USCA Case #23-3015    Document #2109460       Filed: 04/04/2025    Page 358 of 668

62

against him?

A.   Yes.

Q.   What was that?

A.   A certain fellow by the name of James Montgomery.

Q.   What did he tell you about James Montgomery?

A.   That he had brought him into the organization and sort of groomed him and brought him along and then the guy turned on him.

Q.   If you could just fill in the he there and tell us that again, Mr. Watson.  In other words, when he said he brought him into the organization --

A.   Mr. Sweeney brought Mr. Montgomery into the organization. Is that okay?

A.   Yes, thank you.  And what did Mr. Sweeney say about that?

A.   Well, he was somewhat disappointed because Mr. Montgomery had been on several murders with him and did as much as he had done and now he is flipping the script.  Because he got busted on something else, now he is flipping on him to save himself.

Q.   Who is flipping on --

A.   Mr. Montgomery is turning on Mr. Sweeney to save himself.

Q.   Did Mr. Sweeney ask you any advice about that?

A.   Yes.

Q.   What did Mr. Sweeney ask you about that?

A.   He asked me if he could prove that Mr. Montgomery was in on the killings and did as much killing as he did that would

**SA-350**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL   Document 948   Filed 03/11/03   Page 63 of 87
USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 359 of 668

63

they, the jury or whatever, try to work in his favor. I told him no, I didn't think so because it doesn't usually work like that. I said usually the first person that testifies is usually what they go with. And if they got you targeted as the ring leader then that makes the difference.

Q. What was Mr. Sweeney's response?

A. Yeah, I figured as much.

THE COURT: I'm sorry?

THE WITNESS: Yes, I figured as much.

BY MR. ZEIDENBERG:

Q. Now, did Mr. Sweeney talk to you about what role Mr. Montgomery was to play in this case?

A. He was suppose to testify against him.

Q. Did you have any conversation about that fact?

A. Yes. He was talking that Montgomery is going to testify against him. And I said, well, if you got all this muscle and all this gun power and everything, I said, why don't you just kill him, you know. And he said, we been trying to get to that mother fucker but the feds got him hid away too well.

Q. Did he say where they had been looking for him?

A. No.

Q. Now, did Mr. Sweeney talk to you about his personal life?

A. Yes.

Q. What do you recall him telling you about that?

A. He was a little down, despondent, depressed about the

USCA Case #23-3015    Document #2109460        Filed: 04/04/2025      Page 360 of 668

67

(End of bench conference.)

BY MR. ZEIDENBERG:

Q.   Mr. Watson, going back to the conversation you had about Mr. Sweeney's domestic situation, after you advised Mr. Sweeney that perhaps he should tell his baby's mother, wife, however you described it, as someone who should go on with her life without him, can you tell us what his response was to that?

A.   Well, he kind of agreed with it, and he felt that -- he said he had a little animosity towards women, particular women.  And he said, yeah, these bitches no good anyway, you know, because I had to down a couple of them anyway.

Q.   He said, I had to down a couple of them anyway?

A.   Yeah.  Yeah.

Q.   And when you say the term, down a couple of them, what did you understand that to mean?

            MR. BRAMSON:  Objection.

            THE COURT:  Overruled.

            THE WITNESS:  Kill them.

BY MR. ZEIDENBERG:

Q.   I'm sorry?

A.   Kill them.

Q.   Now, did Mr. Sweeney tell you how it was, other than kidnapping, he was able to make money while he was out on the outside?

**SA-352**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,           :

 VS.                            :        CR. NO. 98-329

                                :
VINCENT HILL,                   :
JEROME MARTIN,                  :
SAMUEL CARSON,                  :
WILLIAM K. SWEENEY,             :
MAURICE PROCTOR,                :
SEAN COATES,                    :
          DEFENDANTS.           :

UNITED STATES                   :
          GOVERNMENT,           :
                                :
 VS.                            :        CR. NO. 99-348
                                :
GARY PRICE,                     :
          DEFENDANT             :

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
FEBRUARY 12, 2001
(MORNING SESSION)
(10:55 A.M.)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:                 PHYLLIS MERANA
                                6816 U. S. DISTRICT COURT
                                3RD & CONSTITUTION AVE., N.W.
                                WASHINGTON, D. C. 20001

SA-353

Q.   GOOD MORNING, MR. WATSON.

A.   GOOD MORNING, SIR.

Q.   HOW ARE YOU?

A.   OKAY.

Q.   MR. WATSON, I JUST WANT TO GO BACK IN TIME A LITTLE BIT WITH YOU AND GO THROUGH SOME OF THE MATTERS THAT BROUGHT YOU TO THE ATTENTION OF THE COURTS IN YOUR PAST.  OKAY, SIR?

NOW, ARE YOU THE SAME THEODORE WATSON WHO ON MAY 14, 1963 WAS CONVICTED OF RECEIVING STOLEN PROPERTY?

A.   YES, SIR.

Q.   OKAY.  AND ARE YOU THE SAME THEODORE WATSON THAT ON JULY 10TH, 1963 WAS CONVICTED OF RECEIVING STOLEN PROPERTY?

A.   NO, YOUR HONOR.  NO, SIR.

Q.   SO YOU'RE DENYING A SECOND COUNT OF RECEIVING STOLEN PROPERTY?

A.   TO MY KNOWLEDGE, I DON'T RECALL.

Q.   OKAY.  THE FIRST ONE FOR MAY OF '63, DID YOU SERVE A JAIL SENTENCE ON THAT?

A.   YES.

Q.   DO YOU RECALL APPROXIMATELY THE DURATION OF THE JAIL SENTENCE?

A.   I WAS SENTENCED TO 180 DAYS.  I ONLY SERVED 90.

Q.   OKAY.

NOW, ON OCTOBER 9TH OF 1973, ARE YOU THE SAME THEODORE WATSON WHO WAS CONVICTED OF POSSESSION WITH INTENT

SA-354

12

TO DISTRIBUTE HEROIN?

A.   YES.

Q.   WAS THAT IN THE DISTRICT OF COLUMBIA, SIR?

A.   YES.

Q.   WAS THAT IN THE SUPERIOR COURT OR THIS FEDERAL COURT?

A.   FEDERAL COURT.

Q.   OKAY.  WHAT KIND OF JAIL SENTENCE DID YOU RECEIVE FOR THAT?

A.   ONE TO THREE YEARS.

Q.   AND YOU'RE THE SAME THEODORE WATSON THAT WAS CONVICTED ON MAY 12, 1976 OF POSSESSION WITH INTENT TO DISTRIBUTE HEROIN?

A.   YES.

Q.   OKAY.

          AND DID YOU RECEIVE A JAIL SENTENCE ON THAT, SIR?

A.   YES.

Q.   WHAT WAS THE LENGTH OF THAT JAIL SENTENCE?

A.   FOUR TO TWELVE YEARS.

Q.   OKAY.  HOW MUCH OF THAT DID YOU SERVE?

A.   IT BECAME AN AGGREGATED SENTENCE, I THINK.  ON THE WHOLE, THE TOTAL AGGREGATED SENTENCE WAS FOUR YEARS.

Q.   YOU DID SERVE FOUR ON THAT, SIR?

A.   ON THE AGGREGATED SENTENCE?

Q.   YES.

A.   YES.

SA-355

Q. OKAY. SO YOU WERE RELEASED IN ABOUT 1980 ON THAT?

A. I THINK IT WAS '81.

Q. OKAY. BUT IN THE INTERVENING PERIOD, ON MARCH 25, 1977, YOU WERE CONVICTED OF ESCAPE; IS THAT RIGHT?

A. THAT'S CORRECT.

Q. THAT WAS ESCAPE FROM WHERE? WAS THAT A PRISON OR A HALFWAY HOUSE? WHAT WERE THE CIRCUMSTANCES?

A. ALEXANDRIA CITY JAIL.

THE COURT: I AM SORRY?

THE WITNESS: ALEXANDRIA CITY JAIL.

BY MR. KIERSH:

Q. THAT ESCAPE CHARGE -- WAS THAT PROSECUTED IN VIRGINIA, SIR?

A. YES, IT WAS.

Q. WHAT WAS THE SENTENCE YOU RECEIVED ON THAT?

A. FOUR YEARS.

Q. DID YOU SERVE PART OF THAT?

A. ON THE AGGREGATED SENTENCE.

Q. OKAY. THAT WAS AN AGGREGATE SENTENCE TO THE POSSESSION WITH INTENT TO DISTRIBUTE HEROIN THROUGH '76; CORRECT?

A. AND '73.

Q. OKAY. SO ALL COMBINED TOGETHER?

A. YES.

Q. AND ARE YOU THE SAME THEODORE WATSON THAT ON SEPTEMBER 22, 1988, WAS CONVICTED OF A CONSPIRACY TO DISTRIBUTE A

14

CONTROLLED SUBSTANCE?

A.   YES.

Q.   OKAY.   AND WAS THAT CONVICTION IN THE DISTRICT OF COLUMBIA?

A.   YES.

Q.   AND WAS THAT IN THE SUPERIOR COURT OR IN THE FEDERAL COURT?

A.   FEDERAL COURT.

Q.   AND WHAT TYPE OF SENTENCE DID YOU RECEIVE ON THAT, SIR?

A.   FIVE TO 15 YEARS.

Q.   HOW MUCH OF THAT DID YOU SERVE?

A.   FIVE.

Q.   SO FROM '88 TO '93, YOU WERE LOCKED UP ON THAT CHARGE?

A.   SINCE '92, YES.

Q.   OKAY.   SO IT WAS A LITTLE BIT LESS THAN FIVE YEARS?

A.   YES.

Q.   OKAY.

THEN, MOST RECENTLY, ON FEBRUARY 4TH, 2000, YOU WERE CONVICTED OF CONSPIRACY TO DISTRIBUTE AND POSSESS WITH INTENT TO DISTRIBUTE A CONTROLLED DANGEROUS SUBSTANCE; IS THAT CORRECT?

A.   YES.

Q.   NOW, THAT SENTENCE WAS IMPOSED BY A FEDERAL JUDGE IN GREENBELT, MARYLAND; IS THAT CORRECT?

A.   CORRECT.

SA-357

Q. AND THAT SENTENCE WAS 105 MONTHS; CORRECT?

A. CORRECT.

Q. AND THAT TRANSLATES TO EIGHT YEARS AND NINE MONTHS, CORRECT?

A. CORRECT.

Q. AND ON THAT SENTENCE, YOU HAVE SERVED ONE YEAR?

A. CORRECTION.  IT WILL BE TWO YEARS.

Q. TWO YEARS?

A. THIS MONTH, TWO YEARS.

Q. BECAUSE YOU WERE LOCKED UP BEFORE THE CONVICTION?

A. YES.

Q. SO YOU GOT CREDIT FOR THAT TIME?

A. YES.

Q. OKAY.  SO YOU'VE GOT ABOUT SIX AND A HALF YEARS LEFT ON THAT SENTENCE?

A. APPROXIMATELY, YES.

Q. OKAY.  AND YOU'RE 60 YEARS OF AGE NOW?

A. YES.

Q. OKAY.

NOW, IN THAT CASE -- I AM TALKING ABOUT THE ONE IN GREENBELT -- IN GREENBELT, MARYLAND THAT YOU'RE CURRENTLY SERVING A SENTENCE ON -- SANDRA WILKINSON WAS THE PROSECUTOR FOR THE UNITED STATES IN GREENBELT?

A. YES.

Q. OKAY.  AND ORIGINALLY WHEN THAT CASE CAME INTO THE

SA-358

SYSTEM, IT WAS A NINE-COUNT INDICTMENT; IS THAT RIGHT?

A.  CORRECT.

Q.  AND YOU PLED GUILTY TO FIVE OF THE COUNTS?  THAT WOULD BE COUNTS ONE THROUGH FOUR, COUNT SIX AND COUNT NINE; CORRECT?

A.  CORRECT.

Q.  ALL THE OTHER CHARGES WERE DROPPED, CORRECT?

A.  CORRECT.

Q.  AND YOU HAD AN ATTORNEY NEGOTIATE A PLEA-BARGAIN FOR YOU WITH MS. WILKINSON OF THE U.S. ATTORNEY'S OFFICE; IS THAT RIGHT?

A.  YES.

Q.  WHAT WAS THAT DEFENSE LAWYER'S NAME?

A.  WHICH ONE?  THERE ARE SEVERAL OF THEM.

Q.  NO, I UNDERSTAND.  THE ONE WHO NEGOTIATED THE PLEA BARGAIN FOR YOU WITH MS. WILKINSON?

A.  MR. TUMMINILI.

Q.  RIGHT.

A.  ANGELO TUMMINILI.

Q.  THAT'S T-U-M-M-I-N-I-L-I.

NOW, HE WAS A COURT-APPOINTED LAWYER?

A.  YES.

Q.  OKAY.

NOW, WHEN YOU NEGOTIATED THAT PLEA WITH HIM, PART OF YOUR AGREEMENT TALKED ABOUT YOU PROVIDING SUBSTANTIAL

ASSISTANCE TO THE UNITED STATES, AND IF THE UNITED STATES FELT THAT YOU FULFILLED YOUR OBLIGATION, THE GOVERNMENT WOULD MOVE, UNDER 5K1.1, FOR A DOWNWARD DEPARTURE IN YOUR SENTENCE, IS THAT RIGHT?

A.    THAT'S CORRECT.

Q.    OKAY.    AND YOU CLEARLY WANTED THAT IN YOUR PLEA; DIDN'T YOU.

A. YES.

Q.    BECAUSE YOU HAD BEEN AROUND THE SYSTEM LONG ENOUGH TO KNOW THAT YOU CAN GET YOUR SENTENCE -- YOU COULD WORK OFF YOUR SENTENCE BY PROVIDING SUBSTANTIAL ASSISTANCE TO THE FEDERAL AUTHORITIES?

A.    YES.

Q.    AND THAT WAS YOUR GOAL IN THAT CASE?    THAT WAS ONE OF YOUR GOALS IN NEGOTIATING THAT PLEA-BARGAIN; CORRECT?

A.    RIGHT.

Q.    NOW, WHEN YOU WERE ARRESTED ON THE CHARGES THAT BROUGHT YOU BEFORE THE FEDERAL JUDGE IN GREENBELT, YOU ALSO WERE ORIGINALLY CHARGED WITH POSSESSION OF A WEAPON; ISN'T THAT CORRECT?

A.    YES.

Q.    AND THAT WEAPON CHARGE WAS DROPPED; WASN'T IT?

A.    YES.

Q.    YOU NEVER RECEIVED THE 5K1 LETTER FROM THE GOVERNMENT; DID YOU?

SA-360

A.  NO.

Q.  DO YOU KNOW WHY?

A.  I DIDN'T PROVIDE THE SUBSTANTIAL ASSISTANCE THAT THEY NEEDED.

Q.  WELL, YOU OFFERED THE GOVERNMENT INFORMATION; DIDN'T YOU?

A.  YES.

Q.  BUT ULTIMATELY MS. WILKINSON REJECTED THE INFORMATION YOU HAD PROVIDED TO HER?

A.  THAT'S DEBATABLE.

Q.  WELL, IS PART OF IT RIGHT?

A.  REPEAT THE STATEMENT AGAIN.

Q.  OKAY.

YOU OFFERED MS. WILKINSON, THE PROSECUTOR -- YOU OFFERED TO MEET WITH HER AND PROVIDE ASSISTANCE; ISN'T THAT CORRECT?

A.  THAT'S CORRECT?

Q.  AND, IN FACT, YOU DID MEET WITH HER WITH YOUR COUNSEL; ISN'T THAT CORRECT?

A.  YES.

Q.  BUT ULTIMATELY SHE FOUND THAT THE INFORMATION THAT YOU WERE OFFERING WAS NOT RELIABLE?

MR. ZEIDENBERG:  OBJECTION.

THE WITNESS:  THAT'S DEBATABLE AGAIN.

THE COURT:  IF HE KNOWS.

BY MR. KIERSH:

Q.   IF YOU KNOW, SIR.

A.   REPEAT IT AGAIN NOW.

Q.   OKAY.   LET ME JUST GO BACK.   AGAIN, IF I AM NOT MAKING SENSE, JUST LET ME KNOW.

A.   YOU'RE MAKING SENSE.   JUST GO HEAD.

Q.   YOU HAVE ALREADY TOLD US THAT YOU MET WITH MS. WILKINSON; CORRECT?

A.   CORRECT.

Q.   AND THAT YOU GAVE YOU HER INFORMATION, CORRECT?

A.   CORRECT.

Q.   AND YOU DID NOT GET THE 5K1 LETTER FOR SUBSTANTIAL ASSISTANCE; CORRECT?

A.   CORRECT.

Q.   OKAY.

     MY QUESTION IS DO YOU KNOW WHY YOU DID NOT GET THE 5K1 LETTER FROM MS. WILKINSON?

A.   YES.

Q.   WHAT WAS THE REASON?

A.   SHE MADE IT VERY CLEAR SHE DID NOT LIKE ME AND SHE DIDN'T WANT TO GIVE ME ANYTHING.

     THE COURT:   I AM SORRY?

     THE WITNESS:   SHE MADE IT VERY CLEAR THAT SHE DID NOT LIKE ME AND SHE DID NOT WANT TO GIVE ME ANYTHING.

BY MR. KIERSH:

(END OF BENCH CONFERENCE.)

THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.  YOU MAY ANSWER THE QUESTION.

DO YOU WANT TO PUT THE QUESTION AGAIN, MR. KIERSH?

MR. KIERSH:  THANK YOU, YOUR HONOR.

BY MR. KIRSCH:

Q.  MR. WATSON, AGAIN, GOING BACK TO THE FACTS WHICH RESULTED IN YOUR ARREST, WHICH LED UP TO YOUR SENTENCING IN GREENBELT, WHEN YOU WERE WORKING AT THE PHARMACY, YOU WERE ILLEGALLY OBTAINING PRESCRIPTIONS FOR PHARMACEUTICAL ITEMS THAT YOU WERE NOT ENTITLED TO; CORRECT?

A.  CORRECT.

Q.  YOU WERE NOT AND HAVE NEVER BEEN A LICENSED PHARMACIST; ISN'T THAT CORRECT?

A.  THAT'S CORRECT.

Q.  BUT SOMEHOW OR OTHER, YOU GOT REGISTRATION NUMBERS THAT ONLY A PHARMACIST WOULD HAVE, AND YOU WERE ORDERING PHARMACEUTICALS IN THE FORM OF NARCOTICS FOR YOUR OWN BENEFIT; ISN'T THAT CORRECT?

A.  CORRECT.

Q.  AND AS A MATTER OF FACT, DURING THE PERIOD OF TIME THAT LED UP TO YOUR ARREST FOR THESE INFRACTIONS, THERE WERE OVER 104,000 DOSAGE UNITS OF A CONTROLLED III SUBSTANCE WHICH YOU WERE ABLE TO OBTAIN ILLEGALLY THROUGH USING IMPROPERLY A PHARMACIST'S REGISTRATION NUMBER; ISN'T THAT CORRECT?

26

A.  CORRECT.

Q.  AND THERE WERE OVER 61,000 DOSAGES OF A CONTROLLED IV SUBSTANCE THAT YOU WERE ABLE TO OBTAIN?

MR. ZEIDENBERG:  YOUR HONOR, THIS DOESN'T GO TO THE ISSUE.

THE COURT:  I AGREE.  ENOUGH IS ENOUGH.

MR. KIERSH:  VERY WELL.

BY MR. KIRSCH:

Q.  NOW, YOU WERE MAKING A SUBSTANTIAL AMOUNT OF MONEY WHEN YOU WERE OBTAINING THESE ILLEGAL PHARMACEUTICAL ITEMS; ISN'T THAT CORRECT?

MR. ZEIDENBERG:  OBJECTION.  RELEVANCE.

THE COURT:  THE OBJECTION IS SUSTAINED.

BY MR. KIRSCH:

Q.  NOW, THE DATE THAT JUDGE MESSITTE IN GREENBELT IMPOSED A SENTENCE ON YOU -- THE 105 MONTHS -- THAT WAS FEBRUARY 4TH, 2000; CORRECT, SIR?

A.  CORRECT.

Q.  NOW, AFTER THAT DAY, YOU HIRED A NEW LAWYER TO TRY TO GET YOU A BETTER SENTENCE; ISN'T THAT RIGHT?

A.  THAT'S CORRECT.

Q.  OKAY.  AND THAT'S BECAUSE YOU WERE NOT HAPPY WITH THE SENTENCE YOU RECEIVED ON FEBRUARY 4TH, 2000?

A.  I THINK THE NEW ATTORNEY WAS RETAINED BEFORE THE SENTENCING, IF I AM NOT MISTAKEN.

SA-364

USCA Case #23-3015    Document #2109460        Filed: 04/04/2025    Page 373 of 668

27

Q. BUT YOU WEREN'T HAPPY WITH THE SENTENCE YOU RECEIVED; CORRECT?

A. YES. CORRECT.

Q. AND YOU TOLD US LAST WEEK THAT YOU WERE HOPING TO GET A REDUCTION IN YOUR SENTENCE; CORRECT?

A. CORRECT.

Q. OKAY. SO YOU HIRED THIS LAWYER TO GET YOU BACK INTO COURT TO TRY TO GET RECONSIDERATION OF THE SENTENCE OF 105 MONTHS THAT WAS IMPOSED; ISN'T THAT RIGHT?

A. YES.

Q. OKAY. AND YOU WERE THEN SENT TO -- STRIKE THAT.

YOU WENT TO CHARLES COUNTY TO BEGIN YOUR PERIOD OF INCARCERATION; CORRECT?

A. CORRECT.

Q. AND THAT'S A STATE-OF-MARYLAND FACILITY, IS THAT RIGHT?

A. I GUESS YOU COULD SAY THAT.

Q. OKAY. BUT THAT'S NOT WHERE YOU EXPECTED TO SERVE YOUR FEDERAL SENTENCE; IS THAT RIGHT?

A. NO, IT WASN'T.

Q. YOU WERE JUST BEING HELD THERE FOR SOME PERIOD OF TIME?

A. THAT'S CORRECT.

Q. OKAY. AND YOU NEVER SPOKE TO MR. SWEENEY IN CHARLES COUNTY; ISN'T THAT RIGHT?

A. THAT IS CORRECT.

Q. BUT WHEN YOU WERE AT CHARLES COUNTY, YOU WERE TRYING TO

45

ME.  I JUST WANT TO HEAR ABOUT ERSKINE HARTWELL AND PEOPLE SURROUNDING HIM."  AND THAT WAS EXTENT OF THAT MEETING.

Q.  OKAY.  THAT'S ALL I HAVE.  THANK YOU, MR. WATSON.

THE COURT:  MR. DAVIS?

MR. DAVIS:  I JUST HAVE A COUPLE QUESTIONS, YOUR HONOR.

THE COURT:  OF COURSE.

CROSS EXAMINATION

BY MR. DAVIS:

Q.  MR. WATSON, AM I CORRECT IN UNDERSTANDING YOUR TESTIMONY TO BE THAT YOU MET WITH SEVERAL DIFFERENT PROSECUTORS IN GREENBELT?

A.  TWO.  I THINK I STATED THAT I MET WITH TWO THAT I KNEW WERE PROSECUTORS.  THERE WAS A D.E.A. AGENT AND A FEW OTHER GENTLEMEN IN THERE, BUT I DIDN'T KNOW WHO THEY WERE.

Q.  SO YOU HAD BEEN UP TO THE COURTHOUSE IN GREENBELT ON SEVERAL OCCASIONS IN YOUR EFFORTS TO PROVIDE ASSISTANCE TO THE PROSECUTORS, CORRECT?

A.  TWO OR THREE, YES.

Q.  AND THEY TOLD YOU THAT IT WAS UNLIKELY THAT YOU WOULD BE ABLE TO GET ON THEIR TEAM?

A.  THEY DIDN'T SAY IT.  MS. SANDRA WILKINSON SAID IT.

Q.  HOW LONG DID IT TAKE YOU TO GET ON THE TEAM OF THE DISTRICT OF COLUMBIA'S U.S. ATTORNEY'S OFFICE?

MR. ZEIDENBERG:  I OBJECT TO THE FORM OF THAT

SA-366

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 375 of 668

46

QUESTION.

THE COURT:  SUSTAINED.

BY MR. DAVIS:

Q.  WHEN YOU CONTACTED -- WHEN YOU MADE EFFORTS TO CONTACT THE UNITED STATES ATTORNEY'S OFFICE IN THE DISTRICT OF COLUMBIA, HOW MUCH TIME PASSED BEFORE YOU GOT A RESPONSE?

A.  ABOUT THIRTY DAYS.  MAYBE MORE.

THE COURT:  I AM SORRY?  HOW LONG, SIR?  TWO OR THREE DAYS, DID YOU SAY?

THE WITNESS:  ABOUT THIRTY DAYS.

THE COURT:  THIRTY DAYS?

THE WITNESS:  ABOUT A MONTH AFTER I MADE CONTACT WITH MY ATTORNEY.  AFTER I CONTACTED MY ATTORNEY, AND THEN I GOT HERE, IT MIGHT HAVE BEEN ABOUT THIRTY DAYS.  SOMETHING LIKE THAT.

BY MR. DAVIS:

Q.  AND WHEN YOU REFERENCE YOUR ATTORNEY, YOU'RE SPEAKING OF MR. ALLEN DALE; CORRECT?

A.  CORRECT.

Q.  AND ON HOW MANY OCCASIONS DID YOU MEET WITH THE FEDERAL PROSECUTORS IN THE DISTRICT OF COLUMBIA, IF YOU RECALL?

A.  MAYBE TWO OR THREE TIMES.

MR. DAVIS:  I HAVE NO FURTHER QUESTIONS.  THANK YOU.

MR. BESHOURI:  I HAVE NO QUESTIONS, YOUR HONOR.

**SA-367**

USCA Case #23-3015     Document #2109460     Filed: 04/04/2025     Page 376 of 668

57

A. WHAT DO YOU MEAN BY "ODD JOBS?"

Q. WELL, YOU ASSISTED HER IN VARIOUS ACTIVITIES? YOU DID SMALL TASKS FOR HER; CORRECT?

A. FOR INSTANCE?

Q. FOR HER AT UPLIFT PHARMACY; CORRECT?

A. I MAY HAVE DROPPED HER OFF AT A BUS STOP, OR SOMETHING LIKE THAT. I MAY HAVE TAKEN HER TO THE BUS STOP WHEN HER CAR WAS BROKEN, OR SOMETHING LIKE THAT, AND I'VE LOANED HER MONEY. BUT MENIAL TASKS? I DON'T KNOW. YOU HAVE GOT TO DEFINE THAT A LITTLE BIT MORE FOR ME, PLEASE.

Q. WELL, YOU DEVELOPED A FRIENDSHIP WITH HER; IS THAT RIGHT?

A. IF THAT'S A TASK, YES.

Q. AND, IN FACT, SHE BELIEVED THAT YOU WERE A PHARMACIST; ISN'T THAT RIGHT?

MR. ZEIDENBERG: OBJECTION.

THE COURT: SUSTAINED.

MS. HEPWORTH: I WILL REPHRASE IT, YOUR HONOR.

BY MS. HEPWORTH:

Q. YOU LED HER TO BELIEVE THAT YOU WERE A PHARMACIST; ISN'T THAT RIGHT?

A. NO, I DON'T. NO, I DIDN'T.

Q. AND ISN'T IT TRUE, PURSUANT TO YOUR FRIENDSHIP AND RELATIONSHIP WITH HER, THAT YOU OBTAINED HER D.E.A. REGISTRATION? ISN'T THAT RIGHT?

A.   NO, I DID NOT.

Q.   DIDN'T YOU OBTAIN THE D.E.A. REGISTRATION OF UPLIFT PHARMACY TO PURSUE YOUR CRIMINAL ACTIVITY?

A.   NO, I DID NOT.

Q.   DID YOU FILE AN ALTERED REGISTRATION FOR UPLIFT PHARMACY WITH THE D.E.A. TO OBTAIN THE DRUGS THAT YOU OBTAINED?

A.   SOMEONE ELSE DID THAT.

Q.   BUT YOU OBTAINED THOSE DRUGS; DIDN'T YOU?

A.   YES.

Q.   AND YOU PICKED UP THOSE DRUGS BY C.O.D.; ISN'T THAT RIGHT?

A.   YES.

Q.   SO IT'S YOUR TESTIMONY YOU DID NOT DEVISE THIS SCHEME?

A.   NOT ALONE, NO.

Q.   BUT YOU DID USE THIS ALTERED D.E.A. REGISTRATION OF UPLIFT PHARMACY TO OBTAIN MORE THAN -- BETWEEN $450,000 AND $800,000 WORTH OF DRUGS; ISN'T THAT RIGHT?

          MR. ZEIDENBERG:   OBJECTION.

          THE COURT:   SUSTAINED.

BY MS. HEPWORTH:

Q.   DID YOU GIVE THE INFORMATION THAT SOMEONE ELSE DEVISED THIS SCHEME TO THE U.S. ATTORNEYS IN GREENBELT?

A.   I BROUGHT IT TO THEIR ATTENTION, BUT THEY DIDN'T WANT TO BELIEVE IT.   THEY WANTED TO THINK I WAS THE SOLE PERSON INVOLVED IN IT.   SO THAT'S HOW IT WENT.

SA-369

Q.  SO IT'S CORRECT THAT THEY DID NOT BELIEVE YOU; ISN'T IT?

MR. ZEIDENBERG:  OBJECTION.

THE COURT:  SUSTAINED.

BY MS. HEPWORTH:

Q.  DIDN'T YOU JUST TESTIFY THAT THEY DID NOT BELIEVE WHAT YOU TOLD THEM?

MR. ZEIDENBERG:  OBJECTION, YOUR HONOR.

MS. HEPWORTH:  YOUR HONOR, I BELIEVE THAT'S WHAT HE TESTIFIED.

THE COURT:  WELL, MAYBE HE TESTIFIED TO IT, BUT IT'S AN IMPROPER QUESTION.  HE DOESN'T KNOW WHAT'S IN THEIR MIND.

BY MS. HEPWORTH:

Q.  ISN'T IT TRUE THAT THEY TOLD YOU THAT THEY DID NOT BELIEVE WHAT YOU TOLD THEM?

MR. ZEIDENBERG:  OBJECTION.

THE COURT:  I AM GOING TO LET HIM ANSWER THAT.

THE WITNESS:  AGAIN, PLEASE.

BY MS. HEPWORTH:

Q.  ISN'T IT TRUE THAT THE U.S. ATTORNEYS IN GREENBELT TOLD YOU THAT THEY DID NOT BELIEVE WHAT YOU WERE TELLING THEM?

A.  TRUE.

Q.  NOW, YOU KNOW THE KINDS OF THINGS TO SAY TO PEOPLE TO GET WHAT YOU WANT; DON'T YOU, MR. WATSON?

MR. ZEIDENBERG:  OBJECTION.

THE COURT:  SUSTAINED.

BY MS. HEPWORTH:

Q.  MR. WATSON, WHAT YOU'RE AFTER IN THIS CASE IS SOMETHING FROM THE UNITED STATES ATTORNEY'S OFFICE; ISN'T THAT RIGHT?

A.  THAT IS CORRECT.

Q.  AND IN YOUR TESTIMONY ON DIRECT LAST THURSDAY, YOU TESTIFIED THAT YOU MET WITH MR. ZEIDENBERG AND HIS, QUOTE, LOVELY ASSISTANT, ISN'T THAT RIGHT?

A.  CORRECT.

Q.  AND YOU WERE REFERRING TO ASSISTANT UNITED STATES ATTORNEY CHATURVEDI; IS THAT CORRECT?

A.  I CAN'T PRONOUNCE THE NAME, BUT I GUESS THAT'S RIGHT.

Q.  AND YOU TESTIFIED -- YOU GAVE A NICE LITTLE SPEECH ABOUT HOW THE FEDERAL GOVERNMENT DOESN'T PROSECUTE PEOPLE UNLESS THEY HAVE EVIDENCE AGAINST THEM IN A GOOD CASE, ISN'T THAT RIGHT?

MR. ZEIDENBERG:  I OBJECT TO THE FORM OF THAT QUESTION.

THE COURT:  SUSTAINED.

BY MS. HEPWORTH:

Q.  YOU TESTIFIED THAT THE FEDERAL GOVERNMENT DOESN'T -- THAT YOU TOLD MR. SWEENEY THAT THE FEDERAL GOVERNMENT DOESN'T COME AFTER YOU UNLESS THEY HAVE A STRONG CASE; ISN'T THAT RIGHT?

A.  I SAID THAT THEY DON'T USUALLY PUT THEIR HANDS ON YOU

61

UNLESS, GENERALLY, YOU COMMITTED A CRIME, YOU'RE DEEPLY INVOLVED, OR YOU'RE VERY KNOWLEDGEABLE ABOUT IT.  THAT'S WHAT I SAID, IF I AM NOT MISTAKEN.

Q.  YOU ARE CERTAINLY ABSOLUTELY RIGHT.  YOU REMEMBER EXACTLY WHAT YOU SAID; DON'T YOU?

MR. ZEIDENBERG:  OBJECTION.

MS. HEPWORTH:  WITHDRAWN.

BY MS. HEPWORTH:

Q.  MR. WATSON, YOU SAID THAT IN ORDER TO CURRY FAVOR WITH THE FEDERAL GOVERNMENT; ISN'T THAT RIGHT?

A.  NO.

Q.  YOUR GOAL HERE IS TO OBTAIN A REDUCTION IN SENTENCE; ISN'T THAT RIGHT?

A.  YES.

Q.  AND THAT GOAL IS ONLY OBTAINABLE IF YOU CONVINCE THE UNITED STATES ATTORNEY THAT YOUR INFORMATION AND WHAT YOU HAVE DONE FOR THEM IS WORTH IT; ISN'T THAT RIGHT?

A.  I WOULD ASSUME SO, YES.

MS. HEPWORTH:  NO FURTHER QUESTIONS, YOUR HONOR.

OH, I AM SORRY.  JUST ONE MORE AREA.

BY MS. HEPWORTH:

Q.  NOW, MR. WATSON, YOU HAVE BEEN IN PRISON MANY YEARS; ISN'T THAT CORRECT?

A.  TWELVE, TO BE EXACT.

THE COURT:  I AM SORRY.  SAY AGAIN.

**SA-372**

PROSECUTING YOU?

THE COURT: IS THERE AN OBJECTION?

MR. ZEIDENBERG: YES.

THE COURT: SUSTAINED.

BY MR. ZUCKER:

Q. NOW, I DON'T WANT TO INSULT YOU, SIR, BUT YOU BASICALLY HAVE BEEN A CRIMINAL VIRTUALLY YOUR ENTIRE ADULT LIFE; IS THAT FAIR TO SAY?

MR. ZEIDENBERG: OBJECTION.

THE COURT: HIS RECORD SPEAKS FOR ITSELF. SUSTAINED. HE HAS TESTIFIED TO THAT EXTENSIVELY.

BY MR. ZUCKER:

Q. AND YOU'VE ALSO LEARNED THE VALUE OF PROVIDING COOPERATION THROUGHOUT YOUR LIFE TO THE GOVERNMENT; HAVEN'T YOU, SIR?

A. CORRECT.

Q. YOU HAVE BEEN A COOPERATOR OR PROVIDED INFORMATION BASICALLY SINCE THE '70'S AT LEAST; ISN'T THAT CORRECT?

A. THAT'S A FAIR QUESTION. THAT'S FAIR TO SAY, YES.

Q. AND YOU HAVE USED THAT INFORMATION FOR NUMEROUS PURPOSES; ISN'T THAT CORRECT?

A. WHAT DO YOU MEAN BY "NUMEROUS?"

Q. WELL, YOU HAVE USED IT FOR FINANCIAL GAIN; ISN'T THAT CORRECT? YOU HAVE BEEN PAID FOR IT?

A. NO, I HAVE NOT.

SA-373

75

(JURY OUT.)

MR. ZUCKER:  YOUR HONOR, I WANT TO APOLOGIZE FOR MY LATENESS EARLIER.  I THOUGHT I HAD WORKED IT OUT WITH ONE OF THE CO-COUNSEL TO CONTACT ME AS SOON AS YOU WERE GETTING READY TO COME IN.  AND SOMEHOW WE GOT OUR SIGNALS CROSSED.

THE COURT:  ALL RIGHT.

MR. ZUCKER:  I APOLOGIZE.

THE COURT:  NOW YOU HAVE SOMETHING ELSE?

MR. ZUCKER:  NO.  NO.  I AM JUST LOOKING OVER MY NOTES WHILE WE'RE GETTING READY TO BREAK.

MR. DAVIS:  I DID HAVE A REQUEST I WANTED TO PUT ON THE RECORD, AND I WILL BE HAPPY TO PROVIDE CHAMBERS WITH THE CASE CITE.  THAT'S THE XAVIER BROOKS CASE OUT OF THE D.C. CIRCUIT, AND IT DEALS WITH BRADY INFORMATION.  THIS IS KIND OF PIGGY-BACKING MR. KIERSH'S ARGUMENT THIS MORNING.

THIS CASE, THE BROOKS CASE, INDICATES THAT IF THERE IS MATERIAL IN THE GOVERNMENT'S POSSESSION -- EVEN IF THEY ARE UNCERTAIN WHETHER IT CONTAINS BRADY INFORMATION, IF THERE IS A REASONABLE CHANCE THAT IT MIGHT, IF THEY ARE REQUESTED, THEY ARE OBLIGATED TO REVIEW IT.

AND WITH THAT IN MIND, AND GIVEN MR. WATSON'S COLORFUL CAREER, I AM ASKING THAT THEY REVIEW THE FILE OF MR. WATSON THAT IS CONTAINED IN THE U.S. ATTORNEY'S OFFICE IN GREENBELT, AND SPECIFICALLY IN REGARD TO DEBRIEFING STATEMENTS, OR LETTERS HE MAY HAVE WRITTEN THE PROSECUTORS,

SA-374

OR RIGHT DOWN TO THE FACT THAT HE SAID HE DIDN'T COOPERATE AGAINST "PEEWEE", IF THERE ARE INDICATIONS THAT HE COOPERATED AGAINST "PEEWEE", WE WOULD ASK THAT THESE MATERIALS BE MADE AVAILABLE TO US OR THE INFORMATION BE MADE AVAILABLE TO YOU.

THE COURT:   THAT HE COOPERATED AGAINST WHO?

MR. DAVIS:   HE NAMED SEVERAL PROSECUTORS AND SEVERAL DEFENDANTS.   ONE DEFENDANT HE REFERENCED WAS "PEEWEE".

THE COURT:   ALL RIGHT.

MR. DAVIS: AND THIS WAS A FAIRLY NOTORIOUS CASE OUT IN GREENBELT, AND A LOT OF PEOPLE WERE BROUGHT IN TO PROVIDE --

THE COURT:   WELL, YOU TELL ME WHY THE FACT THAT HE MAY HAVE GIVEN TESTIMONY IN ANOTHER CASE REPRESENTS BRADY MATERIAL.

MR. DAVIS:   OH, IT WOULD JUST BE GIGLIO MATERIAL. IT WOULD BE IMPEACHMENT MATERIAL.   IF HE SAYS HE DID NOT PROVIDE THAT, THAT WOULD IMPEACH HIM.

I AM PARTICULARLY INTERESTED IN IF HE WROTE LETTERS, BECAUSE HE SEEMS LIKE THE TYPE OF INDIVIDUAL THAT WOULD BE VERY -- IT JUST SEEMS LIKE HE WOULD BE VERY PERSISTENT IN HIS EFFORTS TO DO SOMETHING.

I GUESS THE BOTTOM-LINE REASON I AM MAKING THIS REQUEST IS THAT THEY MADE A DETERMINATION THAT HE WAS

SA-375

77

UNRELIABLE. AND I DON'T KNOW IF IT WAS BASED ON SPECIFIC FACTS THAT CAME TO LIGHT AS THEY WERE WORKING WITH HIM OR THINGS FROM HIS PAST, BUT I BELIEVE THAT WE HAVE A BASIS --

THE COURT: THE GOVERNMENT IS NOT REQUIRED TO DO YOUR INVESTIGATIVE WORK FOR YOU, MR. DAVIS.

MR. DAVIS: WELL, YOUR HONOR, I'M NOT --

THE COURT: AS A MATTER OF FACT, I RECALL PAYING AN INVESTIGATOR OF YOURS A FAIR AMOUNT OF MONEY.

MR. DAVIS: LAST MONTH, YES. I SAW THAT, YOUR HONOR. THAT'S ANOTHER MATTER THOUGH. IN REFERENCE TO THIS, I WILL BE HAPPY TO PROVIDE THE COURT WITH THE CASE CITATION, BUT THE CASE IS PRETTY SPECIFIC.

THE COURT: I WILL TAKE YOUR REPRESENTATION AS TO WHAT THE CASE STANDS FOR.

MR. DAVIS: AND I WOULD ASK THAT THE UNITED STATES ATTORNEY'S OFFICE REVIEW THAT FILE.

THE COURT: IF THEY HAVE NOT DONE THAT, AND I WOULD ASK THAT THEY CALL THE PROSECUTOR'S OFFICE IN GREENBELT TO FIND OUT WHETHER OR NOT THERE IS ANYTHING THAT COULD BE CHARACTERIZED AS, QUOTE, BRADY MATERIAL IN THEIR FILE. OTHER THAN THAT --

MR. DAVIS: THANK YOU, YOUR HONOR.

THE COURT: -- THAT'S THE EXTENT OF THE GOVERNMENT'S OBLIGATION.

OKAY?

SA-376

78

MR. ZEIDENBERG:  AGREED, YOUR HONOR.

(WHEREUPON, AT 12:25 P.M., THE ABOVE-ENTITLED MATTER WAS RECESSED FOR LUNCH.)


CERTIFICATE OF REPORTER

THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.

_____

PHYLLIS MERANA

SA-377

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA, | . Docket No. CR 98-329 |
| Government, | . Washington, D.C. |
| | . February 12, 2001 |
| vs. | . 2:10 p.m. |
| VINCENT HILL, | . (AFTERNOON SESSION) |
| JEROME MARTIN, | . |
| SAMUEL CARSON, | . |
| WILLIAM K. SWEENEY, | . |
| MAURICE PROCTOR, | . |
| SEAN COATES, | . |
| Defendants | . |

. . . . . . . . . . . . . . .

UNITED STATES OF AMERICA,      .

         Government,      .

                         .  Docket No. CR 99-348

   vs.                   .

GARY PRICE,              .

         Defendant.      .

. . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

SA-378

2

For the Defendant Carson:            JOSEPH BESHOURI, ESQ.
                                     LEXI NEGIN-CHRIST, ESQ.
                                     419 7th Street, N.W.
                                     Washington, D.C.  20004

For the Defendant Sweeney:           STEVEN R. KIERSH, ESQ.
                                     717 D Street, N.W.
                                     Suite 400
                                     Washington, D.C.  20004

For the Defendant Proctor:           HOWARD BRAMSON, ESQ.
                                     717 D Street, N.W.
                                     Third Floor
                                     Washington, D.C.  20004

For the Defendant Coates:            FREDERICK JONES, ESQ.
                                     901 6th Street, S.W.
                                     Suite 409
                                     Washington, D.C.  20024

For the Defendant Price:             JONATHAN ZUCKER, ESQ.
                                     601 Indiana Ave., N.W.
                                     Suite 901
                                     Washington, D.C.  20024

Court Reporter:                      BEVERLY J. BYRNE
                                     Official Court Reporter
                                     Room 6810 U.S. Courthouse
                                     Washington, D.C.  20001
                                     (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-379

5

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel is all present, Your Honor.

THE COURT:  Thank you, Marshal.  Let's bring Mr. Watson back out.

MR. ZUCKER:  May I resume, Judge?

THE COURT:  All right, Mr. Zucker.

THEODORE WATSON, GOVERNMENT'S WITNESS, RESUMED THE STAND

CROSS-EXAMINATION (Cont.)

BY MR. ZUCKER:

Q.   How are you, Mr. Watson?

A.   Okay, Mr. Zucker.

Q.   Mr. Watson, before we broke, I'd ask you the question, you had denied ever receiving money from the government in exchange for information.  Do you recall that?

A.   Detective Norris.  You said -- you asked me did I receive any money from Detective Norris.  I told you, no.

Q.   Okay.  You've had the lunch hour to think about it.  Are you as certain of that as you are of all the rest of your testimony today?

A.   I don't recall.  It was back in '85, and I don't really recall.

Q.   So is it your testimony it did not occur, or it may have happened and you don't recall?

A.   It's a remote possibility, but I don't recall it.

Q.   But you do recall receiving money from other law enforcement in exchange for providing information, have you not?

A.   No, I don't recall that either.

Q.   All right.  You do recall in 1976 working with the DEA to try and work off a case you had then working with an agent called Charles Wagner, do you not?

A.   Yes.

Q.   Okay.  And you ended up serving a sentence in that case, did you not?

A.   Yes.

Q.   It was a greatly reduced sentence, but it was a sentence nonetheless, correct?

A.   Correct.

Q.   And then you were in Long Park, California, were you not?

A.   That's correct.

Q.   Okay.  And you again cooperated with law enforcement there, did you not?

A.   That's correct.

Q.   And you provided testimony or information that got you an early parole; isn't that correct?

A.   Correct.

Q.   And that's basically been your pattern throughout your life, has it not, sir, to cooperate with law enforcement in order to get benefits?

**SA-381**

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 390 of 668

MR. ZEIDENBERG:  I'm going to object to the form of the question.

THE COURT:  Sustained.

BY MR. ZUCKER:

Q.   All right.  Let's start into the '80's, sir.  In August of 1984, you were arrested.  Do you recall that?

A.   Yes.

Q.   Huh?

A.   I said, yes.

Q.   I didn't mean to interrupt you.  And you cooperated with -- that's when you began your relationship I believe with Detective Norris; is that correct?

A.   That's correct.

Q.   And you also worked with a PG County officer or detective named Harwood, did you not?

A.   That's correct.

Q.   And they got you out of jail; isn't that correct?

MR. ZEIDENBERG:  I'd object.  I'd ask to approach, Your Honor.

THE COURT:  Approach the bench.

(Bench conference on the record.)

10

(End of bench conference.)

THE COURT: Ladies and gentlemen, Mr. Zucker is going to ask Mr. Watson a number of questions. I want to remind you that lawyers' questions are not evidence. It's the witnesses' answers that are evidence. You don't have to accept the evidence, namely, the witness's answer, as being entirely truthful. But the fact that the lawyer implies something in a question does not mean that it has happened. Understood? All right.

BY MR. ZUCKER:

Q. I'm going to rephrase that question, sir.

Norris -- when you started cooperating, Norris and Harwood intervened and helped you get out on bond?

A. That is correct.

Q. Okay. And you started to cooperate with them in an investigation, did you not?

A. That is correct.

Q. And Norris was investigating -- Norris was a Metropolitan Police Department and Harwood was PG County. They were investigating primarily PCP; isn't that correct?

A. That's correct.

Q. And that's what you assisted them with; isn't that correct?

A. That's correct.

Q. And you provided information to them; isn't that correct?

USCA Case #23-3015    Document #2109460       Filed: 04/04/2025     Page 392 of 668

11

A.    That's correct.

Q.    And Norris had asked you everything you knew about PCP distribution and to provide information about all of it; isn't that correct?

A.    That's correct.

Q.    And in connection with that, you actually set up somebody named Charlene Pettigrew in an undercover operation; isn't that correct?

A.    I don't know if --

Q.    I'm sorry.  Chantelle, not Charlene?

A.    That's correct.

Q.    Okay.  And what you basically did was you had either yourself or your car wired and got her, even though you'd done no business with her in the past, you got her into a transaction where you gave her money, correct?

A.    I think so.

Q.    Okay.  And that was to go up to somebody named Billiard in New York who was going to bring down stuff to make PCP with, correct?

A.    That's correct.

        MR. ZEIDENBERG:  Objection, Your Honor.  Same objection.

        THE COURT:  I'm sorry?

        MR. ZEIDENBERG:  I'm objecting as to the going through this case in this manner.  I mean, it's the same

**SA-384**

12

objection I --

THE COURT:  He has testified that he has cooperated on several occasions in the past.  We're not going to go through every --

MR. ZUCKER:  I will live with what I proffered at the bench, Your Honor.

THE COURT:  -- minutia of every occasion.

MR. ZUCKER:  Okay.

BY MR. ZUCKER:

Q.    And --

THE COURT:  You told me one series of questions you wanted to ask.  I suggest you ask them.

BY MR. ZUCKER:

Q.    Okay.  And without going through all the details, as part of that same investigation, you cooperated against Robert Billiard, Gary Jordan, Lawrence Yates, and it led to the execution of a search warrant on Eaton Road, Southeast; isn't that correct?

A.    That's correct.

Q.    Okay.  Now, while that was going on, what you did not disclose to Officer Norris -- Detective Norris -- was that you were also still involved in PCP distribution with somebody named Irwin Wallace; isn't that correct?

A.    That's correct.

Q.    And Irwin Wallace was supplying you and others with PCP;

**SA-385**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

13

isn't that correct?

A.    I don't know about others.  I know me.

Q.    Okay.  You with PCP.  You don't know -- all right.  Fair enough.

And you deliberately hid that from Detective Norris while you were cooperating with him; isn't that correct?

A.    Correct.

Q.    Because you were making -- able to distribute PCP you received from Wallace and make money; isn't that correct?

A.    Correct.

Q.    So basically you're playing both sides against the middle that whole time; isn't that correct?

MR. ZEIDENBERG:  Objection.

THE COURT:  Overruled.

THE WITNESS:  Not the whole time, no.

BY MR. ZUCKER:

Q.    All right.  Well, you're cooperating and receiving benefits from the government over here on one side and telling them you're being completely truthful when you're dealing with Norris, correct?

A.    After I did the first cooperation with them, that was over.  I was released from that.  Then they wanted an extension.  At that time there was no obligation, and they weren't giving me any money.

Q.    All right.  But you do agree you were simultaneously

SA-386

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 395 of 668

14

dealing drugs with Wallace, right?

A.   Yes.

Q.   You've already told us that.  And, of course, you were lying to them about that.  You were being half-truthful?

A.   I wasn't lying to them.  They weren't asking me anything.

Q.   Well, you just told us that Detective Norris asked you to give him all the information you had about PCP distribution in this area, didn't you, sir?

A.   At that time, yes.

Q.   Okay.  And you didn't disclose Wallace, did you?

A.   I wasn't dealing with Wallace at that time.

Q.   But Wallace's mother was your girlfriend, wasn't she?

     MR. ZEIDENBERG:  Objection, Your Honor.

     THE COURT:  Sustained.

BY MR. ZUCKER:

Q.   Incidentally, you were also on parole that whole time, weren't you, sir?

A.   That is correct.

Q.   Okay.  Now, there came a time later on where you learned you were under investigation in PG County, correct, for a deal with somebody named Donna Toney?

A.   That was '88.  Okay, yes.

Q.   Around the same time after your cooperation against the other four individuals here in D.C., right?  It was actually October of '86 you learned of that, right?

SA-387

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

15

A.    Yes, I think so.

Q.    And the way you learned of that was that you were paying somebody, bribing somebody to get information from the DEA office; isn't that correct?

A.    No.

        MR. ZEIDENBERG:  Objection.

        THE COURT:  Sustained.

        MR. ZUCKER:  Approach?

    (Bench conference on the record.)

**SA-388**

USCA Case #23-3015      Document #2109460          Filed: 04/04/2025      Page 397 of 668

19

(End of bench conference.)

BY MR. ZUCKER:

Q.   Do you recall the question, sir?

        MR. ZUCKER:  Do you want to announce the ruling?  I'm sorry.

        THE COURT:  The objection is overruled.  You may go ahead and inquire.

        THE WITNESS:  Repeat the question please.

BY MR. ZUCKER:

Q.   I can't remember what the wording was.

        THE COURT:  Beg your pardon?

        MR. ZUCKER:  Huh?

        THE COURT:  The question was having to do with bribing somebody at the DEA for information.

        MR. ZUCKER:  Okay.

BY MR. ZUCKER:

Q.   Well, you were eventually arrested in January of 1987 for distribution of a half gallon of PCP, were you not?

A.   Yes.

Q.   And that was a distribution to somebody named Donna Toney?

A.   No.

Q.   Do you remember the person's name?

A.   It was -- on the day --

Q.   I can't hear you.  I'm sorry.

**SA-389**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

20

A.    On the day I was supposed to deliver it -- on the day

that delivery was supposing taking place, it wasn't with a

Donna Toney.  It was an agent by the name of Wagner.

Q.    Donna Toney was the co-defendant in the case with you?

A.    Not on that deal, no.

Q.    All right.  Regardless of who it was, you were arrested

in January of '87 for distribution of a half gallon of PCP and

that was based on a DEA PG County investigation, correct?

A.    Donna Toney lived in Virginia, so it wasn't PG at all.

Q.    All right.  Well, PG County police were investigating you

with DEA, right?

        THE COURT:  If you know.

        THE WITNESS:  I just said it was Virginia.

BY MR. ZUCKER:

Q.    All right.  It was Virginia, but it was DEA, correct?

A.    Richard Norris was in it -- I mean, Harvey Norris was in

it, and he was with the task force.

Q.    He was present on the day of your arrest, but it was not

his case, correct?

A.    With the Donna Toney case, yes, it was.  She was from

Virginia, and that was all Virginia people.

Q.    All right.  Let's back up.  Before you were arrested in

that case, you went to Detective Norris in either late October

or early November of 1986 to ask him to check to see if you

were about to be arrested for that distribution, didn't you,

sir?

A.    I may have.

Q.    And you went to him because you were bribing or paying somebody named Norma Lindsey to get that information from DEA; isn't that correct?

A.    I know Norma Lindsey, but I don't know if that's the information I got from her.

Q.    Well, you paid Norma Lindsey, correct?

A.    No, at one time she was a girlfriend.  I didn't have to pay her anything.

Q.    Did you tell Detective Norris that you were paying her?

A.    I don't recall.  I told him we had a past relationship.

Q.    All right.  And she --

         MR. ZUCKER:   Court's indulgence.

     (Pause.)

BY MR. ZUCKER:

Q.    When you went to Norris, -- actually strike that for a second.

     After you were arrested in January of 1987, Norris was there, and he participated in your debriefing, correct?

A.    I think so, yes.

Q.    And Norris came out because you and Norris had a long standing arrangement, correct?

A.    Correct.

Q.    You had been cooperating with him for a long time,

USCA Case #23-3015 Document #2109460 Filed: 04/04/2025 Page 400 of 668

22

correct?

A.    Couple of years, yes.

Q.    Couple of years.  All right.  And what you told Norris was that you were obtaining information illegally based on somebody working at the DEA printing it out of the computer; isn't that correct?

A.    I think so, yes.

Q.    And the information --

A.    Excuse me.  The reason I say I think so, because Ms. Lindsey never worked for DEA.  In fact, at the time, she wasn't even working.

Q.    No, Ms. Lindsey didn't work for DEA.  She knew somebody who did, and through Ms. Lindsey you paid that person money to get information out of the computer printouts at DEA; isn't that correct?

A.    No, I didn't pay anybody anything.

Q.    Well, that is what you told Detective Norris; isn't it?

A.    I don't recall telling him that.

Q.    Would it refresh your recollection to look at Detective Norris's notes from that debriefing?

A.    Yes.

        MR. ZUCKER:  Court's indulgence.

    (Pause.)

BY MR. ZUCKER:

Q.    If you would, sir, take a look at what I'm handing you,

**SA-392**

USCA Case #23-3015   Document #2109460        Filed: 04/04/2025   Page 401 of 668

23

Defendant's 11, and the handwritten pages on these two pages (indicating). Why don't you take a look at that and read them over. And when your recollection is refreshed, just lift your head up.

THE COURT: Would you identify it for the record what Price DX 11 is?

MR. ZUCKER: It's the notes of Detective Norris which are attached to the government's pleading in that case.

(Whereupon, Defendant Price Exhibit No. 11 was marked for identification.)

THE COURT: Dated when?

MR. ZUCKER: The date at the top is January 27, 1987, I believe. Actually, that's the date he was arrested. They were filed with the Court on October 6, 1988. The date on it says, Janaury 27, '87. It's not clear that they were written up that day or the next day.

THE COURT: All right.

MR. ZUCKER: Or afterwards.

BY MR. ZUCKER:

Q. Just lift your head up when you've had enough time.

A. Okay.

Q. You ready?

A. Uh-huh.

Q. Have you had a chance to review those?

A. Yes.

SA-393

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 402 of 668

24

Q.    Okay.   Is your recollection now refreshed about your October 27, '87 meeting with Detective Norris?

A.    Yes, vaguely.

Q.    Okay.   Do you now recall telling Detective Norris that you were paying for this information from a computer printout at the DEA?

A.    That doesn't say I paid anyone.   I know that Ms. Lindsey knew people inside the places that could give her information, and occasionally she would pass it on or let someone know if she heard anything.

Q.    Well, you recall Detective Norris talking about your saying --

        MR. ZEIDENBERG:   Objection.   He's not cross-examining.   This was to refresh his recollection.

        THE COURT:   That's right.

BY MR. ZUCKER:

Q.    If you would, I'll direct your attention to the second paragraph.   I'm going to ask you to read the middle sentence there.

A.    Ms. --

        THE COURT:   Wait a minute.   There's no question pending.

BY MR. ZUCKER:

Q.    Don't read it out loud.   You just read it to yourself and see if that refreshes your recollection about whether or not

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 403 of 668

25

you paid Ms. Lindsey for this information?

A.    (Witness reviewing the document.)

Q.    And if it doesn't, it doesn't.

A.    No, it doesn't state that to me.

Q.    Do you recall telling Detective Norris --

THE COURT:    Mr. Zucker.

MR. ZUCKER:    I'm going to move on to another aspect of --

THE COURT:    Yes, and please remain at the lectern until I give you permission to approach the witness.

MR. ZUCKER:    Yes, Judge.

THE COURT:    You have a way of walking in an intimidating fashion to the witness whenever you want to intimidate the witness.  Don't do it again.

MR. ZUCKER:    All right.  I don't mean to intimidate you, sir.  I pace.  I'm sorry if it intimidates you.

BY MR. ZUCKER:

Q.    Do you recall telling Detective Norris that Lindsey sold the information and shared the profits with her DEA employee friend or contact?  Do you recall saying that?

THE COURT:    Do you recall saying that?

THE WITNESS:    No, Your Honor, no.

BY MR. ZUCKER:

Q.    In any event, whether you paid for it or not, you were aware that this was coming down three months before you were

arrested.  In October of '86, you approached Norris about it; isn't that correct?

A.    Correct.

Q.    You were never prosecuted for that, for getting that information surreptitiously, were you, sir?

A.    No, I wasn't.

Q.    Even though the government knew about it?

A.    True.  Whether it was proven or not, I don't know.

Q.    And it was only when you were arrested in '87 that you finally came somewhat clean with Norris about Mr. Wallace; isn't that correct?

A.    That's correct.

Q.    And that was again, to get yourself out on that half gallon sale of PCP; isn't that correct?

A.    That's correct.

Q.    Now, we're going to shift gears for a minute and turn to your arrest in Greenbelt, the one you're serving your sentence for now.  You recall that?  You testified to that on Friday?

A.    Thursday.

Q.    Thank you.  Thursday, right?

A.    Yes.

Q.    Okay.  You were prosecuted for a drug case there, right?

A.    Correct.

Q.    That was the numerous prescription fraud charges, right?

A.    That's correct.

Q.    Now, you were a convicted felon at that time; isn't that correct?

A.    That is correct.

Q.    And when the police came to your house, there was a pistol there, a .25 caliber pistol behind your headboard that they recovered?

A.    That is correct.

Q.    Okay.  That is a separate criminal offense, felon in possession; is it not?

A.    Yes, it is.

Q.    It's also a violation of your parole, is it not?

A.    Yes, it is.

Q.    And because of your prior record of having at least two prior felonies, you were subject to what's called armed career criminal status; isn't that correct?

A.    That is correct.

Q.    And that is a 15 minimum to life offense; isn't that correct?

A.    That's correct.

Q.    And you were never even charged or prosecuted on that?  Well, I don't know if you were charged on it.  You were never convicted of that, right?

A.    I wasn't charged either.

Q.    Okay.  That would have been in addition to whatever you had to serve on the drug case; isn't that correct?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

28

A.    That's correct.

Q.    Now, you were 60 years old when you were arrested in that case, right?

A.    Yes.

Q.    Okay.  So if you had just gone down for the minimum on that offense, you could not have been eligible for release on that offense until you were 75 approximately, correct?

        MR. ZEIDENBERG:  Objection.  There is no evidence there was any deal for anything concerning that gun charge.

        THE COURT:  I think the implication of the question is that there was a deal; is that correct?

        MR. ZUCKER:  I'm sorry.  I didn't hear the first part of your --

        THE COURT:  I think the implication of the question was that there was a deal.  Is that --

        MR. ZUCKER:  The jury can draw whatever conclusions they wish.  But in the meantime he's clearly -- is it overruled?

        THE COURT:  What is the question again?

BY MR. ZUCKER:

Q.    The last question was if you had been convicted of that offense --

        THE COURT:  Convicted of what offense?

        MR. ZUCKER:  Armed career criminal possession of a gun.  Possession of a gun by a convicted felon with the

SA-398

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

29

enhancement he's already acknowledged was applicable of armed career criminal, which carries a minimum of 15 to life, those were the preceding questions.

The last question that led to the objection was had he been convicted of that offense, he would not have even been eligible for release until he was at least 75.

MR. ZEIDENBERG:  And Mr. Watson testified that he was not charged with that offense.  So, therefore, the question whether he could have been convicted is a hypothetical that doesn't present itself.

THE COURT:  I'm going to permit the question.  If he knows.  If he knows what the answer is.

THE WITNESS:  Repeat the question again.

BY MR. ZUCKER:

Q.    Sure.  You've already told us --

THE COURT:  Do you know what sentence you could have been subjected to if you had been convicted on the pistol charge?

MR. ZUCKER:  Your Honor, he's already admitted that. I'm just doing the math.  I mean, he's already admitted it's a 15 to life.

THE COURT:  Well, you do the math for the jury when you argue to them.  Then the objection is sustained.  I missed your last question.

BY MR. ZUCKER:

SA-399

30

Q.   And you were, of course, trying to cooperate with the government again in relation to that case; isn't that correct?

A.   Yes.

Q.   Okay.  And if you know, was that the reason you were never charged with that gun or was it just another coincidence, if you know?

A.   Well, I was given a choice before I even signed a plea agreement.  As my attorney put it to me, he said, now you can either have a punch in the nose or a kick in the balls.  Now, you can plead to the gun charge which is a mandatory of 15 -- minimum 15 or you can plead to the drug charges which is a 105.  Now, you get a kick in the balls or a punch in the nose.  And I said, well, I'd rather take the punch in the nose.

        THE COURT:  Do I understand you were given a choice between --

        THE WITNESS:  That's how my --

        THE COURT:  That you could plead to the gun charge or plead to the drug charge?

        THE WITNESS:  Yes, Your Honor.

        THE COURT:  Okay.

BY MR. ZUCKER:

Q.   Incidentally, did you write any letters to the prosecutors in that case?

A.   Yes, I wrote several letters to her.

Q.   And that was to Sandy Wilkinson?

**SA-400**

Case 1:98-cr-00329-RCL    Document 949    Filed 03/11/03    Page 31 of 45

31

A.    Yes.

Q.    And was that regarding your case?

A.    Yes, and information that I had.

Q.    You were proffering information to them?

A.    Yes.

Q.    You were asking for more lenient treatment in your case?

A.    Excuse me?

Q.    You were asking -- trying to trade that for more lenient treatment yet again in your case, correct?

A.    Yes.

        MR. ZUCKER:  Could we approach for a second, Judge?

        THE COURT:  Yes.

(Bench conference on the record.)

SA-401

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 410 of 668

32

(Bench conference on the record.)

MR. ZUCKER:  Jencks request as to those.  I mean, it's a different U.S. Attorney's Office, but it's still the U.S. Attorneys.  It's letters from this man about his case, about his cooperation, and about his request for leniency. Everything that brings him here today.

THE COURT:  Denied.  Denied.  Go back and finish your cross-examination.  You've got 10 minutes.

(End of bench conference.)

SA-402

41

A.   No.

Q.   Did they ask you that in relation to Mr. Sweeney, whether or not if they put you in a cell with him you'd try and make a case against him?

A.   No.

Q.   That just happened, right?

A.   Yes.

Q.   Not that they set it up.  It just happened, right?

A.   It was just a coincidence I met him there.  I don't know him.  I never seen him before.

Q.   It's interesting.  How many coincidences happen to you that you're able to turn to your advantage?

        THE COURT:  I'm going to sustain it before you get it out of your mouth, Mr. Zucker.  Sit down.

        MR. ZUCKER:  I have no other questions of this government's witness.  Thank you very much, Mr. Watson.

        THE COURT:  All right.  Redirect?

        MR. ZEIDENBERG:  No redirect, Your Honor.

        THE COURT:  No redirect.  All right.  Mr. Watson, you are excused.  Thank you.

    (Witness excused.)

        THE COURT:  Ladies and gentlemen, it is for you to decide whether Mr. Sweeney made any statements to Mr. Watson. If you find that Mr. Sweeney made any statements to Mr. Watson, you should consider all of the circumstances under

**SA-403**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

42

which such statements were made in determining what weight to give to Mr. Watson's testimony.

The statements testified to by Mr. Watson is evidence limited to Mr. Sweeney and cannot be considered as evidence against any of the other co-defendants. I instruct you that you may not consider Mr. Watson's testimony in the case of the Defendant Sweeney -- excuse me -- I instruct you that you may consider Mr. Watson's testimony with respect to the charges against the Defendant Sweeney, but you may not consider it in any way when deciding whether the government has proved beyond a reasonable doubt that any of the other defendants have committed any crime.

Understood? All right. Mr. Bramson, are you still in the --

MR. BRAMSON: Yes, Your Honor.

THE COURT: -- same circumstances?

MR. BRAMSON: Yes, Your Honor.

THE COURT: All right. Ladies and gentlemen, one of the lawyers in the case has got a doctor's appointment this afternoon, so we are going to recess early this afternoon. You are excused. We'll see you at 10:00 o'clock tomorrow morning.

(Jury Out.)

USCA Case #23-3015     Document #2109460     Filed: 04/04/2025   Page 413 of 668

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
       GOVERNMENT,

  VS.                 :     CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
MAURICE PROCTOR,
SEAN COATES,
       DEFENDANTS.

    FILED

    JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES
       GOVERNMENT,

  VS.               :     CR. NO. 99-348

GARY PRICE,
       DEFENDANT

WASHINGTON, D. C.
FEBRUARY 13, 2001
(MORNING SESSION)
(10:25 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:      PHYLLIS MERANA
                       6816 U. S. DISTRICT COURT
                       3RD & CONSTITUTION AVE., N.W.
                       WASHINGTON, D. C. 20001

SA-405

USCA Case #23-3015   Document #2109480   Filed: 04/04/2025   Page 414 of 668

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004

FOR THE DEFENDANT PROCTOR:             HOWARD BRAMSON, ESQ.
                                       717 D STREET, N.W.
                                       THIRD FLOOR
                                       WASHINGTON, D. C.   20004

FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 415 of 668

3

```
              I N D E X

WITNESS                        DIRECT    CROSS

CHARLENE WILSON

      BY MS.  CHATURVEDI          7

      BY MR.  BESHOURI                     40


GOVERNMENT'S              IN EVIDENCE

TF107                          29


DEFENDANT CARSON'S        IN EVIDENCE

8                              65
```

**SA-407**

4

P-R-O-C-E-E-D-I-N-G-S

THE DEPUTY CLERK:  CRIMINAL CASE 98-329, UNITED STATES OF AMERICA VERSUS VINCENT HILL, JEROME MARTIN, SAMUEL CARSON, WILLIAM SWEENEY, MAURICE PROCTOR AND SEAN COATES, AND CRIMINAL 99-348, UNITED STATES VERSUS GARY PRICE.

ANJALI CHATURVEDI AND PETER ZEIDENBERG FOR THE GOVERNMENT.

CHRISTOPHER DAVIS FOR THE DEFENDANT HILL.

JOANNE HEPWORTH FOR THE DEFENDANT MARTIN.

MR. BESHOURI AND ALEXANDRA NEGIN-CHRIST FOR THE DEFENDANT CARSON.

STEVEN KIERSH FOR THE DEFENDANT SWEENEY.

HOWARD BRAMSON FOR THE DEFENDANT PROCTOR.

FRED JONES FOR THE DEFENDANT COATES.

JONATHAN ZUCKER FOR THE DEFENDANT PRICE.

(THE DEFENDANTS AND COUNSEL WERE PRESENT.)

THE COURT:  GOOD MORNING, LADIES AND GENTLEMEN.

MS. HEPWORTH:  GOOD MORNING, YOUR HONOR.

MR. ZUCKER:  GOOD MORNING, YOUR HONOR.

MR. ZEIDENBERG:  GOOD MORNING, YOUR HONOR.

THE COURT:  WHO IS ON THIS MORNING?

MR. ZEIDENBERG:  THE WITNESS IS CHARLENE WILSON.

THE COURT:  CHARLENE WILSON?

MR. ZEIDENBERG:  YES, YOUR HONOR.

THE COURT:  ARE WE READY FOR THE JURY?

SA-408

USCA Case #23-3015    Document #2109460        Filed: 04/04/2025     Page 417 of 668

5

MR. ZEIDENBERG:  I BELIEVE WE ARE, YOUR HONOR.

JUST ON A MATTER LEFT OVER FROM YESTERDAY, PURSUANT TO THE COURT'S INSTRUCTION, WE CONTACTED THE U.S. ATTORNEY'S OFFICE IN GREENBELT.  WE RETRIEVED THEIR FILE YESTERDAY EVENING AND HAVE REVIEWED IT.

THERE IS NOTHING, IN OUR VIEW, THAT SUGGESTS ANY BRADY OR JENCKS MATERIAL IN THE FILE.  THE ASSISTANT U. S. ATTORNEY OUT THERE INDICATES IN ONE LETTER THAT THE REASON THAT MR. WATSON DID NOT GET A 5K LETTER WAS SIMPLY BECAUSE SHE DIDN'T BELIEVE HIS COOPERATION WAS OF A SIGNIFICANT ENOUGH NATURE TO QUALIFY.  THERE WAS NOTHING TO SUGGEST THAT IT WAS NOT WORTHY OF BELIEF OR IT WAS INCREDIBLE.  THERE WAS NOTHING OF THAT NATURE.

DETECTIVE NORRIS -- WE SPOKE WITH HIM BRIEFLY YESTERDAY.  AND HE HAD CALLED -- WE TRIED TO GET IN TOUCH WITH HIM -- AND HE INDICATED SIMILARLY THAT MR. WATSON HAD NEVER PROVIDED HIM WITH INFORMATION THAT HE FELT WAS UNTRUSTWORTHY OF ANY KIND.  NEVERTHELESS, WE DO HAVE THE FILE, AND I DON'T KNOW IF THE COURT WISHES TO HAVE IT TO PERUSE.  THERE ARE LETTERS --

THE COURT:  YOU MEAN THE FILE FROM GREENBELT?

MR. ZEIDENBERG:  YES.  THERE ARE LETTERS FROM MR. WATSON TO THE PROSECUTOR, AS HE DESCRIBES -- SEVERAL LENGTHY LETTERS, TALKING ABOUT A VARIETY OF MATTERS, INCLUDING HIS OWN CASE AND OTHER CASES THAT HE KNOWS ABOUT

USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 418 of 668

6

AND THINGS OF THAT NATURE.

THE COURT:  DO YOU WANT TO HAVE IT MADE PART OF THE COURT RECORD?

MR. KIERSH:  YES, YOUR HONOR.

THE COURT:  ALL RIGHT.

MR. KIERSH:  I ASK THAT IT BE PLACED UNDER SEAL AND MADE A PART OF THE RECORD.

THE COURT:  WE WILL PLACE IT UNDER SEAL AND MARK IT AS COURT EXHIBIT, I BELIEVE, NUMBER 3.  IS THAT CORRECT, MR. WEST?

THE DEPUTY CLERK:  I BELIEVE SO, YOUR HONOR.

MR. ZUCKER:  YOUR HONOR, I CONCUR IN THAT, BUT I'D ALSO ASK THAT THE COURT --

THE COURT:  WAIT A MINUTE.

THE DEPUTY CLERK:  NUMBER 5, YOUR HONOR.

THE COURT:  NUMBER 5.  ALL RIGHT.  NUMBER 5.  I DO NOT INTEND TO REVIEW IT IN CAMERA.

MR. ZUCKER:  THAT WOULD BE MY REQUEST.

THE COURT:  ALL RIGHT.  ARE WE READY FOR THE JURY?

MS. CHATURVEDI:  YES, YOUR HONOR.

THE COURT:  LET'S ASK FOR MS. WILSON.

THE DEPUTY MARSHAL:  THE JURY PANEL, YOUR HONOR.

THE COURT:  VERY WELL.

(JURY IN.)

**SA-410**



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           .   Docket No. CR 98-329

   Government,              .   Washington, D.C.
          .   March 7, 2001
 vs.                                  .   2:12 p.m.

VINCENT HILL,                        .   (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,                             **FILED**

   Defendants               .   MAR 1 1 2003

. . . . . . . . . . . . . .    .   NANCY MAYER WHITTINGTON, CLERK
          U.S. DISTRICT COURT

UNITED STATES OF AMERICA,            .

   Government,               .

          .   Docket No. CR 99-348
 vs.                                  .

GARY PRICE,                          .

   Defendant.                .

. . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
         ANJALI CHATURVEDI, AUSA
         U.S. Attorney's Office
         555 Fourth Street, N.W.
         Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
         601 Indiana Avenue, N.W.
         Suite 910
         Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
         305 H Street, N.W.
         Second Floor
         Washington, D.C.  20001



SA-411

2

For the Defendant Carson:      JOSEPH BESHOURI, ESQ.
                                    LEXI NEGIN-CHRIST, ESQ.
                                    419 7th Street, N.W.
                                    Washington, D.C.  20004

For the Defendant Sweeney:    STEVEN R. KIERSH, ESQ.
                                    717 D Street, N.W.
                                    Suite 400
                                    Washington, D.C.  20004

For the Defendant Coates:     FREDERICK JONES, ESQ.
                                    901 6th Street, S.W.
                                    Suite 409
                                    Washington, D.C.  20024

For the Defendant Price:      JONATHAN ZUCKER, ESQ.
                                    601 Indiana Ave., N.W.
                                    Suite 901
                                    Washington, D.C.  20024

Court Reporter:               BEVERLY J. BYRNE
                                    Official Court Reporter
                                    Room 6810 U.S. Courthouse
                                    Washington, D.C.  20001
                                    (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-412

73

Q.    Now, Mr. Montgomery, you're testifying here today pursuant to a plea agreement; is that correct?

A.    Yes.

Q.    In fact, you have signed three plea agreements with the United States; is that correct?

A.    Yes.

MR. ZEIDENBERG:  May I approach, Your Honor?

THE COURT:  Surely.

BY MR. ZEIDENBERG:

Q.    I'm showing you what's been marked Government's Exhibit G42C and ask you if you recognize that?

A.    Yes.

Q.    And if you could just flip through it and tell us whether or not your signature appears on that?

A.    I already checked.

Q.    Does your signature appear on it?

A.    Yes.

Q.    What is the date of that plea agreement?

A.    August 12, 1997.

Q.    And is that a copy of the plea agreement that you entered into with the United States?

A.    Yes.

MR. ZEIDENBERG:  Your Honor, I'd move to introduce Government's Exhibit G42C.

THE COURT:  Government's G42C is admitted.

SA-413

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 422 of 668

74

(Whereupon, Government's Exhibit No. G42C was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.   And, Mr. Montgomery, pursuant to Government's Exhibit G42C, that plea agreement, what did you plead guilty to?

A.   To a narcotics conspiracy.

Q.   And your understanding, Mr. Montgomery, of what possible sentence you're facing pursuant to that plea agreement?

A.   Forty to life.

Q.   That would be 40 years to life in prison?

A.   Yes.

Q.   Now, subsequent to entering into that plea agreement on August 12, 1997, did you enter into a second plea agreement on November 4, 1997?

A.   Yes.

        MR. ZEIDENBERG:   If I might approach again, Your Honor?

        THE COURT:   Surely.

BY MR. ZEIDENBERG:

Q.   Showing you what's been marked Government's Exhibit G42E --

        THE COURT:   E as in echo?

        MR. ZEIDENBERG:   Yes.

BY MR. ZEIDENBERG:

Q.   What is the date of that plea agreement, Mr. Montgomery?

**SA-414**

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 423 of 668

75

A.    November 4, 1997.

Q.    Is that a copy of the plea agreement that you entered into with the United States on that date?

A.    Yes.

MR. ZEIDENBERG:  Your Honor, I move to introduce Government's Exhibit G42E.

THE COURT:  Government's G42E is admitted.

(Whereupon, Government's Exhibit No. G42E was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.    Now, Mr. Montgomery, can you tell the ladies and gentlemen what it is you pled guilty to in this plea agreement that's dated November 4, 1997?

A.    To a RICO conspiracy.

Q.    And what overt acts or predicate acts did you admit your responsibility for when you pled guilty pursuant to this plea agreement?

A.    In aiding and abetting at the murder of Chrishauna Gladden.

Q.    And pursuant to that plea agreement dated November 4, 1997, what is your understanding of what possible penalties you could face in this case?

A.    Life imprisonment.

Q.    Life without parole?

A.    Life without parole, yes.

SA-415

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

76

Q. Subsequent to that, Mr. Montgomery, on November 2, 2000, did you enter into a third plea agreement with the United States?

A. Yes, I did.

MR. ZEIDENBERG: Can I approach again, Your Honor?

THE COURT: Yes.

BY MR. ZEIDENBERG:

Q. Showing you what's been marked G42A, do you recognize that, sir?

A. Yes.

Q. Is that the plea agreement that you entered into on November 2, 2000?

A. Yes.

Q. Can you tell the ladies and gentlemen what it is you pled guilty to on November 2, 2000?

A. Each count?

Q. Well, the count to which you pled guilty was what, the charge you pled guilty to was what?

A. RICO conspiracy.

Q. And in pleading guilty to that RICO conspiracy did you have to admit your responsibility for a number of criminal acts?

A. Yes.

Q. Okay.

MR. ZEIDENBERG: Your Honor, if I haven't already

SA-416

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 425 of 668

77

done so, I move to admit Government Exhibit G42E and G42A.

THE COURT:  E is already in, G42A is admitted.

MR. ZEIDENBERG:  Thank you.

(Whereupon, Government's Exhibit G42A was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.   Now, going to the overt acts, or the predicate acts, going to the first one, Mr. Montgomery, can you tell the ladies and gentlemen what the first predicate act you pled guilty to pursuant to that plea agreement?

A.   To the December 19, 1989 murders of Maurice Hallman and Leonard Hyson.

Q.   Actually that's number two.  I would ask you to look just above that.  It should be on the --

A.   I'm sorry.  To conspiracy, conspiracy to distribute and possess with intent to distribute 1,000 kilograms of marijuana.

Q.   Okay.  And let me just stop you and ask you about that.  Were you involved in a marijuana conspiracy in the 1990's?

A.   Once it was explained to me, yes, I realized that I was.

Q.   At the time you were selling marijuana did you believe you were involved in a conspiracy?

A.   No.

Q.   As you understand it, your responsibility here, you say that you pled guilty to distribute and possess over a thousand

SA-417

78

kilos of marijuana, did you -- do you believe you personally sold a thousand kilos of marijuana?

A.    No.

Q.    What is your understanding of why it is you're responsible for selling 1,000 kilos of marijuana?

A.    I don't remember -- I don't remember how it was explained to me, but I remember certain aspects.

Q.    Well, what is your understanding of why it is you are responsible for selling a thousand kilos if you didn't personally sell a thousand kilos?

A.    If I am correct, that any conspiracy that everyone is responsible for -- everyone who sold it is responsible for each other.

Q.    Now, going to number two, what was the second predicate act that you admitted your responsibility for?

A.    For the December 19, 1989 murders of Maurice Hallman and Leonard Hyson.

Q.    Did you participate in the murders of Maurice Hallman and Leonard Hyson?

A.    Yes.

Q.    Going to number three, what was the third predicate act that you admitted responsibility for in that plea?

A.    Assault with intent to kill of a police officer on September 10, 1991.

Q.    Where did that shooting occur?

SA-418

79

A.    On East Capitol Street.

Q.    Did you participate in that shooting?

A.    Yes.

Q.    What was the fourth predicate act that you admitted responsibility for?

A.    First degree murder while armed on June 22, 1994, the murder of Timothy Benton.

Q.    Did you participate in the murder of Timothy Benton on June 22, 1994?

A.    Yes.

Q.    What was the fifth predicate act that you pled guilty to, or I should say admitted responsibility for?

A.    Conspiracy to commit murder in connection with the efforts made to kill Kenneth Adams.

Q.    And Kenneth Adams, as far as you knew at the time, was a government witness at the time you were trying to kill him?

A.    Yes.

Q.    Is that why you were trying to kill him?

A.    Yes.

Q.    What was the sixth predicate act that you admitted responsibility for in that plea?

A.    Aiding and abetting in first degree premeditated murder in connection with Chrishauna Gladden's murder.

Q.    Which occurred when?

A.    October 5, 1996.

SA-419

80

Q.    What was the seventh -- let me jump back.  Did you participate in the murder of Chrissy Gladden and assist in that murder?

A.    Yes.

Q.    And number seven, what was that predicate act that you admitted responsibility for?

A.    Three counts of attempted armed robbery and three counts of murder in connection with the November 17, 1996 murders of Alonzo Gaskins,  Darnell Mack, and Melody Anderson.

Q.    Mr. Montgomery, did you participate in that home invasion and subsequent murders of those three individuals?

A.    Yes.

Q.    What was the eighth and final predicate act that you admitted responsibility for in connection with this plea?

A.    Conspiracy to commit murder in connection with the efforts to find and kill Robert Smith, aka Butchie, a government witness.

Q.    Did you make efforts to try and find and kill Butchie?

A.    Yes.

Q.    What was the reason you were trying to kill Butchie, was it because of his status as a government witness?

A.    No.  Because of some information he found out about us.

        MR. KIERSH:  Objection.

        MR. ZEIDENBERG:  I will rephrase it, Your Honor.

        THE COURT:  Do you want to approach the bench?

SA-420

81

MR. KIERSH: If the question is going to be rephrased so that we avoid the problem then we don't need to.

THE COURT: Well, I'm not sure what the rephrasing is that needs to be made. Do you mean it was a leading question?

MR. KIERSH: No, no, Your Honor. It's the substance of it. Mr. Zeidenberg has already agreed to rephrase it to avoid problems.

BY MR. ZEIDENBERG:

Q. Did you believe that Butchie, Robert Smith, might end up testifying against you and others?

A. Yes.

Q. Is that why you wanted to kill him?

A. Yes.

Q. Now, what is your understanding, Mr. Montgomery, of what penalties you face potentially in connection with this plea agreement that you signed, this last plea agreement, in November of 2000?

A. Excuse me?

Q. What do you think -- what's your penalty? What's the possible penalty in this case?

A. Life without parole.

Q. Mr. Montgomery, can you tell the ladies and gentlemen when you first started committing robberies in the District of Columbia, how old were you? When I say robberies -- let me

conspiracy alleged here.

THE COURT: And I will reiterate the instruction, if you will remind me on Monday, that this background material is not charged in the indictment and is to be considered by the jury only in connection with Mr. Montgomery's credibility.

MR. BESHOURI: I appreciate that, Your Honor. It, obviously, has an impact on my client. And I am asking the Court to put some brakes on to what extent the government can go into this just to establish a relationship. They have, obviously, established a relationship, so the need for this kind of testimony is -- frankly, it's unnecessary to establish a relationship any longer. All it's doing is piling on during a period that precedes the conspiracy by many, many years.

THE COURT: At the moment it does not appear to me to be excessive, but I will keep that in mind. If you will remind me on Monday, if you wish a repetition of the cautionary instruction, I will be glad to give it.

MR. BESHOURI: Very well.

MR. ZUCKER: Your Honor, if I may, it was touched on before by Mr. Beshouri but it seems to have fallen by the wayside. On the 302s -- in connection with the conversation on the 302s that Agent Lisi prepared there was also reference to some notes he prepared, notes he made while interviewing Mr. Montgomery, and I would ask that those be --

THE COURT: I have reviewed those.

SA-422

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

91

MR. ZUCKER:  You have?

THE COURT:  I have reviewed Agent Lisi's notes. They do not constitute Brady material --

MR. ZUCKER:  Or Jencks?

THE COURT:  And none that I saw would be characterized as Jencks Act statements.

MR. ZUCKER:  Thank you.

THE COURT:  Monday morning at 10:00.

(Whereupon, the hearing was adjourned at 4:35 p.m.)

SA-423

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,

    VS.                              :    CR. NO. 98-329

VINCENT HILL,                        :
JEROME MARTIN,                       :
SAMUEL CARSON,                       :
WILLIAM K. SWEENEY,                  :
SEAN COATES,                         :
        DEFENDANTS.                  :

UNITED STATES                        :
        GOVERNMENT,                  :

    VS.                              :

GARY PRICE,                          :
        DEFENDANT                    :

**FILED**

**JUL 1 9 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

CR. NO. 99-348

WASHINGTON, D. C.
MARCH 12, 2001
(MORNING SESSION)
(10:45 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                 PHYLLIS MERANA
                                6816 U. S. DISTRICT COURT
                                3RD & CONSTITUTION AVE., N.W.
                                WASHINGTON, D. C. 20001

SA-424

679

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001


FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C.  20004


FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C.  20001


FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C.  20004


FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C.  20004


FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C.  20004

SA-425

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 434 of 668

ON THE POSTER BOARDS, THE NAMES OF THE INDIVIDUALS ON THE POSTER BOARDS SHOULD BE REMOVED.

THE SECOND MOTION IS MORE COMPLICATED. IT'S MR. CARSON'S MOTION FOR DISCLOSURE OF THE F.B.I. 302'S, WHICH HAVE BEEN INCLUDED IN THE FILE MATERIAL RESPECTING JAMES MONTGOMERY THAT I HAVE PREVIOUSLY REVIEWED FOR THE PRESENCE OF BRADY MATERIAL.

I HAVE RE-REVIEWED THAT FILE AND HAVE MARKED THOSE ITEMS WHICH I BELIEVE TO BE JENCKS MATERIAL, AND IT IS MY TENTATIVE CONCLUSION THAT THE 302'S -- AND I BELIEVE I AM CORRECT IN SAYING ALL OF THEM -- ARE PROPERLY CHARACTERIZED AS JENCKS MATERIAL.

THEY ARE, FOR ALL PRACTICAL PURPOSES, SIMPLY A NARRATIVE RECITATION OF WHAT WAS IMPARTED TO SPECIAL AGENT LISI BY MR. MONTGOMERY ON THE VARIOUS OCCASIONS ON WHICH HE WAS INTERVIEWED. THERE DOES NOT APPEAR TO BE ANY EDITORIAL ACTIVITY WITH RESPECT TO WHAT IS RECORDED THERE. THERE DOES NOT APPEAR TO HAVE BEEN ANY EXTRANEOUS IMPRESSION INCLUDED IN ANY OF THE 302'S, NOR INFORMATION DERIVED FROM OTHER SOURCES. IT IS SIMPLY A RECITATION OF INFORMATION SUPPLIED BY THE WITNESS, MONTGOMERY.

AND NOTWITHSTANDING UNITED STATES VERSUS DONATO AND THE OBSERVATIONS ABOUT 302'S IN THAT OPINION, IT IS MY JUDGMENT, SUBJECT TO SOME SHOWING BY THE GOVERNMENT TO THE CONTRARY, THAT THE 302'S ARE JENCKS ACT STATEMENTS, FOR ALL

SA-426

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 435 of 668

PRACTICAL PURPOSES, AND SHOULD BE SUPPLIED TO THE DEFENSE.

WITH THAT SAID, I WILL HEAR YOU.

MR. ZEIDENBERG:  YOUR HONOR, IT'S OUR VIEW THAT GIVEN THE MANNER IN WHICH THE NOTES ARE TAKEN, WHICH ARE ROUGH NOTES, AND EVEN THOUGH THE 302'S COME OUT IN A COMPLETED VERSION, IT IS CERTAINLY OUR VIEW THEY ARE NOT SUBSTANTIALLY VERBATIM AND, THEREFORE, WOULD NOT CONSTITUTE JENCKS.

NOTWITHSTANDING OUR VIEW ON THAT, WE'RE NOT GOING TO -- I DON'T FEEL IT'S NECESSARY OR APPROPRIATE TO ARGUE THE MATTER.  AND WE WILL COMPLY WITH THE COURT'S --

THE COURT:  ALL RIGHT.  I AM DRAWING UPON THE QUOTATION IN DONATO, WHICH IN TURN QUOTES PALERMO VERSUS UNITED STATES, THE SUPREME COURT DECISION OF 1959, WHICH SAYS THAT JENCKS-ACT-COVERED STATEMENTS CAN BE FAIRLY USED BY THE DEFENSE TO IMPEACH A GOVERNMENT WITNESS.  AND THERE ARE, AS I AM SURE YOU ARE AWARE, A NUMBER OF CONTRADICTIONS IN THE VARIOUS ACCOUNTS THAT MR. MONTGOMERY HAS GIVEN SPECIAL AGENT LISI AS TIME PASSED.  AND I THINK THOSE ARE FAIR GAME FOR CROSS-EXAMINATION.

MR. ZEIDENBERG:  AS I SAID, YOUR HONOR, WE CERTAINLY DON'T WISH TO ARGUE WITH THE COURT OVER THAT CONCLUSION.

THE COURT:  ALL RIGHT.

MR. ZEIDENBERG:  AND WE WILL COMPLY.  THERE ARE A

SA-427

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 436 of 668

FEW MATTERS THAT WE WOULD BE SEEKING TO REDACT THAT GO TO

SECURITY CONCERNS, SUCH AS THE LOCATION OF A PARTICULAR

INTERVIEW AND THOSE TYPES OF MATTERS.

THE COURT:  THAT MAY BE REDACTED, YES.

MR. ZEIDENBERG:  AND ONCE WE HAVE THOSE REDACTIONS

MADE, WE WILL PROVIDE THE 302'S.

THE COURT:  ALL RIGHT.  I WILL ALSO STATE FOR

MR. DAVIS' BENEFIT THAT I HAVE REVIEWED THE MATERIAL.  I

HAVE RE-REVIEWED THE MATERIAL SPECIFICALLY RELATING TO

MR. MONTGOMERY'S ADMISSION TO THE WITNESS SECURITY PROGRAM,

AND I FIND NOTHING THAT COULD BE CHARACTERIZED AS BRADY

MATERIAL IN THERE, INCLUDING MATTERS RELATING TO

MR. MONTGOMERY'S MENTAL ACUITY.

ALL RIGHT.  ARE WE READY TO PROCEED?

MR. ZEIDENBERG:  YES, YOUR HONOR.

MR. BESHOURI:  I AM SORRY, YOUR HONOR.

THE COURT:  MR. BESHOURI.

MR. BESHOURI:  YES, IF I MAY.  I HAVE ONE BRIEF

MATTER BEFORE MR. ZEIDENBERG BEGINS.  SINCE THE WITNESS IS

HERE, IF WE CAN TAKE IT AT THE BENCH, YOUR HONOR

THE COURT:  SURE.

(BENCH CONFERENCE.)

SA-428

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
       GOVERNMENT,

  VS.                     :    CR. NO. 98-329

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,
       DEFENDANTS.

**FILED**

**JUL 1 9 2001**

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES
       GOVERNMENT,

  VS.               :    CR. NO. 99-348

GARY PRICE,
       DEFENDANT

WASHINGTON, D. C.
MARCH 15, 2001
(MORNING SESSION)
(10:15 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:      PHYLLIS MERANA
                        6816 U. S. DISTRICT COURT
                        3RD & CONSTITUTION AVE., N.W.
                        WASHINGTON, D. C. 20001

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 438 of 668

2

FOR THE GOVERNMENT:                     PETER ZEIDENBERG, AUSA
                                        ANJALI CHATURVEDI, AUSA
                                        555 4TH ST., N.W.
                                        WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:                 CHRISTOPHER DAVIS, ESQ.
                                        601 INDIANA AVE., N.W.
                                        #910
                                        WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:               JOANNE HEPWORTH, ESQ.
                                        305 H STREET, N.W.
                                        2ND FLOOR
                                        WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:               JOSEPH BESHOURI, ESQ.
                                        LEXI NEGIN-CHRIST, ESQ.
                                        419 7TH STREET, N.W.
                                        WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:              STEVEN R. KIERSH, ESQ.
                                        717 D STREET, N.W.
                                        SUITE 400
                                        WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:               FREDERICK JONES, ESQ.
                                        901 6TH STREET, S.W.
                                        #409
                                        WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:                JONATHAN ZUCKER, ESQ.
                                        601 INDIANA AVE., N.W.
                                        #901
                                        WASHINGTON, D. C.  20004

SA-430

3

INDEX

WITNESS:                          CROSS (CONTINUED.)

JAMES MONTGOMERY

    BY MR. KIERSH              6

SA-431

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 440 of 668

12

GETTING UP, SO YOU DROVE AROUND TO DRIVE OVER HIM?

A.  THAT WAS MY INTENT.

Q.  RIGHT.  DID YOU DRIVE OVER HIM?

A. I AM NOT SURE IF I DID OR NOT, BUT THAT WAS MY INTENT.

Q.  RIGHT, BUT DIDN'T YOU FEEL A BUMP LIKE GOING OVER SOMETHING?

A. I DON'T REMEMBER IF I DID FEEL A BUMP OR NOT.

Q.  DID YOU KNOW MR. BENTON?

A.  VERY BRIEFLY.

Q.  HOW BRIEFLY?

A.  MAYBE A FEW MONTHS.

Q.  OKAY.  AND WAS HE EVER OUT ON K STREET, SOUTHWEST, SELLING MARIJUANA?

A.  NO.

Q.  THE REASON THAT HE GOT MURDERED HAD NOTHING TO DO WITH K STREET, SOUTHWEST; DID IT?

A. TO MY UNDERSTANDING, IT DIDN'T HAVE ANYTHING TO DO WITH IT.

Q.  I AM JUST ASKING YOU ABOUT YOUR KNOWLEDGE.  IT HAD NOTHING TO DO WITH IT; ISN'T THAT CORRECT?

A.  CORRECT.

Q.  OKAY.  AND YOU NEVER WENT TO THE POLICE AND SAID -- BEFORE YOU ENTERED YOUR PLEA AND SAID, "YOU KNOW, BY THE WAY, THIS GUY, MAURICE PROCTOR, WENT OUT AND SHOT THIS GUY IN MY CAR."  ISN'T THAT RIGHT?

SA-432

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 441 of 668

13

A.  NO.

Q.  AS A MATTER OF FACT, THE ONLY THING -- THE GUY WAS SHOT WHERE?  IN THE HEAD IN YOUR CAR?

A.  YES.

Q.  OKAY.  AND WHAT UPSET YOU ABOUT MR. BENTON BEING SHOT IN THE HEAD IN YOUR CAR WAS NOT THAT THE GUY GOT SHOT IN THE HEAD, BUT IT WAS THAT YOUR CAR GOT HURT OR TOOK SOME DAMAGE?

A.  NOT ONLY THAT.  IT WAS BECAUSE IT WAS DONE WITHOUT MY KNOWLEDGE AND BECAUSE HE DONE IT IN MY CAR.

Q.  RIGHT.  YOU DIDN'T LIKE THAT HE DID IT IN YOUR CAR?

A.  CORRECT.

Q.  AND YOU DIDN'T LIKE THAT HE KILLED A GUY WITHOUT LETTING YOU KNOW AHEAD OF TIME?

A.  CORRECT.

Q.  HAD MR. BENTON DONE ANYTHING TO HURT YOU BEFORE THIS EVENT?

A.  NOT AT ALL.

Q.  AND SO THIS MAN IS LYING ON THE GROUND AFTER YOUR THREW HIM OUT OF THE CAR, SUFFERING FROM A GUNSHOT WOUND -- AT LEAST YOU THOUGHT TO HIS HEAD -- AND THIS IS A GUY WHO HAD DONE NOTHING WRONG TO YOU, BUT YET YOU TURN YOUR CAR AROUND AND TRY TO DRIVE OVER HIM?

A.  CORRECT.

Q.  AND THAT'S NOT PART OF ANY CONSPIRACY; IS THAT RIGHT -- MR. BENTON'S MURDER, AS FAR AS YOU KNOW?

SA-433

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 442 of 668

14

A.  AS FAR AS I KNOW.

Q.  OKAY.  THAT WAS JUST YOU AND MR. PROCTOR DOING SOMETHING?

A.  YES.

Q.  OKAY.

THEN YOU TOLD US ABOUT -- YESTERDAY FOR QUITE SOME TIME YOU TOLD US ABOUT THE TRIPLE MURDER IN TEMPLE HILLS.  I AM CERTAIN YOU RECALL THAT TESTIMONY; CORRECT?

A.  CORRECT.

Q.  OKAY.  NOW, MELODY ANDERSON, THE YOUNG WOMAN WHO WAS KILLED OUTSIDE THE HOUSE -- YOU DIDN'T KNOW HER, DID YOU?

A.  NO.

Q.  YOU NEVER HAD ANY CONTACT WITH HER, DID YOU?

A.  NO.

Q.  "LONNIE" GASKINS.  DID YOU KNOW "LONNIE" GASKINS?

A.  NO.

Q.  DID YOU HAVE ANY CONTACT WITH HIM?

A.  NO.

Q.  OKAY.  AND YOU KNEW -- DID YOU KNOW DARNELL MACK?

A.  I DIDN'T KNOW HIM ON A PERSONAL LEVEL, BUT I KNEW WHO HE WAS.

Q.  YOU KNEW WHO HE WAS?

A.  AND HE KNEW WHO I WAS.

Q.  WELL, HOW DO YOU KNOW THAT HE KNEW WHO YOU WERE?

A.  I MEAN HE SPOKE TO ME BEFORE.  I AM NOT SURE IF HE KNEW

SA-434

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 443 of 668

20

PERRY AND DARNELL MACK?

A.   TO MY UNDERSTANDING, YES.

Q.   AND YOU WERE INVITED TO THE PARTY?

A.   YES.

Q.   OKAY.

SO IN TERMS OF THE PREDICATE ACTS TO THE RICO CONSPIRACY THAT YOU ACKNOWLEDGE INVOLVEMENT WITH, THERE WERE SIX MURDERS SO FAR THAT WE'VE TALKED ABOUT; CORRECT?

A.   YES.

Q.   OKAY.  AND THEN YOU ALSO TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR INVOLVEMENT IN THE MURDER OF CHRISHAUNA GLADDEN; CORRECT?

A. CORRECT.

Q.   SO THERE ARE SEVEN MURDERS THAT YOU'RE DIRECTLY INVOLVED WITH AND YOU ACKNOWLEDGE AS PREDICATE ACTS AS PART OF YOUR PLEA BEFORE THIS COURT; CORRECT?

A.   CORRECT.

Q.   OKAY.  NOW, DO YOU KNOW ANYTHING ABOUT A DOMINICO BENSON?

A.   YES.

Q.   WERE YOU INVOLVED IN HIS MURDER?

A. NO.

Q.   MICHAEL SALTERS?  WERE YOU INVOLVED IN HIS MURDER?

A.   NO.

Q.   NOW, WE HAVE GOT SEVEN MURDERS THAT YOU HAVE TOLD THE

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 444 of 668

21

LADIES AND GENTLEMEN OF THE JURY ABOUT.

YOU TOLD US THAT YOU WERE INVOLVED WITH AN ASSAULT WITH INTENT TO KILL A POLICE OFFICER; IS THAT CORRECT?

A.   YES.

Q.   THAT YOU WERE DIRECTLY INVOLVED WITH, RIGHT?

A.   CORRECT.

Q.   OKAY.   AND YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY ABOUT YOUR PLANS TO DISCUSS KILLING "WOOZIE," WHOSE REAL NAME IS THOMAS FIELDS; IS THAT RIGHT?

A.   YES.

Q.   OKAY.   AND MR. FIELDS WAS FROM L STREET; RIGHT?

A.   YES.

Q.   YOU DIDN'T KNOW MR. FIELDS?

A.   I DIDN'T KNOW HIM?

Q.   DID YOU KNOW HIM?

A.   YES.

Q.   YOU KNEW HIM PERSONALLY?

A.   YES.

Q.   DID YOU CONSIDER HIM TO BE A FRIEND?

A.   YES, BEFORE THE BEEF HIT.   BEFORE THE BEEF CAME DOWN, YES.

Q.   HE WAS A FRIEND OF YOURS?

A.   HE WAS ALL RIGHT.

Q.   ALL RIGHT, BUT THEN HE WAS A GUY, YOU KNOW, YOU GOT INTO THIS BEEF WITH, AND THEN YOU SAID, "I AM GOING TO GO OUT AND

SA-436

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 445 of 668

22

TRY TO KILL THIS GUY"?

A. NO.

Q. WELL, DIDN'T YOU SHOOT AT HIM?

A. YES.

Q. OKAY.

AS A MATTER OF FACT, YOU TOLD THE LADIES AND GENTLEMEN OF THE JURY THAT YOU SHOT AT A CAR THAT YOU THOUGHT MR. FIELDS WAS IN, BUT YOU DIDN'T EVEN KNOW IF HE WAS IN THERE, CORRECT?

A. I AM NOT SURE IF HE WAS IN IT OR NOT, BUT SHOTS WERE FIRED FROM THAT CAR.

Q. RIGHT. BUT DIDN'T YOU SHOOT BACK AT THAT CAR?

A. BECAUSE THEY SHOT AT ME.

Q. DIDN'T YOU SHOOT BACK AT THE CAR?

A. YES.

Q. AND YOU DIDN'T KNOW WHO WAS IN THERE?

A. NO.

Q. OKAY.

AND YOU ALSO TOLD US ABOUT WORM'S MOTHER. DO YOU REMEMBER THAT?

A. CORRECT.

Q. OKAY. NOW, WORM'S MOTHER, AS WE LEARNED FROM YOUR TESTIMONY, IS SOMEBODY THAT YOU THOUGHT WAS A WITNESS TO A CRIME, CORRECT?

A. NO, THAT'S NOT CORRECT.

SA-437

Q. OKAY. WHAT WERE YOU TOLD ABOUT WORM'S MOTHER?

A. THAT SHE WAS A WITNESS TO "BIRD" TRYING TO DISPOSE OF THE CAR OR TRYING TO BURN UP THE CAR.

Q. SO SHE IS A WITNESS TO SOMETHING THAT HAPPENED? IS THAT A FAIR CHARACTERIZATION?

A. YES.

Q. OKAY. AND WHATEVER IT IS SHE WITNESSED, YOU WERE NOT INVOLVED WITH?

A. NO.

Q. OKAY.

SO SOMEBODY TELLS YOU, "WELL, WORM'S MOTHER IS A WITNESS TO AN EVENT; SHE NEEDS TO BE KILLED"; IS THAT RIGHT?

A. CORRECT.

Q. AND YOU, NOT EVEN KNOWING THIS WOMAN -- YOU DIDN'T KNOW HER; RIGHT?

A. NO.

Q. YOU DIDN'T KNOW ANYTHING ABOUT HER; RIGHT?

A. NO.

Q. BUT YOU DID KNOW A COUPLE OF THINGS. YOU KNEW SHE WAS SOMEBODY'S MOTHER?

A. CORRECT.

Q. YOU KNEW SHE HAD A JOB?

A. CORRECT.

Q. YOU DIDN'T HAVE A JOB; DID YOU?

A. NO.

SA-438

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 447 of 668

24

Q. AND YOU KNEW THAT SHE LIVED IN A ROWHOUSE SOMEWHERE; CORRECT?

A. YES.

Q. AND WITH THAT INFORMATION, AND SHE NOT HAVING ANY INFORMATION, AS FAR AS YOU KNEW, ABOUT ANYTHING YOU'RE INVOLVED WITH, YOU GO OUT AND TRY TO FIND OUT WHERE SHE LIVES SO THAT YOU COULD BE A PARTICIPANT IN KILLING HER; ISN'T THAT RIGHT?

A. NO, THAT'S INCORRECT.

Q. WELL, DIDN'T YOU TRY TO FIND OUT WHERE SHE LIVED?

A. "BIRD" SHOWED ME.

Q. OKAY. DIDN'T YOU GO AND MAKE SOME ARRANGEMENTS TO TRY TO LOCATE HER?

A. YES.

Q. AND WASN'T IT GOING TO BE PART OF YOUR PLAN THAT IF YOU HAD THE OPPORTUNITY, YOU WOULD HAVE KILLED THIS WOMAN?

A. PRETTY MUCH, YES.

Q. WELL, NOT PRETTY MUCH. IT'S TRUE IF YOU HAD THE OPPORTUNITY, YOU WOULD HAVE KILLED HER?

A. YES.

Q. YOU WOULD HAVE DONE IT YOURSELF?

A. YES.

Q. AND YOU WOULD HAVE DONE IT WITH ONE OF THOSE FIVE OR SIX GUNS THAT YOU TOLD THE JURY ABOUT YESTERDAY THAT WERE IN YOUR POSSESSION FROM '94 TO '97; CORRECT?

SA-439

A. YES.

Q. OKAY. YOU DIDN'T KNOW IF SHE HAD ANY CHILDREN WHO WERE DEPENDING ON HER; DID YOU?

A. NO. I DON'T KNOW IF SHE -- I DON'T KNOW IF HER KIDS WERE DEPENDING ON HER OR NOT.

Q. YOU DIDN'T CARE; DID YOU?

A. NO.

Q. IT WAS JUST THAT IF SHE'S OUT THERE AND SHE'S A WITNESS AND SHE CAN DO SOME HARM, THAT'S ENOUGH INFORMATION FOR YOU THAT IF YOU HAD THE OPPORTUNITY, YOU WOULD HAVE JUST GONE AND KILLED THIS WOMAN?

A. YES. THAT WAS MY INTENT.

Q. THAT WAS YOUR INTENT?

A. I TALKED TO "CHIN" ABOUT IT. "CHIN" TOLD ME NOT TO DO IT. HE SAID, "FUCK 'BIRD.'"

Q. ALL RIGHT.

A. THAT "BIRD" IS TRYING TO USE ME TO DO IT.

Q. BUT YOU WOULD HAVE DONE IT?

A. ONCE "CHIN" TOLD ME NOT TO, NO, I WASN'T GOING TO DO THAT.

Q. UP UNTIL THAT POINT?

A. UP UNTIL THAT POINT, YES, I WAS GOING TO DO IT.

Q. THEN YOU TOLD US ABOUT -- BY THE WAY, DID YOU TELL THE GOVERNMENT ALL OF THIS ABOUT WORM'S MOTHER?

A. YES.

SA-440

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 449 of 668

26

Q.   AND ALL OF THIS BACK IN '97?

A.   I AM NOT SURE IF I DID OR NOT.

Q.   OKAY.

     THEN YOU TOLD US YESTERDAY ABOUT YOU WOULD DO ARMED ROBBERIES AT THE REQUEST OF "DAHRU" AND CHANDLER.  DO YOU REMEMBER THAT?

A.   YES.

Q.   NOW, WHAT'S "DAHRU'S" REAL NAME?

A.   AND SOMETIMES "CHIN"

Q.   WHAT'S "DAHRU'S" REAL NAME?

A.   DIHRU.

Q.   DIHRU.  I AM SORRY.  WHAT'S HIS REAL NAME?

A.   DARRYL YOUNG.

Q.   OKAY.  AND WHAT'S CHANDLER'S REAL NAME?

A.   ANTHONY CHANDLER.

Q.   OKAY.  NOW, ARE THEY OLDER THAN YOU?

A.   I BELIEVE ANTHONY CHANDLER IS.

Q.   WHAT ABOUT "DIHRU"?

A.   I DON'T THINK "DIHRU" IS OLDER THAN ME.

Q.   OKAY.  ARE THESE GUYS GOOD FRIENDS OF YOURS?

A.   ME AND "DIHRU" WAS GOOD FRIENDS.

Q.   WHAT ABOUT ANTHONY CHANDLER?

A.   WE WAS COOL.  WE WASN'T CLOSER THAN ME AND "DIHRU."

Q.   NOW, HOW MANY TIMES DID YOU COMMIT AN ARMED ROBBERY AT THE REQUEST OF ANTHONY CHANDLER?

SA-441

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 450 of 668

27

A.  I'M NOT SURE.

Q.  WELL, WAS IT MORE THAN FIVE?

A.  I DON'T THINK SO.

Q.  AND HOW MANY TIMES DID YOU COMMIT AN ARMED ROBBERY AT THE REQUEST OF "DIHRU"?

A.  I AM NOT SURE OF THAT ONE EITHER.

Q.  WAS IT MORE THAN FIVE?

A.  I DON'T THINK SO.

Q.  WAS IT ABOUT FIVE?

A.  I DON'T THINK IT WAS FIVE.

Q.  OKAY.  WHEN DID THESE ARMED ROBBERIES OCCUR?

A.  IN '91.

Q.  OKAY.  AND HOW WOULD IT COME ABOUT?  LET'S TALK ABOUT "DIHRU" FIRST.  WOULD HE COME UP TO YOU AND SAY, "JAMES, I NEED SOME MONEY.  SO WHY DON'T YOU GO COMMIT AN ARMED ROBBERY"?  AND DID HE POINT SOMEBODY OUT?  I MEAN HOW DID IT ALL HAPPEN?

A.  SOMETIMES WHEN THEY WOULD BE GAMBLING IN THE PARK --

Q.  WHO IS THEY?

A.  MICHAEL BRODY, OR TONY BRODY, OR ALFRED BRODY.  DUDES LIKE THAT.  ALL THREE OF THEM IS BROTHERS.  IT WAS NOT JUST THEM.  IT WAS OTHER INDIVIDUALS --

Q.  THESE ARE THE GAMBLERS?

A.  -- THAT WERE GAMBLING, YES.

Q.  ALL RIGHT.

SA-442

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 451 of 668

A.   SOMETIMES "CHIN" WOULD BE GAMBLING.  SOMETIMES "MEECHIE" WOULD BE GAMBLING AND THINGS LIKE THAT.  AND I WOULD COME OVER JUST LIKE -- SOMETIMES I WOULD GO TO A CRAPGAME BY MYSELF, BUT AS FAR AS "DIHRU" OR ANTHONY CHANDLER, SOMETIMES THEY WOULD LET ME KNOW WHERE THEY WAS GAMBLING AT AND WHO WAS WINNING THE MONEY.

SO IF IT WAS LIKE MICHAEL BRODY, OR TONY BRODY, OR ONE OF THEM, I KNEW THEM AND THEY WAS ALL RIGHT, BUT I DIDN'T REALLY MESS WITH THEM.  AND I WOULD ASK THEM -- LIKE AFTER THEY WIN A SUBSTANTIAL AMOUNT OF MONEY OR GET READY TO LEAVE THE CRAPGAME, I WOULD ASK THEM FOR MAYBE A HUNDRED DOLLARS, KNOWING THAT THEY WASN'T GOING TO GIVE IT TO ME AND THAT WOULD BE MY REASON TO TAKE IT -- TO TAKE ALL THEIR MONEY.

Q.   BECAUSE THEY WOULDN'T GIVE YOU THEIR MONEY?

A.   RIGHT.

Q.   SO THAT, TO YOU, ENTITLED -- IN YOUR MIND, THAT SAID, "WELL, IF THEY ARE NOT GOING TO GIVE ME THEIR MONEY, THEN I AM ENTITLED TO STEAL THEIR MONEY"?

A.   RIGHT.  AND THEN I WOULD GIVE -- FOR "DIHRU," OR ANTHONY CHANDLER, OR "CHIN," OR WHOEVER THAT PUT ME ON TO THE CRAPGAME, I WOULD GIVE THEM A CUT OUT OF THE MONEY.

Q.   OKAY.  SO YOU WOULD TAKE SOME FOR YOURSELF AND GIVE SOME TO SOMEBODY ELSE?

A.   I'D TAKE MOST OF IT FOR MYSELF, BUT I WOULD ALWAYS GIVE

SA-443

Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 29 of 88

29

THEM A CUT.

Q.  HOW MUCH WOULD YOU TAKE YOURSELF?  75 PERCENT?

A.  PROBABLY SO.

Q.  OKAY.  NOW, WHEN YOU ROBBED THESE PEOPLE, DID YOU HAVE A WEAPON?

A.  SOMETIMES.

Q.  DID YOU TAKE OUT -- DID YOU DISPLAY YOUR WEAPON?

A. SOMETIMES.

Q.  AND ON THOSE "SOMETIMES" WHEN YOU DISPLAYED THE WEAPON, DID YOU POINT IT AT THEM?

A.  YES.

Q.  WAS THE WEAPON LOADED?

A. YES.

Q.  AND DID YOU TELL THEM, "GIVE ME THE MONEY OR I AM GOING TO SHOOT YOU"?

A. PRETTY MUCH, YES.

Q.  AND IF THEY DIDN'T GIVE YOU THE MONEY, YOU WERE GOING TO SHOOT THEM?

A.  I PROBABLY WOULD HAVE CRACKED THEM ACROSS THE HEAD WITH IT.

Q.  YOU WOULD HAVE DONE SOMETHING TO HURT THEM?

A. YES.

Q.  BECAUSE YOU FELT THAT YOU WERE ENTITLED TO THAT MONEY BECAUSE YOU WANTED IT?

A.  YES.

SA-444

USCA Case 1:98-cr-00329-RCL    Document 682    Filed 07/19/01    Page 30 of 88

30

Q.  AND IF YOU WANT SOMETHING, YOU'RE GOING TO GO AND DO WHAT YOU'VE GOT TO DO TO GET IT, RIGHT?

A.  YES.

Q.  NOW, YOU TOLD US YESTERDAY THAT SOMETIMES YOU WOULD HIT PEOPLE IN THE HEAD WITH A PISTOL.  WAS THAT THESE GUYS -- THESE GAMBLERS?

A.  I NEVER HAD TO.

Q.  BUT YOU WOULD HAVE DONE IT?

A.  YEAH.

Q.  AND YOU TOLD US THAT YOU WOULD PUNCH THEM IN THE HEAD SOMETIMES?

A.  YEAH.

Q.  IS THAT HOW YOU WOULD GET THE MONEY IF YOU DIDN'T HAVE A WEAPON ON YOU?

A.  IF I HAD THE WEAPON ON ME, SOMETIMES I WOULD PUNCH THEM.

Q.  JUST PUNCH THEM.  WELL, IF YOU HAD THE WEAPON, WHY DID YOU HAVE TO PUNCH THEM?

A.  BECAUSE I WOULD MUCH RATHER KNOCK THEM OUT AND TAKE IT.

Q.  I SEE.  KNOCK THEM UNCONSCIOUS?

A.  YES.

Q.  OKAY.  AND YOU ALSO SAID SOMETIMES YOU WOULD CHOKE PEOPLE?

A.  YEAH.

Q.  THIS IS TO GET THE MONEY FOR YOURSELF, AND DIHRU, AND CHANDLER?

SA-445

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 454 of 668

31

A.    PRETTY MUCH FOR MYSELF.

Q.    FOR YOURSELF.

AND YOU ALSO TOLD US THAT WHEN YOU WERE SENT TO THE HALFWAY HOUSE, YOU LIED ABOUT WORKING; CORRECT?

A.    YES.

Q.    AND THAT'S BECAUSE YOU DIDN'T WANT TO BE IN THE HALFWAY HOUSE?

A.    CORRECT.

Q.    NOW, A HALFWAY HOUSE IS MUCH LESS RESTRICTIVE THAN A JAIL OR PRISON; ISN'T THAT RIGHT?

A.    YES.

Q.    LIKE IN A HALFWAY HOUSE, DURING THE DAY YOU CAN BE OUT DOING YOUR BUSINESS; RIGHT?

A.    YES.

Q.    YOU JUST HAVE TO BE IN THERE AT NIGHT?  THEY SET A CURFEW FOR YOU?

A.    RIGHT.

Q.    SO IT'S NOT SO BAD; RIGHT?

A.    CORRECT.

Q.    BUT YOU WOULD STILL LIE TO GET YOURSELF OUT OF JUST A HALFWAY HOUSE?

A.    YES.

Q.    BECAUSE THAT SUITED YOUR NEEDS?

A.    YES.

Q.    AND YOU ALSO TOLD US THAT YOU HAVE LIED TO COURTS?

SA-446

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 455 of 668

32

A. YES.

Q. LIKE, FOR INSTANCE, EVERY TIME YOU'D COME UP FOR A SENTENCING IN ONE OF YOUR CRIMINAL CASES, YOU WOULD TELL THE JUDGE OR TELL THE PROBATION OFFICER, WHEN THEY DRAFTED THE PRESENTENCE REPORT, "LOOK, I AM OKAY NOW. I AM GOING TO LEAD A STRAIGHT LIFE. I AM GOING TO BE CLEAN." BUT YOU HAD NO INTENTION OF DOING SO; ISN'T THAT RIGHT?

A. I THINK ON A FEW OCCASIONS I MIGHT HAVE HAD INTENTIONS OF DOING RIGHT, BUT I THINK AT SOME POINT AFTER I GOT SENTENCED OR WHATEVER, I ABANDONED THOSE PLANS.

Q. OKAY.

A. BUT I BELIEVE THAT AT THAT PRESENT TIME, I DID INTEND ON DOING RIGHT.

Q. AND YOU HAVE ALSO LIED, AS YOU TOLD US IN RESPONSE TO A QUESTION BY MR. ZEIDENBERG YESTERDAY -- YOU'VE LIED TO A GRAND JURY IN MARYLAND?

A. YES.

Q. AND THAT WAS BECAUSE YOU THOUGHT IT WAS IN YOUR INTEREST TO LIE TO THE GRAND JURY. SO YOU MADE UP A LIE; CORRECT?

A. YES.

Q. ALSO, DIDN'T YOU TELL US ABOUT A CONSPIRACY TO KILL SOMEONE NAMED ROBIN?

A. YES.

Q. WHO IS THAT?

A. SHE WAS A GOVERNMENT WITNESS AS WELL.

SA-447

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 456 of 668

CLIENT KNOWINGLY WITHHOLD EVIDENCE FROM THE GOVERNMENT, OR OTHERWISE NOT BE COMPLETELY TRUTHFUL WITH THE GOVERNMENT, OR IN HIS TESTIMONY BEFORE GRAND JURIES OR AT TRIALS, OR DECLINE TO TESTIFY IN THE GRAND JURY, OR FOR THE GOVERNMENT AT TRIAL, OR COMMIT ANY CRIME AFTER THE EXECUTION OF THIS AGREEMENT, THEN THE GOVERNMENT WILL BE FREE, ONE, TO PROSECUTE YOUR CLIENT FOR PERJURY."

NOW, LET'S JUST STOP THERE FOR A SECOND. YOU KNEW THE DAY YOU SIGNED THIS AGREEMENT THAT YOU WERE NOT BEING TRUTHFUL WITH THE GOVERNMENT; CORRECT?

A. CORRECT.

Q. YOU KNEW THE DAY YOU SIGNED THIS AGREEMENT THAT YOU WEREN'T TELLING THE GOVERNMENT EVERYTHING YOU KNEW; ISN'T THAT CORRECT?

A. CORRECT.

Q. AND AT SOME FUTURE DATE -- WELL, ACTUALLY, ON AUGUST 12TH, THE DAY YOU SIGNED THIS, YOU WENT INTO THE GRAND JURY; CORRECT?

EXCUSE ME, AUGUST 5TH, THE DAY BEFORE -- THE WEEK BEFORE YOU WENT INTO THE GRAND JURY, CORRECT?

A. I AM NOT SURE.

Q. WELL, YOU LIED IN THE PRINCE GEORGE'S COUNTY GRAND JURY; DIDN'T YOU?

A. YES.

Q. OKAY.

SA-448

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 457 of 668

INTO WITH THE GOVERNMENT IS THAT LETTER THAT YOU SIGNED ON AUGUST 12TH; CORRECT?

A.   THIS ONE?

Q.   YES.

A.   YES.

Q.   OKAY.  AND JUDGE JACKSON SAID, "WHAT I AM SAYING TO YOU IS YOU HAVE GOT TO SATISFY THE GOVERNMENT THAT YOU'RE MAKING A GENUINE EFFORT AND, INDEED, ARE SUCCESSFUL IN ASSISTING THE GOVERNMENT IN THE PROSECUTION OF SOMEONE ELSE."

DO YOU REMEMBER THAT?

A. NOT WORD FOR WORD.

Q.   BUT SOMETHING TO THAT EFFECT?

A.   YES.

Q.   OKAY.  SO EVEN THE JUDGE IS TELLING YOU THE ONLY WAY YOU'RE GOING TO AVOID THIS GUIDELINE SENTENCE OF "40 TO LIFE" IS TO FULFILL THE AGREEMENT AND COOPERATE WITH THE GOVERNMENT; CORRECT?

A.   YES.

Q.   AND AS YOU TOLD US BEFORE, WHEN YOU SIGNED THE AGREEMENT ON AUGUST 12TH, PART OF FULFILLING THE AGREEMENT WAS TO BE TRUTHFUL; CORRECT?

A.   CORRECT.

Q.   AND YOU WEREN'T TRUTHFUL?

A. NO, I WASN'T.

Q.   AND PART OF THE AGREEMENT WAS TO BE FORTHRIGHT; CORRECT?

SA-449

THAT MEANS TELLING THEM EVERYTHING YOU KNOW?

A. CORRECT.

Q. YOU WEREN'T, RIGHT? YOU DIDN'T TELL THEM EVERYTHING YOU KNEW ON AUGUST 12TH?

A. NO, I DIDN'T.

Q. AND ANOTHER PART OF THE AGREEMENT WAS THAT YOU WOULDN'T LIE IN FRONT OF ANY GRAND JURIES; CORRECT?

A. CORRECT.

Q. AND YOU DIDN'T FULFILL THAT PART OF THE AGREEMENT?

A. CORRECT.

Q. OKAY. NOW, THERE CAME A TIME --

MR. KIERSH: MAY I APPROACH THE WITNESS, YOUR HONOR?

THE COURT: YES.

BY MR. KIRSCH:

Q. WHEN YOU CAME BACK BEFORE -- WELL, STRIKE THAT.

THERE CAME A TIME THREE MONTHS LATER WHEN YOU SIGNED ANOTHER PLEA AGREEMENT WITH THE GOVERNMENT; CORRECT?

A. YES.

Q. OKAY. AND THAT WAS ON NOVEMBER 4TH, 1997, IS THAT RIGHT?

A. I AM NOT SURE.

Q. OKAY. WOULD SEEING A COPY OF IT REFRESH YOUR RECOLLECTION?

A. MAYBE.

SA-450

A. WHEN?

Q. THE NEXT DAY ON NOVEMBER 5TH, 1997.

A. I DON'T KNOW IF IT WAS NOVEMBER 5TH. I GUESS IF IT'S DOCUMENTED AS NOVEMBER 5TH, I AM NOT DISPUTING IT.

Q. WELL, WOULD SEEING A COPY OF THE TRANSCRIPT REFRESH YOUR RECOLLECTION?

A. I'M NOT TRYING TO DISPUTE IT.

Q. OKAY.

WHEN YOU CAME BEFORE JUDGE JACKSON ON NOVEMBER 13TH AND JUDGE JACKSON SPOKE TO YOU, HE EVEN MENTIONED SOME NOTIONS REGARDING SENTENCING; DIDN'T HE?

A. I BELIEVE HE MAY HAVE.

Q. AND WHAT HE SAID TO YOU IS THAT YOU ARE NOT AUTOMATICALLY EXCLUDED FROM CONSIDERATION FOR PROBATION BY THE FACT THAT NOBODY RECOMMENDED IT IN THE SUPERIOR COURT IF THE RIGHT THINGS HAPPEN IN THIS CASE IN THIS COURT. DO YOU UNDERSTAND THAT?

MR. ZEIDENBERG: COULD I GET A PAGE?

MR. KIERSH: OH, I AM SORRY. IT'S PAGE 13, LINE 19.

BY MR. KIERSH:

Q. DO YOU RECALL JUDGE JACKSON SAYING THAT TO YOU?

A. I DON'T RECALL HIM SAYING THAT, BUT I AM NOT DISPUTING IT EITHER.

Q. AND WHEN YOU ENTERED INTO THIS SECOND PLEA IN NOVEMBER

OF 1997, BEFORE YOU ENTERED INTO THE PLEA, DID YOU TELL THE GOVERNMENT -- DID YOU TELL AGENT LISI THAT YOU HAD LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

A.    WHAT PARTICULAR TIME ARE YOU SPEAKING ABOUT?

Q.    IN AUGUST OF 1997 WHEN YOU WENT INTO THE GRAND JURY IN PRINCE GEORGE'S COUNTY AND SAID, "JOHNNIE PROCTOR WENT INTO THE HOUSE AND DID THE TRIPLE."

A.    NO, I WAS NOT TRUTHFUL.

Q.    I KNOW YOU WEREN'T TRUTHFUL, BUT HAD YOU TOLD THEM PRIOR TO NOVEMBER 4TH OR 5TH, 1997, THAT YOU HAD LIED IN THE PRINCE GEORGE'S COUNTY GRAND JURY?

A.    I DON'T THINK I DID TELL THEM AT THAT TIME.

Q.    WHEN YOU ENTERED INTO THE SECOND AGREEMENT, THAT AGREEMENT HAD THE SAME REQUIREMENT THAT YOU BE FORTHRIGHT AND TELL THEM EVERYTHING YOU KNOW; RIGHT?

A.    THE SECOND AGREEMENT WAS NOT IN AUGUST OF '97.

Q.    NO.  NO.  OKAY.  I AM SORRY.  THE SECOND AGREEMENT WAS SIGNED ON NOVEMBER 4TH, '97, AND FORMALLY ENTERED IN THIS COURT ON NOVEMBER 5TH, '97; IS THAT RIGHT?

A.    YES.

Q.    AND THE SECOND AGREEMENT HAD THE SAME REQUIREMENTS AS THE FIRST AGREEMENT, THAT YOU BE FORTHRIGHT AND YOU TELL THE GOVERNMENT EVERYTHING YOU KNOW; ISN'T THAT RIGHT?

A.    CORRECT.

Q.    OKAY.  MY QUESTION IS DID YOU TELL THE GOVERNMENT,

Q. BEFORE YOU ENTERED INTO THE SECOND AGREEMENT, THAT YOU HAD LIED TO THE GRAND JURY IN PRINCE GEORGE'S COUNTY?

A. I DON'T THINK I DID.

Q. SO YOU WERE VIOLATING THE AGREEMENT RIGHT FROM THE BEGINNING; WEREN'T YOU?

A. YES.

Q. AND YOU DIDN'T TELL THE GOVERNMENT, PRIOR TO ENTERING INTO THE SECOND AGREEMENT, THAT YOU WERE INVOLVED IN THE MURDER OF MR. HALLMAN; ISN'T THAT RIGHT?

A. CORRECT.

Q. SO YOU WERE VIOLATING ON THAT LEVEL; CORRECT?

A. YES.

Q. YOU DIDN'T TELL THE GOVERNMENT ON NOVEMBER 4TH AND NOVEMBER 5TH THAT YOU WERE INVOLVED IN THE MURDER OF MR. HYSON; ISN'T THAT CORRECT?

A. CORRECT.

Q. YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE MURDER OF MR. BENTON; ISN'T THAT CORRECT?

A. CORRECT.

Q. YOU DIDN'T TELL THE GOVERNMENT YOU WERE INVOLVED IN THE TRIPLE MURDER IN TEMPLE HILLS; ISN'T THAT CORRECT?

A. CORRECT.

Q. SO ON NOVEMBER 4TH AND NOVEMBER 5TH, EVEN THOUGH THIS IS THE SECOND TIME BACK AND EVEN THOUGH YOU SWORE TO TELL THE TRUTH TO JUDGE JACKSON, YOU WERE LYING?

SA-453

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 462 of 668

A.  I THINK WITHHOLDING INFORMATION IS MORE LIKE IT.

Q.  OKAY.  WELL, DIDN'T THE AGREEMENT SAY YOU HAVE TO TELL EVERYTHING?

A.  YES.

Q.  AND YOU SAID YOU WOULD TELL EVERYTHING; RIGHT?

A.  YES.

Q.  BUT YOU DIDN'T DO IT; RIGHT?

A.  TRUE.

Q.  SO WHEN YOU SIGNED THE AGREEMENT WITH THE UNITED STATES ON NOVEMBER 4TH, WHERE YOU PROMISED TO TELL EVERYTHING, YOU WERE LYING BECAUSE YOU DIDN'T TELL THEM EVERYTHING?

A.  YES.

Q.  ISN'T THAT RIGHT?

A.  YES, YOU ARE CORRECT.

Q.  AND YOU LIED BECAUSE YOU THOUGHT IT WAS IN YOUR BEST INTEREST TO LIE; ISN'T THAT RIGHT?

A.  YES.

        MAY I ADD SOMETHING ELSE?

Q.  JUST ANSWER MY QUESTIONS.

A.  ALL RIGHT.

        THE COURT:  YOU WILL GET A CHANCE ON REDIRECT EXAMINATION TO OFFER ANY EXPLANATION YOU NEED.

        MR. KIERSH:  THE COURT'S INDULGENCE.

BY MR. KIRSCH:

Q.  NOW, YOU CAME BACK BEFORE JUDGE JACKSON IN FEBRUARY --

SA-454

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          .  Docket No. CR 98-329

      Government,               .  Washington, D.C.
                                   .  March 15, 2001
  vs.                              .  2:15 p.m.
                                   .
VINCENT HILL,                      .  (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,                       .

      Defendants                .

.  .  .  .  .  .  .  .  .  .  .  .  .

UNITED STATES OF AMERICA,          .

      Government,               .
                                   .  Docket No. CR 99-348
  vs.                              .

GARY PRICE,                        .

      Defendant.                .

.  .  .  .  .  .  .  .  .  .  .  .  .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

SA-455

USCA Case #25-3015    Document #2109460    Filed: 04/04/2025    Page 464 of 668

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

SA-456

Case 1:98-cr-00329-RCL    Document 957    Filed 03/11/03    Page 3 of 91

3

P R O C E E D I N G S

THE COURT:  Are you ready for the jury, Mr. Kiersh?

MR. KIERSH:  Yes.

THE DEPUTY MARSHAL:  Jury panel, Your Honor.

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel is all present, Your Honor.

THE COURT:  Thank you, Marshal.

MR. KIERSH:  Thank you, Your Honor.

JAMES MONTGOMERY, GOVERNMENT'S WITNESS, RESUMED THE STAND

CROSS-EXAMINATION

BY MR. KIERSH:

Q.    Mr. Montgomery, before we broke for lunch we were talking about the second plea that occurred in November of '97, correct?

A.    Second what?

Q.    November of 1997?

A.    I didn't hear the full thing you said.  The second what?

Q.    Before we broke for lunch, you were telling us about the second plea that you took, and that occurred in November of 1997; is that correct?

A.    Yes.

Q.    Okay.  Then a period of time of three years elapses, just shy of three years, and then you enter into the third plea involving your conduct in this case, correct?

SA-457

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

4

A.    Yes.

Q.    The third plea was -- you reached the agreement on the third plea on November 2, 2000; is that correct?  Would you like to see the plea agreement?

A.    Yes.

Q.    Okay.

THE COURT:    That's Sweeney 8; isn't it?

MR. KIERSH:    Sweeney 8, yes, thank you.

(Whereupon, Defendant Sweeney Exhibit No. 8 was marked for identification.)

MR. KIERSH:    May I approach, Your Honor?

THE COURT:    Surely.

BY MR. KIERSH:

Q.    Showing you what's been marked for identification -- it's actually been received in evidence as something else, but Defendant Sweeney 8.  Can you tell us what that is, sir?

A.    Yes, that's my third plea agreement.

Q.    Okay.  And go to the last page and tell us whether or not your signature appears on that?

A.    Yes.

Q.    And it's dated November 7, 2000, correct?

A.    Correct.

Q.    So it's three years and two days after your second plea, correct?

A.    After my second plea?

5

Q.    Yeah.

A.    Yes.

Q.    Okay.  Now, this third plea occurred, as far as you understand, because you came forward with more information about more criminal activity that you had been involved in; isn't that right?

A.    Correct.

Q.    But for three years in between the second and third pleas, you hadn't told anybody about this new additional criminal conduct; isn't that right?

A.    I told them about it before three years.

Q.    Excuse me?

A.    Yes, I did tell them about it before three years.

Q.    All right.  We'll get to that in a second.  The new plea -- excuse me -- the third plea, this is the plea where as part of the conspiracy that you pled to, you acknowledge participating in certain predicate acts; isn't that right?

A.    Yes.

Q.    And those were the six murders, right?

A.    Can I check?

Q.    Oh, sure, take as much time as you need.

A.    (Witness reviewing document.)  I believe there is seven.

Q.    Okay.  Well, thank you.  It's six.  It's Hallman, Hyson, Benton, the three people in Temple Hills, and Chrishauna Gladden; is that right?

SA-459

6

A.    I believe there's seven.

Q.    Okay.  Well, Chrishauna Gladden you told them about back in November of '97?

A.    Yes.

Q.    Right.  So now we come to November of 2000 and you've added six more murders?

A.    Correct.

Q.    You also added the conspiracy to find and kill Kenneth Adams.  That was a new one; is that right?

A.    I believe I told them about that before then.

Q.    Okay.  Well, you never pled to that as a predicate act before that, did you?

A.    I'm not sure if I did or not.

Q.    Do you want to see your second plea to see whether or not Kenneth Adams is included in there?

A.    I mean, I may not have told them about it.  I don't know. I'm not sure.

Q.    All right.  Then let's just talk about these six murders. How much prior to November of 2000 did you tell anyone from the government about your involvement in those six murders?

A.    How much prior to, before?

A.    Yeah, before November 2, 2000 when you signed the plea that talked about those six murders?  How much time prior to it, before November 2, had you told anyone from the U.S. Attorney's Office or from law enforcement about this?

SA-460

7

A.    Sometime in 1999.

Q.    Okay.  Do you remember about when in 1999?

A.    To be honest, no.

Q.    Okay.  Was it in the beginning, do you know, the middle, the end of '99?  And don't guess.  Only if you know.

A.    I don't know.

Q.    Okay.  So sometime from 1997 when you took the second plea in November up until some point in 1999, over a year, you weren't telling anybody about your involvement in those six murders; isn't that right?

A.    Correct.

Q.    And that was another violation of both the first plea agreement and the second plea agreement; isn't that right?

A.    Yes.

Q.    And as far as you know, during that period in excess of a year, the government law enforcement was buying your story about how much you knew; isn't that right?

A.    Yes.

Q.    So as far as you were concerned, you were doing a pretty good job of hiding information from the government for over a year?

A.    I don't agree with that.

Q.    Well, they weren't coming and saying, Mr. Montgomery, we think you're holding back.  We think you're lying; isn't that right?

SA-461

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 470 of 668

73

A. NO.

Q. OKAY. NOW, WHEN YOU GOT TO THE POINT IN TIME IN YOUR PLEA AT THE END, JUDGE JACKSON SPOKE TO YOU ABOUT THE GUIDELINE SENTENCES; DIDN'T HE?

A. I BELIEVE SO.

Q. OKAY.

IF YOU COULD JUST TURN TO PAGE 15. NOW, JUST KEEP THAT THERE. DON'T LOOK AT IT NOW. I AM GOING TO ASK YOU SOME QUESTIONS, IF YOU REMEMBER WITHOUT THE BENEFIT OF THE DOCUMENT.

JUDGE JACKSON TALKED TO YOU ABOUT THE GUIDELINES; CORRECT?

A. I BELIEVE HE DID.

Q. AND THIS IS ON AUGUST 12TH -- EXCUSE ME -- AUGUST 13, 1997; CORRECT?

A. YES.

Q. THE DAY AFTER YOU ENTERED INTO YOUR FIRST PLEA AGREEMENT?

A. CORRECT.

Q. AND JUDGE JACKSON TOLD YOU THAT THE ONLY WAY YOU'RE GOING TO AVOID A GUIDELINE SENTENCE IS TO FULFILL THE COOPERATION AGREEMENT THAT YOU HAVE ENTERED INTO WITH THE GOVERNMENT; ISN'T THAT CORRECT?

A. YES.

Q. OKAY. AND THE COOPERATION AGREEMENT THAT YOU ENTERED

SA-462

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 471 of 668

17

A.   Yes.

Q.   But you didn't testify truthfully, did you?

A.   I'm testifying truthfully now.

Q.   But I'm talking about in August of '97 you weren't testifying truthfully?

A.   Not fully, no.

Q.   Now, I want to go back in time, August 5, 1997, when you gave the statement to the Prince George's County Police.  Now, before you met with the police in Prince George's County, and you wrote out this statement that you did, the police in Prince George's County said to you, Mr. Montgomery, you're going to write out this statement, you got to be truthful; isn't that right?

A.   I didn't meet with them.  I stayed with them the whole time when they came and got me.

Q.   You wrote out a six page statement to the Prince George's County Police on August 5, 1997; isn't that correct?

A.   Yes.

Q.   And that talked about the triple murder in Temple Hills that you testified about yesterday, right?

A.   Correct.

Q.   And before the police asked you to write out that statement, they said to you, Mr. Montgomery, we want a truthful statement or words to that effect, correct?

A.   Yes.

SA-463

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 472 of 668

18

Q.   Okay.  You don't think they wanted a lie from you, right?

A.   Right.  I don't think they wanted a lie, no.

Q.   You thought they wanted the truth?

A.   Right.

Q.   But you weren't going to tell them the story that you told this jury yesterday, correct?

A.   No.

Q.   You told a different version of that story, correct?

A.   Yes.

Q.   So whether it was before this jury yesterday or whether it was to the Prince George's County Police on August 5, 1997, one of those stories wasn't true; isn't that right?

A.   Repeat that again?

Q.   Okay.  You told this jury a story yesterday about how the triple murder occurred in Maryland, right?

A.   Correct.

Q.   And then you told the Prince George's County Police a different story of how the triple murder occurred, correct?

A.   Correct.

Q.   So one of those two stories had to be not truthful, right?

A.   Yes.

Q.   And in both instances, before you told the story, you were told, please be truthful, correct?

A.   Yes.

SA-464

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 473 of 668

19

Q.   So you disregarded it at one point, either yesterday or in August, '97, someone's request to tell a truthful story; isn't that right?

A.   Yes.

Q.   Okay.  Now, you knew back in August of '97 that the Police out in Prince George's County, they'd probably been working pretty hard to try to find out about this triple murder in Temple Hills, correct?

A.   I don't know.

Q.   Well, you had to figure it was three people murdered.  Chances are the police are working hard on it, right?

A.   I don't know if they was working hard on it.  I figured they'd be working on it.

Q.   Okay.  You figured they were working on it.  And did you know that police work is hard work?

A.   I don't know.

Q.   And do you know that people who work in law enforcement risk their lives doing that kind of work?

A.   Yeah.

Q.   I mean, you know that because back in '91, you were charged with trying to kill a police officer?

A.   Correct.

Q.   So you know it's dangerous work?

A.   Yes.

Q.   So you know if police officers or anyone in law

SA-465

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 474 of 668

20

enforcement is doing work, it's probably not too beneficial to them to have somebody come in and lie to them about something they're investigating; isn't that right?

A.    Correct.

Q.    But yet you decided I'm going to lie to the Prince George's County Police, right?

A.    Yes.

Q.    Because it was in your interest, you thought, to lie to the police, correct?

A.    Not only thinking of myself.

Q.    Well, but partly thinking about yourself, weren't you?

A.    Yes.

Q.    Okay.  And you gave the Prince George's County Police the name, Johnny Proctor, as a person who you said with Mr. Sweeney went into the house where the triple murder occurred; isn't that right?

A.    Yes.

Q.    Okay.  Now, you knew -- I mean, I believe your testimony was you didn't actually know Johnny Proctor, but you knew there was a person, Johnny Proctor?

A.    Right.

Q.    Right.  That's why you came up with that name, right?

A.    Correct.

Q.    Okay.  Did you know that back in 1997 that Johnny Proctor was the father of three children?

SA-466

A.   No.

Q.   Did you know that Johnny Proctor is responsible for taking his kids to school and picking his kids up from school?

A.   No.

Q.   You didn't care to learn about that before you came up with the story, did you?

A.   None of that never even registered in my mind.

Q.   Not at all because it was convenient for you to take that name, Johnny Proctor, and put it in here cause you thought it would help your story, right?

A.   Correct.

Q.   Okay.  And you knew, because you're smart and you sort of know what's going on, --

A.   I wouldn't say that I was smart.

Q.   You're smart.

A.   I wouldn't say that.

Q.   You don't consider yourself smart?

A.   I don't consider myself dumb, but I don't consider myself smart, either.

Q.   You read the newspapers, don't you?

A.   Yes.

Q.   Because you read about the triple murder in the newspaper afterwards, didn't you?

A.   No.

Q.   Didn't you testify yesterday you read in the newspaper

22

that a marshal's daughter was one of the people killed?

A.    I testified that Chin told me about that.

Q.    Okay.  But do you read the newspapers generally?

A.    Yes, I do.

Q.    Do you watch the news on television if you have the opportunity?

A.    Yes, I do.

Q.    Okay.  You knew that in Maryland, if you were convicted of -- well, strike that.

It was your belief in August of '97, that in the state of Maryland, if you were convicted of three murders, you'd get the death penalty?

A.    No, that wasn't my belief.  The detectives told me that.

Q.    Okay.  Did they tell you that before you wrote out the statement or after the statement?

A.    I'm not sure if it was before or after.

Q.    Okay.  But it was around the time that you gave that statement?

A.    Correct.

Q.    Okay.  So knowing that if Johnny Proctor -- well, strike that.

Knowing that if the police believed your story, which you were hoping they would do, right?

A.    Correct.

Q.    If the police went out and arrested this Johnny Proctor,

**SA-468**

Case 1:98-cr-00329-RCL    Document 957    Filed 03/11/03    Page 23 of 91

23

and he ended up getting convicted, he could get the death penalty.  You knew all that, correct?

A.   I believe I did know.

Q.   And you didn't care, correct?

A.   No.  But Draper didn't care when he told his cousin that was corroborating either.  He didn't care about us.  He didn't care about me, Bird, or Chin.

Q.   Did I just ask you a question about --

A.   Yes.

Q.   Let me finish please.  Did I just ask you a question about whether or not Draper cared about his cousin or anything?

A.   No.

Q.   My question was whether or not you knew that Johnny Proctor could get the death penalty, correct?

A.   I'm trying to --

Q.   That was my question, wasn't it?

A.   Yeah.

Q.   Okay.  And you knew that the police were actually investigating Johnny Proctor as having been involved in that triple murder after you told them, correct?

A.   I don't know if they was investigating him or not.

Q.   Well, weren't you shown a photo spread --

A.   Yes.

Q.   Let me finish.  A photo spread of a bunch of people and

SA-469

24

asked, can you identify Johnny Proctor in this?

A.    Yes.

Q.    Okay.  So if they were showing you a photo spread and asked you to identify a photo, doesn't that mean to you they're investigating a Johnny Proctor?

A.    No, not necessarily, because I don't know what their investigation consist of.

Q.    But they showed you a photo spread and asked you if you could pick out Johnny Proctor; is that right?

A.    Yes.

Q.    Okay.  And if you had gotten lucky and picked him out, he might have gotten arrested for it, correct?  Right?

A.    Point is I didn't pick him out.  I couldn't pick him out.  I didn't pick him out.

Q.    Okay.  Later on, after '97, you decided, well, I'm going to change my story, and I'm going to change my story when I speak with Agent Lisi about the triple; isn't that right?  Talking about Johnny Proctor and his involvement.  Didn't there come a time when you changed that story?

A.    Yes.

Q.    Okay.  And you spoke with Agent Lisi, correct?

A.    Correct.

Q.    And you know how hard Agent Lisi's working, right?

A.    I don't know how hard he was working.

Q.    Well, you know he's dedicated, right?

SA-470

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 479 of 668

25

A.    I don't know.

Q.    You didn't have any opinions about that?

A.    I ain't care.

Q.    Okay.  You didn't care?

A.    No, I don't care, I mean, whether he work hard or not.
It don't matter to me.  He don't split his check with me.

Q.    All right.  It doesn't matter to you.  But you decided
that, well, I'm going to meet with Agent Lisi, and now instead
of saying that Johnny Proctor went in the house, I'm going to
tell them that Sean Coates went in the house; isn't that
right?

A.    Yes.

Q.    Now, Sean Coates, you testified, is supposed to be one of
your co-conspirators, right?

A.    Yes.

Q.    Supposed to be your friend, right?

A.    Yes.

Q.    So here is Mr. Coates, supposed to be your friend.  He's
supposed to be a co-conspirator, and you're telling an FBI
agent that he went in the house when the killing happened,
right?

A.    Correct.

Q.    And you knew that Sean Coates, if somebody were to
believe your story, he could have been charged in Maryland
with three murders that could have gotten him the death

SA-471

26

Q.    penalty; isn't that right?

A.    No, that's not correct.

Q.    Well, if you thought that Johnny Proctor could have gotten the death penalty, then why didn't you think Sean Coates could have gotten the death penalty?

A.    Because when I told Agent Lisi that I didn't go in the house, that Bird is the one that went in the house, the case wasn't in Maryland no more.

Q.    But you know that Maryland could pick the case back up?

A.    I don't know.

Q.    You didn't know that?

A.    No.

Q.    So to Agent Lisi -- and by the way, do you remember when in 1999 it is that you told Agent Lisi, when you changed your story now and said it was Mr. Coates that went in the house?

A.    I told him at the same time when I told him about my involvement in all the other violence.

Q.    Okay.  So just so we have everything in terms of time order correct, you call up Agent Lisi, and you say, Agent, I've got information about six murders and then Agent Lisi makes a trip out to see you personally, right?

A.    Yes.

Q.    And you tell him about six murders you were involved with, and it's those six murders which ended up being part of your third plea, correct?

27

A.    Correct.

Q.    Okay.  And at that same time, when you're telling Agent Lisi about the six murders, you're falsely accusing your friend and co-conspirator of going into the house in Temple Hills when he didn't go into the house; is that right?

A.    Yes.

Q.    And you said yesterday that there was a reason why you decided to make up this story; is that right?

A.    Yes.

Q.    And that's because you heard on the news or you were told that the young woman, Melody Anderson, who was killed, her father was a United States Marshal, right?

A.    Correct.

Q.    And you said, well, that could cause there to be retaliation against me, James Montgomery, right?  That's what you said?

A.    Correct.

Q.    Okay.  Cause you figured, well, jail is bad enough, but being in jail as the killer of the daughter of a United States Marshal is going to make it that much worse in jail, right?

A.    That's what I believed.

Q.    I mean that's your thought process, right?  That's what you believed?

A.    At that time, yes.

Q.    Right.  So you're also thinking, well, I've got to do

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

28

what's best for James Montgomery, right?

A.    Correct.

Q.    So your thought processes at that time is, well, then let my friend, let my co-conspirator, Sean Coates, let him go to jail and be the one subject to the retaliation that I was afraid of, right?  Put it on him?  That's what you were thinking at the time?

A.    Yes.

Q.    Then after you testified -- excuse me -- after you wrote out the statement to the Prince George's County Police, that very same day, they took you into the Grand Jury in Prince George's County; isn't that right?

A.    I don't know.

Q.    Well, didn't you testify in Prince George's County Grand Jury on August 5, 1997?

A.    I don't remember the date, but I do remember I did testify in the Grand Jury.

Q.    Would seeing a copy of the transcript refresh your recollection, sir?

A.    I'm not disputing it.  I just don't know the date.  If that is the true date on that paper, then I guess it is true.

Q.    You remember that it was very close in time from when you gave the Prince George's County Police the written statement to when they walked you into the Grand Jury?

A.    Yes.

**SA-474**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Q. Now, the police in Prince George's County had you -- well, strike that.

Your testimony in the Grand Jury was very much the same as your written statement; isn't that right?

A. Yes.

Q. Okay. So the police must have believed your story when you gave it to them on August 5?

MR. ZEIDENBERG: Objection.

THE COURT: Sustained.

MR. KIERSH: May I approach, Your Honor?

THE COURT: Sure.

BY MR. KIERSH:

Q. I show you what's been marked for identification as Sweeney Exhibit No. 10. Can you tell us what that is?

A. In the Circuit Court for Prince George's County, Maryland, Grand Jury Proceedings.

(Whereupon, Defendant Sweeney Exhibit No. 10. was marked for identification.)

Q. And, sir, what is the date?

A. Tuesday, August 5, 1997.

Q. So that's the same date that you gave the written statement to the Prince George's County Police, correct?

A. If that's what that paper says.

Q. You don't dispute the paper, do you?

A. I mean, if that's what the other statement, the written

**SA-475**

30

statement that I -- if that's the date on that. I'm not disputing it, if that's the date on there.

Q. Well, I'll show it to you. What's the date? It's right up there.

A. Yes.

Q. Well, just tell us what the date is?

A. 8/5/97.

Q. The same as the Grand Jury transcript?

A. Correct.

Q. When you walked in to the Grand Jury, there was a State's Attorney for the state of Maryland. That was the lawyer who was asking you the questions, correct?

A. Correct.

Q. Had you met with that lawyer before you walked into the Grand Jury?

A. I believe I did.

Q. Was it a man or a woman?

A. A man.

Q. Did you tell him what you had told the police in your written statement?

A. I don't know if I did or didn't.

Q. When you walked into that Grand Jury, you took an oath to tell the truth, didn't you?

A. Yes.

Q. And that oath that you took in Prince George's County

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 485 of 668

31

before the Grand Jury was the same oath to tell the truth that you took before this jury last Wednesday, March 7, correct?

A.   Correct.

Q.   And when you walked into that Grand Jury in Prince George's County, you violated that oath, because you lied to that Grand Jury?

A.   Correct.

Q.   Okay.  And you knew walking into that Grand Jury that you were going to lie even before you were asked any questions, correct?

A.   Correct.

Q.   You weren't tricked in that Grand Jury?

A.   Not at all.

Q.   You knew what you were doing?

A.   Yes.

Q.   Planned it ahead and you carried it out, correct?

A.   Yes.

Q.   And isn't it a fact that you've told the prosecution in this case, and you've told Agent Lisi even before you walked in here that in the state of Maryland, you took an oath to tell the truth, and you intentionally violated that oath by telling a lie; isn't that right?

A.   Could you state that again?

Q.   Well, you told the prosecutors in this case, and you've told Agent Lisi before you walked in here, you had told them

SA-477

that you lied under oath to the Grand Jury in Prince George's County, correct?  Do you understand my question?

A.    Yeah, I understand your question.

Q.    Isn't it a fact that you told them that you lied in the Grand Jury in the state of Maryland?

A.    Yes.

Q.    And you've never been charged with perjury in the state of Maryland, have you?

A.    I haven't been charged yet.  I don't know if they're going to.

Q.    You don't expect that they're going to charge you with perjury in the state of Maryland, do you?

A.    Considering I'm facing life without parole, it really wouldn't even matter.

Q.    What happens if you get probation in this case?  You think you might get charged with perjury?

A.    Maybe.

Q.    You think you might?

A.    I don't know, but maybe.

Q.    Well, if on three separate occasions --

A.    I wouldn't be surprised if I do.

Q.    You wouldn't be -- well, okay. If on three separate occasions you've signed plea agreements here with the prosecution here that says you've got to tell us everything, and you haven't done it, and they haven't pulled your

agreement, then why would you think they'd charge you with perjury in Maryland?

A.     Because these prosecutors don't have nothing to do with whether Maryland prosecute me out there or not.

Q.     And have you spoken to them about that?

A.     Have I spoken to who?

Q.     The Maryland prosecutors?

A.     No.

Q.     Do you have a lawyer for the Maryland case?

A.     No.

Q.     Did anyone suggest maybe you ought to go get a lawyer to represent you on the Maryland charges?

A.     No.

Q.     Then you went into the Grand Jury in D.C. on August 12, 1997; is that -- do you recall that?

A.     Say that again?

Q.     You went into the District of Columbia Grand Jury on August of 1997, August 12, 1997?

A.     Yes.

Q.     And yesterday you told us that before that Grand Jury you lied about your involvement over at 60th and East Capitol?

A.     I lied about it?

Q.     Yes.  You didn't tell the truth about 60th and East Capitol?

A.     Pretty much I did tell the truth.

Case 1:98-cr-00329-RCL    Document 957    Filed 03/11/03    Page 34 of 91

34

Q.   But didn't you say yesterday that you didn't tell the truth about part of what happened at 60th and East Capitol?

A.   I said I didn't tell the full truth, correct.

Q.   Okay.  Do you think you're going to get prosecuted for not telling the full truth before a District of Columbia Grand Jury for perjury?

A.   I don't really know how to answer your question to be truthful.

Q.   Has anyone told you you might get charged with perjury for not telling the full truth before the D.C. Grand Jury on August 12, 1997?

A.   Has anybody told me that?

Q.   Yes.

A.   Not that I know of.

Q.   Now, you testified before the District of Columbia Grand Jury again on September 11, 1998; is that right?

A.   When?

Q.   September 11, 1998?  Do you recall that?

A.   I don't know.

        MR. KIERSH:  Okay.  If I could have the Court's indulgence.

    (Pause.)

        THE WITNESS:  I'm not disputing it if that's what it says.  If that is the true date that it says on that paper, I'm not disputing it.

SA-480

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES OF AMERICA,    . | Docket No. CR 98-329 |
| Government,    . | Washington, D.C. |
| . | March 19, 2001 |
| vs.    . | 2:20 p.m. |
| . | |
| VINCENT HILL,    . | (AFTERNOON SESSION) |
| JEROME MARTIN,    . | |
| SAMUEL CARSON,    . | |
| WILLIAM K. SWEENEY,    . | |
| SEAN COATES,    . | |

Defendants    .

FILED

. . . . . . . . . . . .    .

MAR 1 1 2003

UNITED STATES OF AMERICA,    .

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Government,    .

vs.    .    Docket No. CR 99-348

GARY PRICE,    .

Defendant.    .

. . . . . . . . . . . .    .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001



SA-481

95

2

For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C. . 20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

SA-482

26

Q.    Violent person.  Now, Mr. Montgomery, you were arrested in 1990 for an assault on a police officer while armed.  We've heard about that, right?

A.    Yes.

Q.    You had been shot by the police during the commission of that crime, right?

A.    Yes.

Q.    You called the FBI once you were incarcerated, didn't you?

A.    Yes.

Q.    And then you met with the FBI after that, right?

A.    Correct.

Q.    You were trying to get out from underneath that charge, weren't you?

A.    Yes.

Q.    Of course, you didn't have anything to do with that crime, did you?

A.    Yes and no.

Q.    Well, your testimony on direct was that you were trying to make a fake bargain.  Remember that?

A.    Yes.

Q.    And what is a fake bargain?

A.    That I thought they was going to let me out, and then I was going to renege.  I was going to renege.  I was just going to let them know that it was a lie.  You know what I mean?

SA-483

Q.    You were going to tell them a story.  They were going to cut you loose; is that what you're saying?

A.    Correct.

Q.    And then you were going to renege?

A.    Yeah.

Q.    And say that isn't true?

A.    Uh-huh.

Q.    That's a fake bargain?

A.    Uh-huh.

Q.    That isn't what you're doing here?  This isn't a fake bargain what you're doing here?

A.    No.  The bargain that I tried to make with them, I didn't indicate myself in nothing.

Q.    But you knew Wayne Perry pretty well during this time, didn't you?

A.    Yes.

Q.    He was a friend, right?

A.    Yeah.  Not closer than Chin.

Q.    He was a very good friend of your brother's, Box, wasn't he?

A.    Yes.

Q.    And he became a good friend of yours, too, as a result, didn't he?

A.    He was all right.

Q.    Now, you told the FBI when you met with them, after you

SA-484

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 493 of 668

28

were arrested, you told the FBI that Wayne Perry committed the murders of Teresa Thomas and Terita Lucas, yes.

Q.    You say that's a lie, right?

A.    Yes.

Q.    That wasn't the only murders that you told them about that Wayne Perry was involved in at that time, was it?

A.    No.

Q.    No.  You told them that you were a witness to the murder of Dimencio Benson that Mr. Perry killed, right?

A.    Correct.

Q.    Was that true?

A.    No.

Q.    That was a lie.  You talked about being on the playground located at Kennedy Street, right?

A.    Uh-huh.

Q.    When Mr. Benson was killed, right?

A.    Yes.

Q.    You stated that Benson was killed because he was having a beef with Alpo or Martinez, right?

A.    Yes.

Q.    Over a drug deal, right?

A.    Yes.

Q.    So far untrue, right?

A.    Yes.

Q.    That --

SA-485

29

A.    No, I don't know what the reason was for what happened to him.

Q.    Something did happen to him?

A.    To my understanding, yeah.

Q.    Well, was this a lie that you just said about Perry being involved in this murder or not?

A.    Yes, it was a lie.  I've already stated that.

Q.    But yet Mr. Benson did die?

A.    Correct.

Q.    Not at the hand of Mr. Perry, though, is that what you're saying?

A.    What I'm saying is this.  I said that I was present.  I was not present.

Q.    So you made that part up?

A.    Right.  I mean, I knew about he did get killed or whatever, but I wasn't present to see it.  I wasn't present. I wasn't even there.

Q.    You stated that you were standing within earshot of Alpo Martinez and Wayne Perry when Alpo turned to Perry and told Perry, do the bammer right there.  Isn't that what you said?

A.    Yes, I think.

Q.    That was a lie?

A.    Yes.

Q.    You made all that up, too?

A.    Yes.

SA-486

30

Q.    Made up the part where Alpo said to Perry, do the one from New York.. You made that up?

A.    Yes.

Q.    You made up the part about where you pointed Benson out, this decedent. You pointed Benson out to Wayne Perry at which point Wayne Perry went to Tom and told Tom to kill Benson. You made that up?

A.    Yes.

Q.    Putting yourself in the middle of it, you made that up?

A.    I don't know if I said that. I mean, I don't know if I said I was -- that if I said that.

Q.    You just told me yes, when I asked you the question. Do you want me to read it again?

A.    Oh, I understand the question. I don't know if I said that I said that.

Q.    You also stated at this same time that Wayne Perry was responsible for the murder of Michael Salters, right?

A.    Yes.

Q.    Was that a lie?

A.    Yes.

Q.    You stated that Wayne Perry had a personal problem with Salters since 1989. Was that a lie?

A.    No.

Q.    That was true?

A.    Yes.

SA-487

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 496 of 668

31

Q.   So you plugged in one true fact with one lie, is that what you did there?

A.   Yes.

Q.   You also told them that Mr. Martinez and Mr. Salters had a beef over their respective drug territories, right?

A.   Yes.

Q.   And that Martinez had told Perry that Salters had to go, right?

A.   Yes.

Q.   Was that true or was that a lie?

A.   That was a lie.

Q.   You stated that Wayne Perry was responsible for the killing of Penny Baker. Was that true or was that a lie?

A.   That was a lie.

Q.   Because she had witnessed him kill Darnell Burroughs. Was that a lie?

A.   Yes.

Q.   You stated that Wayne Perry was responsible for the killing of Michael Sanders.  Was that a lie?

A.   Yes.

Q.   These were lies about a person that had become a good friend of yours?

A.   Wouldn't say he was a good friend.

Q.   Did you not just say he'd become a good friend of yours?

A.   I said he was all right.

**SA-488**

32

Q.   Good friend of your brother's at the very least?

A.   I don't know what their relationship was.  I mean, he hung with him more than I did.  He associated closer with them than I did.

Q.   Mr. Montgomery, several years before you were arrested --

MR. BESHOURI:  If I may take just a moment, Your Honor.

(Pause.)

THE COURT:  Go ahead.

BY MR. BESHOURI:

Q.   Several years before you were arrested in August of 1997, Wayne Perry had been sent to prison forever, right?

A.   Yes.

Q.   Wayne Perry was sent to prison after you gave this information that we've just reviewed to the FBI, right?

A.   Yes, but not because of what I said.

Q.   No, I didn't say that.  But you agree with me that that information was provided to the government before Wayne Perry went to jail forever, right?

A.   I don't know.

Q.   You don't know?

A.   Say that again?

Q.   The information that you gave to the FBI that we've just been over, that was in 1991, right?

A.   Yes.

SA-489

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

Case 1:98-cr-00329-RCL    Document 958    Filed 03/11/03    Page 33 of 89

33

Q.    That was before Wayne Perry went to jail, right?

A.    Correct.

Q.    And when he went to jail, he went to jail forever, didn't he?

A.    To my understanding, yes.

Q.    You knew in 1997 when you met with the government to talk about Sam Carson's supposed involvement in the murders of Teresa Thomas and Terita Lucas that the government didn't need any help with Wayne Perry any more, didn't you?

A.    I don't know.

Q.    The truth is, Mr. Montgomery, is that you thought long and hard about how you were going to tell Agent Lisi and the prosecutors about your involvement in Chrishauna Gladden's murder, didn't you?

A.    I thought long and hard about if they find out about it.

Q.    That's because you had the pressure of wondering if Dirty Meat was going to tell a story on you, right, about Chrishauna Gladden, right?

A.    No.

Q.    And you decided you needed something to offset your admission, which you felt forced to give about your involvement in Chrishauna Gladden's murder; is that right?

A.    What you mean, I feel offset?  What do you mean by that?

Q.    Well, you gave up information about Chrishauna Gladden, right?

SA-490

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

34

A.   Correct.

Q.   At the same time you followed that with, look, I've got information for you, Mr. Lisi and the prosecutors, about the murders of Teresa Thomas and Terita Lucas, right?

A.   Yes.

Q.   Of course, you didn't want to talk about your involvement at this time in the murders of Maurice Hallman and Leonard Hyson, right?

A.   Correct.

Q.   You didn't want to talk about your participation in the murder of Timothy Benton, right?

A.   Correct.

Q.   You didn't want to talk about what you did in the house of Lonnie Gaskins out in Maryland, right?

A.   Correct.

Q.   That information wouldn't come for a long time, would it?

A.   Well, I had contemplated at the same time about telling about it, but I didn't feel comfortable.

Q.   Mr. Montgomery, using -- the truth is that using the little information that you had from the newspapers and that Sam Carson told you that the government -- that the detectives rather had inquired of him about a big poster-picture in Teresa Thomas' house and from whatever you got from your meetings with Agent Lisi and the prosecutors, you told a story on Sam Carson relating the murders of Teresa and Terita; isn't

SA-491

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

65

true?

A.   What lie is that that I told?

Q.   About him shooting Leonard Hyson?

A.   No, I told you what I did, and I told you what he did.

Q.   Because you wouldn't do something like that, would you?

A.   I wouldn't do something like what?

Q.   Like lying about somebody doing something they didn't do?

MR. ZEIDENBERG:  Objection.

THE COURT:  Sustained.

BY MR. BESHOURI:

Q.   Mr. Montgomery, I want to move now and talk to you about the first time you came before Judge Jackson when the government moved to have your release revoked.  You remember that?

A.   Correct.

Q.   Now, would you agree with me the one thing you would not want to do is lie to Judge Jackson?

A.   No, I wouldn't want to lie to him, no.

Q.   Because Judge Jackson holds your fate in his hands.  You understand that, don't you?

A.   Correct.

Q.   You wouldn't want to roll the dice with Judge Jackson, right?

A.   Correct.

Q.   Yet when you came before Judge Jackson on March 9, 1999,

66

you did lie to him, didn't you?

A.    I mean, I don't understand.  Lie to him about what?

Q.    Well, Judge Jackson -- the government had some concerns because you had just come forward with even more new information, Maurice Hallman, Leonard Hyson shootings, right?

A.    Correct.

Q.    They were concerned because you came up with even more information now about Timothy Benton's murder, right?

A.    Correct.

Q.    And they came before the judge, and they said, Judge Jackson, we feel obligated to move to have Mr. Montgomery's release withdrawn, right?

A.    Correct.

Q.    And Judge Jackson asked you if, in fact, you had told the whole story?  Remember that?

A.    Yes.

Q.    Whether you had told the whole story now.  Remember that?

A.    Yes.

Q.    And you said to him, Judge, I haven't held anything back, right?

A.    Correct.

Q.    And you said, I feel good that I got it out.  Remember that?

A.    Yes.

Q.    But you hadn't told everything at that point, had you?

SA-493

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 502 of 668

67

Because you -- you can answer that question.

A.   No, I hadn't.

Q.   So you weren't being straight with Judge Jackson, were you?

A.   No.

Q.   And you also didn't correct your attorney when your attorney represented to the judge that you hadn't been involved in any new crimes since you'd been released, right?

A.   Correct.

Q.   And you remember that Judge Jackson actually made mention of that that you hadn't been involved in any new crime, right?

A.   Correct.

Q.   But you had been involved in a new crime, hadn't you?

A.   No.

Q.   Down in Florida?

A.   I was arrested, but it was dismissed because I did not burglarize anything.

Q.   You don't remember admitting to a police officer down there that, yes, you had just come out of the place you burglarized with a friend, and that you were taking the stuff you had just stolen away from there?  You don't remember doing that?

A.   I didn't say that we burglarized anything, because it wasn't my intent to burglarize anything.

Q.   It was your intent to steal, was it not?

SA-494

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 503 of 668



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| UNITED STATES, | : |
|       GOVERNMENT, | : |
| | : |
|  VS. | :    CR. NO. 98-329 |
| | : |
| VINCENT HILL, | : |
| JEROME MARTIN, | : |
| SAMUEL CARSON, | : |
| WILLIAM K. SWEENEY, | : |
| SEAN COATES, | : |
|       DEFENDANTS. | : |
| | : |
| UNITED STATES | : |
|       GOVERNMENT, | : |
| | : |
|  VS. | :    CR. NO. 99-348 |
| | : |
| GARY PRICE, | : |
|       DEFENDANT | : |

FILED

JUL 1 9 2001

NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
APRIL 2, 2001
(MORNING SESSION)
(10:30 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:      PHYLLIS MERANA
6816 U. S. DISTRICT COURT
3RD & CONSTITUTION AVE., N.W.
WASHINGTON, D. C. 20001

SA-495

Case 1:98-cr-00329-RCL    Document 687    Filed 07/19/01    Page 2 of 79
USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 504 of 668

2

FOR THE GOVERNMENT:                    PETER ZEIDENBERG, AUSA
                                       ANJALI CHATURVEDI, AUSA
                                       555 4TH ST., N.W.
                                       WASHINGTON, D. C. 20001


FOR THE DEFENDANT HILL:                CHRISTOPHER DAVIS, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #910
                                       WASHINGTON, D. C. 20004


FOR THE DEFENDANT MARTIN:              JOANNE HEPWORTH, ESQ.
                                       305 H STREET, N.W.
                                       2ND FLOOR
                                       WASHINGTON, D. C. 20001


FOR THE DEFENDANT CARSON:              JOSEPH BESHOURI, ESQ.
                                       LEXI NEGIN-CHRIST, ESQ.
                                       419 7TH STREET, N.W.
                                       WASHINGTON, D. C. 20004


FOR THE DEFENDANT SWEENEY:             STEVEN R. KIERSH, ESQ.
                                       717 D STREET, N.W.
                                       SUITE 400
                                       WASHINGTON, D. C. 20004


FOR THE DEFENDANT COATES:              FREDERICK JONES, ESQ.
                                       901 6TH STREET, S.W.
                                       #409
                                       WASHINGTON, D. C. 20024


FOR THE DEFENDANT PRICE:               JONATHAN ZUCKER, ESQ.
                                       601 INDIANA AVE., N.W.
                                       #901
                                       WASHINGTON, D. C. 20004

SA-496

3

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SP. AGT. VINCENT LISI | | | | |
| BY MS. CHATURVEDI | | | 6 | |
| BY MS. NEGIN-CHRIST | | | | 18 |
| BY MS. HEPWORTH | | | | 22 |
| BY MR. ZUCKER | | | | 23 |
| CINAMA HAWKINS | | | | |
| BY MS. CHATURVEDI | 24 | | | |
| BY MR. KIERSH | | 49 | | |

E-X-H-I-B-I-T-S

| GOVERNMENT'S | IN EVIDENCE |
|---|---|
| M49 AND M50 | 17 |
| PG210 | 26 |
| M51 | 33 |
| PG424 | 44 |
| DEFENDANT CARSON'S | |
| 22 AND 23 | 21 |

SA-497

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 506 of 668

37

A. BACK TO THE HOUSE.

Q. AS YOU WERE GOING BACK TO THE HOUSE AND WHEN YOU GOT BACK TO THE HOUSE, WHO WAS DRIVING THE CAR?

A. "LONNIE."

Q. DID HE PARK THE CAR NEAR THE HOUSE?

A. ACROSS THE STREET FROM THE HOUSE.

Q. ONCE "LONNIE" PARKED THE CAR, WHAT'S THE NEXT THING THAT HAPPENED?

A. WE ALL WALKED UP TO THE DOOR, AND I WAS HOLDING THE SCREEN DOOR FOR HIM.  HE WAS, I THINK, FIDGETING WITH HIS KEYS OR SOMETHING.

Q. WHO WAS FIDGETING WITH HIS KEYS?

A. "LONNIE."

Q. SO "LONNIE" WAS IN FRONT OF YOU?

A. YES.

Q. AND AS YOU WERE HOLDING THE SCREEN DOOR, COULD YOU TELL WHERE DARNELL MACK AND MELODY ANDERSON WERE?

A. THEY WERE BEHIND ME, BUT THEY WEREN'T ON THAT STEP THAT'S HERE.

Q. THE STEP IN FRONT OF THE FRONT DOOR?

A. RIGHT.  THEY WEREN'T ON THE STEP.

Q. OKAY.  AS YOU WERE HOLDING THE SCREEN DOOR AND AS "LONNIE" GASKINS WAS FUMBLING WITH HIS KEYS, WHAT'S THE NEXT THING YOU NOTICED, MS. HAWKINS?

A. I TURNED TO MY RIGHT, AND I JUST SAW TWO GENTLEMEN WITH

SA-498

SKI MASKS AND GUNS.  AND THEN WHEN I TURNED BACK TO LOOK AT "LONNIE," THE DOOR WAS OPEN AND HE HAD GONE IN.

Q.  WHAT DID YOU DO?

A.  I JUST WENT STRAIGHT IN AND KNEELED DOWN OR SQUATTED DOWN BY THE T. V. AND COVERED BY FACE WITH MY HANDS.

Q.  AND YOU SAID YOU CROUCHED DOWN?

A.  YES.

Q.  NOW, ON GOVERNMENT'S EXHIBIT M51, THIS DRAWING THAT YOU PREPARED, THERE IS AN INDICATION OF THE WORD "ME" AND A LINE WITH A DOT AND THEN A CIRCLE AROUND THERE.  WHAT DOES THAT SHOW US?

A.  THAT'S ME SQUATTED DOWN.

Q.  IS THAT THE AREA WHERE YOU SQUATTED DOWN?

A.  YES.

Q.  HOW DID YOU COVER YOUR FACE, MS. HAWKINS?

A.  WITH MY HANDS.

Q.  OKAY.

        MS. CHATURVEDI:  LET THE RECORD REFLECT THE WITNESS PUT BOTH OF HER HANDS OVER BOTH OF HER EYES.

BY MS. CHATURVEDI:

Q.  DID YOU HAVE ANY GLOVES ON OR ANYTHING LIKE THAT THAT YOU REMEMBER?

A.  I THINK I DID, BUT I AM NOT SURE.

Q.  OKAY.

        WHILE YOU WERE SQUATTING DOWN WITH YOUR HANDS OVER

SA-499

39

YOUR EYES, COULD YOU SEE ANYTHING THAT WAS GOING ON?

A.  I COULD SEE MOVEMENT, AND THEN I COULD SEE ONE OF THE, I GUESS, SUSPECT'S SHOES OR SOMETHING.  I COULD SEE HIM STANDING HERE NOT TOO FAR FROM ME.

Q.  NOW, YOU SAID THERE WERE TWO PEOPLE THAT CAME UP WITH SKI MASKS AND GUNS?

A.  YES.

Q.  WHEN YOU CROUCHED DOWN BY THE TELEVISION SET, COULD YOU SEE WHERE THOSE TWO MEN WERE?

A.  ONE WAS NEAR THE COUCH WHERE "LONNIE" AND DARNELL WAS, AND THEN THE OTHER WAS NOT TOO FAR FROM ME.

Q.  THE ONE THAT WAS BY "LONNIE" AND DARNELL -- CAN YOU TELL US WHAT HIS HEIGHT WAS IN COMPARISON TO THE GUY THAT WAS CLOSER TO YOU?

A.  HE WAS SHORTER.  HE WAS VERY SHORT FOR A MAN.  HE WAS ABOUT 5' 5" OR 5' 6".

Q.  MS. HAWKINS, DID YOU EVER HAVE AN OPPORTUNITY TO SEE THE TWO MEN SIDE BY SIDE?

A.  AS THEY WERE RUNNING UP, BUT NOT CLEARLY.  I MEAN NOT BUT FOR A SPLIT SECOND.

Q.  THE MAN THAT WAS STANDING NEXT TO YOU -- WAS HE TALLER OR SHORTER THAN THE MAN THAT WAS BY THE COUCH?

A.  HE WAS TALLER.

Q.  IF, IN YOUR MIND, YOU WERE TO PUT THE TWO MEN SIDE BY SIDE, CAN YOU TELL US ROUGHLY THE DIFFERENCE IN THE HEIGHT

SA-500

BETWEEN THE SHORTER MAN THAT WAS BY THE COUCH AND THE TALLER MAN THAT WAS BY THE DOOR NEAR YOU?

A.  MAYBE THREE OR FOUR INCHES.

Q.  COULD YOU HEAR ANY SOUNDS COMING FROM THE AREA BY THE COUCH WHERE YOU SAW "LONNIE" AND DARNELL AND THE SHORTER MAN?

A.  YES.

Q.  DO YOU KNOW WHAT WAS BEING SAID?

A.  NO.  I JUST HEARD MALE VOICES LIKE, "COME ON," OR MUFFLED VOICES.

Q.  WHAT ELSE DID YOU ULTIMATELY HEAR, MS. HAWKINS?

A.  I JUST HEARD THEIR VOICES.  I COULDN'T HEAR EXACTLY WHAT THEY WERE SAYING.

Q.  AT SOME POINT, DID YOU HEAR GUNSHOTS?

A.  YES.

Q.  HOW MANY GUNSHOTS?  COULD YOU EVEN COUNT HOW MUCH GUNSHOTS YOU HEARD?

A.  WHEN I FIRST SQUATTED DOWN, I HEARD ONE OR TWO.

Q.  AND WHERE WERE THE SOUNDS?  COULD YOU TELL WHERE THE GUNSHOTS WERE COMING FROM?

A.  NO.  MY EARS WERE RINGING.

Q.  AFTER YOU HEARD THE INITIAL ONE OR TWO GUNSHOTS, DID YOU HEAR MORE GUNSHOTS?

A.  YES.

Q.  WHEN YOU HEARD THE SECOND, I GUESS, GROUP OR ROUND OF

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 510 of 668

41

GUNSHOTS, HOW MANY DID YOU HEAR IN THE SECOND GROUP OR THAT SECOND ROUND?

A. ABOUT 15.

Q. AND THE PERSON THAT WAS DOING THE SHOOTING, COULD YOU TELL WHERE THAT PERSON WAS?

A. NO. MY EARS WERE JUST RINGING REALLY BAD.

Q. COULD YOU TELL WHETHER OR NOT ONE OF THE TWO PEOPLE -- ONE OF THE TWO SUSPECTS THAT YOU JUST DESCRIBED -- WHETHER ONE OF THEM APPEARED TO YOU TO BE IN CHARGE?

A. PROBABLY THE SHORTER ONE BECAUSE HE WAS NEAR THE TWO. HE WAS NEAR "LONNIE" AND DARNELL, AND THE OTHER GUY JUST STAYED IN THAT SPOT NEAR ME.

Q. THE GUY THAT STOOD IN THE SPOT NEAR YOU -- DID HE SAY ANYTHING TO YOU?

A. NO.

Q. DID YOU HEAR HIM SAY ANYTHING AT ALL?

A. NOT THAT I CAN RECALL.

Q. DID THERE COME A TIME WHEN THE GUNSHOTS FINALLY STOPPED?

A. YES.

Q. WHAT DID YOU DO?

A. I WAITED UNTIL I HEARD THEM LEAVE, AND THEN I GOT UP AND LOOKED AROUND.

Q. AND ONCE YOU GOT UP AND LOOKED AROUND, WHERE DID YOU GO?

A. OUT ON THE PORCH, AND I SAW MELODY LAYING THERE WITH BLOOD EVERYWHERE.

SA-502



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           .  Docket No. CR 98-329
                                    .
          Government,               .  Washington, D.C.
                                    .  April 2, 2001
     vs.                            .  2:20 p.m.
                                    .
VINCENT HILL,                       .  (AFTERNOON SESSION)
JEROME MARTIN,                      .
SAMUEL CARSON,                      .
WILLIAM K. SWEENEY,                 .
SEAN COATES,                        .

          Defendants                .

. . . . . . . . . . . . . . . . . . .

UNITED STATES OF AMERICA,           .
                                    .
          Government,               .
                                    .
                                    .  Docket No. CR 99-348
     vs.                            .

GARY PRICE,                         .
                                    .
          Defendant.                .
                                    .

. . . . . . . . . . . . . . . . . . .

**FILED**

**MAR 1 1 2003**

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:        PETER ZEIDENBERG, AUSA
                           ANJALI CHATURVEDI, AUSA
                           U.S. Attorney's Office
                           555 Fourth Street, N.W.
                           Washington, D.C.  20001

For the Defendant Hill:    CHRISTOPHER DAVIS, ESQ.
                           601 Indiana Avenue, N.W.
                           Suite 910
                           Washington, D.C.  20004

For the Defendant Martin:  JOANNE HEPWORTH, ESQ.
                           305 H Street, N.W.
                           Second Floor
                           Washington, D.C.  20001



USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 512 of 668

2

For the Defendant Carson:    JOSEPH BESHOURI, ESQ.
LEXI NEGIN-CHRIST, ESQ.
419 7th Street, N.W.
Washington, D.C.  20004

For the Defendant Sweeney:    STEVEN R. KIERSH, ESQ.
717 D Street, N.W.
Suite 400
Washington, D.C.  20004

For the Defendant Coates:    FREDERICK JONES, ESQ.
901 6th Street, S.W.
Suite 409
Washington, D.C.  20024

For the Defendant Price:    JONATHAN ZUCKER, ESQ.
601 Indiana Ave., N.W.
Suite 901
Washington, D.C.  20024

Court Reporter:    BEVERLY J. BYRNE
Official Court Reporter
Room 6810 U.S. Courthouse
Washington, D.C.  20001
(202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-504

17

(End of bench conference.)

THE COURT:  I believe 102 and 103 came in during the course of Mr. Montgomery's testimony; is that correct?

MR. ZEIDENBERG:  That's correct, Your Honor.

THE COURT:  All right.  104 -- Government's Exhibits 104, 105, and 107 are admitted.

(Whereupon, Government's Exhibit Nos. PG104, 105, and 107 were marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.  And starting with 104, can you describe what is shown in that photograph?

A.  Yes, sir.  This photograph is taken directly in front of 3919 and 25th Avenue, and in this photograph, central in the photograph, you'll see the Victim Ms. Anderson laying on the front step leading into the address.

Q.  The door that's directly behind her, what type of door is that?

A.  That's a storm door with glass inserts in it.

Q.  And did you subsequently take fingerprints off of that door?

A.  Yes, sir, I did.

Q.  And that was from the inside or the outside?

A.  It was the interior surface of that door.

Q.  Photograph PG107?

A.  Okay.  This is from the same angle, same direction,

SA-505

46

BY MR. ZEIDENBERG:

Q.    And if you could describe -- is that the shell casing you referred to?

A.    Yes, sir.  This is a photograph taken of the shell casing right here (indicating) just above the evidence tag marked with an N20.

Q.    And I take it the couch was moved prior to your taking that photograph?

A.    Yes, sir.

Q.    Now, did you collect item number N20?

A.    Yes, I did.

Q.    Showing you what's been marked PG414 and ask you if you recognize it?

A.    Yes, sir.  Your PG414 is my item number N20.

            MR. ZEIDENBERG:  Your Honor, I move to introduce PG414.

            THE COURT:  Government's PG414 is admitted.

     (Whereupon, Government's Exhibit No. PG414 was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.    Now, what was the total number of the shell casings that you recovered?

A.    Twelve.

Q.    What caliber were all of the shell casings?

A.    They were all .40 caliber.

SA-506

Case 1:98-cr-00329-RCL    Document 960    Filed 03/11/03    Page 47 of 84

47

Q.    What type of ammunition?

A.    I indicated by the head stamp on each of the rounds, I indicated that they were IMI 40 Smith & Wesson shell casings.

Q.    So is it fair to say that anything other than IMI Smith & Wesson .40 caliber ammunition?

A.    No, sir.  Just that brand name.  That's what I indicated.

Q.    All the same caliber?

A.    Yes, sir.

Q.    That caliber again?

A.    .40 caliber.

Q.    Now, did you fingerprint the apartment?

A.    I examined the apartment and its contents for fingerprints, yes, sir.

Q.    And can you tell the ladies and gentlemen when you're called to a scene such as this, how is it that you determine where to fingerprint?

A.    Every scene is going to be different.  I look for items that have obviously been moved, points of entrance or exit. Each of the items of evidence that were collected were fingerprinted.  It depends on the scene itself.

Q.    Okay.  And is it fair to say you can't physically fingerprint every square inch of any particular location?

A.    No, sir, you can't.

Q.    And you don't fingerprint, for instance, the ceilings?

A.    No, sir.

SA-507

48

Q.   And are there certain types of surfaces that are more conducive to giving fingerprints than others?

A.   Oh, absolutely.

Q.   Such as?

A.   Glass is a perfect surface to get fingerprints from as long as it's not oily or wet.  It's a great surface.  A cinder block you wouldn't be able to get fingerprints from.

Q.   Now, did you attempt to lift fingerprints off the storm door?

A.   Yes, sir, I did.

Q.   Can you tell the ladies and gentlemen about that?

A.   Yes, sir.  I examined the inside and the outside surfaces of the storm door with black fingerprint powder, and I was able to obtain fingerprints from that.

Q.   Can you tell the ladies and gentlemen just briefly when the term is used, recover fingerprints or lift fingerprints, what is meant by that?  What do you physically do?

A.   Okay.  You typically use black powder.  You apply the black powder to the door using a fingerprint brush.  Then you use a special tape that we buy from Searchie Company, and you use the tape.  You apply it over the print very carefully, and then you lift the print using the tape, and you put that on to a white three by five fingerprint card.

Q.   And what do you do with the card once you put the tape on it?

SA-508

49

A.    Okay.  I document the information where the latent fingerprint came from, all the pertinent information as to case number, the number of print, and on each of the lifts that I take, I will draw a diagram indicating the item that I've -- you know, showing the item that I've taken it off of and then I put an X where the latent fingerprint came from.

Q.    I'm showing you what's been marked M, as in Mary, 52, and ask if you recognize that item?

A.    Yes, sir.  Your item number M52 is my lift number 2, and once again, this is a lift card that has all the information, including the address, the case number, and my signature on the front of it.

MR. ZEIDENBERG:  Your Honor, I'd move to introduce M52

MR. KIERSH:  Your Honor, I haven't seen this.  I'd like to examine it first.

THE COURT:  All right.

MR. KIERSH:  Thank you.

MR. ZEIDENBERG:  I'd be moving M52.

THE COURT:  Government's M52 is admitted.

(Whereupon, Government's Exhibit No. M52 was marked for identification and received in evidence.)

BY MR. ZEIDENBERG:

Q.    Did you photograph the actual door that you took the fingerprint from?

**SA-509**

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 518 of 668

72

Q.    So once one examiner looks at it, another examiner looks at it all over again?

A.    Yes.

Q.    Is that --

A.    That's office procedure, yes.

Q.    That's standard procedure?

A.    Yes.

Q.    It's done in every case?

A.    Yes.

Q.    And when you had an opportunity to examine what's been marked M, as in Mary, 52, did you find it to be a match with a known set of prints?

A.    Yes, I did.

Q.    And whose print did you find it to be identical to?

A.    It was identical to Mr. William Sweetney -- Sweeney, I think that's the pronunciation.

Q.    Middle name?

A.    Mr. William Kyle Sweeney.

Q.    And what finger was it of Mr. Sweeney's?

A.    It was finger number 8, which is the left middle finger.

Q.    Any question in your mind about that opinion?

A.    No, it is not.  I am one hundred percent sure.

        MR. ZEIDENBERG:  I have no further questions, Your Honor.

                    CROSS EXAMINATION

1



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          . Docket No. CR 98-329
                                   .
            Government,            . Washington, D.C.
                                   . April 3, 2001
    vs.                            . 2:08 p.m.
                                   .
VINCENT HILL,          .           . (AFTERNOON SESSION)
JEROME MARTIN,                     .
SAMUEL CARSON,                     .
WILLIAM K. SWEENEY,                .
SEAN COATES,                       .
                                   .
            Defendants             .          **FILED**

. . . . . . . . . . . . . .  .     .        MAR 1 1 2003

                                   .    NANCY MAYER WHITTINGTON, CLERK
UNITED STATES OF AMERICA,          .          U.S. DISTRICT COURT
                                   .
            Government,            .     Docket No. CR 99-348
                                   .
    vs.                            .
                                   .
GARY PRICE,                        .
                                   .
            Defendant.             .

. . . . . . . . . . . . . .  .

                    TRANSCRIPT OF TRIAL
          BEFORE THE HONORABLE THOMAS P. JACKSON
        UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C. 20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

SA-511

2

For the Defendant Carson:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7th Street, N.W.
                                   Washington, D.C.  20004

For the Defendant Sweeney:         STEVEN R. KIERSH, ESQ.
                                   717 D Street, N.W.
                                   Suite 400
                                   Washington, D.C.  20004

For the Defendant Coates:          FREDERICK JONES, ESQ.
                                   901 6th Street, S.W.
                                   Suite 409
                                   Washington, D.C.  20024

For the Defendant Price:           JONATHAN ZUCKER, ESQ.
                                   601 Indiana Ave., N.W.
                                   Suite 901
                                   Washington, D.C.  20024

Court Reporter:                    BEVERLY J. BYRNE
                                   Official Court Reporter
                                   Room 6810 U.S. Courthouse
                                   Washington, D.C.  20001
                                   (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

SA-512

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 521 of 668

32

examining PG410 and PG413?

A.    PG410 and PG413, I compared these items and concluded that they were both fired from a barrel -- they're both .40 caliber bullets or bullet jackets, .40 caliber.  And they were fired from a barrel rifled with what's called polygonal rifling.  That's P-O-L-Y-G-O-N-A-L, polygonal rifling.  It's a very distinct type rifling.

Q.    And can you tell us whether or not the type of weapon called the Glock produces that polygonal rifling that you've just described for us?

A.    Yes, a Glock firearm is manufactured with polygonal rifling like that that is on these bullets.

Q.    So are the marks that were left on those two bullets consistent with having been fired from a Glock?

A.    Yes, these could have been fired from a Glock.  That's correct.

Q.    In addition to the bullets, you were given some shell casings to look at?

A.    That's correct.

Q.    And I've handed you now what's been marked and introduced PG400, 401, 402, 403, 404, 406, 407, 408, 409, 411, 412 and 414; is that right?

A.    Yes, that's correct.

Q.    That's 12 shell casings in total?

A.    That's correct.  There are 12 cartridge cases, shell

SA-513

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 522 of 668

33

casings here.

Q.    All right.  And have you had an opportunity prior to testifying today to examine each and every one of those shell casings?

A.    Yes, I did.

Q.    And did you reach any conclusions as a result of that examination?

A.    Yes.  I concluded that these cartridge cases were all fired from one and the same firearm, and that would be a .40 caliber handgun.

Q.    And in addition to determining that all of those shell casings came from one firearm, did your findings -- can they tell you whether or not those shell casings were consistent with having been fired from a Glock?

A.    Yes, the class characteristics on the heads of these cartridge cases are like those that are produced by a Glock firearm.

MS. CHATURVEDI:  I have no further questions.

CROSS-EXAMINATION

BY MR. KIERSH:

Q.    Good afternoon, sir.  Can you tell us again what are Exhibits 410 and 413?

A.    I wish I had them written down in front of me.  I don't. If you could --

Q.    I will approach and show them to you.

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 523 of 668

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,                     :

 VS.                                    :        CR. NO. 98-329

VINCENT HILL,                           :
JEROME MARTIN,                          :        FILED
SAMUEL CARSON,                          :
WILLIAM K. SWEENEY,                     :        JUL 1 9 2001
SEAN COATES,                            :
        DEFENDANTS.                     :

UNITED STATES                           :
        GOVERNMENT,                     :

   VS.                                  :        CR. NO. 99-348

GARY PRICE,                             :
        DEFENDANT                       :

WASHINGTON, D. C.
APRIL 4, 2001
(MORNING SESSION)
(10:15 A.M.)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:          PHYLLIS MERANA
                         6816 U. S. DISTRICT COURT
                         3RD & CONSTITUTION AVE., N.W.
                         WASHINGTON, D. C. 20001

SA-515

Q.  WHAT IF ANYTHING ELSE DID MR. MARTIN SAY ABOUT HIS BELIEF THAT RODNEY SHORT HAD ARRANGED FOR HIM TO BE SENT TO LORTON?

A.  BECAUSE THEY HAD A "BEEF" -- 58TH AND 37TH HAD A BEEF AND ABOUT HIM KILLING TONY FORTUNE.

Q.  YOU HAD A CONVERSATION WITH HIM ABOUT -- I AM SORRY. THE LAST PART OF YOUR ANSWER, I GOT DISTRACTED.  WHAT DID YOU SAY?

A.  KILLING TONY FORTUNE.

Q.  WHO KILLED TONY FORTUNE, ACCORDING TO "PIMP"?

A.  "PIMP."

Q.  AND DID "PIMP" SPEAK ABOUT THE MURDER OF TONY FORTUNE WITH YOU?

A.  YES.

Q.  WHAT DID "PIMP" TELL YOU ABOUT THE MURDER --

        MS. HEPWORTH:  YOUR HONOR, THIS IS SO LEADING. IT'S SO LEADING.

        THE COURT:  NO, IT'S NOT LEADING.  THE OBJECTION IS OVERRULED.

        GO AHEAD.

BY MS. CHATURVEDI:

Q.  WHAT DID MR. MARTIN SAY TO YOU ABOUT THE MURDER OF TONY FORTUNE?

A.  HE SAID THAT HE TRIED -- WELL, HE WAS MAKING MOTIONS LIKE HE WAS GOING TO TRY TO ROB THE CRAPGAME.

USCA Case #23-3015   Document #2109460      Filed: 04/04/2025   Page 525 of 668

86

Q.   WHO WAS MAKING MOTIONS?

A.   TONY FORTUNE.

Q.   AND WHAT HAPPENED AT THAT POINT?

MR. BESHOURI: OBJECTION.  IF WE CAN APPROACH.

MS. CHATURVEDI:  OKAY.

THE COURT:  CAN YOU ANTICIPATE WHAT HIS OBJECTION IS?

MS. CHATURVEDI:  YES.  I DON'T BELIEVE THE ISSUE IS GOING TO ARISE.

MR. BESHOURI:  ALL RIGHT.  WITHDRAWN.

THE COURT:  ALL RIGHT.  GO AHEAD.

BY MS. CHATURVEDI:

Q.   ALL RIGHT.  WHAT DID "PIMP," MR. MARTIN, TELL YOU ABOUT THE MURDER OF TONY FORTUNE?

A.   HE BASICALLY SAID THAT TONY FORTUNE WAS BASICALLY MAKING GESTURES LIKE HE WAS GOING TO ROB THE CRAPGAME.  AND HE SAID HE PUNISHED HIM.

Q.   WHO PUNISHED HIM?

A.   "PIMP."

Q.   WHAT DID YOU UNDERSTAND IT TO MEAN WHEN HE SAID THAT HE PUNISHED HIM?

A.   HE KILLED HIM.

Q.   DID "PIMP" DESCRIBE FOR YOU WHAT HAPPENED AFTER TONY FORTUNE WAS KILLED?

A.   HE STATED THAT HE COULD HAVE SURVIVED BUT --

SA-517

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 526 of 668

94

JURY.

MR. KIERSH:  VERY WELL.

MR. ZUCKER:  YOUR HONOR, I DON'T KNOW IF IT HAS BEEN DONE ALREADY.  I'D REQUEST THAT THE PROSECUTION PROVIDE THE 302'S FOR AN IN CAMERA REVIEW ON JENCKS ISSUES.  IT SEEMS TO ME THAT THE DEBRIEFINGS OF THIS MAN WERE PROBABLY ANALOGOUS TO THE DEBRIEFINGS OF MONTGOMERY.

OBVIOUSLY, I DON'T KNOW THAT UNTIL YOU HAVE REVIEWED THEM, UNLESS THEY AGREE THAT THEY ARE, IN WHICH WHICH CASE THEY WOULD PROVIDE THEM TO US.

ADDITIONALLY, I WOULD MAKE A BRADY DEMAND FOR ANY INDICATION THEY HAVE THAT THIS MAN HAS A CONTINUING SUBSTANCE-ABUSE PROBLEM THAT WOULD AFFECT HIS VERACITY AND ABILITY TO RECALL.

THE COURT:  THE GOVERNMENT KNOWS WHAT IT'S BRADY OBLIGATIONS ARE.  ARE THERE 302'S?

MS. CHATURVEDI:  THE COURT'S INDULGENCE, YOUR HONOR.

THERE IS ONE 302 AND ANOTHER INVESTIGATIVE REPORT. I CAN PROVIDE THEM FOR IN CAMERA INSPECTION.  NEITHER OF THOSE DOCUMENTS, YOUR HONOR, THE GOVERNMENT BELIEVES, ARE JENCKS MATERIAL WITH RESPECT TO THIS WITNESS.  AND IN ANTICIPATION OF THIS ISSUE BEING RAISED, WE HAVE PREPARED A VERY SHORT BENCH MEMORANDUM REGARDING WHETHER OR NOT 302'S CONSTITUTE JENCKS MATERIAL.  WE CAN GIVE A COPY TO THE --

**SA-518**

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 527 of 668

THE COURT:  IN GENERAL OR IN THIS PARTICULAR CASE?

MS. CHATURVEDI:  IN GENERAL, YOUR HONOR.  I WILL GIVE YOU BOTH.  I WILL GIVE YOU THE 302'S AND THE --

THE COURT:  I AM GENERALLY FAMILIAR WITH THE AUTHORITY ON THE SUBJECT.  SOME 302'S, IN MY JUDGMENT, ARE JENCKS MATERIAL.  SOME ARE NOT.

MS. CHATURVEDI:  VERY WELL.  I WILL TURN THEM OVER FOR IN CAMERA INSPECTION.

THE COURT:  SO LET ME A LOOK AT THEM IN CAMERA. IF YOU GIVE THEM TO MR. LELAND, I WILL LOOK AT THEM OVER THE NOONTIME.

MS. CHATURVEDI:  YES, SIR.

(WHEREUPON, AT 12:30 P.M., THE ABOVE-ENTITLED MATTER WAS ADJOURNED.)

CERTIFICATE OF REPORTER

THIS RECORD IS CERTIFIED BY THE UNDERSIGNED REPORTER TO BE THE OFFICIAL TRANSCRIPT OF THE PROCEEDINGS INDICATED.

PHYLLIS MERANA

SA-519

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,                .   Docket No. CR 98-329
                                         .
            Government,                   .   Washington, D.C.
                                         .   April 5, 2001
      vs.                                .   2:15 p.m.
                                         .
VINCENT HILL,                            .   (AFTERNOON SESSION)
JEROME MARTIN,                           .
SAMUEL CARSON,                           .
WILLIAM K. SWEENEY,                      .
SEAN COATES,                             .

            Defendants                    .

. . . . . . . . . . . . . . . . .   .

UNITED STATES OF AMERICA,                .

            Government,                   .

      vs.                                .   Docket No. CR 99-348
                                         .
GARY PRICE,                              .

            Defendant.                    .

. . . . . . . . . . . . . . . . . . .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

SA-520

2

For the Defendant Carson:       JOSEPH BESHOURI, ESQ.
                                     LEXI NEGIN-CHRIST, ESQ.
                                     419 7th Street, N.W.
                                     Washington, D.C.  20004

For the Defendant Sweeney:     STEVEN R. KIERSH, ESQ.
                                     717 D Street, N.W.
                                     Suite 400
                                     Washington, D.C.  20004

For the Defendant Coates:      FREDERICK JONES, ESQ.
                                     901 6th Street, S.W.
                                     Suite 409
                                     Washington, D.C.  20024

For the Defendant Price:       JONATHAN ZUCKER, ESQ.
                                     601 Indiana Ave., N.W.
                                     Suite 901
                                     Washington, D.C.  20024

Court Reporter:               BEVERLY J. BYRNE
                                     Official Court Reporter
                                     Room 6810 U.S. Courthouse
                                     Washington, D.C.  20001
                                     (202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-521

3

P R O C E E D I N G S

THE DEPUTY CLERK:  Criminal Case 98-329, United States of America versus Vincent Hill, Jerome Martin, Samuel Carson, William Sweeney, Sean Coates and 99-348, United States versus Gary Price.

Peter Zeidenberg and Anjali Chaturvedi for the government.  Christopher Davis for Defendant Vincent Hill. Joanne Hepworth for Defendant Jerome Martin.  Joseph Beshouri and Lexi Negin-Christ for Defendant Samuel Carson.  Steven Kiersh for Defendant Sweeney.  Frederick Jones for Defendant Coates, and Jonathan Zucker for Defendant Price.

THE COURT:  Good afternoon, counsel.

MR. BESHOURI:  Your Honor, before we get underway today, may we approach briefly out of hearing of the witness?

THE COURT:  Yes.

(Bench conference on the record.)

MR. BESHOURI:  Your Honor, the Court heard yesterday from this witness that he gave a statement to Mr. Sweeney's investigator in which he disavowed any knowledge of criminal conduct by these defendants.  He also testified then that he wants to withdraw from that position.

The Court has reviewed the 302's, and I'm not asking the Court to revisit whether they should be delivered to the defense, but since the Court has read them, he says in his statement to Mr. Sweeney's investigator that when the FBI

SA-522

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

4

asked him about whether he had any information about these defendants that he told the FBI he didn't know anything about these defendants.

Accepting his explanation that when he spoke to Sweeney's investigator, he had concerns about his safety or his family's safety, whatever the case may be, it's a different circumstance if he tells the FBI in the security of the meeting with them that he knows nothing about these defendants.

So if the 302's establish that, if they say that he wasn't asked, he was inquire of, and he had no information, he said he had no information about -- at least initially -- it seems to me that would clearly be Brady, material favorable to impeachment.

THE COURT:  It probably would.  I do not recall any such statement in the 302's.  Now, I will look at them again in light of what you have represented to me, but I do not recall any similar statement.

MR. BESHOURI:  Very well.

THE COURT:  To that which you have described.  I will do that at the first recess.

MR. BESHOURI:  Thank you, Your Honor.

THE COURT:  Do you still have them here?

MS. CHATURVEDI:  Yes.

(End of bench conference.)

SA-523

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 532 of 668

67

(Bench conference on the record.)

MS. NEGIN-CHRIST:  Your Honor, we just wanted the Court to review the FBI --

THE COURT:  I was going to ask you.  Do you want me to take a look at the 302s now?

MS. NEGIN-CHRIST:  Before the witness is excused.  And we also request --

THE COURT:  All right.  We will take a brief recess.

MS. NEGIN-CHRIST:  There is also a request -- a Jencks request based on the testimony about the notes of the agents.  We would ask the Court to review those for Jencks as well.

THE COURT:  The notes going to the 302s, they are just a rough material for the 302s.

MR. KIERSH:  There may be other notes, and they may be Brady information based upon the new information --

THE COURT:  The government knows what their Brady obligation is.

MR. KIERSH:  Well, Your Honor, I learned about Mr. Bender's psychiatric treatment for the first time five minutes before we walked into the courtroom today.  And it's a pretty important piece of information to learn about.  And none of the defense lawyers knew, and the Court didn't know.

THE COURT:  Well, why is that Brady information?

MR. KIERSH:  That the witness is writing letters to

SA-524

68

a Judge in this jurisdiction saying I'm hearing voices at the time that he says he is developing information --

THE COURT:  And that's exculpatory --

MR. KIERSH:  That's absolutely exculpatory.

THE COURT:  I doubt that.

MR. KIERSH:  Well, my position, Your Honor, is that that certainly is exculpatory.

THE COURT:  I will take a look at the 302s.  We will take a brief recess.

(End of bench conference.)

SA-525

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 534 of 668

76

threatened, who cares?  The man hears voices.  We don't want to hear it.  And it's not helpful to the jury.  It's not relevant.  You know, we don't care what he thinks.  His family wasn't threatened.  That was the question.  This is simple.

THE COURT:  As long as you caution him, when you put the question again and say don't tell us what somebody tell us, but what do you believe at this point?

MR. DAVIS:  But, Your Honor, again, I'm going to object to him saying why he thinks they're doing it, because it has no relevance.

THE COURT:  Then you should not have asked the question on recross.

MR. DAVIS:  I didn't ask him why he thought something, Judge.  I didn't ask him why he thought something. I asked him if his family was threatened.

THE COURT:  She's entitled to ask him on redirect.

MR. DAVIS:  Then my objection is is that he's testifying to speculation.

THE COURT:  And your objection is overruled.

MR. ZUCKER:  I assume mine is as well?

THE COURT:  Yours is, too.

(End of bench conference.)

(Pause.)

THE COURT:  The basis for your request that I rereview these 302s, if I understand correctly, Mr. Kiersh, is

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 535 of 668

77

that you believe that they may be consistent with the statement given to your investigator; is that correct?

MR. KIERSH:  That's one basis, yes, Your Honor.

THE COURT:  And the other basis is that you hope that I will rethink the matter?

MR. KIERSH:  No, I was hoping you're constantly thinking about these matters, as I'm sure you are.  But mental incapacity of a witness, I submit, is Brady.  So I'd ask the Court to look at those notes --

THE COURT:  There is nothing in here relating to mental incapacity.

MR. KIERSH:  That's what I was asking.

THE COURT:  Furthermore, everything that I see written in the 302s is consistent with testimony that he has given here in court, contrary to any suggestion that he might have disclaimed any knowledge about these defendants.  And I believe that I discerned one instance of admissible testimony he was not even asked about on direct examination.

MR. KIERSH:  Very well.  Then we would just ask as with all the other documents, those be sealed and made a part of the permanent record?

THE COURT:  They will be sealed and made part of the record.

All right.  Let's bring the jury back if they're ready.

SA-527

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | . | Docket No. CR 98-329 |
| Government, | . | Washington, D.C. |
| | . | April 9, 2001 |
| vs. | . | 2:12 p.m. |
| | . | |
| VINCENT HILL, | . | (AFTERNOON SESSION) |
| JEROME MARTIN, | . | |
| SAMUEL CARSON, | . | |
| WILLIAM K. SWEENEY, | . | |
| SEAN COATES, | . | |
| | . | |
| Defendants | . | |
| | . | |
| . . . . . . . . . . . . | . | |
| | . | |
| UNITED STATES OF AMERICA, | . | |
| | . | |
| Government, | . | |
| | . | Docket No. CR 99-348 |
| vs. | . | |
| | . | |
| GARY PRICE, | . | |
| | . | |
| Defendant. | . | |
| | . | |
| . . . . . . . . . . . . | . | |

FILED

MAR 1 1 2003

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

| | |
|---|---|
| For the Government: | PETER ZEIDENBERG, AUSA<br>ANJALI CHATURVEDI, AUSA<br>U.S. Attorney's Office<br>555 Fourth Street, N.W.<br>Washington, D.C.  20001 |
| For the Defendant Hill: | CHRISTOPHER DAVIS, ESQ.<br>601 Indiana Avenue, N.W.<br>Suite 910<br>Washington, D.C.  20004 |
| For the Defendant Martin: | JOANNE HEPWORTH, ESQ.<br>305 H Street, N.W.<br>Second Floor<br>Washington, D.C.  20001 |

SA-528

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.  20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.  20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.  20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.  20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.  20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

11

(Jury In.)

THE DEPUTY MARSHAL:  Jury panel is all present, Your Honor.

THE COURT:  Thank you, Marshal.  All right, Mr. Zeidenberg, you may proceed.

MR. ZEIDENBERG:  Thank you, Your Honor.

EUGENE BYARS, GOVERNMENT'S WITNESS, RESUMED THE STAND

DIRECT EXAMINATION (Cont.)

BY MR. ZEIDENBERG:

Q.   Mr. Byars, I was asking you right before the lunch recess, you were saying that you were incarcerated from roughly 1990 when you pled guilty to two robbery counts until early 1997; is that correct?

A.   Yes.

Q.   Now, while you were incarcerated, sometime in early part of -- spring of 1996, did you have occasion to go to the D.C. General Hospital?

A.   Yes.

Q.   Can you tell us -- first of all, why were you at D.C. General?

A.   For medical reasons.  I can't recall what they were.

Q.   When you were at D.C. General, were you still in custody of the Department of Corrections?

A.   Yes.

Q.   Is there a special area of the D.C. General Hospital for

**SA-530**

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

USCA Case #23-3015      Document #2109460         Filed: 04/04/2025      Page 539 of 668

12

inmates?

A.   Yes, lock ward.

Q.   Now, did you see anyone you knew at the lock ward when you went to the hospital?

A.   Yes.

Q.   Who is that?

A.   Pimp.

Q.   What was Pimp --- did Pimp and you speak?

A.   Yes.

Q.   Did he tell you what it was he was doing at the hospital?

A.   Yes.

Q.   What did he say he was doing there?

A.   He was there because he had a hernia.

Q.   I'm sorry?

A.   Hernia.

Q.   Hernia?

A.   Yes.

Q.   Now, while you were there with Pimp, did you have some conversations with him?

A.   Yes.

Q.   Did you have a conversation with him regarding Tony Fortune?

A.   Yes.

Q.   Now, can you tell the ladies and gentlemen how it was that conversation came up?

SA-531

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 540 of 668

13

A.    I was just basically telling him about guys that's down Lorton talking about they wanted to kill him.

Q.    Mr. Byars, if you could put your hand down.

A.    I was basically telling him about guys that's down Lorton talking about they wanted to kill him and do things to him because of the results of Tony Fortune.

Q.    The people that you had talked to in Lorton who wanted to kill -- said they wanted to kill Mr. Martin, where were they from?

A.    They was from 58th and Paradise.

Q.    What did Pimp say when you told him that there were people down at Lorton from 58th and Paradise who wanted to kill him?

A.    It didn't matter.  He was saying things like, he ain't tripping off that shit, and what happens just happens.

Q.    Did you ask him what the problem was between him and 58th and Paradise?

A.    Yes.  He told me -- he was telling me that Tony jumped out there, was trying to advantage take when they was gambling.

Q.    Now, when he said Tony, did you know who he was referring to?

A.    I don't know the dude personally, but I know the name, because the guys in 58 was accusing him of -- that's the reason why they was beefing with them.

SA-532

14

Q.   And the individual that the beef was over was named whom?

A.   Tony Fortune.

Q.   What did Pimp tell you about Tony Fortune?

A.   He would just say that he was trying to advantage take, you know, at a crap game.  And a guy named Block was with Tony, and he wasn't having it.

Q.   Did Pimp tell you what happened when Tony tried to take advantage?

A.   Yes.

Q.   What did he say?

A.   He said he shot him.

Q.   Now, did Pimp tell you what happened as a result of the murder of Tony Fortune?

A.   Yes, it started a turf war.

Q.   Between where?

A.   58th, Paradise and Southwest and Ridge Road.

Q.   Now, as a result of this turf war, did he tell you whether or not there were any casualties?

A.   Repeat that?

Q.   Was anyone hurt or injured or killed as a result of this turf battle?

A.   Yes.

Q.   Who?

A.   A guy named Boo-Boo and a girl named Felicia.  She was paralyzed.

SA-533

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

48

(Jury Out.)

(Recess.)

MR. KIERSH:  Your Honor, just a brief matter to save having to file a pleading.  The Court just informed all of us that on the afternoon of April 19 we will not be in session. What all of the defendants and their lawyers would like to do is have a joint meeting in the cell block on April 19.  So I'd ask the Court -- I'll submit an order, but the same type of order we've had in the past.

THE COURT:  You mean in lieu of having a morning session?

MR. KIERSH:  No, no, we'll have the morning session in court, but then if the marshals can keep everybody here in the afternoon, all the lawyers will come back, and we'll have a joint meeting in the cell block, and I'll give you the same order that we've used in the past.

THE COURT:  If Marshal Adams says that it can be done, we'll do it.

MR. KIERSH:  Very well.  And with respect to this witness, we would ask the same process on any FBI 302s be employed that we've used in the past that the Court conduct an in camera review.

THE COURT:  All right.

(Pause.)

THE COURT:  Are you looking at the 302s, Mr.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

49

Zeidenberg?

MR. ZEIDENBERG:  Yes, Your Honor.  I'll pass them up.

(Pause.)

THE COURT:  I'm going to have to review these.

MR. KIERSH:  Your Honor, I can commence my examination now.  The Court can review them overnight, and then we can revisit in the morning.  I can reopen if necessary.

THE COURT:  All right.  Let's bring in the jury.

THE DEPUTY MARSHAL:  Jury panel, Your Honor.

(Jury In.)

Clerks File

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
      GOVERNMENT,           :

 VS.                                :     CR. NO. 98-329

                       :
VINCENT HILL,                         :
JEROME MARTIN,                        :
SAMUEL CARSON,                        :
WILLIAM K. SWEENEY,                   :
SEAN COATES,                          :
      DEFENDANTS.           :

UNITED STATES                         :
      GOVERNMENT,           :
                       :
  VS.                               :     CR. NO. 99-348
                       :
GARY PRICE,                           :
      DEFENDANT             :

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
APRIL 25, 2001
(MORNING SESSION)
(10:35 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:                PHYLLIS MERANA
                               6816 U. S. DISTRICT COURT
                               3RD & CONSTITUTION AVE., N.W.
                               WASHINGTON, D. C. 20001

SA-536

FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                 ANJALI CHATURVEDI, AUSA
                                 555 4TH ST., N.W.
                                 WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #910
                                 WASHINGTON, D. C. 20004

FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                 305 H STREET, N.W.
                                 2ND FLOOR
                                 WASHINGTON, D. C. 20001

FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7TH STREET, N.W.
                                 WASHINGTON, D. C. 20004

FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
                                 717 D STREET, N.W.
                                 SUITE 400
                                 WASHINGTON, D. C. 20004

FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
                                 901 6TH STREET, S.W.
                                 #409
                                 WASHINGTON, D. C. 20024

FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #901
                                 WASHINGTON, D. C. 20004

SA-537

Case 1:98-cr-00329-RCL   Document 696   Filed 07/19/01   Page 12 of 78

1

DID YOU HAVE AN OPPORTUNITY OR A NUMBER OF OPPORTUNITIES TO SPEAK WITH "DRAPER"?

A.   YES.

Q.   DID HE TELL YOU WHY HE WAS LOCKED UP AT THE JAIL?

A.   YES.   WE WERE IN THE CELL TOGETHER.

Q.   WHAT DID HE TELL YOU AS TO WHY HE WAS LOCKED UP?

A. HE SAID HE WAS LOCKED UP FOR "ROBOCOP" -- A DUDE FROM DOWN IN SOUTHWEST -- A SHOOTING THAT HAPPENED OVER AT SURSUM CORDAS.

Q.   NOW, THIS NAME "ROBOCOP" -- HAD YOU HEARD THAT NAME BEFORE?

A.   YES.

Q.   AND DID YOU KNOW WHAT NEIGHBORHOOD "ROBOCOP" WAS FROM?

A.   YES, HE WAS FROM OUR NEIGHBORHOOD.

Q.   AND THE SHOOTING HAPPENED WHERE?

A.   IT HAPPENED AT SURSUM CORDAS.

Q.   SURSUM CORDAS?

A.   YES.

Q.   DID YOU KNOW "ROBOCOP'S" REAL NAME?

A. NOT REALLY.   NO.

Q.   DID YOU SPEAK WITH "DRAPER" AS TO WHY THE SHOOTING HAPPENED?

A.   YES.

Q.   TELL US WHAT "DRAPER" TOLD YOU.

A.   HE SAID WHEN HE WAS AT THE MIRAGE NIGHT CLUB, "ROBOCOP"

SA-538

Case 1:98-cr-00329-RCL    Document 696    Filed 07/19/01    Page 13 of 78

HAD SMACKED HIM.

Q. AND AS A RESULT OF "ROBOCOP" SMACKING "DRAPER", WHAT DID "DRAPER" DO IN RESPONSE?

A. KILLED HIM.

Q. DID HE TELL YOU WHERE HE KILLED HIM?

A. YES.

Q. DID HE TELL YOU THE CIRCUMSTANCES UNDER WHICH HE KILLED HIM?

A. YES, HE DID.

Q. TELL US ABOUT THAT.

A. HE TOLD ME THAT -- WELL, FIRST OF ALL, HE WAS ARRESTED FOR ACCESSORY.

Q. "DRAPER" WAS ARRESTED FOR ACCESSORY?

A. ACCESSORY TO THE MURDER. AND HE TOLD ME, "THEY AIN'T GOT NOTHING ON ME. I AM GOING BEAT THIS." HE SAID THEY DON'T HAVE NOTHING ON HIM. HE WAS GOING TO BEAT IT, BECAUSE, IN FACT, HE WAS THE ONE THAT ACTUALLY HAD KILLED THE GUY. AND HE SAID ERIC WAS THE ONE THAT DROVE HIM UP THERE, AND HE WALKED THROUGH THE CUT AND CAUGHT HIM WHEN HE WAS SHOOTING DICE AND KILLED HIM.

Q. AND WHEN HE SAID THAT ERIC WAS THE ONE THAT DROVE HIM UP THERE, DID YOU KNOW WHICH ERIC HE WAS SPEAKING ABOUT?

A. MY CO-DEFENDANT.

Q. ERIC JONES?

A. YES.

SA-539

(END OF BENCH CONFERENCE.)

THE COURT:  ALL RIGHT.  THE OBJECTION IS OVERRULED.  YOU CAN ASK YOUR QUESTION AGAIN.

BY MS. CHATURVEDI:

Q.  MR. RICE, YOU HAD INDICATED THAT EVEN BEFORE YOU HAD BEEN INCARCERATED IN 1994, YOU HAD AN UNDERSTANDING AS TO WHO WAS RESPONSIBLE FOR THE MURDER OF TONY FORTUNE.

A.  YES, I DID.

Q.  AND WHAT WAS YOUR UNDERSTANDING AS TO WHO WAS RESPONSIBLE FOR THAT MURDER?

A.  MY UNDERSTANDING WAS THAT IT WAS "PIMP" AND THAT IT WAS 37TH PLACE BECAUSE 58TH WAS ALWAYS "BEEFING" WITH 37TH PLACE AND NOT US.

Q.  WHEN YOU WERE AT THE CHINESE CARRY-OUT WITH "CHIN" AND DAVE CARSON, CAN YOU TELL US HOW YOU BROUGHT UP THE MURDER OF TONY FORTUNE?

A.  WELL, "CHIN" RARELY SAID ANYTHING EVER TO ME ABOUT ANYTHING HE'D EVER DONE.  AND I REALLY DIDN'T KNOW HOW TO ASK HIM.  I WAS KIND OF -- I HAD HEARD ALL KINDS OF -- NOT RUMORS, BUT PEOPLE TALKED TO ME A LOT BECAUSE ON THE STREET WHEN WE WAS LOCKED UP, DUDES ALWAYS RESPECTED ME FROM JAIL.

Q.  SO WHAT DID YOU SAY TO "CHIN"?

A.  I SAID, "MAN, ALL THAT TIME I THOUGHT IT WAS `PIMP,' AND COME TO FIND OUT IT WAS YOU, MAN."

Q.  WHAT DID "CHIN" SAY WHEN YOU SAID THAT TO HIM?

SA-540

4

A. HE STARTED LAUGHING. HE SAID, "WELL, NOW YOU KNOW." HE DIDN'T SAY NOTHING FURTHER. I KIND OF EXPRESSED THE FACT, "THIS IS HOW THE DUDE SAID IT HAPPENED," YOU KNOW. HE REALLY JUST SAID, "NOW YOU KNOW."

Q. AGAIN, HAD YOU SAID THE NAME OF THE PERSON TO HIM?

A. YES. I DIDN'T SAY "TONY FORTUNE." I JUST SAID "TONY" AT 58TH.

Q. WHEN "CHIN" SAID TO YOU, "NOW YOU KNOW," CAN YOU DESCRIBE HOW HE LOOKED AT YOU WHEN HE SAID THAT TO YOU?

A. IT'S TIME FOR ME TO SHUT UP, MAN, AND MIND MY BUSINESS, LIKE I HAD REALLY KIND OF LIKE MESSED UP BY EVEN ASKING HIM.

Q. WHY DID YOU ASK HIM?

A. WHY DID I ASK HIM?

Q. YES.

A. BECAUSE THE WAY IT WAS BROUGHT TO ME, I DIDN'T LIKE IT BECAUSE "BOO-BOO" WAS KILLED BEHIND THAT, AND SEVERAL PEOPLE TOLD ME --

Q. I AM NOT GOING TO ASK YOU WHAT OTHER PEOPLE TOLD YOU. "BOO BOO," THE PERSON THAT YOU MENTIONED WAS KILLED BEHIND THAT -- "BOO BOO" WAS SOMEONE THAT YOU WERE CLOSE WITH?

A. YES, WE WAS COOL WHEN WE WAS YOUNGER. I NEVER HAD A PROBLEM WITH "BOO-BOO."

Q. IN 1996 WHEN YOU WERE ON THE STREET AS WELL, MR. RICE, WERE YOU IN THE AREA OF SECOND AND P STREET AT A TIME WHEN YOU HEARD GUNSHOTS AND "CHIN" WAS IN THE AREA?

SA-541

USCA Case #23-3015   Document #2109160     Filed 07/09/2025   Page 1 of 589
Case 1:98-cr-00329-RCL   Document 697     Filed 07/19/2025   Page 589 of 668



UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
          GOVERNMENT,                    :

 VS.                                     :          CR. NO. 98-329

VINCENT HILL,                            :
JEROME MARTIN,                           :
SAMUEL CARSON,                           :
WILLIAM K. SWEENEY,                      :
SEAN COATES,                             :
          DEFENDANTS.                    :
                                         :
UNITED STATES                            :
          GOVERNMENT,                    :
                                         :
     VS.                                 :          CR. NO. 99-348
                                         :
GARY PRICE,                              :
          DEFENDANT                      :


FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT


                          WASHINGTON, D. C.
                          APRIL 26, 2001
                          (MORNING SESSION)
                          (10:25 A.M.)


                TRANSCRIPT OF PROCEEDINGS
      BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

SA-542

5

(JURY OUT.)

MR. DAVIS: YOUR HONOR, IN CONSULTING WITH MR. HILL. I HAVE ONE VERY BRIEF OR POSSIBLY TWO VERY BRIEF QUESTIONS.

THE COURT: ALL RIGHT.

MR. DAVIS: YOUR HONOR, I NEVER SAW THE 302'S FOR THIS MAN, AND I WOULD LIKE TO KNOW IF THERE IS ANY REFERENCE TO THESE SHOOTING INCIDENTS IN THEM.

THE COURT: I LOOKED AT THE 302. THERE IS ONE 302, AND I LOOKED AT IT IN CAMERA TWICE.

MR. DAVIS: I KNOW. IT'S HARD. I GUESS I COULD ASK MR. ZEIDENBERG.

(CONFERRING WITH MR. ZEIDENBERG.)

MR. DAVIS: I GOT THE ANSWER, YOUR HONOR.

THE COURT: ALL RIGHT. LET'S BRING THE JURY IN.

MS. CHATURVEDI: YOUR HONOR, MR. JONES AND MS. HEPWORTH AREN'T HERE.

THE COURT: I DON'T KNOW WHERE THEY ARE.

MS. CHATURVEDI: I CAN CHECK IN THE HALLWAY IF YOU WOULD LIKE ME TO.

MS. NEGIN-CHRIST: I WILL.

(JURY IN.)

SA-543

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES,
      GOVERNMENT,

   VS.

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,
      DEFENDANTS.

              :   CR. NO. 98-329

UNITED STATES
      GOVERNMENT,

   VS.

GARY PRICE,
      DEFENDANT

              :   CR. NO. 99-348

WASHINGTON, D. C.
MAY 14, 2001
(MORNING SESSION)
(10:35 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:

PHYLLIS MERANA
6816 U. S. DISTRICT COURT
3RD & CONSTITUTION AVE., N.W.
WASHINGTON, D. C. 20001

SA-544

705

FOR THE GOVERNMENT:              PETER ZEIDENBERG, AUSA
                                 ANJALI CHATURVEDI, AUSA
                                 555 4TH ST., N.W.
                                 WASHINGTON, D. C. 20001


FOR THE DEFENDANT HILL:          CHRISTOPHER DAVIS, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #910
                                 WASHINGTON, D. C.  20004


FOR THE DEFENDANT MARTIN:        JOANNE HEPWORTH, ESQ.
                                 305 H STREET, N.W.
                                 2ND FLOOR
                                 WASHINGTON, D. C.  20001


FOR THE DEFENDANT CARSON:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7TH STREET, N.W.
                                 WASHINGTON, D. C.  20004


FOR THE DEFENDANT SWEENEY:       STEVEN R. KIERSH, ESQ.
                                 717 D STREET, N.W.
                                 SUITE 400
                                 WASHINGTON, D. C.  20004


FOR THE DEFENDANT COATES:        FREDERICK JONES, ESQ.
                                 901 6TH STREET, S.W.
                                 #409
                                 WASHINGTON, D. C.  20024


FOR THE DEFENDANT PRICE:         JONATHAN ZUCKER, ESQ.
                                 601 INDIANA AVE., N.W.
                                 #901
                                 WASHINGTON, D. C.  20004

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|

SP. AGT. KRISTEN KANE

| BY MR. ZEIDENBERG | 6 | | 24 | |
|---|---|---|---|---|
| BY MR. BESHOURI | | 10 & 23 | | 30 |
| BY MR. ZUCKER | | 20 | | 34 |

SP. AGT. VINCENT LISI

| BY MR. ZEIDENBERG | 35 | | | |
|---|---|---|---|---|
| BY MR. KIERSH | | 39 | | |
| BY MR. BESHOURI | | 40 | | |
| BY MR. ZUCKER | | 43 | | |

JOHN VENABLE

| BY MR. ZEIDENBERG | 50 | | | |
|---|---|---|---|---|

E-X-H-I-B-I-T-S

GOVERNMENT'S                    IN EVIDENCE

A31                              62

DW100                            64

DW102                            66

DW108                            68

SA-546

Q. YOU BELIEVE YOU MAY BE A COUPLE YEARS OLDER?

A. YES.

Q. I WANT TO DIRECT YOUR ATTENTION, MR. VENABLE, TO THE AFTERNOON OF SEPTEMBER 26TH, 1994. DO YOU RECALL THAT AFTERNOON?

A. YES, I DO.

Q. WHERE WERE YOU THAT AFTERNOON?

A. IN MY HOUSE.

Q. WHERE WAS YOUR HOUSE AT THAT TIME?

A. 69 K STREET.

Q. THAT'S SURSUM CORDAS?

A. YES.

Q. WERE YOU ALONE OR WAS SOMEONE ELSE IN THE APARTMENT WITH YOU?

A. ME, "ROBO," MY MOTHER AND A COUPLE OF MY COUSINS.

Q. NOW, HOW LONG WAS "ROBO" -- AT SOME POINT DID "ROBO" LEAVE OUT OF THE APARTMENT?

A. YES.

Q. HOW LONG HAD HE BEEN IN THE APARTMENT BEFORE HE LEFT?

A. ABOUT 10 -- MAYBE ABOUT 10 OR 15 MINUTES.

Q. NOW, DID YOU TALK TO HIM DURING THAT 10 OR 15 MINUTES?

A. YES.

Q. AFTER 10 OR 15 MINUTES WHEN YOU HAD A CONVERSATION, DID HE LEAVE?

A. YES.

SA-547

Case 1:98-cr-00329-RCL    Document 705    Filed 07/19/01    Page 59 of 89

5

Q. DID YOU KNOW WHERE HE WAS GOING?

A. HE SAID HE WAS GOING OUTSIDE.

Q. NOW, CAN YOU EXPLAIN TO THE LADIES AND GENTLEMEN -- WE HAVE SOME PHOTOGRAPHS, BUT COULD YOU JUST EXPLAIN GENERALLY WHERE 69 K STREET, YOUR ADDRESS -- WHAT TYPE OF RESIDENCE IT WAS AND WHAT IT LOOKED OUT ON?

A. IT WAS A ROUGH NEIGHBORHOOD.

Q. WAS IT A TOWNHOUSE?

A. YES.

Q. AND IS THERE A PARKING LOT RIGHT OUTSIDE THAT APARTMENT?

A. YES, THERE WAS.

Q. WHAT TYPE OF ESTABLISHMENTS ARE OUT THERE?

A. SOME BUILDINGS, TOWNHOUSES, AND PARKING LOTS.

Q. IS THERE A SUPERMARKET?

A. A SUPERMARKET, YES.

Q. AFTER DONNELL WHITFIELD, YOUR COUSIN, WENT OUT OF THE APARTMENT, DID YOU HEAR ANYTHING?

A. YES. I HEARD SOME GUNSHOTS.

Q. DO YOU REMEMBER HOW MANY GUNSHOTS APPROXIMATELY YOU HEARD?

A. AROUND ABOUT 10. NINE TO 10 GUNSHOTS. I DON'T KNOW.

Q. WHEN YOU HEARD THE GUNSHOTS, WHAT DID YOU DO?

A. WENT TO THE WINDOW.

Q. YOU WENT TO THE WINDOW?

A. YES.

Q. WHEN YOU WENT TO THE WINDOW, MR. VENABLE, CAN YOU TELL THE LADIES AND GENTLEMEN WHAT IT IS THAT YOU SAW?

A. I SAW THE DEFENDANT RUN AWAY FROM THE CRAPGAME TO THE CAR.

Q. WHEN YOU SAY "THE DEFENDANT," WHO ARE YOU REFERRING TO?

A. "DRAPER."

Q. DID YOU SEE WHETHER OR NOT "DRAPER" HAD ANYTHING IN HIS HAND?

A. YES, I DID.

Q. WHAT DID HE HAVE IN HIS HAND?

A. HE HAD A GUN.

Q. WHAT DID YOU SEE "DRAPER" DO WHEN YOU LOOKED OUT THE WINDOW?

A. RUN TOWARDS THE CAR.

Q. WHAT HAPPENED WHEN HE GOT TO THE CAR?

A. THE CAR PULLED OFF.

Q. DID HE GET INSIDE IT?

A. YES.

Q. NOW, WHEN YOU LOOKED OUT THE WINDOW AND YOU SAW THIS MAN WITH A GUN THAT YOU IDENTIFIED AS "DRAPER", DID YOU HAVE ANY DIFFICULTY IN RECOGNIZING HIM?

A. NO, I DIDN'T.

Q. WAS THERE ANY QUESTION IN YOUR MIND AS TO WHO IT WAS?

A. NO, SIR. THERE WASN'T.

Q. I AM SORRY?

SA-549

USCA Case #23-3015   Document #2109460   Filed: 04/04/2025   Page 558 of 668

6

A. NO, SIR.

Q. WHAT DID YOU DO NEXT?

A. GOT OUT OF THE WINDOW AND WENT TO THE STORE.

Q. TO THE STORE?

A. YES.  TO THE SUPERMARKET.  AROUND TO THE SUPERMARKET.

Q. AND IS THAT WHERE --

A. THE SHOOTING WAS.

Q. OKAY.  WHAT HAPPENED WHEN YOU WENT OUT THERE?

A. I SEEN MY COUSIN LAYING ON THE GROUND.

Q. YOUR COUSIN WHO?

A. DONNELL.

Q. DONNELL WHITFIELD?

A. YES.

Q. CAN YOU DESCRIBE HOW HE APPEARED WHEN YOU SAW HIM?

A. HE WAS LAYING THERE.  HE IS LAYING DOWN DYING.  THERE WAS SOME MONEY LAYING ON THE GROUND.

Q. WHAT DID YOU NOTICE ABOUT HIM?

A. HE WAS SHAKING.

Q. COULD YOU SEE WHETHER OR NOT HE HAD BEEN SHOT?

A. YES.

Q. COULD YOU ACTUALLY SEE THE WOUNDS?

A. YES.

Q. COULD YOU SEE HOW MANY TIMES HE HAD BEEN SHOT?

A. I COULDN'T TELL HOW MANY TIMES HE WAS SHOT.

Q. WAS HE ABLE TO TALK?

SA-550



1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,              .    Docket No. CR 98-329

        Government,                    .    Washington, D.C.
                                       .    May 14, 2001
    vs.                                .    2:15 p.m.

VINCENT HILL,                          .    (AFTERNOON SESSION)
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,                                    FILED

        Defendants                    .

. . . . . . . . . . . . .             .         MAR 1 1 2003

UNITED STATES OF AMERICA,             .    NANCY MAYER WHITTINGTON, CLERK
                                               U.S. DISTRICT COURT
        Government,                   .

    vs.                               .    Docket No. CR 99-348

GARY PRICE,                           .

        Defendant.                    .

. . . . . . . . . . . . . . .         .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.   20001

For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.   20004

For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.   20001



SA-551

2

For the Defendant Carson:
JOSEPH BESHOURI, ESQ.
LEXI NEGIN-CHRIST, ESQ.
419 7th Street, N.W.
Washington, D.C.  20004

For the Defendant Sweeney:
STEVEN R. KIERSH, ESQ.
717 D Street, N.W.
Suite 400
Washington, D.C.  20004

For the Defendant Coates:
FREDERICK JONES, ESQ.
901 6th Street, S.W.
Suite 409
Washington, D.C.  20024

For the Defendant Price:
JONATHAN ZUCKER, ESQ.
601 Indiana Ave., N.W.
Suite 901
Washington, D.C.  20024

Court Reporter:
BEVERLY J. BYRNE
Official Court Reporter
Room 6810 U.S. Courthouse
Washington, D.C.  20001
(202) 273-0899

Proceedings reported by stenomask, transcript produced from dictation.

SA-552

pull the trigger the gun is fired, the cartridge is fired, the bullet goes down the barrel and out and the cartridge case is automatically ejected from the firearm, it then loads the next cartridge and it's ready to be fired when you, or the person with the firearm, pulls the trigger again.

Q.   Okay.  Showing you what's been marked as DW400, and ask you if you could just hold that up and tell the ladies and gentlemen whether or not you have had an opportunity to examine that particular firearm?

A.   Yes.  I conducted an examination with this firearm.  It bears my laboratory numbers and my symbols.  And --

Q.   Did you come to an opinion, to a reasonable degree of scientific certainty, whether that handgun, DW400, ejected those shell casings, DW402 through DW409?

A.   Yes.  I conducted test fires in our laboratory with this firearm, and then I compared those test fired cartridge cases to these cartridge cases here, my Q266 through Q276.  And I concluded that these cartridge cases were, in fact, fired in this firearm.

Q.   And if you could just explain to us the basis of your opinion.  How is it you are able to come to that conclusion?

A.   Just as I explained earlier, with the agreement of all the fine microscopic marks that this firearm leaves that are unique to this firearm and this firearm alone, let's say for argument-sake its fingerprint, those marks were left

SA-553

connection with this case did you find any evidence to suggest that more than one gun -- let me ask it this way.  Was there any evidence that was inconsistent with a single gun being used?

A.    All the cartridge cases in the case were fired from one or in one in the same firearm.  And all the bullet evidence beared the same general rifling characteristics, which, of course, could have been produced by one in the same firearm.

Q.    Okay.  So nothing is -- everything is consistent with the possibility of one gun being used?

A.    That's correct.

Q.    And again, you are definitive about the shell casings coming from that handgun?

A.    That's correct.

Q.    Now, when you got to your lab did you test fire that weapon before you -- for the record, that is a Beretta 9 millimeter, is that correct?

A.    Yes, this is a Beretta 9 millimeter, Model 92.  And I did test fire this firearm to obtain test fired specimens to compare to the cartridge cases and the bullet evidence.

Q.    Okay.  Now, you already told us what happened when you compared the shell casings.

A.    That's correct.

Q.    They were a match?

A.    That's correct.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,           .   Docket No. CR 98-329
                                    .
            Government,             .   Washington, D.C.
                                    .   May 15, 2001
    vs.                             .   2:15 p.m.
                                    .
VINCENT HILL,                       .   (AFTERNOON SESSION)
JEROME MARTIN,                      .
SAMUEL CARSON,                      .
WILLIAM K. SWEENEY,                 .
SEAN COATES,                        .
                                    .
            Defendants              .
                                    .
. . . . . . . . . . . . . . . .     .
                                    .
UNITED STATES OF AMERICA,           .
                                    .
            Government,             .
                                    .   Docket No. CR 99-348
    vs.                             .
                                    .
GARY PRICE,                         .
                                    .
            Defendant.              .
                                    .
. . . . . . . . . . . . . . . .     .

TRANSCRIPT OF TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:         PETER ZEIDENBERG, AUSA
                            ANJALI CHATURVEDI, AUSA
                            U.S. Attorney's Office
                            555 Fourth Street, N.W.
                            Washington, D.C.  20001

For the Defendant Hill:     CHRISTOPHER DAVIS, ESQ.
                            601 Indiana Avenue, N.W.
                            Suite 910
                            Washington, D.C.  20004

For the Defendant Martin:   JOANNE HEPWORTH, ESQ.
                            305 H Street, N.W.
                            Second Floor
                            Washington, D.C.  20001

SA-555

2

```
For the Defendant Carson:        JOSEPH BESHOURI, ESQ.
                                 LEXI NEGIN-CHRIST, ESQ.
                                 419 7th Street, N.W.
                                 Washington, D.C.   20004

For the Defendant Sweeney:       STEVEN R. KIERSH, ESQ.
                                 717 D Street, N.W.
                                 Suite 400
                                 Washington, D.C.   20004

For the Defendant Coates:        FREDERICK JONES, ESQ.
                                 901 6th Street, S.W.
                                 Suite 409
                                 Washington, D.C.   20024

For the Defendant Price:         JONATHAN ZUCKER, ESQ.
                                 601 Indiana Ave., N.W.
                                 Suite 901
                                 Washington, D.C.   20024

Court Reporter:                  BEVERLY J. BYRNE
                                 Official Court Reporter
                                 Room 6810 U.S. Courthouse
                                 Washington, D.C.   20001
                                 (202) 273-0899
```

Proceedings reported by stenomask, transcript produced from dictation.

SA-556

Case 1:98-cr-00329-RCL    Document 991    Filed 03/11/03    Page 9 of 108

9

Q.    And because of that, what did Draper want to do?

A.    He said he was going to kill him.

Q.    Now, when Draper told you this, Mr. Switzer, what was your response?

A.    I told him, don't do it, because I wanted to do it.

Q.    Soon after that conversation with Draper, did you find out that Robocop, in fact, had been killed?

A.    Yes.

Q.    And did you speak with Draper again after you found out Robocop was killed?

A.    Yes.

Q.    And what, if anything, did Draper say about that murder?

A.    Well, he stopped past my house one night, and he had told me that he had killed Robo.

Q.    And what was your response?

A.    I was upset with him.  I told him at first that I wanted to do it myself.

Q.    And so once he told you that he had accomplished that, how did that make you feel?

A.    I was upset about it.

Q.    Now, at the time you had this conversation with Draper about Robocop, what was your relationship like with Draper at the time?

A.    We had a pretty good relationship.

Q.    Who was older?

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
            GOVERNMENT,                    :
                                           :
                                           :
 VS.                                       :      CR. NO. 98-329
                                           :
                                           :
VINCENT HILL,                              :
JEROME MARTIN,                             :
SAMUEL CARSON,                             :
WILLIAM K. SWEENEY,                        :
SEAN COATES,                               :
            DEFENDANTS.                     :
                                           :
UNITED STATES                              :
            GOVERNMENT,                    :
                                           :
                                           :
 VS.                                       :      CR. NO. 99-348
                                           :
                                           :
GARY PRICE,                                :
            DEFENDANT                       :
                                           :

FILED

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
MAY 23, 2001
(MORNING SESSION)
(10:25 A.M.)


TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:                     PHYLLIS MERANA
                                    6816 U. S. DISTRICT COURT
                                    3RD & CONSTITUTION AVE., N.W.
                                    WASHINGTON, D. C. 20001

FOR THE GOVERNMENT:                PETER ZEIDENBERG, AUSA
                                   ANJALI CHATURVEDI, AUSA
                                   555 4TH ST., N.W.
                                   WASHINGTON, D. C. 20001

FOR THE DEFENDANT HILL:            CHRISTOPHER DAVIS, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #910
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT MARTIN:          JOANNE HEPWORTH, ESQ.
                                   305 H STREET, N.W.
                                   2ND FLOOR
                                   WASHINGTON, D. C.  20001

FOR THE DEFENDANT CARSON:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7TH STREET, N.W.
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT SWEENEY:         STEVEN R. KIERSH, ESQ.
                                   717 D STREET, N.W.
                                   SUITE 400
                                   WASHINGTON, D. C.  20004

FOR THE DEFENDANT COATES:          FREDERICK JONES, ESQ.
                                   901 6TH STREET, S.W.
                                   #409
                                   WASHINGTON, D. C.  20024

FOR THE DEFENDANT PRICE:           JONATHAN ZUCKER, ESQ.
                                   601 INDIANA AVE., N.W.
                                   #901
                                   WASHINGTON, D. C.  20004

INDEX

| WITNESS: | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| SP. AGT. VINCENT LISI | | | | |
|     BY MS. CHATURVEDI | 7 | | | |
|     BY MR. DAVIS | | 11 | | |
|     BY MR. ZUCKER | | 22 | | |
| JAMES MONTGOMERY | | | | |
|     BY MR. ZEIDENBERG | 24 | | | |

MONITOR, CAN YOU JUST POINT OUT WHERE KENARD IS ON THE PHOTOGRAPH?

A. (DOING AS DIRECTED.)

Q. OKAY. AND HE IS STANDING RIGHT BEHIND "PIMP," WHO IS KNEELING DOWN?

A. YES.

Q. AND ARE YOU FAMILIAR WITH THE TYPE OF CAR KENARD HAD?

A. HE HAD AN ACURA LEGEND. ACURA LEGEND.

Q. DO YOU RECALL WHAT COLOR?

A. IT'S LIKE A FUNNY COLOR. IT WAS LIKE A FUNNY COLOR, BUT IF I HAD TO PICK A PARTICULAR COLOR, IT WOULD BE CLOSER TO BEING LIKE BROWNISH -- SORT OF LIGHT COLOR. LIKE A SANDY BROWN-LIKE COLOR. SOMETHING LIKE THAT.

Q. ALL RIGHT.

NOW, MR. MONTGOMERY, I NOW WANT TO TAKE YOU BACK TO WHERE WE WERE RIGHT BEFORE THE BREAK. AND AS I ASKED EARLIER, IS IT TRUE THAT YOU WERE IN A VAN WITH DRAPER SHORTLY BEFORE THE TRIPLE MURDER?

A. YEAH. NOT JUST ME AND DRAPER.

Q. OKAY. WHO ELSE WAS PRESENT?

A. "CHIN" AND "BIRD."

Q. AND DURING SOME OF THE TIME THAT YOU WERE IN THE VAN, DID DRAPER TALK ABOUT "ROBOCOP" OR "ROBO"?

A. YES.

Q. AND CAN YOU TELL US ABOUT THAT CONVERSATION YOU HAD?

A. I DON'T REMEMBER PARTICULARLY HOW IT CAME ABOUT, BUT HE WAS SAYING SOMETHING ABOUT THEY WAS IN THE "EASTSIDE" AND "ROBOCOP" MUSHED HIM IN THE FACE OR SMACKED HIM IN THE FACE, AND THEY HAD LIKE A VERBAL DISPUTE. THEY WAS ARGUING. HE SAID "ROBO" SAID SOMETHING TO HIM ABOUT THINKING HE WAS A BIG BOY OR HE IS STILL A LITTLE BOY, AND HE MUSHED HIM IN THE FACE OR SMACKED HIM IN THE FACE.

Q. WHEN YOU SAY "MUSHED HIM IN THE FACE," WHAT DO YOU MEAN?

A. LIKE SHOVED HIM IN THE FACE WITH HIS HAND.

THE COURT: WHO SHOVED WHOM?

THE WITNESS: "ROBO" SHOVED DRAPER.

BY MR. ZEIDENBERG:

Q. WHAT DID DRAPER SAY HE DID AFTER GETTING SHOVED IN THE FACE?

A. I DON'T RECALL EXACTLY WHAT HAPPENED IMMEDIATELY AFTER THAT, BUT I AM ALMOST CERTAIN -- I DON'T THINK THEY FOUGHT, AS FAR AS I REMEMBER.

Q. WHAT DID DRAPER SAY HE DID TO "ROBOCOP", IF ANYTHING?

A. THAT HE CAUGHT HIM AT A CRAPGAME AROUND SURSUM CORDAS, AND HE HIT HIM A FEW TIMES AND "ROBO" TRIED TO GET UP AND RUN. AND EVERYBODY ELSE THAT WAS GAMBLING LIKE DISPERSED. AND "ROBO" FELL. AND HE WENT OVER TOP OF HIM AND HIT HIM SOME MORE.

Q. AND WHEN YOU SAY "HIT HIM," YOU'RE HOLDING -- I NOTICED YOU RAISING YOUR RIGHT HAND AS IF YOU'RE HOLDING A PISTOL.

SA-562

WHEN HE SAID "HIT" -- IS "HIT" THE WORD THAT "DRAPER" USED, OR IS THAT YOUR WORD?

A.   THAT IS THE TERMINOLOGY THAT ALL OF US PRETTY MUCH USE.

Q.   AND WHAT DID YOU UNDERSTAND THAT TERM TO MEAN?

A.   THAT HE SHOT HIM.

Q.   NOW, WERE YOU AWARE THAT "ROBO" OR "ROBOCOP" -- DONNELL DONNELL WHITFIELD -- STRIKE THAT.  DID YOU KNOW "ROBOCOP'S" REAL NAME?

A.   I KNEW HIS NAME WAS DARNELL, BUT I DIDN'T KNOW HIS LAST NAME.

Q.   WERE YOU AWARE THAT "ROBO" WAS SUPPOSED TO HAVE SHOT SWITZER AT SOME POINT PREVIOUS TO THAT?

A.   YES.

Q.   AND DID YOU EVER INTEND, OR TRY, OR DISCUSS TAKING RETALIATION ON BEHALF OF SWITZER AGAINST "ROBO"?

A.   YES.

Q.   CAN YOU TELL US ABOUT THAT?

A.   IN '94 WHEN I CAME HOME, SWITZER GAVE MY THEN-GIRLFRIEND -- HE GAVE HER A RIDE HOME FOR ME, BUT I RODE ALONG WITH THEM.  WHEN WE CAME BACK FROM DROPPING HER OFF, SINCE I HAD JUST CAME HOME, SWITZER -- WE WERE RIDING AROUND.  HE WAS JUST TALKING TO ME.  AND WE RODE PAST SECOND STREET, AND HE SAID THAT HE WANTED TO GET "ROBO."  AND "ROBO" WAS HUSTLING IN THE BUILDING IN THE SECOND STREET COURT.

SA-563

USCA Case #23-3015 Document #2109480 Filed: 04/04/2025 Page 572 of 668

1

*Clerks File*

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
         GOVERNMENT,

  VS.

VINCENT HILL,
JEROME MARTIN,
SAMUEL CARSON,
WILLIAM K. SWEENEY,
SEAN COATES,
        DEFENDANTS.

              : CR. NO. 98-329

**FILED**

JUL 1 9 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

UNITED STATES
        GOVERNMENT,

  VS.

GARY PRICE,
        DEFENDANT

              : CR. NO. 99-348

WASHINGTON, D. C.
MAY 29, 2001
(MORNING SESSION)
(10: 30 A.M.)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:

PHYLLIS MERANA
6816 U. S. DISTRICT COURT
3RD & CONSTITUTION AVE., N.W.
WASHINGTON, D. C. 20001

SA-564

THAT'S WHAT IT SIMPLY COMES DOWN.  WOULD IT BE REASONABLY FORESEEABLE THAT A WITNESS WOULD BE MURDERED TO HELP THEM FURTHER THE GOALS OF THE CONSPIRACY.

IN THIS CASE, YOUR HONOR, MR. ZEIDENBERG, AGENT LISI AND I HAVE IDENTIFIED 15 WITNESSES THAT, OVER THE COURSE OF THIS CONSPIRACY, THESE MEN SPECIFICALLY ENGAGED IN CONDUCT TO KILL 15 DIFFERENT PEOPLE BECAUSE THEY WERE WITNESSES.

IT SEEMS TO ME, GIVEN THE LOGIC OF PINKERTON AND THE EXTENSION OF PINKERTON IN THE CHERRY CASE, THAT THE STATEMENTS BY MR. SMITH SHOULD COME IN AGAINST ALL OF THE DEFENDANTS.

THE COURT:  MR. KIERSH CAN HARDLY WAIT TO RISE HERE.

MR. KIERSH:  THERE IS JUST ONE VERY IMPORTANT FACTOR BEFORE WE GET INTO MORE OF A DISCUSSION.  PINKERTON IN THIS CIRCUIT HAS NEVER BEEN EXTENDED TO THIS CONTEXT UNDER 804(B)(6).  AND THE GOVERNMENT DIDN'T ARGUE PINKERTON. AS I HEAR MS. CHATURVEDI NOW, THE GOVERNMENT IS ASKING THIS COURT TO ADOPT PINKERTON WITHIN THE ANALYSIS OF 804, WHICH MEANS THAT THIS COURT WILL BE MAKING A FINDING OF FIRST IMPRESSION IN THIS JURISDICTION THAT UNDER 804, ALL CO-DEFENDANTS CAN BE RESPONSIBLE FOR THE ACTS OR THE WORDS OF ANOTHER.  AND IF THAT'S THE GOVERNMENT'S POSITION, THEN WE'LL FRAME OUR ARGUMENTS IN ACCORDANCE WITH THE PINKERTON

DO NOTHING ABOUT IT.  AND I'D ASK THE COURT TO EXCLUDE IT UNDER THAT.

THE COURT:  ALL RIGHT.

MR. KIERSH:  JUST ONE FINAL MATTER BRIEFLY.  IF THE COURT IS GOING TO ALLOW THIS TESTIMONY IN, THEN THERE ARE A COUPLE OF ISSUES THAT WE DO NEED TO RESOLVE THAT I DIDN'T BRING UP UNTIL THE COURT MADE ITS RULING, SPECIFICALLY AS TO THE 302'S OF AGENT LISI, WHICH HAVE BEEN VERY SUBSTANTIALLY REDACTED.

IF THE COURT IS GOING TO LET THIS IN -- I DON'T KNOW YET -- I AM ASKING FOR THE ENTIRETY OF THE 302'S BECAUSE IT BEARS DIRECTLY ON MY CROSS-EXAMINATION OF AGENT LISI.  AND THERE IS ALSO A MEMORANDUM OF THIS COURT, JULY 13TH, RELATED TO BRADY INFORMATION, WHICH NOW BECOMES RELEVANT, ASSUMING THE COURT LET'S IN THE TESTIMONY OF AGENT LISI.

THE COURT:  YOU'RE TELLING ME WHAT YOU'RE ASKING ME TO DO IS LOOK AT SOME MORE 302'S?

MR. KIERSH:  THE POINT IS THIS.  AGENT LISI IS GOING TO GET UP AND SAY, "WELL, WILLIAM SWEENEY SAID ALL THIS EVIDENCE AND SWEENEY WAS RESPONSIBLE FOR CONSPIRING TO KILL ROBERT SMITH BECAUSE ROBERT SMITH SAID THAT HE IS AFRAID OF WILLIAM SWEENEY."

WE, AS WE ADDRESSED PRETRIAL IN THE MOTIONS, INTEND TO BRING OUT A SUBSTANTIAL AMOUNT OF INFORMATION THAT

USCA Case #25-5015   Document #2109460   Filed: 04/04/2025   Page 575 of 668

86

THERE WERE MANY, MANY PEOPLE OUT ON THE STREET WHO WANTED AND, IN FACT, HAD TRIED TO KILL ROBERT SMITH.

THE GOVERNMENT, WHEN THEY GAVE ME THE 302'S, REDACTED OUT ALL OF THIS INFORMATION RELATED TO OTHER PEOPLE WHO ROBERT SMITH WAS GIVING INFORMATION ABOUT.

I AM ASKING FOR THAT INFORMATION SO I CAN INCORPORATE THAT INTO MY CROSS TO ESTABLISH THAT, IN FACT, THERE WERE MANY, MANY OTHER PEOPLE WHO WANTED TO KILL ROBERT SMITH. AND YOUR HONOR RULED THAT -- FOR INSTANCE, WHEN ROBERT SMITH WAS GUNNED DOWN IN THE HOPE VILLAGE HALFWAY HOUSE, THE GOVERNMENT SAID, "WE CONCEDE MR. SWEENEY HAD NOTHING TO DO WITH THAT." AND YOU RULED THAT ANY EVIDENCE PERTAINING TO SOMEBODY ELSE DOING THAT IS ADMISSIBLE." AND I THINK THERE MAY BE EVIDENCE TO THAT EFFECT IN THE REDACTED PORTION OF THE 302'S.

THE COURT: ALL RIGHT. I WILL TAKE A LOOK AT ANY 302'S THAT YOU WANT ME TO TAKE A LOOK AT AND THE REDACTIONS AND SEE WHETHER OR NOT IT WOULD APPEAR THAT YOU SHOULD HAVE ANYTHING THAT HAS BEEN REDACTED.

MR. KIERSH: THERE IS THE COURT'S BRADY ORDER OF JULY 13TH, WHERE YOU WROTE THAT -- YOU LOOKED AT THE GOVERNMENT'S INVESTIGATIVE FILES, AND YOU WROTE THAT THE GOVERNMENT'S INVESTIGATIVE FILES REVEAL -- AND THE COURT DEEMS IT TO BE BRADY INFORMATION TO WHICH SWEENEY IS ENTITLED -- THAT THE SOURCE OF SUSPICION ON THE PART OF P.G.

87

COUNTY AUTHORITIES THAT JAMES MONTGOMERY AND NOT WILLIAM SWEENEY COMMITTED THE TRIPLE HOMICIDES WAS ONE ROBERT "BUTCHIE" SMITH, WHO WAS HIMSELF MURDERED.

THE COURT: YES.

MR. KIERSH: NOW, I HAVEN'T BEEN GIVEN THAT INFORMATION BECAUSE IT DOESN'T BECOME RELEVANT UNTIL I HAVE TO DO THIS CROSS-EXAMINATION. SO NOW I AM ASKING --

THE COURT: NOW YOU HAVE GOT IT. THE INFORMATION IS THERE.

MR. KIERSH: NO, IT'S NOT. THE COURT FOUND PARTICULAR INFORMATION -- THAT THE SOURCE OF THE INFORMATION THAT MONTGOMERY COMMITTED THE TRIPLES WAS SMITH AND NOT SWEENEY. THAT INFORMATION IS WHAT I WANT. NOT JUST THAT IT EXISTS, BUT I WANT TO KNOW WHAT THE INFORMATION IS SO I CAN CONFRONT AGENT LISI ABOUT IT.

THE COURT: I THINK IT IS PROBABLY ONE SENTENCE IN ONE 302.

MR. KIERSH: I JUST WANT TO KNOW WHAT IT IS.

THE COURT: ALL RIGHT.

MR. JONES: YOUR HONOR, THERE IS ONE ISSUE I WOULD LIKE TO ADDRESS AT THIS POINT AS WELL. IN THE 302'S THAT I HAVE --

THE COURT: LOOK, I DON'T WANT TO DEAL WITH THE 302'S RIGHT NOW.

MR. JONES: WELL, THE ONLY THING I AM INTERESTED

SA-568

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,        .   Docket No. CR 98-329

           Government,           .   Washington, D.C.
                                 .   May 29, 2001
    vs.                          .   2:20 p.m.
                                 .
VINCENT HILL,                    .   (AFTERNOON SESSION)
JEROME MARTIN,                   .
SAMUEL CARSON,                   .
WILLIAM K. SWEENEY,              .
SEAN COATES,                     .
                                 .                 FILED
           Defendants            .
                                 .            MAR 1 1 2003
. . . . . . . . . . . . . . . . .
                                 .        NANCY MAYER WHITTINGTON, CLERK
UNITED STATES OF AMERICA,        .             U.S. DISTRICT COURT
                                 .
           Government,           .
                                 .
    vs.                          .   Docket No. CR 99-348
                                 .
GARY PRICE,                      .
                                 .
           Defendant.            .
                                 .
. . . . . . . . . . . . . . . .

              TRANSCRIPT OF TRIAL
    BEFORE THE HONORABLE THOMAS P. JACKSON
  UNITED STATES DISTRICT JUDGE, and a jury.

APPEARANCES:

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             U.S. Attorney's Office
                             555 Fourth Street, N.W.
                             Washington, D.C.  20001


For the Defendant Hill:      CHRISTOPHER DAVIS, ESQ.
                             601 Indiana Avenue, N.W.
                             Suite 910
                             Washington, D.C.  20004


For the Defendant Martin:    JOANNE HEPWORTH, ESQ.
                             305 H Street, N.W.
                             Second Floor
                             Washington, D.C.  20001

SA-569

2

For the Defendant Carson:          JOSEPH BESHOURI, ESQ.
                                   LEXI NEGIN-CHRIST, ESQ.
                                   419 7th Street, N.W.
                                   Washington, D.C.   20004

For the Defendant Sweeney:         STEVEN R. KIERSH, ESQ.
                                   717 D Street, N.W.
                                   Suite 400
                                   Washington, D.C.   20004

For the Defendant Coates:          FREDERICK JONES, ESQ.
                                   901 6th Street, S.W.
                                   Suite 409
                                   Washington, D.C.   20024

For the Defendant Price:           JONATHAN ZUCKER, ESQ.
                                   601 Indiana Ave., N.W.
                                   Suite 901
                                   Washington, D.C.   20024

Court Reporter:                    BEVERLY J. BYRNE
                                   Official Court Reporter
                                   Room 6810 U.S. Courthouse
                                   Washington, D.C.   20001
                                   (202) 273-0899

Proceedings reported by stenomask, transcript produced from
dictation.

**SA-570**

3

P R O C E E D I N G S

THE COURT: Mr. Kiersh, I have looked at these FBI 302s presumably prepared by Special Agent Lisi. What is it that I'm looking for?

MR. KIERSH: I'm looking for anything that would suggest that Robert Smith was cooperating with the police beyond these defendants, because that would give a lot of other people a reason to want to cause harm to Mr. Smith. And that's what I believe is the information that's redacted in the 302s.

THE COURT: All right. What do you have to say, Ms. Chaturvedi?

MS. CHATURVEDI: Your Honor, I won't object to copying -- I think maybe there's three pages in total that were redacted. I can give those to Mr. Kiersh.

THE COURT: I'd give it to him.

MS. CHATURVEDI: That's fine. I'll give them to him.

THE COURT: He obviously was talking about people other than these defendants.

MS. CHATURVEDI: That's fine, Your Honor. And for the purpose of the record about a year ago when we litigated this motion back in June, Your Honor did instruct me to provide to Mr. Kiersh and to all defense counsel any information pertaining to a 1990 or 1991 shooting of Bernard

SA-571

4

Smith -- Robert Butchie Smith while he was at Hope Village.

I turned over all the police reports in connection with that, and I answered a number of questions that Mr. Kiersh asked regarding that shooting. So with the 302s in unredacted form, they have in their possession all of the documents in my possession.

THE COURT: Does he now have unredacted copies of the 302s?

MS. CHATURVEDI: I'll need to make copies of that, Your Honor.

THE COURT: All right.

MR. KIERSH: And one other time saving question. I have about 15 pages of Agent Lisi's handwritten notes that covered the period of time when he was speaking with Mr. Smith. A lot of the notes are illegible. So rather than spend the time on cross-examination, if we could inquire of Agent Lisi, if I go with him through the notes with him about questions I have. I could probably do it in about five minutes, and that would save time of me doing it in front of the jury.

THE COURT: All right. What you want to do -- I take it then what you would want to do would be to have an opportunity to peruse the 302s in unredacted form?

MR. KIERSH: Yes, and then question him about his handwritten notes that are not redacted. I just cannot read

**SA-572**

his handwriting.

THE COURT:  You mean speak to him informally?

MR. KIERSH:  No, no, I'd like to have him on the witness stand.

MS. CHATURVEDI:  Your Honor, he can do that in cross-examination.  They're the same handwritten notes we have copies of.  They're legible, and if he wants to inquire on cross-examination, if it's only five minutes, it shouldn't take very long to do it on cross-examination.

MR. KIERSH:  Then I'll just have to go through it page by page then.  Just trying to save some time.

THE COURT:  Right.  Are you ready for the jury?

MS. CHATURVEDI:  I am, Your Honor.

THE DEPUTY MARSHAL:  Jury panel, Your Honor.

(Jury In.)

SA-573

under which he would be speaking with you, did he continue then after hearing that to tell you about conversations he had with a number of people, but specifically William Sweeney?

A.   Yes, he did.  At first we started talking about drug things, his sources of supply of marijuana, how he got into selling marijuana.  We went through, you know, how his drug operation worked, and then he told me that he knew about quite a few murders and crimes of violence that had been committed by Mr. Sweeney and some of his associates.

Q.   When you -- well, at that point were you interested in hearing about what Mr. Smith knew that Mr. Sweeney had told him?

A.   Yes.  It was kind of -- while I was talking to him, he didn't want to come out and tell me everything he knew.  He wanted to give me --

MR. ZUCKER:  Objection.  The witness can say what the person he's speaking with said.  He cannot say what he was thinking.

THE COURT:  Well, that's correct.

BY MS. CHATURVEDI:

Q.   Did Mr. Smith tell you -- well, what did Mr. Smith tell you?

A.   He told me of crimes that had been committed and gave me kind of a thumbnail sketch of the crimes.  For instance, he would say something to the effect that, well, the triple,

13

Donnell Mack's murder. He said Shorty and them did that.

I said, what do you mean by Shorty and them? And he said Shorty and James Montgomery. And I said, okay, what else about it. And he says, well, I know about that. So he let me know that he knew the details about that murder, and he did that with several different murders.

Q. Did you press him at that moment to go through --

A. No.

Q. -- to identify the other people or other facts that he knew about those crimes of violence?

A. No, it wasn't the time. It was kind of feeling each other out. Although, he, as I said, showed that he was willing to provide this information. He was still -- he wasn't very comfortable in doing so, so I didn't push him on it.

Q. Now, while you were speaking with Mr. Smith this first night upon his arrest, can you tell the ladies and gentlemen and of the jury how you were recording, if you will, what information Mr. Smith was providing you?

A. The first night, the first time that we sat down and talked, when we were talking about the drug things, I would sit and ask him some questions, and he would go through it, and I would sit and listen. Then I would say, well, let me go back and make sure I understand this and take some notes regarding the drug matters.

**SA-575**

24

A.    Sure.

Q.    When we sat down, we thought that Butchie was a very significant supplier of marijuana to Southwest.  We had no idea what he knew.  We were surprised when he began to tell us about the violence, because we didn't expect that.

We expected to know -- we knew he would know about the marijuana and other drugs, but, you know, we weren't sure about the violence.  So we sat down and we started going over the marijuana with him first.  And usually that's the easiest way to go about it with people talking about drugs.  They're generally more reluctant to talk about violence up front as opposed to drug matters.

And what he told us was that he began in early 1994 selling marijuana.  He started off with a small amount, maybe a quarter, a half a pound, worked his way up relatively quickly to the point where he was selling about 100 pounds a week to people in the Southwest area.

And what he said was the way he did it, he didn't like to deal with a lot of people.  He insulated himself with some people that he trusted.  Those people were Petey Johnson, Pooney or Darryl Hines, and a guy named Billy Joe Jenkins.

So Mr. Smith established all the contacts with -- at that point they were Jamaican suppliers.  He would have the marijuana fronted to him.  The level he got to was he was actually being fronted 50 pounds at a time from the Jamaicans.

He would then give that marijuana to those three individuals and let them sell it throughout Southwest, and they would sell it in pound quantities, quarter pound and up quantities.  If somebody wanted three pounds, they would sell them three pounds.

If they wanted a quarter pound, they could get that.  So he explained that.  He wasn't making as much money as the guy on the street selling it, because he would buy it for let's say, $850 a pound or $800 a pound.  He'd sell it for $1,000 a pound, so he would make $150 to $200 a pound.

Whereas if he were selling pounds on the street, he would be making $1,000 a pound, and that's all profit.  But by doing so he minimized his exposure to law enforcement, because he only had to deal with a few people.

He wanted to keep it -- he didn't want everybody to know that he was the source of the marijuana, and that's why he would let those people sell it for him.  However, there were people that he did deal with personally, some people that he knew, if they wanted let's say, half a pound or a pound or a few pounds, he would get that personally for them.  But for the most part, all of the marijuana he sold went through those three people.

Q.  Now, you indicated just a second ago, that although he tried to deal through Petey Johnson and Darryl Hines and Billy Joe Jenkins, that there were occasions when he would also deal

SA-577

with other people directly; is that fair to say?

A.    Yes, ma'am.

Q.    And can you tell us whether or not Mr. Smith told you whether he distributed marijuana directly to William Sweeney?

A.    Yes, he did.

Q.    To Sean Coates?

A.    Yes, ma'am.

Q.    And to Vincent Hill?

A.    Yes, ma'am.

Q.    Among others?

A.    Yes, there were others, but, yes, to those three.

Q.    Did Mr. Smith tell you how he also sold cocaine?

A.    Yes.

Q.    What did he tell you about that?

A.    He tried to shy away from cocaine, because the time that it carried was significantly more.  However, he would, common term, flip cocaine.  He wouldn't keep an inventory of it.  If he knew somebody wanted cocaine or crack, he had the means to get it and knew the people to get it, so he would go to them.

If somebody wanted, let's say, half a kilo, he could go get the half a kilo at a favorable price to him, might sell it and make $500 to $1,000 on half a key.  So he would make the money just by playing middleman for the person who did keep the inventory.  But he generally wouldn't keep the inventory himself.

SA-578

And he said that likewise as with the Jamaicans that he dealt with, they had the access to the cocaine.  They didn't like to deal in it as much, but, you know, they would have it at times.

Q.    Close to the time that you arrested Mr. Smith, did he indicate to you after he was arrested that he had ventured into selling some heroin?

A.    Yes.

Q.    What did he tell you about the heroin?

A.    He said that the heroin was coming from Mr. Sweeney, that Mr. Sweeney --

Q.    Mr. Sweeney meaning?

A.    William Sweeney, yes.  An associate of his, Stephon Mason, had acquired a very significant heroin distributor. And he was getting heroin from Mr. Sweeny.

Q.    And where were they selling the heroin?

A.    In Potomac Gardens.

Q.    I want to turn your attention now to the subject matter of violence, crimes of violence that Mr. Smith talked to you about?

A.    Yes, ma'am.

Q.    Was there a conversation or a number of conversations I guess I should say that you had with Mr. Smith in which Mr. Smith told you about conversations he had had with William Sweeney about the murder of someone by the name of Keith

SA-579

28

Whitey Johnson?

A.    Yes, ma'am.

Q.    What did Mr. Smith tell you?

A.    He said that Mr. Sweeney, Stephon Mason and a younger individual nicknamed Poo, and Mr. Smith was not sure of Poo's real name. I think he said that Poo was somehow a cousin to Mr. Sweeney, had attempted to kidnap Whitey or Keith Johnson.

He said that they had I believe a green rental van, and they tried to kidnap him from the street over off Kentucky Avenue near the Safeway and that Mr. Johnson would not cooperate, and they shot him and killed him, and he gave us the information about Poo that we could call or try to track down Poo and interview him. And based on the information he gave us, Poo was identified, but I can't recall his name right now.

Q.    Now, with regards to that van that was used for this murder of Mr. Johnson, did you come to find out through Mr. Smith how Mr. Sweeney got this van?

A.    Yes. He told me that the van was rented by Erik Jones or Irky Berk's sister, Diane. He said that it was probably in Diane's name and that Mr. Sweeney was listed as a secondary driver. And he told me at that time that Mr. Sweeney used Kirk Ivory Newton as an alias, so to check the rental car companies to see if there was a van with Diane Purvis or Kirk Ivory Newton, and I think he said to check Enterprise, but he

wasn't certain as to what rental car company was used.

Q.   Now, that name, Kirk Ivory Newton, did that name later assist you in, in fact, arresting Mr. Sweeney when he was arrested and charged in connection with the kidnapping of Wysocki and the triple murder?

A.   Yes, because we knew that the name Kirk Ivory Newton was being used by Mr. Sweeney as an alias.  There were various jails in the area that we believed he might be visiting, so that information was given to the jails, and they were told that if somebody comes in with this name, detain them, and that the FBI would be there to see if that was, in fact, William Sweeney, and that's how we ultimately arrested him.

Q.   Did Mr. Smith tell you about conversations he had with Mr. Sweeney involving the shooting of an individual by the name of Michael Jones?

A.   Yes, but he didn't know the name Michael Jones.  What he told me was that, he said that back in 1992, Meechie, and that's just the name he gave me, Meechie was charged with shooting somebody from Condon Terrace.

Q.   Let me just stop you for a second.  When you say he told you, this is what Mr. Smith told you?

A.   Yes, ma'am.

Q.   And the source of his knowledge was what?

A.   Mr. Sweeney.

Q.   All right.  I'm sorry to interrupt.

30

A.    That's okay.  So Mr. Smith is telling me that Mr. Sweeney told him that Meechie got charged with shooting a person from Condon Terrace, and that one of the persons or the victims was cooperating against Mr. -- was cooperating against Meechie. So that Mr. Sweeney went to an area in Southeast near Mississippi Avenue to kill the person who was testifying or who was going to testify against Meechie.

And Mr. Smith was under the impression that the person did die, that there actually was a murder.  And he said that Mr. Sweeney went down there, chased a person through the alley and it was some place near Mississippi Avenue, caught up with him, shot him, and stood over him and shot him some more.  And it was Mr. Smith's understanding that the person died.

And I tried going back and finding this crime, and this is an example of where I'd call him and ask him a question, and I'm trying to find -- I said, hey, you know, tell me about that again.  And then he told me that, yeah, he said, it was Draper or Shorty are the words he used and Birdy and he knew Birdy.

He said Birdy was with Draper when they went down there, and he said Birdy also shot somebody during the same event. So we looked back through and based on what he had told us, it matched up exactly with the shooting of Michael Jones. However, Michael Jones did not die.  Let me back up.  Match exactly.

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 591 of 668
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 31 of 102

31

It matched up -- all the facts matched up with the shooting of Michael Jones.  However, there was only one victim.  So, you know, he was trying to recount to me the conversation that was relayed to him, and he told me that he thought that two people were shot, but he said that Draper and Birdy were the two that went down there to do the shooting.

Q.   In the course of speaking with Robert Smith, did he also inform you about a conversation that he had had with William Sweeney about a witness by the name of Kenny Adams?

A.   Yes.  This is whenever I was away in 1997.  I was speaking to him on the phone.  And he was -- I don't want to use -- he was excited telling me about a witness named Little Wayne.  He said, man, there's this dude, Little Wayne, that's testifying against Poo-Poo.  He said, you better move that guy, because Draper and those guys found out where he's at.  He said, supposedly they got him hiding out in Centreville, Virginia, and those guys have been clocking him.

That's what he used clocking.  He said, Draper and them been clocking him, and he said, they're going to kill that little dude.  You better move him real quick before they get to him.

Q.   Had anyone told you about any effort to get, well, Wayne Wayne or Little Wayne?  What's his real name?

A.   Kenny Adams.

Q.   At that point had you had any information that efforts

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 592 of 668
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 32 of 102

32

were being made to locate and harm Kenny Adams?

A.    No, and I knew that Kenny Adams was cooperating.  I knew he'd been released.  I didn't know where he was staying at that time.  I called another FBI agent who was dealing directly with Kenny Adams.  I said, hey, is Little Wayne out in Centreville?

He said, yeah, he's out in Centreville.  And then I relayed the information to him that Mr. Smith told me.  So then they made the appropriate or took the appropriate steps to have Little Wayne moved.

Q.    In that same conversation you had with Robert Smith about Draper and them, the phrase you used, clocking Little Wayne, did Mr. Smith tell you anything that William Sweeney had told him about an employee at Superior Court?

A.    Yes.  He told me that there was a female at the Superior Court who would get information and pass it along to Mr. Sweeney and that this female had access to computers and it was Mr. Smith's understanding that she could even manipulate the computer system to make charges disappear.  I don't know how that could happen, but that was his understanding.

And whenever I asked him, do you know how they got -- found Little Wayne out there?  He said, I'm not sure, maybe it's the female, but he had no idea if it was the female or not, but he knew that there was a female with access to sensitive information in Superior Court.

33

Q.    Did Mr. Smith tell you about conversations he had with William Sweeney about the kidnapping of Wysocki, Anthony Pryor?

A.    Yes, he did.

Q.    What did Mr. Smith tell you that Mr. Sweeney had told him?

A.    He said that Mr. Sweeney, and these are the words that Mr. Hill used, he said, Draper, Vito, Birdy, Poo-Poo and Sam went to kidnap Wysocki.  And he said that they were waiting for him out in Maryland.  I think he said Montgomery County, Maryland, but he said they were sitting waiting for him to come out of the house, and as they were coming out of the house, they went to grab him, and he fought with them and struggled and started to get away and they shot him in the back with a .45.

After they shot him in the back with a .45, they threw him in the trunk of a car, and he says, they're driving away and the trunk of the car caved in somehow, and Wysocki was able to escape.

And he said that Draper and the others were very upset with Birdy because it was his car that was used when the trunk caved in.  So they blamed him for that.  And he said because of that and he said other things that happened over the years, that they wanted to kill Birdy for.

Q.    Did Mr. Sweeney indicate to Mr. Smith whether or not he,

**SA-585**

34

Mr. Sweeney, knew that he was wanted for that kidnapping?

A.    Yes.   There came a time in 1997 when an arrest warrant was obtained for Mr. Sweeney for that kidnapping of Wysocki, Anthony Pryor.   Mr. Sweeney had told Mr. Smith that, yeah, he found out that he was wanted, that they had a warrant for him for Wysocki's kidnapping.   But he said he wasn't worried, because he sent his investigator to interview Wysocki and that, I think he said he saw him twice maybe and got a statement from him, and that Wysocki said that he didn't know who shot him.   They were wearing masks and he couldn't identify them.

So Mr. Sweeney told Mr. Smith that he wasn't very concerned about that, but he did know that he was wanted.

Q.    Did Mr. Sweeney tell Mr. Smith about Mr. Sweeney's involvement in the murder of Donnell, Robocop, Whitfield?

A.    Yes.   He told us that Mr. Sweeney had bumped into Robocop while they were at the Mirage nightclub one night.

Q.    I'm going to interrupt you again just one second.   This is what Mr. Sweeney told Mr. Smith?

A.    Yes.

Q.    Mr. Smith didn't observe this himself?

A.    No.

Q.    Okay.

A.    I don't think he observed any of this.   This is just what he was told by Mr. Sweeney.

SA-586

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 595 of 668
Case 1:98-cr-00329-RCL  Document 974  Filed 03/11/03  Page 35 of 102

35

Q.    All right.

A.    Mr. Sweeney said that he was at the Mirage nightclub and had somehow bumped into Robocop and they had got into some kind of altercation.  Sometime after that Mr. Smith said that he was at 211 I Street, and he saw Mr. Sweeney and Erik Jones in the house.

They were talking.  Mr. Smith left.  He came back sometime later to 211 I Street, and he said those two were there again.  They told him how they had just come back from killing Robocop.  And they said that they went up there together.  That Draper got out of the car, shot Robocop, and then left the area.

And then he told us that what happened was the gun that he had used to shoot Robocop --

Q.    The gun that who used?

A.    Draper or Mr. Sweeney had used to kill Robocop, he was worried about it, that it would come back to the murder.  So there is an individual named -- they call him Colonel Klink.  His real name I think is William Howard Young.

Anyway, he said that Colonel Klink, everybody on the streets has used him as an expert on guns.  He knows all about guns.  So Mr. Sweeney gave the gun to Colonel Klink and said, hey, can you fix this for me so it won't come back as being the murder weapon.  So he said that he changed the barrel in it, but he didn't change all the parts, and therefore, the

police were able to identify the gun to the shooting of Robocop.

Q.    Did Mr. Sweeney tell Mr. Smith -- Mr. Sweeney or Mr. Jones tell Mr. Smith where it was that Robocop had been murdered?

MR. KIERSH:  Objection and ask to approach on this matter.

THE COURT:  Approach the bench.

(Bench conference on the record.)

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 597 of 668
Case 1:98-cr-00329-RCL   Document 974   Filed 03/11/03   Page 37 of 102

37

(Bench conference on the record.)

THE COURT:  What exactly was your question again?

MS. CHATURVEDI:  Did -- I think I can be specific to avoid the objection, but the question was did Mr. Sweeney or Mr. Jones tell Mr. Smith where the murder of Robocop occurred.

MR. KIERSH:  The objection is to what Erik Jones may have said to Agent Lisi.  That's hearsay.

MS. CHATURVEDI:  I can ask just about what Mr. Sweeney said.

THE COURT:  Fair enough.

(End of bench conference.)

SA-589

38

(End of bench conference.)

THE COURT:   Please rephrase your question.

BY MS. CHATURVEDI:

Q.   Agent Lisi, did Mr. Sweeney tell Mr. Smith where it was that Robocop had been murdered?

A.   Yes, in Sursum Corda.

Q.   Did Mr. Sweeney, Draper, talk to Robert Smith about the triple murder that happened out in PG County?

A.   Yes, he did.

Q.   What did Mr. Sweeney tell Mr. Smith about that?

A.   He told him that the whole plan started after Mr. Sweeney had gone to Las Vegas to see the Tyson-Holyfield fight.  While he was there he had seen Lonnie or Alonzo Gaskins, with a lot of money.

And to back up a little bit, we asked Mr. Smith a little bit about the trip, and Mr. Smith told us that he was the one who even introduced somehow Mr. Sweeney to the real estate agent who booked the trip for them.

Q.   The real estate agent?

A.   I'm sorry, travel agent.  The travel agent.  He said he introduced Mr. Sweeney to the travel agent and the travel agent was able to book the trip for Mr. Sweeney and others who went to Las Vegas to see the fight.

As I said, while they were there, Mr. Sweeney saw Lonnie win quite a bit of money.  So when he came home, he decided he

39

was going to try to kidnap him and rob him for his money.  He said on the night that they went out there, Mr. Sweeney, James Montgomery, Sam Carson, and Sean Coates went in a minivan.

They sat on the house for several hours.  At some point they went in the house.  He said they only had one gun, and that Draper was the one who had the gun.  He said it was a Glock .40 caliber that was used.

I think he said that there's a laser sight on it, too.  And he said Mr. Sweeney had the Glock .40 caliber and James Montgomery had a stun gun that he was going to use to try to stun one of the people inside the house.

They went in the house to try to kidnap Lonnie, and something went bad, and Mr. Sweeney said that Darnell Mack mouthed off, and that he had to kill him.  So he said he shot the two guys inside the house, and then on the way out of the house, he said there was a female standing there, and he said, she was just like frozen, like she was in shock and she couldn't move.  And he said he walked out and looked at her and just shot her in the head and left her there.

Q.    In the course of speaking with Robert Smith, from the time you first talked to him on December 5, 1996, until he was murdered in June of 1997, did Mr. Smith ever tell you that he was in fear with respect to his safety?

A.    Yes.  There was nothing specific.

THE COURT:  Let me interrupt you for a minute.

A.    Yes, sir.

Q.    And he got on board right away?

A.    Yes, sir.

Q.    Now, prior to December 5, 1996, had Robert Smith, as far as you know, been providing information to the United States about any other criminal activity whether it be in the District of Columbia or anywhere else?

A.    No, sir, he had not.

Q.    Now, going back to your telling us that you did not consider him to be a violent guy, there were a lot of violent people out on the street who were looking to have Robert Smith killed; isn't that right?

A.    Not that I know of.

Q.    How about a guy named Solomon?  You remember him?

A.    Yes, sir.

Q.    Okay.  And Solomon is a drug dealer, wasn't he?

A.    Yes, sir.

Q.    And Solomon is also known to traffick in large amounts of narcotics, correct?

A.    Yes, sir.

Q.    Solomon, was he a Jamaican?

A.    Yes, sir.

Q.    And he was uptown on Georgia Avenue?

A.    Yes, sir.

Q.    And you knew that a lot of the Jamaicans, a lot of the

SA-592

Jamaican gangs who were involved in narcotics, had a lot of weapons; isn't that right?

A.   I don't know if I'd say all the Jamaicans had weapons, but, I mean, it wasn't uncommon.

Q.   Yeah, I mean, drugs and guns kind of go together, don't they?

A.   Yes, sir.

Q.   Okay.  And Solomon was also -- his associates were guys named Lee and Pedro; isn't that right?

A.   I think Lee and Pedro were two other Jamaican suppliers. I don't know if they were affiliated with Solomon or not.

Q.   Do you know whether or not Butchie was selling marijuana or buying marijuana through Lee and Pedro?

A.   Yes, he was.

Q.   And those guys also were large sale distributors of marijuana?

A.   Based on the amounts of marijuana that Mr. Smith said he was getting from them, I would consider them, yes.

Q.   Okay.  And do you know whether or not Lee and Pedro typically would be armed?

A.   I don't know to this day who they are.  I don't know Solomon's real name.  We could never get him identified.

Q.   Well, what you do know about Solomon is that at one point in time, Butchie got fronted up 20 pounds of marijuana from him and didn't pay him back; isn't that right?

47

A.    Yes, that was the marijuana that I seized.

Q.    Okay.  But that was right around December of '96, wasn't it?

A.    No, that was 1993.

Q.    '93.  And 20 pounds of marijuana on the street would have a value of about $40,000; isn't that right?

A.    No.  He was paying about I think he said around $850 a pound, so it would be what's 20 times 850, 16,000, $18,000.

Q.    Well, you could -- your profit on a pound would be up to $2,000; isn't that right?

A.    Well, if you want to say the ultimate value if you bagged it up into $20 bags, I guess ultimately it would be 2,000 a pound.

Q.    And so 20 pounds if you lost $2,000 per pound, it would be about $40,000?

A.    No, I think that's inaccurate, because if you want to equate the amount of money that he would have owed Solomon, it would have been what he would have paid Solomon for the marijuana.

Q.    So using your numbers it would have been just shy of 20,000?

A.    Seventeen thousand dollars.

Q.    Now, $17,000 is not a king's ransom, but it's a fairly sizable amount of money; isn't that right?

A.    I would consider it.

SA-594

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

48

Q.    And you know a lot of guys on the street have been killed over a lot less than $17,000, don't you?

A.    I'm sure they have, yes.

Q.    And you also knew that for years before you arrested Butchie that he was a crack dealer?  Didn't you know that?

A.    Yes.

Q.    And you know from your experience in law enforcement just how many people in this city over the years have been killed because of being involved in the crack trade; isn't that right?

A.    In some way, shape or form, yes, sir.

Q.    All right.  So you know when you get involved in the crack trade, you're getting involved in a potentially violent side of life, aren't you?

A.    Yes and no.  There are -- I don't know if it's fair to categorize all of them that way.

Q.    Not all, but a lot?

A.    Correct.  Some people, sure.

Q.    Now, and you knew that Butchie had been involved in the crack business since the '80s; isn't that right?

A.    I believe so, yes.

Q.    And he'd been involved in the PCP distribution business since the '80s?

A.    Yes, although whenever he started back up in the '90s, I think it was predominantly the marijuana and then occasionally

SA-595

49

crack, but I think the majority of his crack dealing, it was more exclusively crack back in the '80s.

Q. And you also knew that he'd been involved in the heroin business since the '80s and forward?

A. I didn't know about the '80s. I knew most recently upon his arrest that he was involved in it at that time.

Q. So you knew he got involved in heroin in the '90s?

A. Yes, through your client, yes.

Q. Through my client. That's what you're saying?

A. What he told me I believe.

Q. You never arrested my client for heroin, did you?

A. Well, for heroin specifically, no, sir.

Q. You've -- he's not charged with heroin distribution in this case; is he?

A. No, sir.

Q. Okay. Now, Butchie in one form or the other, whether it be crack, heroin, PCP or marijuana, was involved in illegal narcotics trafficking from the late '80s until you arrested him in December of '96, correct?

A. That's correct, yes, sir.

Q. Now, a guy who Butchie set up, his name was Edward Taylor; isn't that right?

A. Yes, sir.

Q. And Edward Taylor was a large scale drug dealer in this town, wasn't he?

50

A.   I would say he was significant, yes.

Q.   And as a matter of fact, because of Butchie, Edward Taylor is now doing a 10 year sentence, correct?

A.   I don't know what he got sentenced to.  He was working for a 5(k), and I believe he earned a 5(k), so I don't know what his ultimate --

Q.   But you know he got sentenced for 10 years?

A.   No, I don't.

Q.   You know he got sentenced for a substantial period of time?

A.   No, I don't know what sentence he received.

Q.   And you know that Butchie gave you information about a guy named James Alfred, also known as Bam, in terms of drug trafficking?

A.   No, sir, he did not.

Q.   He did not?  How about James' brother, Ron Alfred, Boo, give you information about him?

A.   About drug trafficking, no, sir.

Q.   Kenneth Johnson, Butchie gave you information about him, didn't he?

A.   Does he have a nickname?

Q.   Well, didn't Butchie tell you that Kenneth Johnson killed Melvin Hill?

A.   If it's in my notes, he must have.  I don't have any specific recollection, but if it's in my notes, he did.

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

51

Q.    Now, then there's also a guy named Fernando Ware?

A.    Yes, sir.

Q.    Do you know Mr. Ware?

A.    No, I don't know Mr. Ware.

Q.    But you know of him, don't you?

A.    I knew of his involvement with Mr. Smith, yes.

Q.    Okay.  And Fernando Ware is doing a long prison sentence, isn't he?

A.    Oh, I didn't know that.  I thought he was on the street.

Q.    Well, if I told you he wasn't, would you be surprised?

A.    No.

Q.    Okay.  And Fernando Ware was arrested for supplying two kilos of cocaine to Reginald Johnson and Ronald Horn in 1987; isn't that right?

A.    I don't know.

Q.    And is it true that at the time of the arrest that those guys, Jackson and Horn, were transporting drugs that they had in their possession for none other than Robert Smith?

A.    I don't know.

Q.    Did you ever ask Fernando Ware about that?

A.    I never met Fernando Ware in my life.

Q.    Did you ever investigate whether or not they were being mules for Fernando Ware?

A.    No, sir.

Q.    Did you know that Butchie paid for lawyers for Reginald

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

52

Jackson and Horn just for the specific reason that they would not become snitches against Fernando Ware and protect him?

A. No, are you talking about back in the '80s?

Q. Yes, sir.

A. No, sir.

Q. And you know a guy named Darryl Coles? You've heard of him, haven't you?

A. That's Mookie?

Q. Mookie, yes.

A. Yes, sir.

Q. And did Butchie tell you that he, back in the '80s, had paid Wayne Perry to kill him?

A. I think he approached Wayne Perry and said something to him about killing Mookie, but I don't know of him paying Wayne Perry to do it.

Q. But you do know, at least it's your information, that Robert Smith, aka Butchie, asked or approached Wayne Perry as you put it about killing Mookie, also known as Darryl Coles?

A. I believe there's something to that effect, yes, sir.

Q. And you don't consider that to be or to constitute the makings of a violent man, who is approaching someone like Wayne Perry to suggest he kill somebody else?

A. I wouldn't say that, no, sir.

Q. No? Haven't you been in this courtroom for the past five months hearing the testimony about Wayne Perry and how violent

53

he is?

A.    Well, I think you misunderstood my answer.

Q.    Okay.  Well, go ahead and tell me what I misunderstand.

A.    I don't -- that would impact on whether or not Mr. Smith is a violent person or his violence, but I would say that in determining how violent he is to consider whether or not to leave him on the street, I don't think that that would be a significant a factor once he acknowledges it.

Q.    So the fact that Robert Smith at some point had approached one of the most violent criminals this city has ever seen and asked him about -- to kill somebody for him, that suggests to you that it's not necessary to ask that that guy be locked up pending sentencing?

A.    Considering everything else, we decided it was okay to put him on the street, or the government ultimately made the decision, but, yes.

Q.    Now, you know also that back in '92 or maybe it was '91 that Robert Smith, aka Butchie, he himself was the subject of an assassination attempt; isn't that right?

A.    He was shot, yes, sir.  I don't know the date.

Q.    Well, it was back -- you know it was in the Hope Village Halfway House?

A.    I know that.

Q.    And you know that whoever shot that place up, shot it up with about 30 rounds trying to get Mr. Smith?

54

A.   Yes, and I think that that may have something to do with the Wayne Perry incident.  I can't be certain, but I think that that's after he had been shot, that's how that came about.

Q.   Okay.  But you knew that back in '92 or '91, whenever the Hope Village shooting happened, and you'll agree it was the earlier '90s?

A.   Yes, sir.

Q.   That somebody was out there trying to kill Robert Smith?

A.   At that time, yes, sir.

Q.   And you were present in this courtroom pretrial when the government announced that they were saying that within any hesitation that William Sweeney had nothing to do with that attempt on Mr. Smith's life back in the early '90s?

A.   I don't remember that, but I don't believe that he had anything to do with that attempt in the early '90s.

Q.   So someone other than my client --

A.   Correct.

Q.   -- made a direct attempt on the life of Robert Smith?

A.   That's correct, yes, sir, in the early '90s.

Q.   After that attempt on Robert Smith's life, a guy named Ricky Spraggs went to the police.  Were you aware of that?

A.   No, sir.

Q.   And told the police that a guy named Rick Wise had been --

**SA-601**

55

MS. CHATURVEDI:  Objection, Your Honor, as to what someone else may have said.

THE COURT:  Well, I don't know.  Do you want to approach the bench?

(Bench conference on the record.)

SA-602

(Bench conference on the record.)

THE COURT:  You're asking a lot of questions as to which there has been no evidence.  Now, I don't know what your source of information is --

MR. KIERSH:  It's Agent Lisi's notes primarily is where this information is coming from.  It's also coming from my client, so there is a very good faith foundation for these questions.

THE COURT:  I think his notes are a very good foundation if that's where they come from.

MS. CHATURVEDI:  I haven't objected to most of the questions.  The objection now, Your Honor, isn't it true, and I can't remember the name, Ricky Spraggs?

MR. KIERSH:  Ricky Spraggs.

MS. CHATURVEDI:  Ricky Spraggs, isn't it true that he said or told the police X.  Whatever Mr. Spraggs may or may not have told the police I think is hearsay.  That isn't something that Agent Lisi has direct knowledge of.

THE COURT:  It may be hearsay, but he's asking a question.  He's isn't relating the hearsay.

MS. CHATURVEDI:  Well, if the question is isn't it true he said X, and Agent Lisi agrees with it or doesn't agree with it, it's a statement --

THE COURT:  Well, either Lisi knows of it or doesn't know of it.  If he knows it, that's all he wants to elicit.

57

Whether it's true or not, it's not being offered or asked to prove it was true?

MS. CHATURVEDI:  Then I guess --

THE COURT:  Rather simply it's whether Agent Lisi knows about it?

MR. KIERSH:  That's correct.  And Spraggs is dead, so I can't ask Mr. Spraggs about it.

MS. CHATURVEDI:  Well, I still think that if, in fact, Agent Lisi does know about it, I ask for Your Honor to instruct the jury that it's not coming in as truth.  It's not a truthful statement.  It's just coming in to show whether Agent Lisi is aware of it.

THE COURT:  Well, all right.  Fair enough.

(End of bench conference.)

58

(End of bench conference.)

THE COURT: Ladies and gentlemen, this is an opportune moment to remind you once again that the lawyers questions are not evidence. The fact that a lawyer asks a question which implies that a particular fact is true doesn't necessarily mean that it's true. So you should recognize that only if the witness himself has personal knowledge of it and confirms what the lawyer asks in the form of a question has evidence to that effect been introduced. Okay.

BY MR. KIERSH:

Q.   Agent Lisi, I just want to step back for a second. A few minutes ago with respect to those brothers, Boo and Bam, you said that Butchie didn't give you any information about them?

A.   No, I think you said any information about them dealing drugs. He mentioned their names a couple of times, but he never said anything about details about their drug activity.

MR. KIERSH: I'm going to have your notes marked as an exhibit. May I approach the witness, Your Honor?

THE COURT: Sure.

BY MR. KIERSH:

Q.   Agent Lisi, I'm showing you what's been marked for identification only as Sweeney Exhibit 29. First just take a look at this package of material and tell me if you recognize that?

A.   Sure.

59

(Whereupon, Defendant Sweeney Exhibit No. 29 was marked for identification.)

BY MR. KIERSH:

Q.   Are those the notes that you drafted in connection with your conversations with Robert Smith?

A.   Yes, sir.

Q.   Okay.  Now, I had a little trouble deciphering those notes.  Could you tell us what is referenced on those notes that are underlined in yellow with respect to Boo and Bam?

A.   Sure.  It said, Ed had a house in Oxon Hill.  Ed was serving Carlos and then E it says Boo and Bam from Fresh Gear.  Draper saw them gambling.  Bam was hitting Carlos.

Q.   Okay.  Now, Ed that you're referencing there, that's Edward Taylor?

A.   Well, I have a question mark, but later we came to learn that it was Ed Taylor.

Q.   Okay.  That's the person earlier you talked about doing some substantial sentence?

A.   Correct.

Q.   Okay.  Now, what was the terminology you used at the end?

A.   Boo and Bam from Fresh Gear.  Draper saw them gambling and said Bam was hitting Carlos.

Q.   Okay.  What does the term hitting Carlos mean?

A.   Serving him drugs.

Q.   Okay.  So do you know the reference Boo and Bam involved

60

in drugs in this?

A.   Yes, but I wouldn't consider that significant details about their drug activity.  That's more or less -- it's nothing significant that we would follow up on.

Q.   This is information that Robert Smith gave you, correct?

A.   Yes, sir.

Q.   It does talk about Boo and Bam, whether it's significant or not to you, it does reference them in connection with drug activity; isn't that correct?

A.   Yes, in some way, yes, sir.

Q.   Now, after -- let's go back to when Robert Smith got shot at the Hope Village Halfway House.  You know from the course of your investigation that he was pretty seriously injured in that; isn't that correct?

A.   I think he was, yes, sir.

Q.   Okay.  And didn't he tell the police afterwards, as far as you know, only if you know, --

A.   I can tell you, no.  I don't know anything he told the police about that.

Q.   You don't know that he said that Ricky Spraggs did it?

A.   I have no idea what he told the police.

Q.   You've heard the name Ricky Spraggs before I mentioned it today?

A.   Never in my life.

Q.   Did you know that Ricky Spraggs got killed within a week

61

of Robert Smith getting out of federal prison?

A.    I have no idea who Ricky Spraggs is, sir.

Q.    And you're saying that Robert Smith never mentioned the name Ricky Spraggs to you.

THE COURT:  Will counsel approach the bench?

MR. KIERSH:  I can move off that subject then.

THE COURT:  Well, I mean, just a minute ago you were telling me everything you were asking had a foundation in his notes.  He says he's never heard of him before.  Is it in his notes?  If not, --

MR. KIERSH:  I'll move on.

THE COURT:  Let's see where you're going with it.

BY MR. KIERSH:

Q.    Do you know about Robert Smith's cocaine trafficking on Langston Lane in the '80s?  Did he tell you about that?

A.    No, sir, not me.

Q.    Well, as far as you know through the course of your investigation, was Langston Lane a particular location that Robert Smith was involved with in the selling of crack in the '80s?

A.    Yes, sir.

Q.    Okay.  And who -- who was he involved with there?

A.    I don't know.

Q.    Did you ever make any inquiry?

A.    Me, myself, no, sir.

SA-608

62

Q.    Okay.  You heard of a guy named Melvin Hill, haven't you?

A.    There's Bucky Hill.  I'm not sure about Melvin Hill.

Q.    Well, you know about the guy who was shot in the company of Robert Smith?

A.    That's Bucky Hill.

Q.    Okay.  Bucky Hill, Melvin Hill.  Bucky is his nickname.

A.    Okay.  I know him as Bucky, yes, sir.

Q.    All right.  You know the circumstances behind that shooting?

A.    Yes, sir.

Q.    Okay.  You know that what happened was Robert Smith is engaged in a crap game with about $20,000; isn't that right?

A.    Somehow 20,000 was involved, yes.

Q.    And somebody thought that they were getting beat out of their money at that crap game; isn't that right?

A.    Yes, sir.

Q.    And then so somebody went out and tried to kill Robert Smith over that crap game; isn't that right?

A.    No, they killed Bucky Hill.

Q.    But they were meaning to kill Robert Smith?

A.    They killed Bucky Hill.  I don't know how they meant to kill Robert Smith.

Q.    Well, because Robert Smith was the one who was gambling, and Hill was just there protecting him?

A.    Sir, --

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

63

Q.    You don't know the answer to that?

A.    I know that Mr. Smith said that they were gambling with Kenny Ray and somebody else.  It was over and they said, meet us up at the church parking lot.  He went up there with Bucky Hill, and while he was talking to one person away from Bucky Hill, somebody walked -- Kenny Ray walked up and killed Bucky Hill.

Q.    Kenny Ray wasn't alone when he went up and killed Bucky Hill.  He was with Darryl Coles; isn't that right?

A.    I remember him telling me that it was Kenny Ray walked up and killed Bucky Hill while he was talking to somebody else.  So I don't see how they tried to kill him when they killed Bucky Hill.

Q.    Did you ever hear the name Darryl Coles in connection with that murder?

A.    No, sir.  I don't remember it.

Q.    Was anyone ever charged with that murder?

A.    I don't know.  I know that Mr. Smith told us that immediately after that he got -- talked to his lawyer and went to Homicide and told Homicide about it, told the people at the Homicide Branch.

Q.    Now, you wrote up a series of notes on 302s after certain conversations with Robert Smith; isn't that right?

A.    Yes, sir.

Q.    You didn't write them up after every conversation; isn't

82

A.    Yes, sir.

Q.    And you could have gone and gotten an arrest warrant or an indictment against him for the murder of Keith Johnson, correct?

A.    Never.  You can't arrest or indict somebody on what one person said they told them.  We didn't have any information to corroborate it.  We have come forward now and developed additional witnesses, but at that time that's all we had was that one.

Q.    All right.  And he is not charged today, is he --

A.    No.

Q.    -- sitting there?

A.    No.

Q.    And you said that there was some information about van records from -- what was the company?

A.    Enterprise.

Q.    Okay.  Did you check out those records?

A.    No.  I said there weren't -- I called -- he said that he had used Enterprise in the past.  He wasn't sure what company was used to rent the van, but he had used Enterprise in the past.  I called Enterprise, and they told me that, in fact, Kirk Ivory Newton had rented cars from them in the past, but did not rent a van during that time period that Mr. Johnson was killed.

Q.    Okay.  So that contradicted the information that Robert

Smith told you about?

A.   I think it corroborates it a hundred percent.

Q.   But you still haven't bothered to charge him?

A.   Mr. Smith's information was that he had used Enterprise in the past.  Enterprise said, yes, Kirk Ivory Newton has been here in the past.  He said he didn't know what van was used at that time.  He said try Enterprise.

Q.   Have you produced those records that you got from Enterprise, have you turned them over to counsel?

A.   There are no records.  I spoke to the person on the phone.

Q.   Did you go and have those records subpoenaed?

A.   No, sir.

Q.   And you also talked about a shooting of Michael Jones, do you remember that?

A.   Yes, sir.

Q.   And you remember Arthur Rice testified that he was present when Michael Jones was shot?

A.   Yes, sir.

Q.   And he was asked by government counsel, well, who else was present when Michael Jones was shot?

A.   Yes, sir.

Q.   And you remember that he specifically did not include William Sweeney in that group?

A.   I remember that very well, yes.

Q.   So what Arthur Rice said about the shooting of Michael Jones is in contradiction of what Robert Smith said about the shooting of Michael Jones?

A.   No.   It's kind of funny, because when Arthur Rice was first interviewed about Michael Jones he specifically said that your client was there.   After that --

Q.   You are telling us that this is what Arthur Rice said?

A.   Oh, yes, sir.

Q.   But he didn't say that to the jury when he testified, did he?

A.   I'm explaining.   Sometime after that he was interviewed again about it, and he mentioned the name of the people who were there, and he kept saying, there is somebody else but I can't remember, there is somebody else, but I can't remember. Earlier he had said your client was there.   Later on he said he couldn't remember.   The government didn't say, well, go say it was Draper, say -- so they didn't bother to ask him about it.

Q.   Also, with respect to the shooting of Michael Jones, Mr. Sweeney is not charged, is he?

A.   Correct.

Q.   And he has never been charged with that event?

A.   Correct.

Q.   Now, Kenny Adams, last week you talked about a traffic ticket that James Montgomery picked up coming back from sort

BEVERLY J. BYRNE, OFFICIAL COURT REPORTER

*Clerks File*

1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
        GOVERNMENT,

VS.                                    :    CR. NO. 98-329 ✓

VINCENT HILL,                          :
JEROME MARTIN,                         :    **FILED**
SAMUEL CARSON,                         :
WILLIAM K. SWEENEY,                    :    JUL 1 9 2001
SEAN COATES,                           :
        DEFENDANTS.                    :    NANCY MAYER WHITTINGTON, CLERK
                                       :    U.S. DISTRICT COURT

UNITED STATES                          :
        GOVERNMENT,                    :

VS.                                    :    CR. NO. 99-348

GARY PRICE,                            :
        DEFENDANT                      :

                                            WASHINGTON, D. C.
                                            MAY 30, 2001
                                            (10:37 A.M.)


                    TRANSCRIPT OF PROCEEDINGS
          BEFORE THE HONORABLE THOMAS P. JACKSON


COURT REPORTER:                PHYLLIS MERANA
                               6816 U. S. DISTRICT COURT
                               3RD & CONSTITUTION AVE., N.W.
                               WASHINGTON, D. C. 20001

SA-614

16

Q. THOSE GUYS YOU JUST MENTIONED, PETEY JOHNSON AND DARRYL HINES -- THOSE GUYS WERE "BUTCHIE'S" DRUG-DEALING PARTNERS, CORRECT?

A. YES, I WOULD SAY THEY WORKED FOR HIM.  YES, THEY WERE PARTNERS.

Q. AND SO "BUTCHIE," IN TERMS OF SIGNIFICANCE AND IMPORTANCE, WAS ABOVE DARRYL HINES AND PETEY JOHNSON, CORRECT?

A. ABSOLUTELY.

Q. THOSE GUYS WORKED FOR "BUTCHIE," CORRECT?

A. CORRECT.

Q. AND THOSE GUYS WERE INVOLVED IN HEROIN TRAFFICKING, CORRECT, THOSE GUYS BEING DARRYL HINES AND PETEY JOHNSON?

A. WITH "BUTCHIE"?  I DON'T BELIEVE SO.

Q. HOW ABOUT INDEPENDENT OF "BUTCHIE"?  DO YOU KNOW IF THEY WERE INVOLVED IN HEROIN TRAFFICKING?

A. PETEY JOHNSON I BELIEVE WAS.  I DON'T KNOW ABOUT THE OTHER TWO.

Q. OKAY. AND THEY WORKED ON THEIR OWN?

A. WITH THE HEROIN?

Q. YES.

A. WHEN YOU SAY "WORKED ON THEIR OWN" --

Q. WELL, YOU JUST SAID THEY DIDN'T WORK WITH "BUTCHIE."

A. CORRECT.

Q. SO DID THEY WORK ON THEIR OWN IN TERMS OF HEROIN

SA-615

11

HIS MARIJUANA FROM HIM?

A. NO, SIR.  HE DID NOT.

Q.  HE DID NOT TELL YOU THAT?

A.  HE DID NOT SAY THAT.

Q.  DID YOU ASK HIM WHETHER OR NOT HE WAS GOING TO KILL RICE --- WAS LOOKING TO KILL RICE?

A.  WE TALKED ABOUT THE PURPOSE OF GOING DOWN THERE.  HE SAID HE WANTED TO CONFRONT HIM AND GET THE MONEY.

Q.  RIGHT.  AND HE KNEW THAT RICE WAS A GUY INVOLVED IN GUNS, CORRECT?

A. I DON'T KNOW WHAT HE KNEW ABOUT RICE?

Q.  HE DIDN'T TELL YOU THAT?

A.  NO, SIR.

Q.  HE KNEW, OBVIOUSLY, THAT RICE WAS A GUY INVOLVED IN SELLING A LOT OF DRUGS BECAUSE HE WAS GETTING THEM FROM HIM, CORRECT?

A.  CORRECT.

Q.  AND ACCORDING TO YOUR NOTES, SMITH GAVE YOU INFORMATION ON A GUY NAMED EDDIE MATHIS, IS THAT CORRECT?

A.  IF I COULD SEE MY NOTES.

Q.  BEFORE WE GET TO THAT, HE GAVE YOU INFORMATION ON A GUY NAMED CORNELL JONES, TOO, DIDN'T HE?

A.  YES, SIR.

Q.  NOW, AS YOU KNOW FROM YOUR INVESTIGATION, CORNELL JONES IS A MAJOR HEROIN TRAFFICKER IN THIS CITY, ISN'T HE?

SA-616

12

THE COURT: MAJOR WHAT?

MR. KIERSH: HEROIN TRAFFICKER.

THE WITNESS: HE IS BELIEVED TO BE. I DON'T KNOW THE DETAILS OF IT, BUT, YES.

BY MR. KIERSH:

Q. OKAY. ACCORDING TO YOUR KNOWLEDGE. THAT'S ALL.

A. YES.

Q. YOU KNOW THAT CORNELL JONES IS A GUY THAT IS IN HIS FORTIES, CORRECT?

A. HE IS OLDER.

Q. AND HE IS A GUY, AS FAR AS YOU KNOW, THAT HAS BEEN THE SUBJECT OF AN ONGOING INVESTIGATION BY THE F.B.I. FOR YEARS AND YEARS INTO HEROIN TRAFFICKING AND OTHER NARCOTICS TRAFFICKING IN THIS CITY?

A. I DON'T KNOW OF ANY SUCH INVESTIGATIONS. I KNOW THAT HE WAS INVESTIGATED PREVIOUSLY, BUT I DON'T KNOW OF ANY ONGOING INVESTIGATIONS, NO.

Q. BUT YOU KNOW THAT HE HAD BEEN INVESTIGATED PREVIOUSLY?

A. WHEN HE WAS CONVICTED. THE INVESTIGATION I KNOW OF IS WHEN HE WAS CONVICTED.

Q. OKAY.

DID THE INFORMATION THAT ROBERT SMITH GAVE YOU ABOUT CORNELL JONES LEAD TO THE CONVICTION OF CORNELL JONES?

A. THE INFORMATION HE GAVE ME, NOTHING WAS EVER DONE WITH IT.

SA-617

13

Q.  OKAY.  YOU KNOW THAT FOR A FACT?

A.  YES.

Q.  NOW, I HAND YOU YOUR NOTES THAT HAVE ALREADY BEEN MARKED.  SEE IF YOU CAN FIND WHERE IT MAKES REFERENCE TO EDDIE MATHIS.

A.  WELL, CAN YOU SHOW ME, JUST TO SPEED IT UP?

Q.  LET ME GET BACK TO THAT.

YESTERDAY YOU TOLD US THAT AFTER "BUTCHIE" BECAME A COOPERATING WITNESS WITH YOU, HE TOLD YOU THAT HE HAD $5,000.00 IN CASH AND A GUN STASHED AWAY IN MARYLAND, CORRECT?

A.  ALONG WITH SOME HEROIN AND MARIJUANA, YES, SIR.

Q.  HOW MUCH HEROIN DID HE HAVE?

A.  I DON'T REMEMBER.

Q.  HOW MUCH MARIJUANA DID HE HAVE?

A.  I DON'T REMEMBER.  I DON'T THINK IT WAS SIGNIFICANT.  IT MIGHT HAVE BEEN -- THE MARIJUANA I THINK WAS MAYBE A POUND, GIVE OR TAKE.

Q.  AND YOU DON'T CONSIDER THAT TO BE SIGNIFICANT?

A.  NOT CONSIDERING THE WEIGHT THAT HE WAS DEALING.  WHENEVER HE WAS DEALING A HUNDRED POUNDS OR SO A WEEK, I DIDN'T THINK A POUND OR SO WAS.

Q.  AND A POUND OF MARIJUANA IS NOT AN AMOUNT THAT TYPICALLY THE F.B.I. WOULD BE INVOLVED IN INVESTIGATING, CORRECT?

A.  NO, THAT'S NOT TRUE.

SA-618

17

TRAFFICKING?

A. WELL, THEY GOT THE HEROIN FROM SOMEBODY. AND I DON'T KNOW WHO HELPED THEM SELL IT.

Q. DID "BUTCHIE" GIVE YOU INFORMATION ABOUT PETEY JOHNSON?

A. YES.

Q. DID HE GIVE YOU INFORMATION ABOUT DARRYL HINES -- TO INVESTIGATE HIM?

A. HE WAS DEAD.

Q. DEAD BEFORE DECEMBER OF '96?

A. HE DIED IN JULY OF '96.

Q. OKAY. WAS ANYONE CHARGED WITH THAT?

A. I BELIEVE SOMEBODY WAS CHARGED, AND THEN IT WAS DISMISSED.

Q. OKAY. WAS "BUTCHIE" CONSIDERED A SUSPECT IN THAT MURDER?

A. NO, SIR. NOT AT ALL.

Q. NOW, MICHAEL FARRAR WAS ALSO A DRUG DEALER WHO WAS UNDER INVESTIGATION BY THE F.B.I.?

A. NO, SIR.

Q. NEVER?

A. NOT TO MY KNOWLEDGE.

Q. OKAY. JUST TO YOUR KNOWLEDGE.

AND DID YOU KNOW THAT MICHAEL FARRAR CARRIED WEAPONS?

A. AT THAT TIME, NO. I CAME TO LEARN IT LATER ON.

SA-619

(BENCH CONFERENCE.)

THE COURT: WHAT IS THE RELEVANCE?

MR. KIERSH: IT IS ENTIRELY RELEVANT. HE IS RELYING ON WHAT ROBERT SMITH SAID TO HIM, WHO HE HAS ALREADY ACKNOWLEDGED GAVE HIM FALSE INFORMATION IN TERMS OF MAKING AN ARREST OF MY CLIENT FOR THE TRIPLE MURDER. I AM PROBING WHETHER OR NOT HE LOOKED INTO ANY OTHER AVENUES OF INFORMATION TO EITHER CORROBORATE OR CONTRADICT WHAT SMITH SAID TO HIM.

THE COURT: I THINK THEY HAVE A CONSIDERABLE AMOUNT OF EVIDENCE.

MR. KIERSH: I DON'T BELIEVE THEY DO, BUT WHETHER THEY DO OR NOT IS IRRELEVANT. I AM ENTITLED TO PROBE THE LEAD AGENT WHO TOOK THE INFORMATION FROM SMITH TO SEE WHAT HE DID TO CORROBORATE OR CONTRADICT SMITH.

THE COURT: WELL, I THINK YOU'RE WASTING TIME.

MR. KIERSH: I DON'T THINK SO, JUDGE.

THE COURT: I AM GOING TO OVERRULE THE OBJECTION. I AM GOING TO LET HIM ASK IT, BUT I AM GOING TO PUT A LIMIT ON YOU. I DO NOT KNOW WHERE YOU'RE GOING WITH A LOT OF THIS INTERROGATION. IT SOUNDS LIKE A DEPOSITION TO ME. AND I DON'T THINK YOU'RE MAKING ANY HEADWAY.

MR. KIERSH: I DISAGREE. I HAVE CAREFULLY DESIGNED THIS BECAUSE THE GOVERNMENT IS PLACING AN UNBELIEVABLE AMOUNT OF RELIANCE ON WHAT SMITH SAID. I CAN'T

42

CROSS-EXAMINE SMITH.

THE COURT:  THERE IS A VAST AMOUNT OF EVIDENCE IN THIS RECORD TO IMPLICATE YOUR CLIENT.

MR. KIERSH:  WHETHER THERE IS OR NOT, THEY ARE RELYING SO MUCH ON SMITH.  SO I NEED TO EXAMINE IT.  I NEED TO EXAMINE WHAT HE DID TO CORROBORATE SMITH.  THAT'S WHERE I AM GOING.

MS. CHATURVEDI:  YOUR HONOR, THE OTHER THING IS AGENT LISI WAS CALLED SPECIFICALLY TO TESTIFY AS TO WHAT SMITH SAID.  IF MR. KIERSH NOW WANTS TO GO INTO HOW AGENT LISI CONDUCTED THE INVESTIGATION, HE IS WELCOME TO CALL AGENT LISI IN HIS CASE, BUT THE PURPOSE IN CALLING AGENT LISI WAS NOT TO GO INTO WHAT CORROBORATIVE STEPS WERE TAKEN OR INVESTIGATIVE LEADS WERE DEVELOPED.  IT'S SIMPLY TO GET MR. SMITH'S STATEMENTS OUT THERE.  THE DIRECT TOOK ABOUT THIRTY MINUTES.

THE COURT:  I AM GOING TO HOLD YOU TO THE SCOPE. I AM GOING TO LET YOU GET AN ANSWER TO THIS QUESTION.

MR. KIERSH:  OKAY.

THE COURT:  AFTER THAT, I AM GOING TO HOLD YOU TO THE SCOPE.

MR. KIERSH:  CAN I JUST HAVE THE QUESTION READ BACK TO ME?

THE COURT:  PARDON?

MR. KIERSH:  CAN I JUST HAVE THE LAST QUESTION

SA-621

49

(END OF BENCH CONFERENCE.)

BY MR. KIRSCH:

Q. AGENT LISI, THE QUESTION IS AFTER ROBERT SMITH WAS MURDERED, DID YOU QUESTION OTHER SUSPECTS IN HIS MURDER?

A. SUSPECTS? YES.

Q. AND HOW MANY OTHER SUSPECTS?

A. ONE.

Q. OKAY. IS THAT OTHER SUSPECT DEPICTED ON THE PHOTO BOARD?

A. NO, SIR.

Q. NOW, IN YOUR NOTES THAT YOU WROTE -- AND, AGAIN, IF YOU NEED TO TAKE A LOOK AT IT, JUST LET ME KNOW. YOU TALKED ABOUT STEPHON'S COUSIN SAYING HE GOT A GUN FROM DRAPER THAT WAS USED IN THE TRIPLE, A .40 CALIBER WITH A LASER SIGHT. DO YOU REMEMBER THAT?

A. YES, SIR.

Q. OKAY. NOW, STEPHON'S COUSIN, WHO YOU'RE REFERENCING IN THIS NOTE, IS JOHNNIE PROCTOR, ISN'T THAT RIGHT?

A. I CAME TO LEARN IT WAS JOHNNIE PROCTOR, YES.

Q. OKAY. NOW, JOHNNIE PROCTOR -- REMINDING THE LADIES AND GENTLEMEN OF THE JURY -- IS THE SAME JOHNNIE PROCTOR WHO JAMES MONTGOMERY HAD FALSELY ACCUSED OF BEING INVOLVED IN THE TRIPLE MURDER WHEN HE SPOKE TO THE PRINCE GEORGE'S COUNTY POLICE, ISN'T THAT RIGHT?

MS. CHATURVEDI: OBJECTION. IT'S BEYOND THE

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES,
            GOVERNMENT,                :

 VS.                                   :        CR. NO. 98-329

VINCENT HILL,                          :
JEROME MARTIN,                         :
SAMUEL CARSON,                         :
WILLIAM K. SWEENEY,                    :
SEAN COATES,                           :
            DEFENDANTS.                :
                                       :
UNITED STATES                          :
            GOVERNMENT,                :
                                       :
    VS.                                :        CR. NO. 99-348
                                       :
GARY PRICE,                            :
            DEFENDANT                   :
                                       :

FILED

JUL 19 2001



NANCY MAYER-WHITTINGTON, CLERK
U.S. DISTRICT COURT

WASHINGTON, D. C.
JUNE 21, 2001
(10:18 A.M.)
(A. M. SESSION)

TRANSCRIPT OF PROCEEDINGS
BEFORE THE HONORABLE THOMAS P. JACKSON

COURT REPORTER:              PHYLLIS MERANA
                             6816 U. S. DISTRICT COURT
                             3RD & CONSTITUTION AVE., N.W.
                             WASHINGTON, D. C. 20001

SA-623

USCA Case #23-3015     Document #2109460     Filed: 04/04/2025     Page 632 of 668

2

(JURY OUT.)

MR. DAVIS:  YOUR HONOR, I WANT TO PROFFER SOMETHING TO YOU WHILE YOU'RE SEATED UP THERE SO THAT YOU CAN REVIEW IT.

THE COURT:  I DON'T WANT TO SEE IT.

MR. DAVIS, I FIND YOU IN CRIMINAL CONTEMPT OF THIS COURT AND FINE YOU THE SUM OF $500.00.

MR. DAVIS:  JUDGE --

THE COURT:  YOU WILL NOT ACCEPT MY RULING.

MR. DAVIS:  JUDGE, YOU TOLD ME --

THE COURT:  DO YOU WANT TO TRY FOR ANOTHER?

MR. DAVIS:  NO, YOUR HONOR, BUT THIS DEEPLY UPSETS ME.  I HAVE BEEN --

THE COURT:  IT DEEPLY UPSETS ME.  DO YOU WANT TO TRY FOR ANOTHER?

MR. DAVIS:  NO, I DON'T.  JUST ONE SECOND.  THIS DEEPLY UPSETS ME.  I HAVE BEEN PRACTICING FOR 17 YEARS. YOUR HONOR, YOU TOLD ME I COULD ASK QUESTIONS ABOUT THE PRIOR ACTS.  I HAVE THEM IN THE 302.  I WAS JUST ASKING THOSE QUESTIONS.  YOU TOLD ME TO MOVE ON FROM ASKING HIM ABOUT CERTAIN QUESTIONS.  I STOPPED, AND I WENT ON TO ANOTHER TOPIC.

THE COURT:  OTHER PRIOR ACTS.

MR. DAVIS:  WELL, YOUR HONOR --

THE COURT:  AND I RULED THREE TIMES.

**SA-624**

sm •

TCB

# ORIGINAL

1

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - - x
                                     :
UNITED STATES OF AMERICA,            :
                                     :
          Government,                :
                                     :
            v.                       :      Case No.
                                     :      CR 98-329
                                     :
VINCENT HILL,                        :
JEROME MARTIN,                       :
SAMUEL CARSON,                       :
WILLIAM K. SWEENEY,                  :      FILED
SEAN COATES,                         :
                                     :
          Defendant.                 :      JUL 1 9 2001
- - - - - - - - - - - - - - - - - - x      NANCY MAYER-WHITTINGTON, CLERK
                                     :          U.S. DISTRICT COURT
UNITED STATES OF AMERICA,            :
                                     :
          Government,                :
                                     :
            v.                       :      Case No.
                                     :      CR 99-348
GARY PRICE,                          :
                                     :
          Defendant.                 :
                                     :
- - - - - - - - - - - - - - - - - - x

Washington, D.C.
Thursday, July 5, 2001
1:50 p.m.
(P.M. SESSION)

TRANSCRIPT OF JURY TRIAL
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE, and a jury

COURT REPORTER:          THOMAS C. BITSKO
                         Miller Reporting Company
                         735-8th Street, S.E.
                         Washington, D.C.   20003
                         (202)  546-6666

SA-625

731

sm

8

not have to be recorded.

In addition, with respect to the narcotics conspiracy charged in Count One, if you find that such a conspiracy existed, you will have to make and record a finding as to whether the quantity of any controlled substance involved met or exceeded the amounts thereof charged.

Keep in mind that some of the Racketeering Acts are also charged as substantive crimes, and your own findings should also be consistent with one another. Thus, for example, if you find beyond a reasonable doubt that a particular murder was committed, and that murder is charged both as a substantive crime and as a Racketeering Act, you should find that the Racketeering Act corresponding to the  murder has, likewise, been proved, unless the government has failed to prove it was committed in furtherance of the RICO conspiracy.

A separate offense--a separate crime or offense is charged against one or more of the defendants in each of the counts of the indictments. Each offense, and the evidence pertaining to it, should be considered and decided separately. The fact that you may find one or more of the accused guilty or not guilty of one of the

SA-626

sm

9

offenses charges should not control your verdict as to any other offense charged, except as I may otherwise instruct you.

You are specifically cautioned against permitting the character of any charge itself to affect your minds in arriving at your verdict. You must permit only the evidence in this case to enter into your deliberations and findings in rendering a fair and impartial verdict.

You will be provided copies of the indictments against these defendants. You are reminded, however, that the indictments are not evidence. An indictment is merely the formal manner of accusing a person of a crime in order to bring him to trial. You must not use the indictments for any purpose other than informing yourselves of the charges you are to consider. In other words, you may not regard them as tending to prove a defendant's guilt or to draw any inference of guilty from them.

The opening statements and closing arguments of counsel are also not evidence. They are only intended to assist you in understanding the evidence and the contentions of the parties.

The questions put to the witnesses by

SA-627

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

10

counsel are likewise not part of the evidence in the case. If a lawyer asked a witness a question that contains an assertion of fact, you may not consider the assertion as evidence of that fact unless the fact is elsewhere established by the evidence or the witness adopts the fact in answering the question.

Finally, anything you may have heard or seen outside this courtroom is not evidence, and that too must be disregarded.

At times throughout the trial, you have heard one defense attorney ask questions regarding a defendant other than his client, and to make various objections and arguments on behalf of a defendant not his client. In addition, you may also have noted throughout the trial that counsel for the defendants have consulted with each other and may have divided tasks to expedite the case and minimize duplication. Indeed, in a case of this length, it is natural for defense counsel to cooperate and consult with one another. These circumstances do not mean that you should regard the defendants as a single person or entity. Each defendant is entitled to your separate consideration.

SA-628

sm

28

information and to testify as government witnesses, and in exchange, the government agreed to confer certain benefits upon them, such as dismissing some charges against these witnesses, and agreeing not to prosecute him or her on other charges.

The government is permitted to enter into this kind of plea agreement. You, in turn, may accept the testimony of such a witness and convict a defendant on the basis of this testimony alone, if it convinces you of the defendant's guilt beyond a reasonable doubt.

You should bear in mind, however, that a witness who has entered into such an agreement has an interest in this case different from other witnesses. A witness who realizes that he may be able to obtain his freedom, receive a lighter sentence, or obtain other benefits by giving testimony favorable to the prosecution, has a motive to testify falsely. Therefore, you must examine his testimony with caution and weigh it with great care. If, after scrutinizing his testimony, you decide to accept it, you may give it whatever weight, if any, you find it deserves.

As was explained to you during the trial, many of the plea agreements requires the government

SA-629

pab                                                                35

witness at the time and other circumstances bearing on the reliability of the witness's identification that you deem relevant;

Third, any other direct or circumstantial evidence that may identify the person who committed the offense charged or corroborate or negate the identification by the witness.

You must be satisfied beyond a reasonable doubt of the accuracy of the identification of a defendant before you may convict him. If the circumstances of the identification of the defendant are not convincing beyond a reasonable doubt, you must find the defendant not guilty.

You may not infer that a defendant is guilty of participating in criminal conduct merely from the fact that he may have been present at the time and place a crime was being committed and have knowledge that it was being committed.

Likewise, you may not infer that a defendant is guilty of participating in criminal conduct merely from the fact that he associated with, was a family member of or lived with other people who were guilty of wrongdoing.

Unless I have instructed you otherwise, you should consider each instruction that the Court

SA-630

pab

36

has given to apply separately and individually to each defendant on trial. Likewise, you should give separate consideration and render separate verdicts with respect to each defendant. Each defendant is entitled to have his guilt or innocence of the crime for which he is on trial determined from his own conduct and from the evidence that applies to him as if he were being tried alone.

The guilt or innocence of any one defendant should not control or influence your verdict as to the other defendants. You may find any one or more of the defendants guilty or not guilty. At any time during your deliberations, you may return your verdict of guilty or not guilty with respect to any defendant on any charge, after which you will resume your deliberations as to the other remaining defendants and charges.

A separate offense is charged in each of the counts of the indictments that you are to consider. Each offense and the evidence that applies to it should be considered separately, and you should return separate verdicts as to each count. Except as I have otherwise instructed you, the fact that you may find a defendant guilty or not guilty of any one count of the indictments

SA-631

pab

37

should not control or influence your verdict with respect to any other count of the indictments.

You are instructed that the question of possible punishment of a defendant in the event of conviction is no concern of the jury and should not enter into or influence your deliberations in any way. The duty of imposing sentence in the event of a conviction rests exclusively upon the Court. You should weigh the evidence in the case and determine the guilt or innocence of each defendant solely upon the basis of such evidence, without any consideration of the matter of punishment.

Some of the elements of the offenses upon which I will instruct you require proof by the government of a certain state of mind, signified by using terms like "intentional" or "knowing."

Someone's intent or knowledge ordinarily cannot be proved directly because, of course, there is no way of looking directly into the workings of the human mind. However, you may infer a defendant's intent or knowledge from the surrounding circumstances, or, in other words, the circumstantial evidence. You may consider any statement or atmosphere done, or not done, by the defendant, and all other facts and circumstances

SA-632

pab

JH

# ORIGINAL

1

## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - x
                        :

UNITED STATES OF AMERICA,     :

     Government,       :

     v.                 :    Case No.
                        :    CR 98-329

VINCENT HILL,          :
SAMUEL CARSON,         :
WILLIAM K. SWEENEY,    :
SEAN COATES,           :

     Defendant.      :

                        :

- - - - - - - - - - - - - - - x

FILED

AUG 1 5 2001

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

Washington, D.C.
Tuesday, August 14, 2001
2:13 p.m.

TRANSCRIPT OF JURY VERDICT FOR SAMUEL CARSON
BEFORE THE HONORABLE THOMAS P. JACKSON
UNITED STATES DISTRICT JUDGE,
and a jury

For the Government:        PETER ZEIDENBERG, AUSA
                         ANJALI CHATURVEDI, AUSA
                         555 4th Street, N.W.
                         Washington, D.C. 20001

For the Defendant Carson:   JOSEPH BESHOURI, ESQ.
                         LEXI NEGIN-CHRIST, ESQ.
                         419 7th Street, N.W.
                         Washington, D.C. 20004

For the Defendants Hill
and Sweeney:              STEVEN R. KIERSH, ESQ.
                         717 D Street, N.W.
                         Suite 400
                         Washington, D.C. 20004

For the Defendant Coates:   FREDERICK JONES, ESQ.
                         901 6th Street, S.W.
                         #409
                         Washington, D.C. 20024

COURT REPORTER:          JON HUNDLEY
                         Miller Reporting Co.
                         735-8th Street, S.E.
                         Washington, D.C. 20003
                         (202) 546-6666

SA-633

765

pab

2

P R O C E E D I N G S

THE CLERK:  Criminal Case 98-329, The United States of America v. Vincent Hill, Samuel Carson, William Sweeney, and Sean Coates.

Peter Zeidenberg and Anjali Chaturvedi for the government; Joseph Beshouri, Lexi Negin-Christ for Defendant Carson; Steven Kiersh for Defendant Sweeney; and Fred Jones for Defendant Coates, and Steven Kiersh standing in for Christopher Davis for Defendant Hill.

THE COURT:  Counsel, I have a note from the jury which says that they have reached a verdict relative to all counts for Samuel Carson. I propose to take that verdict now.

[Jury in.]

THE DEPUTY MARSHAL:  The jury is all present and accounted for.

THE COURT:  Thank you, Marshal.

Ladies and gentlemen, I have a note from your foreman which announced that they have reached a verdict--that you have reached a verdict relative to all counts for Samuel Carson.  Do you wish to return that verdict now?

JURY FOREMAN:  Yes, Your Honor.

THE COURT:  Very well.  Mr. West, you may

pab

3

proceed.

THE CLERK:  Mr. Foreman, how does the jury find the defendant, Samuel Carson, as to Count One: Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about sometime in 1988, and continuing thereafter up until March 1999?

JURY FOREMAN:  Guilty.

THE CLERK:  How does the jury find as to controlled substance, mixtures and substances containing a detectable amount of cannabis?

JURY FOREMAN:  Proven.

THE CLERK:  Mixtures and substances containing a detectable amount of cocaine base?

JURY FOREMAN:  Not proven.

THE CLERK:  Mixtures and substances containing a detectable amount of phencyclidine?

JURY FOREMAN:  Not proven.

THE CLERK:  As to cannabis, how does the jury find as to 1,000 kilograms or more?

JURY FOREMAN:  Proven.

THE CLERK:  How does the jury find the defendant, Samuel Carson, as to Count Two, conspiracy to conduct and participate directly and indirectly, in the affairs of an enterprise,

SA-635

Case 1:98-cr-00329-RCL    Document 765    Filed 08/15/01    Page 4 of 22

pab

4

through a pattern of racketeering activity, from at least 1988, and continuing through and including March 1999?

JURY FOREMAN:  Guilty.

THE CLERK:  As to Racketeering Act 1, Conspiracy to distribute and possess with intent to distribute a controlled substance from on or about 1988, and continuing until March 1999, as to mixtures and substances containing a detectable amount of cannabis?

JURY FOREMAN:  Proven.

THE CLERK:  As to mixtures and substances containing a detectable amount of cocaine base?

JURY FOREMAN:  Not proven.

THE CLERK:  As to mixtures and substances containing a detectable amount of phencyclidine?

JURY FOREMAN:  Not proven.

THE CLERK:  How does the jury find as to Racketeering Act 23, first-degree murder while armed of Anthony Fortune on August 6, 1991?

JURY FOREMAN:  Proven.

THE CLERK:  Racketeering Act 24, assault with intent to murder while armed of Keith Bradley on or about September 10, 1991?

JURY FOREMAN:  Proven.

pab                                                                    5

THE CLERK:  Assault with intent to murder while armed of Jimmy Thomas, Jr., on September 10, 1991?

JURY FOREMAN:  Proven.

THE CLERK:  Assault with intent to murder while armed Officer Adrian Treadwell on or about September 10, 1991?

JURY FOREMAN:  Proven.

THE CLERK:  Assault with intent to murder while armed of Officer Edward McDonald on September 10, 1991?

JURY FOREMAN:  Proven.

THE CLERK:  Assault with intent to murder while armed of Officer Marc Little on or about September 10, '91?

JURY FOREMAN:  Proven.

THE CLERK:  Assault with intent while armed of Officer Alvin Ray on or about September 10, '91?

JURY FOREMAN:  Proven.

THE CLERK:  Racketeering Act 34, Conspiracy to commit murder of members of L Street group on or about July of '96?

JURY FOREMAN:  Proven.

THE CLERK:  Racketeering Act 35, Assault

pab

6

with intent to murder while armed of Ronald Sowells on or about October 30 of '96?

JURY FOREMAN: Not proven.

THE CLERK: Racketeering Act 36, First-degree murder while armed of Maurice Hallman on or about December 19, 1989?

JURY FOREMAN: Proven.

THE CLERK: First-degree murder while armed of Leonard Hyson on or about December 19, 1989?

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 37, First-degree murder while armed of Teresa Thomas on or about March 22, 1991?

JURY FOREMAN: Proven.

THE CLERK: First-degree murder while armed of Terita Lucas on March 22, 1991?

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 38, Assault with intent to murder while armed with a dangerous weapon of Officer Alfred Moss on or about April 7, 1992?

JURY FOREMAN: Not proven.

THE CLERK: Racketeering Act 40, Assault with intent to murder while armed of Roland Brown

on or about October 28, '93?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 41, Conspiracy to commit murder of Steve Dunbar on or about April 9, 1994?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 42, Assault with intent to murder while armed of Ulysses English on or about June 26, 1994?

JURY FOREMAN:  Proven.

THE CLERK:  Racketeering Act 45, Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder rial of United States v. Maurice Proctor, between 1996 and 1997?

JURY FOREMAN:  Proven.

THE CLERK:  Racketeering Act 46, Assault with intent to murder while armed of Popa Mark Phillip on or about August 30, '96?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 47, Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of  U.S. v. Jerome Martin, on or about October '96?

pab

8

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 48, First-degree murder while armed of Chrishauna Gladden on or about October 5, '96?

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 49, Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996?

JURY FOREMAN: Proven.

THE CLERK: First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, '96?

JURY FOREMAN: Proven.

THE CLERK: First-degree felony-murder while armed of Darnell Mack on or about November 17, '96?

JURY FOREMAN: Proven.

THE CLERK: First-degree felony-murder while armed of Melody Anderson on or about November 17, 1996?

JURY FOREMAN: Proven.

THE CLERK: First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996?

SA-640

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

pab                                                                        9

JURY FOREMAN:  Not proven.

THE CLERK:  First-degree premeditated murder while armed of Darnell Mack on or about November 17, 1996?

JURY FOREMAN:  Not proven.

THE CLERK:  First-degree premeditated murder while armed of Melody Anderson on or about November 17, 1996?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 50, Conspiracy to commit murder of Robert Smith between, in or about April 1997 and June 17, 1997?

JURY FOREMAN:  Proven.

THE CLERK:  Count Four, First-degree murder while armed of Maurice Hallman on or about December 19, 1989?

JURY FOREMAN:  Guilty.

THE CLERK:  First-degree murder while armed of Leonard Hyson on or about December 19, 1989?

JURY FOREMAN:  Guilty.

THE CLERK:  That was Count Five.

Count Six, First-degree murder while armed of Teresa Thomas on or about March 22, '91?

JURY FOREMAN:  Guilty.

USCA Case #23-3015    Document #2109480    Filed: 04/04/2025    Page 650 of 668

pab

JH

**ORIGINAL**

1

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF COLUMBIA

- - - - - - - - - - - - - - - - - x
                                  :
UNITED STATES OF AMERICA,         :
                                  :
        Government,               :
                                  :
                                  :   Case No.
            v.                    :   CR 98-329
                                  :
VINCENT HILL,                     :
JEROME MARTIN,                    :
SAMUEL CARSON,                    :       **FILED**
WILLIAM K. SWEENEY,               :
SEAN COATES,                      :       AUG 16 2001
                                  :
        Defendant.                :   NANCY MAYER WHITTINGTON, CLERK
                                  :       U.S. DISTRICT COURT
- - - - - - - - - - - - - - - - - x

                        Washington, D.C.
                        Wednesday, August 15, 2001
                        11:15 a.m.

    TRANSCRIPT OF JURY VERDICT-WILLIAM K. SWEENEY
      BEFORE THE HONORABLE THOMAS P. JACKSON
    UNITED STATES DISTRICT JUDGE, and a jury

For the Government:          PETER ZEIDENBERG, AUSA
                             ANJALI CHATURVEDI, AUSA
                             555 4th Street, N.W.
                             Washington, D.C. 20001

For the Defendant Carson:    LEXI NEGIN-CHRIST, ESQ.
                             419 7th Street, N.W.
                             Washington, D.C. 20004

For the Defendants Hill
and Sweeney:                 STEVEN R. KIERSH, ESQ.
                             717 D Street, N.W.
                             Suite 400
                             Washington, D.C. 20004

For the Defendant Coates:    FREDERICK JONES, ESQ.
                             901 6th Street, S.W.
                             Suite 409
                             Washington, D.C. 20024

COURT REPORTER:              JON HUNDLEY
                             Miller Reporting Co.
                             735-8th Street, S.E.
                             Washington, D.C.  20003
                             (202)  546-6666

SA-642

766

pab                                                                      2

P R O C E E D I N G S

THE CLERK:  Criminal Case 98-329, The United States of America v. Vincent Hill, Jerome Martin, Samuel Carson, William Sweeney, and Sean Coates.

Peter Zeidenberg and Anjali Chaturvedi for the government; Alexandria Negin-Christ for Defendant Carson; Steven Kiersh for Defendant Sweeney; Fred Jones for Defendant Coates, and Mr. Kiersh standing in for Christopher Davis for Defendant Hill.

THE COURT:  Good morning, Counsel.  I have a note here from the jury indicating that they have reached a verdict relative to all counts for the Defendant Sweeney.

Before we bring them in and take the verdict, two matters that I need to put on the record.  First is that defense counsel may have heard me extend congratulations to Mr. Zeidenberg yesterday evening.  Those congratulations had nothing to do whatsoever with the verdict, but rather with the birth of his daughter, Rachel, yesterday.

Second, I must inform you that, with great regret, that your colleague Howard Bramson died

SA-643

pab

3

last night, and I am informed that his funeral will be at Danzansky's Funeral Home on Rockville Pike tomorrow at 11 a.m.  I am also told that a lawyer with whom you are all probably acquainted, Diane Lepley, has further information in case you wish to inquire.

That said, I propose to bring in the jury and take the verdict if that is their wish.

[Jury in.]

THE DEPUTY MARSHAL:  The jury panel is all present.

THE COURT:  Thank you, Marshal.

Good morning, ladies and gentlemen.  I have a note from your foreman indicating that you have reached a verdict relative to all counts for William Sweeney.

Do you wish to return the verdict at this time?

JURY FOREMAN:  Yes, Your Honor.

THE COURT:  Very well.  Mr. West, you may proceed.

THE CLERK:  Mr. Foreman, how does the jury find the defendant, William Sweeney, as to Count One, Conspiracy to distribute and possess with intent to distribute a controlled substance from or

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

pab                                                                    4

about 1988, and continuing thereafter up until March 1999?

JURY FOREMAN: Guilty.

THE CLERK: How does the jury find as to mixtures and substances containing a detectable amount of cannabis?

JURY FOREMAN: Proven.

THE CLERK: Mixtures and substances containing a detectable amount of cocaine base?

JURY FOREMAN: Not proven.

THE CLERK: Mixtures and substances containing a detectable amount of phencyclidine?

JURY FOREMAN: Not proven.

THE CLERK: As to the cannabis, how does the jury find as to 1,000 kilograms or more?

JURY FOREMAN: Proven.

THE CLERK: How does the jury find as to Count Two, Conspiracy to conduct and participate, directly and indirectly, in the affairs of an enterprise, through a pattern of racketeering activity, from at least 1988, and continuing through up to and including March 1999?

JURY FOREMAN: Guilty.

THE CLERK: How does the jury find as to Racketeering Act 1, Conspiracy to distribute and

MILLER REPORTING COMPANY, INC.
735 8th Street, S.E.
Washington, D.C. 20003-2802
(202) 546-6666

SA-645

pab                                                                              5

possess with intent to distribute a controlled

substance from on or about 1988 through March 1999,

mixtures and substances containing a detectable

amount of cannabis?

JURY FOREMAN:  Proven.

THE CLERK:  Mixtures and substances

containing a detectable amount of cocaine base?

JURY FOREMAN:  Not proven.

THE CLERK:  Mixtures and substances

containing a detectable amount of phencyclidine?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 29, First-

degree murder while armed of Glenn Jenkins on July

7, 1993?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 30, Assault

with intent to murder while armed of persons in the

Kentucky Courts neighborhood between 1991 and June

20, 1992?

JURY FOREMAN:  Not proven.

THE CLERK:  Racketeering Act 31, Assault

with intent to murder while armed of persons in the

Kentucky Court neighborhood between 1991 and on or

about June 20, 1992?

JURY FOREMAN:  Not proven.

SA-646

pab

6

THE CLERK: Racketeering Act 39, Attempted armed robbery of Anthony Pryor on or about October 22, '93?

JURY FOREMAN: Proven.

THE CLERK: Armed kidnapping of Anthony Pryor on or about October 22, 1993?

JURY FOREMAN: Proven.

THE CLERK: Assault with intent to murder while armed of Anthony Pryor on or about October 22, '93?

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 43, First-degree murder while armed of Donnell Whitfield on or about September 26, 1993?

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 45, Conspiracy to commit murder of persons expected to testify as witnesses for the government in the murder trial of U.S. v. Maurice Proctor, between 1996 and 1997?

JURY FOREMAN: Proven.

THE CLERK: Racketeering Act 49, Attempted robbery while armed of Alonzo Gaskins, Darnell Mack, and Melody Anderson on or about November 17, 1996?

SA-647

USCA Case #25-3015    Document #2109460    Filed: 04/04/2025    Page 656 of 668

pab

7

JURY FOREMAN:  Proven.

THE CLERK:  First-degree felony-murder while armed of Alonzo Gaskins on or about November 17, 1996?

JURY FOREMAN:  Proven.

THE CLERK:  First-degree felony-murder while armed of Darnell Mack on or about November 17, 1996?

JURY FOREMAN:  Proven.

THE CLERK:  First-degree felony-murder while armed of Melody Anderson on November 17, 1996?

JURY FOREMAN:  Proven.

THE CLERK:  First-degree premeditated murder while armed of Alonzo Gaskins on or about November 17, 1996?

JURY FOREMAN:  Proven.

THE CLERK:  First-degree premeditated murder while armed of Darnell Mack on or about November 17, '96?

JURY FOREMAN:  Proven.

THE CLERK:  First-degree premeditated murder while armed of Melody Anderson on or about November 17, 1996?

JURY FOREMAN:  Proven.

SA-648

pab

8

THE CLERK:  Racketeering Act 50, Conspiracy to commit murder of Robert Smith between April 1997 and June 17, 1997?

JURY FOREMAN:  Proven.

THE CLERK:  Count Ten, First-degree murder while armed of Glenn Jenkins on or about July 7, '93?

JURY FOREMAN:  Not proven or not guilty.

THE CLERK:  Count Eleven, Attempted murder in aid of racketeering activity of Anthony Pryor on October 22, '93?

JURY FOREMAN:  Guilty.

THE CLERK:  Count Fifteen, First-degree murder while armed of Donnell Whitfield on September 26, 1994?

JURY FOREMAN:  Guilty.

THE CLERK:  Count Sixteen, Murder in aid of racketeering activity of Donnell Whitfield on September 26, 1994?

JURY FOREMAN:  Guilty.

THE CLERK:  Count Twenty-Five, Murder in aid of racketeering activity of Alonzo Gaskins on November 17, 1996?

JURY FOREMAN:  Guilty.

THE CLERK:  Count Twenty-Six, Murder in

SA-649

                    IN THE UNITED STATES DISTRICT COURT
                      FOR THE DISTRICT OF COLUMBIA


    United States of America,          )  Criminal Action
                                       )  No. 98-cr-329
                         Plaintiff,    )
                                       )  STATUS CONFERENCE
    vs.                                )
                                       )  Washington, DC
    Jerome Martin,                     )  May 17, 2013
    Samuel Carson,                     )  Time:  9:30 a.m.
    William Sweeney,                   )
    Sean Coates,                       )
                                       )
                         Defendants.   )
    _____


                  TRANSCRIPT OF STATUS CONFERENCE
                          HELD BEFORE
             THE HONORABLE JUDGE ROYCE C. LAMBERTH
                  UNITED STATES DISTRICT JUDGE

    _____


                   A P P E A R A N C E S

    For the Plaintiff:        **Margaret J. Chriss**
                              U.S. ATTORNEY'S OFFICE
                              Special Proceedings Section
                              555 Fourth Street, NW
                              Washington, DC 20530
                              (202) 252-7555
                              Email: Margaret.chriss@usdoj.gov

    For the Defendants
      Jerome Martin:          **Gwendolyn R. Waters**
                              LAWLOR & ENGLERT, LLC
                              6305 Ivy Lane
                              Suite 608
                              Greenbelt, MD 20770
                              (301) 474-3404
                              Email: Watersgwendolyn@gmail.com

      Samuel Carson:          **Kira Anne West**
                              LAW OFFICES OF KIRA ANNE WEST
                              1325 G Street, NW
                              Suite 500
                              Washington, DC 20005
                              (202) 236-2042
                              Email: Kiraannewest@gmail.com

SA-650

William Sweeney:          **Eric Hans Kirchman**
                          KIRCHMAN & KIRCHMAN
                          15 West Montgomery Avenue
                          Suite 205
                          Rockville, MD 20850
                          301-762-2909
                          Email: Kirchlaw@cs.com
                          **Shana Madigan**
                          SHANA MADIGAN
                          6205 Massachusetts Avenue
                          Bethesda, MD 20816
                          202-270-3989


Sean Coates:              **Veronice Annette Holt**
                          VERONICE A. HOLT, ESQ.
                          3003 Van Ness Street, NW
                          Suite WIIII
                          Washington, DC 20008
                          (202) 285-1937
                          Email: Veroniceholt@msn.com

------

Transcriber:              Janice E. Dickman
                          Official Court Reporter
                          United States Courthouse, Room 6523
                          333 Constitution Avenue, NW
                          Washington, DC  20001
                          202-354-3267

SA-651

I think the other thing to kind of keep in mind when we talk about this case and where we are, is the Court of Appeals issued its decision in the direct appeal in, I think, 2007, and then the petition for cert. was denied, I believe, in the same year.  It may have been the direct appeal in 2006 and cert. denied in 2007.  So the one-year deadline has long since come and gone for filing a 2255.

These defendants have filed, in one guise or another, 2255s, and so what they're trying to do now is supplement. And, of course, we're not on just an open field anymore when it comes to supplements.  In order to be timely, whatever claims they raise at this point have to relate back to the claims that they made in their timely filed 2255s.

And I wanted to make that point because I know, since I've entered the case, I've always said to the lawyers who want extensions that I don't oppose any requests for extensions, but we are not waiving any statute of limitations in this case.  I didn't say it at the last hearing, so I just wanted to make sure that's clear.

THE COURT:  All right.  Miss West, do you want to go first?

MS. WEST:  Yes, Your Honor.

THE COURT:  You spent the most time, I guess.

MS. WEST:  I'm sorry, sir?

THE COURT:  You spent the most time, I guess.

**SA-652**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,  .

      Plaintiff,  .  CR No. 98-0329 (RCL)

   v.  .

02 JEROME MARTIN, JR.,  .  Washington, D.C.
03 SAMUEL CARSON,  .  Thursday, August 29, 2013
04 WILLIAM KYLE SWEENEY,  .  3:00 p.m.
06 SEAN COATES  .

     Defendants.  .

. . . . . . . . . . . . . . . .

TRANSCRIPT OF STATUS HEARING
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT JUDGE

APPEARANCES:

For the Government:  MARGARET J. CHRISS, AUSA
                 U.S. Attorney's Office
                 Special Proceedings Section
                 555 Fourth Street, NW
                 Washington, DC 20530
                 (202) 252-7555

For Defendant Martin:  GWENDOLYN R. WATERS, ESQ.
                 Lawlor & Englert, LLC
                 6305 Ivy Lane
                 Suite 608
                 Greenbelt, Maryland 20770
                 (301) 474-3404

For Defendant Carson:  KIRA ANNE WEST, ESQ.
                 Law Offices of Kira Anne West
                 1325 G Street, NW
                 Suite 500
                 Washington, DC 20005
                 (202) 236-2042

SA-653

For Defendant Sweeney:          ERIC H. KIRCHMAN, ESQ.
                                Kirchman & Kirchman
                                15 West Montgomery Avenue
                                Suite 205
                                Rockville, Maryland 20850
                                (301) 762-2909

                                SHANA MADIGAN, ESQ.
                                6205 Massachusetts Avenue
                                Bethesda, Maryland 20816
                                (202) 270-3989

For Defendant Coates:           VERONICE A. HOLT, ESQ.
                                Law Office of Veronice A. Holt
                                3003 Van Ness Street, NW
                                Suite W1111
                                Washington, DC 20008
                                (202) 285-1937

Court Reporter:                 BRYAN A. WAYNE, RPR, CRR
                                U.S. Courthouse, Room 4704-A
                                333 Constitution Avenue, NW
                                Washington, DC 20001
                                (202) 354-3186

Proceedings reported by stenotype shorthand.
Transcript produced by computer-aided transcription

SA-654

PROCEEDINGS

THE DEPUTY CLERK:  Criminal action No. 98-329, United States of America versus Jerome Martin, Samuel Carson, William Sweeney and Sean Coates, whose presence is waived for this hearing.  Counsel, if you would like, you can identify yourselves for the record, or we can begin the hearing.

MS. CHRISS:  Good afternoon, Your Honor.  Margaret Chriss for the United States.

MS. WEST:  Good afternoon, Your Honor.  Kira Anne West for Mr. Samuel Carson.

MS. WATERS:  Good afternoon.  Gwendolyn Waters standing in for Michael Lawlor on behalf of Jerome Martin.

MR. KIRCHMAN:  Eric Kirchman and Shana Madigan on behalf of Mr. Sweeney.

MS. HOLT:  And Veronice Holt on behalf of Sean Coates.

THE COURT:  Okay.  Who wants to go first?

MS. CHRISS:  Your Honor, we were conferring beforehand, and it seems a status hearing in this case was set really just to talk about scheduling --

THE COURT:  Right.

MS. CHRISS:  -- and the supplements.  I think that Mr. Kirchman is going to request nine months, but let me give him the floor.

THE COURT:  Okay.

MR. KIRCHMAN:  Good afternoon.  Eric Kirchman.

SA-655

That's correct, Your Honor. We have made progress, but we need to locate, or attempt to try to locate, some of the witnesses who were identified by prior counsel, some of the issues in the case, and we would being asking for nine months to file it, the supplement.

THE COURT: To file the supplement on the 2255?

MR. KIRCHMAN: Yes, sir.

THE COURT: Okay. Now let me have each of the other defendants then address that, whether you want a different track or how you want to go about it.

MS. WATERS: Good afternoon again. Gwendolyn Waters standing in on behalf of Mr. Martin. We would also be asking the Court, if Mr. Sweeney's attorney needs nine months, we would be fine with that amount of time in order to continue the investigation in this case.

As Your Honor's aware, Mr. Lawlor was also a little tied up with the *Gray, et al.* 2255 that culminated earlier this summer, so we're still conducting investigation in this case. So we'd also be joining the request for nine months in order to file the supplement. Thank you.

MS. WEST: I don't oppose their request, Your Honor, for Mr. Carson.

THE COURT: Okay. Ms. Holt has never taken nine months to do anything, but I'll see what she says.

MS. HOLT: No, but I will concede to my co-counsel's

USCA Case #23-3015    Document #2109460    Filed: 04/04/2025    Page 665 of 668

wishes, particularly with respect to Mr. Sweeney.  He and my client are charged in the same crime, so whatever benefit he has from further investigation, I'll of course agree to.

THE COURT:  Okay.  I'll issue an order to that effect, then.  Anything else y'all want me to do now?

MS. WEST:  I would just like you to rule at some point on the discovery motion that's still pending, Your Honor.

THE COURT:  Okay.  My new clerk will promptly look at that and let me know what we should do.

MS. WEST:  Thank you, Your Honor.

THE COURT:  Thank y'all.

(Proceedings adjourned at 3:05 p.m.)

**SA-657**

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

UNITED STATES OF AMERICA,          :
                                   :     Docket No. CR 98-CR-329-2
                                   :
          vs.                      :        Washington, D.C.
                                   :     Friday, August 3, 2018
JEROME MARTIN,                     :          10:14 a.m.
                                   :
                    Defendant.     :
-------------------------------x


TRANSCRIPT OF STATUS CONFERENCE
BEFORE THE HONORABLE ROYCE C. LAMBERTH
UNITED STATES DISTRICT SENIOR JUDGE




APPEARANCES:

For the Government:          PAMELA STEVER SATTERFIELD, Esquire
                             Assistant United States Attorney
                             555 Fourth Street, NW
                             Washington, DC  20530


For the Defendant:           MICHAEL E. LAWLOR, Esquire
                             Brennan, McKenna & Lawlor Chtd
                             6305 Ivy Lane
                             Suite 700
                             Greenbelt, MD  20770


Court Reporter:              CRYSTAL M. PILGRIM, RPR, FCRR
                             Official Court Reporter
                             United States District Court
                             District of Columbia
                             333 Constitution Avenue, NW
                             Washington, DC  20001

USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 667 of 668

P-R-O-C-E-E-D-I-N-G-S

THE DEPUTY CLERK:  Your Honor, we're on the record for criminal case 98-329, defendant number 2.  United States of America versus Jerome Martin, Jr.

Counsel, can you please approach the lectern and identify yourselves for the record.

MS. SATTERFIELD:  Good morning, Your Honor.  Pamela Satterfield on behalf of the government.

THE COURT:  Okay.

MR. LAWLOR:  Good morning, Your Honor.  Michael Lawlor for Mr. Martin.  He's not present here today, Your Honor.  This is a status conference and I'll waive his appearance for the record.

THE COURT:  All right, Mr. Martin, let's start -- I mean Mr. Lawlor, let's start with you giving me your current version of the status of this matter.

MR. LAWLOR:  Sure, Your Honor.

I have talked to Mr. Kramer.  I know the Court is frustrated for the lack of progress and I apologize for that, but I do want to inform the Court that we have made a lot of progress.

The Court will recall that the record in this case is certainly massive and the docket will spell that out.  We have reviewed it in its entirety.  It was a very time consuming endeavor, but I have sent to Mr. Martin a 199 page summary of

USCA Case #23-3015      Document #2109460      Filed: 04/04/2025      Page 668 of 668

the case that we produced as we reviewed it.

We have retained, if you will, the CJA investigator and investigated aspects of the case that we thought were worthwhile. We have prepared in our, on the verge of filing a supplement to his pro se 2255 petition. One of the holdups, Your Honor, has just been my ability to get with Mr. Martin.

I promised him and I want to see to doing this, having sent him materials. I want to meet with him face to face and we talk on the phone, but I do feel that the case of this magnitude as in any other case want to meet with him face to face. I have had some stumbling blocks on that front. I won't make excuses, I should have done a better job and gotten there sooner.

I will tell the Court that I have talked to Ms. Satterfield and I know she's new, I don't want to speak for her. I knew she was delaying responding so as, not delaying, she had to review the record. As I said, I've talked to her, I'll let her address that. I knew she was still viewing the record. That was part of the holdup from my front end, she still had work to do.

I will tell the Court though that in summary we have reviewed the case. We have investigated the case and we are prepared in short order to file a supplement to the 2255 petition which has already been drafted. It's just a matter of reviewing it with Mr. Martin and making sure that he deems it